**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------- X

TROOPER 1,                          :

                              :   Case No.: 22-cv-00893 (LDH)(TAM)

             Plaintiff,           :

                              :

              v.                   :   **AMENDED COMPLAINT**

                              :

NEW YORK STATE POLICE, ANDREW       :
CUOMO, MELISSA DEROSA and RICHARD   :   **<u>Jury Trial Demanded</u>**
AZZOPARDI,                          :

                              :

             Defendants.          :

---------------------------------------------------------- X

       Plaintiff Trooper 1[1] ("Plaintiff" or "Trooper 1"), by and through her attorneys, Wigdor

LLP, as and for her Complaint against Defendants New York State Police ("NYSP"), Andrew

Cuomo ("Cuomo" or the "Governor"), Melissa DeRosa ("DeRosa") and Richard Azzopardi

("Azzopardi") (collectively, "Defendants"), alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

       1.     Between 2013 and 2021, the Governor of the State of New York, Andrew Cuomo,

sexually harassed at least 11 women, including nine current and former state employees. He

wanted hugs ("the hugs definitely got closer and tighter to the point where I knew I could feel

him pushing my body against his and definitely making sure that he could feel my breasts up

against his body"); kisses ("he would normally go to kiss me on the cheek and he would quickly

turn his head and catch me on the lips"); and to talk about sex ("he wanted to know if I slept with

older men"). He told his victims he was "lonely" and asked them to find him a "girlfriend." He

leered at them ("he was fully staring down my shirt"). And he touched them inappropriately

---

[1]     Contemporaneous with the filing of the original Complaint (Dkt. No. 1), Plaintiff has
moved to request permission to proceed under the pseudonym "Trooper 1." <u>See</u> Dkt. No. 3.

("[h]e placed and pressed, then moved his finger across my breasts in a way that clearly meant to show me his power and his ability to control by body and my dignity").

2.      The Governor did not act alone.  He was enabled by the machinery of the State. Women who had the courage to complain were attacked by a cadre of the Governor's closest advisors.  Among other things, the Governor's protectors described one of his accusers as "crazy" and planned to shut her down; pressured former subordinates to secretly record the Governor's accusers in the hopes of getting information to use against the victims (and then promptly destroyed the evidence when the recordings proved unhelpful); distributed disparaging confidential personnel information to the press to attack one of the victims; drafted an "attacking" and "victim shaming" letter responding to sexual harassment allegations; and improperly "screen[ed]" allegations against the Governor to avoid investigation.

3.      Trooper 1 is one of the Governor's victims.  The Governor requested that Trooper 1 be assigned to the Protective Service Unit ("PSU") – a division of the New York State Police ("NYSP") charged with protecting the Governor – after seeing and talking to her for only a few minutes while she was standing next to her patrol car on a bridge.  He did not care that Trooper 1 did not have the necessary tenure to join the PSU; rather, he arranged for the service requirements to be changed so that Trooper 1 could be close to him.  He then sexually harassed her.  He commented on her appearance ("why don't you wear a dress?"); wanted to kiss her ("[c]an I kiss you?"); asked her to find him a girlfriend who could "handle pain;" and steered their conversations towards sex ("[w]hy would you want to get married? . . . your sex drive goes down").  As with his other victims, the Governor used his physical proximity to Trooper 1 to touch her inappropriately ("he runs his finger down the center of my back of my spine, basically

from the top of my neck, basically midway down with his pointer finger and just said, 'Hey, you'").

4.      An exhaustive investigation by independent attorneys appointed by the New York State Attorney General concluded that "the Governor sexually harassed a number of current and former New York State employees by, among other things, engaging in unwelcome and nonconsensual touching, as well as making numerous offensive comments of a suggestive and sexual nature that created a hostile work environment for women."  The investigation further concluded that "the Executive Chamber's culture – one filled with fear and intimidation, while at the same time normalizing the Governor's frequent flirtations and gender-based comments – contributed to the conditions that allowed the sexual harassment to occur and persist."

5.      A separate comprehensive investigation by the Judiciary Committee of the New York State Assembly found "overwhelming evidence that the former Governor engaged in sexual harassment," expressly highlighting the Governor's victimization of Trooper 1.

6.      Rather than accept responsibility, the Governor and his protectors have lashed out at the independent investigators and the Governor's victims.  For example, the Governor has recently announced on Twitter that he will bring ethics charges against the investigators who revealed his unlawful conduct.  He has even threatened to seek criminal charges against his victims.  Even Trooper 1, who has tried to protect her privacy, has been accused of "extortion" for merely asserting her legal rights.

7.      True to form, immediately after Trooper 1 filed this action, the Governor's spokesman, Defendant Richard Azzopardi, published false statements once again accusing Trooper 1 of the crime of extortion.  These bullying tactics by the Governor and his enablers

were retaliatory and intended to dissuade the Governor's victims, including Trooper 1, from pursuing their legal rights.

8.      Defendants' conduct violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ("Equal Protection Clause"); 42 U.S.C. § 1983; the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.  This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred here.

## PARTIES

11.     Plaintiff Trooper 1 is a member of the NYSP.

12.     Defendant NYSP is a law enforcement agency of the State of New York.

13.     Defendant Cuomo served as Governor of the State of New York from January 2011 until August 2021, when he resigned after an exhaustive investigation found that he sexually harassed nearly a dozen women, created a hostile work environment and engaged in unlawful retaliation.

14.     Defendant DeRosa was the Governor's chief of staff and the highest appointed official in New York.  DeRosa also resigned in August 2021 after the Governor was found to have engaged in unlawful discrimination and retaliation.

15.     Defendant Azzopardi is the Governor's spokesman who attacked the Governor's victims and their supporters.

## ADMINISTRATIVE PROCEDURES

16.     On November 19, 2021, Plaintiff filed a Charge of Discrimination and Retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  Following the EEOC's issuance of a Notice of Right to Sue, Plaintiff will seek leave of the Court to amend the Complaint to add claims under Title VII.

17.     Pursuant to City Law § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

18.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

### I.     TROOPER 1

#### A.     The Governor Wants Trooper 1 on His Protective Detail

19.     The NYSP is a law enforcement organization whose mission is to serve, protect and defend the people of New York, while preserving the rights and dignity of all.  Members of the NYSP, also known as "troopers," perform a wide range of law enforcement tasks from traditional patrol duties to highly specialized investigations.

20.     Trooper 1 has been a member of the NYSP since March 2015.

21.     On November 4, 2017, Trooper 1 was assigned to help secure a press conference by then Governor Cuomo on the Robert F. Kennedy Bridge ("RFK Bridge").  Trooper 1, along with an Officer of the PSU, escorted the Governor's car to Randall's Island, under the RFK Bridge.  During a stop, Trooper 1, the PSU Officer and the Governor exited their vehicles.  The Governor began chatting with Trooper 1, who thought little of the conversation, which consisted of no more than a few minutes of small talk between two unacquainted people.

22.     Immediately thereafter, Trooper 1 learned that the Governor requested that she be transferred to the PSU.

23.     According to a supervisor, the "Governor wanted her on the detail tomorrow."

24.     The invitation came out of the blue, as Trooper 1 had never met or spoken with the Governor and had never expressed any interest in the position.

25.     The PSU Officer was equally surprised by the Governor's request, asking Trooper 1, "What did you say to him???????"

26.     The PSU Officer continued to communicate with Trooper 1 throughout November 2017 about the prospect of "drafting" her into the PSU.  However, later that month, the PSU Officer concluded that Trooper 1 was ineligible for the position, which required three years of experience with the NYSP.  At the time, Trooper 1 had only two.

27.     Nevertheless, shortly thereafter, the PSU Officer asked that Trooper 1 apply for the transfer because the eligibility criteria had been changed specifically to accommodate her.

28.     According to a supervisor, "they changed the minimum from 3 years to 2.  Just for you."

29.     Trooper 1 applied and was transferred to the PSU in January 2018.

30.     The Governor and the NYSP later confirmed that the Governor ordered that the eligibility requirements for the PSU be altered so that Trooper 1 could be assigned to his personal security detail.

**B.     The Governor Sexually Harasses Trooper 1**

31.     Trooper 1 was excited and proud for her transfer to the PSU.  The PSU was a specialized, elite detail of the NYSP, which opened new pathways for career advancement and promotion.  It also opened sought-after opportunities to travel across the country and around the world.  It carried with it tangible benefits, including a vehicle that would be maintained at state expense and specialized training courses not available to other troopers.

32.     Trooper 1 was initially assigned to protect the Governor at his Mount Kisco residence.  This was a typical first posting for new PSU officers and involved, among other things, opening and closing the garage for the Governor and his family, following the Governor and alerting his travel team when he left, recording and logging guests, conducting security checks and monitoring the perimeter and security cameras.

33.     Trooper 1's supervisors instructed her not to speak to the Governor unless he spoke to her first.  The Governor, however, wanted to know about Trooper 1's personal life.

34.     For instance, in September 2018, the Governor asked Trooper 1 personal questions while she was on duty.  During an exchange, Trooper 1 mentioned to the Governor that she would be attending her sister's wedding in Albany.  In response, the Governor offered to give her a tour of the official Governor's Mansion (the "Mansion") in Albany and added, with a snicker, "unless it is against protocols."

35.     Trooper 1 understood the Governor's reference to protocols and his accompanying laugh to mean that the Governor wanted to show her his private quarters at the Mansion.  The comment made her feel uncomfortable.

36.     From here, the Governor's comments to Trooper 1 became increasingly sexual. In another conversation started by the Governor, he asked Trooper 1 about her relationships.  In response to the Governor's questions, Trooper 1 disclosed that she planned to get married.  The Governor then asked Trooper 1 why she would want to marry since, according to the Governor, "it always ends in divorce, and you lose money, and your sex drive goes down."

37.     The Governor's comment, obviously referencing his own experience with divorce, suggested that both he and Trooper 1 might, as still-single people, have an increased sex drive.  The Governor's focus on Trooper 1's sexuality made her extremely uneasy.  She deflected by talking about the positive aspects of marriage.

38.     At the end of 2018, Trooper 1 attended a holiday party as an off-duty invitee with another PSU trooper.  While alone with Trooper 1, the Governor asked her who her close friends were on the PSU.  Trooper 1 responded that she was friendly with the other trooper who accompanied her to the party.  The Governor told Trooper 1 that she should not share any of their conversations with the other trooper and, "as a matter of fact, don't tell anyone about our conversations."

39.     At around this time, Trooper 1, as part of her duties, escorted the Governor from his Mount Kisco residence to his New York City Office.  She was responsible for, among other things, accompanying the Governor up the elevator to his office.  For security reasons, while in the elevator, Trooper 1 was required to stand between the Governor and the elevator doors with her back to the Governor, while the Governor stood behind her.  As she performed her duties

protecting the Governor, the Governor placed a finger on Trooper 1's neck and ran it slowly down her spine to the middle of her back.  Trooper 1 could feel the Governor's finger touch her bra clasp.  As he did so, he stated, "Hey you."

40.     On April 18, 2019, Trooper 1 secured a coveted transfer to the Governor's travel team.

41.     Not only was this role more prestigious, but it also offered a clear path to a promotion to the Investigator rank, which itself offered the possibility of transfer to the other special details within the NYSP.  It also offered increased opportunity to earn overtime pay and a wider variety of useful career experiences, including performing motorcade operations, preparing sites for events, coordinating protection at those events and accompanying the Governor and his family around the state and country.

42.     The Governor, however, continued to harass Trooper 1.

43.     During the summer of 2019, while Trooper 1 was posted outside of the Governor's residence at Mount Kisco, Trooper 1 asked if the Governor needed anything, a question she asked in her professional capacity and not to engage the Governor socially.  The Governor replied by asking, "Can I kiss you?"

44.     Trooper 1 was shocked and did not know how to answer.  She did not want to offend the Governor and thus jeopardize her employment, especially as the Governor had a reputation for retaliating against anyone who crossed him.

45.     Needing to say something, Trooper 1 replied, "Sure."  The Governor then kissed her on the cheek while acknowledging that it was against the rules for him to do so.

46.    Between his sexual provocations in the elevator previously and his requesting a kiss, Trooper 1 thought about a strategy for resisting the Governor's advances while keeping her place in the PSU.

47.    Trooper 1 sought advice from another female trooper on the PSU, whom she learned had also experienced the Governor's advances.  The female trooper advised Trooper 1 that, the next time the Governor requested a kiss, she should tell him that she is sick.

48.    In August 2019, while Trooper 1 was driving the Governor to an event with the Head of the PSU (Trooper 1's supervisor) also in the car, the Governor focused on Trooper 1's appearance.  He asked Trooper 1 why she didn't "wear a dress."  Trooper 1 replied that it would be impossible for her to carry a gun in a dress.  When the Governor continued to ask her about wearing a dress, the Head of the PSU interjected that the PSU wore business attire and Trooper 1 was dressed accordingly.

49.    After the cars parked, Trooper 1 – shocked by the interaction – spoke to another trooper on the PSU, who had been trailing the Governor in a separate vehicle and expressed her horror that the Governor would ask about her clothing.

50.     Immediately, she received a message from the Head of the PSU, who had been present for the entire interaction.  The message said only "stays in truck" – a clear order that she not disclose to anyone the Governor's inappropriate comment.  Fearing official discipline, Trooper 1 did not mention the incident to anyone else at the time.

51.    At around this same time, while Trooper 1 was posted in the "command center" in the lower level of the Mansion, the Governor invited her "upstairs."  In context, it appeared that the Governor was inviting her to his bedroom on the second floor of the Mansion.

52.     Indeed, Trooper 1 had heard from another female trooper that the Governor had once said to her "if you ever need anything, my bedroom's right there," while pointing to his room.

53.     On September 23, 2019, Trooper 1 accompanied the Governor to an event at Belmont racetrack.  The Governor used the event as an opportunity to initiate intimate physical contact with Trooper 1.  Trooper 1 was tasked with, among other things, escorting the Governor to and from the event stage.  As Trooper 1 went ahead of the Governor to hold a door open for him, the Governor placed the palm of his hand on her belly button and slid it across her waist to her right hip, where her gun was holstered.

54.     Trooper 1 felt violated as the Governor intentionally touched her in intimate locations between her breasts and vagina.

55.     Just a few days later, around September 28, 2019, the Governor approached Trooper 1 to, once again, talk about relationships, clearly prompted by the now-public fact that he had broken up with his girlfriend.  The Governor asked Trooper 1 her age and, when she replied she was in her late 20's, the Governor said, "You're too old for me."

56.     The Governor proceeded to ask what age differential Trooper 1 thought the public would be willing to tolerate in a relationship of his, to which Trooper 1 replied that he should probably date someone older than his daughters.

57.     Wanting to gain control of the conversation, Trooper 1 jokingly offered the Governor to be his matchmaker and asked him what his requirements would be, to which the Governor replied that he needed someone who "can handle pain."

58.     Shortly thereafter, in October 2019, while Trooper 1 was accompanying the Governor at an event at the Low Memorial Library, the Governor approached her car, which was parked behind the one he had arrived in.  He walked up to the window and again asked for a kiss.

59.     This time, armed with the advice from her female colleague, she told the Governor she was sick.  The Governor walked away, seemingly disgusted by her response.

60.     On December 26, 2019, Trooper 1 was promoted to Investigator in recognition of her excellent work on the PSU.

61.     On March 5, 2020, while she was greeting the Governor at the airstrip of Farmingdale Republic Airport, the Governor approached her to hug and kiss her.  Trooper 1 tried to deter the Governor by asking, "You don't have COVID, do you?"

**C.      DeRosa Conceals the Governor's Harassment**

62.     By late 2020, news of the Governor's sexual harassment of women started to become public.

63.     For example, on December 5, 2020, Lindsay Boylan, one of the Governor's victims, publicly protested the "toxic environment" and, about a week later, revealed that the Governor "sexually harassed me for years."  As a result, the press began to inquire about the Governor's treatment of women.

64.     Specifically, a reporter from *The Times Union* asked the NYSP about the circumstances of Trooper 1's transfer to the PSU.  The reporter wanted to know how Trooper 1 was "picked" for the detail, as he understood that the requirements had been altered from "four years on the job . . . to three."

65.     To conceal the Governor's unlawful conduct, the Governor and his cohorts responded with a false and misleading statement, making no mention that the Governor

requested that Trooper 1 be transferred to the PSU and that, at the time, she did not have the requisite seniority for the position.  Moreover, the statement purported to take offense that the question had even been asked.

66.     DeRosa was specifically involved in hiding the Governor's behavior.  DeRosa yelled at the editor of *The Times Union* and accused him of being sexist for even making the inquiry.

67.     As a result, *The Times Union* decided not to write on the subject, clearing the way for the Governor to continue to harass Trooper 1.

> ### D.     The Governor's Continued Harassment

68.     Shortly thereafter, on January 23, 2021, while departing an event at the William Reid New York City Housing Authority development in Brooklyn, the Governor was seated in the lead car of a motorcade.  Because of the COVID-19 pandemic, he usually drove his own car in the motorcades.  On this day, because of a security risk, he was seated in the tail vehicle, while Trooper 1 drove his usual vehicle.

69.     When the motorcade was a few blocks away from its destination, the Governor directed the driver to pull over because he wanted to drive himself.  When the Governor exited the lead car, Trooper 1 pulled over, and the Governor began walking towards her.  Trooper 1 opened her door and prepared to wipe down the steering wheel with Clorox, per directions she had received for mitigating the risk of COVID-19 infection.

70.     Approaching the open door, the Governor asked jokingly, "Who told you you could drive my car?"  Trooper 1 responded that she had to finish disinfecting the driver's area, saying, "Let me just wipe this down for you."  The Governor flippantly replied, "Don't worry about it."

71.     The Governor then blocked the door and spread his arms, indicating he wanted Trooper 1 to stop disinfecting the driver's area, get out of the car and give him a hug.  So that she could leave, she quickly hugged him and moved to the tail vehicle.

72.     On June 27, 2021, the Governor again focused on Trooper 1's appearance.  After the Governor landed at Grabeski Airport for a private event, Trooper 1 received him on the tarmac as part of his security detail that day.  She was wearing sunglasses because it was a sunny day with no shade on the tarmac.  As he had so often in the past disregarded her uniform, armament and all other functional trappings of her job with him, the Governor said, "Look at you with your glasses looking like ohwee," meaning he thought she was attractive in her sunglasses.  Trooper 1 replied that she needed her sunglasses to see.  The Governor moved on.

73.     In general, throughout this period, the Governor sought out Trooper 1 to give her unwanted attention, in a way that made no sense given her professional role as part of his security staff.  In January 2021, for instance, the Governor sought out Trooper 1 at an event at the new Moynihan Train Hall to wish her a Happy New Year.  In February 2021, he sought her out at another event to speak to her – which stood out to Trooper 1, as Trooper 1 was standing near a *New York Post* photographer, a press outlet usual politically hostile to the Governor.

74.     Other troopers who witnessed the Governor on these occasions noted that Trooper 1's presence put the Governor in a good mood, and that he often sought out attractive women when he was under stress.

## II.     THE GOVERNOR'S HARASSMENT OF OTHER WOMEN

75.     Trooper 1 was not the Governor's only victim.  Indeed, the Governor harassed numerous other women in almost the same manner that he harassed Trooper 1.

A.    **Brittany Commisso**

76.    Brittany Commisso ("Commisso") was an Executive Assistant who worked in the Governor's Executive Chamber.

77.    As with Trooper 1, the Governor used his authority to be near Commisso.  When Commisso first started, one of the Governor's other assistants looked Commisso "up and down" and predicted that the Governor would "steal" Commisso from her then supervisor.

78.    Not surprisingly, when the Governor first saw Commisso at her desk, he turned around, looked Commisso up and down and introduced himself.  Shortly thereafter, Commisso was assigned more projects working with the Governor directly.  As Commisso explained, the Governor "want[ed] to pull me in to do work for him."

79.    Thereafter, the Governor regularly looked Commisso up and down and commented on her looks.  For instance, the Governor:

- told Commisso that "she looked good for her age and [for] being a mother";

- commented approvingly when Commisso wore a dress because, according to the Governor, Commisso "showed some leg"; and

- made it clear that he did not "like" it when Commisso wore her hair up.

80.    On one occasion, the Governor tried to convince Commisso to take off her hoodie, despite Commisso explaining that it would be inappropriate because she was wearing a light tank top underneath.

81.    In addition, the Governor probed Commisso's personal life, specifically testing Commisso's fidelity to her then husband.  For instance, the Governor wanted to know whether Commisso:

- ever had a boyfriend while married;

- kissed or "fooled around" with anyone other than her husband; or

- had sex with "anyone other than [her] husband."

82.    The Governor also made it a point to ask if Commisso's husband was "mad" when she worked on weekends.

83.    The Governor became particularly interested when he learned the Commisso was in the process of getting a divorce.  He asked one of Commisso's colleagues about the status of Commisso's divorce.  He also asked Commisso and her colleague whether they intended to "mingle" with men during a trip to Florida and whether Commisso's colleague would "tell on" Commisso if Commisso cheated on her husband while in Florida.

84.    The Governor made clear to Commisso that he was available.  He described himself as single and lonely; asked if she knew anyone who could be his girlfriend; and stated that he would date someone in her 30s or 40s (Commisso's age).

85.    On one occasion, the Governor made clear that he wanted to have sex with Commisso, telling her, "If you were single, the things I would do to you."

86.    The Governor initiated physical contact with Commisso, which turned sexual. For example, the Governor would "go to kiss [Commisso] on the cheek" but then "quickly turn his head and catch [Commisso] on the lips."

87.    The Governor also expected hugs, which Commisso described as follows:

> I knew I could feel him pushing my body against his and definitely making sure that he could feel my breasts up against his body. And was doing it in a way that I felt was obviously uncomfortable for me and he was maybe trying to get some sort of personal satisfaction from it.

88.     As another example, on December 31, 2019, the Governor asked to take a "selfie" with Commisso.  As Commisso stood next to the Governor and held up her phone, the Governor grabbed and began to rub her butt.

89.     The same way the Governor told Trooper 1 not to talk about their conversations with anyone, he directed Commisso not to share the selfies from that day with anyone but Alyssa McGrath, another victim of the Governor's sexual harassment.  Later, when facts about the Governor's sexual harassment began to surface publicly, he directed Commisso not to "talk about anything to anyone else."

90.     As with Trooper 1, the Governor focused his sexual attention on Commisso's back.  During one particular hug in early 2020, the Governor rubbed his hands on Commisso's lower back, asking her, "Does that feel good?"

91.     In late 2020, the Governor pulled Commisso in for a close hug while she was leaving his personal office.  Commisso pulled away and protested the Governor's unwelcome physical contact by stating, "You're going to get us in trouble."  The Governor responded, "I don't care" and slammed the door shut.  He then slid his hand up Commisso's blouse and "cupped" her breast.

**B.      Charlotte Bennett**

92.     In January 2019, Charlotte Bennett ("Bennett") began working in the Executive Chamber as a Briefer and, by May 2019, was assigned to work as Senior Briefer and an Executive Assistant for the Governor.  In this dual role, Bennett had frequent contact with the Governor.

93.     Almost immediately, the Governor began asking Bennett about her personal life. For example, on May 16, 2019, the Governor wanted to know the length of Bennett's previous

relationship and whether she "honored [her] commitments," meaning whether she was faithful to her previous boyfriends.

94.     The Governor's questions about Bennett's personal life continued for most of her employment.  For instance, the Governor wanted to know:

- whether Bennett was interested in any Executive Chamber staff members;

- whether she was going to get married to one of the staff members;

- who Bennett was "hitting on" and "who was hitting on [her]";

- whether she "slept with older men";

- whether her last relationship was monogamous;

- the identity of the last person Bennett had hugged;

- whether Bennett had any recent "hook ups"; and

- if she was sleeping with other people.

95.     The Governor went so far as to probe Bennett about her history of being sexually assaulted, including asking for details of the assault.  During this conversation, the Governor referred to the "cone of silence."  Bennett understood that the Governor was "testing" her.

96.     Predictably, the Governor steered their conversations towards sex.  To get Bennett to talk about the Governor's genitals, the Governor repeatedly asked Bennett what others were saying about the size of his hands.  According to Bennett, the Governor's persistence "became him trying to get me to admit to something sexually."  Bennett felt she had to "thread this needle of not making him angry" but also avoid getting into a "fight" with the Governor and "los[]e [her] job."

97.     The Governor also tried to lure Bennett into talking about her own body, questioning her if she had piercings anywhere other than her ears and, after Bennett stated that she was considering getting a tattoo on her shoulder, suggesting that Bennett get a tattoo on her butt.

98.     The Governor made it clear to Bennett that he was available.  He told Bennett that he was really lonely, looking for a girlfriend in Albany and that he had not hugged someone in a long time.  The Governor emphasized that he was not referring to a platonic hug but rather, a "real hug."

99.     He also expressed to Bennett a desire to have a relationship with someone who was "22 and up" (Bennett was about 25 at the time) and asked Bennett whether age mattered in a relationship.

100.     The Governor also made clear to Bennett that he had trouble with monogamous relationships, obviously hoping that Bennett would agree to have a sexual relationship with the Governor even if she was dating someone else.  Bennett understood that the Governor was propositioning her for sex.

101.     The Governor also focused on Bennett's appearance.  For instance, in or around November 2019, the Governor repeatedly asked Bennett why she was wearing her hair in a bun, signaling his disapproval.  On another occasion, he referred to Bennett, who was wearing long jean shorts, as looking "like Daisy Duke."

102.     Bennett ultimately had to take medical leave and was forced to quit her job because of the Governor's harassment.

C.      **Lindsay Boylan**

103.    Lindsay Boylan ("Boylan") is a former employee of the Empire State Development Corporation who, by 2018, officially joined the Governor's Executive Chamber.

104.    Boylan first met the Governor in 2014, before working in state government.

105.    After meeting Boylan only once, the Governor remarked, "Why can't we get more people like that?"

106.    Boylan next met the Governor in 2016 at an event at Madison Square Garden, where she noticed that the Governor paid unusual attention to her, including "wrapping his hands around both sides of [her] hands," which made Boylan feel "weird" and "creepy."

107.    Once she began working with the Governor more closely, she noticed that he frequently commented on her appearance and attractiveness.  For example, the Governor called Boylan a "star" because, in part, she was attractive.  He also stated that Boylan was more attractive than "Hollywood actresses of the past."

108.    Others noticed the undue attention the Governor paid to Boylan and concluded that the Governor had a "crush" on Boylan.

109.    At a holiday party in the Capital in 2016, the Governor saw Boylan from across the room.  Shortly thereafter, Boylan received a call from one of the Governor's assistants, who told Boylan that the Governor wanted to give her a tour of the second floor of the Capital where the Governor's office is located.  Boylan was "really scared" because she was in a "very clear predatory situation" but "said okay because that's what you do."

110.    During the "tour," the Governor pointed out a cigar box given to him by President Bill Clinton, which was a transparent reference to the sexual liaison between President Clinton and Monica Lewinsky in the White House.

111.    In December 2016, the Governor stated that Boylan looked like the "better looking sister" of Lisa Shields, a woman he once dated.  Thereafter, the Governor sometimes referred to Boylan as "Lisa."  The experience was "deeply humiliating" for Boylan, who believed she was treated like "some little doll for the Governor of New York."  According to Boylan, "the whole environment was set up to feed the predator."

112.    The Governor also made overtly sexual comments to Boylan.  In or around October 2017, as Boylan flew with the Governor on his plane, he stated, "Let's play strip poker," directing his comment at Boylan.

113.    On another occasion, the Governor's dog began to scratch Boylan.  The Governor responded to the incident by stating, "Well, if I was the dog, I'd mount you too."

114.    The Governor also went out of his way to make physical contact with Boylan, "casually" touching Boylan on her lower back, waist and legs.

115.    On one such occasion, the Governor approached Boylan to take a picture and touched her back "not in a friendly way," but "in a sexual way."

116.    On another occasion, as Boylan walked by the Governor to leave a meeting, he stepped toward her and kissed her on the lips.

**D.    Alyssa McGrath**

117.    Alyssa McGrath ("McGrath") began as an Executive Assistant in the Executive Chamber since 2018.

118.    In early 2019, McGrath was working alone with the Governor in the Executive Mansion when she noticed that he said a short Italian phrase and then grinned at her.  McGrath later learned that the Governor remarked how McGrath was beautiful.

119.    Indeed, McGrath's colleagues commented to her that the Governor "wants pretty . . . faces around."

120.    McGrath also noticed that the Governor would pay undue attention to her and other colleagues he found attractive.  For instance, the Governor sought out McGrath and Commisso at an annual holiday party and wanted to take a picture with them, even though others were "trying to get to him."  The pictures show the Governor holding McGrath and Commisso tightly around their sides and under their breasts.

121.    As with his other victims, the Governor wanted to know about McGrath's personal and marital life, focusing on McGrath's divorce.  He wanted to know why McGrath no longer wore a wedding ring, including "specific details" about "what exactly happened." McGrath felt like she was being interrogated by the Governor.

122.    The Governor also wanted to know whether McGrath was seeing anyone and whether McGrath planned to "mingle" with men on a trip to Florida with Commisso.

123.    On one occasion in early 2019, McGrath was in the Governor's office, across from him with her notepad and pen, slightly bent over, ready to take dictation.  When McGrath looked up, she noticed that the Governor was staring down her blouse.  As McGrath explained, "he was fully staring down my shirt."

**E.    Ana Liss**

124.    Ana Liss ("Liss") was an Empire State Fellow who worked in the Executive Chamber from 2013 to 2015.

125.    Liss, who had an interest in government service and economic development, was moved closer to the Governor's office in late 2013 but was not given meaningful work.  Rather,

according to a colleague, Liss was moved to sit closer to the Governor because she was "eye candy."

126.    When the Governor first met Liss, he held her hand and gazed into her eyes in a way that, among other things, was "flirtatious."  An aide to the Governor told Liss that the Governor "liked her," which she understood to mean that the Governor found her attractive.

127.    Liss was also told by one of the Governor's aides that she should look attractive and that the Governor preferred blondes.  As a result, Liss felt pressure to appear attractive to the Governor.

128.    Predictably, the Governor told Liss that she looked lovely and almost always addressed her as "sweetheart" or "darling."  Liss found the Governor's conduct demeaning, explaining that the Governor "talk[ed] to [her] like she was a little girl almost."  Tellingly, he never spoke to her about work.

129.    The Governor often kissed and touched Liss at work events, including at a May 2014 celebration where he "approached [Liss], kissed her on the check, and slipped his hand around her lower waist."

130.    The Governor also probed Liss about her personal life.  On one occasion, he stopped by Liss's office, "kissed [her] hand and asked [her] if [she] had a boyfriend and kissed [her] cheek."

**F.      Kaitlin**

131.    Kaitlin is a former employee of the Executive Chamber.

132.    The Governor singled out Kaitlin and paid undue attention to her.  Specifically, at a December 16, 2016, fundraising event for the Governor, Kaitlin, who at the time worked for a

lobbying firm, attempted to shake the Governor's hand.  The Governor responded by pulling her in and holding her in a dance position.

133.     Based on this one brief meeting, the Governor wanted to "steal" Kaitlin.

134.     He therefore directed two of his staff members to locate Kaitlin's contact information and offered Kaitlin a job interview, even though Kaitlin had not applied for, nor expressed any interest in, working for the Executive Chamber.

135.     Kaitlin was concerned that the Governor was extending the offer because of "what [she] looked like."  She made clear to a confidant, "I am not going to sleep with the Governor."

136.     However, Kaitlin's colleagues advised her that the position would be an opportunity to work in government ("[e]verybody told me that I had to take the job"), and she ultimately accepted a job offer.

137.     The Governor, however, focused on Kaitlin's appearance, commenting on whether she wore makeup or stating that Kaitlin "didn't look right."

138.     He also commented on her clothing, once stating that Kaitlin "looked like a lumberjack" because she wore a black and red button-down shirt.

139.     On one occasion, the Governor asked that Kaitlin come into his office to search eBay for car parts for him, something he certainly could have done on his own.  As Kaitlin conducted the search on the Governor's computer, he sat "directly behind" her "backside," making her extremely uncomfortable.

### G.     Other Victims

140.     In September 2019, State Entity Employee #1 attended a work event with the Governor, who grabbed her arm and asked her for a photograph.  The Governor put his arms

around State Entity Employee #1 and "took his hand and double tapped the area where [State Entity Employee #1's] butt and [her] thigh met."  The Governor then moved his fingers to "kind of grab the areas between [her] butt and [her] thigh."

141.    On March 17, 2020, State Entity Employee #2, a former Director of the New York State Department of Health, performed a live demonstration of a COVID-19 nasal swab test on the Governor.  In preparation for the demonstration, the Governor commented on State Entity Employee #2's heeled boots, stating, "You will be fine with those on."  The Governor asked that State Entity Employee #2 not to "go so deep [with the swab] that [she] hit [his] brain."  State Entity Employee #2 reassured the Governor that she would be "gentle but accurate."  In an obvious sexual reference, the Governor replied, "Gentle but accurate[, I've] heard that before."  During the televised demonstration, the Governor remarked, "Nice to see you, Doctor – you make that gown look good," humiliating her.  Indeed, throughout the demonstration, State Entity Employee #2 described the Governor's behavior as flirtation, noticed that he was standing very close to her and gazing at her.

142.    In May 2017, Virginia Limmiatis ("Limmiatis"), attended an event where the Governor gave a speech.  She was wearing a shirt with the name of her employer printed across her chest.  Afterwards, Limmiatis joined the rope line and, upon meeting the Governor, held out her hand.  The Governor proceeded to press the two fingers of his right across the logo on Limmiatis's chest.  As he did so, the Governor pressed his finger on each letter across Limmiatis's chest before sliding his fingers to the next letter.  He then leaned in so that his check touched Limmiatis's cheek and said, "I'm going to say I see a spider on your shoulder" and proceeded to brush the area between Limmiatis's shoulder and breast.

143.    On September 14, 2019, Anna Ruch ("Ruch") attended a wedding of one of the Governor's senior aides.  At the conclusion of the ceremony, which the Governor officiated, Ruch thanked the Governor.  The Governor shook Ruch's hand and then quickly moved his hand to her lower back where there was a cutout in her dress, touching her bare skin.  Ruch grabbed the Governor's hand, removing it from her back.  The Governor responded, "Wow, you're aggressive."  The Governor then cupped Ruch's face in his hands and asked, "Can I kiss you?"  Ruch had to twist away from the Governor as he kissed her left cheek.

## III.    RETALIATION

144.    The Governor's victims were often afraid to reject his advances or complain for fear of retaliation.  Specifically,

- Trooper 1 was afraid to reject the Governor's request for a kiss, so she told him that she was feeling sick.  Indeed, she heard "horror stories about people getting kicked off the detail or transfer[red] over like little things."

- Commisso was afraid to explicitly rebuff the Governor's advances for fear that she would be escorted out of Executive Chamber by the State Police and likely fired from her job.

- Bennett, who complained about the Governor's sexual harassment during her employment, felt "terrified" and "expected to lose [her] job."

- Boylan believed that anyone who complained about the Governor "would be destroyed before they even stepped out the door."

- Liss understood that she would be "laughed out of town" if she complained about the Governor's conduct and that doing so would have been a "fool's errand," possibly resulting in the loss of her job.

- State Entity Employee #1 thought it was "very scary to report something against someone who has so much power" and felt afraid that it "was going to perhaps have

[her] career impacted."  State Entity Employee #1 found the situation "very intimidating."

- Limmiatis chose not to report that the Governor pressed his fingers against her chest because "how do you explain to someone what the Governor did in public, such an egregious act, heinous act.  I was very fearful . . . how does someone believe that this happened to me."

- A former Executive Chamber employee expressed concern about his ability to work in state government if he disobeyed the Governor's senior staff.

- A state employee was told to "leave with as little fuss as possible" and "not make waves" because "the Governor could destroy [her] career and [she] would never find a job in the state again."

145.    These fears were justified.

146.    For instance, Bennett complained about the Governor's harassment but was told that the Governor's conduct amounted to "grooming," not sexual harassment and, therefore, there was no need to escalate her complaint.  Nonetheless, the Executive Chamber instituted "changes in staffing" to prevent, or at least minimize, women from having contact with the Governor.  Presumably, this would result in mostly men having access to the most powerful official in the state.  Indeed, DeRosa advised the Governor that he should not have interacted with Bennett at all.

147.    Boylan, who publicly disclosed the Governor's sexual harassment in late 2020, was attacked by the Governor and his enablers, who called her "crazy" and released Boylan's confidential personnel files to the press.  They plotted ways to shut down Boylan's allegations quickly.  Among other things, they drafted a letter disparaging Boylan, which they circulated to current and former Executive Chamber members, as well as a reporter for the *New York Daily News*.  One person who saw the letter, described it as "attacking" Boylan and "victim shaming."

148.    Kaitlin published a tweet in support of Boylan.  DeRosa responded by pressuring a staff member to call Kaitlin and ask whether Kaitlin was working with Boylan and whether Kaitlyn had any allegations against the Governor.  DeRosa demanded that the staff member surreptitiously record the conversation.  (DeRosa subsequently had the recording deleted because it was not helpful to the Governor.)  Another member of the Executive Chamber spoke to Kaitlin's supervisor[2] to ask whether Kaitlin had retained counsel and asserted a sexual harassment claim.

149.    As the credible allegations against the Governor mounted, the Governor enlisted the help of his brother, prominent CNN anchor Chris Cuomo, who, in turn, tried to unearth negative information about one of the Governor's victims.  Chris Cuomo exchanged messages with DeRosa claiming (falsely) that he had "a lead on the wedding girl [Ruch] being put up to it."

150.    The Governor and his enablers also attacked the Attorney General and the investigators conducting the probe of the Governor's harassment.  For example, one of the Governor's confidants was asked to "spread oppo on [investigator] Joon Kim."[3]

151.    Trooper 1 has also been the victim of retaliation.

152.    On May 19, 2021, Trooper 1 engaged in protected activity when she testified in an official investigation of the Governor's sexual harassment of her and other women.

---

[2]    By this time, Kaitlyn had moved to another state agency.

[3]    The Governor initially requested that the Attorney General appoint private lawyers to conduct an independent review of the Governor's conduct.  Not surprisingly, the Governor turned against the Attorney General and the independent investigators when they unearthed his pattern of sexually harassing women.

153.    She further engaged in protected activity on September 28, 2021, by sending a demand letter asserting her legal rights through her attorneys to counsel for the Governor and DeRosa.

154.    On or around November 12, 2021, DeRosa retaliated against Trooper 1 by falsely accusing Trooper 1 of "extortion" and threatening legal action.

155.    On February 10, 2022, the Governor announced that he will be filing ethics charges against the attorneys who investigated him and unearthed his pattern of sexual harassment, and further warned that "the list of attorneys" targeted by the Governor's ethics allegations "may expand."

156.    The Governor also threatened to seek criminal prosecution of his victims, announcing on Twitter that he will make "submissions" to "relevant district attorneys" related to "perjury" and "witness tampering."

157.    As the Governor and his enablers are aware, prosecutors who have announced decisions not to criminally prosecute the Governor have found his victims credible and the Governor's conduct deeply troubling.  However, they decided that they could not prove, beyond a reasonable doubt, that the Governor's repulsive conduct violated criminal laws.

158.    Nonetheless, the Governor and his enablers have threatened criminal charges against his victims and ethics charges against their attorneys in a blunt – but transparent – effort to dissuade them, including Trooper 1, from seeking to vindicate their legal rights under civil laws that prohibit sexual harassment.

159.    True to form, on February 17, 2022, the same day Trooper 1 filed this action, Azzopardi, the Governor's spokesman, tweeted a statement attacking Trooper 1 and her attorneys, accusing them of an attempt to "extort" a settlement and "cheap cash extortions."  This

statement, falsely accusing the Governor's victim and her attorneys of a crime for trying to

protect her civil rights, was intended to retaliate against Trooper 1 and dissuade her from

continuing to pursue her legal claims.

### FIRST CAUSE OF ACTION
**Discrimination in Violation of the Equal Protection Clause**
**Against Cuomo in His Individual Capacity**

160.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

161.   By the actions described above, Cuomo discriminated against Plaintiff based on

her sex.

162.   As a direct and proximate result of the unlawful conduct, Plaintiff has suffered,

and continues to suffer, monetary and/or other economic harm for which she is entitled an award

of monetary damages and other relief.

163.   As a direct and proximate result of the unlawful conduct, Plaintiff has suffered,

and continues to suffer, severe mental anguish and emotional distress, including, but not limited

to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and

emotional pain and suffering for which she is entitled to an award of monetary damages and

other relief.

164.   Cuomo's discriminatory actions were willfully negligent, reckless or committed

with a conscious or reckless disregard of Plaintiff's rights.

### SECOND CAUSE OF ACTION
**Retaliation in Violation of the Equal Protection Clause**
**Against Cuomo in His Individual Capacity**

165.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

166.    By the actions described above, Cuomo retaliated against Plaintiff for protesting discrimination on the basis of her sex.

167.    As a direct and proximate result of Cuomo's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

168.    As a direct and proximate result of Cuomo's unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

169.    Cuomo's retaliatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights.

### THIRD CAUSE OF ACTION
**Discrimination in Violation of NYSHRL**
**Against the NYSP, Cuomo and DeRosa**

170.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

171.    By the actions described above, these Defendants discriminated against Plaintiff based on her sex.

172.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

173.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited

to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

174.    Defendants' discriminatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights.

### FOURTH CAUSE OF ACTION
**Retaliation in Violation of NYSHRL**
**Against Cuomo, DeRosa and Azzopardi**

175.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

176.    By the actions described above, these Defendants retaliated against Plaintiff for protesting discrimination on the basis of her sex.

177.    As a direct and proximate result of such unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

178.    As a direct and proximate result of such unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

179.    These retaliatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights.

**FIFTH CAUSE OF ACTION**
**Discrimination in Violation of NYCHRL**
**Against Cuomo and DeRosa**

180.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

181.    By the actions described above, Cuomo and DeRosa discriminated against Plaintiff based on her sex.

182.    As a direct and proximate result of such unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

183.    As a direct and proximate result of such unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

184.    These discriminatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of NYCHRL**
**Against Cuomo, DeRosa and Azzopardi**

185.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

186.    By the actions described above, these Defendants retaliated against Plaintiff for protesting discrimination on the basis of her sex.

187.     As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

188.     As a direct and proximate result of such unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

189.     These retaliatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against the Defendants for the following relief:

A.     A declaratory judgment that Defendants violated federal, state and city laws;

B.     An award of economic damages;

C.     An award of compensatory damages;

D.     An award of punitive damages;

E.     Prejudgment interest on all amounts due;

F.     An award of reasonable attorneys' fees and costs; and

G.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 18, 2022
      New York, New York                      Respectfully submitted,

                                      **WIGDOR LLP**

By:
                                      Valdi Licul
                                      John S. Crain

                                85 Fifth Avenue
                                New York, NY 10003
                                Telephone: (212) 257-6800
                                Facsimile: (212) 257-6845
                                vlicul@wigdorlaw.com
                                jcrain@wigdorlaw.com

                                *Counsel for Plaintiff*