# Exhibit 2
# Part 1

In the Matter of the           )
Independent Investigation      )
under New York Executive       )
Law Section 63(8)              )
_____ )


HIGHLY CONFIDENTIAL

VIDEO RECORDED TESTIMONY OF MELISSA DEROSA

New York, New York

Monday, July 5, 2021


Reported Stenographically By:
PATRICIA A. BIDONDE
Registered Professional Reporter
Realtime Certified Reporter
JOB #:   365722

Melissa DeRosa  Highly Confidential
July 05, 2021

1

2

3                     July 5, 2021
                      9:03 a.m.
4

5

6              HIGHLY CONFIDENTIAL Video

7         Recorded Testimony of, MELISSA DEROSA,

8         held at the offices of Cleary, Gottlieb,

9         Steen & Hamilton LLP, One Liberty Plaza,

10        New York, New York, before Patricia A.

11        Bidonde, Stenographer, Registered

12        Professional Reporter, Realtime

13        Certified Reporter, Certified eDepoze

14        Court Reporter, Notary Public of the

15        State of New York, and Notary Public of

16        the State of Connecticut.

17

18

19

20

21

22

23

24

25

```
1                    A P P E A R A N C E S

2

3    CLEARY, GOTTLIEB, STEEN & HAMILTON LLP

4    Special Deputy to the First Deputy Attorney

5    General to the State of New York

6            One Liberty Plaza

7            New York, New York 10006

8    BY:    JENNIFER KENNEDY PARK, ESQ.

9            212-225-2357

10           jkpark@cgsh.com

11   BY:    JOON H. KIM, ESQ.

12           212-225-2950

13           jkim@cgsh.com

14   BY:    LORENA MICHELEN, ESQ.

15           212-225-2482

16           lmichelen@cgsh.com

17

18   VLADECK, RASKIN & CLARK, P.C.

19   Special Deputy to the First Deputy Attorney

20   General to the State of New York

21           565 Fifth Avenue

22           New York, New York 10017

23   BY:    ANNE L. CLARK, ESQ.

24           212-403-7300

25           aclark@vladeck.com
```

```
 1            A P P E A R A N C E S   (CONTINUED)

 2

 3    KAPLAN HECKER & FINK LLP

 4    Attorneys for The Witness

 5          350 Fifth Avenue

 6          Suite 7110

 7          New York, New York 10118

 8    BY:    SEAN HECKER, ESQ.

 9          212-763-0883

10          shecker@kaplanhecker.com

11    BY:    SHAWN G. CROWLEY, ESQ.

12          scrowley@kaplanhecker.com

13    BY:    JUSTIN R. HORTON, ESQ.

14          jhorton@kaplanhecker.com

15

16

17

18

19    ALSO PRESENT:

20    CHRISTIAN BIDONDE, Videographer

21                  - - -

22

23

24

25
```

```
1                      - - -

2              P R O C E E D I N G S

3                      - - -

4              THE VIDEOGRAPHER:  We are on the

5        record at 9:03 a.m. on July 5, 2021.

6        Audio and video recording will continue

7        to take place until all parties agree to

8        go off the record.  Please note that

9        microphones are sensitive and may pick

10       up whispering and private conversations.

11             This is the video recorded

12       deposition of Melissa DeRosa, in the

13       matter of Independent Investigation

14       under law Section 63, Subpoint 8.

15             This deposition is being held at

16       Cleary, Gottlieb, Steen & Hamilton LLP,

17       located at One Liberty Plaza New York,

18       New York.

19             My name is Christian Bidonde.

20       I'm the videographer on behalf of US

21       Legal Support.  The court certified

22       stenographer is Patricia Bidonde, on

23       behalf of US Legal Support.

24             I'm not related to any party in

25       this action nor am I financially
```

1        interested in the outcome.

2                Counsel will state their

3        appearances for the record, after which

4        the court reporter will swear in the

5        witness.

6                MS. KENNEDY PARK:  Good morning,

7        Ms. DeRosa.  I'm Jennifer Kennedy Park.

8        I'm with the law firm of Cleary,

9        Gottlieb, Steen & Hamilton.  But for

10       today's purposes, I'm a Special Deputy,

11       the First Deputy Attorney General of the

12       New York Attorney General's office.

13               MS. CLARK:  Hi.  I'm Anne Clark

14       from the law firm of Vladeck, Raskin &

15       Clark.  And again, I am also a Special

16       Deputy today.

17               MR. KIM:  Joon Kim, also from

18       Cleary, Gottlieb, Steen & Hamilton and

19       appearing as a Special Deputy today.

20               MS. MICHELEN:  Lorena Michelen,

21       also from Cleary, Gottlieb, appearing as

22       a Special Assistant to the First Deputy

23       Attorney General.

24               MR. HECKER:  Sean Hecker, Shawn

25       Crowley, and Justin Horton, all from

```
 1              Kaplan Hecker & Fink for Ms. DeRosa.
 2     M E L I S S A   D E R O S A, called as a
 3            witness, having been duly sworn by a
 4            Notary Public, was examined and
 5            testified as follows:
 6     EXAMINATION BY
 7     MS. KENNEDY PARK:
 8              Q.    Good morning, Ms. DeRosa.
 9              A.    Good morning.
10              Q.    As I just mentioned, my name is
11     Jennifer Kennedy Park.  The New York Attorney
12     General has appointed the law firms Cleary,
13     Gottlieb, Steen & Hamilton and Vladeck, Raskin
14     & Clark to conduct an independent
15     investigation under New York Executive Law 63
16     Section (8) into allegations of sexual
17     harassment brought against Governor Andrew
18     Cuomo as well as the surrounding
19     circumstances.
20              You're here today pursuant to a
21     subpoena issued in connection with that
22     investigation.  I'll note at the outset that
23     obviously today's proceeding is being video
24     recorded and you are under oath.
25              That means that you must testify
```

1    fully and truthfully just as if you were

2    sitting in a court of law before a judge or a

3    jury. And your testimony is subject to the

4    penalty of perjury. Do you understand?

5            A.    I do.

6            Q.    If you would like to make a brief

7    sworn statement today, I'll give you the

8    opportunity to do so at the conclusion of the

9    examination, whether that be today or

10   tomorrow. Okay? Do you understand?

11           A.    I do.

12           Q.    Although this is a civil

13   investigation, the New York Attorney General's

14   office has criminal enforcement authority. So

15   you have the right to refuse to answer my

16   questions if answering the question would

17   incriminate you.

18                 However, a failure to answer can

19   be used against you in a court of law in a

20   civil proceeding. Do you understand?

21           A.    I do.

22           Q.    Okay. You're appearing today

23   with your attorneys. You can consult your

24   attorneys today about privileged matters. But

25   this is not a deposition, and so they won't be

```
 1   making objections.  Do you understand?

 2           A.    Mm-hmm.

 3           Q.    Okay.  As you can see, we have a

 4   court reporter, and we are very thankful to be

 5   in person today.  So you just said "mm-hmm" a

 6   second ago.  We can't say mm-hmm.  So you have

 7   to say yes or no when you're answering my

 8   questions.  You can't nod because she can't

 9   record a nod.

10                 Do you understand?

11           A.    I do.

12           Q.    Okay.  And you have to let me

13   finish before you answer, and I'll let you

14   finish your answer so that she can record my

15   questions and your answers.  Do you

16   understand?

17           A.    I do.

18           Q.    Okay.  If you want to clarify an

19   answer at any point, whether it's to a

20   question that I've just asked you or a

21   question I asked you before, just tell me.

22   Just say "Actually, there's something I want

23   to clarify," and we'll go back and we'll do

24   that.

25                 Do you understand?
```

1          A.    I do.

2          Q.    If you don't understand a

3    question I'm asking, please tell me you don't

4    understand.  All right?

5          A.    Yes.

6          Q.    There you go.  I'm going to ask

7    about some names.  I'm going to ask about some

8    dates and some other specific information.  If

9    you don't remember a specific name, if you

10   don't remember a specific date, I'm asking you

11   to give me your best approximation.

12                Do you understand?

13         A.    Yup.

14         Q.    If you need a break, just let us

15   know, and we'll go off the record as long as

16   there's not a question pending.  If you want

17   to take a break, I'll just ask -- answer the

18   question I've just asked, and then we can take

19   a break.  All right?

20         A.    Sure.

21         Q.    No one is recording this in the

22   room other than the videographer?

23                MR. HECKER:  Correct.

24                MS. CROWLEY:  Correct.

25                MR. HORTON:  Correct.

```
 1          Q.    There you go.  All right.  Under
 2   Executive Law 63, Section 8, the provision of
 3   which this is being conducted, you're
 4   prohibited and your counsel is prohibited from
 5   revealing anything about which we ask you
 6   today or anything about which you tell us
 7   today.  If anyone asks you to disclose that
 8   information, you should let us know.
 9               Do you understand?
10          A.    I do.
11          Q.    Okay.  Are you taking any
12   medication or drugs that might make it
13   difficult for you to understand my questions?
14          A.    No.
15          Q.    Can you state your name, date of
16   birth, and your current home and business
17   address?
18          A.    Melissa Dina DeRosa.
19   ████████████████████.   Should I be looking at
20   you or her when I answer these questions?
21          Q.    So you should really be looking
22   at the camera to the best you can, but I
23   understand that's awkward.  So we'll look at
24   each other.
25          A.    Okay.  ████████████████   I'm
```

1 at ████████████████████████████████

2 ████████████████████.   And I have two

3 offices, 633 Third Avenue in Manhattan and the

4 New York State Capitol in Albany.

5   Q. Okay.  We're both talking a

6 little fast today.  So we'll both try to slow

7 down or the court reporter will tell us to

8 slow down and we'll do our best.  All right?

9   A. Okay.

10   Q. Okay.  Have you ever given

11 testimony before?

12   A. I have not.

13   Q. Okay.  Other than conversations

14 with your lawyers, what have you done to

15 prepare for today's testimony?

16   A. I went back and reviewed some

17 news articles.  I went back and reviewed some

18 e-mails and text messages, and we did two Zoom

19 prep sessions and two in-person prep sessions.

20   Q. Are all the news articles,

21 e-mails, and text messages that you reviewed

22 to prepare for today documents that your

23 counsel has produced to us?

24   A. Yes.

25   Q. All right.  You've got two big

1  binders in front of you.  If you can pull open

2  the second binder right here, the farthest one

3  to your left.

4        A.    The farthest one to my left?  So

5  this one?

6        Q.    Sorry.  Your right.

7        A.    Okay.

8        Q.    And go to Tab 246.  Sorry, very

9  thick.  We'll mark this as our first exhibit.

10  We'll take a moment to look at it.  And when

11  you're done, just look up.

12                (Exhibit 1, Testimony Subpoena

13        for Melissa DeRosa, dated June 28, 2021,

14        marked for identification, as of this

15        date.)

16        A.    (Document review.)

17        Q.    Okay.  Is this the testimony

18  subpoena you received from the New York

19  Attorney General's office?

20        A.    I believe so.

21        Q.    Did you read this subpoena before

22  today?

23        A.    No.

24        Q.    So this is the first time you're

25  reading it?

```
 1            A.    Yes.

 2            Q.    Okay.  Have you fully read it?

 3            A.    Just now, yes.

 4            Q.    Okay.  Do you understand that

 5    this is the subpoena to which your testimony

 6    is being taken today?

 7            A.    Yes.

 8            Q.    Okay.  We're going to turn to

 9    Tab 237, and mark this as the next exhibit.

10                 (Exhibit 2, Subpoena from New

11            York Attorney General's office for

12            Melissa DeRosa, requesting documents,

13            marked for identification, as of this

14            date.)

15            Q.    Why don't you take a look at it.

16    And then when you're done looking at it, let

17    me know.

18            A.    Yes, so I've read this one

19    previously.

20            Q.    Okay.  So is this the subpoena

21    for documents that you received from the --

22            A.    Yes.

23            Q.     -- New York State Attorney

24    General's office?  You just have to wait.

25            A.    Sorry.
```

Melissa DeRosa   Highly Confidential
July 05, 2021

```
1              Q.    It's okay.  She'll go crazy if we
2      don't do that.
3                    So is this the testimony subpoena
4      for documents that you received from the New
5      York Attorney General's office?
6              A.    Yes.
7              Q.    Okay.  And did you review this
8      before today?
9              A.    Yes.
10             Q.    What did you do to comply with
11     the subpoena?
12             A.    The law firm Kaplan Hecker imaged
13     my phone.  I gave them access to my personal
14     Gmail and my campaign Gmail.  All of my
15     e-mails on my official executive e-mail had
16     been retained previously because I had been
17     under a litigation hold.
18                   So from, I think, March 1
19     forward, everything had been retained.
20     Whether or not I had it deleted it in my
21     inbox, there was a backup copy.  And I gave
22     the IT people in my office my BlackBerry to
23     extract the pins.
24             Q.    Okay.  So just back up.  So your
25     BlackBerry, was that something that was issued
```

1    to you by the executive chamber?

2            A.    Yes.

3            Q.    And you provided that to Harold

4    Moore?

5            A.    Correct.

6            Q.    Okay.  And your phone, what kind

7    of phone was it?

8            A.    An iPhone.

9            Q.    Okay.  Do you have any other

10   cellular devices other than the BlackBerry and

11   the phone?

12           A.    There was a work iPhone that was

13   issued to me two years ago that I never turned

14   on and wouldn't be able to turn on if you

15   asked me to.  So that exists in the world, but

16   it wouldn't have anything relevant on it, and

17   I don't know where it is.

18           Q.    Okay.  And the cellular phone

19   that you provided to counsel, that was an

20   iPhone?

21           A.    Yes.

22           Q.    And you said you gave your

23   counsel access to your personal Gmail and to

24   your campaign e-mail.  Do you have any other

25   e-mail addresses other than your executive

1    chamber e-mail address?

2           A.    No.

3           Q.    Did you look through any paper

4    files?

5           A.    I don't keep paper files.

6           Q.    You don't keep any notebooks or

7    journals or schedules?

8           A.    No.

9           Q.    Your personal iPhone, did you

10   check your auto delete feature at any point?

11          A.    Yes.  After we received the

12   subpoena on March 15, we were instructed

13   shortly after that to make sure that the

14   30-day auto-delete had been turned off.

15          Q.    And had your 30-day auto-delete

16   been turned off prior to March 15?

17          A.    I believe a couple of days prior.

18          Q.    How much earlier than March 15

19   did you turn off the auto-delete feature on

20   your iPhone?

21          A.    I think it was probably around

22   the 12th.

23          Q.    What caused you to turn off the

24   auto-delete feature on your iPhone?

25          A.    I didn't realize that it was on.

1    And I was talking to Harold about information

2    that I was -- needed to preserve for another

3    matter.  And so in that process, we realized

4    that the 30-day auto-delete was on and turned

5    it off.

6         Q.    Any other documents you searched

7    to provide in response to the subpoena?

8         A.    Oh, my Twitter account.  They

9    searched the DMs in my Twitter account.

10        Q.    Did you give your counsel access

11   to any other social media accounts?

12        A.    Yes.  But there was nothing.

13   They only have Instagram and there's nothing

14   related to this.  And then I believe that they

15   also went through my -- the hard drive on my

16   computer, both in New York City and Albany, to

17   see if there were any relevant documents.

18        Q.    When you say "the hard drive on

19   your computers in New York City and Albany,"

20   are those executive chamber-issued devices or

21   personal devices?

22        A.    Executive chamber devices.

23   They're my desktops.

24        Q.    So your counsel, Mr. Hecker, and

25   his colleagues went through your executive

1   chamber hard drives?

2          A.    I actually don't know if they did

3   or if the executive chamber did.

4          Q.    Okay.  And do you have any

5   personal computers?

6          A.    A laptop.

7          Q.    And what happened with that?

8          A.    I gave it to Kaplan Hecker and

9   they imaged it.

10         Q.    And going back to social media,

11  do you have Facebook?

12         A.    No.

13         Q.    Snapchat?

14         A.    No.

15         Q.    Any of the other snap platforms?

16         A.    Nothing.

17         Q.    Do you use LinkedIn?

18         A.    No.

19         Q.    Anything else we haven't covered

20  that you did to respond to the subpoena for

21  documents?

22         A.    I think that's it.

23         Q.    Okay.  Can you take us through

24  your educational background, starting with

25  university or college?

1        A.    I attended Cornell University in

2    Ithaca, New York, received a bachelor's degree

3    in industrial and labor relations, graduated

4    in 2004, and then I returned to Cornell

5    University a couple of years later and got a

6    master's in public administration and

7    graduated in 2009.

8        Q.    I'm just going to ask you to slow

9    down.  Okay?

10        A.    Sorry.  It's the pace of my --

11        Q.    I understand but she has to

12    record it, and otherwise we're going to make

13    her day very difficult if we don't slow down.

14              Other than the master's from

15    Cornell, do you have any advanced degrees?

16        A.    No.

17        Q.    Have you taken any advanced

18    courses?

19        A.    No.

20        Q.    Can you outline your employment

21    history for us, starting with your first

22    position after graduating from Cornell in

23    2004?

24        A.    I was a fashion publicist out of

25    school for a year at Theory, which is a

1    fashion house here in New York, my rebellious

2    phase.  I then worked for Bolton-St. Johns,

3    which is my father's firm.  I was there for a

4    year.

5              I worked for one of his partners

6    on a couple of campaigns, a transportation

7    bond act initiative and a congressional

8    campaign.

9              I then worked for -- as a

10   campaign manager for a woman running for

11   congress in Upstate New York, ███████████,

12   at which time I was doing that while

13   simultaneously attending graduate school and

14   going back and forth.

15             And at the conclusion of that

16   campaign, I became the director of

17   communications and legislation for public

18   affairs from Cordo & Company.

19             After that I was named New York

20   State director of President Obama's political

21   organization in New York, Organizing for

22   America.

23             After that I was named deputy

24   chief of staff to the attorney general when it

25   was Eric Schneiderman I served as his acting

1    chief of staff for a brief period of time, and

2    then I became communications director for

3    Governor Cuomo.

4              In 2015 we amended my title to be

5    communications director and strategic advisor

6    to the governor.  The next year I was named

7    chief of staff, and a year and a half later,

8    secretary to the governor.

9              I also serve as the chairwoman on

10   the Council on Women and Girls.

11        Q.    When did you become the

12   communications director for the executive

13   chamber?

14        A.    April 2013.

15        Q.    And just to make sure I got this

16   right:  In 2015 is when you became -- you

17   added the title -- I think you said strategic

18   advisor?

19        A.    Yeah, in January of 2015,

20   strategic advisor.  And then I believe that

21   December is when I was named chief of staff.

22        Q.    December of 2016?

23        A.    I think it was 2015 or

24   January 2016.

25        Q.    Tell us about how it is that you

1   became the communications director for the

2   executive chamber.

3          A.    I had known Governor Cuomo for

4   years just through political circles.  I knew

5   a lot of his top staff.  So I was on their

6   radar.

7                When he was running for attorney

8   general and won, they actually tried to hire

9   me to come in and be director of

10  intergovernmental affairs.  Joe Percoco and

11  Josh Vlasto and ████████     engaged me on that.

12               I declined because I had an offer

13  to be deputy chief of staff to the attorney

14  general, and I thought that I would get more

15  high-level experience being, you know, fewer

16  chiefs situation.  And so I declined that.

17               And then two years later, when

18  the position for communications director

19  opened up, they reached back out and recruited

20  me.  And it was an offer I couldn't pass up.

21         Q.    When you say "they reached back

22  out," who reached back out?

23         A.    Josh Vlasto, Joe Percoco, and

24  Larry Schwartz.

25         Q.    And you said it was an offer you

1  couldn't pass up.  Why is that?

2         A.    Being communications director to

3  the governor of the State of New York is, you

4  know, for me, growing up in politics and

5  always sort of dreaming of being at the center

6  of the political world was something that I

7  couldn't say no to.

8         Q.    Tell us about the interview

9  process.

10        A.    It wasn't an interview process.

11  I was recruited.

12        Q.    In the recruitment process, did

13  you meet with Governor Cuomo?

14        A.    No.  Not until after I accepted

15  the job.

16        Q.    How long was the recruiting

17  process?

18        A.    I'm -- I want to say it was

19  probably, like, a week and a half.  They

20  needed an answer quickly because their

21  communications director was leaving, and if I

22  wasn't going to take the job, then they were

23  going to move on to other options.

24             I had already been working for

25  the state, and so the background review

1   process was able to be expedited.

2          Q.    What was your starting salary as

3   communications director?

4          A.    I think it was ▇▇. It was

5   commensurate with the woman who had the job

6   before me, ▇▇▇▇▇▇▇ was paid.

7          Q.    Did you negotiate that salary?

8          A.    I believe I said, "I expect to be

9   paid what ▇▇▇▇ was paid."

10         Q.    Did you talk to anybody else as

11  part of the decision-making process?

12         A.    What do you mean?  Like, I

13  consulted with family.

14         Q.    Other than family, did you talk

15  to anybody else?

16         A.    Friends, reporters.

17         Q.    And which friends did you talk to

18  during that recruiting process?

19         A.    I spoke to ▇▇▇▇▇▇, who was

20  the attorney general's chief of staff when I

21  was deputy chief of staff.  I spoke to

22  ▇▇▇▇▇▇▇▇, who served as

23  communications -- or campaign manager to the

24  governor's 2008 run.  People like that who

25  just were generally in politics.

1    Q.    Anyone else you can remember

2   talking to during the recruiting process?

3    A.    Like college friends,

4   girlfriends.

5    Q.    And what did you talk to █████

6   ██████ about?

7    A.    I asked him if he thought that it

8   was a good idea.

9    Q.    And what did he say?

10    A.    He thought that I should stay in

11   the attorney general's office and be, like,

12   the youngest chief of staff to the attorney

13   general, and that I would have a lot more room

14   to run and grow, and that if I went over there

15   as communications director, I could get

16   pigeonholed, and in my time in the attorney

17   general's office, I had grown to be much more

18   than that.

19         And so he thought that I should

20   stay and do that versus going to be

21   communications director.

22    Q.    So he was trying to convince you

23   to stay?

24    A.    Yes.

25    Q.    Didn't work?

```
 1          A.    No.

 2          Q.    And you said ▮▮▮▮▮▮▮ -- or I

 3    think it was ▮▮▮▮▮▮▮▮▮▮.    What --

 4          A.          ▮▮▮▮▮▮▮▮▮▮▮▮▮

 5          Q.    What did you talk to her about?

 6          A.    I mean, same thing, what do you

 7    think, and she said it's going to be a lot of

 8    work.  It's 24/7.  It's very intense.  He

 9    works really hard.  He expects everyone around

10    him to work really hard.

11               Although I was always, sort of,

12    hardwired that way.  So it wasn't -- that

13    wasn't something that dissuaded me.  That was

14    something that excited me.

15          Q.    Anything else you remember she

16    said?

17          A.    No.

18          Q.    Did either Ms. ▮▮▮▮▮▮▮ or

19    Mr. ▮▮▮▮ say anything about working with

20    Larry Schwartz?

21          A.    No.

22          Q.    Or working with Joe Percoco?

23          A.    No.

24          Q.    And you said --

25          A.    Not that I recall.
```

1    Q.    -- said you spoke to some college

2    friends.  What did you talk to the college

3    friends about?

4    A.    What do you think, what should I

5    do.  And they were like, of course you should

6    do this.  This is the kind of thing you've

7    wanted your whole life.  Like, you're not a

8    lawyer.  Being chief of staff in the attorney

9    general's office not as a lawyer, like, you're

10   ultimately going to, you know, reach a ceiling

11   and what's the point.

12             So go be in the government's

13   office.  It's what you love.  It's what you

14   care about.  So they encouraged me to take the

15   job.

16   Q.    Anyone discourage you from taking

17   the job?

18   A.    No, other than █████

19   Q.    You said, before you took the

20   role as communications director, that you had

21   known Governor Cuomo for years.

22   A.    Mm-hmm.

23   Q.    When was the first time you met

24   Governor Cuomo?

25   A.    I mean, in rope lines and things

```
 1    like that from the time I was a kid.  One
 2    instance that I remember meeting him in a more
 3    substantive way was in 2008 when I worked for
 4    ▆▆▆▆▆▆▆▆▆▆▆▆▆ and ▆▆▆▆▆▆▆.
 5            They threw a fundraiser for him
 6    at the Capitol Grille, which was a very small
 7    event, 20 people, sit-down lunch.  And so it
 8    was a real opportunity to exchange ideas and
 9    hear from him on his philosophy of governing
10    and get to ask questions.
11        Q.    And that was in 2008 you said?
12        A.    Mm-hmm.
13        Q.    It was the first substantive
14    interaction you had with Governor Cuomo?
15        A.    Mm-hmm.
16        Q.    Were you seated at his table
17    during that lunch?
18        A.    There was only one table.
19        Q.    What do you remember him talking
20    about?
21        A.    I remember him talking about
22    challenging bureaucracy.  I remember him
23    talking about how broken Albany was.  It was,
24    like, very clear back then he was thinking of
25    running for governor.
```

```
 1                   So he talked a lot about his
 2    vision for moving Albany forward and the
 3    dysfunction and on-time budgets and
 4    legislation that would just wean on for years
 5    and years; and that he believed that Albany
 6    is, sort of, where good ideas came to die, and
 7    that didn't have to be the way.
 8                   And he talked a lot about his
 9    time in Albany in the '80s with his father and
10    how government could be a vehicle for good.
11    And if you get good, smart, dedicated public
12    servants, the sky is the limit.  It was very
13    inspiring.
14         Q.    Did you say anything to Governor
15    Cuomo on that occasion?
16         A.    No.  I just listened.  I was a
17    kid.
18         Q.    How old were you?
19         A.    In 2008 I was ███
20         Q.    Who else was at your table?
21         A.    It was the partners at the firm
22    and some clients.  So ████████████████
23    ████████  and some other partners -- or some
24    other clients of the firm.  I can't tell you
25    specifically who.  I don't recall.
```

```
 1          Q.    Were you actually introduced to
 2   the governor on that occasion?
 3          A.    He went around and shook hands
 4   with everyone.  It was a very small event.
 5          Q.    And after that event in 2008,
 6   when was the next time you had a substantive
 7   interaction with him?
 8          A.    In 2010, my father hosted an
 9   event for him, and I met him -- remet him
10   again at that event and had a pretty lengthy
11   conversation.
12          Q.    When in 2010 was that event?
13          A.    I don't recall the month, but it
14   had to be -- like, it was before the election.
15   It had to be, like, August, September of that
16   year.
17          Q.    And you said you had a
18   substantive interaction.  Tell us about that
19   interaction.
20          A.    I was serving as New York State
21   director for Obama's political organization.
22   And so I was point person between ███████
23   ███████  in the White House and the DNC and
24   also the state party here in New York.
25                We had just done Obamacare, and
```

1   so we had a lot of marginal congressional

2   members who were being challenged.  This was

3   during the Tea Party rise.  So it was my job

4   to, sort of, be the go-between, the political

5   eyes and ears, and run the campaigns uniformly

6   for the White House.

7              And so I had access of a

8   tremendous amount of polling information.  I

9   knew a lot about what was going on on the

10  ground and a lot of these, like, marginal

11  areas.  And he was running for governor.

12             So we started talking about that,

13  and I started telling him what I was seeing on

14  the ground and where I saw trouble and how I

15  thought the trend line were going to go, where

16  people were not just going to go vote down

17  ballot, but potentially vote across ballot.

18             And so we just had a very quick

19  political conversation.

20        Q.    How long did that conversation

21  last?

22        A.    Probably, like, ten, 15 minutes.

23        Q.    What was the entry price to

24  attend this fundraiser?

25        A.    I don't remember.

1          Q.    Do you remember how much was

2     raised?

3          A.    No.

4          Q.    When was the next substantive

5     interaction with Governor Cuomo?

6          A.    He called me a couple of days

7     later to follow up on that conversation.

8          Q.    Where did he call you?

9          A.    On my cell phone.

10         Q.    How did he get your cell phone

11    number?

12         A.    From ███████████████████.

13         Q.    How do you know that?

14         A.    Because ██████████████████

15    texted me and said, "Stephanie Benton just

16    asked for your phone number.  I think the

17    attorney general is going to reach out."

18         Q.    Did you know who Stephanie Benton

19    was at that time?

20         A.    I knew that she was the attorney

21    general's executive assistant.

22         Q.    And when was this outreach on

23    your cell phone from the governor?

24         A.    It was shortly after that event.

25    I don't remember specifically.

1       Q.      And he called you on your cell

2    phone, and how long did that conversation

3    last?

4       A.      Probably about ten minutes.  He

5    wanted to make sure that I was talking to his

6    campaign, which was being run at the time by

7    the late ███████████ and also the state

8    party coordinated effort which was being done

9    by ███████████, so that all of the resources

10   were being shared and information shared and

11   that we were being -- that they were being

12   helpful to us, that we were all working

13   together, which I was happy to do.  And that

14   was actually how I met ████████

15      Q.      Did he try and recruit you during

16   that call?

17      A.      No.

18      Q.      You have amazing memory of these

19   occasions.  Did you -- were there documents

20   that you looked at that that refreshed your

21   memory about these moments?

22      A.      No.

23      Q.      When's the next substantive

24   interaction you had with Governor Cuomo?

25      A.      President Obama was coming to a

```
 1   GE plant in Schenectady, and I was the lead on

 2   the ground for the event.  And it was shortly

 3   after the governor had been sworn in.

 4              And so I was charged with, sort

 5   of, corralling all of the elected officials

 6   and making sure that the event went smoothly

 7   in coordination with the White House.

 8              And I saw him at that event and

 9   chatted with him and Senator Gillibrand and

10   Senator Schumer.  It was, like, the first big

11   event after President Obama was sworn in in

12   New York.

13         Q.   So that makes this when?

14         A.   January 2011.

15         Q.   And you said you chatted with

16   Governor Cuomo at this event in January of

17   2011.  What did you chat about?

18         A.   He asked me what my plan was, if

19   I was going to go on the presidential reelect

20   campaign, which was sort of the natural

21   question at that moment.

22         Q.   And what was your answer?

23         A.   I had been offered to be the

24   deputy national political director, but it

25   meant relocating to Chicago, and I didn't want
```

1    to do that.

2              And I thought that it was

3    exciting that Eric had just been elected

4    attorney general, and that he was in the

5    governor's office.  And so I thought there

6    could be an opportunity for me closer to home.

7         Q.    Did you talk to Governor Cuomo

8    about that opportunity?

9         A.    I just said that, basically, that

10   I didn't think I wanted to go to Chicago, and

11   I wouldn't have a choice if I wanted to take

12   that role.

13        Q.    Did he try to recruit you then?

14        A.    He said, "Why don't you come to

15   work for us?  I'm sure there's something in

16   our operation.  We're staffing up right now.

17   Talk to Josh and ████████████ and Joe and

18   see if there's something that makes sense."

19        Q.    Did you do that?

20        A.    Joe Percoco called me shortly

21   afterwards and asked me if I would be

22   interested in director of intergovernmental

23   affairs.

24        Q.    How much -- how long after the

25   meeting with the governor at the event in

1    January 2011 did Mr. Percoco call you?

2        A.    A couple of days.

3        Q.    And tell us about the

4    conversation with Mr. Percoco.

5        A.    He just said, "Hey, reaching out,

6    following up.  I know you spoke to the

7    governor at the event in Schenectady.  Is this

8    something you might be interested in?  I think

9    you could be great for it."

10        Q.    And what did you tell him?

11        A.    I appreciated the outreach and

12    the follow-up, but I had actually accepted an

13    offer in the intervening period for the

14    attorney general.

15        Q.    Did he try to persuade you to

16    change your mind?

17        A.    "Oh, come on, you want to be in

18    the governor's office.  That's where the real

19    stuff happens.  We're going to do marriage

20    equality.  We're going to tame the beast in

21    Albany," you know, kind of thing.

22              And I was like, "I appreciate

23    that and hopefully down the line I won't miss

24    an opportunity to join the team later on.  But

25    right now I think this is what's best for me."

1          Q.     So you're leaving the door open a

2    little bit?

3          A.     Yeah.

4          Q.     So after the meeting with

5    the -- well, the chat with the governor in

6    January 2011, what's your next substantive

7    interaction with Governor Cuomo?

8          A.     I believe it was the following

9    year, in 2012.  We were negotiating I-STOP,

10   which is this prescription drug package.  It

11   was a big initiative for the attorney general.

12   And I was his point person on negotiations.

13               And so it became pretty clear

14   pretty early that, if I wanted to get it done,

15   I had to win the governor's office over.

16               And so I worked with Jim

17   Malatras, who at the time was his policy

18   director, and Larry Schwartz, who was

19   secretary to the governor, and, sort of,

20   brought them along and said this is something

21   that we could do together.  People don't

22   generally think of our offices as working well

23   together.  Here is an opportunity.

24               And they agreed.  And so Jim

25   Malatras and I together worked on that.  And

1   through the course of negotiating that

2   legislation, I would be in Jim's office.  The

3   governor would walk in occasionally and say,

4   "Hello.  How are the negotiations going?" you

5   know, just small talk.

6          Q.    How did the negotiations go?

7          A.    Great.  We passed the package.

8          Q.    How often were you in meetings

9   with Mr. Malatras or Mr. Schwartz during that

10  time when the governor popped by?

11         A.    I would say it's sporadic.  I

12  mean, I was in meetings with Jim Malatras

13  constantly.  But it was like -- you know, it

14  was incidental.  Like, if he happened to be

15  passing through, he would stop in and just

16  make small talk.

17         Q.    And which office were the

18  meetings in?

19         A.    Jim's office.

20         Q.    In 633 --

21         A.    No.  Up in the state capitol.

22  During legislative session, typically we're in

23  Albany.  And then nonsession days we're in the

24  city.

25         Q.    Where is Mr. Malatras' office in

1    relation to the governor's office?

2        A.    Across the hall.

3        Q.    So after the negotiation of

4    I-STOP, when's your next substantive

5    interaction with the governor?

6        A.    I don't think again until they

7    recruited me to come over in 2013.  I'm sure

8    that I saw him at events and said hello, but

9    nothing that stands out.

10       Q.    Okay.  And you joined as

11   communications director.  What was your

12   responsibility?

13       A.    I oversaw the second

14   floor -- second floor shorthand for the

15   executive chamber, the second floor's press

16   operation, and I was also responsibility for

17   the communications of 56 state agencies and

18   authorities.

19             I would hire and fire PIOs at the

20   agencies.  It was my job to do overall

21   strategy, rapid response, press.  If we were,

22   you know, trying to pass a massive piece of

23   legislation, it was my job to win over the

24   editorial boards and push back on detractors

25   and make the best argument.  I spoke to

1    reporters frequently.

2         Q.    You said "PIOs at agencies."  Can

3    you tell us what "PIOs" stands for?

4         A.    Public information officer.  I

5    apologize.

6         Q.    It's okay.  Did you have

7    responsibility for hiring or firing anyone

8    else other than the PIOs?

9         A.    No.  I mean, within my press

10   shop, sure.  But not outside of

11   communications.

12        Q.    So within the communications

13   team, you had hiring and firing authority?

14        A.    Yes.  And that was deputy press

15   secretaries, press secretary, deputy comms

16   directors, assistants.

17        Q.    What about the briefers, were

18   they part of your responsibility and

19   oversight?

20        A.    No.  I didn't interact with the

21   briefers really at all.

22        Q.    And then you said at some point

23   you added strategic advisor as a title?

24        A.    Yes.

25        Q.    What was your responsibilities as

1    strategic advisor?

2          A.     They didn't really change.  It

3    was more a reflection publicly that my role

4    was broader than just doing comms.  I had a

5    very predominant role in what issues we would

6    take up during State of the State or during

7    the legislative session.

8               I would run a lot of the

9    campaigns, be point person.  And so the

10   thought was that if we tacked that on, it was

11   reflective of the fact that I was his

12   strategic advisor, but also that in the

13   outside world, people would be more responsive

14   and recognize that my role wasn't limited to

15   communications.

16         Q.     Did someone have the role of

17   strategic advisor before you?

18         A.     No.

19         Q.     It was a new role created for

20   you?

21         A.     Mm-hmm.

22         Q.     You got to say yes.

23         A.     Yes.  I apologize.

24         Q.     How did it come about that you

25   were going to get this newly created role?

1          A.      Fred Dicker did a New York Post

2    column at the very end of 2014, as we were

3    transitioning from Term 1 to Term 2, and he

4    wrote that it was rumored that I was leaving

5    the administration.

6                And so the governor and I spoke

7    about how best to rebut that rumor.  And I

8    said, "I'm happy to just say that I'm staying

9    here."  And -- but I said to him, you know, "I

10   would also appreciate if you entertained me

11   adding on this additional title to my role.  I

12   want to continue to grow.  I'm more than just

13   comms."

14               I was, you know, Eric's chief of

15   staff.  I was state director for Obama.  Like,

16   I don't want to just be pigeonholed in comms.

17   And so if we did that, it would not only say

18   I'm staying here, it affirmatively, like,

19   also, you know, send a message that I wasn't

20   going anywhere.

21               So it's not just that I'm not

22   leaving this minute, but that I'm not going

23   anywhere.

24          Q.      So creating the role was your

25   idea?

```
 1          A.    Yeah.  Creating the -- it was

 2    still comms director.  It was comms director

 3    and strategic advisor.

 4          Q.    Sorry, creating the title was

 5    your idea?

 6          A.    Mm-hmm.

 7          Q.    Had you talked about the creation

 8    of that title with anyone else before you

 9    raised it to Governor Cuomo?

10          A.    It was actually ████ idea.

11          Q.    And you said there was a New York

12    Post article with a rumor that you would be

13    leaving the executive chamber.

14                Had you been considering leaving

15    the executive chamber?

16          A.    No.

17          Q.    So no truth to that rumor?

18          A.    No.  But Fred Dicker doesn't

19    really care about the truth.

20          Q.    So you added the title of

21    strategic advisor, but your duties remain the

22    same?

23          A.    Largely yes.  It was more

24    actually reflective of what I was already

25    doing.
```

1      Q.    And when you were the comms

2  director, did you do the role more expansively

3  than the prior comms director?  So these

4  strategic responsibilities you were just

5  talking about, were those responsibilities the

6  prior comms director had?

7      A.    Every comms director does the job

8  a little bit differently, but yes.  I would

9  say that ███████████, who had the job

10 before me, who is now the, you know, VP at

11 CNN, Rich Bamberger who had the job before

12 her, like, he was a TV guy.

13          So they were much more focused on

14 tell the story, who's the victim, how do we,

15 you know, in the most compelling way, convey

16 the message.  And I think I was much more

17 tactical, strategic, hand-to-hand combat with

18 the reporters.

19          These are the issues we should be

20 focusing on, the party is shifting this way,

21 we should get there first.  It was just a

22 different approach.

23          But I think that that was also

24 because traditionally my role was larger

25 than -- oh, I'm sorry, can I go back?  I

```
 1    forgot, when I was in my resume, I served as

 2    deputy press secretary to Nydia Velázquez as

 3    well.  So I'm sorry.

 4              MR. HECKER:  What year was that?

 5              MS. KENNEDY PARK:  I got that.

 6              THE WITNESS:  2006.  So it was

 7         right after the democrats took back the

 8         house.

 9         A.    So there, like, was, you know,

10    some comms in my background.  And when I

11    worked for Cordo & Company, it was director of

12    communications and legislation.  People knew I

13    had very good relationships with reporters,

14    but I wanted to be more than that.

15         Q.    Were there any reporters at that

16    time you didn't have good relationships with?

17         A.    I mean, you always fight with

18    certain reporters.

19         Q.    Who were the certain reporters

20    that you were fighting with?

21         A.    Fred Dicker.

22         Q.    Anyone else other than Fred

23    Dicker?

24         A.    I mean, Brendan Scott

25    occasionally.  He was also a Post reporter.
```

1    Liz Benjamin.  But, you know, when you say

2    "fight with," it's, you know, hand-to-hand

3    combat, and then everybody goes out and has a

4    drink afterwards.

5          Q.    I'm not a comms person.  So when

6    you say "hand-to-hand combat," I don't know

7    what you mean.

8          A.    It's, you know, everyone has a

9    job to do.  And they want to write a story,

10   and it's your job to shape the story or kill

11   the story.  And so a lot of times that can be

12   contentious.

13         Q.    And then after you took on the

14   role of strategic advisor, you became

15   secretary to the governor.  Is that right?

16         A.    Chief of staff.

17         Q.    Chief of staff, sorry, to the

18   governor.  How did that happen?

19         A.    The role had become open.  It was

20   first held by ███████, who was viewed

21   largely as, like, a political communications

22   person in the administration.  Then it was

23   held by Josh Vlasto, who had been press

24   secretary and also, you know, did a lot of

25   politics.

1           And so I thought that it was the

2    next natural step for me, following, sort of,

3    the same path as the two males that were

4    before me.  And so I asked for it.

5           Q.    When you say you asked for it,

6    you asked Governor Cuomo for it?

7           A.    Yes.

8           Q.    And what did he say?

9           A.    He said, "Do you think it's going

10   to disrupt the team at all?  How will Jill

11   feel about it?  How will Joe feel about it?

12   How will ███ feel about it?"

13           And I said, "I don't know but I'm

14   happy to have those conversations with your

15   blessing.  I don't want to do anything to,

16   sort of, disrupt the apple cart, but I think

17   I've earned it."

18           And he said, "Have some

19   conversations and if you still feel like it's

20   what you want, then I, you know, I'm on

21   board."

22           Q.    What is your understanding of why

23   the governor thought it might disrupt the

24   team?

25           A.    Chief of staff is a very tricky

```
 1    title in our administration, because really
 2    the chief of staff is the secretary to the
 3    governor.  Chief of staff in our
 4    administration was more focused specifically
 5    on executive operations, politics, comms,
 6    advance, like, that side of the world, not
 7    just running, you know ...
 8              When you're chief of staff to the
 9    governor, you run all the agencies.  You're
10    responsible for the agencies.  You're
11    responsible for the working of government.
12    Chief of staff is sort of a unique, carved-out
13    role.
14              So when people would get that
15    title, sometimes it ruffled other people's
16    feathers because they would think, Oh, are you
17    now my boss, or where does this put me in the
18    world vis-à-vis you?  And like any
19    organization, you have to manage, you know,
20    egos.
21         Q.    So did you go and talk to Jill,
22    Joe, and ▇▇▇▇
23         A.    I did.
24         Q.    Tell us about the conversation
25    with Jill.
```

```
 1          A.    Jill was excited for me.  She was
 2    like, "Congratulations.  Absolutely, you
 3    deserve it.  I'll do anything I can to support
 4    you."
 5          Q.    What was her title at the time?
 6          A.    I think that she was at that
 7    point director of scheduling.  But Joe was
 8    just about to leave, and she was going to take
 9    Joe's title, which was executive deputy
10    secretary.
11          Q.    And what about the conversation
12    with Joe?
13          A.    Joe thought it was great.  I
14    mean, he was leaving, and so I think he wanted
15    to make sure that he could leave feeling good
16    that the organization was fully intact and
17    running in a way that the governor could rely
18    on.
19                And I think that he viewed me as
20    someone who was very steady, that would help
21    that transition.
22          Q.    And I think you said ▮▮▮▮▮▮?
23          A.    Mm-hmm.
24          Q.    Tell us about that conversation.
25          A.    ▮▮▮▮ had just been named
```

1    secretary.  I had known ▮▮▮ since I was a

2    kid.  I had actually gone to him for advice

3    out of college for, like, what to do with my

4    life.

5              And he had always, sort of, been

6    a mentor to me.  And he said that he thought

7    that it was the obvious next step and a

8    well-deserved title that would suggest more

9    about what I was doing and more reflective of

10   my value to the organization, and that I

11   should absolutely take it.

12        Q.    Did you talk to anyone else about

13   taking the role of chief of staff?

14        A.    No.

15        Q.    So what happened --

16        A.    Well, I mean ▮▮▮ like, my

17   husband.

18        Q.    Other than your husband and Jill,

19   Joe, and ▮▮▮ did you talk to anyone else

20   about taking the role of chief of staff?

21        A.    I don't have any specific

22   recollections, but I'm sure I talked to my

23   sister.  I'm sure I talked to my best friend

24   ▮▮▮▮ you know, like, people like that.

25        Q.    Anyone else in the

1    administration?

2          A.    No.

3          Q.    Did you talk to Stephanie Benton

4    about it?

5          A.    No.

6          Q.    Josh Vlasto?

7          A.    He wasn't in the administration

8    at that point.

9          Q.    Did you talk to Josh Vlasto about

10   it?

11         A.    No.

12         Q.    Rich Bamberger?

13         A.    No.

14         Q.    Steve Cohen?

15         A.    No.

16         Q.    Larry Schwartz?

17         A.    No.

18         Q.    So after you have those

19   conversations, you take the role.  Is that

20   right?  Did you go back to the governor to

21   tell him about the conversations?

22         A.    Yes.

23         Q.    And what did you say?

24         A.    I said, "I had the conversations.

25   Everyone's really supportive.  I'm excited.

1    They're excited.  If you really feel like it's

2    okay, it's an opportunity I would like."

3           Q.    And what did he say?

4           A.    He said that's great.  It was a

5    moment of transition.  ██████████, who

6    had been our budget director, was departing.

7    We had just successfully recruited Robert

8    Mujica to come in as budget director.  And so

9    we thought we could announce those two changes

10   at the same time.

11          Q.    And is that what you did?

12          A.    Yes.

13          Q.    So what was your official start

14   date as chief of staff?

15          A.    I think it was December of 2015

16   or January of 2016, in that range.

17          Q.    And as chief of staff, who

18   reported to you?

19          A.    So there's the, like, who was

20   supposed to report to me versus the in

21   practice.  When I took that job, Jill got

22   elevated to deputy executive secretary, which

23   had been Joe's role.

24                And traditionally, the chief of

25   staff did more of the, like, personnel,

```
 1    hiring.  But Jill had been training to do that
 2    under Joe.  And so she kept that portfolio.
 3                 I took legislative affairs,
 4    intergovernmental affairs, communications, and
 5    policy.  And she kept coming from -- you know,
 6    she had been the director of scheduling.  She
 7    took briefings, advance, staffing, personnel.
 8    And so we, sort of, split the responsibility.
 9          Q.    So in your -- in your oversight
10    of legislative affairs, comms,
11    intergovernmental affairs, and policy, were
12    you responsible for hiring and firing of
13    people who served in those roles?
14          A.    Yes, I certainly had a role in
15    it.  It wasn't -- you know, it depended on
16    what level obviously.  I wasn't involved in
17    every hiring and firing.
18          Q.    But ultimately, you had say over
19    who got hired and fired into those teams?
20          A.    I certainly had input, yes.  I
21    mean, there were some times I would not feel
22    like they needed my input.  There were some
23    times when I felt like I wanted to have a say.
24          Q.    But it was up to you whether you
25    had the say or not had the say?
```

1          A.     Yes.  Not solely up to me but up

2    to me.  Secretary to the governor is the

3    person that has the ultimate say in those

4    things.  So if ████ wanted to exert himself,

5    and I deferred a lot to Jill.

6          Q.     Okay.  So secretary to the

7    governor ultimately has responsibility for

8    hirings and firings in the executive chamber?

9          A.     Yes.

10          Q.     Does that include transfers as

11   well?

12          A.     No.  I mean, when I say

13   "ultimately has discretion," it's like they

14   are the ultimate boss so they can have the

15   discretion.  But the -- like ██████████ I

16   can't imagine was involved in any hiring or

17   firing decisions or transfer decisions.

18               Like, it's a role you can, sort

19   of, defer, or you can interject, depending on

20   whether or not you see fit.

21          Q.     And in --

22          A.     But Joe was primarily the person

23   that did the personnel decisions, and then

24   when he left that became Jill.  And then we

25   have an appointment secretary who right now is

1   ███████████, who previously was held by a

2   number of people, ██████████, others, and

3   they play a role in those decisions as well.

4         Q.     So when you were serving as chief

5   of staff, the secretary to the governor had

6   ultimate oversight over hiring and firing.

7               But on a day-to-day basis, that

8   was handled by Jill DesRosiers?

9         A.     Correct.  And then the state

10  operations director is the person that's

11  chiefly responsible for the agencies.  And so,

12  you know, if we were hiring a dep sec or if

13  you're hiring a commissioner, generally

14  speaking, you defer to those people, to the

15  state operations director.

16              It was Howard Glaser, ██████

17  █████████ now it's █████████████.  Because

18  those are the people that they manage.

19  They'll oftentimes ask for your input or sit

20  for an interview, tell me what you think, but

21  you defer to their judgment.

22        Q.     So then you become secretary to

23  the governor.  How did that happen?

24        A.     █████████████ had told the governor

25  he would serve for two years.  His two years

```
1    were coming to an end.  And, sort of, as I
2    imagine how it is in other organizations, you
3    find your replacement.
4                So ████ came to me and said,
5    "You're the obvious choice.  You should take
6    over as secretary.  I want to recommend to the
7    governor that you become secretary."
8         Q.    Anything more said in that
9    conversation?
10        A.    I told him I didn't want the job.
11        Q.    Why not?
12        A.    Because every time that I have
13   moved up in my professional career, there is a
14   focus on my father.  And it's attention I
15   don't like.  And I knew that going from chief
16   of staff to secretary, because it's such a big
17   job, because my father is who he is, that it
18   would all become about him.
19        Q.    You said in the past that the
20   focus had been, when you had been promoted, on
21   your father.  Can you give us some examples of
22   that?
23        A.    When I was named acting chief of
24   staff in the attorney general's office, the
25   New York Times did a write-up, and they
```

```
 1    described me in two sentences.  The second
 2    sentence was, "She's the daughter of powerful
 3    Albany lobbyist ███████████."
 4              Whenever people wrote articles
 5    about anything that I was doing, they would
 6    always tack on a line -- sorry, I, like, get
 7    emotional about it -- tack on a line about,
 8    like, who my father was and --
 9         Q.   Do you want to take a break?
10              MR. HECKER:  Do you want take two
11         minutes?
12              THE WITNESS:  No, it's okay.  I'm
13         okay.
14         A.   So anyways, it was just -- it was
15    unwanted attention.
16         Q.   And when you told Mr. -- are you
17    sure you don't want to take a break?  When you
18    told ████████ that you did not want to take
19    the position because the focus would be on
20    your father, what did he say to you?
21         A.   He said that in life, if you were
22    going to advance, you had to be prepared to
23    take hits and keep going, and that if you
24    showed people who you are, that's all that
25    would ultimately matter.
```

```
1              And so, like, he wanted to push
2    me to do it.  I'm okay.  I'm okay.  I'll get
3    it together.  Give me just one second.
4         Q.    Did you talk to anyone else about
5    taking the position or not taking the
6    position?
7         A.    Yeah.  ████  my husband.
8         Q.    Other than ████  did you talk to
9    anyone else about it?
10        A.    My father.
11        Q.    Okay.  And tell us about the
12   conversation with your father.
13        A.    He thought I was crazy not to do
14   it.  He was like, "You would be the first
15   woman secretary.  You've earned it.  You're
16   smarter than everyone.  You wake up earlier.
17   You run faster.  You jump higher.  Like, you
18   should -- you would be crazy.  This is, like,
19   one of those things you get in life and, you
20   know, you always have that."
21        Q.    Did that change your mind?
22        A.    It was encouraging but I still
23   wasn't completely sold.  And then I had a
24   conversation with the governor and ████
25   together where they, sort of, tag-teamed me,
```

```
 1   and they were like, "You're going to do this,

 2   and you're going to be great."

 3        Q.    Tell us about the conversation

 4   that you had with ████████ and the governor.

 5        A.    They were saying that I was the

 6   only -- they were like, "You aren't, like, an

 7   option, you are the option.  Like, you already

 8   in a lot of ways play the role internally.

 9   People respect you.  When you speak, everybody

10   listens.

11              "Like, you're so assertive.  You

12   have good judgment.  You look around and you

13   can see where the policy is going.  You know

14   how to move legislators.  You know how to deal

15   with press.  Like, this is what you should be

16   doing.

17              "And then you do this, and for

18   the rest of your life, you've done this.  And

19   you don't have to do it forever, but it's

20   something that you really can't pass up."

21        Q.    "Did you raise to -- in front of

22   the governor the concern about your father and

23   the focus on your father if you took the role?

24        A.    He and I have had many

25   conversations about that over the years.
```

```
 1          Q.    And tell us about --
 2          A.    It's not all that dissimilar to
 3   his situation with his father.  So he's
 4   another, you know, voice who always says to
 5   me, like, you can't spend all of your time
 6   worrying about how people are going to judge
 7   you vis-à-vis your dad.
 8          Q.    Anything else you remember the
 9   governor saying during that conversation?
10          A.    No.  They were just very
11   supportive.
12          Q.    Other than being concerned about
13   the focus being on your father if you took the
14   role, did you raise any other concerns about
15   taking the position?
16          A.    Well, I mean, for half a second,
17   I was like, I already work so much.  I'm going
18   to have to work so much more.  But that was,
19   sort of, like, a joke because there was no way
20   to work more than I already was working.  It
21   was just going to be a little bit different.
22          Q.    Did you say that, though?
23          A.    Yeah.
24          Q.    Okay.  What did they say in
25   response?
```

```
1          A.    You're young.  This is when
2    you're supposed to work.  You know, public
3    service has a shelf life at a certain point.
4    You go into the private sector and make lots
5    of money, and you go on vacations and you read
6    a book, but that's not what you're supposed to
7    do at this point in your life.
8          Q.    I can't tell whether you're
9    telling this is what the governor and
10   ████████████ said to you or this is what you're
11   saying about your view.  So --
12         A.    No, this is what they were saying
13   to me.
14         Q.    Okay.  All right.  So how does
15   the conversation with ███████████ and the
16   governor end?
17         A.    I said, "Okay.  I will do it."
18               And ████████████, you know,
19   celebrated because he got to go back to
20   Blackstone and get on a plane to Bermuda.
21         Q.    Did you negotiate salary at that
22   point?
23         A.    No.  Actually, █████ said to me,
24   "You're going to be getting the salary that I
25   have."
```

1        Q.     And what was the salary that ███

2    got?

3        A.     I don't remember.  It might -- it

4    was like ███, ███, but it wasn't a discussion.

5    ███ was like, "You will get the salary that I

6    have."

7        Q.     You didn't ask for more than he

8    got?

9        A.     No.

10        Q.     Did you remember talking to

11    anybody else about -- other than people that

12    we've talked about about taking the role of

13    secretary to the governor?

14        A.     No.  I mean, frankly, it was a

15    small circle, because I didn't want it to

16    leak.  So ...

17        Q.     How long between the first ask

18    and you saying okay?

19        A.     A couple of weeks.  It started,

20    like, in the middle of March, probably.  And I

21    think I accepted the middle of April, and we

22    announced it the end of April.

23        Q.     And what changed going from chief

24    of staff to being secretary to the governor?

25        A.     There was a lot more focus on the

```
 1    agencies, which I didn't really love out of
 2    the gate, in terms of, you know, all of a
 3    sudden I'm thrust into negotiating the capital
 4    plan for the MTA and dealing with New Jersey
 5    on Port Authority matters, you know, dealing
 6    with DEC and DOH when Hoosick Falls happened.
 7              It just -- it became a lot less
 8    about the day-to-day on the governor's
 9    movements and the events and the comms and the
10    politics and a broader shift to the actual
11    running of government.
12         Q.    Did you still have legislative
13    affairs, intergovernment affairs, policy, and
14    comms reporting to you?
15         A.    No.  Those went under Jill.
16         Q.    Okay.
17         A.    We -- well -- oh, I'm sorry.  I
18    think first Linda got that title, and then we
19    named Jill chief of staff when Linda went to
20    DFS.  So for a short period of time, Linda
21    became chief of staff.
22              And I actually think when Linda
23    became chief of staff, we sort of redid the
24    roles, and we shifted those over to Jill as
25    deputy executive secretary.
```

1              And then a short time after that,

2    Linda became head of DFS, and we promoted Jill

3    to chief of staff, which was a very

4    well-deserved promotion.

5          Q.    When you say "Linda," you mean

6    Linda Lacewell?

7          A.    I'm sorry, Linda Lacewell.

8          Q.    And you say "we promoted."  When

9    you say "we promoted," who do you mean?

10          A.    I mean the organization at large,

11    but I consulted the governor on those moves,

12    of course.

13          Q.    And was that in your capacity as

14    secretary to the governor, consulting him on

15    those changes?

16          A.    Yes.

17          Q.    Okay.  So is that part of the

18    role of secretary of the governor?

19          A.    Yes.  Not always but, I mean, we

20    were talking about the governor's chief of

21    staff, yes.

22          Q.    So high-level changes in roles?

23          A.    Yes.

24          Q.    Okay.  So any other aspects of

25    being secretary to the governor that we

1    haven't covered?

2         A.    No.  I mean, it really is just

3    you're responsible for the day-to-day

4    functioning of government.  I don't really

5    know how to be more specific than that.  It's

6    not really -- you know, it's like being chief

7    of staff to the White House.

8         Q.    Maybe we can flesh it out a

9    little bit.  Who did you report to?

10        A.    The governor.

11        Q.    Who reports to you?

12        A.    The chief of staff, state

13   operations director, senior advisors, policy

14   director, and the deputy executive secretary.

15        Q.    Who doesn't report to you?

16        A.    Everybody else.

17        Q.    Who does that include?

18        A.    So the dep secs, which a dep sec

19   is a deputy secretary.  They each have a

20   portfolio.  So there's, like, a dep sec for

21   Health and Human Services, and they have

22   Aging, OTDA, DOH.  And they all report up to

23   them.

24              So it's like there's 56 agencies.

25   So it's broken up by portfolio.  And then

1   those commissioners report up to a dep sec.

2   The dep secs then report to the state

3   operations director, and the state operations

4   director reports to me.

5              And I had comms director, which

6   wasn't necessarily traditional, but --

7        Q.    So just hold -- let's pause

8   there.  So actually, the dep secs do report to

9   you?

10       A.    Well, no.  They report to ███

11       Q.    Through the state operations

12  director?

13       A.    Yeah.  Yes.

14       Q.    Okay.  So I'm trying to figure

15  who --

16              MR. HECKER:  Do you mean direct

17       reports as opposed to indirect reports?

18       Q.    Anyone who doesn't have a chain

19  of reporting that ultimately goes to you.

20       A.    Everyone does.

21       Q.    Okay.

22       A.    Except counsel.

23       Q.    Who does counsel report to?

24       A.    Directly to the governor and

25  Stephanie Benton, or executive assistant.

```
 1          Q.     She reports directly to the
 2   governor?
 3          A.     Yes.
 4          Q.     Are there any counsel roles that
 5   reported to you?
 6          A.     No.  It all flows up through
 7   counsel's office.  And that's a statutory
 8   position.
 9          Q.     What's the protocol for being in
10   communication with the governor?
11          A.     What do you mean?
12          Q.     So is there a protocol for
13   communicating with the governor?
14          A.     I don't understand the question.
15          Q.     Is there a protocol for getting a
16   meeting with the governor?
17          A.     You would ask, like, ██████
18   ████████████ who is our current chief of staff.
19   If she wants a meeting with the governor, she
20   will ask Stephanie, she'll ask me, she'll ask
21   the scheduler.
22                 You go to one of the people that
23   talk to him the most directly, and you say,
24   "This person's requested a meeting."
25                 In a perfect world, it all flows
```

```
 1   through the scheduler.  But that's not how it
 2   always happens.
 3        Q.    Okay.  So the other ways that it
 4   happens are you can either go through the
 5   scheduler, you can go through you --
 6        A.    You go through the secretary, go
 7   through the scheduler, or you go through
 8   Stephanie, who's his executive assistant.  But
 9   ideally, the protocol is you go through the
10   scheduler to avoid mayhem.  I'll, like, do
11   one-offs.
12        Q.    Say that again?
13        A.    I said I'll do, like, one-offs,
14   but it's not -- you can't run an operation
15   like that.
16        Q.    What's a one-off?
17        A.    The head of the AFL-CIO calls me
18   and says, "I really need to get the governor
19   on this Teamsters bill.  Can you get me five
20   minutes?"
21             And I'll go directly to him and
22   say, "▮▮▮▮▮▮▮▮▮ really wants to talk to
23   you.  Can you squeeze in five minutes?"
24             And he'll say, "Yeah, tell him
25   I'll call him in an hour."
```

1          And then I will tell the

2    scheduler and say, "FYI, had this

3    conversation, so at noon he's planning to call

4    ████████

5          But that's not the way it's

6    supposed to work.

7          Q.    Anyone else who can do that?

8    Anyone else who can do a one-off?

9          A.    Anybody else can in theory do a

10   one-off and sometimes people do.  The way that

11   the governor functions is he's a very flat

12   manager.

13          So if he runs into a deputy

14   counsel in the lobby of 633 and that person

15   raises a subject with him and says, "Governor,

16   I really want to make sure you have this thing

17   on your plate," he'll say, "Great.  Let's set

18   up a meeting on that, you know, call Jill."

19          And then I'll get a call from

20   that person's boss and say, "I'm so sorry.

21   This person saw the governor, asked for this

22   thing.  It's totally not baked.  Like, can we

23   undo this, or can we do a meeting quickly to

24   try to get ready for it?"

25          But he will, you know -- if given

1    the opportunity, he'll engage with anyone.

2    But it becomes mayhem if you run an

3    organization like that.

4            Q.    But that happens?

5            A.    It does.

6            Q.    Often?

7            A.    Not often but it happens.

8            Q.    Regularly?

9            A.    Sometimes.

10           Q.    What do you mean --

11           A.    I wouldn't say regularly.  I

12   would say it is the exception, not the rule.

13   But it happens.

14           Q.    But "exception," how often?

15           A.    I don't know, once a week.  Once

16   every couple of weeks.

17           Q.    So if you want to get a meeting

18   with the governor, you go -- you can have a

19   one-off -- right? -- you run into the governor

20   and you ask for a meeting or raise a topic

21   he's interested in.

22                 You could talk to Stephanie

23   Benton.  You could talk to you.  You could

24   talk to the scheduler.  Any other way to get a

25   meeting with the governor?

```
 1           A.    Those are the ways.  But again,
 2   like, if someone went to ████ who is our
 3   chief of staff, and said, "I really need ten
 4   minutes," ████ could, because she speaks to
 5   him all the time, raise it with him directly.
 6                We just as a team try to keep
 7   each other informed or do it in a uniform way
 8   to avoid craziness.
 9           Q.    So we just added the chief of
10   staff as someone who can -- you can go to to
11   get a meeting with the governor.  Anyone else?
12           A.    I mean, when you say "can," like,
13   again, like, any senior staff person, if ████
14   ████ were to see the governor, she could
15   say, you know, "We really need to do a meeting
16   with DOT."
17                She doesn't traditionally.  And
18   if she did, she would tell us beforehand or
19   flag it right afterwards.  It's not the usual
20   way.  But there are people that have access to
21   the governor.  Robert Mujica chiefly, Beth
22   Garvey.
23           Q.    So in the normal course of
24   events, if someone on the senior staff said
25   they wanted a meeting with the governor, said,
```

```
1    "We should talk about X with the governor,"
2    they should inform the scheduler afterward?
3         A.    Yes.  We do staff meetings every
4    day at 9 a.m., and traditionally on those
5    calls is a time where ████ who runs the call
6    right now, or I used to do it when I was chief
7    of staff, Jill did it when she was chief of
8    staff, will say, "Does anyone have anything
9    that they need to raise with the governor?"
10             And that's supposed to be the
11   opportunity when people say, "I really need to
12   get a meeting with him on X, Y, or Z," or "I
13   saw this person at an event, and they really
14   want to talk to him.  You know, I'll delegate
15   it down, but I think he should know that that
16   person wanted to reach out."
17             And then the scheduler is
18   responsible for going to him and saying,
19   "These five people want to meet with you."
20   And that's generally done, you know, on that
21   call.  We'll say, "No, no, no, that person
22   doesn't need that meeting.  Melissa will call
23   them back, or Robert will call them back."
24             But we'll all, sort of, agree as
25   a group which things actually need to be
```

1  raised to him so you keep the knucklehead

2  stuff off his desk.  And then it will go to

3  him through the scheduler or through the chief

4  of staff.

5      Q.    What are the roles that attend

6  the everyday 9 a.m. staff meeting?

7      A.    It's a senior staff meeting.  So

8  it's comms director, it's legislative affairs

9  director, it's policy director, it's state

10  operations director, it's counsel, it's budget

11  director.

12          I join when I can, which is, sort

13  of, how it's always been with the secretary.

14  Secretaries, like, join when they can.  So not

15  every single day.

16      Q.    Anyone else attend those

17  meetings?

18      A.    The scheduler.  Stephanie tries

19  to join when she can.

20      Q.    Anyone else?

21      A.    I may be missing somebody, but

22  not that comes to top of mind.  Press

23  secretary.

24      Q.    So we just, kind of, talked about

25  the way in which you get a meeting with the

1   governor.  What's the protocol for staffing

2   the governor?

3         A.    The -- it's sort of changed over

4   time.  But generally speaking, it was always

5   Jill.  I mean, whether she was scheduler,

6   whether she was chief of staff, whether she

7   was first deputy secretary, it was

8   primarily -- or whether she was -- I'm

9   sorry -- executive deputy secretary.

10              She was chiefly responsible

11   for -- I mean, we have a saying.  It's like,

12   in our office, you change jobs but it's like

13   you take your responsibilities with you, and

14   then you just get more responsibilities.

15              That had always, sort of, been

16   Jill's role since she was scheduler when I

17   first got there in 2013, and that was never

18   really a role that she shook.  So, you know,

19   we do staffing plan for any event.

20              If we do a meeting, you ask the

21   governor who he wants in the meeting, or you

22   ask the meeting lead who would be the

23   appropriate people to be in that meeting, and

24   then you run it by the governor to make sure

25   he's comfortable with that.

1     But it was really Jill who always

2 did it, and now it's ████ who has taken over

3 for Jill since ██████████.

4    Q. Maybe we should step back and

5 define staffing the governor.  So when you say

6 "staffing the governor," what do you mean?

7    A. I mean for any event that you do,

8 there's a staffing plan.  So who's the advance

9 person?  Who's the press lead?  Who's the

10 lights person?  Who's the sound person?

11     Who's the body person?  Who's the

12 person on the ground who gives him the

13 acknowledgement card?  There's a full staffing

14 plan.

15     In terms of staffing him, like,

16 in the capitol, it's traditionally Stephanie,

17 and then she has a couple of assistants who

18 sit outside of her desk in Albany and one

19 person who sits outside of her desk in New

20 York.  And it's generally Stephanie and then

21 with the support of whoever those people are.

22    Q. And if the governor needs

23 coverage or staffing outside of -- from the,

24 sort of, executive assistant perspective,

25 outside of normal working hours, recognizing

```
1    that maybe there aren't normal working hours,
2    how does that happen?
3           A.    So there's always, like, an
4    on-call list.  I've never been directly
5    involved in how it happens.  But from what I
6    understand, they will ask, you know, ▮EA #2▮
7    ▮EA #3▮  the briefers, anyone who is generally
8    around who's available this weekend or who's
9    available after seven, in case you need
10   somebody to either jump on the phone with him
11   and take dictation or go staff him while he's
12   writing his speech.
13               And so they, sort of, self-select
14   into who's available.  I know some people
15   prefer to do it because they have overtime and
16   it's more money.  And then some people are
17   just happy to do it because they live around
18   the corner.
19               You know, they are all friends
20   with each other, and so I think that they try
21   to coordinate with one another to be
22   respectful of each other's personal time.
23          Q.    How did you come to this
24   understanding?
25          A.    Just osmosis.
```

```
1          Q.    And when you said "EA #2    do

2    you mean EA #2           ?

3          A.    Yes.

4          Q.    And when you said "EA #3    you

5    mean EA #3           ?

6          A.    Yes.

7          Q.    Do you have any role in staffing

8    the governor?

9          A.    No.

10         Q.    Have you ever had input into who

11   was going to staff the governor?

12         A.    No.   Except if he's doing, like,

13   a PowerPoint.   The governor has a way, a

14   tendency of, in my opinion, caring about

15   things he shouldn't care about.   Like,      is

16   available.   That kid works every weekend.

17   Don't make him work this weekend.

18              Which I say, "But      is the

19   person who is best at PowerPoint.   So with all

20   due respect, I'm going to overrule you because

21   it will make my life and everyone else's life

22   easier if he is the person working with you."

23              So if there's a situation like

24   that, I may potentially intervene.   But

25   otherwise, no.
```

```
 1          Q.    So sometimes the governor has

 2    input into who is going to staff him?

 3          A.    Yeah.  He'll say, "Who can jump

 4    on the phone?"  I think that there are some

 5    people he's more comfortable with than others

 6    based on their skill level, based on their

 7    past performance.  If somebody doesn't do a

 8    great job once or twice, he doesn't -- he's

 9    not going to ask them back.

10               And then, you know, he's also,

11    like, very wary.  It's the same thing with the

12    mansion staff.  "Oh, I hate to have them

13    working this weekend.  Let them go home at

14    three."

15               "It's their job."

16               "No, but they have families."

17               He tries to be sensitive to other

18    people's schedules and personal lives.  And so

19    if Stephanie says or ____ says or Jill says

20    "So-and-so is available this weekend," he'll

21    say, "EA #2  and EA #3  work all the time.

22    Don't -- find somebody else.  Give them the

23    day."

24          Q.    How many times has that happened?

25          A.    It happens.  I wouldn't say it's,
```

```
 1   like, an every-week occurrence but it
 2   certainly happens.
 3           Q.    How do you know about it if
 4   you're not involved in staffing?
 5           A.    I'm cc'ed on pins with the draft
 6   in confidential that go out every night, and
 7   so generally those conversations that happen
 8   on those pins.
 9           Q.    We haven't covered this but
10   what's a pin?
11           A.    A pin is a direct message from
12   BlackBerry to BlackBerry.
13           Q.    Have you had a BlackBerry your
14   entire time as secretary to the governor?
15           A.    I've had a BlackBerry my entire
16   time in government, when I worked for Eric and
17   the entire time I've worked for the governor.
18           Q.    Did there come a point in time
19   where some people in the chamber switched from
20   BlackBerrys to iPhones?
21           A.    Yes.
22           Q.    And you kept your BlackBerry.  Is
23   that right?
24           A.    Yes.
25           Q.    Who else kept their BlackBerrys?
```

```
 1           A.      Anyone who communicates with the
 2   governor.
 3           Q.      And why is that?
 4           A.      So we were changing over from
 5   BlackBerry to iPhone because allegedly,
 6   although I just think Harold makes it up, the
 7   BlackBerry server was going to come down.  So
 8   it was no longer going to be an option.
 9                   So they started to transition the
10   chamber and the agencies from BlackBerrys to
11   iPhones in anticipation of that change
12   happening.  The governor is very
13   technologically inept.
14                   The thought of having to train
15   him on a new device was something that all of
16   us were very apprehensive about.  So we said
17   to Harold, "When is the drop-dead that the
18   governor has to change over?  And leave us,
19   like those of us who communicate with him on a
20   regular basis with BlackBerrys, and then when
21   he actually has to change over, we'll all
22   change over."
23                   So they issued us the iPhones.
24   It's what I mentioned to you earlier.  But
25   I've never turned it on.  So me, Robert
```

```
1    Mujica, Beth Garvey, Rich Azzopardi, Peter

2    Ajemian before he left, Stephanie, the

3    scheduler, █████ there's a handful of senior

4    staff that kept their Blackberrys with the

5    anticipation of when the governor switched

6    over to the iPhone, that's when we would all

7    switch over to the iPhone.

8              But Howard was bluffing and the

9    iPhone server was not going down.  And so we

10   still have them.  Although as recently as a

11   month ago, he tells me "For real this time

12   it's happening soon."

13        Q.    You say Harold was bluffing, and

14   then I think earlier you -- so you didn't

15   trust Harold's advice on this point?

16        A.    I mean, I love Harold, of course

17   I do.  But he kept saying that the BlackBerry

18   was going to stop working one day, that one

19   day we would turn on our BlackBerrys and they

20   wouldn't work.

21              And I was like, "Okay, Harold.

22   Well, when that day comes will be the day that

23   we move over to the iPhone."

24        Q.    Other than the governor being

25   technologically inept, is there any other
```

1   reasons that he and the team -- the senior

2   staff kept their BlackBerrys?

3          A.     No.

4          Q.     Why does this governor use pin

5   messages?

6          A.     It's a secure way to communicate.

7          Q.     And by "secure," what do you

8   understand that to mean?

9          A.     It doesn't go across servers.

10         Q.     And what's the advantage of it

11  not going across servers?

12         A.     Well, we have had several hacks

13  at my time being secretary to the governor.

14  Just before COVID, for example, an agent of

15  the Iranian government actually hacked into

16  the New York State server.  Our technology is

17  terrible.

18              Harold has been trying his best

19  to transition all of us over, but it's very

20  vulnerable.  And we communicate on highly

21  sensitive topics routinely.

22              And what Harold had told us

23  always was that the pin to pin was the most

24  secure way to communicate.  So if God forbid

25  there was a hack, it wasn't something we had

```
 1   to worry about.
 2           Q.    So how do you tell staff that
 3   they should communicate confidential
 4   information on pin?  How does everyone know
 5   that?
 6           A.    It's not confidential
 7   communication.  It's like, instead of texting,
 8   you pin.  If -- there's a document retention
 9   policy that the state dictates on certain
10   documents that have to be retained.  It's
11   mostly official memos.
12               But beyond that, there's no
13   requirement to save anything, and so it
14   doesn't matter.  Unless you're under
15   litigation hold or you're involved in a
16   lawsuit.
17           Q.    Sorry, maybe I didn't make myself
18   clear.  So you were saying that the reason
19   that you wanted to use pin messages or the
20   executive chamber uses pin messages is because
21   they're more secure and to prevent
22   confidential information from being hacked?
23           A.    And just generally sensitive
24   information.  You're communicating with the
25   governor.  You're communicating with the
```

1    budget director.

2         Q.    Right.  And so how did staff

3    understand what they should and should not

4    communicate over pins versus what they should

5    communicate over e-mail?

6         A.    Well, people that were

7    communicating with the governor primarily

8    communicated over pin.  I, if I was

9    communicating with Jill or Rich or Peter or

10   Stephanie, would maybe send a pin.  A pin has

11   a different noise and a pin stands out.

12              I get inundated with thousands of

13   e-mails every single day.  And so the pins

14   were sort of easier to flag.  And when they

15   came in, it was more like, this is an internal

16   communication you need to respond quickly.

17        Q.    Okay.  So now I understand.  You

18   guys are using pin messages both because

19   they're more secure and because the noise is

20   more obvious.  Is that right?

21        A.    It's not just that.  But it's

22   like, for me, for my organizational stuff.

23   Like, when I see my e-mail, I'll see 2,000

24   e-mails.  And I may not scroll through them.

25              If I see a pin, I'll look at it

 1    immediately because I know it's Jill or Peter

 2    or Stephanie or the governor or somebody

 3    communicating, and it's something I should get

 4    back to.

 5             Q.    Right.  Circling back, though, so

 6    what I was asking about is you explained to

 7    that you're using pin messages because you're

 8    concerned that other modes of communication

 9    were not as secure.  Correct?

10             A.    No.  I said it is a secure mode

11    of communication.

12             Q.    Okay.  But then you gave me an

13    example about the New York State server being

14    hacked.  Right?

15             A.    Right.  I understand you guys

16    don't like pins.

17             Q.    I didn't say I liked pins or

18    didn't like pins.  What I'm trying to

19    understand is, when you're using pins because

20    they're more secure, what is the executive

21    chamber communicating about the use of other

22    communications devices?

23             A.    Well, there's a lot of people

24    that don't have BlackBerrys, and so you just

25    use e-mails.  Some people use text message.

1    You're not supposed to use your personal

2    e-mail in order to communicate about

3    government-related matters.  So that's

4    supposed to stay on your executive e-mail.

5            Q.    Okay.  And so when people are

6    using e-mails, are you giving them

7    instructions about being sensitive around the

8    kind of information they communicate over

9    e-mail?

10           A.    I'm not giving anyone instruction

11   over what they're communicating over e-mail.

12           Q.    Is there any guidance given to

13   anyone in the executive chamber about using

14   e-mail and --

15           A.    When you first --

16           Q.    -- sorry -- and being sensitive

17   to issues around confidentiality?

18           A.    When you first come into the

19   chamber, you have a -- what is it

20   called? -- you go through an orientation where

21   you do a training.  And then every year, I

22   believe that there's a training that you get

23   on ITS matters.

24               But people are responsible to

25   understand the document retention policy and

```
 1   what memos or specific things have to be saved
 2   and archived, and otherwise you're, sort of,
 3   free to do whatever you want.
 4            Q.    Okay.  You're free to do whatever
 5   you want.  So you're explaining to me that the
 6   concern is that -- you have the concern that
 7   if you don't use your BlackBerry, it's not as
 8   secure.  So what is --
 9            A.    I understand that using the
10   BlackBerry --
11            Q.    Can I finish the question?
12            A.    Well, because I think you're
13   mischaracterizing what I said.
14            Q.    Let me just finish the question.
15   Okay?
16            A.    Yup.
17            Q.    Let me just finish the question.
18                  MR. HECKER:  And when you finish
19            this question, can we just take five?
20            We've been going, like, an hour and 15.
21                  MS. KENNEDY PARK:  Yeah, sure.
22            Q.    So you said that you're using the
23   Blackberry because it's more secure.  So I'm
24   asking:  Did anyone in the executive chamber
25   do anything to communicate to executive
```

```
 1    chamber staff how to use less secure forms of
 2    communication to protect sensitive
 3    information?
 4            A.    I don't understand the question.
 5            Q.    Okay.  So you told me that you
 6    were using the BlackBerrys in order -- because
 7    they were more secure.  Right?
 8            A.    Mm-hmm.
 9            Q.    And you were concerned that
10    information that wasn't on the BlackBerry
11    could be hacked, for example.  Right?
12            A.    Mm-hmm.
13            Q.    Right.  So what did the executive
14    chamber do to communicate to people about
15    using communications devices other than
16    BlackBerry pin to keep them secure?
17            A.    I don't think anything.
18            Q.    Okay.  And did anyone in the
19    executive chamber, for example, tell anybody
20    there's certain topics you shouldn't
21    communicate over e-mail about because they
22    could be hacked?
23            A.    I know that the health -- like,
24    certain agencies have concerns about certain
25    sensitive information with identifying numbers
```

```
 1   for, like, DOH, for example.
 2            I know the tax department has
 3   certain restrictions over what they'll send
 4   over e-mail and not send over e-mail.  But
 5   it's traditionally something that's involved
 6   in someone's personal identifying information
 7   which, if were to get out into the public,
 8   could be very damaging.
 9        Q.   Okay.  Did anyone in the
10   executive chamber explain to anybody what
11   topics they should communicate about using
12   pins and what topics they --
13        A.   No.
14        Q.   -- and what topics they could
15   communicate using other communications
16   methods?
17        A.   No.  It's just the standard.  If
18   you're talking about government things, it
19   should be on your government device.  It
20   should be through pin.  It should be through
21   your executive e-mail.
22            And then to the extent that you
23   were texting about it, you had to be prepared
24   to have to turn that over, like, all of your
25   texts over, because our executive BlackBerrys
```

```
 1   don't have text message.  The function is

 2   disabled.  So there is no ability to text on

 3   that.

 4              So inevitably, I mean, you could

 5   choose not to.  But a lot of people text on

 6   their iPhone, but you're told that if you do

 7   that, you have to be prepared that, should

 8   there be a foil or should there be a

 9   litigation, that you have to turn your iPhone

10   over.

11        Q.    Did you ever give any

12   instructions to anyone on topics that they

13   should not use e-mail communications to

14   communicate about?

15        A.    Not that I can recall

16   specifically.

17        Q.    Did you ever give anybody

18   instructions that they had to use BlackBerry

19   pin messages to communicate about certain

20   topics?

21        A.    No.

22              MS. KENNEDY PARK:  We can take a

23         break.

24              MR. HECKER:  Thanks.

25              THE VIDEOGRAPHER:  The time is
```

```
 1           10:18 a.m.  This concludes Media 1.  Off
 2        the record.
 3               (Recess taken from 10:18 a.m. to
 4        10:31 a.m.)
 5               THE VIDEOGRAPHER:  The time now
 6        is 10:31 a.m.  This begins Media 2.  On
 7        the record.
 8    BY MS. KENNEDY PARK:
 9           Q.   Ms. DeRosa, before the break, we
10    were talking about your role and what you did
11    and did not have oversight of.
12               What was your role as secretary
13    to the governor with the PSU?
14           A.   The PSU primarily works with the
15    scheduler and Stephanie.  It's largely a
16    coordinating function, where he's going, when
17    he's going, we need the helicopter, you know,
18    we should have a driver on standby.
19               And I talked to -- you know, when
20    Vinny Straface was the head of the PSU while I
21    was secretary, I would chat with him regularly
22    when I saw him.  I don't have any, like,
23    oversight function of the PSU.  But I would
24    see them obviously constantly.
25           Q.   Okay.  As secretary to the
```

1   governor, did you have any role in any of the
2   hiring decisions for the PSU?
3           A.      I don't think hiring decisions.
4   I think sometimes they will run things by me
5   and say, you know, we're going to do this, and
6   I will say okay.  But I'm not making decisions
7   about the PSU.
8           Q.      What kinds of things would they
9   run by you?
10          A.      There was a period where there
11  was a lot of transition on the PSU.  There
12  were a bunch of members who wanted to go do
13  investigative work.  And so they were
14  relocating them.
15                  And Vinny would say, you know,
16  "For this position, I've got this person.
17  They've staffed a bunch of events before.  If
18  you saw them you'd know them."  You know, just
19  talking through what the changes were.
20          Q.      And --
21          A.      But I don't know any of them,
22  like, individually enough to ever really weigh
23  in in a meaningful way.
24          Q.      Was there any issue with PSU that
25  you ever weighed in on in a meaningful way?

1          A.      I don't think so.

2          Q.      Any transfer decisions you ever

3     weighed in on?

4          A.      I don't think so.

5          Q.      Any firing decisions you ever

6     weighed in on?

7          A.      I don't think so.  ████████  was

8     head of the PSU for a period of time.  And

9     I -- when he said he was going to quit, I

10    tried to convince him to stay longer because I

11    was concerned that there wasn't enough

12    transition time to get somebody properly

13    trained up.  So I had a one-on-one

14    conversation with him.  But otherwise, nothing

15    that comes to front of mind.

16         Q.      Any policy decisions you ever

17    weighed in on?

18         A.      I don't think so except when

19    COVID happened of having the governor drive

20    himself and how they would leave the cars and

21    sanitize the cars before he got in.

22         Q.      And tell us about what is the

23    change with the governor driving himself?

24         A.      The governor used to be driven by

25    a PSU member, and it would be a PSU member and

1    another member of the detail in the car, and

2    the governor would sit in the front seat.

3              When COVID happened, obviously we

4    were trying to limit the governor's exposure

5    to anyone.  And so the governor started

6    driving himself, and I talked to Vinny about,

7    you know, when a trooper would drive a car to

8    someplace where the governor would then get

9    it, that they would wipe down the steering

10   wheel and wipe down anything that anyone could

11   have potentially touched, because early on it

12   was, like, we were especially unclear on the

13   transmissibility of the virus.

14        Q.    Did Mr. Straface object to the

15   governor driving himself?

16        A.    Straface, no.

17        Q.    Was there any debate about the

18   governor driving himself?

19        A.    Not that I recall.

20        Q.    Did you have any input in any

21   policies regarding how long someone had to be

22   in service before they could join the PSU?

23        A.    No.

24        Q.    Are you aware of any changes that

25   were made to the policy regarding how long

1    someone had to be in service before they could

2    join the PSU?

3           A.    Only because of a press inquiry.

4           Q.    Okay.  And what was that press

5    inquiry?

6           A.    There was a Times Union press

7    inquiry back in December, and they raised

8    exactly that point, which I was unfamiliar

9    with.  And I believe the answer was that there

10   had been a change that was made in a prior

11   administration.

12          Q.    And what was the change that had

13   been made?

14          A.    I think it shortened the length

15   of time that somebody needed to be a member of

16   the state police before they could be

17   considered for the protective unit.

18          Q.    And when you say "prior

19   administration," what do you mean?

20          A.    Like the Paterson administration

21   or the Spitzer administration.

22          Q.    And how did you come to

23   understand that the prior administration had

24   shortened the time that you had to be in

25   service before joining the PSU?

```
 1          A.    Because in the context of that
 2   press inquiry, I asked ▮▮▮▮▮▮▮ and Vinny
 3   Straface.
 4          Q.    And what did ▮▮▮▮▮▮▮ tell
 5   you?
 6          A.    I don't remember if it was ▮▮▮▮
 7   or Vinny who told me, but they said yes, there
 8   had been a policy change years prior on the
 9   length of time that someone had to serve in
10   order to be considered for the PSU.
11          Q.    Did they tell you what year that
12   change was made?
13          A.    I'm sure they did at the time,
14   but I don't recall off the top of my head.
15          Q.    Did they tell you why that change
16   was made?
17          A.    No.
18          Q.    Did you ask them?
19          A.    No.
20          Q.    What information was conveyed
21   back to the Times Union reporter?
22          A.    The Times Union reporter was
23   calling about a particular detail member, this
24   woman, Trooper #1.  And they had had a source
25   that said that the governor saw her on a
```

```
 1   bridge and then said, "Hire her."

 2                   So I called Vinny and said, "What

 3   happened here?  We have to get back to this

 4   reporter."

 5          Q.    And what did Vinny tell you?

 6          A.    Vinny said that's not what

 7   happened at all.  There was an event.  I don't

 8   remember if it was, like, an RFK event or a

 9   Kosciusko Bridge event.  It was some event in

10   the city.

11                   It wasn't, like, that they

12   saw -- like, the way that the Times Union

13   reporter portrayed it was, like, you saw

14   someone at a traffic stop, and you were, like,

15   hey, like, you know, chicky, get in the car,

16   kind of thing.

17                   It was like -- no.  It was an

18   event that there was in the city.  She was a

19   lead trooper on the ground.  I think she was

20   member of Troop NYC, which is the state police

21   troop in the city, and that she had been on

22   the ground doing the event.

23                   She had done the advance work,

24   and she had done the event work that day, and

25   that she was really talented and direct and
```

```
 1   spoke assertively and had, like, a great

 2   presence about her in terms of, like, being

 3   able to understand where the governor was

 4   going to move and how the troopers needed to

 5   move in response to that, and that she was

 6   very good and that Vinny said at the time, "We

 7   should hire her."

 8         Q.    So Vinny told you it was his

 9   decision to hire her?

10         A.    Yes.

11         Q.    And he was the one who

12   recommended her to get hired?

13         A.    Yes.

14         Q.    And what was her name?

15         A.    Trooper #1   I don't know her last

16   name.  I believe she's still on the detail.

17         Q.    Still on the governor's detail?

18         A.    Yeah.

19         Q.    And what year was this?

20         A.    I think -- and, like, thus the

21   recollection, and again, this is, like, in the

22   context of getting information for a press

23   inquiry, so this isn't from my original

24   memory, I think it was 2018.

25               And I think Vinny said that at
```

1    the time, he had said to me that he wanted to

2    do this.  And I said, "Great.  More women on

3    the detail.  There's, you know, absolutely no

4    diversity or gender balance on the detail.  So

5    if you think this person is great, great."

6         Q.    So after the Times Union reporter

7    called in December of 2020, Mr. Straface told

8    you that he had consulted you about her

9    hiring?

10        A.    Yes.  He said, "I told you about

11   it at the time, and you thought it was great

12   to increase the gender balance."

13        Q.    And what was the connection

14   between Trooper #1        and this policy change

15   I was asking about?

16        A.    I don't think there was any

17   connection.  The Times Union believed that

18   there had been a change made for that purpose,

19   and it became pretty clear that they had a

20   source who was feeding them bad information.

21   And once they understood that, they didn't run

22   the story.

23        Q.    Anything else Mr. Straface told

24   you about Trooper #1        ?

25        A.    No.

1          Q.    Did he tell you how many years
2    she had been in service prior to joining the
3    PSU?
4          A.    No.  And I didn't ask.  I got the
5    information that was relevant to respond to a
6    press inquiry and didn't have any further
7    discussion about it.
8          Q.    It wasn't relevant how long she
9    had been on PSU, when one of the questions
10   being asked was whether there was a change in
11   policy --
12         A.    She met the criteria --
13               MS. KENNEDY PARK:  Can you just
14         wait until I finish --
15               THE WITNESS:  Sorry.
16               MS. KENNEDY PARK:  -- because
17         she's going to go crazy if we don't do
18         that.
19         Q.    -- so whether there had been a
20   change in policies shortening the time someone
21   had to be in service before joining PSU?
22         A.    It wasn't relevant because the
23   change in policy had occurred in a prior
24   administration.  So the way that the source
25   had been conveying it to the Times Union was

```
 1    to appear nefarious, as if there had been a
 2    policy exception made for this one person,
 3    when in reality that change had been made
 4    years prior.
 5         Q.    Anything else you remember about
 6    the conversation with -- I'm going to call him
 7    Vinny for ease of this discussion -- Vinny?
 8         A.    No.
 9         Q.    You said            .   You spoke
10    to him as well.  What did you speak to
11    about?
12         A.    I don't recall.  I just
13    remember -- like, any time there's -- we have
14    incoming about the state police, I make sure
15    that the head of the state police is aware.
16              But I don't think that --
17    just became the head of the state police.  And
18    so I don't think he had any specific
19    information about it.  I think it was -- Vinny
20    had the information.
21         Q.    Why were you handling this press
22    inquiry?
23         A.    Rich Azzopardi came into my
24    office and said, "The Times Union just called
25    about this issue," and it made me really mad.
```

1           Q.     And why did it make you mad?

2           A.     Because I thought it was sexist.

3           Q.     Why did you think it was sexist?

4           A.     Because the perception I had was

5    that some trooper went to the Times Union and

6    tried to say that this woman only had her

7    position because she was attractive.  And so I

8    said, "Let's get Vinny on the phone and get

9    the facts," and Vinny gave me the facts.  And

10   when I learned the facts, I got even more

11   angry.

12          Q.     Did you convey that to the Times

13   Union?

14          A.     I did.

15          Q.     What did you tell them?

16          A.     I said, "You don't have your

17   facts straight.  This woman, from everything I

18   hear, is strong, smart, incredibly qualified,

19   and does a phenomenal job.  And you guys are

20   trying to reduce her hiring to being about her

21   looks.  And that's what men do.

22                 "If there is an attractive woman

23   seemingly near any male-dominated field, you

24   assume it has something to do with either

25   their attractive level or who they are

```
 1   sleeping with."
 2        Q.    That's what you said to the Times
 3   Union?
 4        A.    Yes.
 5        Q.    And what did they say?
 6        A.    Casey Seiler actually agreed and
 7   said he wasn't going to run the story, that
 8   clearly they had a bad source.
 9        Q.    Did you look for any documents
10   related to the policy around how long someone
11   had to be in service before joining the PSU?
12        A.    No.
13        Q.    After that phone call with the
14   Times Union, have you had any other
15   conversations about that policy?
16        A.    No.
17        Q.    Had you looked at any documents
18   about that policy?
19        A.    No.
20        Q.    After that call from the Times
21   Union, have you had any conversations with
22   anyone else about a trooper named Trooper #1?
23        A.    No.  Only with counsel.
24             MR. HECKER:  No, she's not asking
25        about that.
```

1          Q.     Other than conversations with

2     counsel, have you had any conversations with

3     anyone about a trooper named Trooper #1?

4          A.     No.

5               MR. KIM:  Can I ask a question?

6               MS. KENNEDY PARK:  Yes.

7               MR. KIM:  Have you talked to the

8          governor about the inquiry?

9               THE WITNESS:  About the press

10          inquiry?

11               MR. KIM:  Yeah.

12               THE WITNESS:  I notified him

13          after it was dealt with.

14               MR. KIM:  After you -- they

15          reported back?

16               THE WITNESS:  After Casey told me

17          that he wasn't going to run the story, I

18          told the governor what -- he said to me,

19          "What's going on?  I hear you getting

20          animated in your office," because our

21          offices are, like, connected through a

22          suite.

23               And he said, "What's going on?  I

24          could hear you getting animated."

25               And I said, "This is so crazy.

```
 1        The Times Union called and then I spoke

 2        to Vinny and it was" -- I, like, you

 3        know, gave him a summarized version.

 4               And then the governor called

 5        Casey Seiler.

 6               MR. KIM:  Himself?

 7               THE WITNESS:  Yeah.

 8               MR. KIM:  And what did he say?

 9               THE WITNESS:  He said, "Don't get

10        mad at Melissa for being so amped up.

11        This is one of those topics that sends

12        her off a cliff," and they, like, had a

13        nice talk about the holidays.

14               I was like -- I only know that

15        because then Casey called me back and

16        said, "It's an unusual day when you're

17        the bad cop and he's the good cop."

18               MR. KIM:  Did you talk to him

19        about the way in which this trooper,

20        Trooper #1, was hired?

21               THE WITNESS:  No.  I, like -- it

22        was more of a just straight retelling of

23        this is what happened, and this is what

24        Vinny told me, and I dealt with it and

25        the story is not going to run.
```

```
1              MR. KIM:  Did he say anything
2       about how Trooper #1 was hired?
3              THE WITNESS:  No.  He just said,
4       "Get Casey Seiler on the phone."
5              MR. KIM:  But that's the extent
6       of the conversation that day?
7              THE WITNESS:  Yeah.
8              MR. KIM:  How about after that?
9       Any conversations with the governor
10      about Trooper #1
11             THE WITNESS:  No.  There wasn't a
12      reason.  I hadn't even, you know,
13      remembered who Trooper #1 was until the
14      press inquiry.
15             MR. KIM:  Have you seen her
16      since?
17             THE WITNESS:  If Trooper #1 is who I
18      think she is, I think I saw her.  We had
19      an event for a bill signing on the tenth
20      anniversary of marriage equality, and I
21      think she was at the event.
22             MR. KIM:  Have you ever spoken to
23      her?
24             THE WITNESS:  I'm sure in
25      passing, hello, goodbye.  But I don't
```

1              really -- I'm not, like, a small talk
2         person.
3              MR. KIM:  Thanks.
4              MS. KENNEDY PARK:  Turn to
5         Tab 160 in the binder.  We'll mark this
6         as the next exhibit.
7                   (Exhibit 3, The New York Times
8         article entitled "Who Can Say 'No' to
9         Cuomo?  Melissa DeRosa, His Top Aide,"
10        dated May 14, 2020, marked for
11        identification, as of this date.)
12   BY MS. KENNEDY PARK:
13        Q.    Do you want to take a look at it?
14        A.    I'm familiar with the article.
15        Q.    And if I'm right, this is an
16   article in the New York Times from May 14,
17   2020, the title of which is "Who Can Say 'No
18   to Cuomo?  His Top Aide, Melissa DeRosa."
19             Did you speak to any reporters in
20   advance of this article being published about
21   this article?
22        A.    Ruth La Ferla I spoke to.  Like,
23   I did an interview.
24        Q.    And did you know that Lis Smith
25   was being interviewed by Ms. La Ferla?

```
1            A.    Yes.

2            Q.    How did you know that?

3            A.    Because Ruth asked ██████████,

4    who was managing article, for friends of mine,

5    colleagues who knew me well that she could

6    speak to.

7            Q.    Did you speak to Ms. Smith in

8    advance of this article being published about

9    the article?

10           A.    Yeah.

11           Q.    And tell us about that.

12           A.    I just said, "Thank you so much

13   for talking to her.  I really appreciate it.

14   I'm nervous about this piece coming out, and

15   I'm grateful that you're talking to her."

16           Q.    Did she tell you what she told

17   Ms. Ferla?

18           A.    I'm sure that she did, but

19   I -- the specific conversation doesn't,

20   like -- it wasn't anything so significant that

21   I recall.

22           Q.    Were you involved or consulted

23   about any fact checking on this article?

24           A.    After the fact, when they ran it,

25   there was a mischaracterization of my
```

1    husband's role at Uber.  And so we talked

2    about how to get that fixed.  And a press

3    person from Uber called the Times and they

4    updated it.

5           Q.    In advance of the article being

6    published, were you given a preview of the

7    article?

8           A.    No.

9           Q.    Were you consulted in advance of

10   the article being published about any fact

11   checking for the article?

12          A.    No.

13          Q.    Did you work with anyone in

14   advance of this being published on the fact

15   checking?

16          A.    I don't know what you mean by

17   that.  I did an interview and then they pulled

18   from the interview, and they clearly had done,

19   like, a clip job on other stories about me.

20                And if they had questions, they

21   worked with ██████████.  And if she had a

22   question about something, she would ask me.

23          Q.    Who is ██████████?

24          A.    ██████████ used to work for us.

25   She does communications, social media.  She's

```
 1   a good friend.  She worked for us a few years
 2   ago.  She left the administration and then
 3   during COVID came back to help.
 4            Q.    When you say "us," you mean she
 5   worked at the executive chamber?
 6            A.    Yes.
 7            Q.    And where does she work now?
 8            A.    She's currently not working.
 9            Q.    Other than the
10   mischaracterization of what your husband's
11   role is at Uber, were there any other factual
12   inaccuracies in this article?
13            A.    I don't remember.  I don't think
14   so.
15            Q.    Okay.  In this article, Lis Smith
16   is quoted as saying:
17                  "'If you're an Albany lawmaker
18            and you get a call from Melissa DeRosa,
19            you're essentially getting a call from
20            the governor.'"
21                  Is that accurate?
22            A.    I mean, that's a perception from
23   people.
24            Q.    Is that accurate?
25            A.    No, it's not accurate.  Some
```

1   people I think have that perception.

2          Q.    And what's not accurate about it?

3          A.    The governor and I are not the

4   same person.  And if the governor is calling

5   you, the governor is calling you.  If I'm

6   calling you, I'm calling you.  It's not the

7   same.

8          Q.    Have you ever made a call that

9   the governor didn't know about?

10         A.    Sure.

11         Q.    Did you ever make a call that you

12  lied to the governor about?

13         A.    I don't think so.

14         Q.    It goes on in the bottom of the

15  article to say:

16                "'It is not easy to match his

17         confidence.'"

18                Do you see that sentence?  Oh,

19  you have to go back to the first page.

20  "Confidence."

21                MR. HECKER:  Sorry, where are you

22         pointing?

23         Q.    "'It's not easy'" --

24                MS. KENNEDY PARK:  The second

25         paragraph from the bottom.

```
 1          Q.     (Reading):
 2                 "'It's not easy to match his
 3          confidence, his sense of control during
 4          those briefings, but she does,'
 5          Ms. Smith said.  'She is by no means a
 6          "yes" woman.  As you may imagine, he
 7          does not relish hearing no.'"
 8                 Is that an accurate description
 9   of the governor, that he doesn't relish hearing
10   no?
11          A.     I think that any person in power,
12   you know, there's a give and take.  But I
13   actually think that the governor takes
14   constructive criticism well and asks for it
15   all the time.  He actually doesn't like people
16   who just "yes" him.
17          Q.     Who does he take constructive
18   criticism from well?
19          A.     Senior staff people that he
20   respects, outside advisors who he respects,
21   longtime friends.
22          Q.     Then why, when Ms. Smith said,
23   "As you may imagine, he does not relish
24   hearing no," why didn't you correct that as
25   factually inaccurate?
```

1           A.    It's a quote.  I mean, you'd have

2    to ask her about it.

3           Q.    Did she preview for you that she

4    was going to say that?

5           A.    No.

6           Q.    If you turn to the next page, the

7    second paragraph from the bottom.

8           A.    Mm-hmm.

9           Q.    It says:

10               "Ms. DeRosa is known to be

11          unyielding in her support of the

12          governor."

13               Is that an accurate

14   characterization?

15          A.    I am very supportive of the

16   governor, yes.

17          Q.    Are you unyielding in your

18   support of the governor?

19          A.    I don't know if I'd use that

20   characterization.

21          Q.    How would you characterize your

22   support of the governor?

23          A.    I'm very supportive of the

24   governor.  I don't really understand the

25   question.

```
 1          Q.    It says --
 2          A.    I understand what it says, but I
 3   don't really understand the question.  I'm
 4   very supportive of the governor.
 5          Q.    You can put that binder aside.
 6          A.    We're not going to talk about
 7   Karen?  She's right there on the page.
 8          Q.    We'll talk about Ms. Hinton later
 9   today.
10                In the executive chamber, do
11   you -- you talked earlier about
12   training -- right? -- when you joined the
13   executive chamber.
14                What kind of training do you
15   receive?
16          A.    When you first come onboard, you
17   do, like, an onboarding, and you get a
18   training on all kinds of different topics
19   that's required.
20          Q.    Who does the onboarding?
21          A.    Lauren Grasso does it now, but,
22   you know, I think she's had that job for a
23   couple of years.  There have been different
24   people who have had that job over the years.
25          Q.    Who did your onboarding?
```

1           A.    I don't remember.

2           Q.    And what does the training cover?

3           A.    There's ethics training, there's

4    ITS training, there's sexual harassment

5    training.  And the trainings have grown over

6    the years as we've added additional

7    components.  There's now, like, a gender

8    identity training.

9           Q.    So you're not -- you just said

10   that the onboarding includes sexual harassment

11   training.  Is that right?

12          A.    Yes.

13          Q.    So when you got onboarded, did

14   you get sexual harassment training?

15          A.    Yes.

16          Q.    Okay.  And tell us about that

17   training.

18          A.    It was so long ago.  I don't

19   remember if I took it on a PowerPoint -- like

20   on a video at that point or if I used the --

21   there's like a packet that they give you that

22   you read, and then you certify that you've

23   read.

24          Q.    And you don't remember when you

25   onboarded which one you did?

1          A.     No.

2          Q.     Have you ever done the video

3     training on sexual harassment?

4          A.     I've done the video training on

5     ethics a couple of times.  I don't remember if

6     I also did the sexual harassment one early on,

7     but certainly not for a few years.

8          Q.     Do you understand that the sexual

9     harassment training is a yearly requirement?

10          A.     Yes.

11          Q.     Have you completed it every year

12     you've been in the executive chamber?

13          A.     I believe that I have.  Although,

14     I know through this process that they don't

15     have records of everything.  But I don't know

16     if that's because I didn't do it or it's a

17     record retention issue.

18          Q.     When was the last time you did

19     the sexual harassment training?

20          A.     In May.

21          Q.     When do you normally do the

22     sexual harassment training?

23          A.     There's generally a deadline and

24     our assistants are pretty good about standing

25     over you until you do it.  So whenever, you

1   know, you're coming up on the deadline, you

2   get constant reminders.

3           Q.    What's the deadline?

4           A.    I actually don't know.

5           Q.    Is it at the end of the year?

6           A.    I think so but I'm not sure.

7           Q.    Who would know?

8           A.    Lauren Grasso.

9           Q.    So was the deadline in May?

10          A.    No.

11          Q.    Did you do sexual harassment

12  training in May of this year?

13          A.    Yes.

14          Q.    And why did you do that?

15          A.    The assistants had all of the

16  different trainings printed out, and they were

17  offering them up to people, and I said, "I

18  should just get this done now."

19          Q.    Did you understand why the

20  assistants had all the trainings printed out?

21          A.    I think the people were becoming

22  more aware of everything, obviously given the

23  situation.  And we didn't do any trainings in

24  2020 because of COVID.  And so I think that

25  there was a bigger push earlier on.

1          Q.    Did you have any role in the

2    executive assistants bringing out the sexual

3    harassment training and other trainings in May

4    of this year?

5          A.    I don't think so.

6          Q.    Did you instruct anyone to do the

7    sexual harassment trainings in May of this

8    year?

9          A.    I don't think so.

10         Q.    Were you involved in any

11   conversations in which it was discussed the

12   need to do sexual harassment trainings in May

13   of this year?

14         A.    I don't think so.

15         Q.    You said, I think, that there's a

16   video option and then there's a paper option?

17         A.    Mm-hmm.

18         Q.    Can you tell me who gets to do

19   the paper option and who does the video

20   option?

21         A.    I believe senior staff gets the

22   option to do the paper -- the, like, packet

23   that you read and then certify.

24         Q.    Okay.  And why does senior staff

25   get the option to do the packet?

```
1            A.    Because everyone's schedules are

2    so fluid that when they schedule the

3    trainings, there was this constant issue of

4    people missing them.  And so this was a way to

5    ensure that people were absorbing the material

6    or reading the material if they couldn't make

7    one of the trainings.

8            Q.    The video sessions have to be

9    scheduled?

10           A.    The video sessions are scheduled,

11   yeah.

12           Q.    You can't just click and do it at

13   your leisure?

14           A.    I have no idea but, earlier on, I

15   know that they were scheduled.  And to this

16   day, like, the ethics one, for example, like,

17   there's a scheduled time slot when you can do

18   it.

19           Q.    Okay.  And is -- to your

20   understanding, the sexual harassment trainings

21   were also on some sort of schedule?

22           A.    Yes, I think so.

23           Q.    Were you a part of the decision

24   to offer the sexual harassment training to

25   senior staffers in paper form?
```

1          A.    I don't think I was a part of the

2    decision.  I think maybe I was notified, but

3    I'm not even sure what year it happened.

4          Q.    And you told me earlier you

5    thought there might be a paper trail problem

6    with you doing your sexual harassment

7    training.  Why don't you turn to Tab 146 of

8    your binder.

9                (Exhibit 4, Certification for

10          mandated sexual harassment training from

11          January 4, 2016, marked for

12          identification, as of this date.)

13                MS. KENNEDY PARK:  We'll mark

14          this as the next exhibit.

15          Q.    Tab 146 is, it looks like, your

16    certification from January 4, 2016, for the

17    sexual harassment trainings.  Right?

18          A.    It appears that way.

19          Q.    And on that date you certified

20    that you had read the course material.  Is

21    that right?

22          A.    Mm-hmm.

23          Q.    And that you had completed the

24    learning activities.  Do you see that?

25          A.    I see that it says that.

```
 1            Q.    What learning activities did you
 2    complete?
 3            A.    I don't remember.
 4            Q.    Have you ever completed learning
 5    activities as part of sexual harassment
 6    training?
 7            A.    I don't remember.
 8            Q.    Have you completed any surveys as
 9    part of sexual harassment training?
10            A.    I mean, I remember reading the
11    scenarios.  Like, this person says this, this
12    person says this, and then you read through
13    the questions.  Is that what you mean, or is
14    it something separate than that?
15            Q.    Did you do that?  Did you read
16    through scenarios and then read through
17    questions about those scenarios?
18            A.    Yes.
19            Q.    And did you have to pick the
20    answers for those questions?
21            A.    You -- like it says, like, "yes
22    or no."  And then you just say continue to
23    read.
24            Q.    Okay.  And in the reading, does
25    it tell you what the right answers are to
```

1    those questions?

2          A.    Yes.

3          Q.    Okay.  And do you remember doing

4    that?

5          A.    Yes.

6          Q.    And you did that on January 4,

7    2016?

8          A.    I believe so.  If that's what was

9    required in that year, I know that I have done

10   that.

11         Q.    Okay.  Why don't you turn to the

12   next tab.  It's 147.

13              MS. KENNEDY PARK:  We'll mark

14         this as the next exhibit.

15              (Exhibit 5, Certification for

16         mandated sexual harassment training and

17         equal employment opportunity, rights and

18         responsibilities training from

19         December 14, 2016, marked for

20         identification, as of this date.)

21         Q.    This appears to be your

22   certification of having done two trainings,

23   one is the mandated training on sexual

24   harassment in the workplace, and one is on

25   equal employment opportunity, rights and

```
 1   responsibilities.

 2              Is that right?

 3        A.    It appears that way.

 4        Q.    Okay.  And this is from

 5   December 14, 2016.  Do you see that date?

 6        A.    Mm-hmm.

 7        Q.    Okay.  Tell me what did you

 8   remember about the equal employment

 9   opportunity rights and responsibility

10   training?

11        A.    I don't remember from 2016.

12        Q.    Do you remember ever having taken

13   it?

14        A.    Yes.

15        Q.    And what do you remember about

16   the contents of it?

17        A.    It's about employee fairness and

18   how you treat one another in the office and

19   you make sure that you're not discriminating.

20        Q.    And was there a

21   question-and-answer part of that training?

22        A.    I don't remember.

23        Q.    Do you remember anything that was

24   different about this sexual harassment

25   training than the one you took in January of
```

1   that year?

2           A.     I don't remember.

3           Q.     Go to Tab 245.

4                  (Exhibit 6, Certification for

5           mandated sexual harassment training,

6           dated May 5, 2021, marked for

7           identification, as of this date.)

8                  MS. KENNEDY PARK:  We'll mark

9           this as the next exhibit.

10          Q.     This is a certification from

11  May 5, 2021, signed by you, to the 2021

12  mandated sexual harassment training in the

13  workplace.  Is that right?

14          A.     Yes.

15          Q.     And this is the training we were

16  just talking about that you took in May of

17  this year.  Is that right?

18          A.     Yes.

19          Q.     And do you remember reading the

20  course material?

21          A.     Yes.

22          Q.     And how is that course material

23  any different than course material you studied

24  previously on sexual harassment?

25          A.     I don't remember.

```
 1            Q.     And do you remember what the
 2    learning activities were for this course
 3    material?
 4            A.     It was the questions.
 5            Q.     The hypotheticals you were just
 6    telling me about?
 7            A.     Yeah.  Yes.
 8            Q.     Okay.  There's no certification
 9    that's been produced for training for you for
10    the years 2018 and 2019.  Did you take sexual
11    harassment training in 2018?
12            A.     I think so.  But there's no
13    record of it, so I can't be certain.
14            Q.     Okay.  And how would the record
15    have gotten lost?
16            A.     I don't know.
17            Q.     Did you take sexual harassment
18    training in 2019?
19            A.     I think so.
20            Q.     And there's no record of it.
21    Have any idea of what happened to that record?
22            A.     No idea.
23            Q.     Do you have an actual memory of
24    taking the training in 2019?
25            A.     I have memories of my assistants
```

1    every year coming in and saying, "We have to

2    make sure that this gets done."  So I don't

3    know why it wouldn't have happened in those

4    two years.

5           Q.    And are your assistants

6    responsible for making sure you sign the form

7    after you've completed the training?

8           A.    I don't know that they're

9    responsible for it, but they've, like, taken

10   on that responsibility.

11          Q.    And who does the certification go

12   to?

13          A.    I believe to Lauren Grasso.

14          Q.    Any reason to believe she threw

15   out your certification?

16          A.    I don't know that there was,

17   like, meticulous attention to record retention

18   or that it didn't happen.  But I find it hard

19   to believe that, when these things come around

20   and everyone is very focused on we have to

21   meet these deadlines, that it wouldn't have

22   happened.

23          Q.    So you believe the training

24   happened in 2018 and 2019?

25          A.    Yes.

```
1              Q.    Didn't happen in 2020.  Right?

2              A.    No.

3              Q.    And why didn't it happen in 2020?

4              A.    In COVID we suspended a lot of

5    the mandated rules and responsibilities around

6    these trainings.

7              Q.    And why did you do that?

8              A.    Because we were battling a global

9    pandemic and no one had a minute to breathe.

10             Q.    When was it -- that suspension

11   lifted?

12             A.    I don't remember.

13             Q.    Who was involved in the decision

14   to make the suspension?

15             A.    Beth Garvey and I'm sure myself.

16             Q.    And who was involved in the

17   decision to lift the suspension?

18             A.    Same.

19             Q.    And tell us about why you made

20   the decision to lift the suspension.

21             A.    Well, it wasn't a specific

22   decision to lift the suspension.  As COVID

23   improved, we just began lifting all kinds of

24   suspensions, unless they were absolutely

25   necessary to fight the pandemic.
```

**Melissa DeRosa - Highly Confidential**
**July 05, 2021**

1    Q.    And do you remember when the

2  suspension on training was lifted?

3         A.    No.

4         Q.    Did you ever talk to the governor

5  about the suspension on training?

6         A.    No.

7         Q.    Did you ever talk to the governor

8  about lifting the suspension on training?

9         A.    No.

10        Q.    What do you know about the

11 governor having taken sexual harassment

12 training?

13        A.    Same, similar situation.  I know

14 that every year we have to do the trainings,

15 and I know that Stephanie would go in there

16 and make sure that he read the packet and

17 signed the certification.

18        Q.    How do you know that?

19        A.    Because I've gotten the question

20 in the context of press inquiries.

21        Q.    Okay.  And what was the question?

22        A.    "Did the governor take a sexual

23 harassment training?"

24        Q.    Okay.  And who did that come

25 from?

1          A.    I don't remember originally.  It
2    may have been Norah O'Donnell.
3          Q.    And what did you do to find out
4    the response to that inquiry?
5          A.    I asked Stephanie and the
6    governor.
7          Q.    Okay.  And what did Stephanie
8    tell you?
9          A.    That every year she would get a
10   reminder about the trainings, and that she
11   would make sure to print out and give them to
12   him, and that he would review them and then
13   sign them, and then she would give them to
14   whoever, whether it be Lauren Grasso or
15   whoever had her role before that.
16         Q.    Did she watch him review them?
17         A.    No.
18         Q.    And what did the governor tell
19   you?
20         A.    That every year he would get the
21   trainings, and that he had to read a packet
22   and sign something.
23         Q.    Did she tell you that he did, in
24   fact, read the packet?
25         A.    Yes.  He said he believed that he

1    didn't remember a year when he didn't have to

2    do that.

3           Q.    And he said -- did he tell you

4    that he recalled the packet containing sexual

5    harassment training?

6           A.    Yeah.

7           Q.    Okay.  Did you --

8           A.    All of trainings.  I mean, we

9    generally do them all at once.

10          Q.    Did he tell you anything else

11   about the sexual harassment training?

12          A.    No.

13          Q.    Who went back to the reporter?

14          A.    I don't remember if it was me,

15   Peter, or Rich.  One of the three of us.

16          Q.    And what was the reporter told?

17          A.    That he completed the sexual

18   harassment training.

19          Q.    Was there any discussion about

20   whether the governor had signed his own

21   certification or someone else signed it for

22   him?

23          A.    No.

24          Q.    That question wasn't raised by

25   the press?

1        A.    I don't think so.

2        Q.    Is that something you talked to

3   Ms. Benton about?

4        A.    No.

5        Q.    Is it something you talked to the

6   governor about?

7        A.    No.

8        Q.    Have you talked to anyone about

9   that topic?

10        A.    I don't think so.

11        Q.    After the question from Norah

12   O'Donnell on whether the governor did his

13   sexual harassment training, has there been any

14   other discussions you've been a part of about

15   the governor doing his sexual harassment

16   training?

17        A.    No.   Again, like anything on this

18   topic, I feel like conversations were had

19   around the context of incoming press

20   inquiries.

21        Q.    I'm not sure -- what is that in

22   response to?

23        A.    You are asking about if there was

24   ever any other conversation around this.   So I

25   think the only other time there could have

1    been conversation around it is if there was an

2    additional press inquiry, but the answer

3    didn't change.

4            Q.    Okay.   Was there an additional

5    press inquiry about whether the governor had

6    done the sexual --

7            A.    I don't remember.

8            Q.    We just can't talk over each

9    other.

10           A.    Sorry, sorry.

11           Q.    Was there an additional press

12   inquiry about whether the governor had done

13   his sexual harassment training?

14           A.    I don't remember but there very

15   well may have been.

16           Q.    Okay.   Other than press

17   inquiries, were there any other conversations

18   you were a part of about whether the governor

19   had done his sexual harassment training?

20           A.    No, not that I recall.

21           Q.    Have you ever seen the employee

22   handbook?

23           A.    Yes.

24           Q.    Do you do training on the

25   employee handbook?

1          A.    I don't think so.

2          Q.    Does the equal opportunity

3    employment training that we just looked at,

4    does that cover the employee handbook?

5          A.    I don't remember.

6          Q.    Who's responsible in the

7    executive chamber for making sure that the

8    employee handbook is complied with?

9          A.    I don't know.

10         Q.    Do you have that responsibility?

11         A.    No.  I think that it's personal

12   responsibility.

13         Q.    Everyone in the executive chamber

14   either directly reports to you or indirectly

15   reports to you.  Is that right?

16         A.    Mm-hmm.

17         Q.    But you don't think you have

18   responsibility for ensuring that the employee

19   handbook is complied with?

20         A.    No.

21         Q.    Why don't we turn to Tab 153.

22               (Exhibit 7, Employee Handbook,

23         marked for identification, as of this

24         date.)

25         Q.    Before we look at the handbook,

1    does the governor have a role in making sure

2    that this handbook is complied with?

3           A.    I think that when you get the

4    handbook, you're supposed to certify that you

5    have read the handbook and that you will live

6    up to the responsibilities therein.  I think.

7           Q.    Did you do that?

8           A.    Eight years ago probably.  I

9    don't think it's something we do annually.  I

10   think it's something you do onboarding.

11          Q.    I apologize for interrupting you.

12                It's something that happens when

13   someone is onboarded to the executive chamber?

14          A.    I believe so, yeah.

15          Q.    And what is done within the

16   executive chamber to make sure that people do,

17   in fact, comply with their obligations under

18   the employee handbook?

19          A.    I don't think that that's how the

20   world works.  Like, you -- there's not one

21   person standing over someone's shoulder,

22   saying, "We have to make sure that you're

23   adhering to every single one of these things."

24                You're supposed to read it and

25   take your own role and personal responsibility

```
 1    to make sure you're adhering to it.

 2          Q.    Is there anyone who has

 3    responsibility for ensuring that the employee

 4    handbook is complied with?

 5          A.    I don't know.

 6          Q.    Is there any sort of compliance

 7    function within the executive chamber?

 8          A.    In which regard?

 9          Q.    In ensuring that the handbook is

10    complied with.

11          A.    There's lots of things in a

12    handbook.  Like, what specifically?  There's

13    an ethics officer.  There's somebody -- you're

14    supposed to clear things through counsel.

15    You're supposed to clear things through JCOPE.

16                I mean, there's not one person

17    that's charged with standing over someone's

18    shoulder and making sure that every line in

19    this book is adhered to, no.

20          Q.    So there are people who have

21    responsibility for ensuring that parts of this

22    handbook are complied with.  Is that what

23    you're saying?

24          A.    Sure.

25          Q.    Okay.  And who are the people who
```

1   have responsibility for ensuring that parts of

2   this handbook are complied with?

3          A.    Well, really it's really

4   yourself.

5          Q.    I think you just told me that it

6   was --

7          A.    Yeah, there's counsel.  If you've

8   got --

9                MS. KENNEDY PARK:  Hold on just a

10         second.

11               MR. HECKER:  Hey, Melissa, wait

12         for her question.

13         Q.    I think what you just told me

14   there's an ethics officer, there's counsel,

15   and now you're saying it's primarily yourself.

16               So, again, who has responsibility

17   for ensuring that parts of the employee

18   handbook are complied with?

19         A.    You're asking an open-ended

20   question when I think that there are specific

21   answers.  So there's someone that's supposed

22   to make sure that you do your trainings every

23   year.  That's Lauren Grasso.

24               It's supposed to be that, if you

25   have a potential conflict, that you run that

 1    through counsel's office, and that you get the

 2    okay through counsel's office and if that

 3    needs to be taken through JCOPE.  So there are

 4    different pieces.

 5              But I think ultimately people

 6    have personal responsibility.  Because it's

 7    not as if the counsel is standing over your

 8    shoulder, saying, "Did you do this, did you do

 9    this, did you do this" every day.

10         Q.    I'm not asking about someone

11    standing over your shoulder.  You said that

12    Lauren Grasso has responsibility for certain

13    aspects of the handbook, and that the

14    counsel's office has responsibility for

15    certain aspects of compliance with the

16    handbook.

17              Is there anyone else or any other

18    function that has responsibility for ensuring

19    compliance with aspects of the handbook?

20              MR. HECKER:  And just before

21         answering that, you may just want to

22         look at the table of contents so you can

23         see if that prompts a thought about

24         whether there are people who have

25         responsibility for aspects of this.

```
 1              A.     (Document review.)
 2                     These are all the different
 3    trainings that get broken out every year.  I
 4    think it's generally a supervisor who is
 5    supposed to make sure your employees are
 6    adhering to these.  There's not, like, a
 7    one-stop shop.
 8              Q.     Okay.  So supervisors have
 9    responsibility for ensuring that the people
10    they supervise comply with this handbook.  Is
11    that right?
12              A.     Yes.
13              Q.     Are you a supervisor in the
14    executive chamber?
15              A.     I am.
16              Q.     Okay.  So you have responsibility
17    for ensuring that the people you supervise
18    comply with this handbook.  Is that right?
19              A.     Yeah.
20              Q.     What did you do to ensure that
21    the people who you supervise complied with
22    this handbook?
23              A.     If an issue came to my attention,
24    I would make sure that it was addressed.
25              Q.     Can you give me an example?
```

```
 1          A.    No.
 2          Q.    No issues have ever come to your
 3   attention that raise --
 4          A.    Not top of mind.
 5          Q.    Can you wait for me to just
 6   finish the question, because then she's really
 7   going to get mad.
 8                There are no examples that come
 9   to your mind of issues that were raised to
10   your attention that called into question
11   whether this handbook was being complied with?
12          A.    Not top of mind.
13          Q.    Who's ████████████? 
14          A.    I don't know.
15          Q.    You've never heard the name
16   ████████████?
17          A.    I may have heard of it, but it
18   wasn't something that was -- sticks in my
19   mind.
20          Q.    Where did you hear the name?
21          A.    I don't know.
22          Q.    Where may have you heard the
23   name?
24          A.    I have no idea.
25          Q.    Who's ████████████?
```

1      A.      ███████████      is somebody who

2  worked on the floor doing health policy and

3  now works at the Department of Health.

4      Q.      How did he come to work at the

5  Department of Health?

6      A.      He was transferred to the

7  Department of Health after he had an issue

8  with me.

9      Q.      And what was the issue?

10     A.      We had a phone call about COVID

11  in schools.  He was responsible for making

12  sure that we had all of the updated

13  information and that compliance was occurring

14  statewide.

15              And there had -- you know, we did

16  these phone calls every day, every other day.

17  And after about half a dozen of them, when he

18  didn't have answers to any of the repeated

19  questions that he would get every morning, I

20  said, "I don't understand how it is that at

21  this point you don't have the answers to these

22  questions.  You're talking about matters of

23  life and death.  You're talking about people's

24  children.  And yet you come to these calls

25  every day completely unprepared.  And if you

1    can't do this, then we're going to need to

2    find somebody else who can."

3              And then following that, it was

4    relayed back to me that he, apparently after

5    the call, called me a number of things

6    including a bitch.  I got a phone call from a

7    lobbyist that said that he had said it to

8    multiple people, and that a bunch of the

9    lobbyists were talking about how ████████

10   ████████ was running around calling me a bitch,

11   and I believe ████████, who was someone that

12   he worked with, may have reported it.

13        Q.    When you say "reported it,"

14   reported it to who?

15        A.    I think told a supervisor but I'm

16   not sure who.

17        Q.    And you said he called you a

18   number of things.  What else did he call you?

19        A.    All I know specifically was bitch

20   but that was enough.

21        Q.    And after it was reported, what's

22   the next involvement you had with ████████

23   ████████

24        A.    I don't think I did.  I spoke to

25   Judy Mogul and Beth, and I told them what had

1    happened.

2          Q.    And what did you tell Judy Mogul?

3          A.    Exactly what I just told you.

4          Q.    And what did you tell Beth

5    Garvey?

6          A.    They were on the phone together.

7          Q.    Did you ask that he be

8    transferred?

9          A.    I said I didn't feel comfortable

10   with him working under me if, in reaction to

11   me asking him to do his job and pushing him on

12   questions of life or death, that his response

13   to that was to say I was a bitch and say it to

14   a number of people.

15         Q.    Did you ask for him to be removed

16   from the second floor?

17         A.    Yes.  I said I was no longer

18   comfortable with him.

19         Q.    Sorry.  You said --

20         A.    In that position.

21         Q.    -- you were no longer comfortable

22   with him, and you wanted him off the second

23   floor?

24         A.    I don't remember the exact words

25   that I used, but I said, "in that position."

1   So that's the sum and substance of the

2   takeaway.

3         Q.    Okay.  And him calling you a

4   bitch is the thing that made you

5   uncomfortable?

6         A.    Yes.

7         Q.    And then what happened?

8         A.    And then I believe that they

9   counseled him, and I think he requested the

10  transfer to DOH.

11        Q.    Okay.  When you say "counseled

12  him," what do you know about his counseling?

13        A.    I don't know anything about it

14  beyond the fact that Beth Garvey spoke to him

15  and I believe counseled him.

16        Q.    How do you know that Beth Garvey

17  spoke to him and counseled him?

18        A.    Because she told me afterwards.

19        Q.    Okay.  And what did she tell you

20  happened at the counseling?

21        A.    That he acknowledged it and that

22  he wanted the opportunity to apologize to me.

23        Q.    And what else did she tell you

24  happened at the counseling?

25        A.    Nothing.

1              Q.    Did he apologize to you?

2              A.    No.

3              Q.    Did you tell Ms. Garvey that you

4    did not want him to have that opportunity?

5              A.    I said it was unnecessary.

6              Q.    And why did you think it was

7    unnecessary?

8              A.    Because it was unnecessary.

9              Q.    Why was it unnecessary?

10             A.    It just was.

11             Q.    Can you help me understand that?

12   He had made you feel uncomfortable.  Why was

13   it unnecessary --

14             A.    Because I didn't think him

15   apologizing --

16             MS. KENNEDY PARK:  Sorry, we

17         just -- let me make sure she got the

18         question.  Hold on a second.

19             MR. HECKER:  Melissa, you got to

20         slow down.

21             THE WITNESS:  Okay.

22             Q.    I said, "Can you help me

23   understand why you think it was unnecessary?"

24             A.    It just -- I didn't think that an

25   apology would do anything to resolve the

1     situation.  It was what it was.  It was just

2     unnecessary.

3            Q.     But you thought transferring him

4     would resolve the situation?

5            A.     I thought that it was

6     inappropriate to have somebody who was working

7     for me, after having a difficult conversation

8     where they were held accountable, to then

9     react to that by running around and calling me

10    a bitch.

11           Q.     Did you talk to anyone else about

12    this incident with ███████████  other than

13    Ms. Mogul and Ms. Garvey and the lobbyist?

14           A.     Not that I recall.

15           Q.     Who was the lobbyist?

16           A.     ███████████ .

17           Q.     I think you said that ██████████

18    requested a voluntary transfer.  Is that

19    right?

20           A.     I think so.

21           Q.     How did you come to that

22    understanding?

23           A.     I think that's what Beth told me.

24    Or Judy.  One or the other.

25           Q.     Earlier you told me that one of

1   the purposes of the employee handbook is to

2   make sure people, I think you said, behave

3   appropriately.  We can go back and look.  But

4   words to the affect of behave appropriately in

5   the executive chamber and show respect.

6                Can you think of any other

7   occasions when you've been involved in a

8   situation where someone wasn't behaving

9   appropriately or with respect in the executive

10  chamber?

11          A.    Not off the top of my head.

12          Q.    Okay.  Do you know ███████████?

13          A.    Yes -- well, no.  But I know the

14  name.  I don't know him but I know the name.

15          Q.    Okay.  How do you know ██████

16  █████?

17          A.    He had an incident with

18  ██████████.

19          Q.    Okay.  And tell us about that

20  incident.

21          A.    I don't know anything about it.

22  I just know that there was a conference call

23  where I think that she asked a question, and

24  in response to that he called her ███████

25          Q.    And how did you come to that

1    understanding?

2           A.    Judy told me.

3           Q.    Why was Judy telling you?

4                 MR. HECKER:  Can we just

5           establish -- is that a privileged

6           conversation?  I just don't want to --

7                 MS. KENNEDY PARK:  I'm not aware

8           that it is.  But we can take a break,

9           and you guys can think about it.

10                MR. HECKER:  Do you know the

11          answer?

12                MS. CROWLEY:  Yeah, I think it

13          is.  Can we just take a break now?

14                MS. KENNEDY PARK:  Sure.  Why

15          don't we go off the record.

16                THE VIDEOGRAPHER:  The time is

17          11:16 a.m.  This concludes Media 2.  Off

18          the record.

19                (Recess taken from 11:16 a.m. to

20          11:22 a.m.)

21                THE VIDEOGRAPHER:  The time is

22          11:22 a.m.  This begins Media 3.  On the

23          record.

24    BY MS. KENNEDY PARK:

25          Q.    Before break we were talking

1    about ▮▮▮▮▮▮▮ and Senior Staffer #2 .  Can

2    you tell me what you know about that incident.

3              MR. HECKER:  Yeah, to the extent

4         the information is only through

5         discussions either with your counsel or

6         with Ms. Mogul, I instruct you those are

7         privileged discussions.

8              So you can talk about any other

9         discussions or information you have

10        independent of discussions with counsel.

11        Q.   Do you have any information about

12   the incident between ▮▮▮▮▮▮▮ and

13   Senior Staffer #2    that did not come either

14   through Judy Mogul or through your personal

15   counsel?

16        A.   No.

17        Q.   Okay.  Are you aware of any

18   occasions on which anyone in the executive

19   chamber made a report to GOER?

20        A.   Yes.  ▮▮▮▮▮▮▮, who was

21   formally our counsel, made a report to GOER

22   about an agency matter, but I can't recall the

23   specifics.  I think Jill may have done a

24   report to GOER on an employee, ▮▮▮▮▮▮,

25   years ago.

1           I'm sure that there are more, but

2    those are the only ones that come to top of

3    mind.

4           Q.   Okay.  Tell us about the report

5    to GOER that was made by ███████████.

6           A.   I don't remember.  I remember

7    that at some point in June she asked for a

8    conference call.  I don't remember what the

9    specifics of the incident were.

10          Q.   In June of what year?

11          A.   2020.

12          Q.   And you said it was related to

13   somebody at an agency?

14          A.   I believe so.  I don't think it

15   was an executive chamber employee.  I think it

16   was an agency matter.

17          Q.   You said she asked for a call.  A

18   call with whom?

19          A.   I remember this based on,

20   admittedly, like rereviewing documents.  So my

21   knowledge of that is not, like, a unique

22   memory.  It's from looking at e-mails.  It

23   was, I think, me and Judy and ███████ maybe

24   Beth, but I'm not 100 percent sure.

25          Q.   Okay.  And do you recall what you

1   were told on this phone call?

2        A.    I remember -- I don't remember

3   the exact incident of what occurred, but I

4   know that -- I believe that it resulted in the

5   person being referred to GOER, I think maybe

6   ultimately fired.  I don't know.

7        Q.    The person who was complaining

8   being referred to GOER, or someone else being

9   referred to GOER?

10       A.    No.  A person, like, that had

11  alleged to do something.  But again, I don't

12  remember any of the specifics.

13       Q.    Okay.

14       A.    So I don't want to say something

15  I don't know.

16       Q.    Was the governor briefed on

17  anything about this incident that ▮▮▮▮▮▮▮

18  was reporting on?

19       A.    No.

20       Q.    What was your understanding of

21  why that incident was being reported to GOER?

22       A.    I think it was a sexual

23  harassment incident, but I don't remember the

24  specifics.

25       Q.    Because it was a sexual

1   harassment incident, it was being reported to

2   GOER?

3          A.    Yes.

4          Q.    And is that consistent with your

5   understanding of what the employee handbook

6   requires?

7          A.    So from the training, from what I

8   understand, is that it can either go to GOER

9   or you can report it to your supervisor or you

10  can report it to counsel within your agency.

11             And then once one of those people

12  are aware, they can help you navigate.  But

13  ultimately GOER does sexual harassment

14  investigations.

15         Q.    Okay.  So ultimately it's GOER's

16  responsibility to do a sexual harassment

17  investigation?

18         A.    Yes.

19         Q.    So whether someone brings it to

20  you directly or brings it to their supervisor

21  or brings it to counsel, ultimately it reports

22  to GOER?

23         A.    Yes.

24         Q.    Okay.  And you say you came to

25  that understanding from the training?

1        A.     Yes.

2        Q.     When did that become your

3  understanding?

4        A.     Always.

5        Q.     The entire time you've been in

6  the executive chamber?

7        A.     I think so, yeah.

8        Q.     There's no point in time at which

9  the law changed regarding the reporting of

10  sexual harassment issues to GOER?

11        A.     I don't think so.   The

12  legislature has a different mechanism.   They

13  report to JCOPE.   I know that we changed the

14  law around the standard of sexual harassment,

15  but I don't think we changed the law around

16  the reporting mechanism.   But I might be

17  wrong.

18        Q.     Okay.   We'll come back to the

19  change in the law in a few minutes.

20             But then the second incident you

21  said you were aware of that went to GOER that

22  involved the executive chamber came through

23  Jill DesRosiers and was about ███████████.

24             Tell us about that.

25        A.     I think, and this was a long time

1   ago, but my -- I think that there was an

2   incident where ████████ had been on the road

3   at an event and invited somebody to his room

4   and answered the door wearing, like, boxer

5   shorts, with a drink in his hand.

6             And then that person I believe

7   went to Jill, and then Jill reported it.  I

8   think ██████ maybe quit or something.  I

9   think this led to his dismissal.

10        Q.    How did you become aware of this?

11        A.    I believe Jill briefed me at the

12  time.

13        Q.    And what was your understanding

14  as to why Jill was briefing you?

15        A.    Because this incident had

16  occurred and it needed to be dealt with.

17        Q.    And what was ████████ role?

18        A.    He -- I think he did

19  intergovernmental affairs but, like, our

20  regional position.  He was in her line of

21  command.

22        Q.    So he worked in the executive

23  chamber?

24        A.    I don't know if technically he

25  worked in the executive chamber or if he was

1    on an agency line, but he certainly did work

2    supporting the chamber.

3           Q.    Who was the complainant in that

4    situation?

5           A.    I don't remember.

6           Q.    Do you remember if it was an

7    employee of the executive chamber?

8           A.    It was certainly an employee.  I

9    don't know if it was of an agency or the

10   executive chamber.

11          Q.    What else do you remember about

12   Ms. DesRosiers telling you about that

13   incident?

14          A.    I remember just that, that she

15   told me about the incident and that ultimately

16   he was dismissed.  I don't remember if in the

17   between -- I don't know if he quit on his own,

18   he was fired.  I just don't remember the

19   details.

20          Q.    And she told you it was being

21   reported to GOER?

22          A.    I believe so.

23          Q.    Okay.  Did you brief the governor

24   on that incident?

25          A.    I think afterwards.  I think

1    after he was gone.

2         Q.    Okay.  And what did you tell the

3    governor?

4         A.    I don't remember specifically but

5    I assume -- well, I shouldn't assume.  I let

6    him know that he was gone.  I don't remember

7    how I conveyed the exact circumstances.

8         Q.    But did you tell him him being

9    gone related in some way to him having engaged

10   in the behavior you described?

11        A.    I don't think I was specific, and

12   I'm not even sure I said, "sexual harassment,"

13   but I think I told him it was a disciplinary

14   issue.

15        Q.    And was it your conclusion that

16   ██████████ had engaged in sexual harassment?

17        A.    It's not my job to interpret, but

18   it seemed like inappropriate behavior.

19        Q.    Let's go back to -- you said

20   there was a change in the law on sexual

21   harassment.  Tell us what you know about that

22   change in the law on sexual harassment.

23        A.    In 2019 we changed the law to go

24   from severe and pervasive to no longer having

25   to be severe and pervasive.  So it could just

1    be in the mind of the person who's being

2    harassed, like, if you feel uncomfortable.

3            Q.    Make sure I understand this.  So

4    before the law that was passed in 2019, in

5    order to be sexual harassment under New York

6    State law, the conduct had to be severe or

7    pervasive.

8            Is that right?

9        A.    Correct.

10           Q.    And the law that was passed

11   eliminated that requirement?

12       A.    Correct.

13           Q.    Okay.  And what was your

14   involvement in getting that law passed?

15       A.    I was a chief proponent of it,

16   through the Council on Women and Girls.

17           Q.    And what does it mean to be the

18   chief proponent of it?

19       A.    Internally, a lot of times

20   different staff people will take a lead on a

21   certain policy matter or issue area, and this

22   was one that I was very vocal on.

23           Q.    And why did you think this policy

24   change needed to be made?

25       A.    Conversations with stakeholders

```
 1    within the Council on Women and Girls, they

 2    thought that the standard legally was set in a

 3    way that discouraged reporting or that was too

 4    murky for plaintiffs to be able to come

 5    forward.

 6           Q.    Did you agree?

 7           A.    Yeah.

 8           Q.    And so, in part, you wanted the

 9    law to get passed to encourage reporting?

10           A.    I wanted the law to get passed so

11    that victims would be able to have an easier

12    time reporting.

13           Q.    And how does that law make it

14    easier for victims to report?

15           A.    It's not actually about the

16    reporting.  I guess that's the wrong word.

17    Just the standard, so that if there is an

18    incident of sexual harassment, that the

19    standard is lower so that people would be held

20    accountable in a different way.

21                 So it wasn't on the victim to

22    prove and, like, what does "severe and

23    pervasive" mean and have the courts

24    interpreted it.

25           Q.    What was the governor's role in
```

**Melissa DeRosa - Highly Confidential**
**July 05, 2021**

```
 1    this change in the law?
 2              A.    He signed the bill.
 3              Q.    Other than signing the bill, did
 4    he have a role in the change of the law?
 5              A.    I don't believe it was an issue
 6    that he personally negotiated.  I think that
 7    that was me and Alphonso David.  But obviously
 8    he was of -- like, always briefed on what we
 9    were doing, and that was a component of the
10    women's agenda that I spearheaded that year.
11              Q.    Do you remember briefing him on
12    this change in the law?
13              A.    I'm -- not specifically.  But I'm
14    sure it happened.  I'm sure that in the
15    context of negotiations -- I think we did it
16    in a budget -- we explained to him that this
17    was one of the things that we were moving
18    forward on.
19              Q.    Are there documents reflecting
20    that briefing?
21              A.    I don't think so.  They're
22    verbal, not written.
23              Q.    What do you remember about that
24    verbal briefing?
25              A.    I don't.  I mean, I just know --
```

```
 1    I just know that on high-level issues,
 2    especially when you're coming down to it at
 3    the end and it's, like, what are we going to
 4    get, what's falling off the table, that that
 5    would have been one that we mentioned.
 6           Q.    Did you brief him on why the law
 7    needed to be changed?
 8           A.    I think Alphonso briefed him on
 9    why the law needed to be changed, like, before
10    an event on it, to explain so he understood.
11           Q.    Do you know what event that was?
12           A.    I think we did a bill signing
13    with a bunch of the women's rights advocates.
14           Q.    Why don't we -- can you turn to
15    Tab 153?
16                 MR. HECKER:    153 again?   The
17           handbook?
18                 MS. KENNEDY PARK:    153.   The
19           handbook.
20                 MR. HECKER:    The same handbook?
21                 MS. KENNEDY PARK:    Yeah.
22           Q.    Turn to page 17.   So if you look
23    at the prior page, just so we're all oriented,
24    the prior page has "Sexual Harassment" at the
25    top.   This is a section of the handbook that
```

1    is on the definition of "sexual harassment."

2            Do you see that?

3        A.   Mm-hmm.

4        Q.   Okay.  And you see on the -- page

5    17 the definition of "hostile environment."

6    You see that?

7        A.   Yes.

8        Q.   Okay.  And the definition says:

9            "Hostile environment sexual

10           harassment includes, but is not limited

11           to words, signs, jokes, pranks,

12           intimidation or physical violence which

13           are of a sexual nature, or which are

14           directed at an individual because of

15           that individual's sex."

16           Did you understand that to be

17   part of the definition of sexual harassment

18   while you were working in the executive

19   chamber?

20       A.   (Reading):

21           "Which are directed at an

22           individual because of that individual's

23           sex."

24           I thought that there was also,

25   like, an unwanted component of that.

 1          Q.    That's a separate part of the

 2    definition on the prior page.  Do you want to

 3    look at that?

 4          A.    Sure.

 5          Q.    On the bottom of page 16, it

 6    says:

 7                "Sexual harassment includes

 8          unwelcome conduct."

 9                Do you see that?

10          A.    Mm-hmm.

11          Q.    So that's one part of the

12    definition.  On page 17, there's a different

13    part of the definition:

14                "Hostile environment sexual

15          harassment includes."

16                Do you see that?

17          A.    Yes.

18          Q.    Is that your understanding of a

19    part of the definition of sexual harassment

20    while you worked in the executive chamber?

21          A.    I know that there is sex-based

22    harassment, and then there is, like, quid pro

23    quo sexual harassment.  So I think this would

24    fall under the category of the sex-based

25    harassment.  Right?

```
 1            Q.    And do you know what hostile
 2    environment sexual harassment is?
 3            A.    Yes.
 4            Q.    Okay.   And is this the definition
 5    of hostile environment sexual harassment?
 6            A.    Yes.
 7            Q.    And so when you were working in
 8    the executive chamber, this was your
 9    understanding that part of -- this was your
10    understanding of the definition of hostile
11    environment sexual harassment?
12            A.    Yes.  I mean, I don't know it,
13    you know, word for word but the thrust.
14            Q.    Okay.   And when were you made
15    aware of this definition?
16            A.    I mean, I just have always known
17    what a hostile work environment is.   It's
18    just, like, a term that I'm aware of.   I don't
19    remember as, like, a moment -- you know what I
20    mean? -- like a moment where I became aware of
21    what that term meant.
22            Q.    This handbook, you said you read
23    it when you were onboarded.   Is that right?
24            A.    No.  I said you're supposed to
25    read it when you're onboarded.  I believe that
```

1    I had, like, went through it.  I don't know

2    that I can say I read it word for word.

3         Q.    But you told me you had to

4    certify that you had read this when you were

5    onboarded.  Is that right?

6         A.    That you had to review it, yes.

7         Q.    You told me that you had to

8    certify that you had read it.  Right?

9         A.    I think so.

10        Q.    Okay.  And you told me that you

11   had, in fact, certified that you read this

12   handbook.  Is that right?

13        A.    Yes.

14        Q.    Okay.  So you read this handbook

15   when you were onboarded?

16        A.    Yes.

17        Q.    Okay.

18        A.    I mean, a version of this.  I

19   think this is a 2018 version.  I don't know

20   how it changed from 2013.

21        Q.    Yup.  After you were onboarded,

22   have you had any occasion to review this

23   employee handbook?

24        A.    What do you mean, "had an

25   occasion"?

Melissa DeRosa - Highly Confidential
July 05, 2021

```
1              Q.    Was there a time when you looked
2    at it?
3              A.    I don't think so.
4              Q.    So since you were onboarded,
5    you've never looked at this employee handbook?
6              A.    I don't think so.  I think we
7    just do the annual trainings.
8              Q.    You told me there's no annual
9    training on the employee handbook.  Right?
10             A.    Sexual harassment has its own
11   training.
12                   MR. HECKER:  Hang on.  I don't
13             think there's --
14             Q.    You told me there's no annual
15   training on the employee handbook.  Correct?
16                   MR. HECKER:  Actually, she said
17             that the components of this are what
18             they train on.
19                   MS. KENNEDY PARK:  Let's ask the
20             question.
21             Q.    So is there a training on the
22   entirety of the employee handbook?
23             A.    I don't think so.
24             Q.    Okay.  There's sexual harassment
25   training.  Correct?
```

1          A.    Yes.

2          Q.    Okay.   So other than the sexual

3    harassment training, have you had occasion to

4    read this employee handbook since you were

5    onboarded?

6          A.    I don't think so.

7          Q.    If you go further on page 17,

8    into the fifth full paragraph, see the

9    sentence that begins "Furthermore"?

10               MR. HECKER:   Page 17?

11         Q.    Fifth paragraph, the last

12   sentence.   It begins "Furthermore."

13         A.    Yes.

14         Q.    Okay:

15               "Furthermore, any supervisory or

16         managerial employee who observes or

17         otherwise becomes aware of conduct of a

18         sexually harassing nature must report

19         such conduct so it can be investigated."

20               Did you understand this to apply

21   to you?

22         A.    Yes.

23         Q.    You are a supervisor or

24   managerial employee?

25         A.    Yes.

1          Q.     Is there any occasion on which

2     you have reported conduct of a sexual

3     harassing nature?

4          A.     Yes.

5          Q.     What was that occasion?

6          A.     There was a woman, ▮▮▮▮▮▮

7     ▮▮▮▮▮▮   who I believe was at DCJS, who, after

8     I gave a speech on sexual harassment, sent me

9     a letter detailing to me a situation that was

10    happening with her.  I consulted with counsel

11    at the time and referred it to the inspector

12    general's office.

13               When I became aware that

14    Charlotte Bennett said something at a bar

15    about an interaction she had with the

16    governor, I immediately called Judy Mogul and

17    reported it.

18         Q.     Any other occasions?

19         A.     Those are the two I remember

20    specifically.

21         Q.     Okay.

22         A.     Oh, and -- I'm sorry -- Brittany

23    Commisso.

24         Q.     Any other people?

25         A.     I don't know how Alyssa McGrath

```
 1    was handled.  I don't know if ultimately she

 2    was claiming sexual harassment or not.  But

 3    that was handled by counsel's office and I

 4    believe referred to the attorney general's

 5    office.

 6            Q.    Anyone else?

 7            A.    I think that's it.

 8            Q.    Okay.  Let's start with ██████

 9    ██████.  You said she worked for DCJS.

10    What's DCJS?

11            A.    It's a state agency that handles

12    criminal justice issues.

13            Q.    And what did the letter say?

14            A.    I don't remember.

15            Q.    Can you tell me the thrust of the

16    letter?

17            A.    I honestly don't even remember

18    except that the thrust was that she believed

19    she was the victim of sexual harassment.

20            Q.    And the victim of sexual

21    harassment by who?

22            A.    I believe it was her supervisor.

23            Q.    Do you remember any of the

24    details of what she alleged had happened to

25    her?
```

1           A.    I don't know.  If you asked me

2    four years ago, I could recall them, but I

3    don't remember.

4           Q.    And did this occur in 2017?

5           A.    2017 is when she reported it to

6    me.  I don't remember if it happened in real

7    time or if it had happened earlier.

8           Q.    So this was a letter you

9    received.  Was that a physical handwritten

10   letter?

11          A.    I think it was an e-mail.

12          Q.    On your executive chamber e-mail?

13          A.    Yes.

14          Q.    Have you seen a copy of that

15   e-mail recently?

16          A.    No.

17          Q.    And what did you do after you got

18   the e-mail?

19          A.    I went to Alphonso David, who was

20   our counsel at the time, and said, "I just

21   received this e-mail.  How -- what's the best

22   protocol to handle this?  Given that it's not

23   an executive chamber employee, they don't

24   report to me, but I have now become -- made

25   aware of the situation."

```
 1            Q.    And what did he tell you?
 2            A.    He advised that we refer it to
 3     the inspector general's office for
 4     investigation.
 5            Q.    Do you remember why he said to
 6     advise -- to go to the IG's office?
 7                 MR. HECKER:  Sorry, can we just
 8            pause for a second?
 9                 THE WITNESS:  Is this counsel
10            conversations?
11                 MR. HECKER:  This is while he
12            was --
13                 THE WITNESS:  Counsel?
14                 MR. HECKER:  -- counsel?
15                 THE WITNESS:  Yeah.
16                 MR. HECKER:  I think that's
17            privileged.
18                 MS. KENNEDY PARK:  All right.
19     BY MS. KENNEDY PARK:
20            Q.    Are you aware of how that
21     complaint was handled other than from Alphonso
22     David?
23            A.    You mean the aftermath?
24            Q.    Yes.
25            A.    I believe he -- the supervisor
```

1    was ultimately fired.

2         Q.    How did you come to know that?

3         A.    I think it was reported in the

4    paper.

5         Q.    Okay.  Did you brief anyone on

6    the letter from ███████████?

7         A.    No.  Except I think there was a

8    press inquiry about it.

9         Q.    And what did you say in response

10   to the press inquiry?

11        A.    I don't remember but I think in

12   that context, I had to talk to the

13   communications team about it.

14        Q.    In preparation for today's

15   testimony, did you look at any documents

16   related to ███████████?

17        A.    No.

18        Q.    Did you brief the governor on

19   ███████████?

20        A.    I think at the time I told him,

21   because it was right after I had given a

22   speech that this had come through and that he

23   might get a press question on it at an event,

24   and that the matter had been referred.  But I

25   don't believe I told him the specifics.

1        Q.    Meaning the specifics of what --

2        A.    The allegations.

3        Q.    -- ▮ had alleged had

4 happened to her?

5        A.    Yes, correct.

6        Q.    Any other conversations with the

7 governor about ▮?

8        A.    Not to my knowledge.

9        Q.    We'll come back to the other

10 three.

11        If you look at that same

12 document, let's turn to page 40.  Just so

13 everyone's following along, on page 40 there's

14 a section that has a bold heading that says

15 "Retaliation."

16        Do you see that?

17        A.    Mm-hmm.

18        Q.    Okay.  Were you made aware of

19 this section on retaliation as part of your

20 role in the executive chamber?

21        A.    I'm sure that I read it at some

22 point, yes, back when I onboarded.  And I

23 think it's also a part of the annual sexual

24 harassment training.  I think there's a

25 modified section on it.

1          Q.     Other than during your onboarding

2    when you read the employee handbook or during

3    the annual sexual harassment training, have

4    you had occasion to review this definition on

5    retaliation?

6          A.     I mean --

7                 MR. HECKER:  Outside discussions

8          with counsel.

9                 THE WITNESS:  No.

10         Q.     Outside of discussions with your

11   private counsel, have you had occasion to

12   review this definition of retaliation with

13   anyone in the executive chamber?

14         A.     I don't think this definition of

15   retaliation, no.

16         Q.     So is there any occasion, other

17   than the onboarding or the annual training,

18   where you looked at this definition of

19   retaliation?

20         A.     I don't think so, no.

21         Q.     Okay.  And at the bottom of page

22   40, it says:

23                "Adverse employment action.

24         Retaliation occurs when an adverse

25         action or actions is taken against the

1              employee by the employer.  The action

2              need not be job-related or occur in the

3              workplace.  Unlawful retaliation can be

4              any action, more than trivial, that

5              would have the effect of dissuading a

6              reasonable worker from making or

7              supporting a charge of discrimination."

8                    Did you understand that to be the

9       definition of retaliation while you've been

10      employed at the executive chamber?

11           A.    I don't know word for word but

12      the thrust.

13           Q.    You understood that that

14      substance was the substance of the law on

15      retaliation.  Is that correct?

16           A.    Yes.

17           Q.    And that this was the executive

18      chamber's policy on retaliation.  Is that

19      correct?

20           A.    The thrust of it, yes.

21           Q.    Okay.  And at -- flip over to the

22      next page.  It says:

23                    "Actionable retaliation by an

24              employer can occur after the individual

25              is no longer employed by the employer."

1          Did you understand that to be

2  part of the executive chamber's policy on

3  retaliation as well?

4      A.   Yes.

5      Q.   And it goes on to say:

6          "This can include giving an

7      unwarranted negative reference for a

8      former employee."

9          Did you understand that to be

10  part of the executive chamber's policy on

11  retaliation?

12      A.   I don't know specifically but the

13  thrust.

14      Q.   So you understood substantively

15  that an unwarranted negative reference for a

16  former employee could be a form of

17  retaliation?

18      A.   Yeah, unwarranted, yes.

19      Q.   You can go ahead and put that

20  aside.

21          What is the process for somebody

22  getting a transfer from the executive chamber

23  to a state agency?

24      A.   I think it's person by person.

25  There's no set process.

```
 1          Q.     And when you say "person by
 2   person," you mean you'll work it through
 3   individually with any person who wants to
 4   transfer to a state agency?
 5          A.     Not anyone who wants to, but if
 6   somebody wants -- you know, has an interest in
 7   going to an agency, either because it's less
 8   hours or it's an area of interest or they
 9   think it could be a better fit, if that person
10   is qualified and there's an opening available,
11   we're generally happy to facilitate that.
12          Q.     Does the executive chamber try to
13   place people into state agencies or generally
14   keep them in state government rather than
15   going to private?
16          A.     If they're, like, a good,
17   talented person and they say that they want to
18   leave, of course, you, like, lobby them to see
19   if you can keep them.  Public service
20   obviously doesn't pay as much as the private
21   sector, and when you have someone who is
22   skilled and talented, you want to try to hold
23   on to them.
24          Q.     Have you ever called a state
25   agency and asked them to, in substance, revoke
```

1  an offer that had been made to someone in the

2  executive chamber?

3          A.    I don't think so.

4          Q.    Have you ever called anyone in a

5  state agency and told them you wanted them to

6  stop trying to hire somebody from the

7  executive chamber?

8          A.    I don't think so.

9          Q.    Are you aware of either of those

10 things occurring on anyone else's behalf in

11 the executive chamber?  Meaning did somebody

12 else in the executive chamber do those things?

13         A.    Not specifically.

14         Q.    Generally?

15         A.    I know that when, like, earlier

16 in the administration, when Joe did personnel

17 matters, that sometimes that he would weigh in

18 on those kinds of things but not anything

19 specific.

20         Q.    When you say "Joe," you mean Joe

21 Percoco?

22         A.    Yes.

23         Q.    And what do you know about Joe

24 weighing in on those things?

25         A.    Nothing specific, just general,

1    that, like, he would get involved.

2              Q.     And get involved how?

3              A.     And decide whether or not he

4    thought people should be transferred into

5    agencies.

6              Q.     Okay.   Was there anyone specific

7    that you're aware of that Mr. Percoco decided

8    could not be transferred to a state agency?

9              A.     Not specifically.

10             Q.     Generally?

11             A.     I mean, just what I just told

12   you.

13             Q.     Okay.   How did Andrew Ball leave

14   the executive chamber?

15             A.     Which time?

16             Q.     How many times has he left the

17   executive chamber?

18             A.     He changed roles a number of

19   different times.

20             Q.     Within the executive chamber?

21             A.     I don't know if he was moved on

22   to agency lines during his time in the

23   executive chamber.

24             Q.     Are you aware of him leaving the

25   executive chamber?

```
1          A.     Yes.
2          Q.     What do you know about the
3    circumstances under which he left the
4    executive chamber?
5          A.     He had a really difficult time
6    after the Percoco case.  He had to testify.  I
7    think it was really hard on him
8    psychologically.  He -- following that was a
9    very disruptive force internally,
10   interpersonally, and in terms of substance.
11               And we kept trying to give him
12   different roles and nothing fit.  Nothing
13   worked.  And he spoke to Judy Mogul a great
14   deal during his time there in trying to figure
15   it out.
16               And then ultimately I sat him
17   down with someone named ████████████ and Jill
18   to try to come up with a new system for
19   events, where I made each of them a captain
20   and they would each have their own teams.
21               And I thought it would be really
22   productive for the governor, for Jill, for the
23   operations team.  I thought it would give each
24   of them a leadership opportunity to grow.  And
25   Andrew was not happy about that, and then
```

1    basically said that he wanted to leave.

2         Q.    And where did he want to go?

3         A.    Just go.

4         Q.    Did he want to go to a state

5    agency?

6         A.    I don't think so.

7         Q.    Is there any point at which

8    Mr. Andrew Ball expressed or you became aware

9    of him expressing a desire to go to the MTA?

10        A.    He wanted to go be -- I'm

11   sorry -- you're refreshing my memory.  He

12   wanted to go be chief of staff to ███████.

13        Q.    And why didn't that happen?

14        A.    Because he wasn't ███████.

15        Q.    And how did they come to

16   understand that he wasn't ████████?

17        A.    ████ didn't want to hire him as

18   his chief of staff.

19        Q.    How do you know that?

20        A.    Because I spoke to ██████

21        Q.    Okay.  Tell us about the

22   conversation with ████

23        A.    I don't remember it specifically,

24   but I know that ████ -- it was, like,

25   offboarding somebody at a certain point and

```
1    saying, like, will you take this person.
2              And he thought that Andrew Ball
3    was someone who ███████████████, and
4    that if he went over to the agency, that he
5    would be really ██████████.  And he would have
6    this big title, and that it wouldn't be
7    productive, and that he wouldn't be ████████
8    as his chief of staff in the agency.
9         Q.    So you were trying to convince
10   ████ to take Andrew Ball and he was resisting?
11        A.    Early on.  And I think I even
12   asked the two of them to sit down and have
13   coffee at one point.
14        Q.    And did they?
15        A.    I think so.
16        Q.    And so from your perspective, the
17   reason Mr. Ball did not get that position is
18   because ████ didn't want him to have the job?
19        A.    ████ didn't want him to have the
20   job.  It would have to be some other different
21   job.  And then I don't remember how it
22   ultimately came to a flat-out end with trying
23   to find Andrew something, but it became clear
24   that it was time for Andrew to go.
25        Q.    Okay.  And I think you said
```

1   earlier that it became clear it was time for

2   Andrew to go because he was ███████████ and he

3   had interpersonal challenges.

4                What did you mean by that?

5        A.    He had a history of ███████ a

6   lot of the staff.  He would get on conference

7   calls and speak over people.  He wouldn't take

8   direction from ████.  He thought he should

9   have been ██████ boss.  He had an ███████

10  ████████ of his role in the chamber.

11               I had him work for ██████████ at

12  one point, who was state operations director.

13  He's like a pros pro.  And he went to go work

14  for ██████ and ██████ said, like, "Andrew, I'm

15  going to -- you're going to learn some

16  things."

17               And then he said to ██████ in

18  response, "You're going to learn some things

19  from me."

20               And ██████ came to me and said,

21  "I'm not dealing with this ██████.  Like, I

22  don't know who █████████████████."

23               I tried to put him with ██████

24  ████████ at one point.  There was a similar

25  negative back and forth.  I think Andrew

1    believed that he should have been her boss.

2           And at a certain point, ▮▮▮ was

3    very exasperated with him and how ▮▮▮▮▮▮

4    he was to the team.  Any time she did calls on

5    events or tried to move any project forward,

6    it was almost like he would be ▮▮▮▮▮▮▮ for

7    the sake of being ▮▮▮▮▮▮.

8           Q.    You said he was ▮▮▮▮▮ staff.

9    Can you tell me what that means?

10          A.    Well, I mean, it was in the

11   Percoco case.  Like, he would just -- he would

12   belittle, be mean to, make fun of, openly

13   condescend to staff, both his contemporaries

14   and his juniors.  I think he thought of

15   himself as a mini Joe Percoco.

16          Q.    And you said that he, I think you

17   said, had negative back and forth with ▮▮▮

18   ▮▮▮▮.  What was that?

19          A.    Similar to the ▮▮▮▮▮

20   situation where she would give him a project

21   or ask him to do something, an assignment, and

22   he would be flip about it.  It was beneath

23   him.  It wasn't something that was up to his

24   level of sophistication.

25          And he was, you know, like a

1   younger staff person.  I think he felt a

2   certain level of ▇▇▇▇▇ because of the

3   amount of time that he had been with the

4   state.  But it didn't match with his

5   ▇▇▇▇▇▇

6              Like, for the first five or six

7   years he was there, he really was, like, an

8   advance person, a body person.  And so we kept

9   trying to give him opportunities to grow that

10  were a little bit separate from the governor.

11             You know, go work for the state

12  operations director, go work for ▇▇▇▇ at

13  one point.  And he -- at any time you did, it

14  would just blow up.  And the person would come

15  back and say, "I'm not taking this anymore."

16        Q.    How old was he?

17        A.    I want to say Andrew was, like,

18  ▇.  ▇ or ▇

19        Q.    Did you view this course of

20  conduct that he engaged in as consistent with

21  the employee handbook?

22        A.    What do you mean?

23        Q.    Well, so earlier you told me that

24  one of the purposes of the employee handbook

25  was to ensure that there was respect in the

1    workplace.  Right?  Did you view his conduct

2    as consistent with respect in the workplace?

3           A.    No.

4           Q.    So what did you do about it?

5           A.    The Andrew issue, I mean,

6    ultimately I said it's time to go.  I tried

7    him in a number of different positions, but

8    Andrew's ███████████████████████████ in the

9    workplace far predated my being in a senior

10   role.

11             Like, this was when I was comms

12   director.  It's when I was chief of staff.

13   You know, he really was like a Joe person.

14   And I think that he ████████████████████

15   accordingly.

16          Q.    So you were the person who

17   ultimately decided that Andrew needed to leave

18   the executive chamber?

19          A.    I just said that I was done

20   trying to find him another position.

21          Q.    Did you ever consider making a

22   report to GOER about Andrew's conduct?

23          A.    No.  I reported it to Judy.  At

24   one point I actually said to Andrew, "I'm not

25   comfortable being in a room with you without a

1    lawyer anymore," because he grew increasingly

2    ████████████████████.   And I told Judy and

3    reported it to Judy.

4            Q.    And what did Judy do about it?

5                  MR. HECKER:  You don't have to

6            describe discussions you had with Judy.

7            Are you aware of Judy taking any action

8            after you reported it to Judy?

9            A.    I think -- I don't think official

10   action.  I think that she tried to mentor him

11   and support him.  She had been his lawyer

12   during the Percoco stuff, and so she had a

13   relationship with him.  And I think that she

14   encouraged him to try something new.

15           Q.    Meaning new in terms of his

16   ████████?

17           A.    No.   I mean new in terms of,

18   like --

19           Q.    Leave?

20           A.    Yeah.  I mean, not in a, like,

21   you have to leave but in a, like, you've been

22   here for ten years.  Like, if you're going to

23   grow, you need to be in a different

24   environment.  Try something new.

25           Q.    So counseled him out?

1          A.     She wasn't -- I don't think that

2     that was her -- like, I didn't tell her to

3     counsel him out.  But I think in counseling

4     him, he came around to that decision.

5          Q.     Okay.  I'm actually asking a

6     slightly different question.  Apologize if

7     this wasn't clear.  But while he was in the

8     executive chamber, were there any efforts that

9     you were a part of to try to get him to change

10    the way he interacted with other members of

11    the staff?

12         A.     Jill spoke to him multiple times.

13    I spoke to him multiple times.  Alphonso David

14    certainly sat with him multiple times.  Judy

15    sat with him multiple times.

16         Q.     And when you sat with Andrew to

17    talk about the way he was treating other staff

18    members, what did you tell him?

19         A.     That you -- just because you're

20    in a position where you can make decisions, it

21    doesn't -- like, that doesn't mean that your

22    role is to constantly berate people, talk over

23    people.  Like, part of your job is to foster

24    their own growth, get them to lift themselves

25    up.

```
 1                    A team is only strong as its
 2   weakest link.  You don't want to push people
 3   down.  Trying to give him positive -- like,
 4   different ways that he could be to be
 5   positive.
 6          Q.    Like coaching?
 7          A.    Yeah.
 8          Q.    And is what Jill and Alphonso did
 9   to your understanding similar?
10          A.    Yes.
11          Q.    Okay.  And that coaching didn't
12   stick?
13          A.    No.
14          Q.    And that's ultimately why you
15   decided he had to leave the executive chamber?
16          A.    Again, I didn't tell him he had
17   to leave.  But I was done trying to find him
18   another -- like, we had moved him around nine
19   times in eight years.  It was
20   counterproductive at a certain point.  He
21   wasn't showing up to work.  He would come in
22   for half days.
23          Q.    Where we started talking about
24   Andrew Ball, we were talking about employees
25   who left the executive chamber and any role
```

```
 1   you had or you were aware of in the executive

 2   chamber preventing someone from taking another

 3   job or saying someone shouldn't have another

 4   job.  We started talking about Andrew Ball.

 5              I'm going to butcher his last

 6   name, but Staffer #5        , what do you know

 7   about how he left the executive chamber?

 8         A.    He went to the Port Authority.

 9         Q.    Okay.  And how did that come

10   about?

11         A.    I think he worked with Jill.  He

12   really wanted to go to the Port Authority, and

13   she helped facilitate after years of sitting

14   on this desk outside of Stephanie's office.

15         Q.    Do you know how -- you said,

16   "years."  So it took him a long time to go to

17   the Port Authority.  Is that right?

18         A.    I mean, I don't know how long he

19   had been requesting the transfer to the Port

20   Authority.  But I'm saying I know that he sat

21   outside of Stephanie as, like, Stephanie's

22   assistant for years.

23         Q.    You have no knowledge about how

24   long he had been asking for the transfer to

25   the Port Authority?
```

1          A.    No.

2          Q.    Do you have any knowledge of any

3     calls that Jill made to the Port Authority

4     about him?

5          A.    Not firsthand.

6          Q.    Secondhand?

7          A.    No.   I mean, I can imagine that

8     he called ███████████████████.

9          Q.    Not imagine.   Do you have any

10    knowledge?

11         A.    No.

12         Q.    Okay.   Prior to ██████ going to the

13    Port Authority, had there been any other

14    positions that you're aware of he had

15    expressed an interest in?

16         A.    I don't remember.

17         Q.    How about ███████████? How did

18    she leave the executive chamber?

19         A.    I don't remember.

20         Q.    Do you know who she is?

21         A.    Yes.

22         Q.    Do you have any knowledge about

23    where she went?

24         A.    No.

25         Q.    What was her role in the

1    executive chamber?

2         A.    She was an assistant working on

3    that same desk that ████ worked on.  And

4    she was also a press assistant for a period of

5    time.

6         Q.    You have no idea where her next

7    job was after the executive chamber?

8         A.    I don't remember.

9         Q.    You knew she left.  Right?

10        A.    Yeah, years ago but I don't

11   remember.

12        Q.    Was there any discussion about

13   why she was leaving?

14        A.    No.

15        Q.    Was she good at her job?

16        A.    Sure.  I mean, she was a press

17   assistant.  It wasn't, you know, someone I

18   came into a lot of contact with.

19        Q.    Did you field any calls about her

20   when she was leaving the executive chamber?

21        A.    I don't think so.  I don't

22   remember.

23        Q.    What about ████████? What

24   was your role, if any, in his leaving the

25   executive chamber?

```
 1          A.    I don't think I had a role in his
 2    leaving the executive chamber.
 3          Q.    What do you know about why he
 4    left the executive chamber?
 5          A.    I don't remember.  It was after
 6    all the Joe stuff.  I don't remember.
 7          Q.    You don't have any memory of
 8    having discussions about why ███████████
 9    was leaving the executive chamber?
10          A.    I don't remember.
11          Q.    Were you part of any discussions
12    about his potential future employers?
13          A.    I don't remember.
14          Q.    Were you part of any discussions
15    about contacting his potential future
16    employers?
17          A.    I don't think so.
18          Q.    How did Annabel Walsh leave the
19    executive chamber?
20          A.    She quit.
21          Q.    And what's your understanding of
22    why she quit?
23          A.    She -- I told her that I didn't
24    think that she was succeeding as scheduler.  I
25    wanted to move her into a different role.  She
```

1    could stay in the chamber, she could go to the

2    campaign, she could go to an agency, but that

3    it was time to have a new scheduler.  And she

4    made the decision to seek outside employment.

5         Q.    Where did she end up?

6         A.    I think WeWork.  I don't think,

7    obviously, that she's -- she was working with

8    my friend ███████████.  I don't remember

9    where she went.  I thought it was WeWork, but

10   the expression on your face leads me to

11   believe otherwise.

12        Q.    That was that expression.  But

13   she went to a private employer?

14        A.    Yes.

15        Q.    Did you have any contact with her

16   private employer?

17        A.    No.

18        Q.    Did you tell her she shouldn't

19   go?

20        A.    I told her I really wanted her to

21   go to the campaign.  I love Annabel.  She's

22   like a little sister.  And I wanted to keep

23   her in the family, and just because the

24   scheduling role didn't work out, I didn't want

25   her to interpret that to mean that she needed

1    to leave.

2            I wanted to keep her around

3    somehow, but that's not what she was

4    interested in.

5            Q.    Sorry, I think you said -- you

6    just said, "keep her in the family."  What did

7    you mean by that?

8            A.    Just like, you know, I have,

9    like, a little core group of staff people

10   that, like, I consider like little brothers,

11   little sisters.  And she's like a little

12   sister.

13           Q.    Who else would you put in that

14   category?

15           A.    Dani Lever.

16           Q.    Anyone else?

17           A.    Peter Ajemian.

18           Q.    Anyone else?

19           A.    I mean, over the years, sure.

20   But those are the ones that, like, come to

21   mind of the most recent.

22           Q.    Sure.  Over the years, who else

23   has been in that group?

24           A.    ████████████.

25           Q.    Anyone else?

```
 1        A.     ████████████.

 2        Q.     Anyone else?

 3        A.     ███████████ , ██████████████.

 4        Q.     Anyone else?

 5        A.     That's all I can think of off the

 6   top of my head.

 7        Q.     And so just to be clear, this is

 8   a group of people that you think of as, sort

 9   of, part of a family.  Like, you think of them

10   like little brothers or little sisters?

11        A.     Yeah.

12        Q.     Are all these people younger than

13   you?

14        A.     Yes.

15        Q.     And if you're part of this group

16   of people, so what do you do to support this

17   group of people?

18        A.     I've tried to mentor them over

19   the years, give them advice about their career

20   trajectory, personal relationships.

21        Q.     Anything else?

22        A.     No.

23        Q.     Have you ever tried to leave the

24   executive chamber or thought about leaving?

25        A.     For, like, five minutes after the
```

1    campaign in 2014 but it was fleeting.  And

2    right now I'm considering my options.

3         Q.    Who did you talk to in 2014 about

4    your fleeting idea of maybe leaving?

5         A.    I think Joe at the time.

6         Q.    Joe Percoco?

7         A.    Yeah.

8         Q.    Anyone else?

9         A.    I think the governor.

10        Q.    And tell us about the

11   conversation with the governor.

12        A.    It wasn't -- it wasn't, like, a

13   memorable conversation.  I think at the time

14   ▮▮▮▮ had just left -- my husband had just

15   left.  He had gone to the campaign, and he had

16   decided he wasn't coming back, and then I was

17   trying to decide whether or not I should go or

18   stay.

19             And I think both Joe and the

20   governor said, "You have so much growing to

21   do, you know, you should stay and continue to

22   be in public service."  But it was never,

23   like, a real conversation.

24        Q.    Did you talk to anybody else

25   about potentially leaving in 2014?

1      A.    I think, like, ██████████.

2      Q.    And who's ████████████?

3      A.    A friend of mine who is in public

4  relations.

5      Q.    Were you considering going to

6  work with ███████████?

7      A.    He offers me a job once every six

8  months.  You know, it's like one of those

9  people that ...

10      Q.    And had he offered you a job in

11  2014?

12      A.    I think he was, like, when the

13  time is right, you know, which is the same

14  thing he says to when I see him, like, two

15  weeks ago.

16      Q.    Two weeks ago did he offer you a

17  job?

18      A.    No.  I'm being facetious, I'm

19  sorry.

20      Q.    Any other occasions in which

21  you've considered leaving the executive

22  chamber?

23      A.    No.  I thought about going over

24  to the campaign in 2018 but ultimately decided

25  not to.

1     Q.    And why not?

2     A.    [Former Consultant] agreed to do the

3  reelect, and so there -- it wasn't -- they

4  didn't need both of us.

5     Q.    Any other occasions in which

6  you've considered leaving the executive

7  chamber?

8     A.    No.

9     Q.    You said you're exploring your

10  options right now.  What did you mean by that?

11     A.    There's possibility, given where

12  we are in the election calendar, that I would

13  go work on the reelect or pull together the

14  coordinated effort for democrats statewide,

15  which is, sort of, the same conversation we

16  had in 2018.

17     Q.    I see.  When [Former Cons] took the

18  role?

19     A.    Yeah.

20     Q.    So it would be that role?

21     A.    Maybe or some hybrid of -- [Former Cons]

22  was really focused on the campaign.  This

23  would be more global.

24     Q.    And who are you talking to about

25  that?

```
 1              A.    I've had some conversations with
 2    the governor about it.
 3              Q.    Tell us about those
 4    conversations.
 5              A.    Literally just that.  We're at
 6    the point in the calendar where we have to
 7    think about the political apparatus and who's
 8    going to run that.  And we've got a bunch of
 9    congressional -- I mean, Nancy Pelosi is
10    holding on to the majority by four seats.  We
11    can't afford to lose any of the congressional
12    seats.  We should try to shore up a couple.
13              And so we've had very preliminary
14    conversations around that.
15              Q.    When does that decision have to
16    be made?
17              A.    There's no deadline.
18              Q.    When is that decision normally
19    made?
20              A.    It depends on the year.  I think
21    it's going to be a really tough year
22    politically next year, with crime rising and
23    with, you know -- everything is now so
24    controlled by democrats.  I think there's,
25    like, a swing -- more center that we have to
```

1    consider.

2              So I would think that we should

3    be getting something up and running sooner

4    rather than later.

5         Q.    When Former Cons. took the role,

6    when was she appointed or announced to that

7    role?

8         A.    She came in -- she did just the

9    reelect.  But she came in -- I want to say it

10   was something like February or March.  But at

11   that point the primary calendar was different.

12   The primaries took place in September.  We've

13   since changed the law, and they take place in

14   June.  So everything, like, bumps back.

15              MS. KENNEDY PARK:  Why don't we

16         go off the record.

17              THE VIDEOGRAPHER:  The time is

18         12:07 p.m.  This concludes Media 3.  Off

19         the record.

20              (Lunch recess taken from

21         12:07 p.m. to 1:01 p.m.)

22         (Continued on the next page.)

23

24

25

```
 1              A F T E R N O O N   S E S S I O N
 2                        - - -
 3               (Time noted:  1:01 p.m.)
 4                        - - -
 5                    THE VIDEOGRAPHER:  The time is
 6              1:01 p.m.  This begins Media 4.  On the
 7              record.
 8                        - - -
 9      M E L I S S A   D E R O S A, resumed and
10              testified further as follows:
11      CONTINUED EXAMINATION
12      BY MS. KENNEDY PARK:
13              Q.    Let's shift the focus of our
14      conversation a little bit and talk about some
15      specific people.  Okay.  Do you know who
16      Lindsey Boylan is?
17              A.    Yes.
18              Q.    Okay.  When did you first meet
19      Ms. Boylan?
20              A.    I don't remember specifically but
21      sometime I would say 2016ish, 2017ish.
22              Q.    And when you met her, what was
23      her role?
24              A.    Chief of staff to Howard Zemsky,
25      who was the CEO of Empire State Development
```

1   Corporation.
2          Q.    Can we call Empire State
3   Development Corporation ESDC?
4          A.    Yes.
5          Q.    Okay.   Great.   And do you
6   remember the first time you met her?
7          A.    I don't specifically.
8          Q.    Okay.   And when she was the chief
9   of staff to Howard Zemsky in his role at ESDC,
10  how often did you interact with her?
11         A.    Not frequently.   She would come
12  to -- on some trips.   She would be in some
13  group meetings.
14               But I didn't ever focus that
15  heavily on economic development as a portfolio
16  of mine, like, in the division of labor and
17  senior staff.   That more went to the budget
18  director.   So I wasn't -- I didn't interact
19  with her a ton.
20               There were many more people on
21  the second floor who interacted with her more.
22         Q.    Who are the people that
23  interacted with Ms. Boylan more?
24         A.    I would say Jill DesRosiers,
25  Annabel, Rob mainly.   Because, you know, she

1    would be involved in projects and events.  So

2    she would come to briefings with the governor

3    about what those projects or events were.

4              Sometimes she would come to

5    events.  And so it was, sort of, like, the

6    events side of the world, like, more of the

7    logistics, or, like, Robert Mujica who did the

8    finances.

9         Q.    Okay.  So Lindsey's interactions

10   were more with Jill and Annabel on the event

11   side or on the briefing side, and then with

12   Mr. Mujica on the, sort of, policy economics

13   side?

14        A.    That's correct.

15        Q.    And 2016 and 2017, was budget

16   part of your portfolio?

17        A.    Everyone works on the budget.

18   But Robert is the point person.  In 2016, I

19   was chief of staff, and then 2017, I was --

20   after the budget, I became secretary.

21        Q.    And you said she went on trips.

22   What kind of trips did Ms. Boylan go on?

23        A.    Economic development

24   announcements.  We traditionally have relevant

25   commissioners and their senior staff attend

1   announcements.  And they're generally part of

2   briefing the governor beforehand, and then

3   working with the press office on the back end

4   to answer any questions from the media.

5           Q.    Were you ever present when

6   Ms. Boylan briefed the governor on one of

7   those events?

8           A.    I'm sure that I was.  I don't

9   have any specific recollection, but I'm sure

10  that I was.

11          Q.    Okay.  You have no memory of what

12  happened during that briefing or how they

13  interacted?

14          A.    No, not a specific memory.

15          Q.    Did there come a time when you

16  had more interaction with Ms. Boylan?

17          A.    When she transitioned over to the

18  second floor.

19          Q.    Okay.  And how did it come about

20  that she transitioned over to the second

21  floor?

22          A.    We needed somebody on the second

23  floor who could be more focused on economic

24  development, and she was seemingly very

25  competent.  And it seemed like it would be a

1    good fit.

2              She came over to be dep sec,

3    which was a little bit tricky because

4    technically a dep sec is then the boss of the

5    commissioners that are under their portfolio.

6              So it was a little bit strange

7    because she's going from being chief of staff

8    to Howard Zemsky to them being technically his

9    boss.

10             But we thought that she would be

11   a good fit, so she became dep sec for economic

12   development, and I think we also gave her a

13   title of senior advisor to the governor, which

14   is something she had wanted.

15        Q.   Was the dep sec for economic

16   development a role that was created, or did

17   that exist beforehand?

18        A.   It existed.

19        Q.   And who filled that role?

20        A.   Lindsey.

21        Q.   Before Lindsey?

22        A.   Oh, I think ██████████, which

23   I would never have remembered except that you

24   mentioned him earlier.

25        Q.   And you said she became dep

1    secretary and you said senior advisor to the

2    governor?

3         A.    Yeah.

4         Q.    I think you said that was a title

5    she wanted?

6         A.    I believe so, yes.

7         Q.    Okay.  And what's your

8    understanding of why she wanted that title?

9         A.    I think that it projects that

10   you're doing more than just that portfolio.  I

11   know that she had an interest in learning

12   about and being involved in more than just

13   economic development.

14               And it wasn't an uncommon thing.

15   We have a number of people who have the title

16   senior advisor.

17        Q.    Is it similar to when you had

18   your title of strategic advisor?

19        A.    I think so.  It's comparable.

20        Q.    And you said, "we" decided she

21   would come over.  Who's the "we"?

22        A.    We had the opening.  So we had to

23   fill it.  I think -- I believe that it was me

24   in consultation with Jill and ▆▆▆▆▆▆▆,

25   who at the time was state operations director,

1  and the governor.

2      Q.   And what do you remember the

3  governor saying about filling that role, the

4  role left by ███████████?

5      A.   I don't remember anything

6  specific, but he, I think, also believed that

7  she was competent and strong and would be a

8  good fit.

9      Q.   Are you aware if the governor had

10  any conversations with Ms. Boylan in advance

11  of her taking the position?

12      A.   I am aware that he talked to her

13  about coming to the floor.

14      Q.   Okay.  And how did you become

15  aware of that?

16      A.   Because he told me.

17      Q.   Okay.  And what did he tell you?

18      A.   Nothing specific more than, "I

19  spoke to Lindsey, she's open to the role.  I

20  think she'd be great."

21      Q.   So this was around the time she

22  was being considered for the role?

23      A.   Yeah.

24      Q.   And do you remember anything else

25  he said about the conversation with Lindsey?

1          A.     Nothing specific.

2          Q.     Do you remember the governor ever

3     telling you that Lindsey Boylan had conveyed

4     that she thought you didn't like her, and that

5     made her worried about taking the position?

6          A.     No.

7          Q.     Anything like that the governor

8     said to you?

9          A.     No.

10         Q.     Any conversations the governor

11    had with you about concerns Ms. Boylan had

12    about taking the position in the executive

13    chamber?

14         A.     No, other than the trickiness

15    around Howard.

16         Q.     Any concerns, other than the

17    trickiness around Howard, that Ms. Boylan

18    raised about taking the position in the

19    executive chamber?

20         A.     Not with me.

21         Q.     So she took that role when?

22         A.     January, February 2018 I want to

23    say, which I only remember more specifically

24    because everything that's come back up.

25         Q.     Just to go back a second, you

1   said the governor had a conversation with

2   Ms. Boylan about the role that he told you

3   about.

4                Was that a one-on-one

5   conversation?

6          A.    I think so.

7          Q.    And do you know if that

8   conversation was in person or over the phone?

9          A.    I have no idea.

10         Q.    Did you ever ask?

11         A.    No.

12               MR. HECKER:   Sorry.   Just so the

13         record is clear, which conversation

14         one-on-one?

15               MS. KENNEDY PARK:   The

16         conversation that the governor had with

17         Ms. Boylan about taking the role.

18         Q.    Was that in person or was

19   that --

20               MR. HECKER:   Do you know?

21         Q.    -- over the phone?

22         A.    I don't know.

23         Q.    You don't know.

24               And you never asked anybody

25   whether it was in person or over the phone?

1              A.    No.

2              Q.    Okay.   So she takes the role in

3     January, February, sometime of 2018.

4                    Did you observe her interact with

5     the governor?

6              A.    Sure.

7              Q.    Okay.   And tell us about what you

8     observed.

9              A.    That she was generally a, like,

10    competent voice in the room.   There are

11    certain people that interact with him better

12    than others.   If you speak in an assertive

13    way, if you're able to answer second question,

14    the third question, the fourth question, you

15    tend to be much more successful with him.

16                   People who are a little bit more

17    meek or unsure of themselves or don't have

18    that information don't succeed as well.   And I

19    remember being in briefings with her where

20    questions would come up about specific

21    projects, and I remember thinking, like, she

22    can handle these questions.

23             Q.    And why were you involved in

24    those briefings?   If it's, sort of, her area

25    is under your portfolio, why do you end up in

1    the briefings?

2            A.    Sometimes when we're getting

3    ready to do an event, you'll go through the

4    whole day.  So it'll be, like, prep for

5    Thursday, pull everyone in that has some piece

6    of Thursday.

7                 And so he'll run through, you

8    know, meeting by meeting, and then the person

9    who has to be in the room has to answer the

10   substance.  You have, like, the substance

11   person, the logistics person.

12                And sometimes I would work on

13   things that she was involved in, just not

14   predominantly.

15           Q.    Other than the interactions in

16   which you observed her briefing the governor,

17   did you observe any other interactions between

18   her and the governor?

19           A.    Not really.

20           Q.    Did you observe her and the

21   governor ever touch?

22           A.    No.  I mean, it wouldn't be a

23   crazy thing if he hugged her because he's

24   someone who hugs people in the office.  But

25   nothing specific that stands out.

```
 1            Q.    Did you ever observe him hug
 2    Lindsey Boylan?
 3            A.    I can't specifically recall, but
 4    I wouldn't be surprised.
 5            Q.    All right.  But you don't
 6    remember it happening --
 7            A.    No.
 8            Q.    -- yes or no?
 9            A.    No.
10            Q.    Okay.  And did you ever observe
11    the governor yell at Ms. Boylan?
12            A.    There was one call that I was on.
13    I don't remember if she was in the room or on
14    the phone.  I wouldn't say it was yelling, but
15    he was stern with her.
16            Q.    Okay.  And what was that call
17    about?
18            A.    I think it was about an
19    MTA-related project.
20            Q.    And what happened?
21            A.    She didn't have the answers to
22    the questions that he was asking.
23            Q.    And what did he do?
24            A.    I think he said, "Everybody go
25    back and get your act together before you come
```

1    talk to me again."

2          Q.    Is that something out of the norm

3    for the governor?

4          A.    No.

5          Q.    And what happened after that with

6    Ms. Boylan?

7          A.    I don't remember anything

8    remarkable immediately following that.

9          Q.    You were present for that?

10         A.    Again, I don't remember if it was

11   on the phone or in the room.

12         Q.    But you overheard it?

13         A.    Yes.

14         Q.    Did she ever speak to you about

15   that occasion?

16         A.    No.

17         Q.    Did she ever speak to you about

18   any occasion or any issues or concerns she had

19   about her interactions with the governor?

20         A.    No.

21         Q.    Did she ever speak to you or

22   raise any concerns she had about her

23   interactions with anyone in the executive

24   chamber?

25         A.    No, not that I can recall -- oh,

1   ████████ .

2          Q.    And what did Ms. Boylan raise to

3   you about ████████?

4          A.    It was bizarre.  We were on the

5   second floor of the Capitol in Albany, and

6   something happened between the two of them in

7   the hallway.  And Lindsey came to my office

8   and said, "I'm not dealing with that little

9   shit anymore.  He is so disrespectful.  I just

10  asked him for something, and he snapped at

11  me."

12         Q.    And what happened after that?

13         A.    I called ████████ into my

14  office.

15         Q.    And what happened?

16         A.    I took her side, like, with the

17  perspective that that wouldn't be an uncommon

18  thing that ████ -- how ████ would behave.

19  I was perhaps not the best manager in that

20  moment and didn't ask him questions.

21              I assumed that what she told me

22  was correct.  And I said to him, "You can't

23  speak to Lindsey that way.  It's unacceptable.

24  She's a senior person in this office.  She is

25  someone who is above you."

1              And he started saying to me, "She

2    went ▮▮▮▮ on me.  I did not say anything to

3    her.  I literally just walked by and said,

4    'Hi, Lindsey,' and she started screaming at me

5    like a ▮▮▮▮▮.  It's not fair that you're

6    assuming that what she said was correct."

7         Q.    And how did you resolve that

8    situation?

9         A.    I apologized to ▮▮▮▮▮ for not

10   hearing him out first, and I said that I would

11   go back and talk to Lindsey, and that I wanted

12   the two of them to be respectful to one

13   another, and that there shouldn't be a

14   situation where people are yelling at each

15   other in the hallway.

16             And then I went back to Lindsey

17   and I said to Lindsey, "▮▮▮▮ says that

18   something different happened," and she was

19   very defensive.  And it was almost a situation

20   of, like, agree to disagree.  Like, the two of

21   them, their versions of the story could not

22   have been more black and white.

23             And the ultimate outcome in both

24   of their conversations with me was like, we

25   have to move forward.  Whatever it is that

1   happened here, like, we're all adults, and we

2   have to move forward and we have to be

3   respectful.

4           Q.    Was it an isolated incident

5   having two senior members of the governor's

6   staff yelling at each other?

7           A.    Like that, yes.

8           Q.    And what made that different than

9   other occasions?

10          A.    I wouldn't say people yell at

11  each other, and like, there -- it's a very

12  high-stress environment.  It's very

13  high-pressure jobs.  People go through long

14  periods of time where they don't get a lot of

15  sleep.

16              There are times when people can

17  be short with one another or be stern with one

18  another or raise their voice.  But it's not

19  common that you would just see two adults

20  screaming at each other in the hallway of the

21  second floor of the Capitol with absolutely no

22  basis.

23              Like, that was a very -- the fact

24  that I'm remembering that is, like, that was a

25  very specific thing.

1          Q.     What about screaming at each

2     other in their offices?  Is that an occurrence

3     that you've seen in the executive chamber?

4          A.     Early on in my tenure.

5          Q.     And who was involved in those

6     occasions?

7          A.     Joe and Larry, Howard and Joe.

8          Q.     Anyone else?

9          A.     Those are the people that I

10    recall most specifically.

11         Q.     Have you ever screamed at anyone

12    in the executive chamber?

13         A.     I don't think I scream at people.

14    I certainly have raised my voice.

15         Q.     And who have you raised your

16    voice at?

17         A.     Rich Azzopardi, Howard Zucker,

18    ███████████.  I mean, I don't view it as

19    yelling.  I get animated, I get short with

20    people sometimes, but it's not like gratuitous

21    screaming for the sake of screaming.

22         Q.     And on the occasion that ███████

23    and Ms. Boylan were engaged in the hallway,

24    you thought that was gratuitous screaming?

25         A.     It was nonsensical.  There was no

1    basis for an argument.  There was no -- it was

2    just two people were screaming at each other

3    in the hallway.

4           Q.    Okay.  And so the line you're

5    drawing is between, sort of, it doesn't make

6    sense to be screaming versus we're having some

7    sort of legitimate disagreement --

8           A.    Policy -- sorry -- I don't mean

9    to speak over you.

10          Q.    It's okay.  A legitimate

11   disagreement about something, and then that's

12   okay to raise our voices about that?

13          A.    I'm not saying it's ever okay to

14   raise your voice, but I, in my mind,

15   differentiate between if you're having a

16   disagreement over a policy or if

17   you're -- something is going on and you're

18   attempting to hold someone accountable for,

19   you know, a subject matter, versus just

20   gratuitous eruption.

21          Q.    Have you ever had a gratuitous

22   eruption?

23          A.    Well, I guess that's in the eye

24   of the beholder.  I don't think so.

25          Q.    Has anyone ever told you that

1    they thought that you had erupted at them?

2         A.    Not -- no.

3         Q.    Anyone ever told you that they

4    thought you had treated them disrespectfully?

5         A.    Lindsey Boylan.

6         Q.    Anyone other than Ms. Boylan?

7         A.    I think Kelly Cummings on one

8    occasion.  I think ██████████ on one

9    occasion.  No one else I can recall

10   specifically.

11        Q.    Have you ever had someone mentor

12   you about your management style?

13        A.    Yes.

14        Q.    Who?

15        A.    ██████████, ██████████████.

16   I mean, like lots of mentors over the years.

17        Q.    And on what occasion -- well,

18   what occasion ██████████ mentored you on your

19   management style?

20        A.    There were instances where he

21   thought that people were too siloed and that

22   it would be beneficial to do more than just

23   the 9 a.m. morning meeting, to do lunch

24   meetings once every three days.

25             He thought that on -- you know,

```
 1   if we didn't have to be working 24 hours a
 2   day, perhaps we shouldn't be, like, you know,
 3   you've got to let people put fuel in the tank,
 4   you've got to let people unplug every once in
 5   a while, like those sorts of things.
 6            Q.    What about ████████████?
 7            A.    I mean, ████████ was -- this is
 8   such a digression but she, you know, was the
 9   most powerful woman in New York politics.
10   When I was a kid, I looked up to her.
11                 She was the one that taught me,
12   sort of, the opposite of those things, which
13   is like, 24 hours a day, you sleep with the
14   BlackBerry next to your head.  Like, if you
15   get an e-mail, within five minutes you
16   respond.
17                 As a woman in this business, you
18   are always going to be held to a higher
19   standard.  You have to work harder.  You have
20   to know more.
21            Q.    Did anyone in the executive
22   chamber ever offer you mentorship or coaching
23   about your management style?
24            A.    No.
25            Q.    Did Jill DesRosiers ever speak to
```

1    you about the way you treated anyone in the

2    executive chamber?

3            A.    Jill would give me feedback.

4            Q.    Let's talk about this feedback.

5    What kind of feedback did Jill DesRosiers give

6    you?

7            A.    Jill would say, "I think you're

8    being a little bit too hard on that person,

9    like.  You know, we've got to give them time

10   to get room to run."  Or, "if that person

11   doesn't get back to you right away, call me,

12   and I'll track down the answer."

13                I think she understood that I

14   was a little bit -- I think that Jill thought

15   that I was a little bit too hands-on and

16   micromanaging in some regards, and so she

17   sought to put a little bit more cushion

18   between me and some of the people that she

19   felt like that management style wouldn't be

20   effective with.

21           Q.    So who are the people that Jill

22   was trying to put a cushion between you and

23   them?

24           A.    I don't remember specifically.

25           Q.    Do you remember any specific

```
 1    person that Jill came to speak to about and
 2    give you feedback about?
 3           A.     I feel like Andrew Ball at one
 4    point.  I hate that that name keeps coming up,
 5    but, I think, that's it.
 6           Q.     Anyone else?
 7           A.     It's possible, but not that I
 8    remember specifically.
 9           Q.     And let's circle back to Lindsey
10    Boylan.  You said that there had been -- I
11    can't remember your words exactly and I don't
12    want to scroll through.
13               But there had been some negative
14    interaction with Ms. Boylan.  Can you tell us
15    about what happened?
16           A.     Lindsey, when she came to the
17    floor, any time that I heard about Lindsey, it
18    was in the context of Lindsey being a problem.
19    It was ███████████ coming to me and saying,
20    "I am not going to work with this woman
21    anymore.  She treats my assistants terribly.
22    She is a bully.  She refuses to come to
23    meetings."
24               It was Jim Malatras, who at the
25    time wasn't even working for the chamber, but
```

1   I brought him in to help with the State of the

2   State process.  He used to be our state

3   operations director -- I'm sorry, I'm going to

4   speak more slowly -- and our policy director.

5                   He's someone I lean on a

6   tremendous amount in terms of his brilliance,

7   and I brought him over as a favor to help us

8   with State of the State.  She was really nasty

9   with him, "You're just over here because

10  you're a man, and I should be leading these

11  discussions."

12                  She just had this natural

13  tendency to be very aggressive and obnoxious

14  to people, regardless of their station, age;

15  it didn't matter.  It was everything from the

16  assistants to the commissioners and to her

17  boss, who was the state operations director,

18  ███████████ .

19                  And ████████████ has zero ego.

20  She is just not somebody who needs to be

21  recognized or acknowledged or praised.  She

22  just really genuinely cared about the

23  functioning of government.  And this was a

24  constant issue.

25                  And then she also had a number of

```
 1   altercations with Annabel and Stephanie and
 2   Jill.
 3        Q.    Can we focus on that interaction
 4   she had with you?
 5        A.    Sure.
 6        Q.    So what was the interaction she
 7   had with you?
 8        A.    I rarely interacted with her.
 9   There's one interaction with her, which has
10   been reported, which was in July of 2018.
11   Jill called me and she was very upset.  I
12   don't -- let me stop.
13             I don't remember if it was over
14   the phone or in person, but I believe she
15   called me from, like, across the office.  She
16   was sitting in her office.
17             And there was some project event
18   that they had been working on, the events
19   team, and Lindsey had gone around the group,
20   the team, directly to the governor.
21             And Jill called me and said, "I'm
22   not doing this anymore.  It's her or me.
23   She's so out of control.  She's not a team
24   player.  She does this all the time.  I'm not
25   doing this anymore."
```

1          Q.     Were those Jill's words?

2          A.     Pretty -- I mean, I don't -- not

3     necessarily verbatim, but that was the sum and

4     substance.

5          Q.     Okay.  And it was because --

6     sorry -- Jill's comment that it's her or me

7     stemmed from, you said, Lindsey had gone

8     around the team and gone to the governor.

9                 Can you tell us a little more

10    about that?  What happened?

11         A.     I don't remember specifically if

12    it was a project or an event, but, like, the

13    way that it works with the governor, the way

14    it's supposed to work, is that we reach

15    consensus as a team and then we go in unified.

16                If you don't do that, it

17    doesn't -- it doesn't function.  And everyone

18    has an opportunity to raise their perspectives

19    or objectives, opinions, but, ultimately, you

20    come to a group consensus, and then you're all

21    together.  You don't undermine one another.

22                And the whole system breaks down

23    when people go directly to him and undermines

24    people, and then, he has a different

25    expectation or he thinks something is ready

1    that's not ready.  And this was a recurring

2    theme with Lindsey.  And Jill had reached her

3    breaking point.

4            Q.    What was the specific incident

5    that Jill was talking about?

6            A.    I don't remember, as I said, if

7    it was a project or an event.  But it was

8    something where she had gone around.

9            Q.    And earlier you told me there

10   were occasions on which people would go

11   directly to the governor.  Right?

12           A.    Yes.

13           Q.    And that wasn't the preferred

14   protocol, but it happened.  In fact, you did

15   that.  Right?

16           A.    Well, I'm secretary to the

17   governor.

18           Q.    Right?  And you said other people

19   did that to you.  Right?

20           A.    Sure.

21           Q.    Okay.

22           A.    But -- but --

23           Q.    Could you just pause for a

24   second?  What made Lindsey's attempts to speak

25   to the governor different?

1          A.    Well, as I said, that was the

2     exception, not the rule, and it was not the

3     preferred protocol.  And generally, it

4     happened with people not in the executive

5     chamber.  It would be a deputy commissioner

6     sees him in the lobby, and it's there one

7     opportunity to speak to him.

8               The people inside the chamber,

9     especially, have a sympathy to making sure

10    that the whole team succeeds and making sure

11    that we're all on the same page.

12              And so, especially, within the

13    executive chamber, people don't do that.  With

14    Lindsey, it was chronic.

15          Q.    Was there any other individual in

16    the executive chamber who had broken protocol

17    the way you are describing Ms. Boylan did?

18          A.    Not chronically, no.

19          Q.    Anyone ever do it?

20          A.    Sure.  As I said.

21          Q.    Who else did it?

22          A.    As I said, you know,

23    occasionally, Rob Mujica.  Occasionally, you

24    know, the state operations director.

25          Q.    Who at the time was who?

```
 1          A.        ███████████      but very rarely.

 2    She was very good about that.

 3          Q.     Okay.  And when you say

 4    Ms. Boylan broke this protocol chronically,

 5    what do you mean by "chronically"?

 6          A.     Exactly what the word means.  She

 7    did it all the time.

 8          Q.     Okay.  All the time.  So, like,

 9    ever day?

10          A.     Multiple times a week.

11          Q.     Multiple times a week.  Okay.

12                 Prior to the call in July 2018

13    from Jill DesRosiers, did you speak to

14    Ms. Boylan about your preferred protocol for

15    reaching -- bringing issues to the governor's

16    attention?

17          A.     When she came over to the floor,

18    we talked to her -- me, Alphonso, Jill --

19    about how we operate as a team and interact

20    with him.

21          Q.     And what did you tell her?

22          A.     That we reach team consensus.  We

23    go to him with one unified voice.  We don't

24    always get our way, but, you know, sometimes

25    you do, sometimes you don't.
```

```
1              You stand with the team.  You
2    present an idea.  If he calls upon you, of
3    course, you should answer him directly and
4    give your perspective.  But that it didn't --
5    it wasn't functional for people to go to --
6    run to him constantly with ideas and work
7    outside of the protocol.  There's just too
8    much going on.
9         Q.    Is that a normal part of the
10   onboarding process for new members of the
11   executive chamber?
12        A.    Not formally, but when you're
13   bringing someone in to be a part of senior
14   staff, then yes.  Like, I remember having that
15   conversation with ████████ when he became
16   state operations director.
17              I remember having that
18   conversation with Dani Lever when she was
19   first brought in.  Like, that was -- you know,
20   we would talk each other through it.  You want
21   each other to succeed, and so you try to get
22   everybody going on the right foot.
23        Q.    Okay.  So what happens after Jill
24   comes to you and says, "It's her or me"?
25        A.    I called Lindsey.
```

```
 1              Q.    Okay.  Tell us about that
 2     conversation.
 3              A.    I don't remember it exactly, but
 4     as she says it was, I said something to the
 5     effect of "What the fuck?"
 6              Q.    Okay.  You're saying she says
 7     that.  But do you remember --
 8              A.    She said it to Ronan Farrow.  I
 9     don't have specific memory of --
10                    THE WITNESS:   What?  Well, I'm
11              just saying --
12                    MR. HECKER:   Just answer what you
13              remember.
14              Q.    Just tell me what you remember.
15              A.    Oh, okay.
16              Q.    What do you remember?
17              A.    I remember that I called her and
18     I was -- and I wanted an answer as to why she
19     was doing this.
20              Q.    Okay.  And what else do you
21     remember about the conversation?
22              A.    I remember that she responded
23     screaming, "I don't want to do this anymore,
24     forget this," and hung up the phone.
25              Q.    You just imitated her voice.  Can
```

1  you tell me what your voice was like on that
2  call?
3          A.    I think how I did it.
4          Q.    Just, like, right now?
5          A.    Yeah.
6          Q.    Your voice was that level?
7          A.    No, no, no.  I'm sure it
8  was -- I'm sure I said, like, "Lindsey, what
9  is wrong with you?"  Something like that.
10         Q.    Okay.
11         A.    In, like, a stern, you know --
12         Q.    And you're not disputing that you
13  might have said, "What the fuck"?
14         A.    I'm not.
15         Q.    Okay.  And then she said -- and
16  then what happens after she says "I'm not
17  doing this"?
18         A.    She hung up the phone and I
19  believe left the office for the day.
20         Q.    Okay.  Did you think she was
21  resigning?
22         A.    I don't think I knew.  I think
23  that, like, she was -- she had a tendency to
24  have outbursts and then come back the next
25  day.  So I don't think I knew.

```
1              I was -- it was also in the
2     middle of the 2018 campaign.  I was, like,
3     splitting my time between the governor's
4     office and the campaign.  I was taking a lot
5     of personal time off.
6              And so I had very little
7     bandwidth, and it was -- this was, like, a
8     constant problem.
9         Q.    You said she had a tendency to
10    have outbursts like this.
11             How many other outbursts had she
12    had like this where she left and you weren't
13    sure if she was coming back?
14        A.    I don't know if any of them were
15    quite like that, but it wasn't uncommon for
16    her to have an outburst.
17        Q.    And when you say "outburst," what
18    do you mean?
19        A.    Respond to somebody yelling and
20    then either, like, close her door or leave for
21    the afternoon.
22        Q.    Okay.
23        A.    But not saying, like, "I quit."
24        Q.    Right.  And on this occasion in
25    July, she didn't tell you she quit.  Right?
```

```
 1          A.    I don't think so.

 2          Q.    You just weren't sure if she had

 3   or not?

 4          A.    Well, not I wasn't sure if she

 5   had or not.  I wasn't sure what her intention

 6   was after that phone call.

 7          Q.    Okay.  And are there any other

 8   occasions in which Ms. Boylan had an outburst

 9   and you weren't sure what her intentions were?

10          A.    Yeah, the day that Alphonso David

11   confronted her.

12          Q.    You're talking about in September

13   of --

14          A.    2018.

15          Q.    -- 2018?

16          A.    Yes.

17          Q.    Any other occasions in which

18   Ms. Boylan had an outburst and you weren't

19   sure what her intentions were?

20          A.    Not specifically.

21          Q.    Okay.  So she hangs up and

22   leaves.  And then what happens?

23          A.    I told Linda, Alphonso, and Jill

24   about the incident.

25          Q.    Okay.  So Linda Lacewell,
```

1    Alphonso David, and Jill DesRosiers --

2          A.    I'm sorry.

3          Q.    It's okay.  We'll fill it in

4    together.  Okay.

5                So what did you tell Linda

6    Lacewell?

7          A.    I summarized her conversation.

8          Q.    You did this over the phone or in

9    writing?

10         A.    No, I think in person.

11         Q.    Okay.  With all three of them?

12         A.    Yeah, we -- the 39th floor of 633

13   Third Avenue, there's not that many offices.

14   So if you're, you know, dealing with something

15   sensitive, typically you, like, huddle in

16   somebody's office.  It's just walking, you

17   know, a couple of feet.

18         Q.    All right.  Tell us about the

19   huddle.

20                MR. HECKER:  Hang on one second.

21                THE WITNESS:  Oh, because

22         Alphonso?

23                MR. HECKER:  Well, I'm just

24         trying to understand, we're talking

25         about in -- this is in 2018?

1          MS. KENNEDY PARK:  July 2018.

2          MR. HECKER:  I had understood

3      that the executive chamber was asserting

4      privilege over that discussion with

5      counsel.

6          If I'm wrong, I'm happy to

7      correct the --

8          MS. KENNEDY PARK:  They've

9      produced text messages between you and

10     Ms. Lacewell and Ms. DesRosiers about

11     this incident, and Mr. David.  So ...

12         MR. HECKER:  I'm fine with

13     being -- asking her about those,

14     obviously.  I just -- I'm not the one

15     drawing the lines.  So I don't want to

16     get her crosswise with the decisions the

17     chamber's made about privilege.

18         MS. KENNEDY PARK:  Okay.  So for

19     that conversation, you're going to

20     instruct her not to answer on the

21     grounds of executive chamber privilege?

22         MR. HECKER:  I'm happy to take a

23     break and called Mitra Hormozi or Paul

24     Fishman.  I --

25         MS. KENNEDY PARK:  Let's not do

```
 1          that.
 2                  MR. HECKER:  Okay.
 3     BY MS. KENNEDY PARK:
 4          Q.    So after the privileged
 5     conversation that you had with Ms. Lacewell,
 6     Mr. David, and Ms. DesRosiers, what happens
 7     next?
 8          A.    I sent Lindsey a text message and
 9     said something to the effect of, you know,
10     "I'm sorry that it was a tough conversation.
11     I hope to see you back tomorrow.  Fighting to
12     make New York a better place, and if you need
13     me, I'm here."
14          Q.    Were you sorry?
15                  MR. HECKER:  Were you -- I'm
16          sorry?
17          Q.    Were you sorry?
18          A.    I was sorry that it was so
19     heated.
20          Q.    And then what happens after that?
21          A.    She responded in a text message
22     that night, responding essentially, "I
23     don't" -- you know, "I don't mind tough days.
24     I can't handle conversations like that."
25                  And I -- sorry.  I should wait
```

 1    for you to ask another question.

 2           Q.    What happens next?

 3           A.    I didn't respond because I didn't

 4    think it would be productive.

 5           Q.    Did you have an understanding as

 6    to whether Ms. Lacewell reached out to

 7    Ms. Boylan?

 8           A.    The next day.

 9           Q.    And do you have an understanding

10    as to whether Mr. David reached out to

11    Ms. Boylan?

12           A.    I think Alphonso talked to her

13    the same day that I spoke to her.

14           Q.    Any understanding if

15    Ms. DesRosiers spoke to her?

16           A.    It's my understanding Jill and

17    Lindsey had a conversation first, and that's

18    what prompted Jill to call me and why I then

19    called Lindsey.

20           Q.    After you called Lindsey, did

21    Jill have a conversation with Ms. Boylan?

22           A.    Not that -- I don't know.  I

23    don't think that day.

24           Q.    After that day?

25           A.    I -- well, she came back to work.

1    So everyone talked to her again at some point.

2    But Linda was the one who had a conversation

3    with her after the incident -- after that

4    incident.

5          Q.    And what do you know about the

6    conversation between Ms. Lacewell and

7    Ms. Boylan?

8          A.    I don't know anything specific,

9    just that Linda said, you know, "You're an

10   important part of the team.  We all need to

11   work together."  You know, "I hope that you're

12   part of the team," something like that.

13              MS. KENNEDY PARK:  Can I ask a

14          question?  So the chamber is not

15          asserting privilege over the --

16              MR. HECKER:  I don't know.

17              MS. KENNEDY PARK:  -- discussion

18          between Ms. Lacewell and Ms. Boylan, but

19          they are asserting privilege over the

20          discussion between Ms. Lacewell and Ms.

21          DeRosa?

22              MR. HECKER:  Say that again, the

23          first -- the --

24              MS. KENNEDY PARK:  Okay.  So we

25          just asserted privilege over the

```
 1        conversation with Ms. DeRosa that was
 2        had by Ms. Lacewell and Mr. David.
 3        Right?
 4             MR. HECKER:   That she was
 5        listening in on.  That she was --
 6             MS. KENNEDY PARK:   That she was
 7        present for.  Right?
 8             MR. HECKER:   Yeah.
 9             MS. KENNEDY PARK:   And now we're
10        talking about a conversation that
11        Ms. Lacewell had with Ms. Boylan, but
12        the chamber has not directed you to
13        assert privilege over that?
14             MR. HECKER:   You mean between
15        Lacewell and --
16             MS. KENNEDY PARK:   No.
17        Ms. Lacewell and Ms. Boylan.
18             MR. HECKER:   Well, I don't know
19        whether they're asserting privilege over
20        that conversation, but she's not in it.
21        So ...
22             MS. KENNEDY PARK:   They're
23        not -- she's going to tell me now what
24        just happened in the conversation, but
25        the executive chamber hasn't instructed
```

1          you to assert privilege over it?

2                MR. HECKER:  Do you know?

3                I don't know the answer to that.

4          I don't have clear instruction on it, so

5          I just don't know.

6                THE WITNESS:  Can I be helpful?

7                MR. HECKER:  No.

8                MS. KENNEDY PARK:  Not on the

9          record.

10                MR. HECKER:  No.  We can take a

11          minute if you want.

12                MS. KENNEDY PARK:  Why don't you

13          take a minute.  Right?  Why don't we go

14          off the record.

15                THE VIDEOGRAPHER:  The time is

16          1:34 p.m.  This concludes Media 4.  Off

17          the record.

18                (Recess taken from 1:34 p.m. to

19          1:41 p.m.)

20                THE VIDEOGRAPHER:  The time is

21          1:41 p.m.  This begins Media 5.  On the

22          record.

23  BY MS. KENNEDY PARK:

24          Q.    I think where we left off is:

25  What was your understanding of the

1    conversation that Ms. Lacewell had with

2    Ms. Boylan?

3          A.    I don't have a specific memory,

4    but I've seen the texts. And, I mean, the

5    texts, I think, are self-explanatory in that

6    she says, "I spoke to her. I don't know if

7    she'll be back, but we'll see."

8          Q.    Do you have a memory of that

9    separate from the text messages?

10         A.    No.

11         Q.    Okay. And how did the -- and

12   then how did the situation resolve?

13         A.    She came back.

14         Q.    And was there any discussion

15   after she came back about that incident?

16         A.    Not that I recall.

17         Q.    Was there any

18   suggesting -- suggestion that Ms. Boylan get

19   coaching?

20         A.    No, I don't -- not that I recall.

21         Q.    Was there any suggestion that she

22   get counseling?

23         A.    We had an ongoing conversation

24   with Alphonso about the fact that this kept

25   happening and that it all, sort of, came to a

1    head in September, which is when she was

2    getting counseled.

3            Q.    So prior to July of 2018, you're

4    saying that there had been conversations about

5    getting Ms. Boylan counseling?

6            A.    About, like, this is not

7    stopping; in fact, it's only getting worse and

8    more widespread behavior, and we need to do

9    something about this.

10              But, I mean, unfortunately, and

11   this is not a great human resources answer,

12   but in a world where there's, like, a million

13   things going on, it's, like, you'll have that

14   conversation and then unfortunately not follow

15   up.

16              And it wasn't until September

17   when ESD actually asked that she be removed

18   from the floor and from the payroll because of

19   her treatment of subordinates on the floor;

20   that they came with that formal request, made

21   a formal complaint.

22              There were a number of --

23           Q.    Why don't you pause just for a

24   second?

25           A.    Sorry.

```
 1            Q.    So the question was:  Prior to
 2    July of 2018, was there any counseling that
 3    was provided to Ms. Boylan?
 4            A.    No, not that I know of.
 5            Q.    Okay.  But there were -- you said
 6    there were discussions about providing her
 7    counseling?
 8            A.    I think in the summer.  I don't
 9    think about earlier -- I don't earlier than
10    that conversation that I had with her.
11            Q.    So you think after July 2018
12    there were discussions about counseling for
13    her?
14            A.    Yeah.  I just remember in the
15    run-up to the ultimate September parting of
16    ways that there were conversations, that it
17    was -- this was not -- it wouldn't be
18    tolerable in the long run.  We had to figure
19    this out.
20            Q.    But that counseling did not occur
21    between July 2018 and September 2018?
22            A.    I don't know if Alphonso had
23    independent conversations with her.  I don't
24    know.
25            Q.    Okay.  But to your knowledge --
```

1        A.    But not that I recall.

2        Q.    To your knowledge, no counseling

3   occurred?

4        A.    Not that I recall.

5        Q.    Okay.  Can you recall anyone else

6   in the -- I think we covered this earlier, but

7   remind me.  -- anyone else in the executive

8   chamber who had received counseling?

9        A.    ███████████ , ███████████ .  Those

10  are the two I remember off the top of my head.

11  But I'm sure there are more.

12       Q.    Okay.  And ███████████ , what did

13  he do that resulted in counseling?

14       A.    ███████████ , who used to work for

15  us, complained about his treatment of her, and

16  so he was formally counseled.

17       Q.    And when you say -- we're talking

18  about counseling.  Let's make sure we have the

19  same definition.

20             When you're saying "counseling,"

21  what do you mean?

22       A.    I mean that Alphonso and one

23  other person, generally Camille Varlack or

24  whomever the ethics officer is at the time,

25  would sit someone down, go through complaints

1  that are made against them while obviously

2  protecting complainants' names, and their

3  behavior in the office, review what

4  their -- how they are supposed to be behaving

5  per the handbook, and advise them on how

6  things needed to change moving forward.

7        Q.    And did Mr. ▆▆▆▆ counseling

8  result in him leaving the executive chamber?

9        A.    No.

10        Q.    What happened with him?

11        A.    He understood that how he behaved

12  towards ▆▆▆ was not acceptable, and from my

13  understanding, he changed his behavior towards

14  her.

15        Q.    And who did ▆▆▆▆▆▆

16  counseling?

17        A.    I believe Alphonso and Judy at

18  different points.

19        Q.    Anyone else you can remember

20  getting counseling?

21        A.    Those are the only ones I can

22  remember off the top of my head.  I'm sorry.

23        Q.    And ▆▆▆▆▆▆ counseling, did

24  that directly result in him leaving the

25  executive chamber?

1    A. No. I think that ███████

2 finally understood that ████████ was -- it

3 wasn't going to work and it was time to find

4 something new.

5    Q. So if my understanding is right,

6 that the purpose of the counsel is to --

7    A. Improve your --

8    Q. -- get someone to change their

9 behavior?

10    A. Yes.

11    Q. Improve their behavior?

12    A. Yes.

13    Q. So their behavior is consistent

14 with the handbook?

15    A. Yes.

16    Q. It's not a "You're getting fired"

17 message?

18    A. Correct.

19    Q. I got you.  All right.  So why

20 don't we look at what's Tab 4 in your binder.

21    A. These are very intense binders.

22    Q. All right.  So this is -- if I'm

23 right, what you're looking at is a series of

24 text messages between you, Jill DesRosiers,

25 Alphonso David, and Linda Lacewell, from

```
 1    July 26, 2018.  Is that right?
 2            A.     Correct.
 3            Q.     And there's an attachment that
 4    you send.  And that attachment appears to be
 5    what's on page 2, which is a snapshot or
 6    screenshot of a text message between you and
 7    Lindsey Boylan.
 8                   Is that right?
 9            A.     Correct.
10            Q.     Is this a text message between
11    you and Ms. Boylan you were referring to
12    earlier?
13            A.     Yes.
14            Q.     Where she says:
15                   "I don't mind tough days at all"?
16            A.     Yes.
17              MS. KENNEDY PARK:  Oh, yeah,
18          let's mark this as the next exhibit.
19              (Exhibit 8, Text messages between
20          Melissa DeRosa, Jill DesRosiers,
21          Alphonso David, and Linda Lacewell from
22          July 26, 2018, marked for
23          identification, as of this date.)
24            Q.     And then the next day, Ms. Boylan
25    writes:
```

```
1                    "I'm not sure why Alphonso
2            couldn't pick up the phone or ask me
3            himself.  What I said and why I was
4            asking him, Alphonso, to join the
5            meeting.  That's not a team.  That's
6            either because he is afraid of me or
7            doesn't respect me."
8                    Do you have an understanding of
9     what she's referring to there?
10           A.    No.
11           Q.    You said that the interaction
12    with Jill was about disregarding protocol.
13                  What was Alphonso David's role in
14    that protocol?
15           A.    I don't remember.  I don't
16    remember -- I've seen this exchange in the
17    lead-in to this interview.  I don't remember
18    specifically.
19           Q.    Okay.  Do you remember generally
20    what the issue was with Mr. David?
21           A.    No.
22           Q.    Okay.  And then she says:
23                  "This is after I had already been
24           read the riot act by Jill."
25                  Do you have an understanding what
```

1    she meant by being read the riot act by Jill?

2         A.    I think, and, like, looking at

3    this and refreshing my memory, it's what I

4    said earlier, which is I think that my

5    conversation came after the conversation Jill

6    had with her.

7         Q.    Okay.  And that she was

8    interpreting her conversation with Jill as

9    having been read the riot act?

10        A.    Yes.

11        Q.    Okay.  And then Mr. David wrote

12   back in the next set of texts on the next

13   page:

14             "I'm not doing this.  She is

15        certifiably ████.  One day it is one

16        person, the next day it is someone

17        else."

18             Do you remember that?

19        A.    I've seen this so -- in that

20   context.

21        Q.    Do you have any independent --

22             MR. HECKER:  Sorry.  The

23        questions she's asking about your memory

24        are going to be, like, your memory, not

25        just do you remember seeing this text in

1          prep.  That's not the question.
2               MS. KENNEDY PARK:  I don't want
3          to know about what you saw with your
4          lawyer.
5          A.   Okay.  So no.
6          Q.   Okay.  Do you remember any
7     conversations with Mr. David about Ms. Boylan
8     being one day one person and the next day
9     someone else?
10          A.   This was a constant dialogue.  I
11     don't remember a specific conversation with
12     Alphonso in the lead into September, but this
13     was a constant refrain.
14          Q.   I'm trying to understand.  This
15     was a constant refrain before July 26, 2018?
16          A.   Yes, it started earlier.
17          Q.   Okay.  And so the discussion
18     about potentially giving her counseling
19     started before July 2018?
20          A.   No, I don't -- I don't remember
21     specifically when we talked about "counseling
22     her."  But I don't think it was before July.
23     But Alphonso may have a different
24     recollection.
25          Q.   Okay.  If you flip through on the

1    26th -- let's see.  On the bottom it says

2    -4837.  Ms. Lacewell says that "She didn't say

3    it's over."

4             This is after Ms. Lacewell has a

5    conversation with Ms. Boylan.  What did you

6    understand Ms. Lacewell to mean by "She didn't

7    say it's over"?

8         A.    What I said before, that it

9    wasn't necessarily that she was leaving.

10        Q.    What did -- what did Ms. Boylan

11   say to you was her perspective on this issue

12   of breaching protocol?

13        A.    The conversation she and I had

14   was very short.  We didn't talk about it

15   again.

16        Q.    You never spoke again about the

17   issue of protocol for contacting the governor

18   with Ms. Boylan?

19        A.    Not based on my recollection, no.

20        Q.    Did anyone else between July of

21   2018 and September of 2018, to your knowledge,

22   have a conversation with Ms. Boylan about the

23   protocol for contacting the governor?

24        A.    Rob talked to her a lot about it.

25        Q.    Okay.  And what do you know about

1   the conversations between Mr. Mujica and

2   Ms. Boylan about the protocol for contacting

3   the governor?

4         A.     Lindsey and Rob had a very

5   friendly relationship, and I think that he was

6   trying to coach her to be successful and not

7   take things so personally.  She would pin the

8   governor or call the governor and say, "I have

9   this idea for this project."

10                And the governor would say,

11  "Great, run that by Rob and ▮▮▮▮▮▮▮

12                And then she would go to Rob and

13  say, "What does he think, I'm stupid?  You

14  know, this is so insulting.  I have to go run

15  it by you and ▮▮▮▮▮

16                And Rob would say, "Lindsey,

17  we -- nobody just runs the governor things.

18  We talk these things through.  Like, it

19  shouldn't be insulting to you that he's asking

20  you to talk to me about a project.

21                "I have 25 years of experience in

22  this area.  ▮▮▮▮▮ is the head of development

23  for the MTA.  And he wants us to all be a team

24  and talk to each other about these things."

25                And I know that, you know, she

```
 1    would constantly run to Rob and, you know,

 2    complain or vent about her frustrations on

 3    these things, and that he would try to give

 4    her positive feedback to improve.  I think

 5    that they've had a friendly relationship.

 6         Q.    And in the conversations that you

 7    understand were had between Mr. Mujica and

 8    Ms. Boylan, what did she say was her

 9    perspective on why she was going directly to

10    the governor?

11         A.    She was just offended that she

12    didn't have that direct line, that she felt

13    like she should be able to go directly to him,

14    and that if she didn't, it's because she was

15    being disrespected in some way.

16         Q.    Okay.  Did she ever say that she

17    felt that other people had a direct line to

18    him and that she should also?

19         A.    I don't know.

20         Q.    Do you know anything else about

21    what Ms. Boylan said was her perspective to

22    Mr. Mujica?

23         A.    No, I mean, I know that she told

24    Rob that she ████ Annabel and Stephanie and

25    Jill, that she thought I was a ████, that I
```

```
 1   had ███████████████, and that she felt like
 2   she was being "discluded" from things that she
 3   should be in charge of because she had more
 4   talent in her pinky than everyone in the
 5   building.
 6        Q.    Are those all quotes you're
 7   offering us from Mr. Mujica that he said
 8   Ms. Boylan said?
 9        A.    The Annabel, Stephanie, Jill,
10   yes.  The ██████ and █████████████, yes,
11   and I believe she put it in writing.  And the
12   part about more talent in her pinky, I think
13   she expressed to ████████████ in writing.
14        Q.    And when did you learn about
15   these things?
16        A.    With Rob, I learned about them
17   after the fact, in March of last year when she
18   sent her threatening text message to him.
19             With the ██████████, more
20   talent in my pinky, at the time, because that
21   was, sort of, ████████ breaking point when she
22   came to me and said, "Her or me.  I'm not
23   doing this anymore."
24        Q.    Sorry.  When you say you learned
25   about all the things about Annabel, about Dani
```

```
 1    Lever, about Stephanie Benton, about the ████
 2    comment, and ██████████ comment, and about
 3    her complaining about being excluded, those
 4    were in March of 2020?
 5         A.    Correct.
 6         Q.    Okay.  And that the talent in the
 7    pinky was when?
 8         A.    It was in an e-mail that Lindsey
 9    wrote to ██████████ in September of 2018.
10         Q.    And when was the last time you
11    saw that e-mail?
12         A.    In preparation for today.
13               MR. HECKER:  You're talking about
14          outside of prep?  I'm not -- look, did
15          you have a recollection of having seen
16          that at the time?
17               THE WITNESS:  It was a pretty
18          unforgettable e-mail.
19               MR. HECKER:  Okay.
20         Q.    And you said ██████████ said
21    it was either her or Ms. Boylan?
22         A.    She -- yes.
23         Q.    When was that?
24         A.    In sum and substance.  In
25    September of 2018.  She sent me a series of
```

1   e-mails where ▓▓▓▓ assistant had inquired

2   as to the location of the dep secs, because

3   there was going to be a storm, and that's a

4   traditional thing that the state operations

5   director does, figure out where all the

6   commissioners are, figure out where all the

7   dep secs are, so you can deploy assets and

8   resources around the state.

9           Lindsey responded, essentially

10  saying, "How dare you ask where I'm going to

11  be, and if this governor or senior staff need

12  to get me, they can get me whenever they want.

13  They have my phone numbers."

14          And then separately, she refused

15  to get on State of the State calls that ▓▓▓

16  and her deputy, ▓▓▓▓▓▓▓, were running

17  because she felt it was a waste of her time

18  and beneath her if she wasn't involved in

19  conversations with ▓▓▓▓▓▓▓ and Jim

20  Malatras, because they were really the

21  decision makers, and that she wasn't going to

22  participate in anything with her anymore.

23          And ▓▓▓▓ finally reached a point

24  where she started forwarding me these e-mails

25  and was like, "Melissa, I'm not doing this

```
 1    anymore.  I'm not doing this with her.  Like,
 2    either she goes or I go."
 3              And at this point, again, this
 4    was, like, right around the time of the
 5    primary in 2018.  I was taking a lot of time
 6    off working on the campaign, and it was, like,
 7    any time that I was getting any outreach,
 8    like, that there were issues in the office, it
 9    always seemed to be associated with Lindsey.
10         Q.   And what did you do after
11    Ms.           outreach?
12         A.   I forwarded the e-mails to
13    Alphonso.
14         Q.   And what did you ask him to do?
15         A.   I said, "Please create a file for
16    Lindsey."
17         Q.   It sounds like you remember that
18    e-mail, so why don't we pull it up.
19         A.   Sure.
20         Q.   Tab 165.
21              (Exhibit 9, E-mails including
22         e-mail from Lindsey Boylan to
23                             , marked for
24         identification, as of this date.)
25              MS. KENNEDY PARK:  Let's mark
```

1            this as the next Exhibit.

2            Q.    The bottom -- the very bottom is

3     an e-mail from Lindsey Boylan to ███████

4     ████████████████████████████████████

5     And then there's an e-mail from █████ to you,

6     Ms. Lacewell, and Ms. DesRosiers that says:

7                  "I am sick and tired of the way

8            she treats people."

9                  Is this the e-mail you were

10    referring to?

11           A.    One of, yeah.

12           Q.    And in it she says -- Ms. █████

13    says:

14                 "She needs to be counseled."

15                 Was that a reference to Lindsey

16    Boylan?

17           A.    I'm sorry, let me just -- if it's

18    okay.

19                 (Document review.)

20                 Yes.

21           Q.    And then the next e-mail, you

22    respond to Mr. David, Ms. Lacewell, and

23    Ms. DesRosiers.  And you say:

24                 "Alphonso, please create a file

25           for Lindsey.  Please put this in it."

1          A.      Yes.

2          Q.      Okay.   Is that the e-mail you

3     were just referring to?

4          A.      Yes.

5          Q.      Okay.   And what did you mean by

6     "create a file"?

7          A.      In my experience, when you have

8     personnel issues, you have to document them.

9     And so I was saying, we have an issue, the

10    state operations director, who is her official

11    boss, is saying she needs to be counseled.   So

12    I think you have to create -- start to create

13    a record.

14         Q.      Okay.   And had you ever asked

15    Mr. David before to create a record or a file

16    for someone because of an HR issue?

17         A.      I think ███████████.   And I don't

18    think I asked him to do that.   I think that

19    Jill did.   But I knew about it.

20         Q.      Anyone else?

21         A.      Not that I recall.

22         Q.      Anyone else you were aware of

23    that had a file like this created for them?

24         A.      Not that I recall, but I'm sure

25    there are others.

```
 1          Q.    How about ███████?

 2          A.    Oh, I'm sure ████████

 3          Q.    How are you sure?

 4          A.    Well, I'm -- I take that back.

 5   I'm not sure.  I assume.

 6          Q.    Don't assume.  Do you know if

 7   ████████ --

 8          A.    I don't.

 9          Q.    -- has a file like this?

10          A.    I don't.

11          Q.    ████████

12          A.    I don't know.

13          Q.    And then Mr. David responds:

14                "We manage all allegations/claims

15          using the same process and applying the

16          same standard.  Accordingly, given that

17          this was independently forwarded to

18          counsel's office, we have already begun

19          compiling information regarding this and

20          other allegations regarding this

21          employee."

22                What did you understand Mr. David

23   to mean when he said, "We use the same

24   process"?  What was the process?

25          A.    I think exactly what -- I think
```

1   his words mean what they say, that he was

2   saying that, you know, she -- I think that he

3   was responding to the fact that I said,

4   "Create a file for Lindsey" to make clear that

5   this was not a unique situation.

6           And with any complaints, they're

7   handled the same way, which is that you begin

8   to compile complaints.

9       Q.   Okay.  So you understand that

10  what he was writing back was, this is normally

11  what we do, we create a record of the

12  complaints?

13      A.   That's how I understood it.

14      Q.   And what was your expectation

15  about what Mr. David would do after he created

16  the file with this document in it?

17      A.   Counsel Lindsey.

18      Q.   Did you have any other

19  expectation about what he would do?

20      A.   No.

21      Q.   Did you expect him to

22  investigate?

23      A.   Yes.

24      Q.   Okay.  And what did you -- how

25  did you expect him to investigate?

1         A.    Talk to the people who were

2   making official complaints to get their side

3   of things, and also speak to Lindsey.

4         Q.    Were you aware of Mr. David

5   having done that type of investigation in any

6   other circumstance?

7         A.    With the ███████████████

8   situation.

9         Q.    Anyone else?

10        A.    I don't remember off the top of

11  my head.  That's just one that specifically

12  sticks out.

13        Q.    And to your knowledge, is that

14  what Mr. David did?

15        A.    I think so.

16        Q.    And what do you base that on?

17        A.    Because I remember that he spoke

18  to Senior Staffer #2 and Senior Staffer #3 at the time.  And I

19  remember that ████████ said that she appreciated

20  that I had taken her complaint to Alphonso.

21  And so I assumed that that meant that he was

22  managing it from there.

23        Q.    Do you understand

24  Senior Staffer #2 to be making a complaint

25  about Ms. Boylan?

```
 1        A.    Yes.

 2        Q.    Did you understand Senior Staffer #3

 3   to be making a complaint about Ms. Boylan?

 4        A.    Yes.

 5        Q.    And what is your basis for saying

 6   that you understood Snr Staffer #2 to be making a

 7   complaint about Ms. Boylan?

 8        A.    Not dissimilar to            They

 9   had nasty e-mail exchange, which then was

10   forwarded to Alphonso and said, "I want to

11   make a complaint."

12        Q.    Snr Staffer #2 did that?

13        A.    It was either she or Snr Staffer #3 but

14   they were both on the same chain.

15        Q.    And they said -- your

16   recollection is that in those documents, they

17   said, "We want make a complaint"?

18        A.    Yes.

19        Q.    And so did Ms. Boylan get

20   counseling?

21        A.    An attempt at it, yes.

22        Q.    And by "attempt at it," what is

23   your understanding of what happened?

24        A.    That Alphonso --

25              THE WITNESS:  Am I allowed to
```

1          talk about this?

2          A.    That Alphonso sat her down.

3                THE WITNESS:  Am I allowed to

4          talk about this?

5                MR. HECKER:  Hang on.

6                I think this is privileged.

7                MS. KENNEDY PARK:  There are --

8                MR. HECKER:  I think --

9                MS. KENNEDY:  -- piles of

10         documents about this.

11               MR. HECKER:  Can you -- look, I

12         don't want there to be an issue.  Can

13         you use the documents and ask her about

14         those?  If they produced the documents,

15         go for it.

16               MS. KENNEDY PARK:  I'd like to

17         know what she knows.

18    BY MS. KENNEDY PARK:

19         Q.    So what do you know about what

20    happened with Ms. Boylan?  And how do you know

21    it?

22               Why don't you start with:  How do

23    you know it?

24               MR. HECKER:  Do you only know it

25         through discussions with counsel;

```
 1           Alphonso David in particular?
 2                 THE WITNESS:  Yeah.
 3                 MR. HECKER:  Have you seen
 4           documents relating to it separately?
 5                 THE WITNESS:  The memo that was
 6           put on file subsequently.
 7                 MS. KENNEDY PARK:  Are you going
 8           to allow her to testify what --
 9     BY MS. KENNEDY PARK:
10           Q.    In the moment what Mr. David told
11     you?
12                 MR. HECKER:  The memo has been
13           produced.  Right?
14                 MS. KENNEDY PARK:  The memo's
15           been produced.  This has all been
16           waived.  I mean, there's press articles
17           about this.
18                 MR. KIM:  The subject of Lindsey
19           Boylan and Alphonso David has been
20           waived as far as I -- a number of people
21           have testified about it.
22                 I mean, it's our view it's, sort
23           of, sword and shield.
24                 But consultations with -- you
25           know, and what they did with Lindsey
```

1     Boylan, that's been openly discussed.

2               MR. HECKER:  Go ahead.

3               THE WITNESS:  Okay.

4          A.    Following their meeting, Alphonso

5     and I spoke.  I don't remember if it was on

6     the telephone or in person.  But he told me

7     that he had sat her down with, I think,

8     Camille -- I think Camille, but there was

9     definitely another person present.

10              And that they talked to her about

11    the complaints that had come in; the three

12    women at ESD and the fact that Howard Zemsky

13    and the counsel at ESD had formally requested

14    she be removed from the ESD line and the

15    floor.

16              █Senior Staffer #3█ and █Senior Staffer #2█ feeling

17    that she mistreated them.

18              ████████████████ -- and I can't

19    remember if there was more than that, but at

20    least those instances.  And that they

21    attempted to speak to her about it, but it

22    didn't go very far, that she pretty quickly

23    erupted and said, "I'm quitting," and she

24    left.

25              And then I found out subsequently

1    that day from a lobbyist that she had sent out

2    a blast e-mail to her contacts saying, "Today

3    is my last day in the executive chamber."

4    BY MS. KENNEDY PARK:

5            Q.    Okay.  And before that

6    conversation with Mr. David, were you aware of

7    the three women at ESD who had raised concerns

8    about Ms. Boylan?

9            A.    Yes.

10           Q.    And how did you become aware of

11    that?

12           A.    From Alphonso.  It's, like, a

13    very serious thing when an agency requests to

14    have somebody removed from the floor and the

15    line.  It's -- I don't have any memory of that

16    ever happening.

17           Q.    I think the question I asked was:

18    How did you become aware?

19           A.    Yeah.

20           Q.    You became aware of it through

21    Mr. David?

22           A.    Yeah.

23           Q.    So prior to the conversation

24    after the meeting with Lindsey Boylan

25    between -- between "Mr." Boylan and Mr. David,

1    that was not the first time you heard about

2    these three women?

3            A.    No.

4            Q.    Okay.  And so then you said after

5    the meeting, Lindsey Boylan -- at the meeting,

6    Mr. David reported that Lindsey Boylan had

7    said she quit?

8            A.    Yes.

9            Q.    Okay.  She told Mr. David she

10   quit?

11           A.    Yes.

12           Q.    Okay.  And then she said --

13           A.    I think so.

14           Q.    Your recollection is that Mr.

15   David told you --

16           A.    Yes, that's my --

17           Q.    -- that Ms. Boylan had quit?

18           A.    That's my recollection.

19           Q.    Okay.  And this was --

20           A.    I just -- I'm hedging a little

21   bit because I don't remember if it was a

22   situation like when I spoke to her on the

23   phone, and she, like, left the office and we

24   were unsure of what was going on.

25                 But I know that shortly

1    afterwards, she sent out a blast e-mail to her

2    contacts saying that today was her last day in

3    the executive chamber.

4            Q.    Okay.  So in between the meeting

5    with Mr. David that you had and you learning

6    of the blast e-mail, it sounds like you had

7    some concern that maybe you were in this "what

8    is her intention" place, like you had

9    described to me before, is she quitting or is

10   she not quitting.  Is that right?

11           A.    No.

12           Q.    No?

13           A.    I'm saying I don't remember if

14   Alphonso said to me that she declared in the

15   meeting that she was quitting, or if it wasn't

16   until afterwards.

17               So I'm not -- I don't want to

18   characterize what I knew at the time as saying

19   I was in that place of I don't know.  I'm just

20   saying to you my memory isn't clear.

21           Q.    Okay.  Your memory is not clear

22   as to whether you understood, based upon your

23   meeting with Mr. David, that Ms. Boylan had

24   quit?

25           A.    That's what I'm saying.

1          Q.    Okay.  And that she had, on prior

2    occasions, caused some confusion about whether

3    she was quitting the executive chamber?

4          A.    At least the one instance with

5    me.

6          Q.    Are you aware of any other

7    instances?

8          A.    No.

9          Q.    You told me that she had had

10   multiple outbursts like the one with you.

11   Right?

12         A.    Yes.

13         Q.    And on those other outbursts, I

14   think you already told me that her intention

15   as to whether she was going to remain in the

16   chamber was unclear.  Is that right?

17         A.    I don't think so.

18         Q.    Okay.

19         A.    There were other times when she

20   had outbursts with staff and she would act

21   out, but I don't remember any other specific

22   time when I thought to myself, is she not

23   coming back or coming back.  That doesn't

24   necessarily mean that it didn't happen, but I

25   only recall that one time.

```
 1            Q.    I see.  Meaning it didn't happen
 2    with other people, just not you?
 3            A.    That's what I'm saying.  I
 4    don't -- I can't, you know, speak to every
 5    incident.
 6            Q.    Okay.
 7                  MS. CLARK:  Jen, can I just jump
 8            in?
 9                  MS. KENNEDY PARK:  Yeah, sure,
10            sure.
11                  MS. CLARK:  So you said the ESD
12            wanted her removed from their floor.
13                  Why didn't she move to the
14            executive chamber floor when she
15            switched from ESD to becoming deputy
16            secretary?
17                  THE WITNESS:  So she had a very
18            big office on 37, and all of the offices
19            on 39 where the governor sits, which is
20            sort of viewed as, like, that's where
21            all the senior staff are, there were no
22            offices that were similar to the one
23            that she had on 37.
24                  So when she came over, she
25            requested to stay on 37 so that she
```

Melissa DeRosa Highly Confidential
July 05, 2021

```
 1              could keep her office and her assistant,

 2              because, otherwise, she would have been

 3              either severely downgraded in terms of

 4              office size, or she would have gone to

 5              the 38th floor, which she viewed as,

 6              like, beneath her.

 7                   MS. CLARK:  It was her request to

 8              stay on 37?

 9                   THE WITNESS:  Yeah.

10    BY MS. KENNEDY PARK:

11         Q.   Did she tell you that she viewed

12    being on the 38th floor as being beneath her?

13         A.   Not in those specific words.

14         Q.   And what were the words she used?

15         A.   I didn't have the conversation

16    with her.  Jill had the conversation with her.

17    And I believe, based on my recollection, that

18    Jill said, "Either you can have one of these

19    smaller offices on 39, or we can give you a

20    bigger office on 38."  And that she didn't

21    react well to the idea of being put on the

22    38th floor.

23         Q.   Okay.  And what else did Jill

24    tell you about her not reacting well?

25         A.   That Jill's takeaway was she
```

1    viewed it as being beneath her.

2            Q.    All right.  So circling back, so

3    now you're not sure exactly the memory of what

4    Mr. David told you about whether she was

5    quitting or not, but then you become aware

6    that there is an e-mail that Ms. Boylan has

7    sent.

8                Were you on that e-mail?

9            A.    I don't remember.  I

10   didn't -- let me put it this way:  If I was,

11   that wasn't how I learned of it.

12           Q.    Okay.  And you learned of it

13   from?

14           A.    A lobbyist.

15           Q.    Okay.  Which lobbyist?

16           A.    I think it was -- I think it was

17   ███████.  I don't -- ███████████.  But I

18   don't remember.  I think it was him.

19           Q.    Okay.  So after you learned about

20   the e-mail, what did you do?

21           A.    I think I called the

22   communications department and said, "We may

23   get press incoming on this."

24           Q.    Okay.  And by calling the

25   communications department, who did you call?

```
1              A.   Dani and Rich.

2              Q.   Okay.  And what did they say?

3              A.   I just said, "I'm flagging this.

4    I feel like you could get press incoming.  If

5    you do, let me know."

6              Q.   Okay.  Did you make any attempt

7    to reach out to Ms. Boylan?

8              A.   I don't think so.

9              Q.   Did you speak to anyone else in

10   the executive chamber about the e-mail other

11   than Dani Lever and Rich Azzopardi?

12             A.   I think Alphonso.

13             Q.   Okay.  And what do you recall

14   about your conversation with Mr. David?

15             A.   I don't.  I think I just was

16   like, "Well, she sent this out.  So I guess

17   that's that."

18             Q.   Did you start looking for a

19   replacement?

20             A.   Not in two days, but, yeah,

21   pretty immediately.

22             Q.   How immediately after that e-mail

23   did you start looking for a replacement?

24             A.   That's an important job.  So I

25   don't remember specifically, but sometime in
```

1    the near future.

2          Q.    Did you ever speak to the

3    governor about Ms. Boylan's leaving the

4    executive chamber?

5          A.    Yes.

6          Q.    Okay.   And tell us about that

7    conversation.

8          A.    Alphonso and I spoke to him

9    together.

10              THE WITNESS:   Is that --

11              MR. HECKER:   Yeah.  I mean, I

12         think that's privileged unless

13         Alphonso's already disclosed it.

14              MS. KENNEDY PARK:   So just to be

15         clear, the executive chamber's position

16         as communicated to you -- sorry, just

17         got to make a record -- the executive

18         chamber's position as communicated to

19         you is that you can disclose the

20         conversations with Ms. Boylan, but you

21         can't disclose the conversations with

22         the governor related to Ms. Boylan?

23              MR. HECKER:   Can -- I don't know

24         that that fairly captures it.   There are

25         some conversations we were aware of and