# Exhibit 4

1

2  ---------------------------------------X

3  IN THE MATTER OF INDEPENDENT

4  INVESTIGATION UNDER

5  EXECUTIVE LAW 63(8)

6  ---------------------------------------X

7

8

9

10                    REMOTE PROCEEDINGS

11                    RICHARD AZZOPARDI

12                 TUESDAY, JUNE 23, 2021

13                      9:00 A.M.

14

15

16

17

18

19

20

21

22  Reference No.: 4616221

23  Reported By:  Rita Persichetty

24

25

Page 2

1   A P P E A R A N C E S:

2

3   KRIEGER KIM & LEWIN LLP

4   Attorneys for the Witness

5        500 Fifth Avenue

6        New York, New York 10110

7   BY:  EDWARD Y KIM, ESQ.

8           - and -

9        ALEXANDRA MESSITER, ESQ.

10       EMAIL:  edward.kim@kkllp.com

11

12  CLEARY GOTTLIEB STEEN & HAMILTON

13  Attorneys for New York State Attorney

14  General's Office

15       One Liberty Plaza

16       New York, New York 10006

17  BY:  JOON H. KIM, ESQ.

18          - and -

19       HYATT MUSTEFA, ESQ.

20       EMAIL:   hmustefa@cgsh.com

21

22  VIDEOGRAPHER:  MARC FRIEDMAN

23

24

25

```
                                              Page 4
 1                P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  Good morning.  We
 3       are going on the record at 8:58 a.m. on
 4       Wednesday, June 23, 2021.  Please silence
 5       your cell phone, computer tones or any
 6       other electronic devices you have near you.
 7       Audio and video recording will continue to
 8       take place unless all parties agree to go
 9       off the record.
10           This is media unit number one of the
11       video recorded deposition of witness
12       06/23/2021.  My name is Mark Friedman, I'm
13       your certified video legal specialist.
14       Your court reporter today is Rita
15       Persichetty and we are both from the firm
16       of Veritext Legal Solutions.
17           This deposition is being held via
18       remote video conference.  All counsel
19       consent to this remote video arrangement
20       and waive any objections to this matter of
21       reporting.  If there any objections to the
22       court reporter swearing the witness
23       remotely and this remote video arrangement
24       please state them now.
25           Hearing no objection, would counsel
```

1       now state on the record their appearances

2       and affiliations, beginning with the

3       noticing attorney.

4              MR. J KIM:  Good morning.  This is

5       Joon Kim, the law firm of Cleary, Gottlieb,

6       Steen & Hamilton.  I'm appearing in my

7       capacity as a special deputy to the first

8       deputy attorney general of the State of New

9       York.

10             MS. MUSTEFA:  Good morning.  My name

11      is Hyatt Mustefa.  I'm also affiliated with

12      the law firm Cleary, Gottlieb, Steen &

13      Hamilton, and also I am a special deputy to

14      the first deputy of the New York attorney

15      general.

16             MR. E KIM:  Morning.  Edward Kim.  Oh,

17      I'm sorry.  Edward Kim from the law firm of

18      Krieger Kim & Lewin in for Rich as a party.

19      And I'm joined off camera by my colleague

20      Alexandra Messiter from the same firm.

21             THE VIDEOGRAPHER:  Would the court

22      reporter please swear in our witness and we

23      can proceed.

24             THE COURT REPORTER:  The attorneys

25      participating in this deposition

1           acknowledge that I am not physically

2           present in the deposition room and that I

3           will be reporting this deposition remotely.

4           They further acknowledge that, in lieu of

5           an oath administered in person, the witness

6           will verbally declare his testimony in this

7           matter is under penalty of perjury.  The

8           parties and their counsel consent to this

9           arrangement and waive any objections to

10          this manner of reporting.  Please indicate

11          your agreement by stating your name and

12          your agreement on the record.

13               MR. E KIM:  Edward Kim, no objection.

14               MR. J KIM:  Same, no objection.

15   R I C H A R D    A Z Z O P A R D I,

16          called as a witness, having been sworn

17          by the Notary Public, was examined and

18          testified as follows:

19   EXAMINATION

20   BY MR. J KIM:

21          Q.   Good morning.  Can you hear me?

22          A.   I can.

23          Q.   Okay.  So as we mentioned at the

24   start, the -- we are -- I'm appearing on

25   behalf -- in my capacity as a special deputy to

Page 7

1    the first deputy attorney general.  The New York

2    Attorney General's office has appointed the law

3    firms of Cleary, Gottlieb, Steen & Hamilton and

4    Vladeck, Raskin & Clark to conduct an

5    independent investigation under New York

6    executive law section 63(8) into allegations of

7    sexual harassment brought against the governor,

8    Andrew Cuomo, as well as the surrounding

9    circumstances.

10             And you are here today pursuant to a

11   subpoena that's been issued in connection with

12   that investigation.

13             Do you understand that?

14        A.   Yup.

15        Q.   And I'll note at the outset that, as

16   you can see, the proceeding is being video

17   recorded.  And you are under oath, and that

18   means you must testify fully and truthfully just

19   as if you were in a court of law sitting before

20   a judge or a jury.  And your testimony is

21   subject to the penalty of perjury.

22             Do you understand that?

23        A.   I do.

24        Q.   And if you would like to make a brief

25   sworn statement, we will give you an opportunity

Page 8

1   to do so before the conclusion of the

2   examination.  And I'll remind you and your

3   counsel of that opportunity at the end of the

4   testimony today, at the end of my questions.

5           Although this is a civil

6   investigation, the New York Attorney General's

7   office also has criminal enforcement powers and

8   you have the right to refuse to answer any

9   questions that we ask if answering the question

10  might incriminate you.

11          Do you understand that right?

12      A.   Sure.

13      Q.   However, a failure to answer a

14  question that we ask can be used against you in

15  a court of law in a civil noncriminal

16  proceeding.  And so asserting your Fifth

17  Amendment right, although you are entitled to do

18  so, and there can be no negative inferences

19  drawn from it in a criminal proceeding, the fact

20  that you assert a Fifth Amendment right can be

21  used in a noncriminal civil proceeding.

22          Do you understand that?

23      A.   Yes.

24      Q.   You're appearing today with your

25  attorney present, and you can consult with the

1  two of them on questions of privilege.  And if

2  an issue of privilege comes up, you know, you

3  should -- we'll give you an opportunity to speak

4  with them.  We would ask, however, that if

5  there's a question pending, that you answer that

6  question to the best of your ability before

7  consulting with your lawyer.

8            Do you understand that?

9       A.   Okay.  Yes.

10      Q.   We also have, as you can see, a

11  videographer and a court reporter present.  And

12  the court reporter will be taking down my

13  questions, our questions, and your answers, and

14  so it will be important in order to have a clean

15  record for you to answer all of the questions

16  verbally.  So not a nod or a shake of the head

17  or with uh-huhs or -- you know, with a yes or no

18  in addition to the other words that you use.

19            Do you understand that?

20      A.   Okay.

21      Q.   And we should also try not to speak

22  over each other.  I'll try to wait for your

23  answers to be complete before asking another

24  question, and if you can wait until my question

25  is over before answering, that will ensure the

```
                                       Page 10
 1    cleanest record possible.
 2              If you don't understand a question,
 3    please let me know and I'll try to rephrase it a
 4    different way so that you can understand it.
 5              I will be asking questions that --
 6    about names and dates and other specific
 7    information.  If you remember the specific
 8    information, you are obligated, as you're under
 9    oath, to give that answer.  Even if you don't
10    have a recollection of a specific name or date,
11    you're still obligated to give your general
12    recollection of what I'm asking about and just
13    make clear that, you know, your recollection is
14    of a general nature as opposed to -- if you
15    don't remember the specifics.
16              Do you understand that?
17        A.    I do.
18        Q.    If you need a break at any point,
19    please tell us and we will -- as I said, unless
20    there's a question pending or an appropriate
21    time shortly after, we'll take a break.  And
22    also we should -- we'll try to take a short
23    lunch break so, you know, everyone involved can
24    get something to eat.
25              Can you confirm -- can you and your
```

```
                                           Page 11
 1    lawyers confirm that you're not yourselves
 2    recording this proceeding on your end?
 3         A.    Yeah, we can confirm we're not --
 4    we're not recording.
 5         Q.    Okay.  And can you also confirm that
 6    you will not communicate, during the dep --
 7    during the testimony, with anyone outside of the
 8    group that's sitting there, even at breaks,
 9    about the substance of the testimony?
10         A.    Confirmed, yes.
11         Q.    Under executive law 63(8), the
12    provision under which this investigation is
13    being conducted and this testimony is being
14    taken, the law has strict confidentiality
15    requirements that prohibits you and your counsel
16    from revealing anything that we ask you about
17    during your testimony to anyone.
18              And if anyone asks you to disclose
19    that information, we would ask that you let us
20    know, through your lawyers.
21         A.    Okay.
22         Q.    Do you understand that?
23         A.    I do.
24         Q.    And you're also entitled to be free
25    from retaliation for answering our questions
```

1  or -- and cooperating with our investigation.

2  And if you believe at any point in time that you

3  are being retaliated against for complying with

4  the subpoena or answering our questions, we also

5  ask that you inform us, through your lawyers, so

6  that we can be made aware of that as well.

7       A.    Okay.

8       Q.    Are you taking any medication or drugs

9  that might make it difficult for you today to

10  understand any questions?

11       A.    No.

12       Q.    Have you had any alcohol today?

13       A.    I have not.

14       Q.    Okay.  Is there any reason why you

15  would not be able to answer the questions today

16  fully and truthfully?

17       A.    Not to my knowledge.

18       Q.    Okay.  Can you please state your name,

19  give us your date of birth and your current home

20  and business addresses for the record?

21       A.    Sure.  My name is Richard Alan

22  Azzopardi.  I was born ███████████.  I

23  currently live at ███████████████████

24  ███████████.  I currently work at the --

25  at -- in the executive chamber at the State

```
                                              Page 13
 1    Capitol.  The State Capitol does not have a
 2    street -- does not have an actual address.  The
 3    Dunkin Donuts within the State Capitol is 170
 4    State Street.  Closest thing I got.
 5         Q.    Okay.  Good to know.
 6               Have you given testimony before?
 7         A.    I have not.
 8         Q.    And other than conversations with your
 9    attorneys, what have you done to prepare for
10    today's testimony?
11         A.    I slept well last night.  I've -- you
12    know, it's -- it's a tricky question for you to
13    ask me, Counselor, because I occasionally have
14    to answer press inquiries about -- about this
15    inquiry.
16         Q.    Yeah.  No.  In terms of your
17    testimony, though, what have you done to prepare
18    for it?
19         A.    I consulted with my -- I consulted
20    with my attorneys more than they probably would
21    like.
22         Q.    Any one other than your attorneys?
23         A.    No.
24         Q.    Who else knows that you are testifying
25    today, other than your attorneys?
```

```
                                        Page 14

 1        A.    My wife, my super -- my supervisor so

 2   I can take the day off.

 3        Q.    And who's your supervisor?

 4        A.    Melissa DeRosa.

 5        Q.    Anyone else you told?

 6        A.    No, not to my knowledge.

 7        Q.    And --

 8        A.    No one else I've told.  No one else

 9   I've told.  No one else knows, to my knowledge.

10        Q.    And did Melissa DeRosa say anything to

11   you about the testimony?

12        A.    No.

13        Q.    I think we sent over to your counsel a

14   binder or there's three binders in there, a

15   Redweld of documents.  I think at this point if

16   you can open it up.  I think we should have sent

17   over two sets so that you can take a look and

18   your lawyer can take a look, but ...

19            MR. E KIM:  Give us one sec, Joon.

20            MR. J KIM:  Okay.

21            MR. E KIM:  We have to cut the box

22   open.

23            (Off the record.)

24        Q.    So you have them in front of you?

25        A.    I do.
```

```
                                      Page 15

 1        Q.    Okay.  It should be three binders.

 2   One of them should say "binder one," one of them

 3   should say "binder two," and one should say

 4   "binder three" I believe.

 5        A.    Correct.

 6        Q.    Okay.  And for all involved, don't be

 7   afraid, we won't be going through all of them,

 8   but in light of the -- that we're not present in

 9   the same place we wanted to send over anything

10   that, you know, might come up.  So -- but I

11   will, during the course of the testimony, direct

12   you to particular documents in there and I'll

13   refer to them as, you know, tab X on binder one

14   or tab Y in binder two so that we can all follow

15   along, okay?

16        A.    Okay.

17        Q.    So if you can look at the one that's

18   says binder one and go to tab 52.

19        A.    Okay.

20        Q.    And do you see that this is the

21   subpoena for testimony that we issued?

22        A.    Yes.

23        Q.    And you understand that it is this

24   subpoena under which you are testifying today?

25        A.    Yes.
```

```
                                            Page 16

 1        Q.   If you can go to the next tab, 53,

 2   these are two subpoenas that we had served on

 3   you requesting documents that you have.

 4             Do you recognize those subpoenas?

 5        A.   Okay.  I recognize receiving them and

 6   given -- given to my counsel, yes.

 7        Q.   And what did you do to respond to this

 8   subpoena and produce documents?

 9        A.   I forwarded to my counsel, my -- my

10   counsel had -- had then made arrange -- made

11   arrangements to produce these documents.

12        Q.   Okay.  What did -- did you conduct any

13   searches of your own for responsive documents?

14        A.   I think once -- I think once the

15   request for documents came to me, I gave them to

16   my -- I gave them to my counsel.  And if you

17   want to -- if I'm saying something contrary,

18   please -- please let me know.  And I believe

19   through an out -- through an outside vendor they

20   arranged for documents -- the documents to be

21   produced.  I provided any and all passwords I

22   had to produce the documents.

23        Q.   And did you provide your cell phone

24   for them to access?

25        A.   I did.
```

```
                                        Page 17
 1        Q.    Okay.   And as well as personal E-mails
 2    that you use?
 3        A.    I did.
 4        Q.    And are you aware of any documents,
 5    other than responsive documents, that may be
 6    contained in the devices, device or E-mail
 7    accounts that you provided to your lawyers that
 8    might contain responsive documents?
 9        A.    I don't believe so.   I believe
10    chamber -- I believe chamber counsel had access
11    to my computer at work.   I don't have a work
12    computer -- I mean, I don't have a take-home
13    laptop or anything like that.   But I -- I
14    provided everything -- everything that was asked
15    of me and everything I could think of.
16        Q.    Okay.   Can you -- you can put the
17    binder to the side for the moment.
18              Can you describe -- walk through for
19    us your educational background?
20        A.    I graduated Bay Shore High School in
21    1998.   I graduated SUNY New Paltz in 2002.
22        Q.    Okay.   And after you graduated SUNY
23    New Paltz what did you do?
24        A.    I was a reporter for a number of
25    years.   I worked at the Register Star in Hudson.
```

```
                                            Page 18
 1   I worked at The Berk -- Berkshire Eagle in
 2   Pittsfield, Mass.  I worked for The Daily
 3   Gazette in Schenectady.  And then after -- then
 4   after that I switched careers.
 5        Q.   And where did you go when you switched
 6   careers?
 7        A.   I was an aide in the state senate.  I
 8   had a number of jobs -- had a number of jobs for
 9   about five years'ish there.  I was a -- I worked
10   in the -- I worked for the central press office.
11   I was a press guy for a state senator.  I was
12   a -- I was a chief of staff for a state senator.
13   I -- I was -- I worked for head of coms for a --
14   for a conference.  And then I took the job with
15   the governor's office in May of 2012.
16        Q.   And what positions have you held in
17   the Governor's office?
18        A.   Well, I think my first title was
19   technically deputy Albany press secretary, and
20   then I became deputy Albany coms director.  That
21   had to do more with the restructuring of the
22   office than the change of responsibilities.  And
23   after the re-election in 2014 I became senior
24   deputy communications director.
25            After the election in 2018 I was
```

Page 19

```
 1   senior advisor to the -- senior advisor to the
 2   governor, which had a slightly wider realm of
 3   response -- responsibilities but less in the
 4   day-to-day.  For the last month I've retained
 5   those responsibilities and I'm a coms director
 6   for the -- for the Governor.
 7       Q.   Tell us how you first got hired to
 8   work in the Governor's office.
 9       A.   They were looking to expand -- they
10   were looking to expand their shop.  Two -- I
11   think two things happened.  I -- they were --
12   they were looking for somebody who lived in
13   Albany who could work with the press corps in
14   Albany.  I happened -- I happened to have
15   experience working the press corps in Albany.  I
16   came recommended from a couple -- from a couple
17   people they talked to.  And then I was also in
18   the news in and around that time.
19       Q.   And who -- was -- did you express
20   interest in joining the Governor's office or did
21   they reach out to you?
22       A.   I interviewed with them during the
23   transition.  I interviewed with ███████████
24   who ██████████████████████████, great guy.
25   He -- you know, it was good conversations.  With
```

```
                                          Page 20
 1    the -- at the time they were stopped up.  You

 2    know, at the time there was a hiring freeze,

 3    which is a little difficult during a transition.

 4    Then about a year and a half later when the need

 5    arose they gave me a call.

 6         Q.    Sorry, who gave you a call?

 7         A.    I think it was Rich Bamberger, the

 8    then --

 9         Q.    Sorry, you said "the need arose gave

10    you a call," sorry.  I thought you were saying a

11    name.

12              Okay.  So Rich Bamberger reached out

13    to you?

14         A.    I think it was him.  It may have been

15    ███████████████████████ who was a friend of mine

16    who worked in the chamber at inter gov first

17    just to see if I was interested still.  And then

18    he reached out to me.

19         Q.    And did you have to -- did you go

20    through interviews?

21         A.    They were pretty informal.  They were

22    pretty informal.  We met for drinks a couple

23    times.

24         Q.    Okay.  Did you --

25         A.    They knew enough about -- they knew
```

```
                                          Page 21
 1   enough about me where they thought I would be a
 2   fit.
 3        Q.    Did you meet with the governor?
 4        A.    No, I didn't.
 5        Q.    Had you met the governor before?
 6        A.    I had not.
 7        Q.    So you did not meet the governor until
 8   after you were hired?
 9        A.    Yeah.
10        Q.    Okay.  And had you had interactions
11   with the executive chamber in your prior jobs?
12        A.    Some, some, you know, yeah, I
13   worked -- I worked with them during -- during
14   campaigns.  I knew -- I knew -- I had mutual
15   friends who worked -- who worked there that I
16   knew.  I met some -- I met some members there
17   socially.  So I was -- I was a known entity.
18        Q.    Had you had any interactions with the
19   Governor before?
20        A.    I don't -- briefly a couple years
21   before.
22        Q.    What interactions had you had with
23   him?
24        A.    He was -- hello, hello, good-bye,
25   thank you.  He -- he endorsed -- he endorsed a
```

Page 22

1   senator I was working for at the time.

2        Q.    Who was that?

3        A.    That would be Craig Johnson.  He

4   served -- he served senate district in Long

5   Island 7th district from 2000 -- geez, 2007 to

6   2010.

7        Q.    Any other interactions you had had

8   with the Governor?

9        A.    None -- none that I can think of.

10       Q.    So can you walk through for us the

11  different roles that you have had in the

12  executive chamber, what your job

13  responsibilities were and how it changed over

14  time, if it changed?

15       A.    I mean, in all my roles I've been the

16  primary contact with the Albany press corps.  I

17  take inquiries.  That remains -- that remains to

18  this day, though.  You know, there's not a whole

19  lot of hours anymore.

20            When I was -- when I was senior deputy

21  communications director, my job was to help run

22  the mechanics of the office, make sure the --

23  make sure the press releases get out, make sure

24  the -- make sure -- make sure the -- the van

25  gets -- the van -- that the truck with the

1   camera gets to Buffalo, you know.  And just

2   take -- and just took care of the logistics.

3            As senior advisor, you know, I

4   helped -- I helped with some of the politics, I

5   helped with some of the -- some of the policy.

6   I still maintain my -- my -- my role.

7            And then as coms director, geez, what

8   don't I do?  It's -- I run the -- I -- I keep my

9   other role and I run the office.

10       Q.   And by "the office," what are you

11  referring to?

12       A.   The communications office.

13       Q.   And how big is the communications

14  office?

15       A.   I'd say about 15, 15 to 18 people, you

16  know, the -- I don't have -- I don't have the

17  firm count in my head.

18       Q.   And how is it -- how is the

19  communications office organized or structured?

20       A.   Well, on one -- on one side you have

21  deputy -- you have -- you have -- you have a

22  coms director at the top, right.  And then below

23  him judicially is a press -- the press secretary

24  whose responsibility is traditionally to -- to

25  travel with the governor and also help take

Page 24

 1    incoming.

 2            I -- I structure my current office a

 3    little bit -- a little bit different, but I'm --

 4    I'm telling you generally how it's gone for the

 5    last 10 -- 10 or 11 years.

 6            You got a press secretary.  Underneath

 7    them is a bunch -- is a group of deputy press

 8    secretaries.  They're generally -- they're

 9    generally younger, less -- less experienced.

10    You take the job to get the experience.  They're

11    charged with writing press releases, doing --

12    doing -- you know, doing transcripts of events,

13    doing press advance at events.  So that's one

14    group.

15            And then underneath the senior deputy

16    coms director, who -- who I said -- who remember

17    said is charged with running the day-to-day

18    operation of the office.  I have a group of

19    deputy communications directors.  They are --

20    they are issue specific.  You know, I have one

21    for economic development, one for energy and the

22    environment, one for public safety, one for

23    health, and I'm sure I'm forgetting one or two.

24            But basically -- basically they're --

25    they're supposed to be issue experts, they're

```
                                              Page 25
 1   supposed to interact with the state agencies
 2   that -- that help -- that implement the policy
 3   around these issues, help -- help them when
 4   they're -- help the agencies with press
 5   inquiries.  And just basically -- and just
 6   basically keep the agencies running to help the
 7   deputy -- the senior deputy coms director.
 8             That in a nutshell is how it works --
 9   is how it runs.
10        Q.   So how many deputy communications
11   directors are there?
12        A.   I want to say there's four to five.
13        Q.   And that's separate from the press
14   secretary?
15        A.   Correct.
16        Q.   Does the deputy communications
17   directors report directly to you or do the press
18   secretary?
19        A.   They report directly to the senior
20   deputy coms director.
21        Q.   Okay.  I see.  Who is the -- who's the
22   senior deputy coms director right now?
23        A.   Right now it's ███████████.
24        Q.   And that's what you were before you --
25   about a month ago or --
```

```
                                              Page 26
 1        A.    No, before a month ago I was senior

 2   advisor.   I was senior deputy coms director from

 3   2015 to 20 -- 2019.

 4        Q.    I see.   And in 2019 someone else took

 5   over that role?

 6        A.    Yes.   Peter Ajemian.

 7        Q.    And who's the press secretary?

 8        A.    Right now?

 9        Q.    Yes.

10        A.    ███████████████████████████ is the

11   acting press secretary.   She's also director of

12   communications in the Thruway.   She's been over

13   to help us out on a temporary basis to help me

14   while I transitioned.   My team's in -- my team's

15   in place and -- and -- and I believe she's going

16   to start to transaction back to her -- her old

17   role, which in itself is more than a full-time

18   job.

19        Q.    And prior to you becoming the

20   communications director, who was the

21   communications director?

22        A.    It was Peter Ajemian who took over for

23   Dani Lever who left in I believe October.

24        Q.    Dani Lever left in October of 2020?

25        A.    I may -- you know, last year has been
```

Page 27

1   hard, time and space is harder, but I believe --

2   I believe that's right.

3        Q.   Okay.  And so Peter Ajemian had

4   stepped into that role after she left?

5        A.   Yup.

6        Q.   Okay.  And then when did Peter Ajemian

7   leave?

8        A.   May.

9        Q.   And why did Peter Ajemian leave?

10       A.   You know, he didn't state a real -- he

11  didn't state a direct reason to me, but the last

12  year has been very hard.  A lot of us have never

13  slept.  I think the current circumstances are

14  obviously outside the -- outside the realm of

15  what a communication director for a -- for a

16  politician generally deals with.  You know, he

17  didn't -- he didn't give a stated reason but I

18  did think he needed a break.

19       Q.   What do you mean by "current

20  circumstances"?

21       A.   Well, circumstances I'm talking to you

22  about today.

23       Q.   Right.  I was asking if it's that or

24  there's also a lot of other current

25  circumstances like COVID and things like that,

Page 28

1   so --

2        A.   Oh, I'm aware.  I'm aware, Counselor.

3   Yeah.  I mean, the whole -- the whole thing

4   entirely.  The last year and a half has been

5   unprecedented, and I'm talking about everything.

6        Q.   And had you had any conversations with

7   Peter Ajemian about the -- this investigation

8   and the allegations of sexual harassment?

9        A.   I mean, vis-a-vis his -- vis-a-vis

10  his -- vis-a-vis my testimony, his testimony, in

11  general?  I just want to be specific.

12       Q.   In general.

13       A.   In general about the -- about the

14  investigation?  No.  We answered a lot of press

15  inquiries together but, you know, I think he

16  kept his own counsel on a lot of things.

17       Q.   How about the allegations that have

18  been made?

19       A.   About whether -- about -- about the

20  truthfulness or them or whether he believes them

21  or anything like -- anything like that?

22       Q.   Yeah.

23       A.   No.  To be honest with you, no, we

24  didn't -- we didn't delve too specifically in

25  there.  I mean -- but you have to understand,

```
                                           Page 29
 1   Counselor, you know, the day -- the day-to-day
 2   on this, especially when this first started,
 3   it -- it became a lot -- it became a lot and the
 4   hours got longer.  And so, you know, I don't
 5   think we had a -- had a whole lot of time for
 6   reflection.
 7        Q.   Do you know if anyone tried to
 8   dissuade Peter Ajemian from leaving?
 9        A.   I did.  I did.  I didn't want him to
10   go.  But look, ultimately everyone -- everyone
11   makes their own decisions so -- and he did -- he
12   did help me out, he stayed an extra week or two
13   to help -- to help -- to help with the
14   transition.  And I do thank him for that, but
15   that was purely selfish of me.
16        Q.   How about Melissa DeRosa, did she try
17   to convince him not to leave?
18        A.   I don't know.  I don't know.  She -- I
19   did -- I did tell her I was trying to get him to
20   stay a little longer just to help with the
21   transition, but, you know.
22        Q.   How about the Governor?
23        A.   I don't think so.
24        Q.   Dani Lever, why did she leave?
25        A.   She was with us a very long time and
```

```
                                        Page 30
 1   she got a -- she got a great job at Facebook she
 2   couldn't say no to.
 3        Q.   Okay.  So during your time in your
 4   different roles, it sounds like a big part of it
 5   was responding to press inquiries, correct?
 6        A.   That's -- that's a good part of the
 7   job, yes.
 8        Q.   And also issuing public statements on
 9   behalf of the chamber?
10        A.   Uh-huh.
11        Q.   Either that's a yes or a no.
12        A.   That's a yes.
13        Q.   And how did you go about responding to
14   press inquiries and issuing public statements?
15   What's the process that's followed or that you
16   followed?
17        A.   I mean, depends on the circumstance,
18   sir.  Do you have anything -- you got anything
19   more specific?
20        Q.   Yeah.  So if -- we've been talking
21   about, you know, the current circumstances and
22   dealing with the sexual harassment allegations.
23   When there are articles being written about it
24   or press inquiries about it, how did you -- how
25   did the press office go about figuring out how
```

Page 31

1    to respond to them?

2         A.   We -- again, we convene -- we

3    convene -- we convene a group of people who --

4    people who know what they're talk -- people who

5    know what they're talking about, people who are

6    mentioned in the article.  You try to

7    reconstruct what happened.  You try to get

8    other -- you try to get other recollections

9    together and you formulate the -- you formulate

10   the best statement that reflects the truth as we

11   know it.

12        Q.   And is that a consistent practice with

13   other subject matters that you're responding to?

14        A.   I think so.  I mean, it depends on

15   the -- depends on the weight and the severity.

16   Are there -- are there many issues I can just

17   take care of because I know the -- because I

18   know the answer, absolutely.  Anything that's

19   weighty, of course -- of course you talk it out,

20   you consult with counsel.  You talk to -- you

21   talk to people who would -- you talk to people

22   who have knowledge, that you think would have

23   knowledge.  You do the best you can.

24        Q.   Do you always do that, talk to the

25   people who have knowledge?

```
                                        Page 32
 1        A.   That is -- that is our practice.  We
 2   try our best.
 3        Q.   And who are the people that the -- the
 4   group that you generally got together in
 5   connection with the responses to the sexual
 6   harassment allegations?
 7        A.   Well, you know, it was my -- it was --
 8   it was myself, it was -- it was Melissa, it was
 9   Peter, it was several -- several counsels who
10   work for us.  And -- and -- and occasionally, as
11   you know, we talk to some people on the outside
12   that gave us our -- that gave us some
13   perspective.
14        Q.   How about the Governor?
15        A.   Of course.
16        Q.   And --
17        A.   I'm sorry.  Can I -- I'm sorry.  I
18   don't mean to cut you off.  I mean, obviously if
19   something involves his conduct you have to ask
20   him at some point.
21        Q.   Yeah.  And how would you communicate
22   with the Governor in connection with these
23   inquiries?  How did you communicate with the
24   Governor in connection with these inquiries?
25        A.   Sometimes he -- he was on calls with
```

1  us, sometimes -- sometimes it was one-offs,

2  sometimes -- sometimes Melissa, as his top aide,

3  went to him and asked for -- and -- and asked

4  for his perspective, you know.  It's -- it's a

5  combination of everything.

6       Q.   So you said Melissa DeRosa was part of

7  that group.  Was she involved in virtually all

8  of the responses or were there responses that

9  she was not knowledgeable about or consulted on?

10      A.   I think -- listen, she's the

11 Governor's's top aide.  She's my direct

12 supervisor.  I -- I keep her on the loop on

13 everything.  She also used to be coms -- she

14 also used to be communications director.  This

15 is -- this is her world and her -- and her

16 advice I deeply value.

17      Q.   So is the -- is the answer yes, she's

18 generally involved in all of the communications?

19      A.   The answer -- the answer is yes with

20 more -- with more context than you probably

21 wanted.

22      Q.   Understood.  And how about the

23 Governor?

24      A.   I would say -- I would say something

25 involving -- involving allegations against his

1  personal conduct, I don't think anything went

2  out the door without his -- without his

3  knowledge.  On other issues there -- there are

4  some stuff I don't bring to him because I can

5  just handle it.

6      Q.   Right.  But on these --

7      A.   That's -- on something important about

8  him.

9      Q.   -- on issues of sexual harassment

10  allegations against him.

11      A.   I would think -- I would think nothing

12  went out without -- without his okay, and I

13  think anybody who thought it wouldn't would find

14  that odd.

15      Q.   Because he'd read it anyway, right?

16      A.   It's about -- it's about him, you

17  know.  If somebody said something about one of

18  my staff members, I wouldn't put anything out

19  without talking to them too, you know.  I mean,

20  it's common sense.  I understand why you're

21  asking the questions, but it's -- it's -- you

22  know, that's the -- that's what it is.

23      Q.   Yeah.  And then so Melissa DeRosa,

24  Peter Ajemian.  Stephanie Benton, was she part

25  of the group that would be consulted?

                                                    Page 35

1        A.    At some times -- at some points, yeah,

2    because she's the Governor's gatekeeper.  And on

3    these -- on these issues -- on these issues like

4    she's allegedly outside for some of them, you

5    know, or close -- or close by.  Of course you'd

6    talk to her.

7        Q.    Sorry, you said she's allegedly

8    outside some of them?

9        A.    She's -- you know, there was some

10   allegations where like she was like, oh, she was

11   just outside the door or, oh, she was there and

12   just left, so yeah --

13       Q.    Right.  I --

14       A.    -- that's -- yeah.

15       Q.    Okay.  But other than when she's a

16   potential fact witness, was she part of the

17   group that you would consult or did consult on

18   how to respond to press inquiries and sexual

19   harassment allegations?

20       A.    I mean, if she was on -- I mean, she

21   may have been on the E-mails because we were

22   on -- you know, because this is an ongoing

23   conversation.  But her role in this was, if

24   she -- if -- if somebody materially tried to

25   bring her into this, like what -- what is this,

```
                                      Page 36
 1   what happened, you know.
 2        Q.   Okay.  And you said there were
 3   several -- several counsel who worked -- counsel
 4   who worked for us.  Who -- that you consulted.
 5   Who were those?
 6        A.   Judy -- Judy Mogul, Beth Garvey, Linda
 7   Lacewell, occasionally -- occasionally Steve
 8   Cohen.
 9        Q.   And why were they consulted?
10        A.   There's very little -- very little I
11   do without consulting -- without consulting
12   counsels.  I believe, you know, Judy -- Judy is
13   our head ethics person.  Beth was -- Beth is our
14   counsel -- Beth is our counsel.  Linda and Steve
15   are longtime members of the administration
16   whose -- whose expertise and -- and legal acumen
17   we respect deeply.
18        Q.   So you described both of them as
19   longtime members of the administration.  Is
20   Steve Cohen a member of the administration?
21        A.   Currently, yes.
22        Q.   Was he at all times you were
23   consulting with him?
24        A.   During this time period I think he was
25   actually.  He was -- he was in -- he works for
```

```
                                         Page 37
 1    ESD.
 2         Q.    And so when you say -- you just --
 3    broadly, they work -- have some role in state
 4    government?
 5         A.    Yes.
 6         Q.    They're not members of the executive
 7    chamber?
 8         A.    No.  But again, you know, as we -- as
 9    we relied on some people outside for advice,
10    these were counsels who know us, know -- know
11    the circumstances, know the shorthand.  So of
12    course -- of course we brought them in to ask
13    them for -- ask them for their advice and
14    expertise in consultation with our actual --
15    with our -- with our counsels in the chamber.
16         Q.    Okay.  And you said you also consulted
17    with other people outside.  Who were those?
18         A.    Jeff Pollock, Liz -- Liz Smith, Josh
19    Vlasto.  I think at some point Rich Bamberger
20    was in there, but -- and then at some point Josh
21    fell out.  And yeah, I did bring -- we bring
22    Dani in the loop for a little bit too at some
23    point.
24         Q.    Dani Lever?
25         A.    Yes.
```

```
                                            Page 38
 1         Q.    And who is Jeff Pollock?
 2         A.    Jeff Pollock is the Governor -- is --
 3    is our -- our pollster and -- and campaign
 4    consultant.  He's been with us for years.
 5         Q.    And was he ever a member of the
 6    executive chamber?
 7         A.    There's no amount of money you could
 8    pay him to do that.
 9         Q.    Okay.
10         A.    No, no.
11         Q.    How about Liz Smith?
12         A.    No, she was an outside consultant.
13         Q.    And when you say "outside consultant,"
14    what do you mean by that?
15         A.    She previously worked for us -- she
16    previously worked for us in -- on the campaign
17    in 2018.
18         Q.    I see.
19         A.    So again, she knows -- she knows us,
20    she knows the world, and she's one of those -- I
21    mean, I don't think anybody could say she's not
22    one of the smartest political minds out there.
23         Q.    Is -- is Jeff Pollock on sort of -- is
24    there any formal arrangement between the
25    executive chamber and him for the advice he's
```

```
                                          Page 39
 1   providing?
 2        A.    I don't believe there is.
 3        Q.    How about Liz Smith?
 4        A.    No.
 5        Q.    How about Josh Vlasto?
 6        A.    No.
 7        Q.    How about Dani Lever?
 8        A.    No.  She had a day job.
 9        Q.    Yeah.  Was there ever any discussion
10   about sharing information with people who are
11   not part of the executive chamber and not
12   retained in any formal capacity, the proprietary
13   of that?
14        A.    I think we felt these are people who
15   have been with us for a long time who we could
16   trust.  I mean, this -- this entire -- this --
17   you know, my entire world is based on trust.
18        Q.    But other than that trust, was there
19   any discussion among anyone about that?
20        A.    Not that I am aware of.
21        Q.    And so what -- and were they
22   consulted, Jeff Pollock, Liz Smith, Josh Vlasto
23   and Dani Lever on -- on various subjects or --
24   you know, we've been talking about the responses
25   to the sexual harassment allegations, but were
```

Page 40

1    they consulted on other subject matters as well?

2         A.   I talked -- previous to all this I

3    talked to Dani every -- almost every day after

4    she left about her take on various -- on various

5    things.  And I -- and we pick Josh's brain too

6    and -- and Pollock -- and Pollock too.

7              Like, you know, we -- these are

8    people -- I spend most of my day, Counselor,

9    talking -- on the phone talking to people, what

10   do you think, what's going on, what's going on

11   out there, did you see this thing we did, how do

12   you think it's playing.  I mean, you know, this

13   is -- that's -- that -- and that's how we do

14   most of -- that -- that's how I do most of my

15   day.

16             And when something like this happens,

17   I think it's natural -- it was natural to us

18   that we turn to these people.

19        Q.   But the -- the question was, you

20   turned -- have you turned to those people

21   regularly on -- in other subject matters as

22   well?

23        A.   Oh, I mean, I think my -- I'm sorry, I

24   think the shorter version of my answer was yeah,

25   I do it all the -- I do it all the time.  I

```
                                        Page 41
 1    value -- individually I value all their opinions
 2    and I -- and I solicit it.  Sometime -- and most
 3    of the time it's very informal.
 4         Q.    Okay.  You said, on the sexual
 5    harassment issues, that Josh Vlasto was
 6    consulted for a time being -- for a time.  Did
 7    there come a time when he was no longer as
 8    actively consulted?
 9         A.    Yeah, toward -- towards the -- towards
10    the end.  You'd have to ask -- you'd have to ask
11    him why he dropped off.  My suspicion is he got
12    the document -- he had a similar document
13    request that -- that everybody else did and, you
14    know, and he probably -- and he probably -- he
15    probably thought he did what he thought was best
16    for -- probably thought was best.  I actually
17    don't know the answer, though.  That's me
18    supposing.
19         Q.    You haven't spoken -- you haven't
20    spoken to him about it?
21         A.    No, I have not.
22         Q.    Have you spoken to anyone else about
23    why Josh Vlasto was playing less of a active
24    role?
25         A.    No, I have not.
```

```
                                        Page 42

 1        Q.   Are you aware of whether he was asked

 2   specifically to -- to play more of an active

 3   role in responding to these allegations of

 4   sexual harassment?

 5        A.   Was he asked to?

 6        Q.   Yes.

 7        A.   Like -- like in -- in -- when these --

 8   when this happened in March?

 9        Q.   Yeah.

10        A.   I think, you know, we called and asked

11   him to hop on a -- hop on the phone, but like as

12   far as any other conversations, I don't know.

13        Q.   You don't know of anyone asking him to

14   be -- to play a bigger role or play a more

15   leadership role in coordinating the response?

16        A.   I don't -- that's news to me.

17        Q.   Who else was in the outside -- the

18   group outside with whom you and others consulted

19   on issues of sexual -- responding to the sexual

20   harassment allegations?

21        A.   Well, it's -- it's not a state secret,

22   Counselor, Chris was among them, Chris Cuomo.

23        Q.   And how did it come about that he was

24   consulted?

25        A.   He had -- all I know he got added to
```

```
                                          Page 43
 1    the call one day.  I don't know -- I don't know
 2    who added him but, you know --
 3         Q.    You don't know who added him?
 4         A.    I don't know who added him.
 5         Q.    And how often was he on calls?
 6         A.    Not as -- not as often as everybody
 7    else.  I mean, he also -- you know, he's also
 8    got a day job too.  I think -- say -- say we --
 9    say we did 25 calls, I'm just making up a
10    number, throughout the cost -- course of all
11    this, he was on less than a half dozen.
12         Q.    And fair to say there were a large
13    number of calls on -- dealing with the response
14    to sexual harassment allegations?
15         A.    There was -- there was a large number
16    of press inquiries, sir, yes.
17         Q.    So you -- you threw out 25.  What do
18    you think is an -- an approximate number of
19    calls?
20         A.    I'll stick -- I'll stick -- I'll stick
21    to that, even though I -- I fully acknowledge --
22    I fully acknowledge I may -- I may be
23    undercounting or vastly overcounting.
24         Q.    And how frequently was the Governor on
25    the calls?
```

1      A.   Not -- not -- there -- a lot of the

2  calls were in preparation -- I mean, we did a

3  lot more calls with the group.  The Governor was

4  on some of them.  The Governor was on some of

5  them and Chris was on some of them, but for the

6  most part it was -- most part it was us.

7      Q.   And on any of the calls that the

8  Governor was on, did he specifically address any

9  of the allegations?

10     A.   I mean, a lot of the time he -- a lot

11 of the time he listened.  He's been -- he's

12 been -- he's been militant that he did nothing

13 wrong and he certainly never touched anybody.

14 What he said -- what he said -- what he said

15 privately matches what he said -- what he said

16 publicly.

17     Q.   Has he -- did he at any point address

18 any of the allegations, specifically made by

19 Charlotte Bennett?

20     A.   I had one -- he had one -- I had one

21 conversation in the presence of counsel.

22     Q.   And who -- who was -- who that who,

23 was the counsel?

24     A.   That would be Judy -- Judy Mogul and

25 Linda Lacewell.

```
                                              Page 45
 1        Q.    And when was that?
 2        A.    Shortly after their -- shortly after
 3   the Time story came out before he went out --
 4   before he went out there and addressed them
 5   publicly.
 6            MR. J KIM:  And is that something that
 7        the substance of which you are asserting
 8        privilege over, Ed -- Ed, I guess is --
 9            MR. E KIM:  Yeah, I think -- that's
10        for the chamber to decide, but for now I
11        think he can't -- he will not be able to
12        discuss that.
13        Q.    And was that conversation in person or
14   on the phone?
15        A.    It was in person.
16        Q.    And who else was there?
17        A.    Melissa, Liz, Jeff, Peter.  I may be
18   forgetting somebody but like I don't think so.
19        Q.    And where was it?
20        A.    It was -- it was -- it was on the
21   grounds of the mansion.
22        Q.    And was it one meeting or was it a --
23   a period of time that you all were together at
24   the mansion?
25        A.    One, one meeting.
```

```
                                            Page 46

 1        Q.    And what time of day was it?

 2        A.    It was late afternoon.

 3        Q.    And in terms of timing it was, you

 4   were saying, shortly after the New York Times

 5   article of Charlotte Bennett?

 6        A.    Yup.

 7        Q.    And did you -- how long did you stay

 8   at the mansion when you went that time?

 9        A.    It was a couple hours.

10        Q.    Were others there overnight?

11        A.    I don't think so.

12        Q.    Okay.  Was it over a meal, dinner?

13        A.    I think -- I can't remember if there

14   was -- I mean, I'm sure there was something to

15   snack on.  I can't remember if it was a formal

16   meal.

17        Q.    But you didn't stay overnight?

18        A.    I live three blocks away.

19        Q.    Did you participate in a breakfast

20   meeting?

21        A.    Yes.

22        Q.    Was -- was the meeting we're talking

23   about the breakfast meeting or were you there

24   for a meeting the -- the day before and the

25   breakfast meeting?
```

```
                                        Page 47

 1        A.    It was a meeting there the day before

 2   and a breakfast meeting.

 3        Q.    By the way, how many times have you

 4   been to the mansion?

 5        A.    A lot.  I've been here nine years.

 6   Almost incalculable.

 7        Q.    Okay.  And both for events and -- and

 8   for meetings?

 9        A.    For events and for meetings and for --

10   and, you know, meeting for travel.

11        Q.    Okay.  Any other -- in any of your

12   conversations with -- that included the Governor

13   did he address Lindsey Boylan's allegations?

14        A.    I don't know if he did directly with

15   me there, to be completely honest with you.  I

16   have -- I have no memory of that.

17        Q.    How about any of the other

18   allegations?

19        A.    No, I mean occasionally I get a

20   blanket, this is all crazy.  But like aside from

21   what we discussed I don't think I've discussed

22   anything specifically with him.

23        Q.    When you say I get a blanket, this is

24   all crazy, meaning go out publicly and say none

25   of this is true, basically?
```

Page 48

1        A.    I think it was his internally being

2    like, what -- what happened here, this -- I

3    don't -- I don't understand how any -- how -- I

4    don't understand any of this.  More -- more of

5    like a frustration sort of thing.  You know what

6    I'm saying?

7        Q.    From him?

8        A.    This wasn't -- yeah.  He's not giving

9    me direction to go out there and say this is all

10   crazy.

11       Q.    Okay.  So what is the process under

12   which how you decide whose name the statement is

13   going to go out under?

14       A.    Depends.  Sometimes it's -- sometimes

15   it's -- sometimes it's a matter of triage,

16   sometimes it's to be consistent with statements

17   we've said -- sometimes we said it was

18   consistent with statements that we've said

19   before.  You know.  I mean, it's -- it's not --

20   it's not a firm -- it's not a firm standard but

21   happy to answer whatever follow-ups you have.

22       Q.    So there's no -- there's no practice?

23   I mean, because we -- obviously, and we'll go

24   through some of the context, but sometimes it

25   will be Beth Garvey, sometimes it will be you,

```
                                        Page 49
 1   sometimes it will be someone else in the press

 2   office, sometimes it will be in the Governor --

 3   from the Governor.

 4        A.   I see.  In the case -- in the case

 5   of -- in the case of Beth Garvey or before her

 6   Alphonso David or before her ███████████, if

 7   there's a statement that has more -- that

 8   addresses legal issues or has more -- has more

 9   legal weight behind it.  And -- and by the way,

10   a statement that, you know, the -- the lawyers

11   themselves mostly crafted, aside -- aside

12   from -- aside from some -- you know, aside from

13   some grammar and typos and tightening, that goes

14   out from them.

15             Every -- every -- every other thing

16   else it's like sometimes a message is better

17   coming from the Governor, sometimes a message is

18   better coming from the press shop, you know, I

19   think it's better if we -- if you want to talk

20   about specifics I -- you may gain more pertinent

21   information that come that way.

22        Q.   And but does it -- and whoever it goes

23   out under is there a process by which the --

24   it's checked, the facts are checked to make sure

25   it's correct and accurate and truthful?
```

Page 50

```
 1        A.    Yes.
 2        Q.    And what is that process?
 3        A.    Again, we talked -- we -- we try -- we
 4   try to find the facts, we -- if there's a
 5   document attached we try to find the documents.
 6   If there's circumstances of something happening,
 7   we go to the people who are policy -- if it's a
 8   policy problem, go to the people who are policy
 9   experts.  If it's regarding a specific --
10   regarding a specific situation involving people
11   you try to go to those people.
12        Q.    So with respect to the sexual
13   harassment litigations made against the Governor
14   and many of them are allegations about things
15   that happened where the people were alone with
16   the Governor, were -- were statements issued
17   responding to those verified with the Governor
18   before they were issued?
19        A.    Again -- again -- again, Counselor, at
20   large if it's about -- if it's about the
21   Governor and about -- and allegations about the
22   Governor's actions it is cleared by him.
23        Q.    Generally speaking, what's the process
24   by which the press and press clippings are
25   conveyed to the Governor on a regular basis?  Is
```

```
                                         Page 51
 1   there a practice and what is it?
 2        A.    Occasionally they're -- you know,
 3   they're sent to him via -- via BlackBerry.
 4   Sometimes they're printed -- sometimes they're
 5   printed out for him, but I'd had say 99 percent
 6   of the time they're pinned -- they're pinned to
 7   him.
 8        Q.    They're in pins?
 9        A.    Yes.
10        Q.    And how do you -- how do you go about
11   collecting and sending press bookings in pins?
12        A.    If it's a -- a press clipping to his
13   pin?
14        Q.    Yeah.
15        A.    Okay.  Story gets -- story gets
16   circulated to our -- to our general -- to our
17   general press lists and then, you know,
18   sometimes it's me, sometimes it's other senior
19   staff, but most of the time it's one of the
20   press secs who are on a rotating -- press
21   secretary, sorry, who are on a rotating basis,
22   you know, several times a day pin him story --
23   pin him the stories that go.
24        Q.    And so -- because the pin is the -- is
25   the BlackBerry messaging service, right?
```

```
                                            Page 52

 1        A.   I think the BlackBerry messaging

 2   service is a little bit of a different animal.

 3   I -- I -- I never used it, but the pin is -- the

 4   pin is a -- the pin is a --

 5        Q.   Point to point?

 6        A.   Yeah.

 7        Q.   And so you -- the people who send this

 8   are -- have to cut and paste the substance of an

 9   article to pin it?

10        A.   Uh-huh.

11        Q.   And what's the frequency with which

12   press clippings were pinned to the Governor?

13        A.   I think he gets them in the morning

14   and then several times during the day it gets

15   sent to him.  If it's some -- if it's something

16   of importance, you know, we'll do -- we'll do

17   it -- we'll do it when it hits.

18        Q.   And is it basically anything that

19   references him or the work that he's doing or

20   the --

21        A.   Him, the work that he's doing,

22   Washington, anything relevant to our work.  I

23   mean, and, you know, over the last year that got

24   wider.  Over the Trump administration, when he

25   was banging against New York every day and it
```

Page 53

```
 1    got much wider, you know, I mean, it's a -- it's
 2    an expansive list.
 3         Q.    And certainly any press articles about
 4    the sexual harassment allegations made against
 5    the governor were being provided to him?
 6         A.    I think so.
 7         Q.    What's the reason for the pins, if you
 8    know?
 9         A.    I'm sorry, what?
10         Q.    What's the reason that this was sent
11    via pin to the Governor?
12         A.    He -- he does not have an E-mail.
13         Q.    How about links to the articles or ...
14         A.    Pins don't work like that.
15         Q.    Okay.  Why -- yeah, and why doesn't he
16    use an E-mail or have an E-mail?
17         A.    I don't know.  I don't know.  You're
18    going to have to ask him.  I mean, I've read
19    stories about it before I came on board.  You
20    know, Chuck Schumer -- Chuck Schumer doesn't use
21    E-mail.  My ████ who's roughly his -- the same
22    age as the Governor doesn't use E-mail.  I think
23    it's preference but you'd have to ask him.
24         Q.    And there's no discussions about it?
25         A.    No.
```

```
                                              Page 54
 1        Q.    Because there have been, as you've
 2   pointed out, reporting about, you know, people,
 3   who have -- have views about the reasons being
 4   to not have any record or foilable records.
 5   There's no discussions that you were party to of
 6   that nature?
 7        A.    Was not.  I read those stories too.
 8        Q.    Any inquiries that you had to deal
 9   with from reporters or otherwise asking about
10   that issue?
11        A.    Over the years I'm sure I have -- I'm
12   sure I have and -- yeah, I don't -- I don't
13   recall specifically.
14        Q.    What did you say in response?
15        A.    I don't recall specifically, but I'm
16   sure -- sure there -- there's a relevant press
17   clipping any -- anywhere in these binders.  If
18   you want to point me to it I could talk -- I
19   could talk to you about it.
20        Q.    Okay.  While you were with the
21   executive chamber, have you received any
22   training on policies and procedures relating to
23   sexual harassment?
24        A.    I have.
25        Q.    How often?
```

```
                                                    Page 55
 1         A.    Once -- generally once a year.
 2         Q.    And how did you -- what form did that
 3    training take?
 4         A.    It's a -- it's a print -- it's a
 5    printed out PowerPoint that you have to -- that
 6    you have to review.  If you have any further --
 7    if you have any further questions you contact
 8    your HR representative.  You test it, you -- you
 9    know, you -- you know, they stress to you
10    don't -- don't just -- don't just flip through
11    and keep it and be cavalier about it, actually
12    look at it, actually read it.
13              That is my -- that is my practice.
14    Tends to pile up towards the end of the year but
15    I do -- I do read through everything and then
16    sign my attestation form.
17         Q.    And how do you and how did you
18    physically go about signing that attestation
19    form?  Do you -- did you do it physically or by
20    clicking on the computer?
21         A.    I believe I did it physically, and
22    then I handed it to my assistant.  I don't know
23    what happens after that.
24         Q.    And you've done that every year?
25         A.    I believe I have, I think last year
```

Page 56

1   there was an exemption because of COVID, on the

2   training.  I'd have to check with my HR people

3   but like, you know, I -- I fill out -- every

4   time they tell me to fill something out I

5   make -- make time for it.

6           Q.   And the sexual harassment training,

7   did you always actually take it yourself?

8           A.   What's the alternative, I'm sorry,

9   Counselor?

10          Q.   Well, to -- if you can answer the

11  question.

12          A.   I'm sorry.  I'm sorry.  That's against

13  the form.

14               I believe so, yes.

15          Q.   Yeah.  You -- you are aware that one

16  of the allegations that Charlotte Bennett made

17  in one of -- in a number of the articles is that

18  she had heard -- overheard Stephanie Benton

19  saying that she took -- she reviewed the sexual

20  harassment training for the Governor and that he

21  signed it after that.

22               Do you remember that allegation?

23          A.   I did -- I did hear that allegation.

24  I was subsequently told by Stephanie Benton that

25  was not true.

```
                                    Page 57

 1        Q.    I'm sorry.  I -- my computer made a
 2   noise, I didn't catch that answer.
 3        A.    At the good part?  Sorry.  I have read
 4   that but -- I have read that.  I have
 5   subsequently heard from Stephanie Benton that
 6   that was absolutely not true.
 7        Q.    That's not true she said?
 8        A.    Yup.
 9        Q.    Did you ask the Governor?
10        A.    I hadn't -- I had not.
11        Q.    What did Stephanie Benton say
12   specifically, other than it's not true?
13        A.    He signed it.  He took it, he signed
14   it.
15        Q.    Every year?
16        A.    I asked her about 2019, which is
17   what -- which is what Charlotte -- which is what
18   Charlotte Bennett said.  I think the implication
19   is yes.  Did I ask that specific question, no,
20   but that's -- that's not what we were talking
21   about.
22        Q.    Okay.  Can you go to the binder, again
23   the binder number one, and go to tab 54.
24        A.    This is the manual?
25        Q.    Yes.  Do you recognize it?
```

```
                                         Page 58
 1        A.   Yes, I have a -- I have a copy of it
 2   at my desk.
 3        Q.   Okay.  Do you have a physical copy of
 4   it on your desk?
 5        A.    In my desk, yeah.
 6        Q.   Okay.  Does everyone or just -- to
 7   your knowledge, or --
 8        A.   Everyone gets it.  I don't know what
 9   they do with it.
10        Q.    Yeah.
11        A.    Mine's in my top right-hand drawer.
12        Q.    And it's the handbook for employees so
13   everyone gets a hard copy as well as accessible;
14   is that correct?
15        A.   Yes, that is -- that is what I --
16   well, I do, and I assume everybody else does.  I
17   don't think I'm special here.
18        Q.   Okay.  Can you turn to page 16 of
19   this.
20        A.   Okay.
21        Q.   And towards the bottom it says,
22   "Sexual harassment includes unwelcome conduct,
23   which is -- which is either of a sexual nature
24   or which is directed at an individual because of
25   that individual's sex when such conduct is the
```

```
                                              Page 59
 1    purpose or effect of unreasonably interfering
 2    with an individual's work performance or
 3    creating an intimidating, hostile or offensive
 4    work environment.  Even if the -- if the
 5    reporting individual is not the intended target
 6    of the sexual harassment, such conduct is made
 7    either explicitly or implicitly, a term or
 8    condition of employment or submission to or
 9    rejection of such conduct is used as the basis
10    for employment decisions affecting individual's
11    employment."
12            Is that statement consistent with your
13    understanding of the sexual harassment policy
14    that applied in the executive chamber?
15        A.    I believe so.  I believe so.
16        Q.    How about the next paragraph?  It
17    says, "Hostile environment, sexual harassment
18    includes, but is not limited to, words, signs,
19    jokes, pranks, intimidation or physical violence
20    which are of a sexual nature or which are
21    directed at an individual -- at an individual
22    because of that individual's sex."
23            Is that consistent with your
24    understanding of the policy?
25        A.    Sure.
```

```
                                              Page 60

 1        Q.    "Sexual harassment also consists of

 2   any unwanted verbal or physical advances,

 3   sexually explicit derogatory statements or

 4   sexually discriminatory remarks made by someone

 5   which are offensive or objectionable to the

 6   recipient which cause the recipient discomfort

 7   or humiliation or which interfere with the

 8   recipient's job performance."

 9            Is that consistent with your

10   understanding?

11        A.    That's how I read it, yes.

12        Q.    If you go to the fifth full paragraph,

13   on the last sentence it says, "Furthermore, any

14   supervisory or managerial employee who observes

15   or otherwise becomes aware of conduct of a

16   sexually harassing nature must report such

17   conduct so that it can be investigated."

18            Is that consistent with your

19   understanding as well?

20        A.    Sure.

21        Q.    During your time at the executive

22   chamber, have you observed or been made aware of

23   any conduct that could constitute sexual

24   harassment under these definitions?

25        A.    No, I have not been.  Though if --
```

```
                                          Page 61

 1    though if confronted with it I would go through

 2    the process outlined in this book to report it.

 3         Q.    Sorry.  I -- maybe it's just me, I'm

 4    not hearing it fully.

 5         A.    Sorry.  I'm -- I'm talking to you.  I

 6    should really be closer to here, where the phone

 7    is.

 8         Q.    Maybe can you move the phone over a

 9    little bit or --

10         A.    Yeah, it's -- it's -- is it better?

11         Q.    -- it's as close as it can be?

12              MR. E KIM:  Yeah.  Maybe, Rich, if you

13         want to shift over a little bit.

14              MR. J KIM:  Yeah.  It is louder when

15         he's looking -- like when he's closer to

16         the phone.

17              THE WITNESS:  Okay.  Better?

18              MR. J KIM:  Yeah.  Thank you.

19              THE WITNESS:  Okay.  I said I -- I

20         said I -- uh-oh.  Okay.

21    BY MR. J KIM:

22         Q.    The question was, during your time --

23         A.    I know.  Sorry, you're blinking on and

24    off.

25              MR. E KIM:  Sorry.
```

```
                                              Page 62

 1            THE WITNESS:  Okay.  We're back.

 2       Q.   The question was, during your time at

 3   the executive chamber have you observed or been

 4   made aware of any conduct that could constitute

 5   sexual harassment under the definitions provided

 6   here?

 7       A.   I don't believe I have.

 8       Q.   Has anyone reported to you -- or

 9   reported's perhaps too formal a word.

10            Has anyone said to you or told you of

11   any conduct that the -- could constitute sexual

12   harassment?

13       A.   You know what, something that just

14   occurred to me.  Unrelated to all this, yes, I

15   did get -- I did get a report and I refer -- and

16   I referred it.  A junior -- a junior staffer of

17   mine talked about conduct involving a coworker,

18   outside premises, where he got -- where he got

19   inappropriate at a bar.  He came to me, told me

20   about it.  I sent him to Lauren Grasso, our HR

21   representative, to lodge a complaint if she

22   wanted to talk it through.  Like I don't know

23   what happened because of it, but like you -- you

24   asked a very large blanket question.

25            That was probably -- probably a little
```

```
                                                    Page 63
 1   bit outside of what you're look -- what you're

 2   looking for, but that is the answer.  I've

 3   gotten one complaint that -- I made aware of,

 4   outside the premises, that I did refer that to

 5   HR.

 6        Q.   And who was that who made the

 7   complaint?

 8        A.   ██████████████████.

 9        Q.   And --

10        A.   And I believe -- I believe she

11   witnessed -- witnessed something involving a

12   friend.

13        Q.   And what did she say she witnessed?

14        A.   I think she said the guy got too

15   handsy with her friend at the bar.  They were

16   both -- they both worked here.  The guy crossed

17   the line, to her, and I said, okay, you know,

18   talk to Lauren Grasso, you know.  And I arranged

19   for her to go over there immediately.

20        Q.   And who was --

21        A.   I want to say this was -- the guy?  I

22   couldn't tell you.  I couldn't tell you.  She

23   went over -- I want to say it was late 2019,

24   earlier 2020.

25        Q.   And who was the -- did she say this
```

```
                                                Page 64
 1    guy had -- was handsy with herself or she
 2    observed the guy handsy with somebody else?
 3         A.   Observed handy [sic] with a coworker
 4    that they both knew.
 5         Q.   And who was that?
 6         A.   I don't know.
 7         Q.   And what did Lauren Grasso do about
 8    that, to your knowledge?
 9         A.   I don't think it was up to -- I don't
10    know.  I -- you know, I know ██████ talked to her.
11    I never -- I never followed up with ██████ how it
12    went.  I never followed up with Lauren Grasso.
13    At that point I didn't think it was appropriate
14    for me to follow up with her because I was sort
15    of the middleman here, you know.
16         Q.   Do you know if she or anyone reported
17    it to GOER, G-O-E-R?
18         A.   I think -- I think that's the --
19    that's the customary, that's what's supposed to
20    do, that's what you're supposed to do.  I don't
21    know in this particular case.  Again, this was
22    an employee of mine made a complaint to me as
23    her superior, but it involved two other
24    employees who are not in the press office who
25    are in other parts of -- other parts of the
```

```
                                    Page 65
 1    chamber off premises.
 2              I -- I didn't think it was appropriate
 3    for me to follow up on that, other than to
 4    advise her to, you know, go -- go to our human
 5    resources department.
 6         Q.   Any other incidents that could
 7    constitute sexual harassment that you remember
 8    becoming aware of or seeing?
 9         A.   I really don't.
10         Q.   Can you turn to page 40 of this?
11              MR. E KIM:   Page 40 at tab 16, Joon,
12         or tab 40?
13              MR. J KIM:   Yeah, sorry.   Page 40 of
14         the same tab 54.
15              MR. E KIM:   Oh, of the same tab.
16              MR. J KIM:   Yeah, sorry.   Tab 54,
17         page 40.
18         A.   Okay.
19         Q.   And the bottom part talks about
20    adverse employment action -- or this whole part
21    talks about retaliation.   But I'll direct your
22    attention to adverse employment action.
23    "Retaliation occurs when an adverse action or
24    actions is taken against the employee by the
25    employer.   The action need not be job related or
```

Page 66

1   occur in the workplace.  Unlawful retaliation
2   can be any action more than trivial that would
3   have the effect of dissuading a reasonable
4   worker from making or supporting a charge of
5   discrimination."
6           Is that consistent with your
7   understanding of the sexual harassment policy?
8       A.   This is how I read it.
9       Q.   And the question was:  Is that
10  consistent with the understanding that you had
11  about what was required in connection with
12  retaliation?
13      A.   It's what's consistent with what I've
14  read, yes.
15      Q.   And then the next page, 41, at the top
16  says, "Actionable retaliation by an employer can
17  occur after the individual is no longer employed
18  by that employer.  This can include giving an
19  unwarranted negative reference for a former
20  employee."
21          Do you see that?
22      A.   I do.
23      Q.   Was that also -- is that also
24  consistent with your understanding of the state
25  policies?

Page 67

1       A.   This is how I read it.

2       Q.   Was it consistent with your

3   understanding, while you were in the executive

4   chamber, about the law relating to retaliation?

5       A.   This is how I understand it.

6            MR. J KIM:  We've actually been going

7       about an hour and the audio -- the video

8       needs to be changed.  Should we just take

9       like a 5-, 10-minute break for -- I

10      actually have to use --

11           THE WITNESS:  Sure.

12           MR. J KIM:  -- a comfort break, but,

13      you know, also -- also matches I think the

14      time that we need to switch the videos.

15           THE WITNESS:  Okay.  Sure thing.

16           MR. J KIM:  Can we come back at like

17      10:15 or 10:20 to give us --

18           THE WITNESS:  Sure.

19           MR. J KIM:  Thank you.

20           THE VIDEOGRAPHER:  Stand by to go off

21      the record.  The time is 10:12 a.m.  We are

22      going off the record.  This will end media

23      unit number one.

24           (Short recess taken.)

25           THE VIDEOGRAPHER:  The time is

```
                                            Page 68
 1        10:21 a.m. we are back on the record and
 2        this will be the start of media unit number
 3        two.  Counsel.
 4             MR. J KIM:  Thanks.
 5        Q.   When was the first time that you
 6   became aware of any allegations of sexual
 7   harassment being made against the Governor?
 8        A.   When Lindsey Boylan tweeted her --
 9   tweeted her tweet.
10        Q.   And is that about December of 2020?
11        A.   Sure.
12        Q.   And how did you learn about it?
13        A.   Got a call saying, hey, did you see
14   that tweet?  And then my in-box started to
15   flood.
16        Q.   Who called you to say, see that tweet?
17        A.   Probably Melissa, but it was -- it was
18   tough competition between her and Jimmy Vielkind
19   from the Wall Street Journal.
20        Q.   And prior to that, Lindsey Boylan's
21   tweet, had you heard anything about sexual
22   harassment allegations against the Governor?
23        A.   I have not.
24        Q.   And so what happened next?  You --
25   you -- you got a call from Melissa DeRosa, you
```

```
                                              Page 69

 1    see that, and then Jimmy Vielkind from the Wall

 2    Street Journal?

 3         A.   Yup.  I -- I went to the -- went to

 4    the office, met Melissa, met counsel.  Then we

 5    started discussions about how to respond, but

 6    also we had to wait and see what else she was

 7    going to -- what else she was going to say,

 8    because we had nothing to respond to.

 9         Q.   And what did you discuss with Melissa

10    DeRosa?

11         A.   Well, she came in and shortly after

12    counsel came in.  Then we had discussions

13    amongst ourselves.

14              MR. J KIM:  And are those -- is the

15         substance of those discussions also

16         something you're asserting privilege over?

17              MR. E KIM:  That's right, Joon.

18              MR. J KIM:  Okay.

19         Q.   At that time, when you're dealing with

20    it that day, did you have any discussions with

21    the Governor yourself?

22         A.   I don't believe I had.  I don't

23    believe I did.

24         Q.   And so you -- you went in the

25    office -- which counsel was it that was there?
```

```
                                        Page 70
 1        A.    Linda Lacewell walked in.   Beth Garvey
 2   came in -- came in soon.   Judy came in around
 3   the same time, Judy Mogul.   I can't remember if
 4   she was there in person or over the phone but
 5   she was substantial part of -- of these
 6   conversations.
 7        Q.    And at that point in time what did you
 8   know about Lindsey Boylan?
 9        A.    I knew -- I knew she -- what did I
10   know about her?   I didn't know her very well
11   when she worked here, but I knew -- I knew she
12   left in 2018 under a cloud.   I didn't know the
13   exact circumstances but I know she had
14   confronted about a complaint and she left.
15             I also know she's one of only two
16   people who -- who after -- who after they left
17   we changed all the senior staff codes in our --
18   on our phones.
19        Q.    Sorry.   You're speaking a little fast,
20   I didn't catch that.
21        A.    I also know she's one of only two
22   people, two ex-senior staff employees, who after
23   they left we changed all the conference codes on
24   our -- all the conference call codes on our call
25   because there was -- there was a lack of trust
```

```
                                            Page 71
 1   in that.

 2            And then I know -- then I know that

 3   she -- that she was very supportive of us

 4   publicly after she left, until she decided to

 5   run for Congress.  Then she start -- then she

 6   started being very critical of the

 7   administration.  She lashed out at members -- at

 8   coworkers -- at coworkers of mine who disagreed

 9   with her online.  She threatened some of my

10   coworkers as well privately because the Governor

11   made an action that -- made an action to fight

12   COVID that she thought adversely affected her

13   political campaign.  She threatened retribution.

14            And then -- and then prior to her

15   making her -- prior to her making her claim,

16   she -- she started talking about a hostile

17   workplace here and made demonstrably false

18   characterizations about how she left.

19            And then we decided not to respond to

20   that story.  And then she -- and then she ended

21   up publicly saying -- publicly saying other

22   accusations about -- about the administration

23   that I believe to -- I believe to be false.

24            She said stuff about me, publicly,

25   that I believe to be false.  And then she
```

Page 72

1   escalated, escalated, escalated.  And then --
2   and then she made her claim about ten minutes
3   after claiming that the Governor lied about
4   owning an eagle feather.
5        Q.    About owning what?
6        A.    An eagle feather.  Apparently --
7   apparent -- he said -- he said that in a speech
8   in a context of an outdoor trip with his
9   daughters and how they left with an eagle
10  feather.  Apparently -- apparently it's -- it's
11  against a federal -- it's against federal
12  wildlife law to actually own an eagle feather,
13  no matter what the circumstances are.  That was
14  a story a couple years ago.
15            And then she said that we -- he
16  actually lied about that story.  Then ten
17  minutes later she does this.  It was all -- it
18  was all -- it was all strange and escalating.
19       Q.    So let me back up because you went
20  through a lot.  The question was originally,
21  what did you know at the time when -- when she
22  first made these -- you're aware she tweeted.
23  You -- you said you didn't know her that well.
24  At the time what did you know about her?  And
25  you said she left under a cloud.

```
                                       Page 73
 1        A.    Everything -- everything I said in my
 2   statement, Counselor, was contemporaneous
 3   information up until that day.
 4        Q.    Oh.  So you knew all of this, because
 5   some of it you were -- some of it you were
 6   describing things she had said afterwards so
 7   that --
 8        A.    No -- I'm sorry.  The time -- the
 9   timeline in my -- in my spiel, which is accurate
10   in my mind, but, you know, we'll talk about
11   that, and when she made the tweet, I talked
12   about everything that I knew about her in
13   between when she left and when she made that
14   tweet.  The harassing and threatening behavior,
15   the threats against my coworkers, the
16   mischaracterizations about me, the hostile
17   work -- the hostile workplace stuff, that all
18   came before she tweeted.
19        Q.    So were you aware of all of that as of
20   December of 2020?
21        A.    I didn't know -- I didn't know -- I
22   didn't know chapter and verse the exact
23   circumstances of why she left, but like I
24   knew -- I knew she left under a cloud because
25   she was confronted with complaints against her.
```

```
                                          Page 74

 1        Q.    How did you -- how did you --

 2              (Reporter clarification.)

 3              THE WITNESS:  I will very much try to

 4        slow down.

 5        A.    Confronted about complaints against

 6   her.  I did not know the specifics of those

 7   complaints.

 8        Q.    Were you informed about that at the

 9   time she left?

10        A.    Water cooler -- water cooler talk.

11   Nothing official.  She left -- she left in a

12   huff.  Then she put out an E-mail to everybody

13   saying, I quit, thank you.  And so this was

14   loose -- you know, I never asked anybody in

15   senior staff about it but that was what I heard.

16        Q.    And had you personally had

17   interactions with her?

18        A.    A few.  Unremarkable.

19        Q.    What kind of interactions?

20        A.    Conference calls together -- we were

21   on conference calls together.  We were at a --

22   we were at a staff retreat together.  We -- you

23   know, we talked -- we talked in -- I think me,

24   her and her boss at the time, Howard Zemski,

25   had -- had conversations.  Really nothing
```

```
                                              Page 75
 1   remarkable.
 2              You know, during her time she mostly
 3   stayed in the city.  I was mostly based in
 4   Albany so, you know -- and she wasn't working in
 5   the chamber for all that long.
 6        Q.   Had you seen her interact with the
 7   Governor?
 8        A.   If I had it wasn't very remarkable.
 9        Q.   Uh-huh.  Had you been in any meetings
10   where you were with her and the Governor?
11        A.   I did a record search.  The short
12   answer is I don't recall.  I did a record search
13   with publicly available information, and I was
14   in a couple, but they were meetings with 30
15   people on them or something like that.
16        Q.   And how about events that you were at
17   that she was at as well?
18        A.   Must have, must have been.
19        Q.   But you don't -- nothing -- nothing
20   that you remembered?
21        A.   Nothing remarkable.  I certainly
22   didn't travel with her.  You know, we were
23   probably in the same room with a hundred other
24   people.
25        Q.   Okay.  And so going -- focusing -- I
```

1    know a lot has happened so, you know, it might

2    be hard to just sort of keep it separate, but

3    focusing on when you first learned that Lindsey

4    Boylan is tweeting, saying -- making allegations

5    of sexual harassment, although without a lot of

6    detail at that point.  You get a call from

7    Melissa DeRosa, you go in, you meet -- you also

8    get a call from Jimmy Vielkind.  Anyone else?

9         A.   Yeah, everyone.  Every reporter on the

10   face of the earth, yes.

11        Q.   Do you respond -- did you respond to

12   any of them before meeting with Melissa DeRosa

13   and the counsel or did you meet with them first?

14        A.   No, but it was a race -- it was a race

15   because they were -- you know, they were post --

16   they were posting stories.  We had to get to the

17   bottom of the facts and we didn't know what the

18   facts are -- the facts were.

19        Q.   I mean, the allegations were simply

20   that there was sexual harassment.  It wasn't a

21   specific.

22        A.   But then what do you -- but then what

23   do you -- but what's she going to do?  Is she

24   going on TV?  Is she -- is she talking to a

25   reporter and giving other details that we have

1   to respond to?  What is she talking about?  You

2   know, you have -- I mean, these are -- there's a

3   combination between figuring out what it was we

4   had to respond to and -- and reporters looking

5   to get stuff on the web up as quick as possible

6   without any context while we're trying to get

7   the context, while we're not getting any context

8   from -- from the complainant.

9        Q.   And so what did you do after the

10  meeting?  Well, other than the meeting that

11  you're -- you're with counsel that you're

12  asserting privilege over, any other discussions

13  or conversations or meetings with anyone on this

14  subject?

15       A.   No.  No.

16       Q.   Okay.  So what did you do?

17       A.   We formulate -- we formulated a -- we

18  formulated a response to her -- to her

19  allegation.

20       Q.   And what was the response?

21       A.   The response was -- the response,

22  denial from our press secretary.  She did not

23  file -- she -- we checked to see if she filed --

24  if she ever filed any complaints.  We checked --

25  you know, we -- contemporaneously, with the

```
                                              Page 78
 1   information we had, we checked -- we checked to
 2   see if there was anybody -- anybody who we could
 3   talk to that may have been the third party.  At
 4   some point the Governor -- at some point the
 5   Governor was asked and he said, didn't happen.
 6        Q.   Did you ask the Governor?
 7        A.   It wasn't me.
 8        Q.   Okay.  Someone did and it was conveyed
 9   back to you?
10        A.   Yes.
11        Q.   Other than a denial, what else did you
12   do?
13        A.   I was asked -- we had to correct the
14   record, sir.
15        Q.   The question was simply what else did
16   you do?
17        A.   I -- well, also we -- in what context?
18        Q.   To respond to Lindsey Boylan's claim.
19        A.   Lindsey Boylan's claim of sexual
20   harassment was responded to with a statement.
21   Upon talking to -- upon talking to counsel, who
22   I believe also talked to GOER, we also decided
23   to correct the record and the circumstances of
24   her -- of her departure, because that was
25   demonstrably false information.
```

```
                                          Page 79
 1        Q.   Is it your understanding that she had
 2   made public statements about the circumstances
 3   of her departure?
 4        A.   She had.
 5        Q.   What were they?
 6        A.   She tried -- she left because of a
 7   toxic workplace, and she tried to quit three
 8   times until it actually stuck.  That is actually
 9   not -- that is actually not what happened.
10        Q.   So you -- so you read the -- the claim
11   that it was a toxic culture or that there was
12   sexual harassment as saying that that's the
13   reason she left?
14        A.   She said she -- but when she said she
15   left, it had nothing to do with -- she had
16   nothing to do with sexual harassment.
17        Q.   So it's your understanding that she
18   said that her departure had nothing to do with
19   sexual harassment?
20        A.   She said on -- she said that in the
21   New York Post.  She said it on Twitter.
22        Q.   She said in -- when did -- when did
23   the New York Post article come out?
24        A.   A week -- a week before.
25        Q.   Before the -- before the tweet?
```

```
                                          Page 80

 1       A.    Before the tweet about sexual

 2   harassment, yes.

 3       Q.    She had -- so your recollection is

 4   that there was -- sorry, let me step back.

 5            The first time that you said you heard

 6   about allegations of sexual harassment was when

 7   she tweeted and then you started getting calls

 8   from Melissa DeRosa and Jimmy Vielkind, right?

 9       A.    Correct.

10       Q.    Are you saying there was -- a week

11   before there was a New York Post office saying

12   Lindsey Boylan said that -- making allegations

13   of sexual harassment before that?

14       A.    No.  She -- a week before she claimed

15   that she left -- she claims she left the chamber

16   because it was a toxic workplace and that she

17   tried to quit three times before it stuck.  That

18   produced -- that produced news articles -- that

19   produced news articles.  At the time we decided

20   not -- we decided not to respond.  But, you

21   know, as she -- as her claims were escalating,

22   which tended to dovetail with her -- with her

23   political ambitions, we -- we decided we needed

24   to start correcting the record because she's out

25   there saying things that are not true about --
```

                                                    Page 81

1    about how she left the administration.

2          Q.   So let's step back then and talk about

3    what you remember about this New York Post

4    article.

5               What -- what did you -- what do you

6    remember about that because it sounds like that

7    preceded the tweet?

8          A.   It was based entire -- it was based

9    entirely on her previous tweet where she said

10   this was the most toxic workplace she ever

11   worked in.  She -- and that she tried to quit

12   three times until -- until it finally stuck.

13              The -- the reality is, she was brought

14   up on numerous complaints by both her

15   subordinates and her -- and her coworkers.  When

16   she was confronted by those complaints she quit.

17   Three days later she asked for her -- she asked

18   for her job back.  Like I said, she -- she --

19   her claims -- her claims against the Gov --

20   against our office we believe are demonstrably

21   false and were escalating.  We did try not to

22   engage for a long time but it got to -- it got

23   to a point where we had to correct the record.

24         Q.   Okay.  So let me -- I -- I know --

25   you're -- you're giving me sort of lengthy

```
                                                    Page 82
 1   answers for very specific questions.

 2             So, the very specific question was:

 3   When the Post article came out, what discussions

 4   did you have and with whom?

 5        A.   I talked about -- I talked about it

 6   with -- with my team and with counsel, and then,

 7   you know, we made a decision that we're in the

 8   middle of a second wave of COVID, there's a lot

 9   of stuff flying around, you know, we -- we're --

10   we'll just -- it's one -- it's one article,

11   we'll just ignore it.

12        Q.   And did you -- who -- did you talk to

13   Melissa DeRosa about that?

14        A.   I must have.

15        Q.   How about the Governor?

16        A.   Him I didn't talk to.

17        Q.   You don't remember it, though,

18   specifically?

19        A.   I didn't talk -- I know I didn't talk

20   to him.  I must -- something like this I

21   definitely would have talked to her, and I have

22   a vague memory of that.  And then, you know, I

23   think I looped in Beth Garvey as well.

24        Q.   And did -- did Melissa DeRosa agree

25   with not saying anything at the time?
```

```
                                         Page 83

 1        A.   Yeah, I think so.  I mean -- I mean,
 2    yeah.  It wasn't a long -- it wasn't a long
 3    discussion.
 4        Q.   Okay.  So there was a decision made,
 5    we're just not going to respond this.  And then
 6    time -- and then about a week passed before
 7    the -- her tweet that then raised sexual
 8    harassment?
 9        A.   About a week -- about a week passed as
10    she -- she did escalate like her -- her attacks
11    on us.  During that time I believe, if you look
12    at her Twitter feed, you'll see she -- she
13    increasingly -- she increasingly was like,
14    saying stuff that we believe to not be true
15    about -- about the Governor, about -- about
16    working here.  And, you know -- and she
17    escalated to the point where the press -- where
18    everybody started to notice and the -- and the
19    Governor himself was implicated.  It used to --
20    she used -- she limited her complaints to staff
21    before that.
22        Q.   She what, sorry?  You were -- you were
23    breaking up a little.
24        A.   She limited -- she limited her
25    complaints -- complaints escalated and were
```

Page 84

1   limited to staff, but then finally she made
2   accusations with nothing -- with no specifics to
3   back it up against the Governor, which we had to
4   address.  But when people write about that,
5   they're going to write about everything else she
6   said too and we had to correct -- we had to
7   correct the record on that at least.
8          We addressed the allegations of
9   harassment, and then we had to address the
10  record on some of the other things she said
11  because they were all going to -- they were all
12  going to be part of the same swirl.
13      Q.   So what -- what decision was made to,
14  quote, correct the record?
15      A.   Well, I talked to -- when I was
16  talking -- I talked to reporters.  I said, hey,
17  she's been out there.  She's been out there
18  saying -- here's our response to the sexual
19  harassment complaint.  She's been out there
20  saying a lot of things over the past -- over the
21  past week, especially about the circumstances of
22  departure.  That's false.  She got fired after
23  being confronted.  And to the one -- the
24  reporter said to me, do you have anything to
25  back it up?  Prove it.

Page 85

1      Q.    Who said that to you?

2      A.    Bernadette Hogan from the Post, David

3  Caruso from the AP.  I think Jimmy was also

4  interested.  I think ultimately they ended up

5  not publishing anything of substance to it and

6  then several others.

7           (Discussion held off the record.)

8           THE VIDEOGRAPHER:  Standby.  The time

9      is 10:41.  We're going off the record.

10          (Short recess taken.)

11          THE VIDEOGRAPHER:  This meeting is

12     being recorded.  The time is some 10:44.

13     We are back on the record.

14     Q.    So I think when we broke you said

15  people were saying prove it, Bernadette Hogan

16  from the Post, Caruso, Timmy [sic] as well.  And

17  so what did you -- so what did you do to -- to

18  try to prove it?

19     A.    Well, I consult -- I consulted with

20  counsel.  I believe counsel consulted with GOER.

21  And in order to correct demonstrably false

22  information, I did -- I did share, I did

23  share -- I did share documents documenting

24  her -- documenting her departure and her

25  ultimate thing -- ultimate attempt to come back.

```
                                        Page 86
 1    That -- that was redacted in such a form that it
 2    protected the complainants.
 3         Q.   To what, sorry?
 4         A.   Redacted in such a way as to protect
 5    the complainants.
 6         Q.   And was there -- and who were the
 7    lawyers that you consulted with; Linda Lacewell
 8    and who else?
 9         A.   Linda Lacewell, Judy Mogul, those were
10    the main two.  I can't remember if Beth was in
11    the mix.
12         Q.   Okay.  And -- and GOER you said?
13         A.   They consulted with GOER.
14         Q.   Did you have any conversations with
15    GOER?
16         A.   No, but the lawyers -- the lawyers
17    represented that they did.
18         Q.   Okay.  Was there any discussion
19    that -- that you were involved in about whether
20    those documents were privileged?
21         A.   Again, I consulted with counsel.
22         Q.   Okay.
23              MR. J KIM:  And are you asserting
24         privilege -- and I guess this is a question
25         for Ed, asserting privilege over whether
```

```
                                              Page 87
 1        those discussions involved -- whether those
 2        consultations involved question of whether
 3        those documents were privileged or not?
 4             MR. E KIM:  Yeah, yeah, I think
 5        we're -- I think we're instructing Rich not
 6        to answer questions about the -- the
 7        details of the consultation.
 8   BY MR. J KIM:
 9        Q.   Was there any discussions that you
10   were part of as to whether releasing such
11   documents would constitute retaliation?
12        A.   Again, I'm going to have to -- I'm
13   going to have to assert privilege to my -- to
14   any conversations I had with counsel.
15        Q.   And in your mind what was it that you
16   were producing?  Were these -- I know it's been
17   described as personnel folder or file, what --
18   what did you think it was that you were
19   producing?
20        A.   The documents documenting the --
21   documenting the circumstances around her getting
22   confronted for multiple allegations of bullying
23   and harassment in the workplace.  Her reaction
24   to them.  And a follow-up -- and a follow-up
25   memo documenting a conversation where she asked
```

```
                                        Page 88
 1   for her position back.
 2        Q.    So in your mind it wasn't her
 3   personnel file?
 4        A.    In my mind those are the documents --
 5   in my mind the documents as I described them is
 6   what it was.  Whether they were in a file or
 7   not, that's -- it's not relevant to me.
 8        Q.    Are you aware whether employees of
 9   executive chamber have a personnel file each?
10        A.    I'm not in the human resources
11   department, Counselor.  I'm sorry, I don't know.
12        Q.    Well, do you have an understanding?
13   Maybe the understanding is I don't, but ...
14        A.    I do not.  I -- I assume everyone does
15   have a -- you know, you file paper -- you file
16   paperwork to -- when you -- when you come in,
17   you file paperwork when you get promoted, you
18   file paperwork if you get a pay raise, you file
19   paperwork if you move departments.  I'm assuming
20   that's kept somewhere, but I -- but I don't
21   know.
22        Q.    Okay.  And how did you obtain these
23   documents that you ended up producing?
24        A.    I spoke to -- I spoke to another
25   counsel who had -- who had access to them
```

1   after -- after I consulted other counsel about

2   them.

3          Q.   Who did you speak to to get them?

4          A.   Julia, last name starts with a P.  I'm

5   sorry, it's one of those names you read on

6   E-mail all the time.

7          Q.   Yeah, I know.  Julia K-p-i-e-c, right?

8          A.   Kpiec, thank you.

9          Q.   And did she have the -- the documents?

10         A.   She did.

11         Q.   Did you speak with Alphonso David?

12         A.   I think I did.

13         Q.   Okay.  When did you speak with

14  Alphonso David?

15         A.   That afternoon.

16         Q.   Before you got the file or after?

17         A.   I believe it was -- I believe it was

18  very contemporaneously.

19         Q.   Okay.  And who reached out to who?

20         A.   I think I called him.  He knew more

21  about the situation than anybody.

22         Q.   Did someone direct you to call him or

23  you just did it?

24         A.   If it came up or if I did it -- I

25  mean, again, we're in a group.  I don't -- I

```
                                                    Page 90
 1    don't -- I don't quite remember, but I would
 2    have called -- you know, wouldn't have been
 3    weird if somebody asked to call him.  It
 4    wouldn't have been weird if I called him myself.
 5         Q.   Okay.  What did you tell him?
 6         A.   I believe that conversation may also
 7    be privileged.
 8              MR. J KIM:  Is that right, are you --
 9         Ed, are you asserting privilege over
10         conversations with Alphonso David?
11              MR. E KIM:  You know, Joon, I think
12         that one we may to check with chamber.
13         I -- I don't want to step out of bounds
14         with what they've been doing.  But we -- we
15         may need to check with them.  And if
16         it's -- you know, if it's important enough
17         we can raise it with them on a break or
18         something.
19              THE WITNESS:  And I tried to answer --
20              MR. J KIM:  I said, I think in the
21         beginning, we directed you not to call
22         people about --
23              MR. E KIM:  That's why I was asking
24         permission, but, you know, we can just
25         table it.
```

```
                                              Page 91

1         A.    Listen, I'm prepared to answer the

2    question if the chamber's -- if the chamber's

3    position is it's not privileged, but I -- you

4    know, I want to -- I'd like to check.

5         Q.    Did he send you anything?

6         A.    I believe -- I believe he sent me the

7    last document.

8         Q.    Okay.  But was -- was that a document

9    that you already had or ...

10        A.    I don't remember.  I don't -- I don't

11   remember.  He may have sent me duplicate

12   documents that I had.  That last -- that last

13   file first conversation, I believe he had that

14   was -- he sent to the chamber.  And I can't

15   remember if it was in their files or not.

16        Q.    And then did you consult with anyone

17   else other than the -- Melissa DeRosa, with

18   counsel in the office, Alphonso David.  Anyone

19   else?

20        A.    I think there were some calls.  I

21   think -- I think Josh and Liz, maybe Jeff were

22   on those -- were on those calls.  I mean, if

23   they contributed -- if they contributed to the

24   conversation in any meaningful way I don't

25   remember -- I don't -- I don't recall directly.
```

```
                                              Page 92
 1    But the people I discussed for the important
 2    conversations and the relevant ones.
 3          Q.    Uh-huh.  But you remember consulting
 4    with Josh and Liz Smith at the time?
 5          A.    I remember being on calls, I remember
 6    being on calls with them.  I remember being on
 7    calls with them.  I talked to Rich Bamberger too
 8    around that day.
 9          Q.    Uh-huh.  Did --
10          A.    And he -- because -- I'm sorry, you --
11    I'm just talking.  You were asking a question.
12          Q.    Did Rich -- did anyone else play a
13    role in sending these documents to reporters,
14    other than yourself?
15          A.    I believe Josh did, and Rich I don't
16    believe actually sent them, but I think, you
17    know, he started -- I think -- I think reporters
18    started calling him for them once these stories
19    started to pop.
20          Q.    And why did Josh send them as opposed
21    to directing them to you?
22          A.    I think he may have been talking to
23    the reporter subsequently who had a better
24    relationship with than me.
25          Q.    Was there any discussion about sharing
```

```
                                      Page 93
 1   internal executive chamber documents with people

 2   outside of chamber and the propriety of that?

 3              MR. E KIM:  Are you talking about

 4        outside of --

 5              MR. J KIM:  Yeah, I guess outside

 6        of -- outside of conversations with

 7        lawyers.

 8        A.   Any conversations to that -- of that

 9   nature would have been with counsel.

10        Q.   Are you -- have you ever -- are there

11   any other instances where you have sent out

12   documents of that nature to --

13        A.   Not me -- not me personally.  There

14   was a well -- there was a well-documented

15   previous incident involving Howard Glaser and

16   this administration.

17        Q.   Yeah, what was that?

18        A.   It was -- I -- I forget the exact

19   circumstances, but there was -- there was --

20   there was a state -- there was a state employee

21   who made one representation about why -- about

22   why he was fired.  Came to the attention of

23   Howard Glaser that -- that -- that he was fired

24   for cause.

25              The story itself was starting to get a
```

                                                        Page 94

1    lot of pickup.  Howard went on the radio and --
2    and discussed the personnel -- and discussed the
3    personnel file and read some of its contents.  I
4    was a relatively junior staffer when that
5    happened.
6         Q.   And what was the discussions about
7    whether that was appropriate or not for him to
8    do that?
9         A.   I wasn't privy to any of that, but you
10   did ask -- that is the only -- that is a
11   previous -- time that I understand this
12   happened.
13        Q.   Any other instances that you are aware
14   of where documents about personnel were -- were
15   made public in this way?
16        A.   None -- none come to mind.
17        Q.   Putting aside the discussions with the
18   lawyers, did you have any personal reservations
19   about doing that?
20        A.   I have a legal question, then I
21   consulted with counsel.
22        Q.   Other than legal question you didn't
23   have any questions?
24        A.   I wanted to correct demonstrably false
25   information.  No.

```
                                               Page 95
 1        Q.    Did you know -- did you have any basis
 2   to know whether she had been sexually harassed
 3   or not?
 4        A.    Like I said, that was a separate --
 5   that was -- that was a separate -- that was --
 6   in our -- in our minds, that was a separate --
 7   that was a separate line of thought, the
 8   separate -- separate inquiry.  She didn't
 9   file -- she didn't file a complaint.  No one who
10   had been -- no one who we knew were --
11   remembered anything weird in meetings, which is
12   what she tweeted.
13             And -- and again, the Governor denied
14   it.  And we addressed that -- and we addressed
15   that in a separate statement.
16        Q.    So just to ask the question again.
17   Did you have any personal basis to know whether
18   she had been sexually harassed or not?
19        A.    I don't.
20        Q.    And so when you say it's separate, so
21   you're saying this was being released in --
22   in -- in a way that's unrelated to her claim of
23   sexual harassment?
24        A.    The circumstances about her departure
25   were -- since those are still fresh in
```

1  everybody's mind, were going to be included in

2  every story about her claim.  Which, again, we

3  answered separately.  So we -- we determined it

4  was ready -- rather than ignore her, which we

5  had done previously, we had to start correcting

6  the record and start correcting the record of

7  her false claims.

8      Q.   And in your mind it's -- the two

9  things were separate?

10     A.   Yes.

11     Q.   It just happened to be sent the day

12 she made the sexual harassment allegations, even

13 though you initially decided not to?

14     A.   She -- in the week in between she

15 continued to escalate her attacks, attacks at

16 the administration, which were false, and we --

17 and we were determined to correct the record.

18 On the sexual harassment claims, that was a --

19 that was a separate statement that dealt with

20 that.

21     Q.   I'm not -- I guess my question

22 isn't -- I understand that there are

23 statements -- not every statement you can -- you

24 can split up every statement into separate

25 statements, but your testimony about whether the

```
                                            Page 97
 1    decision to release the documents was, in your
 2    mind, a separate matter and unrelated to her
 3    allegation of having suffered sexual harassment?
 4         A.    Yes.
 5         Q.    They were unrelated?
 6         A.    Yes.
 7         Q.    Just happened to be the day that she
 8    made those sexual harassment allegations and
 9    that it was sent to reporters who are asking
10    about it?
11         A.    Asking the reporter to her asking
12    about -- her claims at large.
13         Q.    Her what, sorry?
14         A.    They were sent to reporters who were
15    asking about her -- who were asking about not
16    only her sexual harassment claims but the
17    hostile workplace claims.  Like I said --
18         Q.    The reporters who were calling you,
19    were they not -- sorry.
20         A.    No, I'm done.
21         Q.    Were the reporters who were calling
22    you not asking you about the sexual harassment
23    claims?
24         A.    They certainly were.
25         Q.    So they were sent to reporters who
```

1    were asking about sexual harassment claims,

2    correct?

3         A.   They were sent to reporters who

4    were -- who were interested in the circumstances

5    of her departure as well as the statement about

6    her sexual harassment complaint.

7         Q.   It's your testimony that in your mind

8    the two were unrelated, the sexual harassment

9    allegation and you're sending of the documents

10   were unrelated?

11        A.   The responses were unrelated.

12        Q.   What do you mean by "the response"?

13   So what do you mean the responses are unrelated?

14             My question is:  In your mind, under

15   oath, your testimony is that your sending of

16   those documents to the reporters were unrelated

17   to Lindsey Boylan's allegation of sexual

18   harassment?

19        A.   Yes.

20        Q.   Did you discuss -- do you know if the

21   Governor knew that you were sending out these

22   documents?

23        A.   I don't know if I did.  I don't know

24   if I did.

25        Q.   Did you have any -- any discussions

```
                                              Page 99
 1    with him about it?
 2         A.    No.
 3         Q.    He certainly obviously become aware of
 4    it because it made it's way in the papers pretty
 5    quickly.
 6         A.    I would -- I would think -- I would
 7    think so.  I didn't have any direct conversation
 8    about the file.
 9         Q.    If you can turn to tab 12 in the
10    second binder, binder two.  You see this is a --
11    a text -- well, it is a text chain --
12         A.    Yes.
13         Q.    -- that you are on?
14         A.    Yes.
15         Q.    And although it says "dad" at the top,
16    █████████████    is -- it appears to be Richard
17    Bamberger's device.
18              Do you see that?
19         A.    Uh-huh.
20         Q.    Okay.  And so this is a text chain
21    that you're on.  It says, "Caruso feels need to
22    get█████, █████ and █████████ out and any
23    paperwork out.  He says they are debating at AP
24    what to do but this will steamroll so may have
25    to do something."
```

1            Do you remember being in a text

2    exchange -- well, just to help you, if you want

3    to look at the next page.  He writes, 20 minutes

4    later, "Bernadette is talking to Isabel now

5    about what was told by her former colleagues.

6    Campbell says he doesn't write-off of unverified

7    tweets.  He called Lindsey.  She won't talk."

8            Do you remember being on a text chain

9    with Rich Bamberger, Dani Lever and Josh Vlasto

10   and Melissa DeRosa?

11       A.   I mean, no, but this -- this document

12   does refresh my memory.

13       Q.   Okay.  What does he mean -- who's

14   Caruso?

15       A.   David Caruso is the reporter for the

16   AP who he was talking to.

17       Q.   Okay.  Was he talking to him or were

18   you talking to him as well?

19       A.   We were both talking -- we were both

20   talking to him.

21       Q.   By the way, like, Rich Bamberger is at

22   Kivvit at this point, right?

23       A.   Yeah.

24       Q.   And is there just an understanding

25   from the reporters that he speaks for the

1  executive chamber?

2      A.    No.   I think in this particular case,

3  and usually this happens a lot with TV news,

4  because his -- his background was from CBS,

5  which is that if a big story breaks, all of a

6  sudden he gets calls just because, yeah, he's in

7  that -- he's in that world.   He doesn't speak

8  for us, but like thinks -- but like he does have

9  people who are in our world -- people know he's

10  still like in our world and we're still social

11  with him so they call and say, hey, what do you

12  make of this, what this was.   And I -- Caruso

13  definitely reached out to him first that day.

14      Q.   Is that -- by the way, is that common,

15  in your experience, of reporters reaching out to

16  former employees of organizations to get the

17  official word from -- from those organizations?

18  I mean, you were a reporter before too, right?

19  Like is that --

20      A.    Reporters --

21      Q.   -- a common occurrence?

22      A.    Sorry, I didn't mean to cut you off.

23  Reporters beg, borrow and steal any angle they

24  can to try -- to try to get -- to try to get

25  access to something.   So, yeah, they'd call

1    former -- they call former people.  And the

2    former people would be talking to us.  Again,

3    Rich is -- I said this before I think, we spend

4    our entire day on the phone with people like

5    asking what they think about stuff.

6              Reporters are the same way and they --

7    and they have their connections and sometimes --

8    and I think they perceive, though it may not

9    be -- it's -- I don't think it's -- I don't

10   think it's truthful in this case, that former

11   guys who are still close, who have their own --

12   who have their own interests, and like want

13   shift reporters may give them -- may give them

14   access -- better access or fresh dirt or like

15   something that's not necessarily authorized.

16       Q.   So I -- I understand that reporters

17   will beg, borrow and steal to get information.

18   In your experience, is it common for

19   organizations to also regularly bring in people

20   who are not part of that organization any more

21   to speak on behalf of the organization?

22       A.   I think -- I think as part of the

23   human condition when you -- when you feel like

24   you're in battle you turn to those you trust.

25       Q.   And is that -- you were in battle --

```
                                              Page 103
 1    was that all the time, you're in battle?
 2           A.   Define a time period, Counselor.
 3           Q.   I'm asking you, is it always a battle?
 4           A.   It's not always a battle but this --
 5    this was obviously a serious -- a serious event.
 6           Q.   Is this unusual, though, to bring
 7    in -- I thought you said you sort of regularly
 8    consulted with people like Steve Cohen, and
 9    others?
10           A.   Yeah, I -- I do.  I think -- I thought
11    you were asking me two slightly different
12    questions.
13           Q.   Okay.
14           A.   Like -- like yes, we turn to people
15    who know us, worked with us, understand --
16    understand us and -- and who also happen to be
17    very good and very smart.  We do do that.  I
18    think what -- I thought what you were asking me
19    before was it -- is it unusual for reporters to
20    go to former -- to go to former people to try to
21    get official statements.  I thought those were
22    two slightly different questions.
23           Q.   Okay.
24           A.   My -- you want -- are you satisfied
25    with my answer to the second or --
```

```
                                           Page 104

 1        Q.   Yeah, sure.

 2        A.   Okay.

 3        Q.   When he says, "Caruso feels we need to

 4  get ████ , ██████ and ████████████ out," who's that a

 5  reference to ████ ,██████ and ████████████?

 6        A.   I don't know.

 7        Q.   Do you know anyone -- anyone by the --

 8  by the name --

 9        A.   A lot of people named ██████.

10        Q.   You know a lot of ██████.  How about

11  ██████ --

12        A.   I know a lot of people --

13        Q.   -- spelled ████?

14        A.   Yeah, I don't know.

15        Q.   How about ██████████?

16        A.   ████████████ could -- could -- ████████████

17  could be a reference to Catalina Cruz who used

18  to work for us.  She's an assemblywoman now.

19        Q.   Okay.  Were there discussions here

20  about -- sorry, let me step back.

21             Were there discussions at that time

22  about reaching out to other former female

23  staffers at the executive chamber to get ahead

24  of any reporting?

25        A.   I think there may have -- I think
```

1    there may have been a thought about talking to

2    some of Lindsey's ex-coworkers when we're --

3    when there was discussion about what to do to

4    correct the record to some of the people who are

5    actually there.  That could be these people.  I

6    don't know.

7          Q.   Okay.  Then you say --go ahead --

8          A.   In the end I think you saw -- I think

9    you saw what we did.

10         Q.   Okay.  And it says "and any paperwork

11   out."  What's that a reference to?

12         A.   I believe that's in reference to the

13   documents.  Again, the number one question

14   reporters ask me, prove it.

15         Q.   Okay.  He says, "They are debating at

16   AP what to do but this will steamroll so may

17   have to do something."

18              What did you understand him to mean,

19   this will steamroll?

20         A.   They're going to move -- they're

21   debating whether -- whether a tweet with no

22   accusations, no -- and no -- no -- and basically

23   directed the reporters that she's giving no

24   details, with -- with no complaint filed -- with

25   no complaint filed behind it was worth doing.

                                                    Page 106

1   They were having an internal debate that I guess

2   they informed Rich of.

3        Q.   And did that weigh for or against

4   releasing the paperwork?

5        A.   Neither.  Neither.  The AP was one of

6   many outlets that we were dealing with that day.

7        Q.   I see.  Was the decision if you're

8   going to issue to one, you give it to all of

9   them?

10        A.   It was -- the Post and the AP really

11   wanted it.  They were after us for a long --

12   they were after us on that.  When I say "after

13   us," I mean they were persistent on -- on that.

14   Other people, once those stories published,

15   wanted the same documents.  I wasn't -- I wasn't

16   widely -- it wasn't -- I wasn't blanket

17   distributing it, I don't believe.  That's not my

18   memory.

19        Q.   Okay.  If you look to the next page of

20   that document, it says, "Bernadette is talking

21   to Isabel now about what was told her by former

22   colleagues.  Campbell says he doesn't write-off

23   of unverified tweets.  He called Lindsey.  She

24   won't talk."

25             So Bernadette is who?

1      A.    Bernadette's Bernadette Hogan from the

2   Post.

3      Q.    Isabel?

4      A.    Isabel, I believe Isabel Vincent who

5   works the Sunday desk at the Post.

6      Q.    So all both Post reporters?

7      A.    Uh-huh.

8      Q.    And former Campbell, Campbell is who?

9      A.    Jon -- that's Jon Campbell a reporter

10   with Gannett.

11      Q.    And were you talking to all of those

12   people yourself or --

13      A.    I was.  Not Isabel, but I was talking

14   to Bernadette.  Bernadette's the one who wrote

15   the hostile workplace story a week prior.  She

16   heard from her own sources about the

17   circumstances of her leaving.  And then

18   previous -- and previous -- and had previously

19   tried to track that down.

20      Q.    How did she try to track that down

21   previously?

22      A.    I think she was trying to talk to

23   people.

24      Q.    And she had talked to you and asked

25   for evidence or proof or documents?

1      A.    Yeah, and she certainly did that day

2    too.

3      Q.    Previously you hadn't provided it?

4      A.    Previously -- what changed there was

5    the escalation during the week of attacks upon

6    the administration that we believed to be

7    baseless.

8      Q.    Who had you discussed it -- this with

9    previously, Bernadette's requests?

10      A.    I don't know if I did.  She hammers me

11    with ten things a day, to be honest with you.

12      Q.    Okay.  So you want to look on the next

13    tab, tab 13.  And this is a text chain with the

14    same people.  It says, "Caruso says he has to go

15    and will update."

16           Melissa says, "Hold."

17           Melissa says, "We're getting it to him

18    now.  Anything from DN?"

19           I assume that's Daily News?

20      A.    Yes.

21      Q.    "I didn't call Dennis."

22           Who's Dennis?

23      A.    Dennis Slattery is the reporter from

24    Newsday -- I'm sorry, the Daily News.

25      Q.    The Daily News.

1          "Do we need to" -- Melissa DeRosa

2     says, "Yes.  Got voice mail.  Texted him.  AP

3     all set.  Tying up the Times now."

4          So this is -- looks like a text chain

5     where you -- you're talking about what to do,

6     hold, and then the decisions made to send out

7     the documents.  And then you say, "AP all set.

8     Tying up the Times now."

9          What does that mean, "AP all set.

10    Tying up the Times now"?

11         A.   I think -- that's -- that's not

12    necessarily what this text chain's about.  The

13    AP -- a lot of these things, we didn't have

14    out -- we didn't even have our original answer

15    formulated yet so they were going up with no

16    response from us.

17         Rick obviously did talk to David about

18    the circumstances of her leaving, but AP put up

19    a story that had -- I believe had -- at first

20    had no response from us, had no response that

21    denied any of the remarks.  And we were still

22    trying to formulate our actual conclusion.

23    Yeah, Sunday at 1:43, you know, half -- half the

24    time, half that day I spent was trying to hold

25    people at bay from doing -- tying stuff up just

Page 110

1  based on the tweet, while we tried to get our

2  arms around what it was so we could formulate a

3  response.

4       Q.   So if you look at the time, it's

5  Sunday at 2:30.  It says "AP all set."  If

6  it's -- if you can go to this -- hold on.  Let

7  me just see which binder this is.

8            If you can go to tab 6 of that same

9  binder, and just keep in it your head 2:30 p.m.

10 Sunday?

11      A.   Okay.

12      Q.   See it, 2:29 you send former press

13 secretary Caitlin Girouard?  Girouard?

14      A.   Yeah.

15      Q.   "Simply no truth to these claims," and

16 then attached are some documents, right?  These

17 are the documents we talked about or --

18      A.   Okay.  Then my -- then my recollection

19 doesn't necessarily -- wasn't necessarily

20 correct.  They were -- in the case of the AP.  I

21 apologize.

22      Q.   So you -- does this -- does this

23 refresh your recollection that you -- you sent

24 to David Caruso, right around this time, the

25 documents?

1      A.    Along with the response from the

2   press -- from the press secretary.  We must

3   have -- we must have come -- we must have come

4   to that at the same time.

5      Q.    And why was -- this one, it looks like

6   it's coming out from Caitlin versus someone else

7   or you?  How -- how is that decision made?

8      A.    She's our press secretary.  She's one

9   of the people who speaks on the record.

10  Obviously, you know, I think it's evident with

11  the -- with the nature of the allegation, having

12  it -- having it come from -- having it come from

13  a woman we certainly -- would certainly be

14  beneficial.  At a certain point in the

15  conversation we did loop in -- we did loop in

16  Caitlin to discuss everything that was going on.

17     Q.    And what was -- what had been done to

18  verify that -- the statement that there's simply

19  no truth to these claims?

20     A.    As I said before, we sought -- we

21  sought to see if she got a complaint.  We tried

22  to recollect anybody who saw -- who saw anything

23  in meetings with her.  And we talked to the

24  Governor.  Again, they're asking for our

25  response.  You're asking for the Governor's

Page 112

1   response to these -- these allegations.  His

2   response is there's simply no truth to these

3   allegations.

4          Q.   You spoke to the Governor?

5          A.   Someone spoke to the Governor and that

6   statement was approved.

7          Q.   Okay.  If you look at this document

8   that was sent around or these documents, there

9   were parts that were redacted and filled in with

10  ESD official one, two; you see that?

11         A.   I do.

12         Q.   Whose handwriting is that?

13         A.   Unfortunately -- and I say

14  unfortunately only because of the penmanship,

15  mine.

16         Q.   And did you -- you whited out the

17  names and -- and put these descriptions for

18  them?

19         A.   I did.

20         Q.   And did anyone direct you to do that?

21         A.   This was -- this was upon -- this was

22  upon consultation of counsel.

23         Q.   They said take out the names of the

24  complainants?

25              MR. E KIM:  Joon, I think we need to

```
                                          Page 113
 1        stay away from, you know, what counsel
 2        advised him on.
 3        Q.   But you were also giving out names to
 4   reporters of -- or someone was, it looked like,
 5   in the earlier texts, of names of the
 6   complainants to talk to?
 7        A.   I was not.
 8        Q.   Huh?
 9        A.   I was -- I was not.
10        Q.   It was someone else, to your
11   knowledge?
12        A.   I don't know.  I think some people --
13   I think we did try to call -- I think we did try
14   to call some people who knew -- who -- who
15   worked with Lindsey about -- about their
16   encounters with her.  Ultimately, this is when
17   I -- this is what was decided to be done.
18        Q.   Sorry, I'm getting -- I'm not catching
19   everything you're saying.  If you go a little
20   closer to the phone.  Sorry.
21             MR. E KIM:  It's a lifelong condition
22        but we'll try to remedy that.
23             THE WITNESS:  I should have mentioned
24        this at the beginning when you asked me if
25        I had any conditions.
```

Page 114

1           I'm -- I'm sorry -- I'm sorry,

2     Counselor.  One more time.

3        Q.    Let me look it up.

4           Were you aware that the names of

5     certain of the complainants were being provided

6     to reporters?

7        A.    I don't know if they were the actual

8     complaint -- I don't know if they're actual

9     complainants here.  I do know -- and again, I

10    just don't -- I just don't remember all the

11    complainants in the actual document.  I'm sure

12    you have an unredacted copy somewhere.

13          I'm sorry.

14          You know, there -- I think we

15    contacted -- I think some people who did work

16    with Lindsey -- with Lindsey were contacted,

17    that report -- reporters wanted.  I think

18    ultimately that's not what -- that's not what

19    happened.

20       Q.    And you see that the first page of the

21    document, the subject line is "confidential

22    personnel matter"; right?

23       A.    Yes.

24       Q.    And then the second document up top

25    says, "Draft, privileged and confidential

Page 115

1  attorney/client privileged communication."

2          And the last E-mail from Alphonso

3  David also says "privileged and confidential

4  attorney/client communication, attorney work

5  product."

6          I suspect the answer to this will be

7  that you're asserting privilege, but any

8  discussions you had about the fact that these

9  documents, on their face, asserted

10  attorney/client privilege and work product

11  privilege and whether sending it out would be

12  appropriate?

13      A.   Again, I think -- I think -- I think

14  your hunch is right.

15      Q.   Have you ever sent out to reporters

16  any other documents that -- in your career that

17  were marked -- visibly marked at the top

18  attorney/client privilege attorney work product?

19      A.   None come to mind, but if I had I

20  would have consulted counsel before.

21      Q.   Okay.  Do you remember any instances

22  of that?

23      A.   None -- none come to mind -- one comes

24  to mind, but like I said, if I -- for something

25  like that I would have consulted counsel.

1      Q.   So if you can flip through tabs 2, 3,
2  4 and 5 of that same binder number two.  Those
3  all appear to be E-mails where you send the same
4  document to various reporters, New York Times,
5  Wall Street Journal, New York Post, Times --
6  Times Union, correct?
7      A.   Uh-huh.
8      Q.   Did anyone -- any others that you
9  remember sending this to, other than these that
10  we have?
11      A.   I believe the Huffington Post.  There
12  may -- there may have been others but, you know.
13      Q.   Okay.  Do you remember any other
14  reporters asking you -- well, what did you tell
15  the reporters as to what this is?
16      A.   I'm condensing several conversations.
17  Again -- again, if the conversation with the
18  reporter turned to, by the way, she -- she --
19  separate from this, she lied -- she lied --
20  she's been lying about how she left the
21  administration.  And two to one, they all said,
22  you got any proof of that.
23      Q.   So, sorry.  You -- you recall saying
24  "separate from this," when you talked to
25  reporters?

```
                                              Page 117

 1        A.    I'm talking about a different -- I'm

 2   talking about a different subject other than the

 3   sexual harassment tweet, yeah.

 4        Q.    So you --

 5        A.    Again, Counselor, every story about

 6   this will also have -- will also have she

 7   previously accused us of having a toxic

 8   workplace and that she ended up leaving -- and

 9   she ended up leaving on her own volition.  Every

10   story was including that.

11        Q.    I understand they're going to -- the

12   stories.  My question was a much more narrower

13   one, which is:  You actually recall saying to

14   reporters, "separate from this" when you sent

15   these out or talked about this, these records?

16        A.    Okay.  Sorry, there's some banging

17   again.

18              I may not -- I may not have, but

19   the -- my conversations are more -- are more

20   personable than this current one.

21        Q.    Are more what, sorry?

22        A.    My conversations with them are more

23   conversational and more personable than this one

24   so, sorry -- sorry about that.

25        Q.    No offense taken -- no offense taken
```

Page 118

1   to personable comment.

2        A.    Yeah.

3        Q.    That's my normal reaction to Ed Kim.

4        A.    I was warned.

5              So -- no.  When I talked -- when I

6   talked to reporters, if they expressed interest

7   in reporting at the toxic workplace stuff,

8   once -- again, the Post had this for -- the Post

9   has been gnawing at this, the AP was obviously

10  very interested in this.  Once those -- once

11  those two stories popped, people called me and

12  were -- and were like, can you verify that

13  information, can you share that information.

14       Q.    Okay.  Did you -- and did you --

15  were -- were your discussions about this, these

16  documents and the substance of them, off the

17  record or on the record or it depended on the

18  outlet?

19       A.    Depended on the outlet.  You know, I

20  don't think -- we're all having normal

21  conversations.  I don't think I ever said off

22  the record.  I may have.  I may have.  But, you

23  know, if they're looking for -- they weren't

24  looking for me to verify.  They weren't looking

25  for me to verify as -- you know, with quotes

Page 119

1   around them.  They're looking for the records.

2        Q.   Okay.  So just, if you can look at

3   tab 16 and the first couple texts -- well, at

4   least the second one we've seen before.

5   "Bernadette is talking to Isabel now."

6             Bamberger says, "Dana just called me.

7   She says she has to write something and suggests

8   we get her something so it's on record.  She

9   said please give her anything."

10            What do you understand that to mean?

11       A.   I believe that was in reference, the

12  direct denial, which I don't think we had at the

13  time.  Can I check the time stamp on that to

14  make sure?  What page was that?

15       Q.   We get it on the record at 11:33 a.m.?

16       A.   11:33 a.m.  Yup.  Yeah.  By that point

17  I think we're still figuring out what -- what we

18  needed.

19       Q.   Okay.  Before sending them out to

20  reporters, did you send images of these

21  documents to anyone, that you remember.

22       A.   Looks -- looks like I did to this

23  chain.

24       Q.   Huh?

25       A.   Looks like I did to this chain.

Page 120

1      Q.    Yeah.   Okay.   How about the people at
2  tab 14?  I don't know if that's what you're
3  looking at.  It's actually a different -- a
4  slightly different chain.
5      A.    Bamberger, Dani, Vlasto.
6      Q.    This one includes Steve Cohen.
7      A.    Okay.
8      Q.    Do you remember discussions you had
9  with Steve Cohen about this?
10     A.    Not in particular.  Yeah, I guess I
11  did see these images out.  I want people to
12  know -- people who are talking to reporters to
13  know what they're talking about.
14     Q.    You have a -- you have a recollection
15  of why you sent it -- images to these particular
16  people, just that they need -- you wanted them
17  to know what you were sending out?
18     A.    I want -- and also if they were
19  talking to reporters I wanted them to know the
20  facts -- the facts as they were.
21     Q.    And were they -- do you know if Steve
22  Cohen was talking to reporters too at the time?
23     A.    I don't believe Steve -- I don't
24  believe Steve Cohen was.  I could -- I could be
25  wrong.  He may know one or two.

```
                                             Page 121
 1        Q.    Okay.  But Dani Lever was?
 2        A.    It look like she was talking to Dana
 3   and a couple -- Dana Rubenstein and -- and maybe
 4   one other --
 5        Q.    And we know --
 6        A.    If we're looking at the text chains.
 7        Q.    And we know Bamberger was.  Although,
 8   actually this one does not -- yeah.  And this
 9   one includes Bamberger.
10              Okay.  If you go to tab 15.
11        A.    Uh-huh.
12        Q.    You send this time, "confirm receipt
13   and -- confirm receipt and that they're on the
14   right order, please."
15        A.    Yeah.
16        Q.    "In the right order."
17              Were you -- were you asking these
18   folks to -- to check the order correctly or
19   was -- do you know what the --
20        A.    I think I sent them images, sent them
21   images, you know, and -- ever send more than one
22   images on your phone?  Do you do it the right
23   way or do you do it the wrong way?  If you do it
24   the wrong way, if it's a page, it's like reading
25   backwards.
```

```
                                              Page 122
 1        Q.    So you're asking them to confirm that
 2   it's in the right order before they read it so
 3   that --
 4        A.    So they --
 5        Q.    Not asking them to tell you what the
 6   right order is?
 7        A.    Right.
 8        Q.    Okay.   Vlasto says, "Reading now."
 9   Lever says, "Do we have any additional details
10   of complaints made against her?   This just
11   mentions them but doesn't explain what they
12   were."
13              Do you know what --
14        A.    I guess she --
15        Q.    -- Dani Lever was asking?
16        A.    I think she was -- I think she was
17   reading and commenting before she finished
18   reading.
19        Q.    I see.   Because it is -- the documents
20   are pretty detailed.
21        A.    Correct.
22        Q.    And then if you go down, if you go two
23   more pages, there's a -- it looks like a link to
24   contact information for ████████████?
25        A.    Yes.
```

Page 123

```
 1        Q.    Who's ██████████?
 2        A.    She used to work at ASB.  She
 3   currently works for -- she currently -- no.
 4   Until yesterday I think she was coms director
 5   for the ████████ campaign.
 6        Q.    And why were you sending her
 7   information?
 8        A.    I believe she had an adverse
 9   experience working -- working under Lindsey at
10   ESD and she agreed to talk to reporters on
11   background.
12        Q.    Was she one of --
13        A.    I don't think anything ever came of
14   it.
15        Q.    Was she one of the complainants, to
16   your knowledge, that you had whited out?
17        A.    I don't -- I don't remember.  I think
18   you have the names of all the complainants, but
19   I don't believe she was.  But she -- she did not
20   have a good experience working for Lindsey.
21   People were asking if we had -- besides
22   paperwork, if we had other people that we can --
23   we can direct them to.  █████ doesn't work for us
24   anymore.  She's got no reason to not be honest.
25        Q.    Was there also a -- a decision to send
```

1  out names of people who just had bad experiences

2  with Lindsey Boylan?

3      A.   "Decisions" a strong word.  Again,

4  reporters were asking if there was anybody else

5  they can talk to about her experience there.  I

6  heard through the grapevine that ███ had a bad

7  experience there.  I don't quite know what they

8  were.  I did talk to here.  And she said, yeah,

9  if somebody calls me I'll talk to them on

10  background.  I don't think anybody actually

11  called her.

12      Q.   In your mind, giving the names of just

13  people who had bad experiences with her, was

14  necessary to correct the record?

15      A.   Correct.

16      Q.   Anyone who had any bad experiences

17  with her?

18      A.   I think they can provide color --

19  color to reporters.  Reporters make up their own

20  decisions.  This sort of thing happens every

21  day.

22      Q.   Right.  People have bad experiences

23  with people, that doesn't necessarily rebut the

24  claim as to why someone leaves, correct?

25      A.   It does -- it does provide context,

1  though, in relation to her -- in relation to her

2  theory that this was a hostile work environment,

3  when in fact the documents show that she herself

4  was -- was accused of bullying and harassment.

5      Q.   Did you discuss --

6      A.   Just because they weren't the

7  complainants.

8      Q.   Did you discuss the -- providing names

9  of other people who had bad experiences with her

10 to reporters, did you discuss that with anyone?

11     A.   I'm sure it came up in the

12 conversation --

13     Q.   With Melissa DeRosa?

14     A.   -- in the group -- in the group one

15 that we were having.  I think counsels were part

16 of that conversation too.

17     Q.   And the Governor?

18     A.   I don't think so.  That's -- that's a

19 pretty small ball.

20     Q.   You say -- Steve Cohen asks, "Why

21 ███?"

22          And then you say, "Different ████

23 you're thinking of.  She was ESD press

24 secretary."

25          What ████ did you think Steve Cohen was

1  referring to?

2       A.   Well, there's ████████████ who was the

3  ST press secretary, and then for many years

4  there was an ████████████ that was on the

5  second -- that was on the second floor who did

6  inner gov.

7       Q.   And you thought he was probably

8  thinking of somebody else?

9       A.   Steve never met ████████████████.

10      Q.   Can you turn to tab 17?

11      A.   One, seven?

12      Q.   Yeah.

13      A.   Okay.

14      Q.   And this is, again, a text chain that

15  includes Melissa DeRosa, Vlasto, Dani Lever, you

16  and Rich Bamberger.  And if you go three, four

17  pages in, the one that says "Caruso says he's

18  still going through documents," that's from you.

19           And then Melissa DeRosa --

20      A.   Hold on.  I'm sorry, I'm not there

21  yet.

22      Q.   I will go to -- if you look at the

23  Bates numbers at the bottom, 311 --

24      A.   I'm here now, sir.

25      Q.   3119.  "Caruso says he will -- he's

Page 127

1   still going through documents."

2           And Melissa DeRosa says, "Yeah, but

3   the deal was he couldn't post."

4           What is -- what is Melissa DeRosa

5   referring to there, couldn't post?

6       A.   I think he said he wouldn't -- I think

7   he said he wouldn't post his first draft until

8   he went through the documents and determined

9   whether or not they were useful to him.

10      Q.   He wouldn't post the article?

11      A.   Right.  And I think subsequently he

12  posted a version -- he posted a version anyway.

13  Which, you know, that happens in life.

14      Q.   What does that mean?  Wait.  So when

15  you say "that happens in life," were you hoping

16  he wouldn't post or -- or wait or -- oh, I see,

17  you're saying -- I see.  That they'll wait to

18  review the documents before they post so that

19  the article has that?

20      A.   Right.

21      Q.   But he --

22      A.   Right.  But they were still reviewing

23  the documents, and then they decided to post

24  what -- what was the news of the day while he

25  was still going through them, and he

```
                                                Page 128
 1    subsequently updated.
 2          Q.    Got it.
 3          A.    Sometimes -- you know, sometimes that
 4    happens.
 5          Q.    Okay.  And then tab 8.  I know -- I
 6    know we're going a little back and forth, but
 7    so -- "And from some helpful stuff here, I know
 8    he talked to ████ and ████████ ."
 9                And -- and then the next text is Times
10    Union.
11                So it looks like you're reading the
12    Times Union article post and you're saying
13    there's some helpful stuff in there, right?
14          A.    Uh-huh.
15          Q.    And who's ████ and ████████ ?
16          A.    ████ is ████████████ .  She
17    used to work for me.  And ████████ used to
18    be -- was our deputy secretary for the
19    environment, I believe.  You know -- yeah.  They
20    both -- funny on this one, I didn't send -- I
21    didn't send him to them.  They told me
22    subsequently he talked to them.
23          Q.    I see.  So did -- did you send
24    reporters to people?
25          A.    I didn't -- I didn't send him to -- I
```

Page 129

1   didn't send him to these two.

2        Q.    But some others?

3        A.    I mean, that day I can't remember.  I

4   think -- I can't think of what I was mostly

5   doing that day.

6        Q.    And what was the reason to send them

7   to other people?  Who were -- who were the

8   people?

9        A.    Reporters were doing -- forget --

10  forget Lindsey Boylan for a minute.  Soon as

11  that broke, the reporters who, again, were --

12  who I think were skeptical on its face of her

13  claim because she refused to talk to them, were

14  calling anybody who used to work here, who had

15  Cuomo in their LinkedIn, and starting the first

16  round of these quote/unquote hostile -- hostile

17  workplace stories to spring up later.

18             So I know -- I know, you know,

19  ███████-- I -- I remain close to both of them.

20  One works for Scott Stringer, and the other one

21  works -- is out in ████████ now.  And they called

22  me after the fact and goes, yeah, I got a call

23  from the Times Union out of nowhere.  I talked

24  to him on background.  And he actually talked to

25  three people on that story, if I remember

1    correctly.  I don't know who the third one is.

2         Q.    By the way, putting aside the sexual

3    harassment allegations, in your experience are

4    people who say that the -- that it is a hostile

5    work environment or a difficult work

6    environment, is there no truth to those claims?

7         A.    I think this is -- I think this is a

8    tough hard-charging place to work.  I think the

9    expectations are -- are very high.  I think the

10   expectations should be high.  And it's

11   fast-paced.  The work is not -- the work is not

12   for everyone.  I'm assuming we'll be talking

13   about this in quite some detail.

14             But I actually -- I actually -- I

15   actually don't -- I actually don't in my

16   experience.  I've been here nine years.  I've

17   read a lot, and I'm sure you've talked to a lot

18   of people who didn't last very long here, had

19   some very strong opinions about the place.  I

20   do -- I do too and, you know, I think -- and I'm

21   proud of what I've done here.  I'm proud of my

22   accomplishments here, and I'm proud of what

23   we've done as an administration.

24        Q.    Right.  I understand that.  I

25   understand.  You've -- you've said it many times

Page 131

1   publicly, as well as others, and we've seen
2   actually talking points to that effect.  But if
3   people -- and you're saying people can disagree,
4   but my question was slightly different.
5           Are people who are describing that
6   environment as -- as difficult, hostile, toxic,
7   in your mind are they lying?
8       A.   I think there may be a great deal of
9   embellishment that's -- that -- that's in these
10  stories, in my opinion.
11      Q.   What's -- what's embellishment that
12  you've seen in the story, putting aside the
13  sexual harassment, which I understand your
14  position?  But what -- people who have talked
15  about the work environment, what -- what aspects
16  of it, in your mind, are embellishments or
17  untrue?
18      A.   I think -- I think the environment
19  where like everyone screams at each other and
20  tosses TV off walls and doing all that, I -- I
21  think that's --
22      Q.   Who has said they -- who has said
23  they -- the TV was tossed at?
24      A.   The Times Union.  Again, there's a
25  whole subculture of these stories that sprang --

1    that sprang up.  At a certain level I think -- I

2    think the reality becomes -- starts to get

3    mythologized a little bit.

4        Q.    Are you aware of an incident where the

5    Governor threw a computer monitor at Josh

6    Vlasto?

7        A.    I am not.

8        Q.    Not aware of that, right?

9        A.    I'm not aware of that.

10       Q.    And you would have no basis to say if

11   that happened, whether it was true or not,

12   right?

13       A.    I would think I would have heard about

14   it, but I wasn't -- I certainly wasn't there and

15   I certainly didn't hear about it.

16       Q.    And then the next page on this, it

17   says, "Give them the docs," from Josh.

18       A.    What page?

19       Q.    226.

20       A.    Yup.

21       Q.    What -- what do you think he's

22   referring to there?

23       A.    He's referring to the personnel file.

24       Q.    Yeah.  And if you go to the next page,

25   you write back, "I don't know if I trust them."

Page 133

1           And Vlasto says, "Fair enough."

2           What did you mean by that?

3      A.   It ultimately -- it ultimately

4  wouldn't -- it ultimately wouldn't have mattered

5  but, you know, he burned -- he burned me before

6  on stuff I said on the record, off the record,

7  stuff like that.  Subsequently, by the way, he

8  called me and I ended up providing him the

9  information because he expressed an interest in

10 them.

11     Q.   Why would it matter the providing of

12 these documents, why would you provide it only

13 to people you trust?

14     A.   I think I was mad at -- my point is I

15 was mad at him over some -- over some other

16 stuff.  Then he talked to me -- then he

17 called -- then the reporter called and we

18 talked.

19     Q.   If you can turn to tab 53 of this same

20 binder.  This is later.  It's in March.  It

21 comes up again, and there's -- I think you were

22 responding to a longer potential story on this.

23 On the second page, Ajemian asked, Peter Ajemian

24 asked, "Talked through with Linda, here's a

25 tweaked version.  Beth, will Volforte agree this

1  is accurate?"

2          What's that a reference to Volforte,

3  will they agree it's accurate?

4      A.   I think they're -- I think they're

5  for -- you know, for fairly obvious reasons I

6  think this was a New Yorker story.  Peter was

7  flacking this one, I was not.  And Volforte is

8  the head of GOER, and I'm sure he wanted to --

9  he wanted to make sure the statement from Beth

10 reflect -- you know, was okay -- was okay with

11 GOER.

12     Q.   And was he the person that you

13 understood was consulted with about the release

14 of the documents relating to Lindsey Boylan?

15     A.   That may -- that may -- that may

16 result -- that may be the result of a privileged

17 conversation.  I refer to Ed.  Happy to answer

18 it if it's not.

19          MR. E KIM:  Yeah, the short answer,

20      Rich, is if Joon is asking you a question

21      and the answer would involve something you

22      learned from discussions with counsel then

23      you should avoid talking about it.

24          THE WITNESS:  Okay.

25          MR. J KIM:  Okay.  I'm actually at a

Page 135

1        little bit of a natural breaking point, can

2        we take a five-minute break?

3             THE WITNESS:  Sure.

4             MR. E KIM:  Yeah.  And, Joon, if it's

5        okay, maybe we can take a slightly longer

6        one, because the noise situation, we

7        realize, is due to some construction that's

8        happening.  So we're just going to have to

9        move conference rooms, so we might have to

10        redial in and all that.  Okay.

11             MR. J KIM:  Should we say noon or --

12             MR. E KIM:  Yeah, I think that's fine.

13             MR. J KIM:  Okay.  We'll -- we'll hop

14        back on at noon then.

15             THE VIDEOGRAPHER:  Stand by to go off

16        the record.  The time is 11:44.  We're

17        going off the record and this will end

18        media unit number two.

19                  (Short recess taken)

20             THE VIDEOGRAPHER:  This meeting is

21        being recorded.  The time is 11:59 a.m.

22        Eastern Standard Time.  We are back on the

23        record.  This will be the start of media

24        unit number three.  Counsel.

25        Q.   So if you can turn to tab 19 of that

1    same binder in front of you, the binder number

2    two?

3         A.    Binder two?

4         Q.    Yes.

5         A.    Okay.

6         Q.    And this is a text chain that includes

7    you, it's from Melissa DeRosa.  And it's the

8    following today, December 14.

9         A.    Uh-huh.

10        Q.    And includes you, Linda Lacewell,

11   Steve Cohen, Richard Bamberger, Dani Lever, Josh

12   Vlasto.  And Melissa writes, "Thoughts?"

13             And then you'll see the second page

14   she has written out some possible comments,

15   "Yes, I heard about the tweet, about comments

16   supposedly made, and there's just no truth to

17   it.  Or yes, I heard about the tweet and there's

18   just no truth to it.  Did you comment on her

19   appearance?  There's just no truth to the

20   tweets.  I support women having the opportunity

21   to speak out.  I believe in transparency, but

22   there was nothing inappropriate that happened."

23             And you write, "Yes."

24             What's your understanding of what this

25   exchange was and what it is -- what's written

1   out here?

2        A.   My recollections was this was either

3   the morning of or the night before the

4   Governor's first public appearance following

5   that -- following that Sunday, and I think

6   we're -- I think, you know, we're a -- we're a

7   workshop in training.

8        Q.   You're preparing for questions you

9   might get on it?

10       A.   Uh-huh.

11       Q.   And something like this, what's your

12  understanding of -- does Melissa -- is it common

13  for Melissa to draft it, something like that,

14  and share it with you and people to comment

15  or --

16       A.   Sorry.

17       Q.   Go ahead.

18       A.   What was the end of that statement,

19  the people --

20       Q.   Or does it depend?

21       A.   I think it depends.  I think in this

22  case, my vague recollection is of there was

23  definitely conversations with the group before

24  this about what he -- what she said.  And this

25  might be a distillation of everything that was

Page 138

1  said.  It was certainly reflective of how I

2  thought he should answer -- answer these

3  questions, especially with so little

4  information.

5       Q.   And before drafting something like

6  this, would Melissa DeRosa have discussed it

7  with the Governor?

8       A.   I don't know if it's before -- I don't

9  know if it's before or after.

10      Q.   But at some point -- right, because

11 he's going to deliver it.  These are notes for

12 him?

13      A.   Yeah, at some point.

14      Q.   And then if you go further, there's --

15 there's a few more exchanges about it.  Dani

16 Lever said, "I'd do the second," if you're -- if

17 you go to page 2531.  "The first gives her too

18 much room to define inappropriate."

19           Do you know what that means?

20      A.   No, but I think we're just work --

21 we're just work shopping a statement in order to

22 make it as clear and concise and direct as

23 possible.

24      Q.   Then if you go to 2536, a few pages

25 later, Linda Lacewell writes, "Does he get away

```
                                               Page 139

 1   with not answering if he commented on her

 2   appearance?"  Was there --

 3        A.   Okay.

 4        Q.   Was there any discussion about whether

 5   the Governor had in fact commented on her

 6   appearance or not?

 7        A.   No.

 8        Q.   To your -- sorry, go ahead.

 9        A.   Not with me, sorry.

10        Q.   Not with you?

11        A.   Not with me.

12        Q.   In your experience -- in your

13   experience, have you seen the Governor comment

14   on people's appearances?

15        A.   I really haven't.  Read a lot of

16   stories about it, but I really haven't in my own

17   personal view.

18        Q.   Okay.  Including women, you haven't

19   heard him comment on women's appearances?

20        A.   No.  Sorry, I shook my head.  I should

21   have answered affirmatively.  No.

22        Q.   Okay.  And in the next -- the last on

23   this -- in this tab, Steve Cohen says, "I think

24   going down that path doesn't end cleanly.  No

25   doesn't make sense.  Yes invites another
```

                                                    Page 140

1   question and sounds funky.  And that often

2   comment seems similarly weird.  The problem is

3   LB doesn't mean what she says.  She -- she must

4   mean he made a comment that was an inappropriate

5   sexual innuendo.  To that the answer's a strong

6   didn't happen.  But you're forced to unpack it

7   to get to the directed no."

8           Do you remember that exchange?

9       A.   I don't, but Steve -- Steve's a lawyer

10  who certainly gets down to it.

11      Q.   Yup.  So you don't remember there

12  being a -- an understanding in the group that he

13  may have commented on her appearance but just

14  not in a inappropriate way?

15      A.   That's -- that's not my understanding.

16  Is it possible, sure, but that's not my

17  understanding.

18      Q.   Okay.  That's sort of the implication

19  of this comment in the sense that you can't just

20  say no, if you commented on her appearance.  And

21  then you have to drill down and then it gets, as

22  he said, funky?

23      A.   But I think -- I think ultimately it

24  goes down to what -- I mean, I hate interpreting

25  what other people say, especially --

Page 141

1    especially -- especially an attorney, but I

2    think Steve's ultimate solution was obviously

3    she -- obviously she meant this and the answer

4    is no.

5         Q.    Okay.  Can you go to tab 22.

6         A.    Okay.

7         Q.    This is December 15, Tuesday.  "Times

8    Union is calling around," you write, "to former

9    staffers trying to feel out if Boylan is telling

10   the truth or is full of it.  So far it sounds

11   like the latter.  Might as well feed them our

12   people."

13        A.    Yes.

14        Q.    Do you remember -- what do you

15   remember about that Time, like learning that

16   Times Union is reaching out to former staffers?

17        A.    They were calling around, and again,

18   this is -- this was a repeat of my life for

19   several months.  They were calling around to

20   former staffers after Lindsey -- after Lindsey

21   did her -- did her tweet looking at hostile

22   workplace and if they could find somebody else

23   that had a sexual harassment thing.  The Times

24   Union informed me that they found nobody else --

25   nobody else in the latter.  Some people that

                                                      Page 142

1    have had -- that said they had adverse

2    experiences here.

3              My point is this, there -- you know,

4    we've been around more than ten years.  There's

5    a lot of people coming out of the shop.  Most of

6    the people I know end up having pretty good

7    experience -- end up having pretty good

8    experiences, some people -- some people did not.

9    And those people -- and the latter category was

10   having the loudest voice.

11             I have former coworkers call me up and

12   say, this is garbage, this is stupid, yeah, this

13   is hard work, but like it's not -- it's not

14   abusive like they said it's abusive, you know.

15   And I say, oh, you know, would you be willing to

16   talk to somebody -- somebody about it?  They

17   said sure, and for those ones -- for those ones,

18   I may have sent them over to Ed.  I think I sent

19   over quite a few people.  They ended up not

20   doing the story until -- yeah, they -- I'm

21   sorry.  Yeah, they -- they ended up not doing --

22   I don't think they ended up doing a story about

23   this until much, much later.

24             I was trying to figure out where --

25   where this fell into the timeline, that was the

1    reason for my pause, Counselor.

2         Q.   So some people are reaching out to you

3    saying I'm getting calls.  There are people who

4    are -- who had good experiences, there are

5    people who had bad.  So the thinking is let's

6    even out the -- the voice and let's give some

7    names of people who had better experiences or

8    you think had better experiences.  Is that fair?

9         A.   That's fair.  I think in this category

10   there's also the people -- there's also a

11   category of people who are calling me saying,

12   I -- who hadn't been called, that said I can't

13   believe I'm reading this stuff.  How can I help?

14        Q.   And so did you come up or did you or

15   anyone else come with a list of people to reach

16   out to, at this time?

17        A.   A list?  Not really.  I talked to my

18   own network.  I think I talked to ███████████.

19   I sent her -- sent her somebody's way.

20        Q.   Is she someone that you thought was --

21   had a positive experience?

22        A.   She's like -- she's a very

23   accomplished person who was our operations --

24   who was our operations director who has been

25   working in politics for a really long time.

Page 144

```
 1   And, yeah, she called me up and just
 2   expressed -- expressed like how -- how crazy
 3   this all was to her.
 4        Q.   The next page, it says ███  and ███.
 5   Who's ███?
 6        A.   I don't know, but I don't think it's
 7   the ███ you think it is.
 8        Q.   Who do I think it is?
 9        A.   I think you think it might be Ana
10   Liss, the --
11        Q.   No, I actually don't.  Okay.  I
12   assumed you -- I assumed you would not send it
13   my way but, you know.
14        A.   Yeah, yeah.  I don't know.  Who said
15   that?  Bamberger?  Yeah, I don't -- I don't know
16   who that is.
17        Q.   You don't which ███ that is?
18        A.   I don't.
19        Q.   And then the next one Melissa DeRosa
20   says, "Call ███."
21        A.   I believe she meant ███with a █,
22   same ███.
23        Q.   I see.  Same ███.
24             And it says -- he asks, "Who are we
25   having to call?"  And you give Ed McKinley's
```

Page 145

1   contact info.

2          A.    Uh-huh.

3          Q.    And then you say, "Rich Bamberger says

4    okay."  And you write at the end, "And the

5    stance should be, I hear you're calling around.

6    I've been sick about this all week.  She's a

7    nightmare, et cetera."

8          A.    Yup.

9          Q.    And "she's a nightmare," who's "she" a

10   reference to?

11         A.    That would be Lindsey Boylan.

12         Q.    Is it -- was this the kind of stance

13   that you were providing to the people that might

14   get called?

15         A.    These are -- these are what I was

16   hearing from them, not the other way around.

17         Q.    You're saying -- you're saying you

18   heard this from some people --

19         A.    Uh-huh.

20         Q.    -- that she's a nightmare?

21         A.    Uh-huh.

22         Q.    Okay.  Who said that to you?

23         A.    ▮▮▮▮▮▮▮▮▮▮▮, who again was one of --

24   who now that I'm remembering was one of the

25   complainants.  ▮▮▮▮▮▮▮▮▮ I believe was one of

1  the complainants.  I believe ███████ who I was

2  talking to during the time said that.  She was

3  also -- she was also sick so I wasn't going

4  to -- I wasn't going to put her in to it.

5       Q.   But this is you giving these other

6  folks who were going to reach out to people

7  talking points, so to speak?

8       A.   Not talking points, an -- an

9  explanation about why -- about why they're

10  calling them, why they're calling him.

11       Q.   Anyone else you remember reaching out

12  to other than these folks?

13       A.   If they'd be willing -- if they'd be

14  willing to talk on background about their

15  experiences here, that category?

16       Q.   Yeah.  Or -- or in this time period

17  getting them to reach out.

18       A.   Again, I talked to ████ -- subsequent

19  to them being called by the Times Union, I

20  talked to ████, I talked to ██████████.  I

21  talked to ███████████, who is a former press

22  secretary.  I talked to █████████████ as a former

23  coms director.  You know, I -- we -- a lot of us

24  talk -- a lot of us talk to each other, I

25  mean ...

Page 147

```
 1        Q.   How about -- you said that it's not
 2   the Ana that I'm thinking of, but did you -- did
 3   you reach out to Ana Liss?
 4        A.   During this -- during this time?  This
 5   is in -- this is in a -- different -- different
 6   issue, different issue.
 7        Q.   Okay.  What's the issue that you
 8   reached out to her on?
 9        A.   Subsequently to Lindsey's story and
10   then her refusal -- and then her refusal to talk
11   to reporters about any specifics, we got -- we
12   started getting calls from former staffers
13   saying that -- you had the media calling, that
14   was -- that was all happening, but you were
15   also -- but also she was contacted directly
16   via -- via LinkedIn, and she was also talking to
17   people -- she was also talking to -- she also
18   seemed to have retained a law firm that was
19   sending very similar theme messages to people on
20   LinkedIn, people who she never worked with.
21   People -- I think people who just had Cuomo in
22   their -- in their bio.
23        Q.   How did you learn that, that she was
24   reaching out?
25        A.   They -- people started -- I -- we
```

 1  started getting texts from -- we started getting

 2  calls from people, including like an intern who

 3  worked with us nine years ago, and they're all

 4  like, what is this.

 5        Q.    Uh-huh.  And so what did you -- what

 6  did you do to when you heard that?

 7        A.    We believed it -- we believed it to be

 8  political.  We believed that -- that she -- that

 9  she was trying to call around to find -- to find

10  other disgruntled staffers to embellish and to

11  potentially lie about their experience here.  So

12  we kind of -- so we did what we normally do, we

13  called our networks to see what's going on.

14        Q.    Did you -- you say you thought she was

15  telling people to potentially lie about their

16  experience.  Did anyone who reached out to you

17  say that Lindsey Boylan asked them to lie?

18        A.    Again, we thought this was a -- we

19  thought this was a -- we though this was

20  political, we believed this was political, that

21  she was trying -- that she was trying to use

22  this to help her run for office.  That --

23  that -- and that was informed by her other

24  continually escalating behavior before this

25  time.  So we -- and yeah, we're trying to see if

```
                                            Page 149
1    people called and what she said, if she -- if
2    she called.
3         Q.   Okay.  Let me ask the question again.
4    Did anyone that called you tell you that Lindsey
5    Boylan had asked them to lie?
6         A.   I don't believe anybody who called us
7    ever called her back.
8         Q.   Okay.  Did anyone ever tell that you
9    Lindsey Boylan had asked them to lie?
10        A.   Anybody -- anybody who Lindsey
11   contacted -- Lindsey contacted who subsequently
12   went public I don't think they talked to us.
13        Q.   Okay.  So did you ever hear from
14   anyone that Lindsey Boylan had asked them to
15   lie?
16        A.   No, but that was the belief at the
17   time.
18        Q.   Okay.  So that belief at the time, and
19   you've -- you've answered twice with my earlier
20   questions, was that it was a -- political,
21   correct?
22        A.   Correct.
23        Q.   Okay.  It was escalating?
24        A.   Correct.
25        Q.   Okay.  And then you added, and so she
```

1   was trying to see if people -- call people to

2   tell them to lie.  Trying to understand where

3   you get that last piece.

4        A.   That was the belief that she was

5   trying to call people to orchestrate people

6   going public about their -- about their

7   experiences here and embellishing their

8   experiences and possibly lying.  That's what we

9   believed she was up to.

10       Q.   Why did you believe that?

11       A.   That seemed to be consistent with

12  their behavior.  She was lying about her

13  experiences here.  I think she was trying to get

14  others -- others to verify her cause.

15       Q.   Okay.  She was lying about being

16  sexually harassed, that was your view?

17       A.   She lied about -- she lied about the

18  circumstances of how she left.  She lied

19  about -- she lied about me on Twitter.  She

20  bullied and threatened my coworkers over text

21  message.  This was -- this was -- this was

22  escalating increasingly combative behavior.

23       Q.   What was her lie about you on Twitter?

24       A.   She said I was berated -- she said I

25  was berated by the Governor in front of her.  I

1    have no memory of that.  That was a coward or

2    something.  I'm not afraid of Andrew Cuomo.

3        Q.   He's never berated you?

4        A.   We've had tough conversations before,

5    but we're big -- we're big boys, and I can't

6    remember having that in front of other people.

7        Q.   I'm not asking whether you're a big

8    boy or not.  I know -- I understand your desire

9    to answer my questions in the way you want them

10   to.  I'm just trying to get answers to my

11   questions, okay?

12       A.   All right.  Let me take a breath.

13       Q.   I fully understand the message you're

14   trying to deliver.  It's been delivered.  Just

15   if you can answer the questions.

16       A.   Okay.

17       Q.   Has Andrew Cuomo ever berated you?

18       A.   Never berated me?  He's yelled at me.

19   I've yelled back at him, but it was fine.

20       Q.   Okay.  Has he ever thrown anything at

21   you?

22       A.   Has not.

23       Q.   Has he thrown fruit at you?

24       A.   I want to ask what type of fruit, but

25   no, the answer is no.

```
                                                    Page 152
 1        Q.    Okay.  How about when a head shot of
 2   his that was outdated was provided to the press,
 3   do you remember him throwing something at you,
 4   with other people present?
 5        A.    No.  No.
 6        Q.    Apricots.  Throwing apricots at you.
 7   Dried apricots.
 8        A.    Are you serious?
 9        Q.    Just asking you a question.
10        A.    I understand, but --
11        Q.    The answer can be no, if it's
12   truthful.
13        A.    I think I'd remember that.  The answer
14   is no.
15        Q.    Okay.  And so you were -- a decision
16   was made at one point to reach to people who
17   might get contacted by her?
18        A.    Yeah.
19        Q.    Who made that decision?
20        A.    You know, we all did.  We're all
21   sitting around, our phones start all going off,
22   started getting crazy.  So we all said, hey,
23   let's call around, see -- see how -- see how far
24   this is going, see if she's reaching.
25        Q.    Okay.  And when was this,
```

```
                                                        Page 153
 1   approximately?

 2        A.    Within the -- within the week of that

 3   story.

 4        Q.    This is now in February or -- or in

 5   December?

 6        A.    No, this -- this is December.

 7        Q.    December.

 8        A.    This was before her Medium post --

 9        Q.    Okay.

10        A.    -- back when nobody -- nobody knew

11   what -- what -- what the allegations possibly

12   were.

13        Q.    Okay.  And in that context who did you

14   reach out to?

15        A.    You know, it was in that -- it was in

16   that same ballpark.  I reached out to      , I

17   reached out to      , I reached out to -- I

18   reached out to      , I reached out to

19        .  I probably reached out to a couple other

20   people.  And yeah, Ana was on the -- kind of the

21   outer circle but going through my phone I gave

22   her a call.

23        Q.    Ana Liss?

24        A.    Yeah.

25        Q.    And what did -- what did she say?
```

```
 1      A.   You know, I talked to her.  I thought
 2   it was a friendly conversation.  I know
 3   subsequently she thinks otherwise, and I -- that
 4   was never the intent.  I called her and I --
 5   and, you know, ██████████████████████.  So I
 6   said oh, hey, you know, I won't keep you long.
 7   I -- I said, hey, have you seen this stuff with
 8   Lindsey Boylan?
 9            And she's like, yeah, I saw something
10   about that.
11            And I said -- I said -- I said,
12   awkward question, but like have you been
13   contacted by -- have you been contacted by her?
14   She's reaching out to all sorts of -- she's
15   reaching out to anybody that had Cuomo in their
16   biography.  And we're just kind of curious like,
17   you know, if she went far back.  You've been
18   here a while.  Had she reached out to you.
19            And she said, no, of course not.
20   And -- and she actually said to me that she's
21   got -- she's got no complaints about her time
22   here, which is what she said.
23            I said, okay.
24            And then, you know, talked about her
25   ████████, asked about her -- asked about her
```

 1      ███████, asked her what she's doing now.  I knew

 2   she was doing something in Rochester, and she

 3   said she worked for Monroe County doing that

 4   kind of development.

 5           I said -- I said, that's great.

 6   Our -- our regional rep out there is a guy named

 7   ███████████████, very good, very attentive.  But

 8   I said, hey, if you can't get him sometime, keep

 9   my number, if you need -- if you need something

10   in this direction.

11           And we said good bye.  I didn't think

12   anything of it until I got -- until I started

13   getting media requests a couple weeks later.

14       Q.   What kind of media requests did you

15   get?

16       A.   First it was Jimmy Vielkind came

17   out -- first Jimmy Vielkind came out and she --

18   with her story, you know, which was, you know,

19   surprising given what she said to me on the

20   phone call.  But people have a right to change

21   their minds or, you know, reinterpret stuff, I

22   guess.

23           I think Jimmy knew about my call but

24   didn't -- didn't use it for whatever, and then

25   he -- and then I got -- and then she went to

1    local media and mentioned the call.  I started

2    getting calls from our local media.  I think

3    eventually Jimmy called -- Jimmy called me to

4    incorporate to another story.

5         Q.   Okay.  What did they say?

6         A.   They said she -- they said, as I'm

7    sure you read, they felt like the call was an

8    effort to intimidate.  That certainly wasn't my

9    intent.  It was one -- it was one of -- one of

10   several calls I made on this and one of a

11   hundred calls I probably made that week on any

12   number of issues.

13        Q.   Do you have any understanding why a

14   staffer receiving a call from you or anyone else

15   who were considered part of the inner circle

16   would feel that it was either an effort to

17   intimidate or deliver a message or to check in

18   is that -- do you not understand that potential

19   reaction at all?

20        A.   I mean, listen, what she came -- what

21   her allegations were subsequently, I had no

22   contemporaneous knowledge of, number one.

23   Number two -- number two, I wouldn't call us

24   friends.  We were friendly.  ██████████████████

25   ██████████████████████████     And that

1  certainly wasn't the intent and that certainly

2  wasn't anything to go through my mind.

3          I mean, I thought our relationship --

4  I thought our relationship, when she worked

5  here, was friendly, you know, and -- you know, I

6  certainly say tough stuff in the press sometimes

7  but like that's not my role here.

8      Q.   Do you think people who have worked in

9  the executive chamber have an understanding of

10  what happens and can happen to people who

11  disagree or say things that undermine the

12  executive chamber?

13      A.   I think that -- I think that's a

14  very -- I think that's a very tired trope

15  associated with this administration.

16      Q.   You think it's not true at all?

17      A.   I think -- I think it's -- I think

18  it's -- I think it's a little -- I think it's a

19  little -- and I'm not saying you're saying this,

20  but I think it's a little insulting to -- to do

21  that.  We're all hard -- we're all hardworking

22  people.

23      Q.   Not trying to insult you, just asking

24  you a question.  The answer can be no.  Do you

25  have any -- let me -- let me repeat the

Page 158

1   question.

2           Do you think people who have worked at

3   the executive chamber have an understanding,

4   based on their experience, of how people who say

5   things that are negative about the Governor or

6   the executive chamber get treated, do you think

7   people gain an understanding of that while

8   they're in the executive chamber?

9           Pretty simple.  I'm not trying to be

10  insulting.  Surprised that you find my question

11  to be insulting, but I'll ask it nonetheless.

12      A.   I think --

13      Q.   -- understanding or not.  The answer

14  can be no, that they don't have gained an

15  understanding.  Just a question.

16      A.   Counselor, the answer is no, but if

17  they do, they shouldn't.

18      Q.   The answer's no, that they don't gain

19  an understanding one way or the other?

20      A.   I don't think -- I don't -- that's not

21  my case certainly.

22      Q.   No.  I'm -- let me ask you the

23  question again:  Based on your experience --

24  okay.  If you can just -- I'm trying to keep

25  this -- question pretty simple.

1          Based our experience, the people in

2     the executive chamber who work there gain an

3     understanding, one way or the other, about how

4     people who say things that might not be

5     beneficial to the executive chamber or the

6     Governor get treated, do they gain an

7     understanding of that?

8          A.    No.

9          Q.    They don't?  They don't --

10         A.    You ask it again?

11         Q.    Do people who worked at the executive

12    chamber gain an understanding of how people who

13    say things that are negative about the executive

14    chamber or the Governor are treated?

15         A.    No.

16         Q.    We assume people gain an understanding

17    of that?

18         A.    No.

19         Q.    They don't.  Why not?

20         A.    You asked -- you asked -- you asked my

21    opinion, and you asked my opinion, which is

22    informed by my experience, and the answer is no.

23         Q.    It wasn't an opinion.  It was asking

24    you whether people gain an understanding.  You

25    say no.  So why is it that they don't get an

1  understanding?  Is it that -- are they not

2  allowed to read statements made about people who

3  cross the executive chamber?

4       A.   I think you're conflating -- I think

5  you're conflating --

6       Q.   No.  If you can't -- if you don't

7  understand the question you can tell me that,

8  I'll rephrase.

9       A.   I'm trying to answer --

10      Q.   My question is, first:  Do people of

11 the executive chamber, do they have -- do they

12 gain an understanding of how people are treated

13 if they cross the Governor or the executive

14 chamber?  Yes or no.  You said no, that's what

15 I'm following up.  So I'm trying to follow up on

16 no, which means no, they don't gain an

17 understanding, in your view.  I'm trying to

18 follow up on that.

19      A.   I believe --

20      Q.   How does someone not gain an

21 understanding?  Maybe they don't -- they're not

22 allowed access to statements made by you or

23 others, because otherwise they must gain an

24 understanding one way or the other, unless

25 they're not allowed to.  That's what I'm trying

1    to understand.

2              MR. E KIM:  Yeah, Joon, I don't -- I

3         don't know if what we're getting hung up on

4         here is that Rich is focused on a different

5         part of the question, about how people are

6         treated.  I'm not sure if that's the date.

7              MR. J KIM:  They can be treated well.

8         They may have an understanding they'd get

9         treated well.  That's still an

10        understanding.

11        A.   I honestly don't understand the

12   question.

13        Q.   You don't understand the question

14   whether people in the executive chamber have an

15   ability to assess how -- how people who cross

16   the executive chamber are treated?  You don't

17   understands that question?

18        A.   I don't understand that question.

19        Q.   What about that question don't you

20   understand, which word?

21        A.   You're asking me -- you're asking me

22   if -- if people -- you're asking me to -- you're

23   asking me to -- you're asking me to opine on

24   what other people think --

25        Q.   No, I'm not.

Page 162

1      A.    -- and I just don't get the question.

2      Q.    I'm asking you, based on your

3   observations, whether people who work there have

4   the ability to assess the treatment.  And then

5   we can talk about your opinion, you can refuse

6   to answer that.  But the question is simply does

7   someone have the ability, and you say no,

8   that's --

9      A.    Does someone have the ability --

10     Q.    I don't understand --

11     A.    -- the ability to make an observation?

12          MR. E KIM:  So yeah, the question

13       that's pending is, do people who work in

14       the chamber have the ability to -- to

15       assess the treatment of -- of people who

16       disagree with the administration.

17          THE WITNESS:  Well, that implies

18       people who work here have basic cognitive

19       skills, so sure.

20   BY MR. J KIM

21     Q.    Thank you.  That was the question.

22   Okay.  Now you can refuse to answer the rest if

23   you want.

24     A.    I'm glad -- I'm glad we got here, sir.

25   What's the second question?

1    Q.   Okay.  So -- and would it surprise you

2    to learn that some people who worked at the

3    executive chamber have developed a view that if

4    you cross the executive chamber or the Governor

5    that you're not treated well?  Does that --

6    would that --

7         A.   I mean -- I mean, I don't know what

8    treated -- what treated well, doesn't treat --

9    doesn't treat well means.  I do know there have

10   been rumors about this administration and it --

11   and it -- and it being vindictive that go -- go

12   back years.  That has not been my experience --

13   that has not been my experience here, okay.

14        Q.   Is -- is it your assessment that

15   the -- the response of Lindsey Boylan has not

16   been vindictive in any way?

17        A.   I believe -- I believe her behavior

18   towards us has been harassing and abusive and

19   has -- and it's also involved demonstrably

20   disproven lies, and we had to correct the

21   record.

22        Q.   Okay.  So --

23        A.   So no.

24        Q.   -- you've been asked -- the simple

25   question is:  Do you believe -- I -- I

                                                    Page 164

1    understand your desire to say what you want to

2    say, I get that that's part of your job, but

3    this is actually an under oath testimony where

4    you honestly have to try to provide the truthful

5    answers, not whatever you want to tell me.  Like

6    we get it, but, you know, I don't want to keep

7    having this debate because it's just going to

8    make this longer.

9               I understand what you want to say on

10   the record.  Just trying to get truthful answers

11   to the questions.  And that question simply is:

12   Do you believe that your treatment of Lindsey

13   Boylan is in any way vindictive, yes or no?

14        A.    No.

15        Q.    Okay.  And in your experience, you

16   have not observed any conduct of -- coming out

17   of the executive chamber that could be perceived

18   as vindictive?

19        A.    My experience, my opinion, no.

20        Q.    Not a continuing single thing?

21        A.    Nothing that comes to mind.

22        Q.    And if anyone were to believe that and

23   think that the executive chamber has, on

24   occasion, been vindictive, they would just be

25   wrong, in your view?

```
                                          Page 165

 1          A.    I would say so.

 2          Q.    Okay.  Did -- do you know ███████

 3    ███████████is?

 4          A.    Yeah.

 5          Q.    Did she reach out to you?

 6          A.    She may have.

 7          Q.    Okay.  And what did -- do you remember

 8    talking to her in February of this year?

 9          A.    Not really.

10          Q.    How about ████████████████?

11          A.    I don't know if I know her.

12          Q.    How about ██████████████?

13          A.    I've talked to ███████.  I can't

14    remember about this, but I know -- I know ████████.

15          Q.    Have you spoken to her about Lindsey

16    Boylan allegations?

17          A.    I can't -- I can't remember.  It's

18    possible.

19          Q.    How about ███████████████████?

20          A.    Yes.

21          Q.    Okay.  How did that come about?

22          A.    She called me, I believe.

23          Q.    What did she say?

24          A.    She said she was contacted by Lindsey.

25    She thought all the stuff was crazy.  And I
```

1    asked -- I asked if -- she's one of the people I

2    asked if she talked -- if she talked to people

3    on background.  And I can't remember -- I can't

4    remember what happened after that.

5         Q.   Did you -- did there come a time when

6    you were involved in any discussions about a

7    letter that potentially could be drafted and

8    sent from former members of the executive

9    chamber?

10        A.   Is this the letter was later published

11   in the New York Times?

12        Q.   I'm just asking generally first, any

13   discussions about any letter.

14        A.   I want to be specific, though.  Is

15   this the letter in the New York Times?

16        Q.   I don't know what discussions you were

17   part of, whether -- and whether it ended up

18   being in the New York Times or not.

19        A.   And the letter was about what?

20        Q.   Letter responding -- well, I -- I'm

21   trying to get a truthful answer.  If you have --

22   any letter, have you been a part of any

23   discussions about drafting of any letter

24   involving the executive chamber or the Governor?

25        A.   I've been -- very wide question.

```
                                                    Page 167
 1        Q.    In the last year.
 2        A.    That's also a very -- that's a very
 3   wide question.
 4        Q.    How many letters?  What letters?
 5        A.    I was involved in drafting many
 6   letters that were released to the press on a
 7   variety of issues.
 8        Q.    Okay.  What do you remember?
 9        A.    Letters to Congress, letters resolving
10   the salt cap, letters for pandemic aid.  Again,
11   that's -- I -- I don't think that's what you're
12   really asking me, so can you ask the question
13   again?
14        Q.    I'm trying to get to it.  I want to
15   make sure I'm not missing anything.  So you
16   just -- if you can just answer the questions,
17   and that was an answer to the question, not
18   trying to predict where I'm going.
19             So, many subjects, correct?
20        A.    Yes.
21        Q.    Okay.  Did any -- how about any
22   relating to -- in any way, to the sexual
23   harassment allegations against the Governor,
24   either in terms of timing or subject matter, as
25   a response to allegations in the -- in the
```

1    broadest sense possible, any letters that were

2    being discussed in connection with sexual

3    harassment allegations being made?

4         A.    Yes.

5         Q.    What -- what discussions did you have?

6         A.    I worked with Linda on a draft of a

7    letter from -- from staff about their positive

8    experiences here.  Seeing if there was

9    something -- which is, you know, something that

10   has been done.  We worked together to see if

11   there's some language that worked that was --

12   that -- that would have been remotely

13   interesting.  Turned out it wasn't.  You know,

14   we -- we tried, we looked at it.  I don't think

15   it ever went anywhere.

16        Q.    Okay.  So when was this?

17        A.    December, January around there.

18        Q.    Okay.  And who's idea was it to draft

19   the letter?

20        A.    I don't know.  I think we talked -- I

21   think we talked about what it would look like

22   in -- in a group.  I worked on it with Linda.

23   We did a draft.

24        Q.    What group talked about it?

25        A.    I think it was me.  I think it was me,

Page 169

```
 1   I think it was Melissa, I think it was Dani.  I
 2   think it was sort of the same group.
 3        Q.   And what was the substance of that
 4   letter?
 5             MR. E KIM:  And -- of the letter or
 6        the -- I just want to steer around the
 7        discussion where counsel was present.
 8             MR. J KIM:  The letter.  The letter.
 9             MR. E KIM:  Okay.
10        A.   The letter -- the letter was about --
11   was about the experience working in the
12   executive chamber.  It was a -- I would deem it
13   a positive -- a positive letter that talked
14   about -- talked about the work we've done, how
15   support -- how supportive they -- they were --
16   you know, even though they left how supportive
17   they were still of our efforts.  Like I said we
18   played around with some language and just, you
19   know, it ended up not being worth it.
20        Q.   And why not?  Why -- why did it end up
21   not being worth it?
22        A.   Stuff died down by then, you know, for
23   a -- for a little while, for a little while
24   that, you know, we still were -- you know, in
25   the middle of all this we're still fighting a
```

Page 170

1  second wave of the pandemic.  You know, a couple

2  news -- couple news cycles went by, just let it

3  go.

4      Q.   Did you share a draft of the letter

5  with anyone?

6      A.   I don't know.

7      Q.   You don't know if you shared it with

8  anybody?

9      A.   Yeah, I don't know.

10      Q.   Do you have a draft?

11      A.   I don't think I do.  I think I did

12  some line edits -- I think I did some line edits

13  with her.

14      Q.   When you say you drafted a letter,

15  were you literally physically with her when you

16  drafted it or were you --

17      A.   I was physically editing -- I was

18  physically editing some copy.

19      Q.   I see.  And you were physically

20  together in the office --

21      A.   Uh-huh.

22      Q.   -- typing something up?

23      A.   Uh-huh.

24      Q.   And -- but you decided not to send it

25  around?

1      A.   I don't know what happened with it.  I
2   left it with her.
3      Q.   Do you know if there's any other --
4   was there any discussions of any other letters,
5   whether you were part -- part of them or not?
6      A.   Well, this is -- this is what I was
7   trying to get to.  I am aware of another letter
8   that hit the press.  I was not involved -- I was
9   not involved in discussions of that letter or in
10  the drafting of that letter.
11     Q.   And what -- when did you learn about
12  that other letter?
13     A.   When the New York -- when the New York
14  Times called me.
15     Q.   What did they say?
16     A.   They sent me -- well, they called.
17  They sent me and Peter an E-mail describing the
18  substance of the letter, which previously I had
19  not recalled seeing.  While preparing for
20  this -- for this testimony I subsequently did
21  discover an E-mail or a version of that letter
22  was sent to me, but I have no recollection of
23  it.  I didn't -- I don't even -- I don't
24  remember receiving the E-mail, and I -- I don't
25  remember anything about it.

1     Q.   And so -- and this letter, what was

2  the substance of this letter?

3     A.   It was responding to Lindsey.

4     Q.   And it included -- it discussed

5  Lindsey Boylan, correct?

6     A.   Yes.

7     Q.   In addition to saying --

8     A.   The letter --

9     Q.   -- things about the Governor?

10    A.   Yeah, it was not the letter -- this

11  was not the letter I was working on.

12    Q.   The letter you were working on did not

13  describe Lindsey Boylan?

14    A.   Correct.

15    Q.   Or discuss Lindsey Boylan?

16    A.   Correct.

17    Q.   And do you know if your -- the letter

18  you were working on was before or after the --

19    A.   I honestly don't know.  I honestly

20  don't know.  Again, I worked on that one

21  December/January, and then this -- I don't know

22  what timeline this other letter was.  Again,

23  I -- again, I wasn't involved in the drafting of

24  it.

25    Q.   Okay.  If you can turn to a tab 14 in

Page 173

1  your binder, binder one, sorry.  You may have

2  been -- you may be on binder two.

3          MR. E KIM:  Binder one, Rich.

4      A.    Yup.

5      Q.    Do you see this --

6      A.    I do.

7      Q.    Okay.  So Linda Lacewell sends it to

8  you on December 16, and if you can -- you can

9  flip through the letter and take a look.

10     A.    Yup, I'm familiar with this E-mail.

11     Q.    Which letter is -- which letter is

12  this one, between the two we've been talking

13  about?

14     A.    This is not the letter -- this is not

15  the letter I was working with on with Linda.

16     Q.    Okay.  And by the way, the -- the copy

17  of the letter you were working on with Linda,

18  have you looked for it in response to our

19  subpoena?

20     A.    Whatever is -- whatever is in there

21  my -- my counsel has extracted.  I have not

22  looked for any documents.  My counsels -- my

23  counsels were -- my counsels did.

24     Q.    Where would the draft of the letter

25  be?

1      A.    Like I said, I left it with Linda.

2      Q.    Like physically left it like in a hard

3    copy?

4      A.    Uh-huh.

5      Q.    And where did you work on it?  On your

6    work computer?

7      A.    In her office, in her office.

8      Q.    On which computer?

9      A.    Hers.

10      Q.    So you were sitting in her office.

11    Were you physically typing or --

12      A.    I was scribbling and line editing with

13    a pen.

14      Q.    I see.  She had a hard copy?

15      A.    Yeah.

16      Q.    She was working on her computer?

17      A.    I believe so.

18      Q.    And that's the last time you saw it?

19      A.    That's the last time I saw it.

20      Q.    And what was the general -- what you

21    remember about the substance of that letter?

22      A.    A general substance, the general

23    substance of that letter was a positive

24    experience -- it didn't mention Lindsey.  It was

25    about the positive -- it was about a positive,

Page 175

1   inclusive experience of working here.

2   Accomplishments that we did, the -- you know,

3   the support -- the support that we feel.  The

4   fact that we're -- the fact that many of us

5   still keep in touch and still consider each

6   other family, something along those lines.

7               Like I said, we played around, that

8   language and that sentiment, it's just, you

9   know -- I don't know what I'd gain to send it

10  out and have people sign it.  I don't know what

11  the value was.

12       Q.   So this letter, you received it

13  obviously, but you don't remember anything else

14  about this letter?

15       A.   I have no -- I have no recollection of

16  either -- of either seeing this or hearing about

17  it.  I certainly didn't work on it.

18       Q.   Okay.

19       A.   That was -- I'm sorry, you go.

20       Q.   Does look like you received it?

21       A.   I did.  I -- apparently I did, but I

22  have no recollection of it.

23       Q.   And even in reading it it doesn't jog

24  your memory?

25       A.   It really doesn't.  I don't know if I

1    ever saw it.  I mean, during this -- during this

2    entire time period I get inundated with E-mails.

3    I also don't review my personal E-mail as

4    closely as I do my official one.

5        Q.   Uh-huh.  Why was she sending it to you

6    in your personal E-mail?

7        A.   I don't know.  You have to ask her.

8        Q.   Do you get a lot of E-mails from

9    people, personal E-mails to your personal E-mail

10   from work?

11       A.   No, I'd say 95 percent of them are in

12   my official E-mail.

13       Q.   So what did you tell the New York

14   Times when they asked about this letter?

15       A.   I think -- I think we recently

16   reviewed the story, and I don't believe we

17   commented.

18       Q.   Do you remember subsequently there

19   being press inquiries about this letter, other

20   than the New York Times?  Was it just the New

21   York Times?

22       A.   No, I don't remember.  What page am I

23   turning to?

24       Q.   I'm looking for it, but I -- before I

25   show you the -- the document, what recollection

Page 177

1    do you have of reporters asking about this

2    letter?

3        A.   I believe it came up in a piece that

4    Ronan Farrow wrote that Peter Ajemian did most

5    of the work on.

6        Q.   Yeah.  And what do you -- what do you

7    remember about that?

8        A.   I remember that they had some of

9    their -- they had some of their facts and their

10   timelines wrong when I went through the fact

11   checking process, and they had me being involved

12   in drafting the letter, and that just wasn't

13   true.  And so -- and so, you know, we addressed

14   that with them.

15       Q.   Okay.  So let me -- I think I've found

16   at least one document that is a -- sort of a

17   fact check document for Ronan Farrow.  In tab 69

18   on tab -- binder two.

19            Or at least or a document that refers

20   to the letter.

21       A.   Yup.

22       Q.   And I think 70 probably has a

23   longer -- actually, no.  It's not 70.  But

24   anyway, from this one do you remember Peter

25   Ajemian saying, "Please see below from Rich

1    Azzopardi regarding the letter.  We will likely

2    have a comment regarding Lindsey's added shot at

3    Melissa about being a mean girl.  Along those

4    lines, ███████, can you please let me know if

5    there are other mentions of Melissa that

6    didn't -- I didn't discuss yesterday, thank

7    you."

8              And you write, "The first I heard of

9    any letter was this week when contacted by

10   another outlet."

11        A.    Yes.

12        Q.    And this is March of this year?

13        A.    Yes.

14        Q.    So was that -- is that correct, a

15   correct statement?

16        A.    Yup.  That was my recollection at the

17   time.  And also, just because someone sent me a

18   copy of the E-mail, I don't remember opening it,

19   I don't remember -- I don't remember -- I don't

20   remember reading it.  And I certainly didn't --

21   I certainly didn't work on it.

22        Q.    How about the other letter that you

23   did work on?

24        A.    That -- that wasn't asked about.

25        Q.    But you said, "The first I heard of

Page 179

1    any letter was this week when contacted by
2    another outlet."
3         A.   I was talking specifically about
4    Lindsey's letter, which is -- they were
5    specifically asking me about.
6         Q.   You said any letter, not that letter.
7         A.   I was talking about -- I was talking
8    about the letter they were writing about, which
9    was the same letter, focusing on the New York
10   Times.
11        Q.   You can put that one away.
12             Other than Linda Lacewell, did you
13   have any discussions with anyone else about the
14   letter that you did work on whether, you know,
15   let me leave it at that, did you have
16   discussions with anyone other than Linda
17   Lacewell about that letter?
18        A.   None that I can recall.
19        Q.   You didn't talk to Melissa DeRosa
20   about it?
21        A.   I may have, it doesn't come to mind.
22        Q.   And you don't remember who you
23   discussed not -- not being worth sending that
24   letter out with?  Did you discuss that --
25        A.   I think Linda.  It was Linda.  We're

                                                    Page 180

1    kind of line editing and where does this get us,

2    you know, what -- what -- what value does this

3    happen have in the public discourse.

4         Q.    Turn to tab 1 in binder two.  I'm

5    sorry, tab -- sorry.  I'm sorry, tab 2 in binder

6    one.

7         A.    Uh-huh.

8         Q.    So it's an E-mail from ████  to you and

9    Melissa DeRosa.

10              Who is ██████████?

11        A.    Who -- I'm sorry, you asked me ████

12   is?

13        Q.    Yeah, who is █████?

14        A.    █████, she's a finance director for the

15   campaign.

16        Q.    And it says, "These are all entities

17   plus people she paid for rates.  Let me know if

18   we should dig into any."

19              What is this a list of and whose the

20   "she" here?

21        A.    She would be Lindsey Boylan.

22        Q.    Okay.  And what is it -- what is this

23   list?

24        A.    It's a list of -- I'm sorry.  It's a

25   list of people -- list of her vendors.

```
                                            Page 181

 1        Q.    Her what?

 2        A.    Vendors.

 3        Q.    Vendors, what do you mean by vendors?

 4        A.    People she paid in her Congressional

 5   race.

 6        Q.    And why is ██████████ sending you this?

 7        A.    We're looking for connections.

 8        Q.    Connections meaning what?

 9        A.    Sir, I think I've made it clear we

10   believe her -- her -- her public behavior is

11   political in nature, always corresponds with her

12   political aspirations.  We found out her

13   campaign manager is the same campaign manager

14   that Jumaane -- that Jumaane Williams hired.

15   And, you know, so we're looking for connections

16   to see if there was a political aspect to -- to

17   her -- to her escalating -- her escalating

18   attacks, and -- and this was -- this was one of

19   the things that we looked at.

20        Q.    And what's "this," just looking at

21   vendors?

22        A.    Yeah.

23        Q.    Okay.  And how is she -- how is ██████

24   ██████ able to get this information?

25        A.    It's all publicly available.  It's on
```

Page 182

1  search engines, you know.  She's -- you know,

2  she can -- she can -- she can look up more

3  easily than we can.  It's all publicly available

4  information.

5       Q.   And what -- who asked her to do this?

6       A.   Well, it's to me and Melissa.  I

7  didn't ask her, so maybe it was her.

8       Q.   I'm not asking -- if you don't know,

9  you don't remember.  What do you -- what do you

10 remember about who asked her to do this?

11      A.   I don't -- I don't know -- I don't

12 know who asked but I was put on it.

13      Q.   Did you ask?

14      A.   I'm guessing -- no, I'm guessing it

15 was Melissa I just don't know.  I just don't

16 know.

17      Q.   Did you -- do you remember any

18 discussions about getting the vendor list

19 together, other than this E-mail?

20      A.   I did -- we did speak about looking

21 into possible connections.  I guess this is one

22 of them.

23      Q.   Who did you speak with about it?

24      A.   Melissa.

25      Q.   Anyone else?

```
                                         Page 183
 1        A.    Peter may have been around.

 2        Q.    Anyone else?

 3        A.    Not that comes to mind at the current

 4   moment.

 5        Q.    And what did you do with this list?

 6        A.    Nothing -- nothing in -- nothing

 7   particular I don't -- stood out, I don't think.

 8   Again, I said --

 9             THE WITNESS:  I'm sorry, is that

10        somebody else?

11             MR. J KIM:  I think it's better now.

12             MR. E KIM:  I think that was an echo

13        or something.

14             THE WITNESS:  Okay.

15        Q.    What did you do --

16        A.    To my knowledge -- to my knowledge, I

17   don't think we did anything on this, but, you

18   know, we -- we certainly tried to research

19   connections.

20        Q.    What else --

21        A.    That was one of the things we did.

22        Q.    Do you know if anyone else did

23   anything on this, Melissa or anyone else?

24        A.    I think we -- I think we looked at

25   some of her donors too.  I know we pulled
```

Page 184

1    Jumaane Williams' donors to look for

2    comparisons.   I know we pulled the working

3    families parties donors to look at -- to look at

4    comparisons.

5              We hadn't -- we had a -- an

6    intermediary try to get some information from

7    her campaign manager who works in the attorney

8    general's office.

9         Q.    Who was that intermediary?

10        A.    That would be ████████, the chief

11   of staff.

12        Q.    And what did you reach out -- you

13   reached out to him?

14        A.    We reached out to him and -- because

15   he knew the campaign manager████████, to see

16   if he can find some -- to see if he can find out

17   any information.

18        Q.    And did he?

19        A.    He did.

20        Q.    What information did he find?

21        A.    Apparently she -- she told her

22   campaign that morning she was going forward with

23   the accusations of sexual harassment, which

24   were -- and that she had no intent to follow up

25   on them because she said that she -- she didn't

Page 185

1  want to go there but in her heart she knows that

2  he harassed her.  I don't know what that means

3  but that was what was relayed to us.

4       Q.   So let me unpack that.  So she

5  informed her campaign that she was going forward

6  with the accusations the morning of when the

7  tweet or later?

8       A.   Yeah, the morning of the tweet.

9       Q.   Got it.  And she said she had no

10  intent to follow-up on them?

11       A.   Yup.

12       Q.   Meaning she'll just do the tweet and

13  then not do any more --

14       A.   I think they -- I think -- I'm sorry,

15  are you finished now?

16       Q.   That was her intent, is what she said?

17       A.   And I believe -- what was told to us

18  is the campaign manager asked her, how could you

19  do this without any specifics.

20            And she said, I know he harassed me in

21  my heart.

22            I don't know what that means.

23       Q.   Okay.

24       A.   But that's what was relayed back to

25  us.

1      Q.    That was what?

2      A.    That's what was relayed back to us by

3   ███████ .

4      Q.    I see.  Anything else that was relayed

5   back to you by ████████ ?

6      A.    I don't think so.  I mean, Melissa may

7   have had another conversation with him but

8   that's what -- that's what I was told.

9      Q.    And who did ██████████ get this

10  information from?

11     A.    I believe her campaign manager.  Oh.

12  Who at that -- who at that time -- that's the

13  other piece of information.  He said -- he

14  informed ████████ , according to him, that he

15  wanted to leave but didn't think it was a good

16  look because of the accusations, and he was a

17  mail campaign manager.

18     Q.    And who was that?

19     A.    ███████████ .

20     Q.    And how did ████████████ know to reach

21  out?  Did he know someone in the campaign?

22     A.    He knew ██████ .  Yeah, I believe he also

23  did some work for the attorney general.

24     Q.    Sorry, ██████ -- ████████████ did some work

25  for the attorney general?

Page 187

1         A.    I believe that's correct.

2         Q.    And who reached out to ███████████?

3         A.    Melissa did, I did.  I don't think it

4    was the same phone conversation -- I don't think

5    it was the phone -- same phone conversation but

6    we both did.

7         Q.    And what did you -- what did you ask?

8         A.    I think I asked -- I asked -- I asked

9    if he knew anything.  He said he could see what

10   he finds out.

11        Q.    Knew anything about what?

12        A.    What the play is here, what the heck's

13   going on?  This orchestrated?  Is this not?  Is

14   this like part of something?  Is this an actual

15   campaign thing?  And that's the information he

16   came back to me with.

17        Q.    And did you say to ███████████ that

18   this was related to earlier her allegations of

19   sexual harassment?

20        A.    He knew, he knew.  I said, you see

21   what -- you see what happened.  Let's go -- you

22   know this guy, what's the deal here.

23        Q.    By "this guy" meaning ███████████?

24        A.    Yes.

25        Q.    Okay.  Any other requests you made of

Page 188

1       ███████████████?

2           A.   I don't think so.  Again, there may

3       have been subsequent conversations, but that was

4       to the extent of what I -- what we talked about.

5           Q.   Okay.  So you believe you got the

6       vendor list, you got donor lists, who did you

7       get -- who got you the donor lists?

8           A.   I mean, again, they're publicly

9       available but the campaign pulled them for us.

10          Q.   ███████████?

11          A.   I believe it was -- I believe -- I

12      believe it was her, yeah.

13          Q.   Did she send that to your E-mail?

14          A.   I believe so.

15          Q.   Okay.  So I don't know if this -- this

16      was pulled from your E-mail searches.  Did you

17      find any donor lists -- or maybe your lawyer

18      knows, unless you haven't looked at it.  Do

19      you -- do you know if you have donor lists that

20      were sent to you -- to your personal E-mail?

21          A.   I believe it was one of the documents

22      we reviewed.

23          Q.   Okay.

24               MR. E KIM:  Just answer to the best of

25           your recollection.  You don't need to talk

```
                                              Page 189
 1        about, you know, whatever --
 2              THE WITNESS:  Gotcha.
 3              MR. E KIM:  -- you reviewed, but to
 4        the best of your recollection.
 5        A.    I believe -- I believe so, yes.
 6        Q.    Okay.  So vendor list, donor list,
 7   information from ███████  through ████████.
 8   Anything else that you gathered?
 9        A.    That's the extent of it, I believe.
10        Q.    And did you do anything with any of
11   that information?
12        A.    No.
13        Q.    So did you know that some of that
14   information, particularly relating on Jumaane
15   Williams, the connection was in the -- in drafts
16   of the letter that you were forwarded?  Are you
17   aware of that now?
18        A.    I was -- I was aware of that when the
19   New York Times story came out.
20        Q.    But you don't -- but you don't
21   remember the information you were gathering
22   making its way into this other letter?
23        A.    No.
24        Q.    Okay.  Any other statements that you
25   remember working on about -- or being involved
```

```
                                        Page 190
 1    in about Lindsey Boylan?

 2        A.   I mean, I think there were a couple of

 3    other stories in -- in between -- in between

 4    December and the Medium post where she spoke to

 5    reporters about a hostile workplace, and I may

 6    have been involved -- I may have been involved

 7    in -- in drafting -- in drafting some.

 8        Q.   If you look at tab 28 of binder two.

 9        A.   Yup.

10        Q.   In the bottom it says, "She is

11    disgruntled, former employee who quit after

12    being counseled on multiple harassment

13    complaints against coworkers/subordinates.  She

14    later asked to return to chamber and that

15    request was not granted."

16        A.   Yup.

17        Q.   It's sent originally from you.  Did

18    you draft this statement?

19        A.   I believe I did.  I believe I did.

20        Q.   And do you know if it was ever issued?

21        A.   I don't think it was.

22        Q.   What discussions do you remember

23    having about that statement?

24        A.   I think -- I think it was -- I think

25    it was she was not a big part of the story.  I
```

                                                          Page 191

1   was comfortable certainly saying -- saying

2   what's been on the -- what's been out there

3   already on the record, and I think that required

4   the proper context of it.  There's apparently a

5   discussion and I don't think -- I don't think

6   my -- I don't think my view prevailed.

7        Q.    And in this chain you -- you write it,

8   Steve Cohen makes some edits, it looks like, in

9   all caps, right?

10       A.    Uh-huh.

11       Q.    And then you write back saying he did

12  not -- he read it to me.  What's meant by that?

13       A.    I'm sure that was the reporter.  I'm

14  sure that was the reporter summarizing what

15  he -- what he was quoting her saying in the

16  story.

17       Q.    I see.  You're saying -- because it's

18  not -- at least the chain doesn't give context

19  for what you mean.  You think there may have

20  been like other texts, you may have been talking

21  on the phone or --

22       A.    I could have --

23       Q.    -- just out of the blue -- he read it

24  to me, so ...

25       A.    It could be in response to another

Page 192

1   chain.  I don't know.

2        Q.   But it sounds like -- you're saying

3   the article, the reporter read it to you, so

4   that you have -- and this statement would be in

5   response to whatever it is that's read to you --

6        A.   Correct.

7        Q.   -- or to be included?

8        A.   Correct.

9        Q.   And then you see --

10       A.   I'm sorry, Joon.

11       Q.   -- Melissa DeRosa adds some people and

12  then Josh Vlasto says, "Please don't send this

13  please, please, please."

14            Do you know why Josh Vlasto didn't

15  want this thing to be sent?

16       A.   I don't.  But, you know, maybe if this

17  was an article about a -- about a hostile

18  workplace, maybe he thought the response was too

19  hot.

20       Q.   And -- but you didn't agree?

21       A.   Again, it's nothing that hasn't

22  already been out there.  I -- I honestly think

23  context in these instances is what's needed.

24       Q.   But you -- you think you -- you ended

25  up not sending this?

1      A.   I don't believe it ended -- I ended up

2   not.  I could -- I could be wrong but I don't

3   believe I did.

4      Q.   And in your view this type of a

5   statement is not something that could be viewed

6   in any way as vindictive?

7      A.    I think it's -- I think it's merely

8   correcting the record.

9           MR. J KIM:  So it's 1:05.  It makes

10          sense to take a -- a quick break for lunch?

11          THE WITNESS:  Sure.

12          MR. J KIM:  I mean, I -- I -- I don't

13          want to make people wolf down food too

14          quickly, but I can eat pretty quickly,

15          whatever --

16          THE VIDEOGRAPHER:  Let me go off the

17          record first?

18          MR. J KIM:  Yup.

19          THE VIDEOGRAPHER:  Okay.  Stand by.

20          The time is 1:06 p.m.  We are going off the

21          record.  This will end media unit number

22          three.  Stand by.

23   (Luncheon recess taken at 1:06 p.m.)

24

25

1          A F T E R N O O N     S E S S I O N

2              (Time noted:  1:36 p.m.)

3      R I C H A R D    A Z Z O P A R D I,    resumed

4          and testified as follows:

5    CONTINUED EXAMINATION

6    BY MR. J. KIM:

7              THE VIDEOGRAPHER:  Time is 1:36 p.m.

8          we are back on the record.  This will be

9          the start of media unit number four.

10   BY MR. J KIM

11        Q.   Okay.  So do you remember,

12   Mr. Azzopardi, in February of this year Lindsey

13   Boylan issued a medium piece with -- with

14   additional details about her allegations?

15        A.   I do.

16        Q.   And how did you first learn about

17   that?

18        A.   Somebody from my office flagged it for

19   me.

20        Q.   By your office you mean the press

21   office?

22        A.   Yes.

23        Q.   They saw it when it was actually

24   posted?

25        A.   Yes.

1     Q.    And what did you do after you learned

2  about that?

3     A.    I believe I was working home from that

4  day.  I went -- I ran to the office and the same

5  group, the same, roughly the same group

6  convened.  I think sans a couple of people to

7  discuss a response.

8     Q.    And roughly the same group, can you

9  tell me who you remember convening?

10     A.    Melissa, Peter, Danny via phone, I

11  think Liz, I think Pollack, Judy, Beth, Linda.

12  So we discussed a response with counsel.

13     Q.    And at that time had you -- at that

14  time did you or anyone else to your knowledge do

15  anything to verify the truth of any of Lindsey

16  Boylan's allegations that were set forth in

17  greater detail in the media piece?

18     A.    We looked -- we looked at the post.

19  We tried to look at contemporaneous information.

20  Someone discussed with the governor.  She

21  gave -- she gave one -- she gave a detail that

22  involved a plane ride and an approximate date

23  and time.  We looked at the records to see who

24  she was on the airplane with and we called them

25  up.  We called up these people to see - to see

Page 196

1   what their recollection was.

2        Q.   Let's take that one at a time.  You

3   said someone spoke to the governor, do you know

4   who spoke to the governor?

5        A.   I don't know.

6        Q.   And was the answer conveyed back to

7   you?

8        A.   I believe the answer's conveyed back

9   was very similar, is that he didn't harass her,

10  this instance didn't happen.

11       Q.   Was the answer that none of the

12  incidents that she alleged happened?

13       A.   I believe that's right.  Though if

14  there's a document that goes through.  But the

15  response was in the -- it would be beneficial

16  for me to review, I'd like to review it.

17       Q.   I don't know that we have a document

18  that goes through the responses item by items

19  so.

20       A.   Okay.

21       Q.   Do you remember whether there was any

22  specific discussion about the allegation that

23  the governor had kissed her?

24       A.   I believe there was -- I believe we

25  talked about it in consultation with counsel and

Page 197

1   then I think you saw our final product.

2       Q.    And any discussion about any reporting

3   back about what the governor said about that?

4       A.    I believe that was done with counsel

5   but I think the final -- our final statement

6   reflects what came back.

7       Q.    How about any discussions about there

8   was allegations that the governor had shown

9   Lindsey Boylan like a cigar box that had been

10  given to him by President Clinton?  Any

11  discussion about that that you remember?

12      A.    Inside the group that was with counsel

13  and I can tell you that I have seen the governor

14  give that to her before, to a variety of people

15  myself included.

16      Q.    And by that to her, meaning what?

17      A.    This is -- this is, you know, this is

18  like the bust of Robert F. Kennedy, this is the

19  Williams Jennings Bryant poster that like, you

20  know, that like influenced -- that influenced my

21  campaign posters.

22          Here's a -- here's a shot -- here's

23  some pictures of me in HUD.  Here's a tchotchke

24  got from Bill Clinton.  Here's a cigar box I got

25  from Bill Clinton.

1            He's given that tour to reporters.

2     He's given that tour to guests.  He's given that

3     tour to staff members when it's like a quiet

4     moment.  I will say -- I'm familiar with that

5     tour that he's given to men and women staff

6     members and visitors.

7          Q.   So that -- that aspect of what she

8     said having been shown the cigar box of -- that

9     was Bill Clinton, that was not something in your

10    view was -- seemed wrong or incorrect?

11         A.   I don't know if it happened when she

12    said it did.  I don't -- I don't know what the

13    circumstances were, if it happened, if it didn't

14    happen but I'm saying something very same that

15    to her seem to be, you know, seem to be standard

16    in my recollection in my experience.

17         Q.   Did you have any personal knowledge of

18    any of the incidents or events that Lindsey

19    Boylan included in her media piece?

20         A.   On its face I'm going to say I did not

21    but is the media piece in the documentation?  I

22    could look at it?

23         Q.   Yeah, it should be.  Is it, ███?  May

24    be in the media it mentions.  It may not be in

25    all the media because I don't think you're

Page 199

1    mentioned in it, but we can pull it up.  But why
2    don't we walk through it and then we'll -- some
3    of the other questions, it may be in some of the
4    other documents we look at.
5         A.    Okay.
6         Q.    But sitting here today you don't
7    remember saying, Oh, I was there or I wasn't
8    there or personally having knowledge of any of
9    the allegations?
10        A.    I don't believe so, sir.
11        Q.    Okay.  And then so what was -- and so
12   you said counsel was involved.  Was that again
13   Judy Mogul and Beth Garvey?
14        A.    I believe Linda Lacewell.
15        Q.    I mean what did you decide to do after
16   you met?
17        A.    We put out a -- we put out a
18   statement -- we put out a statement from our
19   office denying her allegation of sexual
20   harassment.  We put out a subsequent statement
21   about the one -- of the -- of her concrete
22   allegations that actually had a real time stamp
23   on it that we were able to look up from those
24   who rode on a plane with her during the month of
25   October 2018 saying that the Governor's comment

1   to her that she reported did not happen.

2       Q.   How was the mention of playing strip

3   poker?

4       A.   That would be the one.

5       Q.   And who -- who reached out to the

6   individuals?

7       A.   I did.

8       Q.   Each of them?

9       A.   Yup.

10      Q.   And what did you -- what did you ask?

11      A.   Here's what Lindsey said, do you have

12   any memory of this happening.  To the one -- to

13   the one they said no.  And then I said, is it

14   possible that like that could have been said and

15   he couldn't have heard.  They said no, the plane

16   is really small.  You hear all the conversation

17   that goes on everywhere.  We would have

18   remembered that.  And I said, would you be

19   okay -- it would be okay signing a statement

20   that said so.  They said yes.

21      Q.   And they said that the plane is a

22   plane where you can hear everyone talking?

23      A.   I've been on that plane, sir, it's a

24   sardine can.

25      Q.   And did you reach out to any state

Page 201

```
 1  troopers?
 2       A.   I don't think so but the state trooper
 3  would have been further away.
 4       Q.   What do you mean by that?
 5       A.   I believe they would have been further
 6  away in the seat.  The state trooper usually
 7  sits on the bench seat behind and then there's
 8  four seats up front.
 9       Q.   Did you do anything about -- did you
10  or others look at -- look through Lindsey
11  Boylan's other prior tweets and do anything
12  about that?
13       A.   Did we do anything about the prior
14  tweets?
15       Q.   Yes.
16       A.   We looked at the prior tweets, yeah.
17  There was a time -- there was a time we did
18  assemble a timeline of her tweets, absolutely.
19       Q.   And what did you do with that after
20  doing the timeline?
21       A.   I don't think I disseminated them
22  widely but I did try to talk through some
23  context of reporters.  It's possible I sent
24  them.  I don't think they were all that
25  interested in them.
```

Page 202

1    Q.   And what was -- what was the context
2  that she had said positive things about the
3  governor?
4    A.   The prospect -- when she left, her
5  problem was not with the governor, her problem
6  was with the staff to my -- and she, and I know
7  she tried -- I know she had her issues.  She
8  tried to get her job back.  They said no.  She
9  was outwardly supportive of the governor
10  publicly.  No one asked her to be, proud of the
11  work, proud of the work, thought she had a hand
12  in that was advancing.  She tweeted
13  encouragement.  Nobody asked her to.  And then
14  she decided -- then she decided -- then she
15  decided to run for office.  When you're running
16  in a democrat primary being there is a certain
17  lane for people who are -- who don't
18  particularly like the governor.  It's an easy
19  one to get into, and that's when the -- that's
20  when the attacks started and they -- that's when
21  the steady drum beat started, and then there
22  would be times -- there'd be times she'd go on
23  these weird storms and weird hours of the day.
24  And then -- and then the attack, then when the
25  governor made -- I went through -- I went

Page 203

1   through.  The rest of it has all been on the

2   record.  I don't have to repeat it, if you don't

3   want me to.

4        Q.   Yup.  And how about were there

5   discussions about threatening tweets or messages

6   she had sent to people in the executive chamber?

7        A.   Yes.

8        Q.   And what was -- what was the

9   discussions about that?

10       A.   I think I -- I think I started to talk

11  about that before but I'll finish it.  The -- at

12  some point she decided -- at some point during

13  COVID we changed the ballot access restrictions.

14  That made it easier to collect less signatures

15  get on the ballot.  She took that as a personal

16  affront to her that she thought made her job

17  easier.

18            She threat -- she texted both Danny

19  and Rob Mohica (phonetic) and was like, I

20  know -- I know -- I know you did.  Something

21  along the lines of, I know you did this to hurt

22  me.  That's okay.  Retribution is coming or

23  something along those lines.

24            I don't have the text in front of me

25  and then she did that.  Subsequently she

1   started -- subsequently she started texting --

2   she started E-mailing people like ███████

3   and John Maggiore I who hasn't with us for like

4   a year. ████████████████████████  ████████

5   █████████   And Danny, and I think Rob and some

6   others about how they were horrible people.

7   Like out of nowhere, horrible people, that

8   enabled harassment.  These people were -- these

9   particular people were not involved in her -- in

10  the initial complaints to her -- the initial

11  complaints against her.  I think they tried to

12  keep in touch -- I think they tried to keep in

13  touch with her to be as friendly as possible

14  with her.  And like out of nowhere she's like

15  threatening us.

16         And then I see her -- and by the way,

17  she's also been like anybody who speaks up in

18  our defense, she threatens on line.  You know,

19  of course, you keep an eye on it.  Everybody in

20  the world sent them to me, you know.

21         Q.   And --

22         A.   I don't know how to respond to the

23  rest of your question.  I don't think we

24  necessarily -- I think I lost track.  Did I

25  answer it or no?

1       Q.    What, if anything, was decided to be

2   done on the text messages that she had sent to

3   the people within the chambers?  Dani Lever?

4       A.    At some point, I believe at -- at some

5   point I believe we did shop the reporters to see

6   if they'd been interested in it.

7             At the time this wasn't the time.

8   This wasn't around the media post.  This was

9   before that.  And at the time they said -- they

10  basically said she's a one day story, so no,

11  they weren't interested in them.

12      Q.    And were they more interested after

13  the media post?

14      A.    By that time -- by that time -- by

15  that time I don't think they ever saw the light

16  of day so I don't think so.

17      Q.    Why didn't they?

18      A.    I'm sorry, what?

19      Q.    Why didn't you?  Oh, I see.  You did

20  shop it.  It just didn't see the light of day?

21      A.    It didn't see the light of day, yeah.

22      Q.    If you can turn to tab four of binder

23  one.

24      A.    You know what?  I have a tab one, I

25  have a tab two.  I have a three and then I have

Page 206

1   a five.

2        Q.    Oh yeah, okay?

3        A.    All right.  Hold on.

4              MR. E KIM:  I think we're missing

5        four, maybe there's two docs maybe behind

6        three.

7              MR. J KIM:  We can.

8        A.    I see them.

9              MR. E KIM:  Well, this may be tab

10       three.

11       A.    The text, I see the text in the

12   tweets.

13       Q.    Does it start with Liz Smith at the

14   top or?

15             MR. E KIM:  No, this is an E-mail from

16       Melissa DeRosa dated February 24th.

17       Q.    There's a response to that.  Why don't

18   we -- can you -- Hyatt, can you post tab four to

19   binder one or just put it up?

20             So I think what you just saw was the

21   one on the bottom?

22       A.    Yup.

23       Q.    Lindsey continued to tweet positive

24   things.  And then you see the lower text

25   messages Lindsey Boylan sent two top members of

1    the administration after the governor signed an

2    executive order truncating the petition period?

3        A.   Yup.

4        Q.   And you see that Liz Smith says, I

5    think the tweets with no fingerprints OTR are

6    fine to pass along.  What does she mean by "no

7    fingerprints OTR"?

8        A.   Mean off the record.

9        Q.   They mean off the record or on the

10   record?  Off the record?

11       A.   They mean off the record, correct.

12       Q.   I would lay off the other stuff

13   because it only points back.  It only point back

14   to the governor's office and reinforce bully

15   story line?

16       A.   Yes.

17       Q.   So what -- do you remember this being

18   Liz Smith's view?

19       A.   I think she wanted to -- I think she

20   wanted to be careful.  I mean she wanted to be

21   careful.  I don't agree.  I personally don't

22   agree with that sentiment but, you know, Liz is

23   smarter than I am.

24       Q.   But at this point you did -- or --

25   what -- were the texts also provided, passed

Page 208

1   along?

2        A.   I'm sorry.  Can you go back?  What's

3   the date in that E-mail?

4        Q.   February 24?

5        A.   February 24?  My -- my recollection is

6   that we provided the text to reporters much

7   earlier in between.  If there was -- if they

8   were shopped around again after the media piece,

9   I don't remember.  Doesn't mean it didn't happen

10  though.

11       Q.   And what's her reference to reinforce

12  bully story line?

13       A.   All of the -- all of the hostile work

14  place stories that have been going out at this

15  point we're getting it from every side.

16       Q.   But is that a view you shared or no?

17       A.   No.

18       Q.   That to reinforce the bully story

19  line?

20       A.   No, I personally didn't but, you know,

21  I respect Liz and her opinion.

22       Q.   All right.  We can put that down.  And

23  then if you look at tab five, the immediate next

24  tab.  It's that same day, February 24th, Josh

25  Vlasto sends you the copy again to your personal

Page 209

1   E-mail address of the prior documents?

2        A.   Yes.

3        Q.   Do you know why he sent it to you that

4   day?

5        A.   My recollection is that Linda wanted a

6   copy of what I sent out and I just didn't have

7   it and I thought on the off chance he may still

8   have it, so he sent it to me, I sent it to Linda

9   is my recollection.

10       Q.   I see.  Linda was asking about what do

11  we send out and you didn't have --

12       A.   She just wanted a copy of it with the

13  redactions, it's not -- you know, obviously we

14  have the actual file.

15       Q.   Was she planning to send it out again

16  or is she just wanted it for -- you know --

17       A.   She is -- she is not involved with

18  press, no.

19       Q.   She's not involved in press at all?

20       A.   She doesn't talk to reporters but she

21  does give advice.

22       Q.   I see.  And then if you go to tab

23  eight.  It's the same thing but then you forward

24  it to yourself on March 8.  Do you remember why

25  you forwarded it?

```
                                            Page 210
 1        A.    Looked like I forwarded to my
 2   government E-mail?
 3        Q.    Yeah.
 4             MR. E KIM:  The one we're looking at
 5        tab five.
 6             THE WITNESS:  Yeah, I'm looking.
 7        A.    The lag of a couple days.  I don't --
 8   I don't remember but I put it in my government
 9   E-mail.  Is there a subsequent one?
10        Q.    No, I wouldn't see it.  So you don't
11   remember why you were forwarding it to your
12   government E-mail?
13        A.    No.  I assume at that point I
14   forwarded it to Linda or maybe she needed it
15   again.  I'm speculating at this point.
16        Q.    Okay.  Can you look at tab 17 of this
17   binder.
18        A.    Yes.
19        Q.    And this is -- who's ███████████████?
20        A.    ██████████████  is currently my deputy
21   in the press office.
22        Q.    Got it.  So this is ████████ texting
23   you, MDR asked squad to circulate the Stasi
24   piece defending governor.  The folks don't feel
25   comfortable and folks don't feel comfortable
```

1    with that.  If she just wants it pinned to him,

2    they will handle but not sending it wide.

3            Do you know what this is a reference

4    to?

5        A.    Yes.

6        Q.    What is it talking about?

7        A.    Well, the Stasi piece was a piece

8    defending the governor.  Linda Stasi is, yeah,

9    she's a well-known columnist.  I guess Melissa

10   did ask my team.  I made sure she read it.  I

11   think she asked the team to send it wide to

12   everybody on clips (phonetic).  Junior guys in

13   my press shop, I think there were some younger

14   staff members who were close to some of the

15   complainants who had a very firm -- who had a

16   very firm view of what happened and -- and was

17   trying -- sided with their friends, I get it.

18   And I think the kids in my shop, these are all

19   younger people, sir, were worried about

20   circulating anything that seemed to be defensive

21   of the governor and that would -- that would

22   anger their coworkers.  I don't know if that's

23   real.  I don't know -- I don't know if that was

24   a not real sentiment but that's -- that is my

25   interpretation of what it was like ...

1      Q.   And so what -- how -- do you know how

2   this was resolved, how?

3      A.   I don't.

4      Q.   And who conveyed --

5      A.   I don't -- I'm sorry.  I'm sure, you

6   know, I'm sure the governor eventually saw the

7   piece.

8      Q.   And did you have any conversations

9   with ███████ or Peter or anyone else about who

10   felt uncomfortable about it?

11      A.   No.

12      Q.   Did you speak with anyone directly

13   about whether they felt comfortable?

14      A.   I did -- I did talk to my staff.  I

15   did talk to my staff.  I mean before this you

16   had the matter -- you had the matter about the

17   nursing homes that also came down sort of

18   contemporaneously.

19          And, you know, I asked them if they

20   ever had any questions or concerns to come to

21   me, you know, you throw around words like, you

22   know, investigation or EG inquiry, you know,

23   that stuff sounds scary, but, you know, we got a

24   job to do.  If you don't feel comfortable doing

25   it, we can talk about it.  But you know, that

```
                                             Page 213
 1    was the extent of my conversations.
 2         Q.    Did anyone come to you?
 3         A.    Yeah.
 4         Q.    Who came to you?
 5         A.    This woman named ████ who was on
 6    loan from OASIS, the state agency to help out
 7    with the COVID response.  She said, you know
 8    what, this is all crazy.  I'd rather go back to
 9    my agency.  I said, okay, you know, I had
10    another -- another coworker --
11         Q.    What's his name?
12         A.    Sorry.  ████.
13         Q.    What's her last name?
14         A.    ████, I don't remember to be honest
15    with you.  I could have -- I could have my
16    attorneys follow up if that's important to you.
17         Q.    Yeah, I think it would be helpful to
18    know.
19         A.    Okay.  Okay.  And had somebody else
20    come to me who had a daughter and, you know, we
21    just had a daughter and like wasn't comfortable
22    and asked -- and asked -- told me she was going
23    to pursue other jobs.  I said okay, let me know
24    if you need anything.  She actually decided to
25    stay.
```

Page 214

1      Q.    What did -- what did --

2      A.    You know, for --

3      Q.    She came to you after the nursing home

4   stuff or the --

5      A.    After the harassment stuff, yeah.  And

6   I was very supportive and but ultimately she

7   decided to stay for -- I think we provided more

8   flexibility than some other jobs she was looking

9   at.

10     Q.    And what's her name?

11     A.    ███████████, ██████████████████, ███████

12  ██████████████.

13     Q.    █████, got it.  Anyone else?

14     A.    ██████████████ who I talked to before.

15  She was a different, slightly different

16  circumstance.  She was committed to us, was

17  committed to the team but she had ████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ██████████████████████████████. ████████████████

21  ████████████████████ ██████████████████████

22  ████████████████████████████████████

23  ████████████████████████████████████.

24     Q.    Anyone else?

25     A.    For the most part I think specifically

Page 215

1    about this, I think that's -- I think that's it.
2    But you know, this also -- Counselor, this also
3    comes after a very long year where we didn't
4    sleep where every day was a tragedy.  So a lot
5    weighed on us at the same time.
6         Q.   When ████████ said to ask squad
7    circulate the Stasi piece defending the
8    governor, who had she asked ████████ to circulate
9    it to?
10        A.   We have a press list.  You know, we
11   have press -- I mean it's -- it's not like a
12   press list like you blast out a press release
13   like an internal press, an internal press list
14   of people who you send clips to as you go so,
15   you know what's going on during the day.
16        Q.   And then who was on that press list?
17        A.   The chamber.
18        Q.   Every one on the chamber?
19        A.   Chamber and commissioners, yup.
20        Q.   And commissioners, I see commissioners
21   of different agencies?
22        A.   Yes, I believe the chamber and the
23   quote/unquote cabinet so.
24        Q.   Okay.  Can you take a look at the tab
25   61 of binder two.

1      A.   Yup.

2      Q.   So this one looks like a series of

3   E-mails where there are particular points that

4   look like you were working on finding responses

5   or drafting responses to a New York Times --

6      A.   Yup.

7      Q.   -- report; is that right?

8      A.   Yup.

9      Q.   Something like this and then there's,

10  you know, in all caps or some other way

11  identification of how you're going to respond.

12          The first E-mail in this chain is the

13  Melissa DeRosa.  She fills out like things off

14  the record, how Lindsey know who released it,

15  you know, fixated on her characterization of

16  him.  Off the record this or that or on the

17  record this or that, from a spokesperson.

18          Is this something -- how does

19  something like this get drafted?  Is Melissa

20  DeRosa taking a first crack at how to respond

21  and forwarding of the group for comment or?

22      A.   Sometimes.  That's not it.

23      Q.   Or does something like that usually

24  follow like a meeting or a, I guess, first if

25  you have a particular recollection of this

Page 217

1   exchange?

2        A.   I think we definitely talked about it.

3   I think we definitely talked about it, you know,

4   with roughly the same group.  We definitely

5   went -- we definitely went through it on the

6   phone.  We definitely threw stuff around.  We

7   needed, you know, tried to figure out what we

8   answered previously, what we haven't answered

9   previously.  And it looks like she probably took

10  a first crack at that answer.  That's not

11  atypical.  Sometimes it's her, sometimes it's

12  me.  Sometimes it's Peter.

13           So this -- I'm sorry, sir, is this the

14  Ronan Farrow piece we're looking at?

15       Q.   I think this one is New York Times.  I

16  think Ronan Farrow comes later.  Hold on.

17  This -- March.  Actually this could be the Ronan

18  Farrow because the Ronan Farrow piece comes out.

19       A.   Yeah, I believe this is the piece.

20  Yeah, this is the piece.

21       Q.   And so she starts -- so you're being

22  told by the reporter or if it's Ronan Farrow.

23  Here is things that I'm saying, what's your com

24  -- what's your response?

25       A.   Correct.  Then I believe we talked all

Page 218

1    three by the phone and then we tried to fine

2    tune answers.

3         Q.    And usually -- this is a sort of --

4    this was a common group for this subject matter,

5    sounds like Melissa?

6         A.    Correct.

7         Q.    And at this time, I mean Linda

8    Lacewell is the superintendent of DFS, right?

9         A.    She also was in the chamber doing work

10   in COVID relief.

11        Q.    And was Linda Lacewell this involved

12   on a regular basis on subjects other than the

13   sexual harassment issues?

14        A.    COVID issues, you know, there may have

15   been something else that's come up too.

16        Q.    How about prior to COVID?

17        A.    Prior to COVID?  I'd call her a lot.

18   I'd call her a lot and sound board off her.  She

19   was the -- she was the chambers risk officer and

20   compliance officer for a very long time.

21        Q.    Uh-huh.

22        A.    So I do -- we do really value her

23   opinion.

24        Q.    So if you look at the first -- the

25   third page of this and one of the -- one of the

1    comments is she reiterates her claims the

2    governor kissed her on the lips in 2018 and the

3    response, proposed response at this point is

4    from a spokesperson this is not true.

5         A.   Yes.

6         Q.   When it's from a spokesperson, at this

7    time, what does that mean?  Does that mean you?

8         A.   Could be me, could be Peter.  Like I

9    said Peter negotiated this one.  I have no

10   problem putting my name on anything that I

11   believe to be true.

12        Q.   At this point it could be Peter --

13   whoever is -- whoever is the lead on responding

14   to a particular article?

15        A.   Correct.

16        Q.   When it says, this is not true,

17   presumably that -- was -- this is the type of

18   thing would be checked with the governor since

19   he's the one that would be able to fact check

20   that?

21        A.   This had been checked with the

22   governor previously as our answer.

23        Q.   And then do you remember in connection

24   with these draft answers, Beth Garvey writes

25   back, we don't have to make news with that

```
                                           Page 220
 1   answer.  It can be spun as retaliatory.
 2            Do you know what she was referring to?
 3       A.   I think she was referring to my
 4   statement.
 5       Q.   Your statement was after the
 6   statements and she and her lawyers, members of
 7   the press reaching out to former members of the
 8   chamber many of who have never worked with her,
 9   these former members of chamber called to let
10   various staff people know and convey that they
11   were upset by the outreach.  As a result we
12   practically reached out to some former
13   colleagues to check in and make sure they had a
14   heads up.
15            Is that the statement?
16       A.   I don't think that's the one.  That's
17   another one I saw.  Maybe -- I guess that's the
18   one.  I really thought there was another
19   statement made here that was similar to the last
20   one we were talking about.
21       Q.   Do you believe and so --
22       A.   Okay.
23       Q.   What did you think -- it may -- I mean
24   it's not clear to me what part she's referring
25   to.  So she just said we don't have to?
```

1    A.   Yeah, yeah.  I'm sorry.  I thought she

2   was talking about in reference to my previous

3   comment about maybe reiterating, harassing

4   staff.  So I actually -- I actually don't know.

5   The argument seems to be about this statement

6   but I'm not really tracking it.

7    Q.   And do you remember having a

8   discussion about making sure you're not doing

9   anything that would be considered retaliatory?

10    A.   Well, that would probably be a

11   discussion for counsel.

12    Q.   Then --

13    A.   But that statement here is that it

14   could be spun as retaliatory doesn't mean it was

15   retaliatory is my reading.

16    Q.   If you look at tab 62.

17    A.   62.

18         MR. E KIM:  62 you said?

19         MR. J KIM:  Yeah, 62.  That same

20    binder.

21    A.   Okay.

22    Q.   And here again Beth says, in another

23   E-mail exchange on the same topic, I spoke to

24   Melissa earlier.  I think she agrees we

25   shouldn't give news to this story if there isn't

1   any in the statement.  Keeping it to prior

2   statements can create new exposure re

3   retaliation.  Note her tweets re civil suits is

4   the safest.

5            Any discussion beyond this that you

6   remember about things you say being potentially

7   retaliatory?

8        A.   No, I'm sorry.  I don't have -- I

9   don't recall any.

10       Q.   Okay.  If you go to tab 67 this looks

11   to be either -- I don't know if that last one

12   was in response to Ronan Farrow.  This one

13   definitely looks to be because it's -- it says

14   New Yorker fact check, right?

15       A.   Okay.

16       Q.   And the first one, the first fact

17   check is new information on the day that Lindsey

18   Boylan was tweeting back in December.

19   Allegation of harassment there was a group of

20   people helping with the gov with coms relating

21   to this incident.  They were planning to call,

22   discuss the tweets and how to respond.

23            MDR, Peter, Jamie and Steve Cohen, the

24   group was exchanging tweets and a group E-mail

25   was circulated to plan a call.  E-mail planning

```
                                           Page 223
 1   a call to talk about the tweets.
 2            Then in all caps they disputed this
 3   discussion with editors.  What is that -- what
 4   is that a reference to?
 5        A.   I don't know.  That's a question for
 6   Peter.  I don't know what that means.
 7        Q.   But presumably disputed this
 8   discussing with editors that it's -- it looks to
 9   be saying we're disputing this.  We're going to
10   discuss it with the editors.
11        A.   You know, I think I know what it is.
12        Q.   Okay.
13        A.   I think Peter may not have been part
14   of the first call in December.  He may have been
15   on some of the E-mails.  He may not have been
16   part of that first call.  You know, just like in
17   this piece, I push back against being part of
18   the Lindsey Boylan letter.  I think that's what
19   he was disputing.  The facts that they had were
20   a little bit less than precise if I'm jogging my
21   memory so ...
22        Q.   But it is true that there were text
23   chains and group discussions responding in terms
24   of how to respond to a tweet, right?
25        A.   Counselor, you should know we spent
```

1  several hours talking about just this so --

2      Q.   That's why I'm asking.

3      A.   Yeah, I think -- I think if Evan Peter

4  was just as I was sensitive about my alleged

5  involvement in the letter, which wasn't true, I

6  think he himself may not have been a part of

7  that first call or series of calls, and I think

8  that's what he was up against.

9      Q.   Do you remember that that he was not

10  part of that in the beginning?

11      A.   I remember he was upset about one

12  aspect of the article he had taken out and I

13  believe this was it.  You know, exact groups, I

14  told him the people I remembered.  The days are

15  blurred.  I know at one point Peter -- Peter was

16  involved but he may not have been part of that

17  first series of calls.

18      Q.   If you go to -- because if you go to

19  some of the text that we were going through

20  earlier, he is on some of them?

21      A.   Yeah, but, you know, I think if you

22  look through a lot of texts they got from me I'm

23  on them, you know.  Am I participating in them

24  or others participating in them a lot more.  I

25  think -- I think it was the call.  I think

1    that's what it was disputed.  You'd really have

2    to ask him though but that's my memory.

3         Q.   And tab 69 which we looked at earlier,

4    we won't cover the same ground again, but about

5    the letter, the earlier part of it talks about

6    the "mean girls"?

7         A.   Uh-huh.

8         Q.   Was that a term that you had heard

9    used "mean girls"?

10        A.   No.

11        Q.   You never heard of it?

12        A.   No, I had not heard of it at the time,

13   no.  You do understand during that time I was in

14   Albany a lot and this sounds like a lot of that

15   happened in the city.

16        Q.   I see.  So you were -- you've always

17   been officed in Albany?

18        A.   I've gone back.  I now travel back and

19   forth much more than I used to.  I was in the

20   city office occasionally.  Certainly haven't

21   been the last year and change for reasons but I

22   live in Albany, you know, my primary job has

23   always been to deal with the Albany press corps

24   so no, I hadn't heard this before I was asked

25   about it.

1      Q.    Pre COVID where did the governor spend
2    most of his time?
3      A.    Westchester and he worked out of the
4    city office and about a year before COVID he
5    moved to -- he moved to Albany full time.
6      Q.    And then once he moved full-time
7    though where -- once he moved to Albany full
8    time is that where Melissa DeRosa, Stephanie
9    Benton, and the other senior staff worked out of
10   Albany?
11     A.    Stephanie -- Stephanie lives in the
12   Albany area as well and she traveled, yeah.
13   Yeah, you know, mostly moved up here but in just
14   flacking these stories, it sounds like a lot of
15   a lot of this type of stuff was based out of
16   stuff that happened a couple years ago when it
17   was more city based.
18     Q.    You have until prior to Ronan Farrows
19   article you had not heard of the "mean girls"
20   being used to describe certain people in the
21   senior staff?
22     A.    There were earlier articles than
23   Ronan's.
24     Q.    I see.  Earlier articles but
25   relatively close in time?

1       A.    Uh-huh.

2       Q.    Before that you had not heard people

3   refer to as the "mean girls"?

4       A.    No.  And that's a characterization I

5   would dispute personally but we can talk about

6   that.

7       Q.    I'm just asking you whether it's a

8   term that you had heard --

9       A.    Yeah, I know.

10      Q.    -- used before?

11      A.    I know.  Okay.

12      Q.    Do you know -- so when did you first

13  meet Charlotte Bennett?

14      A.    20 -- late 2018, early 2019.  It must

15  have been when she first started.

16      Q.    Okay.  And how did you meet her?

17      A.    She joined the briefing team and we

18  traveled to an event together.

19      Q.    And how much interaction did you have

20  with her while she was working in the executive

21  chamber?

22      A.    Not very much.  Not very much.  I

23  didn't really despite the fact I did cover an

24  event up until recently, you know, the briefing

25  team -- to the extent that the briefing team and

1   the press team worked together, it usually based

2   upon events that really wasn't anything I was

3   part of planning in.

4        Q.   She was -- and she was based in New

5   York in the beginning, city?

6        A.   I don't know where she was based out

7   of.

8        Q.   Would you -- did you have more

9   interaction with briefers who were in Albany

10  versus New York City or is it in your day-to-day

11  you didn't have a lot of interaction with the

12  briefings?

13       A.   Didn't have a lot of interactions with

14  them.

15       Q.   And did you have occasion to observe

16  her interactions with the governor?

17       A.   I have not.

18       Q.   You've never seen the two of them

19  interact?

20       A.   They were, again, only during that one

21  trip where we flew, I believe, Jones Beach and

22  Shirley Chisholm Park but she had just started.

23       Q.   Uh-huh.  And have you had any sort of

24  conversations with Charlotte Bennett one-on-one?

25       A.   I don't believe -- I don't believe I

Page 229

1  have.

2      Q.    How about in group settings, have you

3  spoken to her at all?

4      A.    If I have they weren't really

5  remarkable.

6      Q.    And at some point she left the

7  executive chamber, right?

8      A.    Yes.

9      Q.    Do you remember learning that she was

10  leaving?

11      A.    No.

12      Q.    Okay.  Did you learn about her leaving

13  before her allegations about sexual harassment?

14      A.    I heard she left but no.

15      Q.    I see.  So you just at some point you

16  heard she left?

17      A.    At some point I heard she left.

18      Q.    And --

19      A.    For a job at DOH or something.  I

20  vaguely remember a goodbye E-mail sent around.

21      Q.    I see.  Did anyone talk to you about

22  it?

23      A.    No.

24      Q.    You just remember seeing her goodbye

25  E-mail?

```
                                          Page 230

 1        A.    Yes.

 2        Q.    And so did you have any knowledge

 3   about why she left?

 4        A.    No.

 5        Q.    Obviously you're not aware of the

 6   allegations she has made.  Fair to say based on

 7   what we've talked about you don't have any

 8   personal knowledge about any of her interactions

 9   with the governor?

10        A.    I do not, sir.

11        Q.    And any -- actually so why don't we

12   move to sort of when you first learned that she

13   had or was going to make allegations, sexual

14   harassment allegations against the governor,

15   when you learned of that and how?

16        A.    I got -- Jessie McKinley from the New

17   York Times sent me and Peter an E-mail Friday

18   night that I think the team started going

19   through -- the team started going through for a

20   story that I was going to publish sometime on

21   Sunday.

22        Q.    I see.  So similar to some of these

23   E-mails we've seen where he sends in an E-mail

24   what they're going to say and essentially is

25   asking for a response if any to particular?
```

```
                                          Page 231
 1        A.    Correct.

 2        Q.    So what did you do when you got that?

 3        A.    I forwarded it to Melissa.  I'm sure I

 4   forwarded it to Beth, Linda, Judy and Peter.   If

 5   I didn't do it, Peter did.

 6        Q.    And then what?  Were there calls or

 7   what happened?

 8        A.    There were conference calls,

 9   consultation with counsel, you know, where we

10   thought -- where we thought -- where we started

11   to try to get facts where we can get them and

12   started to write the statement.

13        Q.    And was the governor involved in any

14   of those discussions?

15        A.    I don't remember if he was on these

16   particular group chat, group calls.  Obviously

17   he was consulted at some point, not by me

18   though.

19        Q.    Did you learn whether what the

20   Governor's position was with respect to the

21   truth of the allegations?

22        A.    Not at that -- not at that time.  We

23   had a subsequent conversation.  That subject

24   that was with consultation with counsel.

25        Q.    I see.  The conversation we talked
```

Page 232

1    about in the mansion preparing him for speaking

2    publicly about it.

3              So other than that you didn't come to

4    learn or what the Governor's position was with

5    respect to the truth of the allegations?

6         A.   The only instance -- the only instance

7    where I heard the other side was in consultation

8    with counsel.

9         Q.   And did -- when -- did you ever learn

10   that she had raised issues, you know, internally

11   before going public with these allegations?

12        A.   Only through -- only through the --

13   only through the New York Times inquiry.

14        Q.   I see.  How about internally like from

15   others in executive chamber?

16        A.   No, not before this.

17        Q.   I see.  So right, right.  So as you're

18   dealing with the inquiry, the inquiry comes in,

19   you get on calls.  Do you at some point learn --

20        A.   Yes.

21        Q.   -- internally that actually she had,

22   you know, this had come up before and someone

23   had -- was aware of it, someone internally?

24        A.   This -- I have an answer but this was

25   during a conversation in consultation with

Page 233

1  counsel and I do -- I do have familiarity with

2  their version of events.

3       Q.   Their version meaning the counsel's

4  version?

5       A.   Correct.

6       Q.   So you -- you're not going to get in

7  to the substance of what you learned but you

8  didn't know about it before --

9       A.   Correct.

10      Q.   -- the New York Times saying here's

11 something we're going to report?

12      A.   Correct.

13      Q.   And so that's the first you knew about

14 either the reason for the move when she left the

15 executive chamber or what was known prior to her

16 going to the New York Times?

17      A.   Correct.  I think there may have been

18 a tweet out there with Lindsey but felt like she

19 was tweeting -- she was tweeting at her on

20 something.

21      Q.   Yeah.

22      A.   At the time I don't think I knew what

23 the relevance of that was.

24      Q.   At the time, I think it was either a

25 retweet or like or something that Charlotte

Page 234

1   Bennett did, did that come to your attention and

2   did you do anything about it?

3        A.   I didn't do anything -- it came to

4   my -- it came to my attention as odd through

5   somebody who used to work here but I didn't do

6   anything about it.

7        Q.   Did anyone consider reaching out to

8   her or ...

9        A.   I don't -- I don't know.

10       Q.   You didn't discuss it with anyone?

11       A.   I don't think so.  I don't think that

12   was relevant to me at the time.

13       Q.   Okay.  So if you can turn to tab 35 of

14   that second binder.

15            By the way, before we turn to this, so

16   what is -- what do you remember -- so you have

17   outreach from the New York Times saying here's

18   something we're going to say.  You have group

19   calls but with, you know, some of the same

20   people, same counsel was there so we won't get

21   into substance, what's the decision that's made?

22   What do you guys -- what do you decide to do in

23   response to the New York Times story?

24       A.   I think we decided, you know, we need

25   to have a statement, you know, it's -- it had to

1  be sympathetic.  We had to figure out the right

2  -- we had to figure out the appropriate tone and

3  I think a lot of that is, a lot of that is

4  reflected in this chain.

5      Q.   So if you look at tab 35 you see it's

6  a statement.  It's February 27 which is a

7  Saturday.

8          Do you remember this being over a

9  weekend that you had to do this?

10     A.   Yeah, he called us this on a Friday

11  and the story published on a Sunday.

12     Q.   Okay.  And she drafts, it looks like a

13  statement draft, Miss Bennett has every right to

14  speak out.

15          Second paragraph starts, when she came

16  to me and opened up about being a sexual assault

17  survivor dot dot dot, this is sort of in first

18  person.

19     A.   Uh-huh.

20     Q.   Was this intended to be a statement

21  that was to come from the governor?

22     A.   Yes.

23     Q.   Is that what you remember about it

24  being drafted like a statement from the

25  governor?

Page 236

1      A.   Yes, I believe that's what ultimately
2  went out I think.
3      Q.   Yeah, I believe so.  If you look at
4  tab four of the -- you don't need to look at it
5  but binder three, there's a statement.
6           Is it your understanding that this
7  statement had been run by the governor himself
8  as coming from him?
9      A.   It would have had to have been.
10     Q.   But you were not part of the --
11     A.   No, I don't believe I made the call on
12 this one.
13     Q.   Okay.  And then the statement from
14 Beth Garvey, you see that?
15     A.   Yes.
16     Q.   And this is and were you part of
17 drafting that?
18     A.   I was, you know, I was part of this
19 chain.  I gave -- I gave -- I gave some
20 suggestions to it.  I made some -- I believe I
21 made some edits but, you know, I generally
22 agreed with the tone and of the substance.
23     Q.   But with respect to what Beth
24 Garvey -- with respect to any of it you did not
25 have any personal knowledge about either the

Page 237

1    interactions with the governor or the matter

2    being escalated to special counsel at the time

3    and the transfer request, the subject of Beth

4    Garvey's statement?

5         A.   I did not but again, there were

6    conversations and consultation with counsel to

7    try to drill down to the facts as we knew them

8    and I believe that these statements are

9    reflective.

10        Q.   Okay.  So staying on tab 35, you see

11   Chris Cuomo is included in this chain?

12        A.   Yes.

13        Q.   Was he also on calls that -- on this

14   subject of Charlotte Bennett?

15        A.   I believe he was on at least one.

16        Q.   And what comments or contributions did

17   Chris Cuomo have?

18        A.   I think he -- I think he generally --

19   I think he generally agreed with the tone.  I

20   can't remember the substance.

21        Q.   You'll see if you go to the next tab,

22   tab 36, these also include draft statements?

23        A.   Uh-huh.

24        Q.   And it looks like it's early in the

25   day and Saturday it's working its way through

Page 238

1    various people.

2              And on the third page of this E-mail,

3    Saturday, February 27 at 8:05 a.m. Melissa sends

4    an E-mail, a different approach, and there's a

5    draft statement that is longer and different?

6         A.   Okay.  Yup.

7         Q.   Where it talks about her being a

8    victim of sexual assault, talking about a speech

9    she gave on sexual assault.  And then her

10   sharing personal information with the governor,

11   now regretting it, felt uncomfortable.

12             Do you know -- do you remember

13   discussions about this version of the statement?

14        A.   I don't remember discussions but my

15   view is that this was the card that came with

16   the final statement but it was split up.

17        Q.   And do you know if this, the

18   information contained in this version also came

19   from the Governor?

20        A.   I don't have direct knowledge if it

21   did.

22        Q.   If you look at tab 39.  Now it's the

23   following day, Sunday, and there's sort of

24   another draft statement that's being discussed.

25             Do you know what lead to this second

1   statement?

2       A.   I think, you know, pick up,

3   follow-ups, more stories, a sort of merging of

4   the Times story about Charlotte Bennett versus

5   like some hostile workplace stuff.  I think it

6   was all becoming a bit of feeding frenzy in a

7   shnoz (phonetic).  We're getting a lot of

8   request for comment, I believed.  So I think

9   there was an attempt to put one clean thing out.

10      Q.   And how did the process of drafting

11  this statement occur?  Same thing?  Calls?

12      A.   I think it was, yeah, I think it was

13  calls, there were questions, there were

14  discussions, there were copy edits, there was

15  talk about substance all with counsel.

16           You know, and I believe some version

17  of this went out.  I think some version of this

18  went out.

19      Q.   Yeah, if you look at tab six of

20  your -- of the other binder, tab binder three?

21      A.   Okay.

22      Q.   How -- how involved was Chris Cuomo in

23  these -- in this statement?

24      A.   I mean he gave advice.  I think, you

25  know, he had general advice about tone, about

Page 240

1   how aggressive or not aggressive you should be

2   in responding.  You know, he's the Governor's

3   brother.  You know, I'll stop before I stick to

4   my commentary because I think I just want to

5   answer your next question -- ask your next

6   question.

7           Q.   Yup.  Can you turn to tab 45 in the

8   first binder.

9           MR. E KIM:  Also, Joon, whenever you

10      hit a natural point if we can take a brief

11      break.

12          MR. J KIM:  Probably like five

13      minutes?

14          MR. E KIM:  Sure.

15          MR. J KIM:  Okay.

16          THE WITNESS:  I don't know if we have

17      a 45.  We have a 44 and 49.

18          MR. J KIM:  In binder one you don't

19      have a 45?

20          MR. E KIM:  Correct.

21          MR. J KIM:  Hyatt, can we put up 45?

22          Q.   So this is, I think looks like a text

23  to you and others.  You and Melissa from █████

24      █████?

25          A.   Yes.

```
                                                    Page 241
  1        Q.    This is ████████████?
  2        A.    ████████████████████
  3        Q.    And how well do you know ███████████?
  4        A.    He is a longtime friend.
  5        Q.    How do you know him?  When did you
  6    meet him?
  7        A.    I think I met him before I met
  8    Melissa.  During -- through living in Albany.
  9        Q.    Okay.  Did you ever -- just friends or
 10    work together or --
 11        A.    Friends.  No, friends.
 12        Q.    And if you look at the second page of
 13    this, talks about -- he sends a link to a tweet
 14    involving Charlotte Bennett and then -- if you
 15    go to the next page, Hyatt, there's a long --
 16        A.    Yup.
 17        Q.    -- thing he writes about Brazilian
 18    jujitsu and other things.
 19              Do you remember receiving this?
 20        A.    Yes, and I believe Melissa called them
 21    and said your heart is in the right place but
 22    stop sending this stuff, you know.
 23        Q.    What was this?
 24        A.    Some is a pep talk, some of it's
 25    things to look into.  I don't know, man, you
```

1   know, there's a lot of stuff flying around the

2   Internet.  I was getting barraged by free advice

3   from a lot of people.  He's a very good guy who

4   I think was trying to be helpful.

5          Q.   So the things to look into, it looks

6   like from the bottom, it says, please have

7   someone look into Charlotte ███████████████████

8   ████████████████████████, see that?

9          A.   Yup.

10         Q.   And that's a reference to Charlotte

11  Bennett having ███████████████████████████

12  ██████████?

13         A.   I actually don't know.

14         Q.   Were you aware that she had been a

15  victim of sexual assault?

16         A.   Yes.

17         Q.   You were also aware that that's what

18  the subject of conversations she had with the

19  governor?

20         A.   So I've read.

21         Q.   And did you -- did you have someone

22  look into any sexual assault allegations that

23  Charlotte Bennett had made in college?

24         A.   No.

25         Q.   Do you know if anyone else did?

1      A.    I don't believe so but I don't know.

2      Q.    Did you talk to anyone about looking

3  into her experiences in college?

4      A.    No.

5      Q.    How about looking into other things

6  about her?

7      A.    No.

8      Q.    You did not -- you did not have any

9  conversations with anyone?

10      A.    I did not have any conversations.

11      Q.    Do you know what opposition research

12  is?

13            MR. J KIM:  We can take down this.

14      A.    I do, sir.

15      Q.    What's opposition research?

16      A.    Trying to do research usually in the

17  context of political campaigns on information

18  that can potentially be damaging to your

19  opponents.

20      Q.    And did you do any such kind of

21  opposition research or as you put it,

22  researching for damaging information against

23  Charlotte Bennett?

24      A.    I did not.

25      Q.    Do you know if anyone did?

```
                                              Page 244
 1        A.    I assume not.

 2        Q.    Why do you assume not?

 3        A.    I just don't think they would and can

 4   I go back to ████   for one second?

 5        Q.    Sure.

 6        A.    Again, we told him -- we told him to

 7   stop sending us stuff like that.  It's not

 8   helpful.  If you notice we didn't respond.

 9        Q.    So the question again, why do you

10   think no one would have looked into Charlotte

11   Bennett?

12        A.    I guess I don't know but I certainly

13   didn't.  I never had conversations with him

14   about it, with anybody about it.

15        Q.    How about Lindsey Boylan?

16        A.    You saw -- I mean I think you saw we

17   looked into Lindsey.

18        Q.    Right.  How about any of the other

19   complainants?  Do you know if anyone had done or

20   any discussions about opposition research on

21   them?

22        A.    I have not been involved with any such

23   discussions and I don't believe I've heard any

24   such discussions.

25        Q.    How about the investigators in the --
```

Page 245

1    in the current investigation?

2         A.    Excuse me?

3         Q.    How about opposition research into the

4    people who have been appointed to conduct the

5    investigation on behalf of the attorney general?

6         A.    And to you, Counselor?

7         Q.    Or anyone on our team?

8         A.    I don't remember being involved in any

9    such conversations.

10        Q.    Are you aware whether anyone was asked

11   to do that?

12        A.    I am not.

13        Q.    Are you aware whether Steve Cohen was

14   asked to conduct opposition research into any of

15   the other lawyers appointed to do the

16   investigation?

17        A.    I am not.

18        Q.    You were not part of any such

19   discussions?

20        A.    Not that I recall.

21        Q.    Has there been any reporters asking

22   you that question whether anyone had --

23        A.    No.

24        Q.    -- corrected opposition research into

25   the lawyers assigned to do the investigation?

1          A.    No, no reporters asked me that

2     question.

3          Q.    How about opposition research into the

4     attorney general?

5          A.    Nope.

6          Q.    I think we can take a break here?

7          A.    Okay.

8                MR. J KIM:  Come back in 2:55.

9                MR. E KIM:  Sure.

10               THE VIDEOGRAPHER:  Stand by.  Time is

11          2:47 p.m.  We are going off the record.

12          This will end media unit number four.

13                    (Short recess taken)

14               THE VIDEOGRAPHER:  The time is

15          2:56 p.m.  We are back on the record.  This

16          will be the start of media unit number

17          five, Counsel.

18          Q.    Do you remember at some point

19     receiving inquiries about a person who was at

20     Gareth Rhodes wedding who was -- said that the

21     governor had touched her in a way she -- that

22     made her feel uncomfortable?

23          A.    Yes, Peter -- Peter I believe actually

24     made that inquiry.  I am aware of it.

25          Q.    So you're aware of it but Peter was

                                                        Page 247

1   primarily dealing with that?

2        A.    Uh-huh.

3        Q.    So if you want to look at tab 42 in

4   binder two?

5             MR. E KIM:  I think we have a gap

6        there.  Joon, we have 39 and 44 we got.

7             MR. J KIM:  Okay.  Maybe we just put

8        up 42, Hyatt.

9        Q.    Maybe we just start with the first

10  E-mail at the bottom from New York Times, Jessie

11  McKinley.  So when something like this comes

12  in -- you want to scroll up -- and Peter says, I

13  think we have to refer to yesterday's statement.

14  How does it work like?  You and Peter both get

15  it.  Do one of you talk about and decide who

16  runs with it?

17       A.    I think a lot of it has to do with

18  triage.  I was probably dealing with something

19  else when it came in.

20       Q.    Okay.  Anything you remember about the

21  back and forth in terms of how to respond to

22  this one?

23       A.    Not particularly.  I mean this one --

24  this one -- this one was just odd.

25       Q.    Any discussions with Gareth Rhodes

Page 248

1   about it?

2        A.   I -- if they were, they were brief.  I

3   subsequently learned the woman in question was a

4   good friend of his wife's, you know.

5        Q.   Uh-huh.

6        A.   So I'm sure he wasn't happy.  His

7   wedding was on the front page of the paper, you

8   know.

9        Q.   Are you friendly with Gareth Rhodes?

10       A.   Yes.

11       Q.   Any discussions about Gareth Rhodes or

12   his wife coming out in support of her friend who

13   was at the wedding?

14       A.   No, we saw it.  I mean, I don't

15   remember him but I do know his wife who was

16   supportive, you know.  I wasn't going to

17   harangue him and put him between us and his

18   family.

19       Q.   Do you know if anyone -- anyone else

20   did?

21       A.   I don't know.

22       Q.   How about Karen Hinton when her

23   allegations came out?  Is that something you

24   were dealing with?

25       A.   The Washington Post story, I think

1    Peter dealt with that but, you know, I'm aware.

2         Q.    What do you remember about how you

3    learned about it and what you did in response?

4         A.    This was a Josh Dawsey story from the

5    Washington Post, came in in and around the same

6    time as that Wall Street Journal story about Ana

7    Liss.  I think it was the same weekend day.  I

8    took that one.  Peter took the other one.  We

9    were both involved in the responses.  You

10   know --

11        Q.    Why don't you turn -- we can drop this

12   document, Hyatt.  Why don't you turn to page

13   seven of binder one.

14        A.    All right.

15        Q.    By the way, it looks like this in one

16   but in other E-mails sometimes you draft things

17   either draft statements or things and send it to

18   yourself.  Is that something you do in practice

19   or what is -- what is that?

20        A.    Usually when this happened especially

21   in a weekend at home, if I'm going to type

22   something, sometimes especially if it involves

23   links or something else, it's easier if I work

24   on it on my iPad which is not a government issue

25   iPad.  It's my personal iPad and then I send it

1   back.

2        Q.   So this is -- these are drafts

3   statements and things that you are working on

4   and then in order to have it with your -- at

5   your work computer you E-mail it to yourself?

6        A.   Uh-huh.  Also looking at this, this

7   sort of thing, read this, global this, global

8   this, I was likely pulling up past statements on

9   my iPad.  And sending them to my work, getting

10  them in one order, getting them in a nice order

11  and sending them to my work phone.

12       Q.   And like this type -- this thing where

13  you write where re Karen, you have a draft

14  statement, work global, work environment you

15  have a statement, language male staff attributed

16  to governor, is this something that you were

17  just drafting by yourself or do you think this

18  was again, or not again, whether this was at the

19  same time or after discussions with others?

20       A.   This one could be either.  If I'm

21  looking at the E-mail, it looks like I got the

22  inquiry from the Washington Post.  At some point

23  it was Peter was quoted in the Washington Post

24  so I must have handed this off at some point

25  while I dealt with the other story.

1      Q.   But you draft the statement, male

2  staffers attributed to the governor.  I've been

3  here more than eight years and I never heard him

4  use coarse language like that.  That's a

5  reference to you, right?  You'd been there over

6  eight years?

7      A.   Correct.

8      Q.   And coarse language like that I think

9  is the reference on the earlier page to two male

10  aides who worked for Cuomo over the course of

11  his career saying that he berated them with

12  explicit language sometimes calling them pussies

13  and sometimes saying you have no balls?

14      A.   Correct.

15      Q.   So you've never heard him say someone

16  doesn't have balls?

17      A.   I never heard him use vulgar language

18  like that.

19      Q.   Okay.  My question was, have you ever

20  heard him say that people didn't have balls?

21      A.   I'm sorry, I thought that was covered

22  in my answer, no.

23      Q.   Okay.  And is the fact that you've

24  never heard it that to you it's your belief he

25  never said it to anyone?

1      A.   I can't say he didn't say anything

2   that I wasn't around for but that was the best

3   response I had considering how can you -- even

4   if you asked him how can he recollect, how can

5   he recollect everything he said in his entire

6   life.

7      Q.   Well --

8      A.   That --

9      Q.   -- did you -- sorry.  Go ahead.

10      A.   And that was the best context.  I

11   believe -- I believe he was asked and he

12   certainly didn't remember that but a blanket

13   denial without a -- a blanket denial to

14   something that doesn't have any sort of context

15   to it or something to track down like I don't

16   know what that would have done, you know, or if

17   that was -- I thought -- I thought the much more

18   defensible plause (phonetic) was me and my

19   personal experience.

20      Q.   So did you -- do you remember

21   specifically asking him whether he had ever said

22   anyone had no balls?

23      A.   It was either me or someone else ran

24   this past him.  I can't remember who.

25      Q.   I'm looking through some of these

Page 253

1   other documents to see if it's worth showing

2   you.

3              124 if you can go to tab 49.  This one

4   relates to Karen Hinton?

5       A.    49 binder two.

6       Q.    Yeah, sorry.

7              MR. E KIM:  Okay.  Binder two, tab 49.

8       Okay.

9       Q.    This looks like an E-mail where Amy

10  Brittain sends you again sort of points about

11  Karen Hinton?

12      A.    Uh-huh.

13      Q.    And she had made an allegation about

14  when Governor Cuomo was HUD secretary about how

15  a hug that they had in a hotel.

16             Do you remember that?

17      A.    Yup.

18      Q.    And you have drafted a response re

19  Karen Hinton, this did not happen.  Karen is a

20  known antagonist of the governor who is

21  attempting to take advantage of this moment to

22  score cheap points with made up allegations in

23  21 years ago.  All women have the right to come

24  forward and tell their story.  However, it's

25  also responsibility of the press to consider

```
                                           Page 254
 1   self-motivation.  This is reckless.

 2             Did you -- had you asked the governor

 3   whether he had ever hugged Karen Hinton in a

 4   hotel room?

 5        A.   I didn't ask him -- I didn't ask him

 6   directly.  He was asked though I'm told.

 7        Q.   By who?

 8        A.   Probably by Melissa.

 9        Q.   And he said -- in your understanding

10   he said he had never hugged Karen Hinton in a

11   hotel room?

12        A.   That's my understanding.

13        Q.   And then there's -- there's the talk

14   about the statement that the governor had

15   issued -- you had issued about Ron Kim.

16        A.   Okay.

17        Q.   How did that come up, what was that

18   about?

19        A.   I'm sorry, the statement -- the

20   statement I made about Ron Kim?

21        Q.   Yeah.

22        A.   Ron Kim went public about a phone call

23   him and the governor had.  He told -- he told

24   mistruths and some lies in his version of that

25   phone call.  I was in the room when that phone
```

Page 255

1    call was made.  I corrected it on the record.

2         Q.    And what were the mistruths or lies?

3         A.    Governor did not threaten to destroy

4    him.  The governor did not say to feel his

5    wrath.  You know, there were specific things

6    that got repeated over and over and over again.

7    It just wasn't true.

8         Q.    Had you ever heard the governor

9    threaten anyone?

10        A.    No.

11        Q.    Have you ever heard him say anything

12   that's threatening?

13        A.    No, I mean, I probably, I hear -- you

14   know, I hear stories about it from the media

15   about stuff happening but never in my presence.

16        Q.    Have you heard of the recording where

17   he compares people to -- says he'll compare

18   people to child molesters?

19        A.    That I became aware of.

20        Q.    Did you hear it yourself?

21        A.    I -- I heard it from the New York

22   Times.

23        Q.    Did you consider that call in any way

24   to be threatening?

25        A.    No.

1      Q.    So in your mind saying that someone --
2  you'll compare someone to a child molester is
3  not in any way threatening?
4      A.    No, it was a -- it was a tough call.
5  It was a tough call but, you know, context is
6  everything.
7      Q.    The question is simply in your mind
8  you did not consider calling saying that you'll
9  compare someone to a child molester, if they
10  don't do what you want, to be in any way
11  threatening?
12      A.    There was a -- I have -- there is a
13  distinction in my mind between threatening
14  somebody and having a tough conversation with
15  them.  My version of that call was the latter.
16  My answer to that one is no.  I can talk more
17  about it but I have a feeling you don't want to
18  hear about it.
19      Q.    Sure, you can tell more about -- you
20  can talk more about how you think that's not
21  threatening?
22      A.    The context of the call was the WFP
23  saying, okay, okay, elect -- primary is over,
24  you have the line but, you know, anybody who
25  asks I'm going to say, well, you're not -- he's

1   like, at least he's not the republican after

2   them running around the state for a year

3   questioning his democrat bona fides and his

4   progressive bona fides.  They're going to say

5   fine, you can have the line but, you know, if

6   anybody asks we're going to say, well, at least,

7   you know, he's like this, much better than a

8   republican, you know, and he made a comparison

9   that, you know, was what it was.  I don't think

10  it was a threat but I think it was a -- I think

11  it was a demonstration of how offensive he heard

12  them.

13       Q.   So in that context because he compared

14  them to a republican, a response of saying that

15  you will -- compare you to a child molester is

16  not in any way threatening in that context in

17  your mind?

18       A.   Yes.

19       Q.   Would you consider that bullying?

20       A.   I consider that being forceful.

21       Q.   Okay.

22       A.   And I would consider that on the side

23  of disproportional but --

24       Q.   You would not consider it bullying?

25       A.   I would not consider it bullying.  If

Page 258

1   these -- if these -- these are people -- these

2   are people who oppose us every cycle, we're not

3   bullying them.

4        Q.   Have you heard the governor in your --

5   from your -- in your view bully anyone?

6        A.   I don't believe he's a bully.

7        Q.   So someone opposes you in every cycle

8   it's not bullying to say you'll compare them to

9   child molesters?

10       A.   Again, he was pointing out, he was

11  pointing out how crazy they thought -- he

12  thought their statement was.  It was a

13  disproportional response maybe.

14       Q.   But not bullying?

15       A.   It's not -- it's not -- being forceful

16  is not bullying.

17       Q.   Being tough and forceful, that's all

18  it is, right?

19       A.   Yes.

20       Q.   When did you learn about Ana Liss's

21  allegations?

22       A.   When Jimmy Vielkind's from the Wall

23  Street Journal called me.

24       Q.   Okay.  What do you remember him

25  saying?

Page 259

1      A.   I remember -- I remember saying I

2   thought that was -- I remember in my mind, wow,

3   it's strange.  We had a conversation where she

4   said the opposite but I listened to what he had

5   to say.

6      Q.   And then what did you do?

7      A.   Got the team together, we talked about

8   a response with counsel.

9      Q.   Actually can we go back -- sorry,

10  there's another document I wanted to show you on

11  Karen Hinton.

12           If you can turn to tab 26 on binder

13  one.

14           And this may overlap between Ana Liss

15  and Karen Hinton.

16      A.   Yes.

17      Q.   This is a chat exchange between you

18  and Melissa DeRosa.  It looks like you say, we

19  have a -- we have what looks like a screenshot

20  of a phone that gets cut off.

21           It says, can you call something and in

22  response call ■ and she did not, left a message

23  and do you -- do you recognize that and do you

24  remember what that was and what the cutoff parts

25  may be?

```
                                            Page 260

 1        A.    Are you asking me what the screenshot

 2   was?

 3        Q.    Yeah.

 4        A.    It's me and her kidding around.  She's

 5   very impatient.  She -- I was calling the editor

 6   of the Washington Post something about the

 7   piece.  I can't remember what it was and she

 8   asked me repeatedly, did you call?  Did you

 9   call?  Did you call?  Screenshot.  Called him.

10   She called.  I'm sorry, I called four times in a

11   row.  She called.  Then called again, then she

12   texted me, then I sent her saying, hey lady, I'm

13   doing my job, you know.

14        Q.    And what's -- who's █?  Called █?

15        A.    I think there were definitely

16   people -- there's people who worked with Karen

17   Hinton at the time, at the time

18   contemporaneously who she was very close with,

19   who told her -- who said that she never said

20   anything about this hug.  So to the extent that

21   the Washington Post was interested in talking to

22   them we directed them to him.

23        Q.    That's █.  And so who's --

24        A.    Yeah.

25        Q.    -- and they spoke K K, ask her to call
```

Page 261

1    █████████████ ?

2        A.    ███████████     I believe is the chief of

3    staff at HUD.

4        Q.    I see.  And you asked another HUD

5    person and she says yes.

6        A.    Uh-huh.

7        Q.    And then the next page --

8        A.    Now whether --

9        Q.    Go ahead.

10        A.    Sorry.  So whether they did or didn't,

11    I don't know.

12        Q.    Now on the next page it says, gov

13    called editor and she says text.  I'm on with

14    Vince.

15        A.    Yes.

16        Q.    What is that a reference to?

17        A.    I was talking to either Josh or his

18    cowriter mentioned the governor had talked to

19    the editor.

20        Q.    The governor called the editor?

21        A.    Uh-huh.

22        Q.    Of the Washington Post?

23        A.    Whoever -- I think the editor who was

24    on duty that day.

25        Q.    I see.  Do you know what he said?

```
                                                  Page 262
 1        A.    No.  Wish I did.
 2        Q.    Is that he did frequently, calling
 3   directly editors, papers?
 4        A.    From time to time.  On this one I
 5   don't know if it's somebody he knew back from
 6   the HUD days or anything.  I just don't know.
 7        Q.    And then on the next page you say,
 8   Jimmy reached out.  Hostile workplace complaint
 9   from Ana Liss, not harassment but now think
10   governor's actions are inappropriate.
11           So is this real time you're getting
12   the call from Jimmy Vielkind and you're
13   informing --
14        A.    Yeah.
15        Q.    -- Melissa about it?
16        A.    Yes.
17        Q.    So what did you do -- what did you do
18   about Ana Liss's allegations?
19        A.    Same thing I believe.  We all got on
20   the phone, we talked this through.
21        Q.    Same group?
22        A.    Similar, yeah.  Maybe a person or two
23   less.
24        Q.    Do you know if you decided to respond
25   in any way?
```

1       A.    I believe we did respond.

2       Q.    Then at some point after that did you

3  come to learn that one of the executive

4  assistants in Albany had alleged that the

5  governor had touched her in the mansion?

6       A.    Yes.

7       Q.    How did you learn of that?

8       A.    Another press inquiry, this one from

9  the Times Union.

10      Q.    And prior to the Times Union inquiry

11  to you had you heard anything about that?

12      A.    Not a thing.

13      Q.    Okay.  So what do you remember

14  receiving?

15      A.    Got a call saying that somebody made a

16  complaint within the last day or so and went in

17  and consulted the counsel.

18      Q.    And did you have an understanding or

19  did you gain an understanding of who it might

20  be?

21      A.    Yes.

22      Q.    Who?

23      A.    Brittany Commisso.

24      Q.    And did you know Brittany Commisso?

25      A.    Not well.

1      Q.   Had you -- how often had you seen her?

2      A.   She was an executive assistant during

3   COVID.  She sometimes ran the nurses station

4   when she wasn't an assistant in the pool.

5   Hello, goodbye, that's it.

6      Q.   Any conversations you've had with her?

7      A.   Hello, goodbye.

8      Q.   Had you ever seen any interactions

9   between her and the Governor?

10      A.   Nothing notable.

11      Q.   And so what did you give consultation

12   including with counsel and then what did you

13   decide to issue a statement?

14      A.   I think eventually that one was

15   responded to by the governor's attorney.

16      Q.   Governor's private attorney?

17      A.   Correct.

18      Q.   Let me show you tab -- by the way, did

19   you do anything to -- let me step back.

20           Do you have any personal knowledge of

21   the allegations made by that complainant?

22      A.   I do not.

23      Q.   You do or do not?

24      A.   I do not.

25      Q.   Okay.  And did you do anything to

Page 265

1  inquire about the truth of her allegations?

2       A.    I believe at a certain point, you

3  know, I alerted the right people at a certain

4  point this guy handed over to the governor's

5  attorney for them to work out.

6       Q.    So if you look at tab 54 --

7            MR. E KIM:  What volume?  Binder one?

8            MR. J KIM:  Sorry.  Binder two.

9            MR. E KIM:  Tab 54?

10            MR. J KIM:  Yeah, 54.

11       Q.    There's an E-mail from Stephanie

12  Benton at the bottom.  It says, as I said

13  yesterday, I've never done anything like this.

14  The details of this report are gut wrenching and

15  completely untrue.  I'm not allowed to defend

16  myself publicly because of the review but I'm

17  confident in the result of the attorney

18  general's report.

19            Do you see that?

20       A.    Uh-huh.

21       Q.    And it comes from Stephanie Benton.

22       A.    Uh-huh.

23       Q.    What was your understanding of what

24  this was?

25       A.    This was probably something from the

                                              Page 266

1   governor.

2        Q.   Was it common for E-mails from the

3   governor to come from Stephanie Benton?

4        A.   I wouldn't say so but in this one, I'm

5   sure they wanted to get something in front of

6   the group.

7        Q.   Right.  So your understanding this was

8   something being sent to you as a possible

9   statement that the governor would issue?

10       A.   Something to get an opinion on.

11       Q.   Okay.  And Steve Cohen says, take out.

12  Completely untrue.  Rich A version.  See that?

13       A.   I must have spitballed something as a

14  starting point but eventually got handled by his

15  attorney.

16       Q.   Do you know why he said take out,

17  completely untrue?

18       A.   I don't know.

19       Q.   And you said --

20       A.   I think, I believe --

21       Q.   Go ahead.

22       A.   -- that was probably -- it was

23  probably the lawyer and him probably talking.

24       Q.   And you said you had spitballed a

25  statement.

1        Did you -- did your statement include
2   a denial of the allegations?
3        A.   I can't remember.  Is there a record
4   of it?
5        Q.   I'm not sure if we've seen it but --
6        A.   Okay.  Maybe I said something over the
7   phone, maybe I said something to someone at
8   another medium, but again, eventually it got
9   taken out of our hands and the lawyers just
10  dealt with it.
11       Q.   How did you know that they were
12  untrue?
13       A.   Somebody talked to the governor.  He
14  denied it.
15       Q.   You heard that, you heard that he
16  denied it?
17       A.   Yeah, and I believe we said as much.
18       Q.   Do you know if anyone had asked her?
19       A.   At that point she had gotten her own
20  attorney, Mr. Kim.
21       Q.   This is the question --
22       A.   And I believe --
23       Q.   Do you know -- and?
24       A.   I believe there was --
25       Q.   Sorry --

1      A.    I think someone did talk to her

2  attorney, attorney to attorney.  I don't know

3  the contents of that information.

4      Q.    And do you know what report if any was

5  made of this allegation?

6      A.    We had an -- we had an obligation to

7  inform them that if this is a, if this was an

8  allegation of a physical crime to inform the

9  attorney of their right to file a police report.

10  They denied it from what I understand.  And I

11  believe our counsel contacted Albany police to

12  alert them of the existence of the allegation.

13  I believe they went back, my reading from press

14  reports and from what I think being thrown

15  around at the time was APD reached out to the

16  attorney and they declined to file a criminal

17  complaint.

18      Q.    How did you learn all this?

19      A.    Some of it APD said publicly, some of

20  it I believe I was told while we were -- while

21  we were considering facts.

22      Q.    If you look at tab 47 of binder one.

23      A.    When this is all over, Mr. Kim, I'd

24  love to know, I'd love to know what the process

25  was for determining the numbers here.

1     Q.   There's nothing scientific.  We were

2   putting together documents that might we might

3   show you and -- and we have obviously gotten it

4   from multiple sources, so it's a little all over

5   the place.  We wanted to keep the sourcing the

6   same and as opposed to chronological.  And one

7   set, binder one is stuff from you.  Binder two

8   is stuff from others.  Binder three is media so.

9   There is --

10        A.   Well --

11        Q.   There is a method to the madness.

12        A.   Fair enough.  Okay.  I'm on -- I'm on

13   41.

14        Q.   47?

15             MR. E KIM:  47.

16        Q.   Binder one?

17             MR. E KIM:  I don't know if we have a

18        47 in that one.

19             MR. J KIM:  Okay.  Can we put that one

20        up.  You know what, sorry.  Hold on.  Is

21        that 47?  My 47 is, my 47 is a Thursday,

22        March 11 text from Rich to Beth Garvey and

23        Melissa DeRosa, RA 1929.  Yeah.

24        A.   Uh-huh.

25        Q.   So you write, I heard from a person

Page 270

1  familiar that Beth called the Albany police

2  yesterday and pushed them to open a criminal

3  investigation to alleged incident in the matter.

4   I feel very confident in the source and am

5  writing a story.  Please call.

6          You are conveying a message from a

7  reporter, right?

8      A.   Either Brendan Lyons or Jimmy Vielkind

9  or Jessie McKinley or all three called me at the

10  same time though I think Brendan Lyons called me

11  first.

12     Q.   So you're reporting what you're

13  hearing and then Beth Garvey is responding

14  saying, push does not accurate?

15     A.   Yes.

16     Q.   As required by policies and protocols.

17  ██████  was -- they referred to complainant's

18  attorneys.  Melissa add (phonetic) routine alert

19  following state mandated procedures.

20          Then once you have this exchange then

21  did you call -- would you call the reporters and

22  convey this information?

23     A.   I believe I did and there was some

24  formal statement we put together too, I think

25  probably from Beth Garvey.

Page 271

1        Q.    Yeah, I think it's tab 11.  That same

2   binder, binder one?

3        A.    Okay.  Yup.

4        Q.    This is again you working, you must be

5   on your own iPad or something and writing to

6   yourself?

7        A.    Correct.

8        Q.    And if you can go to tab 55 in binder

9   two?

10       A.    I mean you're keeping all the good

11   stuff, Counselor.

12       Q.    Huh?

13            MR. E KIM:  We're missing 55.

14            MR. J KIM:  Oh, man.  55 is a long one

15       so Hyatt, you can put up 55 and go to --

16       maybe it's not that long.  This one is not

17       that long.

18            Okay.  It's a text chain, if we can go

19       down to 540 at the bottom.  It's the Bates

20       number 540.  Yup.  You go up a little bit.

21       Go up a little bit more.

22       Q.    So this is a -- this is a chat chain

23   that you are on.  I think RA is you.  This is

24   given actually in a cleaner format and various

25   people, I think LL is Linda Lacewell and Melissa

```
                                                Page 272
 1    DeRosa and various people.
 2              And then there's a report about a
 3    shadow NY Gov Cuomo's office is conducting its
 4    own investigation into harassment.
 5              And then if you scroll down there's a
 6    comment from the lawyer.  The attorney of client
 7    has not filed a complaint asked that his name be
 8    withheld out of concern for viewing her identity
 9    should remain including governor's office and
10    you write, I'm dealing with this.
11         A.   Uh-huh.
12         Q.   What do you -- what do you remember
13    about this?  What were you dealing with?
14         A.   My recollection -- my recollection
15    stuff started spinning in weird ways here.
16    Generally speaking when you get a part of this
17    as well, I believe it has to go through GOER as
18    well.  My conversation -- has to go through GOER
19    as well.  I do have a question about -- I do
20    have a question about privilege.
21              MR. E KIM:  Okay.  Joon, do you want
22         us to confer briefly on this?
23              MR. J KIM:  Why don't we just stay on,
24         you can go on mute.
25              THE WITNESS:  That's fine.
```

Page 273

1          MR. E KIM:  Hold on a second.

2          (Discussion held off the record.)

3     A.    Okay.  Counselor, I was talking about

4 Beth Garvey about how to deal with this.  I was

5 advised by counsel that the contents of that

6 conversation are -- do fall under privilege but

7 I think there was some changes in that time

8 during the story that reflected our point of

9 view.

10    Q.    And the "this" that you consulted with

11 her on was this claim that the executive chamber

12 was conducting its own investigation?

13    A.    Yes, which was a specious argument and

14 there's some -- there was some back and forth

15 but it is subject to privilege that I'd like to

16 tell you about but I defer to counsel.

17    Q.    Okay.  Then did there come a time when

18 you learned of allegations that Kaitlin ▓▓▓▓

19 was making?

20    A.    I didn't know her very well.  I

21 heard -- I saw that stuff in the context of the

22 New York Magazine piece.

23    Q.    Did you know Kaitlin ▓▓▓▓?

24    A.    I met her maybe once or twice.  She

25 worked briefly in the downstate office when I

Page 274

1   was definitely at the upstate office.

2       Q.   And any observations that you had of

3   interactions between her and the Governor?

4       A.   None.

5       Q.   Did you have any knowledge about how

6   she was hired?

7       A.   No, not until the New York Magazine

8   piece came out.

9       Q.   And then how about why she left?

10      A.   Nope.

11      Q.   And then after the New York piece --

12  the New York Magazine piece came out, did you

13  have discussions with people about how she was

14  hired?

15      A.   Enough to formulate an answer in the

16  piece.

17      Q.   And who did you discuss that with --

18  sorry.

19      A.   I discussed it -- I'm sorry, I

20  discussed it with the team -- I discussed it

21  with the team.  I discussed it with the team.

22  We consulted with counsel's office and what was

23  reflected in the piece I believe which was that

24  she came highly recommended from ███████    at

25  a time when we were looking for new people.

Page 275

1        Q.    And had you heard that the governor

2    had seen her at an event?

3        A.    Only in the context of the piece.

4        Q.    If you look at tab 39, binder one?

5        A.    Okay.

6        Q.    This is this text chain.  Liz Smith

7    says, I can't hear anything.  Melissa, don't

8    speak.  Are you on?  Liz Smith says, looks like

9    I lost it at the lumberjack.

10            Is this -- what is this a text chain

11   while you're on a call?

12       A.    Yes.

13       Q.    Do you think this was for one of the

14   group calls that you were having at this time?

15       A.    This was -- this was -- we knew this

16   New York Magazine piece was coming out.  We knew

17   it was going to be long.  We knew it was going

18   to be slanted towards one perspective, you know,

19   and I -- while getting the facts I wanted

20   Liz's -- I wanted Liz's 2 cents.

21       Q.    And Liz says, on the second page, make

22   it painful for her, guys.

23       A.    Liz says that?

24       Q.    You see at the top of page two?

25       A.    This was the fact checker who was

1  giving me very little time on the piece and just

2  wanted to send me an E-mail.  I wanted a phone

3  call so we can actually discuss what was in the

4  piece, figured there was some stuff we could

5  knock out while in basic conversation for a

6  reporter who is a fact checker who was writing a

7  cover story about the governor, we all got very

8  aggravated.  She didn't want to talk, instead

9  she wanted to send me an E-mail and give me an

10  hour to respond.  We all thought that was -- we

11  all thought that not playing on a spool

12  (phonetic).

13      Q.   And make it painful for her as the

14  reporter?

15      A.   Make the fact checker.

16      Q.   And then Liz Smith says, Rich, stop,

17  you're being absurd.  Find the right balance.

18           What is she talking about?

19      A.   Well, you know, she'd say a sentence,

20  I diagrammed the sentence.  I'd asked her what

21  she meant by that, asked her what she meant with

22  this.  I think you find common cause with her

23  today, Counselor.

24      Q.   Sorry.  So this is -- what are you

25  listening in on?

1      A.    Nothing?  You got nothing?

2      Q.    I'm just neutral.  Just want to -- I

3  guess I'm trying to understand.  Are Liz, you

4  and Peter dialed into a call?

5      A.    We're all talking.  No.  I'm on the

6  phone with the New York -- with the New Yorker

7  Magazine fact checker.

8      Q.    You're actually on the phone and

9  they're listening in --

10     A.    They're listening because I want

11 their -- I want their insight into and how to

12 respond to this stuff and the person called, you

13 know, she sent me an E-mail, didn't send me

14 specifics.  Just said I'll send you something in

15 an hour.  I called her back.  I got her on the

16 phone, I said can't we just talk?  She was -- it

17 was a reporter who refused to talk and then we

18 finally got her to talk.  And then yeah, I may

19 have been cross examining some of what was

20 getting reported a little bit more to the point

21 where Liz said, I was, you know, I was talking

22 too much.

23     Q.    I see.  So she's telling you stop

24 that.  That you were -- you were cross-examining

25 her?

1      A.   Yes.  I thought I was being perfectly

2  fine for what it's worth.

3      Q.   And then did someone else take over

4  the call, Peter or Melissa?

5      A.   No.

6      Q.   Then Peter says, she's muting Rich's

7  phone when she does that.  Melissa, I can hear

8  you.  I guess Melissa was talking and were you

9  guys in a room together or something?

10     A.   We're in the room together, yeah.

11     Q.   I see.  And what is -- at the end of

12  it Liz Smith's reactions, I'm having a panic

13  attack.  I can't breathe.  What was going on?

14     A.   Well, here's one of the things where

15  it was -- where it paid to be on the phone.

16  This is a front page New York Magazine story

17  that was allegedly very highly -- it was very,

18  very deeply reported.

19          I got my own opinions on the piece.

20  And then -- and then they referenced and in the

21  piece they referenced Linda Lacewell as Linda

22  Lovelace if you look her up -- if you look

23  earlier, I stopped her in her tracks and she got

24  mortified.

25     Q.   I see.  So she you got -- she got

1   Linda Lacewell's name wrong?

2       A.    Embarrassingly so.

3       Q.   Can you go to -- can we go to --

4   actually --

5           MR. E KIM:  Joon, are you -- I guess

6       when you hit a natural point, maybe we can

7       take a brief break.

8           MR. J KIM:  Yeah, I think this is a

9       good time and then I think just to give you

10      a heads up probably, if we take a

11      five-minute break, maybe an hour more I

12      think we'll been done by five.

13          THE WITNESS:  Okay.

14          MR. J KIM:  So I can't promise you

15      know, but that's what it looks like.

16          MR. E KIM:  Okay.

17      A.   I'll do my best.

18          MR. E KIM:  So 3:50 we'll get back on.

19          THE VIDEOGRAPHER:  Stand by.  The time

20      is 3:46.  We're going off the record.  This

21      will end media unit number five.

22          (Short recess taken.)

23          THE VIDEOGRAPHER:  The time is

24      3:56 p.m.  We are back on the record.  This

25      will be the start of media unit number six.

1          Counsel.

2          Q.    Can you turn to tab 36 in binder one?

3          A.    Okay.

4          Q.    This is a text exchange between Marina

5     Villenueve and you?

6          A.    Well, it's pretty one-sided.

7          Q.    Sorry.  Yeah, all from -- all from her

8     but it's to you?

9          A.    Yes.

10         Q.    Who is she?

11         A.    She is a correspondent from the AP.

12         Q.    And do you remember receiving this

13    inquiry from her?

14         A.    Not particularly.

15         Q.    She asked --

16         A.    If you look at my records she texts me

17    a lot.

18         Q.    She asks, why is the governor calling

19    up lawmakers to warn calling for his resignation

20    or could threaten the AG's investigation.

21               Is it your understanding that the

22    Governor was calling law makers and saying that?

23         A.    Not particularly.  Did I have -- did I

24    have a press request on this?

25         Q.    Yeah, she asks --

1      A.   I know.  I'm curious.  She must have

2    saw something on Twitter.  That's usually where

3    she gets her stuff from.  They're the documents

4    that refresh my memory on this.

5      Q.   Not that I've -- I've seen or we've

6    seen.

7      A.   Okay.

8      Q.   You don't remember inquiring about

9    that or becoming aware that he was doing that?

10     A.   I don't.  Not to say I didn't get

11   inquiries.  I just don't.

12     Q.   I guess my question is not whether you

13   got inquiries but whether you knew, either

14   checked with the governor or an executive

15   chamber about whether he was doing that?

16     A.   No.

17     Q.   Because you don't know one way or the

18   other?

19     A.   I don't.

20     Q.   Can you turn to tab 45 of the second

21   binder.

22     A.   Okay.

23     Q.   And in response to the statement that

24   Charlotte Bennett's concerns were treated with

25   sensitivity and with respect and in accordance

Page 282

1    with the law and policy, Bernadette has a number

2    of questions about Judy Mogul and Jill

3    deRosiers's review?

4         A.    Uh-huh.

5         Q.    And also has the question to you or --

6    sorry, to ████████████ copying you and Peter, why

7    wasn't this complaint handled by GOER in the

8    first place so the executive chamber break its

9    own rules.

10             Do you remember fielding that request?

11        A.    Vaguely.

12        Q.    And what did you -- what did you

13   learn?

14        A.    I don't think -- I think -- I think

15   that the decision was to let that question play

16   out during this investigation, Counselor.

17        Q.    Did you inquire about whether the

18   complaint should have been raised with GOER or

19   reported to GOER?

20        A.    I had a conversation about this which

21   was part of the initial response to Cheryl [sic]

22   Bennett's initial complaint that was done --

23   that was done with counsel.

24        Q.    So you are asserting privilege?

25        A.    I'm asserting privilege.

```
 1            MR. J KIM:  And let me -- Hyatt, can
 2       you show 35106 is one of the documents we
 3       got overnight from executive chamber.
 4       Q.   And similar theme this time from
 5  Josefa Velasquez about the Cuomo administration
 6  flouting its own harassment policies with
 7  respect to GOER.
 8            Is it -- is it the same answer that
 9  any discussions about that would be privileged?
10       A.   Correct.  Any discussions about that
11  with me about would be privileged.
12       Q.   And then second question's about the
13  leaking of Lindsey Boylan personnel information
14  or the providing of it.
15            Any discussions at this time in March,
16  in following up on requests like this that you
17  can talk about in terms of what you learned
18  about whether or not it's --
19       A.   Ultimately I can't remember if i was
20  in response to this inquiry but ultimately and
21  on the record statements from Beth Garvey was
22  issued in consultation with counsel that
23  reflected the thoughts -- that reflected the
24  thoughts of the administration.
25       Q.   Did you -- sorry -- let me just check,
```

Page 284

1    had you received --

2              MR. J KIM:   We can take that down,

3         Hyatt.

4         Q.    -- had you received inquiries from the

5    media about the relationship between ███████████

6    ███████████and the governor?

7         A.    When?

8         Q.    At any point?

9         A.    One.

10        Q.    Oh, one, sorry.   I thought you said

11   when.   When?

12        A.    This would be the ███████████ I

13   believe.

14        Q.    What did they ask?

15        A.    They had some ███████ as they described

16   to us that showed something that turned out did

17   not show and ███████████had to go -- and ███████████

18   had to go on the record denying a relationship

19   with the governor.   I know I keep my answers

20   short but I imagine that was a mortifying

21   experience for her.

22        Q.    Have you heard of any rumors other

23   than ██████████████████████████████, that

24   called you about the governor having a

25   relationship with ██ Senior Staffer #1 ██?

1      A.    Political opponents tried to shop this

2   around in 2018.  It's not true.

3      Q.    How do you know it's not true?

4      A.    I know.  I asked her.

5      Q.    What did you ask her?

6      A.    I asked her if this was true.

7      Q.    And what did she say?

8      A.    It had been going around.  She said

9   absolutely not and it's also insulting and

10  sexist for someone, written to someone to

11  explain a way a woman getting in to a high power

12  position like that she has to sleep with her

13  boss.

14     Q.    Have you asked the governor?

15     A.    No.

16     Q.    Are you aware of the governor having

17  relationships with any -- any staffer or any

18  state employee?

19     A.    No, sir.

20     Q.    Have you asked him?

21     A.    We've -- I have.

22     Q.    When did you ask?

23     A.    When we had the deal with this New

24  York Post story that was -- that was very, very,

25  very flimsy.

Page 286

1      Q.    Which New York Post story?

2      A.    The one about him and Sandra.  Was

3   about two months ago.

4      Q.    And what did you ask about him?

5      A.    For the conversation asked and we had

6   to ask him directly and if he ever had -- if he

7   ever had an inappropriate relationship or any

8   relationship with the staffer.  He said no.

9            I may have asked him through his

10   attorney.  I just want to revise that.  I'm

11   sorry.

12      Q.    So you asked him through his attorney?

13      A.    I may have asked him -- we may have

14   asked him through his attorney, yeah.

15      Q.    Which one?

16      A.    Rita.

17      Q.    Rita Glavin?

18      A.    Yeah.

19      Q.    Prior to that had you ever asked him

20   or do you know if anyone asked him?

21      A.    Prior to that he was asked publicly

22   and he said no.

23      Q.    Can you turn to tab 44 of binder two.

24      A.    Yup.

25      Q.    And this is an E-mail from Liz Smith

Page 287

1  or between you and Liz Smith and copying Danny

2  Labor and Melissa DeRosa and Peter Jim in USA

3  Today asking her whether she's part of the team

4  advising Cuomo.  She responds, this would be

5  bad.  You say, yeah, don't, and she says this

6  would be bad for my credibility and yours.

7         What did you understand her to mean?

8         A.   There was rumor that she was talking

9  to reporters on the outside about what she

10  thought about this and she didn't necessarily

11  want people -- people knowing -- figured it

12  would hurt her credibility if they thought that

13  she was talking, if that she was also giving us

14  advice at the same time.  She's kind of giving

15  us under tree (phonetic).

16         Q.   I see.  So was she also talking on the

17  outside on the record or --

18         A.   I think.  No, reporters were calling

19  her.  Again, Mr. Kim, I go back to what I said

20  earlier.  Everybody in our world spends the

21  entire day on the phone talking to each other.

22  Probably not healthy but that's what we do.

23  Reporters, people in my side of the world, you

24  know.

25         Q.   So was there a view better for both

1  her and your credibility that it not be known

2  that she's consulting?

3      A.   I mean, she's offering advice.  I

4  wouldn't call it consulting but that's obviously

5  her view.  I'm pretty agnostic towards it

6  because she was part of us anyway and she seems

7  part of us, you know, I'm not going to tell her

8  how to do her business.

9      Q.   I know we've covered this ground in

10  the context of other questions but let me ask

11  you about your observations from being in the

12  executive chamber the years that you have.

13          First, about the governor's conduct.

14  Have you ever seen him hug anyone?

15      A.   Yes.

16      Q.   In what context have you seen him hug

17  anyone?

18      A.   Guests, visitors, people he hadn't

19  seen in a while, people at events.

20      Q.   Staffers too?

21      A.   Less so, he sees those guys every day.

22      Q.   Sorry?

23      A.   I said not really, he -- you know, he

24  sees us every day.

25      Q.   How about kissing?

1    A.   I've seen him kiss people on the cheek

2  at events, staff -- not staff but like visiting,

3  visiting people, social situations.  I mean

4  listen, he's the youngest of like the last

5  generation of politicians that were a lot more

6  back slapping, a lot more gregarious, a lot more

7  courtly.  I think he's actually addressed that

8  times have changed, norms have changed and need

9  to be more careful.

10          I slipped a little bit, add in,

11  Counselor, you can keep going.

12    Q.   Have you seen him kiss men and women?

13    A.   I've seen him kiss men on the cheeks.

14    Q.   Who?

15    A.   Like guys he's known for 20, 30 years,

16  you know.

17    Q.   Like --

18    A.   Like a Ken Dowling type, you know,

19  like Michael -- Michael Dowling type or Al Gore.

20  There is a picture of him in his office kissing

21  Al Gore on the cheek.

22    Q.   Have you seen him kiss anyone on the

23  lips, in the mouth?

24    A.   No.

25    Q.   Have you heard of him ever kissing

Page 290

1  anyone on the lips or mouth or someone else

2  seeing it?

3      A.   No.  To amend the last question, I

4  suppose I have seen him kiss Sandra Lee on the

5  lips.

6      Q.   Any one other than Sandra Lee?

7      A.   No.

8      Q.   Have you heard -- have you seen anyone

9  sitting on his lap?

10     A.   No.

11     Q.   And have you heard of anyone seeing

12  that?

13     A.   I heard that someone was spreading a

14  vicious rumor about that.

15     Q.   And what did you hear?

16     A.   I heard there was someone saying that

17  someone saw a staffer sitting on his lap at a

18  Super Bowl party a couple years ago.  I was

19  there.  I didn't see it.

20     Q.   And where did you hear that that rumor

21  was being circulated?

22     A.   Press, during the height of the silly

23  (phonetic) season --

24     Q.   In the height of the what?

25     A.   The silly season, the height of like

Page 291

1    us getting kicked in the teeth every day with
2    like weird stories about hostile work place.
3         Q.    Have you ever -- have you ever seen
4    him with his head in the lap of any staffer?
5         A.    No.
6         Q.    And have you heard of anyone seeing or
7    hearing anything like that?
8         A.    No.
9         Q.    Have you heard the governor commenting
10   on people's appearance?
11        A.    Personally me.
12        Q.    What did he -- what did he say?
13        A.    I hadn't seen him in a couple of
14   months, he'd been down. ███████████████████
15   no joke.
16        Q.    ████████
17        A.    ████████
18        Q.    And what did he say?
19        A.    He was very impressed. ████████████
20   ████████████████████████████████████████████
21   ████████████████████████████.
22        Q.    Other than you, have you heard him
23   commenting on anyone's appearance?
24        A.    No.
25        Q.    Have you heard him -- go ahead.

```
                                                  Page 292

 1        A.    I'm sorry.  It was like I heard many

 2   stories in the media about it.  I personally

 3   haven't.

 4        Q.    Have you ever heard him refer to a

 5   staffer as being beautiful?

 6        A.    No.

 7        Q.    Have you heard anyone say that he had

 8   said that?

 9        A.    Only in the press.

10        Q.    Do you know ███████████ is?

11        A.    Yes.

12        Q.    How do you know her?

13        A.    She used to work with me.

14        Q.    And did she ever say anything to you

15   about the governor saying that to her?

16        A.    No, I don't think she has.

17        Q.    Where is ███████████ now?

18        A.    Last I checked she was in the state

19   education department.

20        Q.    Have you heard of the governor -- have

21   you heard the governor ever comment on people's

22   clothing?

23        A.    He tells me I need a shoe shine.  You

24   know, if I get a new pair of shoes or suit, he

25   notices.
```

Page 293

1      Q.   How about women?

2      A.   I don't think I've -- you know, maybe

3  occasionally he'd say oh, you look nice day but

4  you know, nothing crazier than that.

5      Q.   Have you ever heard him make any jokes

6  or comments with sexual innuendos?

7      A.   I have not.  I have not in person both

8  in loose private events and in the office, I

9  just haven't.

10     Q.   Has he ever commented to you about

11  trying to develop a one line, a good one liners

12  for him to use in press conferences or

13  otherwise?

14     A.   Yeah, I'm usually not that good at it.

15     Q.   Did he ever suggest or say anything to

16  the effect of, you should develop a line like,

17  yeah, this is like sex without the orgasm or

18  something of that nature?

19     A.   No.

20     Q.   You don't remember him saying anything

21  like that?

22     A.   No, I don't remember him saying that.

23     Q.   Have you ever seen him or heard of him

24  asking someone to sing a song?

25     A.   No.

Page 294

1      Q.    How about memorize song lyrics?

2      A.    Nope.  I've read a written report in

3  regard to that but I have no knowledge.

4      Q.    You mean press reports?

5      A.    Yes.

6      Q.    How about commenting on people's sex

7  drive?  Have you ever seen him or hear him say

8  that?

9      A.    No.

10      Q.    Have you ever had -- heard him joke or

11  say to people, can you find me a girlfriend?

12      A.    Nope.

13      Q.    Have you heard him comment on anyone's

14  tattoos or tattoos in general?

15      A.    Yeah, I guess some of the fortunate

16  ones.

17      Q.    What?  Sorry.  I couldn't hear you.

18      A.    ███████████████████████████████████.

19      Q.    ██████████████████████████████████?

20      A.    ██████.

21      Q.    █████████████████████████████?

22      A.    ████████.

23      Q.    And --

24      A.    He wanted to know what they were and I

25  explained to him ███████████████████████████████

Page 295

1  ████████████████████████████████

2  ████████████████████████████████████

3  █████████████████████████████████████

4  ██████████████████

5      Q.   How about any comments he's made to

6  anyone else about their tattoos?

7      A.   I don't think -- I don't know anybody

8  that has visible tattoos that are in our

9  chamber.

10     Q.   How about outside the chamber?

11     A.   Sorry, Counselor, I have no idea.

12     Q.   Are you aware of any instances where

13  the governor met people and then asked that, you

14  know, they find them through pictures and get

15  them to come work in the executive chamber.  You

16  heard anything like that?

17     A.   No, I have not.

18     Q.   Have you heard him commenting on the

19  size of his hands?

20     A.   Have not.  I read that report.

21     Q.   Other than that?

22     A.   No.

23     Q.   Have you ever heard him yell at

24  anyone?

25     A.   He's yelled at me on occasion.

1       Q.    About what?

2       A.    Oh, you know, some work products, I

3   ran into disagreements with him in the past.

4   Sometimes he yells, sometimes I yell.

5       Q.    Okay.  Anyone else?

6       A.    Sure.  I'm sure it's happened.

7   Nothing crazy comes to mind.

8       Q.    How about get angry at anyone?

9       A.    I mean, I've seen him get frustrated.

10  Absolutely.

11      Q.    Okay.  To whom?

12      A.    To staff, to others around him, you

13  know, but I mean, sir, he's a human too.

14  Sometimes people get frustrated.

15      Q.    And you've said that you haven't seen

16  him throw anything at anyone?

17      A.    I hadn't seen him throw anything at

18  anyone.  No apricots, no bananas, no pretzels,

19  no household objects.

20      Q.    You haven't heard of it?

21      A.    I haven't heard of it.

22      Q.    What devices were you -- have you been

23  issued by the executive chamber that you use?

24      A.    I get -- I have a BlackBerry that I

25  use.  I have a computer at my desktop and I have

Page 297

1  an iPhone that I don't -- that I rarely use.  It

2  stays at home.  I use it -- I use.  My

3  BlackBerry is being serviced.

4       Q.   Do you still use a BlackBerry?

5       A.   I do.

6       Q.   And you use that to pin?

7       A.   Yeah, I'm not a huge pinner though.  I

8  mean, if I need to talk to him, I pick up the

9  phone.

10      Q.   And do you know if your pin has been

11  searched for documents responsive to our

12  subpoena?

13      A.   Whether my pins have been searched?

14      Q.   Or your BlackBerry?

15      A.   My BlackBerry?  My BlackBerry was

16  actually was being serviced when that thing came

17  through.  Computer services has it.  I don't

18  know if they're able to pull anything off of it.

19      Q.   Service for because of problems?

20      A.   It's not working.

21      Q.   And did you ever get it back?

22      A.   I got a new one.  At some point I

23  believe to cooperate with your investigation

24  everyone who had a BlackBerry had it taken and

25  issued new ones.  At that time I had issued a

Page 298

1  new one.

2       Q.   I see.  And you don't know if your old

3  one was searched?

4       A.   I don't know if they were able to get

5  anything off it.  That was a question for

6  computer services.

7       Q.   But your personal iPhone was on, I

8  understand it was on 30 day auto delete?

9       A.   Correct.

10      Q.   Is that right?

11      A.   I said correct.  Did you ask a

12  follow-up?

13      Q.   Yeah, I was saying is that right but

14  we spoke over each other.

15      A.   Yes, yes.

16      Q.   And is that something that -- well,

17  why did you have it on 30 day auto delete?

18      A.   You know, I don't know.  I forgot I

19  had it.  I believe four iPhones ago back when

20  storage was an issue, I was running out of

21  space.  Realized that text messages were taking

22  up a lot of my space.  I put on the auto delete

23  then and I think it's like three iPhones later,

24  storage space is not really a problem anymore

25  but it remained, you know, when phones get

1  transferred, settings get transferred.

2      Q.   Were there any policies that you were

3  aware of within the executive chamber about

4  document retention?

5      A.   Yes.

6      Q.   What -- what policies are you aware

7  of?

8      A.   The chamber -- the chamber had a

9  document has a document retention policy that

10  about 29 pages it's publicly available.  It

11  lists -- it lists all the documents that should

12  be -- that should be preserved.

13      Q.   And were you complying with those

14  requirements?

15      A.   I was to the best of my ability.

16      Q.   What is it your understanding of what

17  type of documents needed to be preserved?

18      A.   Press releases, government orders,

19  executive orders, documents and reports, things

20  along those lines.  Most of them I would say, I

21  would say I'm probably not the proud custodian

22  of any of those.

23      Q.   But how about just exchanges with

24  other people in the executive chamber about

25  office business?

1        A.    We followed the state archive policy

2   which was adopted by executive chamber that by

3   and large E-mails are -- E-mails are the

4   equivalent of post it notes.

5        Q.    Meaning what?

6        A.    Meaning I don't routinely save them.

7        Q.    Were you the subject of any document

8   holder or retention notices?

9        A.    I was.  Yes.

10        Q.    When was that?

11        A.    That was I believe -- I believe in --

12   told to put my system about a year ago and

13   change related to various civil suits related to

14   pandemic.

15        Q.    But when did you take your cell phone

16   off of 30 day auto delete?

17        A.    When -- well, I got the document

18   request.  I handed it to -- I sent it to the

19   chamber counsel at the time.  About a week later

20   we had a call about it.  He told me to check.

21            MR. E KIM:  Richie, you shouldn't get

22        into what he told you.  Maybe you can just

23        as a result of the conversation what you

24        did.

25        A.    As a result of the conversation --

Page 301

1    thank you, Ed -- as a result of the

2    conversation, I checked my phone and auto delete

3    was on which I wasn't aware of.  I wasn't aware

4    of it.  I didn't remember until he told me to

5    look for it.

6         Q.   So it's recently in connection with

7    our document request that you changed it to get

8    rid of the 30 day delete?

9         A.   Yes.

10        Q.   During the period prior to that when

11   you were on a document hold, it had been getting

12   deleted automatically?

13        A.   Yes, but the litigation hold was just

14   for my E-mails.

15        Q.   It didn't include text?

16        A.   Nope.  And I wasn't formally aware of

17   the litigation for quite sometime.

18        Q.   And who had issued the litigation

19   hold?

20        A.   ███████████  our former counsel.

21        Q.   This was in connection with the

22   various investigations in to nursing homes,

23   things like that?

24        A.   No.

25        Q.   What was --

1      A.    This was, I believe it was -- again

2   you should talk to her because I'm not a lawyer

3   here but I was told it was a civil hold in

4   relation to perspective lawsuits.

5      Q.    About?

6      A.    So COVID.  COVID pandemic, like

7   purchasing, procurement, anything else that may

8   come up.  I was told that it was a proactive

9   step she took, not in direct relation to any

10  particular suit.

11     Q.    So you have not received any retention

12  notice in connection with, for example, the

13  nursing home related investigation?

14     A.    I don't believe I'm a party to any of

15  that investigation, sir.

16     Q.    Or any other investigation that's

17  going on other than ours?

18     A.    You guys are number one.

19     Q.    Is there anything else that you think

20  might be relevant to our investigation that you

21  know you'd like to tell us?  And also as I said

22  at the beginning, give you an opportunity to

23  make a statement on the record or I'll start

24  with, is there anything else other than any

25  potential statement?

```
                                              Page 303

1          A.   I don't want to make my lawyer

2    nervous, sir.  I'm okay.

3          Q.   He doesn't get that nervous easily,

4    Ed, so.

5          A.   I know.

6          Q.   How about do you want to make a

7    statement of any kind?

8          A.   I don't think so.  I think everything

9    I would have said I happened to slip into the

10   testimony.

11              Listen, I'm proud of the work I've

12   done here.  I'm proud of the people here.  I'm

13   proud of the -- I'm proud of what we've done for

14   the people of New York.

15              I do think there are some -- I do

16   think some of these complaints are politically

17   motivated and are driven.  I think I made those

18   points a couple times today.  I won't repeat

19   every last instance to you.  I think you

20   understand what my perspective is.

21         Q.   You've said some of them are

22   politically driven.  You clearly said a number

23   of times, Lindsey Boylan's.  Who else do you

24   think is politically driven?

25         A.   Well, I think Karen Hinton is writing
```

Page 304

1    a book.

2         Q.   Okay.  Anyone else?

3         A.   I think -- I think the -- I think the

4    rest of them, you know, bears some -- bears some

5    investigation.  That's why the governor

6    authorized this investigation and that's why you

7    guys are doing the work you're doing.

8              MR. J KIM:  All right.  Well, thank

9         you for your time.  I'll conclude by

10        reminding you that under executive law

11        63(8), you know, we ask you and information

12        that you've obtained through our questions

13        is confidential and you should not disclose

14        it to anyone and, if you, you know, if you

15        think of anything or if you need to come

16        back to us with additional information, you

17        know, you can contact your lawyer and he

18        can get in touch with us.

19             THE WITNESS:  Okay.

20             MR. J KIM:  All right.  Let me -- let

21        me pause for a second is to make sure,

22        Hyatt, make sure I didn't miss anything.

23             MS. MUSTEFA:  I don't believe so.

24        There's nothing on my end.

25             MR. J KIM:  Thank you.  And I know

1      you're quite interested in the manner in

2      which the binder was organized but I think

3      I told Ed before the reason we sent it

4      over.  Normally when we were in person we

5      would have shown it to you and taken it

6      back.  But, you know, I'd ask for you to

7      hand over your copy to Ed and Ed, you can

8      either just destroy it, delete it, destroy

9      it or send it back to us, whatever is

10     easier for you but you're not to keep a

11     copy.

12          THE WITNESS:  Okay.

13          THE VIDEOGRAPHER:  Anybody else?

14     Stand by to go off the record.  This

15     concludes today's deposition of the witness

16     06232021.  The number of media units used

17     is six.  They'll been retained by Veritext

18     Legal Solutions.  We are going off the

19     record at 4:30 p.m. eastern standard time.

20     Stay safe everybody.

21          (Time noted: 4:30 p.m.)

22

23

24

25

Page 307

1

2                    C E R T I F I C A T E

3

4     STATE OF New York)

                              :ss

5     COUNTY OF RICHMOND)

6

7          I, RITA M. PERSICHETTY, a Notary Public within

8     and for the State of New York, do hereby certify:

9          That RICHARD AZZOPARDI, the witness whose

10    deposition is hereinbefore set forth, was duly sworn

11    by me and that such deposition is a true record of

12    the testimony given by such witness.

13         I further certify that I am not related to any

14    of the parties to this action by blood or marriage;

15    and that I am in no way interested in the outcome of

16    this matter.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18    this 30th day of June, 2021.

19                      _____

20                      _____

                              RITA M. PERSICHETTY

21

22

23

24

25