# EXHIBIT 12

Impeachment Investigation Report to Judiciary Committee
Chair Charles Lavine and the New York State Assembly
Judiciary Committee

Davis Polk & Wardwell LLP
November 22, 2021

Executive Summary ............................................................................................... 1
I.    Introduction .................................................................................................. 5
   A.   Chronology of Relevant Events ............................................................ 5
   B.   Impeachment Standards ........................................................................ 6
II.   Summary of Investigative Steps ................................................................ 7
   A.   Due Process to Former Governor Cuomo ............................................ 8
   B.   Information from Senior Executive Chamber Employees..................... 9
III.  Sexual Harassment ................................................................................... 10
   A.   Overview .............................................................................................. 10
   B.   Allegations by State Employees .......................................................... 10
      1.   Charlotte Bennett ........................................................................ 10
      2.   Lindsey Boylan ............................................................................ 10
      3.   Brittany Commisso ...................................................................... 11
      4.   Ana Liss ....................................................................................... 11
      5.   Alyssa McGrath ........................................................................... 11
      6.   Kaitlin .......................................................................................... 12
      7.   State Entity Employee #2 ............................................................ 12
      8.   Trooper #1.................................................................................... 13
   C.   Allegations by State-Affiliated Entity Employee ............................... 13
      1.   State-Affiliated Entity Employee #1 ........................................... 13
   D.   Allegations by Non-State Employees .................................................. 13
      1.   Virginia Limmiatis ...................................................................... 13
      2.   Anna Ruch .................................................................................... 13
      3.   Sherry Vill................................................................................... 14
   E.   Analysis of Sexual Harassment Allegations Against Former Governor Cuomo.. 14
      1.   The Legal Standard ...................................................................... 15
      2.   Former Governor Cuomo's Understanding of the Law Regarding Sexual
Harassment .............................................................................................. 15
      3.   Examples of Former Governor Cuomo's Extensive Misconduct.................. 16
      4.   Additional Allegations Against Former Governor Cuomo.............................. 24
IV.   Publication of *American Crisis: Leadership Lessons from the COVID-19
Pandemic* ........................................................................................................... 25
   A.   Overview.............................................................................................. 25
   B.   Investigative Steps .............................................................................. 27
   C.   Former Governor's Lack of Cooperation and Response ..................... 27
   D.   Relevant Facts ..................................................................................... 28
      1.   Initial Outreach, Auction and Contract Negotiations .................. 28
      2.   Public Statements by Then-Governor Cuomo ............................. 28
      3.   JCOPE Approval........................................................................... 29
      4.   Drafting Process........................................................................... 31
      5.   Audio Recording........................................................................... 34
      6.   Promotional Activities ................................................................. 34
   E.   Conclusion ........................................................................................... 36
V.    Disclosure of Nursing Home Information ................................................ 36
   A.   Overview.............................................................................................. 36

B.   Investigative Steps ...................................................................... 37
C.   Former Governor's Lack of Cooperation and Response .................... 37
D.   Background .............................................................................. 37
E.   Initial Reporting of Nursing Home Fatalities ................................ 38
F.   July DOH Report ...................................................................... 39
   1.   Disclosure of Nursing Home Fatalities ................................... 39
   2.   Former Governor Cuomo's Involvement in the DOH Report ....... 40
G.   Executive Chamber Responses to Government Requests .................. 41
H.   Conclusion ............................................................................... 41
VI.   Governor Mario M. Cuomo Bridge ............................................... 42
A.   Overview ................................................................................. 42
B.   Investigative Steps ................................................................... 43
   1.   The Opening of the First Span of the Bridge ............................ 43
   2.   The Opening of the Second Span of the Bridge ......................... 44
   3.   Executive Chamber Knowledge of the Bolt-Related Safety Issues with the Bridge ................................................................................... 45
C.   Conclusion ............................................................................... 45
VII.   Conclusion .............................................................................. 45

## Executive Summary

Speaker Carl Heastie charged the Judiciary Committee of the New York State Assembly (the "Committee") with the responsibility of conducting an impeachment investigation to determine whether then-Governor Andrew M. Cuomo should be removed from office.  The Committee engaged Davis Polk & Wardwell LLP ("Davis Polk") to conduct the investigation on its behalf.  As mandated by Speaker Heastie, Davis Polk investigated multiple allegations of potential misconduct by former Governor Cuomo, including those related to: sexual harassment and other sexual misconduct; the publication of former Governor Cuomo's October 2020 book; information provided by former Governor Cuomo and his administration regarding the effect of COVID-19 on nursing home residents; and information regarding safety concerns about New York State bridges.  As part of our mandate, in investigating each of the issues, we considered whether former Governor Cuomo directed, or had knowledge of, executive personnel or others attempting to suppress or obstruct related investigations.

Davis Polk submits this report to the Committee to summarize its work and conclusions on each of the areas of the investigation.  This report is not intended to detail or assess every piece of evidence gathered during the course of our investigation.  Several law enforcement agencies have announced investigations into the former Governor's conduct that overlap with the Committee's mandate.  We have been instructed by Speaker Heastie to fully cooperate with these investigations, including by turning over documents and the other evidence that has been obtained in the course of our investigation, and that process is ongoing.  We remain committed to the integrity of those investigations and avoiding any action that would compromise them.  This report is written with that goal in mind.

In the course of this investigation, Davis Polk has reviewed approximately 600,000 pages of documents, including photographs, text messages, BlackBerry PIN messages, emails, policies and procedures, recordings of phone calls, social media accounts, materials from prior litigations, video recordings, interview memos, transcripts, and other relevant materials.  In addition, we interviewed, received proffers from, and/or reviewed interview and/or deposition materials for more than 200 individuals.  We also reviewed the statements and writings by the former Governor and his counsel throughout the investigation, including those made to the Office of the New York Attorney General ("NYAG") in response to its August 3, 2021 report ("NYAG Report").  An overview of our findings is set forth below.

### *Sexual Harassment*

We investigated allegations of sexual harassment, sexual assault, and other sexual misconduct by former Governor Cuomo while he was the Governor of New York.  Twelve women have made such allegations.  We conducted interviews of relevant witnesses, and undertook an independent review of tens of thousands of documents, including emails, text messages, BlackBerry PIN messages, photographs, recordings of

phone calls, social media accounts, materials from prior litigation, video recordings, interview memos, deposition transcripts, video recordings of depositions, and other relevant materials.

We conclude that there is overwhelming evidence that the former Governor engaged in sexual harassment.  This report highlights, in particular, extensive details regarding two of the complaints against former Governor Cuomo: the complaints raised by Trooper #1 and Brittany Commisso.

<u>Trooper #1</u>

- Trooper #1 has worked for the New York State Police since 2015.  Trooper #1 has alleged that the then-Governor touched her inappropriately on multiple occasions – including by running his finger slowly down her spine, running his hand across her stomach, kissing and hugging her, and making numerous inappropriate and offensive comments to her.  *See infra* at Section III(E)(3)(a).  According to Trooper #1, the then-Governor instructed her not to tell "anyone about [their] conversations."

- The former Governor has not publicly denied that he engaged in the conduct described by Trooper #1; to the contrary, he has said, "Now, I don't recall doing it, but if she said I did it, I believe her."  The former Governor admitted the behavior identified by the trooper was "insensitive," "embarrassing to her, and it was disrespectful."  In addition, her testimony was corroborated by other State Troopers, including those who witnessed the kissing and touching by the former Governor, and those who recall Trooper #1 contemporaneously describing the then-Governor's conduct to them.

<u>Brittany Commisso</u>

- Brittany Commisso, an Executive Assistant in the Executive Chamber since December 2017, has alleged a pattern of sexual harassment by former Governor Cuomo, which began with flirtatious and sexually suggestive comments, and escalated to hugging her tightly, kissing her on the cheek, sometimes turning his head to brush her lips, touching her buttocks on multiple occasions, massaging her buttocks while taking a "selfie" with her, and reaching under her shirt and groping her breast.  According to Ms. Commisso, the then-Governor asked her not to share "the things that have gone on," stating that it could get him in "big trouble."

- The former Governor has denied engaging in this conduct.  Initially, the former Governor's defense was focused on November 16, 2020, because the NYAG incorrectly identified November 16 as the date on which the then-Governor groped Ms. Commisso's breast.  However, Ms. Commisso has consistently made clear, and the NYAG Report indicated, that she did not remember the exact date of the incident.  Moreover, we have now

2

independently collected and reviewed evidence relating to the incident described by Ms. Commisso, and have determined the correct date of the incident: December 7, 2020.  The new evidence that we obtained – to which Ms. Commisso did not have access – corroborates Ms. Commisso's recollection about the events of that date.

- Now that the December date has been identified, the former Governor has raised a different defense: that Ms. Commisso has given differing accounts of the incident to various parties.  We have carefully examined Ms. Commisso's prior statements and find that she has been consistent in all material respects in describing the former Governor's conduct toward her.  In addition, Ms. Commisso's statements have been corroborated by other Executive Chamber employees and by contemporaneous text messages and other documentary evidence.

The experiences of Ms. Commisso and Trooper #1 are just two examples of the inappropriate nature of the former Governor's conduct, and each independently satisfies the definition of sexual harassment under New York State law.  The former Governor acknowledged his understanding of this standard in his sworn testimony before the NYAG: "unwanted verbal or physical advances, sexually explicit derogatory statements, or sexually discriminatory remarks . . . which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation or which interfere with the recipient['s] job performance," and "that consist[] of more than petty slights or trivial inconveniences."[1]

By highlighting these two examples, we do not intend in any way to diminish the allegations of the other ten women who have come forward or suggest that we do not find them to be credible.  We have reviewed the former Governor's challenges to the allegations, and nothing in his voluminous submissions can overcome the overwhelming evidence of his misconduct.

*Publication of* American Crisis: Leadership Lessons from the
COVID-19 Pandemic

We also investigated whether the former Governor engaged in any misconduct in writing, publishing, and promoting his book, *American Crisis: Leadership Lessons from the COVID-19 Pandemic* (the "Book").  We have reviewed evidence demonstrating that, in contravention of the requirement set forth by the Joint Committee on Public Ethics ("JCOPE") that "[n]o State property, personnel or other resources may be utilized for activities associated with the book," the former Governor utilized the time of multiple state employees, as well as his own, to further his personal gain during a global pandemic – a time during which the former Governor touted the "around-the-clock" state response to the crisis.

Certain senior state officials worked extensively on the Book, including attending meetings with agents and publishers, transcribing and drafting portions of the Book,

3

coordinating the production and promotion of the Book, and participating in working sessions to review and finalize the Book.  This work was done as part of the regular course of work in the Executive Chamber, including during normal work hours.  One senior state official explained that Book-related assignments were given by superiors and expected to be completed, and the work was not voluntary.  Another senior state official complained in a text message to a colleague that work on the Book was compromising the official's ability to work on COVID-related matters.  Additionally, junior state employees were asked by senior Executive Chamber officials to perform tasks that were related to the Book as part of their regular course of work.

The former Governor profited substantially from the Book, and he tried to downplay the extent of his earnings.  Former Governor Cuomo's book contract guaranteed payment to him of $5.2 million in royalty advances, with additional payments available if the Book met certain sales targets.  In public statements, the former Governor suggested otherwise, indicating that his income from the Book was principally dependent on sales.

### *Disclosure of Nursing Home Information*

We also gathered evidence to assess whether the former Governor directed his staff to inappropriately withhold or misrepresent information regarding the effects of COVID-19 on nursing home residents in New York.  Our investigation focused in particular on the preparation and publication of a report by the New York State Department of Health ("DOH") dated July 6, 2020, titled "Factors Associated with Nursing Home Infections and Fatalities in New York State during the COVID-19 Global Health Crisis" (the "DOH Report").  Evidence obtained during our investigation demonstrates that while the DOH Report was released under the auspices of DOH, it was substantially revised by the Executive Chamber and largely intended to combat criticisms regarding former Governor Cuomo's directive that nursing homes should readmit residents that had been diagnosed with COVID-19.

In preparing the DOH Report, members of the Executive Chamber and the NYS COVID-19 Task Force (the "Task Force") considered which population of deaths to disclose: deaths of nursing home residents that had occurred within the nursing home facility ("in-facility") only, or whether to also disclose deaths that occurred outside the facility ("out-of-facility"), such as after transfer to a hospital.  The DOH Report ultimately disclosed in-facility deaths only.  While the DOH Report accurately stated that the disclosed numbers related to in-facility deaths only, the decision to exclude the out-of-facility deaths resulted in a report that was not fully transparent.  While the Executive Chamber and certain witnesses have explained that there are several possible reasons for choosing to report in-facility deaths only, including questions regarding the reliability of data regarding out-of-facility deaths (which was more difficult to collect and verify than in-facility deaths), certain witnesses have stated that a reason for including in-facility deaths only was because including the higher number would have distracted from the overall message of the DOH Report and would have also been inconsistent with data that had been publicly reported at the relevant time.  Of note, we did not uncover any

4

documents during the course of our investigation that undermine the central conclusion of the DOH Report that COVID-19 was likely introduced into nursing homes by infected staff, nor did any Executive Chamber, Task Force, or DOH employee with whom we spoke disagree with that conclusion.  To be clear, we did not conduct an independent medical review of the cause of nursing home infections and deaths during the pandemic and such a review was not within our mandate.  We note that many of the decisions regarding the pandemic and related policies were made in the context of a once-in-a-century event that was fast-moving and presented significant challenges.

### *Opening of the Governor Mario M. Cuomo Bridge*

We also investigated whether then-Governor Cuomo, or others acting at his direction, took steps to withhold safety information from the public regarding the Governor Mario M. Cuomo Bridge (the "Bridge"), opened the Bridge or parts of the Bridge despite potential or known safety concerns, or obstructed investigations by state agencies into those concerns.  Because our review focused on the conduct of then-Governor Cuomo or those acting at his direction, the safety of the Bridge was beyond our purview.  Evidence obtained in the course of our investigation indicated that Executive Chamber and New York Thruway Authority (the "Thruway") officials engaged in discussions regarding the Bridge and its construction status before and after the opening of the two Bridge spans, and that while the Executive Chamber became aware of alleged deficiencies in the bolts used to construct the Bridge by no later than December 2018, the Thruway repeatedly informed the Executive Chamber (and announced publicly) that the Bridge was safe and fit for use.  Given that substantial further evidence would need to be gathered and analyzed in order to complete an investigation, and in light of the former Governor's resignation, the Committee instructed us not to pursue this aspect of our investigation.  The Committee will make all evidence that it has gathered available to appropriate authorities.

**********

## I.   Introduction

### A.   Chronology of Relevant Events

On March 17, 2021, the New York State Assembly retained Davis Polk to conduct the impeachment investigation on its behalf.  As set forth in greater detail below, Davis Polk reviewed hundreds of thousands of pages of evidence, obtained from a range of entities and individuals.  Davis Polk also interviewed, received proffers from, or reviewed testimony from witnesses across all areas of the investigation.  During the course of the investigation, Davis Polk provided regular updates to the Committee, including in Executive Sessions on April 21, 2021, May 26, 2021, June 30, 2021, and August 9, 2021.  The Committee has been given access to the available evidence.

On August 3, 2021, the NYAG issued a 165-page report with respect to that Office's investigation into allegations of sexual harassment against the former Governor.  The NYAG's investigation concluded that the former Governor "sexually harassed a

number of current and former New York State employees by, among other things, engaging in unwelcome and nonconsensual touching, as well as making numerous offensive comments of a suggestive and sexual nature that created a hostile work environment for women."[2]  The NYAG's inquiry also concluded that the former Governor's behavior "was not limited to members of his own staff, but extended to other state employees . . . and members of the public."[3]  On August 7, 2021, the NYAG agreed to provide the evidence underlying its report to the Assembly and its counsel, and that process began soon after.  Certain of that evidence has since been released publicly by the NYAG's Office.

At the Committee's August 9, 2021 meeting, we reviewed with the Judiciary Committee the findings of the NYAG Report relating to sexual harassment and misconduct, as well as evidence that Davis Polk had obtained independently.  Immediately following the August 9 Committee meeting, Speaker Heastie and Chairman Charles Lavine publicly stated that the Committee, and the Assembly, were deeply disturbed by the findings of the NYAG Report.  Further, Speaker Heastie stated, "it is abundantly clear to me that the Governor has lost the confidence of the Assembly's Democratic majority and that he can no longer remain in office."  Chairman Lavine stated that the Committee would move swiftly to consider potential Articles of Impeachment.

The next day, on August 10, 2021, then-Governor Cuomo announced his resignation.  On August 13, 2021, on the advice of Committee staff counsel, Speaker Heastie explained that the State Constitution does not authorize the legislature to impeach and remove an elected official who is no longer in office.

## B.    Impeachment Standards

The following impeachment jurisprudence informed the impeachment investigation.  Although the Constitution of the State of New York grants the Assembly the "power of impeachment," it does not clearly define what constitutes an impeachable offense or the standard for impeachment.[4]  The State Constitution authorizes "removal" of certain elected state officers for "misconduct or malversation in office."[5]  In addition, a New York statute provides that the standard in the Court for the Trial of Impeachments (the "Impeachment Court") is "willful and corrupt misconduct in office."[6]  Nothing in the State Constitution or statutes expressly limits impeachment to criminal acts.

Then-Governor Cuomo resigned from office on August 10, 2021, before Articles of Impeachment were considered by the Assembly.  As noted above, Committee staff counsel advised that the Assembly cannot impeach a former state official who resigned from office.[7]  Based on our review, we believe that this conclusion was reasonable and supported by law.  That is, the weight of the authority suggests that the Assembly and the Impeachment Court – which sits in judgment – lack jurisdiction to impeach and try a governor of New York after that person has left office.

*First*, a plain text reading of the relevant section of the New York State Constitution and its implementing statute suggests that a former officeholder cannot be

convicted and disqualified from holding future office by the Impeachment Court.[8] Article VI, Section 24 of the New York State Constitution provides that "[j]udgment in cases of impeachment shall not extend further than to removal from office, *or removal from office and disqualification* to hold and enjoy any public office of honor, trust, or profit under this state; but the party impeached shall be liable to indictment and punishment according to law" (emphasis added). By its terms, this provision authorizes a judgment from the Impeachment Court that extends to either: (1) removing a public official from office, or (2) removing that official from office *and* also disqualifying that official from holding future office. It does not appear to authorize a judgment that merely disqualifies a former officeholder from holding future office. This reading is supported by Section 240 of the Judiciary Law, which states that "[t]he court for the trial of impeachments has power to try impeachments, when presented by the assembly, of all civil officers of the state." The reference to "civil officers" would seemingly exclude an officer, including a governor, who has resigned and is therefore no longer a "civil officer" at the time of the impeachment trial.

   *Second*, legislative history – namely, the Judiciary Committee's view on impeachment of former officials, as expressed in an 1853 report – reinforces the view that the Assembly may not impeach a governor who has left office. In 1853, the New York State Assembly Judiciary Committee considered whether a former official could be impeached and opined that "[i]t is [ ] clear from the terms of the Constitution, that the person must be in office at the time of impeachment[,]" as the Constitution "provides but two modes of punishment . . . removal from office, or removal and disqualification to hold office; in either mode of punishment the person must be in office, for removal is contemplated in both cases, which cannot be effected unless the person is in office."[9] Consistent with the Committee's historical views on impeachment, we have not identified a single impeachment or trial of an impeached public official in New York that commenced after that official left office.

   To be sure, some authority suggests that former officials are subject to impeachment under the U.S. Constitution or other state constitutions. But the precedent from these jurisdictions considers different constitutional language and does not establish a clear rule for post-resignation impeachment, and thus does not alter our view on the law of impeachment in New York.[10]

   Based on the analysis set forth above, we believe that the determination of staff counsel that the Assembly and Impeachment Court may not lawfully impeach and try a governor after that official has left office is supported by the weight of available authority.

## II.  Summary of Investigative Steps

   Davis Polk reviewed approximately 600,000 pages of documents, including photographs, text messages, BlackBerry PIN messages, emails, policies and procedures, recordings of phone calls, social media accounts, materials from prior litigations, video recordings, interview memos, transcripts, and other relevant materials. Davis Polk also interviewed, received proffers from, and/or reviewed interview and/or deposition

materials for over 200 individuals.  Davis Polk also reviewed the statements and writings by the former Governor and his counsel throughout the investigation, including those made in response to the NYAG Report and written submissions dated September 13, 2021, September 30, 2021, and October 8, 2021.

### A.    Due Process to Former Governor Cuomo

The former Governor received due process throughout this investigation, including:

- The Committee afforded the former Governor the opportunity to make submissions or provide any other information or evidence for the Committee's review, and he made multiple submissions in response.

- The Committee requested, both informally and through subpoenas, all relevant documents in the former Governor's possession to ensure that the record before the Assembly would be complete.  Despite his pledges of cooperation, former Governor Cuomo has failed to meaningfully respond to these requests.

- The former Governor has had access to extensive evidence.  In addition to the NYAG's 165-page report and three volumes of accompanying exhibits, while in office, counsel for the then-Governor reviewed certain emails of state employees and had access to certain statements that they made to counsel for the Executive Chamber.

- With respect to his Book, the former Governor had access to information regarding the drafting, production and promotion of the Book, given his personal involvement in the matter.

In the face of an impeachment trial, the former Governor chose to resign, not to contest the available evidence and confront witnesses in that legal forum.  Having foregone that opportunity, he is not entitled to the production of any further evidence from this Committee.

Beginning in March 2021, Davis Polk engaged with former Governor Cuomo's counsel to explain the scope of the Committee's investigation and request relevant documents.  Davis Polk sent voluntary document requests to then-Governor Cuomo on May 7, 2021 and June 9, 2021.  Former Governor Cuomo's counsel stated that he would cooperate with these voluntary requests and indicated that a subpoena would not be necessary to obtain the requested information given the then-Governor's pledge of cooperation.  On July 27, 2021, having not received the bulk of the requested materials, the Committee served a subpoena on the then-Governor, which largely overlapped with the Committee's prior voluntary document requests.  The Committee served a supplemental subpoena on the then-Governor on August 9, 2021, with a more narrow scope.  Throughout the process, Davis Polk spoke by phone with counsel for the former

Governor to express the importance of the document requests and subpoenas and to endeavor to obtain documents and information relevant to our investigation, as well as to answer a number of questions posed by the former Governor's counsel.

The former Governor made repeated pledges of cooperation, through his attorneys and in public statements by his press team.  For example, on August 5, 2021, a spokesperson for the former Governor stated: "The Assembly has said it is doing a full and thorough review of the complaints and has offered the Governor and his team an opportunity to present facts and their perspective.  The Governor appreciates the opportunity.  We will be cooperating."[11]  Nonetheless, at no time has the former Governor meaningfully complied with the Committee's requests or cooperated with its investigation.

In response to all of the Committee's requests – which included requests for all documents and communications regarding a number of issues, including those relating to the women who had come forward as victims of sexual harassment and misconduct, the drafting and publication of the Book, the effect of COVID-19 on nursing home residents, and the opening of the Governor Mario M. Cuomo Bridge – former Governor Cuomo produced limited documents over the course of almost six months.  The documents produced by former Governor Cuomo largely consisted of dictated transcripts from the Book and BlackBerry PINs regarding topics such as the then-Governor's response to media inquiries and reports, the status of investigations into the then-Governor, and messages of support for the then-Governor after allegations of sexual harassment were made public.

The former Governor resigned on August 10, 2021, without having complied with the Committee's subpoenas in any meaningful way, and subsequently, counsel for former Governor Cuomo made clear that they did not intend to comply with the Committee's subpoenas (questioning their legality in light of the former Governor's resignation).[12]

While the former Governor has not complied with the Committee's document requests and subpoenas, he has taken the opportunity afforded to him by the Committee to provide written submissions.  His counsel made three written submissions, on September 13, 2021, September 30, 2021, and October 8, 2021.  We have carefully reviewed all three, as well as the 153-page submission that the former Governor's counsel submitted to the NYAG on October 20, 2021 and released publicly on his campaign website.[13]  The former Governor's counsel also requested that we review certain submissions made by the Executive Chamber, and we have done so.

## B.    Information from Senior Executive Chamber Employees

Prior to former Governor Cuomo's resignation, the Committee also issued testimonial subpoenas to senior Executive Chamber employees.  At the time of resignation, some of the relevant interviews were scheduled and others were in the process of being scheduled.  Some senior Executive Chamber employees questioned the legality of these subpoenas given the former Governor's resignation.  Following the resignation, several officials declined to be voluntarily interviewed or otherwise have not

made themselves available to the Committee.  To avoid additional expense to the taxpayers and further delay, the Committee chose not to issue new subpoenas or engage in litigation with the individual Executive Chamber employees to enforce the prior subpoenas.  The Committee has not received full compliance with many of its evidentiary requests to Executive Chamber employees.

## III.   Sexual Harassment

### A.   Overview

We conducted an investigation into allegations of sexual harassment, sexual assault, and other sexual misconduct by former Governor Cuomo while he was the Governor of New York.  Twelve women have made such allegations.  Seven of these women were state employees at the time of the former Governor's conduct; the remainder of the allegations were made by an employee of a state-affiliated entity and by other residents of or visitors to the State of New York.  A brief summary of each of their allegations is below.

### B.   Allegations by State Employees

#### 1.   *Charlotte Bennett*

Ms. Bennett, who served as an Executive Assistant and Senior Briefer to former Governor Cuomo from January 2019 to June 2020, and as a member of the Health Policy Team from June 2020 to November 2020, alleged that the former Governor made numerous inappropriate and sexually suggestive comments to her.  Among other things, Ms. Bennett alleged that the then-Governor asked about her romantic relationships, including whether she was monogamous and whether she would date an older man, and told her that he would be willing to date someone as young as 22 years old.[14]  According to Ms. Bennett, the then-Governor regularly commented on her appearance, including by calling her "Daisy Duke" (in reference to the type of shorts she was wearing) and suggesting that she get a tattoo on her buttocks rather than in a visible location.[15]  She has alleged that the then-Governor asked her to memorize song lyrics, which she was required to sing to him.  Ms. Bennett said that the former Governor also sang to her, and supplied one such recording, in which he sang the refrain "Do you love me? Do you really love me?"[16]  Ms. Bennett also alleged that the then-Governor made several inappropriate comments about her experience as a victim of sexual assault.[17]

#### 2.   *Lindsey Boylan*

Ms. Boylan worked at a state agency, Empire State Development, beginning in March 2015 and subsequently served as a Special Advisor to former Governor Cuomo through September 2018.  She has alleged that the former Governor engaged in a pattern of inappropriate comments and touching, sexually harassing her and creating a hostile work environment.[18]  According to Ms. Boylan, the then-Governor repeatedly touched her, including on her waist and back; he repeatedly hugged her and kissed her on the

cheek, and once kissed her on the lips without her consent.[19]  Ms. Boylan also alleged that the then-Governor frequently commented on her appearance.  Ms. Boylan supplied an email from early in her tenure with the state government, in which a senior aide to the then-Governor told Ms. Boylan that the then-Governor thought Ms. Boylan looked like his ex-girlfriend.  Ms. Boylan alleged that the then-Governor thereafter began referring to her by that ex-girlfriend's name.[20]  According to Ms. Boylan, the then-Governor made a number of other inappropriate comments to her, including asking her to play strip poker and saying, after his dog jumped on her, that if he were a dog, he would "mount her" too.[21]  After Ms. Boylan's allegations of sexual harassment against the then-Governor became public, Executive Chamber employees released certain portions of Ms. Boylan's personnel files.[22]

### 3.   Brittany Commisso

Ms. Commisso, an Executive Assistant in the Executive Chamber since December 2017, has alleged a pattern of sexual harassment by former Governor Cuomo, as detailed more fully in Section III(E)(3)(b) of this report.  Among other things, Ms. Commisso has alleged that the then-Governor engaged in inappropriate conduct that began with flirtatious and sexually suggestive comments, and escalated to hugging her tightly, kissing her on the cheek, sometimes turning his head to brush her lips, touching her buttocks on multiple occasions, massaging her buttocks while taking a "selfie" with her, and ultimately reaching under her shirt and groping her breast.[23]  According to Ms. Commisso, the then-Governor also asked her not to share "the things that have gone on," stating that it could get him in "big trouble."[24]

### 4.   Ana Liss

Ms. Liss, who worked in a variety of roles in the Executive Chamber from 2013 to 2015, has alleged inappropriate touching and comments by the then-Governor during her time in the Executive Chamber.[25]  She has stated that, among other things, the then-Governor kissed her cheek and hand and, at an event at the Executive Mansion in 2014, the then-Governor put his hand around her waist and kissed her cheek before taking a photo with her.[26]  According to Ms. Liss, the then-Governor called her "sweetheart" and "darling," asked whether she had a boyfriend, and commented on her appearance and the appearance of others.[27]  She also stated that sexual harassment in the Executive Chamber was "normalized" in the office culture.[28]

### 5.   Alyssa McGrath

Ms. McGrath, an Executive Assistant in the Executive Chamber since 2018, has alleged that the then-Governor made repeated inappropriate comments to her and touched her inappropriately.  According to Ms. McGrath, the then-Governor kissed her on the cheek and forehead.[29]  Ms. McGrath has alleged that the then-Governor's inappropriate comments included inquiring about the status of her divorce, asking if she planned to "mingle" with men on an upcoming trip, and asking if she would "tell on" Ms. Commisso if Ms. Commisso cheated on her husband.[30]  She (and others) also alleged that the then-

11

Governor subsequently referred to Ms. Commisso and Ms. McGrath as the "mingle mamas."[31]  Ms. McGrath also alleged that the then-Governor spoke to her in Italian, which was later translated for her as a comment about her beautiful appearance.[32]  Ms. McGrath explained that, on another occasion, she was called to the then-Governor's office to take dictation for him and was sitting across the desk from him with her head down and her notebook in front of her, waiting for him to speak.  She said that when the then-Governor did not speak for some time, she looked up and saw that he was staring down her shirt.[33]  According to Ms. McGrath, after the then-Governor realized that she had seen where he was looking, he asked about the charm on her necklace, which was hanging between her breasts.[34]

### 6.   *Kaitlin*

Kaitlin, an Executive Chamber employee from December 2016 to January 2018, who has chosen to remain anonymous, alleged that the former Governor touched her and interacted with her in a way that made her uncomfortable.[35]  According to Kaitlin, she met the then-Governor during a fundraising event in December 2016; during this initial encounter, the then-Governor "grabbed" Kaitlin, held on to her hand, took pictures with her in a dance pose, and told her that she was going to work for him at the state level.[36]  According to Kaitlin, by the end of that week, the Executive Chamber reached out to her at her then-employer to hire her away to work with the then-Governor.[37]  Kaitlin stated that during her interview with the Executive Chamber, she was asked what she wanted her salary to be, and that in response to the number she provided, which she knew was above the range for the position, her interviewer laughed and indicated that it was "probably not going to happen."[38]  However, when Kaitlin was offered the job, it was at the salary she had proposed.[39]  Kaitlin also indicated that, in her experience, hiring across the state agencies was generally a protracted process, but that the process was expedited when the then-Governor wanted to hire someone.[40]  Kaitlin also alleged that the former Governor made inappropriate comments to her while she worked in the Executive Chamber, including about her appearance.[41]

### 7.   *State Entity Employee #2*

State Entity Employee #2, a doctor and former Director at the New York State Department of Health, performed a COVID-19 test on the then-Governor during a televised press event in May 2020.  According to State Entity Employee #2, while she was conducting a test swab on the then-Governor prior to the televised event, he told her to "make sure you don't go so deep that you hit my brain," to which State Entity Employee #2 responded that she understood and would be "gentle but it has to be accurate."[42]  State Entity Employee #2 said that the then-Governor responded by saying, "gentle but accurate[;] I heard that before," which State Entity Employee #2 said that she felt the then-Governor intended to convey a "joke of an implied sexual nature."[43]  According to State Entity Employee #2, during the televised press event, for which she had changed into PPE (including a gown, N95 mask, and face shield), the then-Governor said, "[Y]ou make that gown look good."[44]  State Entity Employee #2 said that she felt the then-Governor would not likely have made this comment to a male physician.[45]

### 8.    *Trooper #1*

Trooper #1 has worked for the New York State Police since 2015.  After the then-Governor met her briefly at an event, Trooper #1 was told that the then-Governor had requested that she join his Protective Services Unit ("PSU").[46]  Trooper #1 was told that the minimum tenure requirement for the role was waived for her.[47]  After joining the PSU, she worked initially at the then-Governor's residence in Mount Kisco, New York, and subsequently was moved to a role on the then-Governor's travel team.[48]  As detailed in Section III(E)(3)(a) of this report, Trooper #1 has alleged that the then-Governor touched her inappropriately on multiple occasions – including by running his finger slowly down her spine, running his hand across her stomach, kissing and hugging her, and making numerous inappropriate and offensive comments to her.  According to Trooper #1, the then-Governor instructed her not to tell "anyone about [their] conversations."[49]

### C.    **Allegations by State-Affiliated Entity Employee**

### 1.    *State-Affiliated Entity Employee #1*

An employee of a state-affiliated entity, who has remained anonymous, alleged that, in September 2019, while she was taking a photograph with the then-Governor at an event sponsored by her then-employer, the then-Governor "double tapped the area . . . under [her] butt cheek."[50]  According to the employee, the then-Governor's "fingers moved two times upward" to "grab the area between [her] butt and [her] thigh."[51]  The employee contemporaneously disclosed the incident to a co-worker, and to family and friends, and drafted a contemporaneous email memorializing the incident.[52]

### D.    **Allegations by Non-State Employees**

### 1.    *Virginia Limmiatis*

Ms. Limmiatis, an employee of an energy company, has alleged that she attended an event on May 24, 2017, at which then-Governor Cuomo touched her without her consent.[53]  According to Ms. Limmiatis, at the event, she was wearing a t-shirt with her employer's name printed across it at approximately chest level, and the then-Governor ran his fingers across the logo and, in turn, Ms. Limmiatis's breasts, pressing down on each letter.[54]  Ms. Limmiatis has alleged that the then-Governor next leaned in, placed his cheek against Ms. Limmiatis's cheek and whispered, "I'm going to say that I see a spider on your shoulder," and then brushed his hand over the area below Ms. Limmiatis's collarbone and above her breast.[55]  Ms. Limmiatis has said that she was moved to come forward after reading about the then-Governor's March 3, 2021 press conference during which he stated that he never touched anyone inappropriately.[56]

### 2.    *Anna Ruch*

Ms. Ruch, an attendee at a wedding in New York State in September 2019, has alleged that when she met the then-Governor at that event, he "shook her hand and then quickly moved his hand to her back, touching her bare skin on a place where there was a

cutout in [her] dress."[57]  Ms. Ruch said that she felt uncomfortable and "immediately grabbed the [then-]Governor's wrist and removed his hand from her back," after which the then-Governor remarked that she was "aggressive" and cupped her face in his hands and said, "[C]an I kiss you?"[58]  According to Ms. Ruch, she felt distraught and uncomfortable, did not respond, and tried to move away and turn her face as the then-Governor kissed her left cheek.[59]  Ms. Ruch said that later that night, she told several people about the then-Governor's conduct.[60]

### 3.    *Sherry Vill*

Ms. Vill, a business owner who resides in a suburb of Rochester, met the then-Governor in May 2017, when he toured her home after it was damaged by flooding.[61] According to Ms. Vill, she asked the then-Governor about the state of her home, and the then-Governor responded by taking her hand and kissing her on both cheeks, without her consent.[62]  Ms. Vill said that, as the group was walking out of the house, the then-Governor turned around and told Ms. Vill she was beautiful.[63]  Ms. Vill stated that she felt uncomfortable and stayed behind at the front of her home as the then-Governor and his staff toured the damage on the side of her home.[64]  According to Ms. Vill, when the group returned, the then-Governor approached her, asked if there was anything else she wanted, and then leaned down and kissed her again – also without consent – while grabbing her hand.[65]  According to Ms. Vill, after the visit, she received a voicemail from someone in the Executive Chamber inviting her to attend an event at which the then-Governor would be present.[66]  Ms. Vill said that none of her family members, nor any neighbor who had met the then-Governor during the same visit, received an invitation to the event.[67]  Ms. Vill also later received signed photos from the then-Governor's visit; neither her family members nor her neighbors received photographs either.[68]

### E.    Analysis of Sexual Harassment Allegations Against Former Governor Cuomo

The former Governor has challenged the allegations of these twelve women in numerous ways – ranging from attacking the credibility of several of the women, to taking issue with whether his conduct toward others meets the legal definition of sexual harassment.  First, we address the legal standard for sexual harassment under New York State law.  In various public statements, the former Governor has claimed that his conduct did not constitute sexual harassment because he was "joking" or because he was being "generational" or "cultural."[69]  In his sworn testimony before the NYAG, the former Governor said that he could not rule out that someone on his then-staff "may have sat on [his] lap" and that he "may have" kissed certain then-staff members on the lips.[70] The former Governor attempted to justify this conduct by explaining that he worked with certain staff members for many years, and that they "did social events," "weddings," and "parties."[71]  He has also said it was not his intent to offend anyone.[72]  At other points, his lawyers have claimed that certain women did not identify conduct that was sufficiently severe or pervasive to meet the legal definition of sexual harassment.[73]  However, as the former Governor admitted under oath in his deposition, he was aware that none of these explanations constitutes a defense to sexual harassment under New York State law.[74]

### 1.   The Legal Standard

Under New York State law, employees who experience sexual harassment in the workplace may bring a hostile work environment claim showing that the plaintiff was subjected to inferior terms, conditions or privileges of employment because of the individual's sex.[75]

Until October 2019, when new sexual harassment legislation was enacted, a plaintiff alleging a claim of hostile work environment created by sexual harassment under New York State law had to show that the alleged conduct was: (1) objectively severe or pervasive; (2) subjectively harassing; and (3) motivated by discriminatory animus.[76] Whether an environment was sufficiently "severe or pervasive" to be hostile was determined by looking at the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) whether the conduct was physically threatening or humiliating or merely an offensive utterance; and (3) whether the conduct unreasonably interfered with an employee's work performance.[77]  Circumstances where there is "direct contact with an intimate body part" constitute "one of the most severe forms of sexual harassment."[78]  Plaintiffs alleging sexual harassment are not required to present "direct evidence of her harasser's motivation for discrimination against her" or to prove that "her harasser's intent was to create a discriminatory environment."[79] Indeed, a harasser's professed intent that his conduct was innocuous, such as statements that he was making a joke or acting based on his personal background, is not sufficient to defeat liability.[80]

In August 2019, then-Governor Cuomo signed legislation enacting new workplace harassment protections, which eliminated the requirement that to be legally actionable, harassment must be "severe or pervasive." [81]  It is noteworthy that, in signing the new legislation, then-Governor Cuomo referred to the prior heightened "severe or pervasive" standard as an "absurd legal standard."[82]  Under the current New York State Human Rights Law, there is a violation regardless of whether the conduct at issue would be considered severe or pervasive, as long as the conduct rises above "petty slights or trivial inconveniences."[83]

### 2.   Former Governor Cuomo's Understanding of the Law Regarding Sexual Harassment

Former Governor Cuomo's own sworn testimony indicates that he understood the law as described above.  In his deposition with the NYAG, the former Governor acknowledged that, as the former Attorney General of the State of New York, he was aware of the law regarding sexual harassment, and he stated that he understood certain core tenets of sexual harassment law.[84]  The former Governor acknowledged that his intent was irrelevant under the law, and that – as a result of a state law that he personally signed as Governor – conduct need not be severe or pervasive to constitute sexual harassment.  For example, former Governor Cuomo stated that he understood that:

- "Sexual harassment . . . consists of any unwanted verbal or physical advances, sexually explicit derogatory statements, or sexually discriminatory remarks made by someone which are offensive or

objectionable to the recipient, which cause the recipient discomfort or humiliation, . . . or which interfere with the recipient['s] job performance."[85]

- "Sexual harassment need not be severe or pervasive to be unlawful and can be any sexually harassing conduct that consists of more than petty slights or trivial inconveniences."[86]

- "It is not a requirement that an individual tell the person who is sexually harassing them that the conduct is unwelcome."[87]

Former Governor Cuomo also testified that he had taken New York State's required sexual harassment training several times, most recently in 2019.  We were provided with a copy of the former Governor's 2019 Mandatory Training Attestation Form, in which he confirmed that he had read and understood the materials and that he was "responsible for complying with its contents."[88]

### 3.  *Examples of Former Governor Cuomo's Extensive Misconduct*

The former Governor has also raised a number of factual arguments in response to the allegations that have been made against him.  He has claimed, for example, that certain of the women had credibility issues, motives to fabricate allegations, or were seeking publicity or personal gain.[89]  He has said that the NYAG's investigation was politically motivated,[90] and he has pointed to various pieces of evidence that he contends were not adequately explored.[91]  The former Governor also pointed to the fact that there were some Executive Chamber employees and State Troopers who never saw him sexually harass anyone.[92]  After interviews with relevant witnesses and the independent review of tens of thousands of documents – including emails, text messages, Blackberry PIN messages, photographs, recordings of phone calls, social media accounts, materials from prior litigation, video recordings, interview memos, deposition transcripts, and other relevant materials – we find that there is overwhelming evidence that the former Governor engaged in multiple instances of sexual harassment.  We highlight two examples here, which – standing alone – demonstrate that the former Governor engaged in sexual harassment, both under the former New York State law, which required conduct to be severe or pervasive, and under the more recent, less stringent sexual harassment law signed by the former Governor.

### a.  **Trooper #1**

The anonymous State Trooper, referred to in the NYAG Report as "Trooper #1," has worked for the New York State Police since 2015, and, beginning in 2018, was part of the former Governor's PSU.[93]  In this description, we have omitted certain identifying details in an effort to protect the identity of Trooper #1, who wishes to remain anonymous.  Trooper #1 stated that the former Governor engaged in the following conduct:

- While standing behind Trooper #1 in an elevator, the then-Governor placed his finger on the top of her back, ran his finger slowly down the center of her spine, and said, "Hey, you."[94] Trooper #1 said that she felt the then-Governor's hand run over her bra clasp.[95]

- The then-Governor asked, "Can I kiss you?" Trooper #1 was unsure what to do, so replied, "Sure."[96] The then-Governor then kissed her on the cheek[97] and said something like, "[o]h, I'm not supposed to do that" or "unless that's against the rules."[98] Trooper #1 explained that she felt that she could not say "no" to the then-Governor or respond in a way that would make him unhappy.[99] A few months later, the then-Governor approached the window of a car in which Trooper #1 was seated and asked if he could kiss her, but she responded that she was sick.[100]

- At an event at Belmont Park Arena, then-Governor Cuomo exited the public area event space and entered a secure area. Trooper #1 held open a door to a building, which was away from the public area of the event, in that secure area for the then-Governor. As the then-Governor walked by Trooper #1, he ran the palm of his left hand across her stomach,[101] with the center of his hand on her belly button and pushing back to her right hip, where her gun was holstered.[102]

- Trooper #1 also stated that she had no plans to report the incident.[103] She said that having been newly assigned to the travel team at that point, she did not want to "make waves," noting that she had heard "horror stories" about people getting kicked off the detail or transferred over "little things."[104] She said, "I'm here to do a job."[105]

- As Trooper #1 was sitting in the driver's seat of the then-Governor's car, preparing to wipe it down and exit so that the then-Governor could drive it, he stood with his arms outstretched blocking her exit.[106] Trooper #1 said that she felt that she could not get out of the car without giving him a hug.[107]

- The then-Governor offered to give Trooper #1 a tour of his home in Mount Kisco, "[u]nless it [was] against any protocols," after which he smirked and snickered and walked away.[108] Trooper #1 understood this to carry an insinuation that made her uncomfortable.[109]

- The then-Governor asked Trooper #1, "Why don't you wear a dress?" and why she wore dark colors.[110]

- The then-Governor commented that Trooper #1 looked like an "Amish person" and that her suit jacket was too big,[111] which Trooper #1 thought could have been interpreted as a suggestion that she wear "tighter clothes."[112]

- The then-Governor asked Trooper #1's age, and then said, "you're too old for me," and asked what the age difference between him and someone he dated

could be before "people start[ed] saying things[.]"[113]  After Trooper #1 tried to deflect the conversation by asking what the requirements were for the then-Governor's partner, the then-Governor responded that he was looking for someone who "[c]an handle pain."[114]

- The then-Governor asked Trooper #1 why she would want to get married, noting that "it always ends in divorce, and you lose money, and your sex drive goes down."[115]  Trooper #1 said that she felt that the then-Governor wanted her to engage with him regarding sexual matters, and that she responded by discussing the positive attributes of marriage.[116]  Sometime following this exchange, and after a holiday party, when the then-Governor saw Trooper #1 interacting with other Troopers, he instructed her not to "tell anyone about our conversations."[117]

Trooper #1 stated that she was a professional in a male-dominated field who was just trying to do her job, and that when the then-Governor made inappropriate comments that "crossed a line" and touched her inappropriately, she felt "uncomfortable" and "creeped out."[118]  She described feeling "completely violated" and "in shock" in response to the incident where he ran his hand across her stomach.[119]  She stated that she "loved" her job, and the fact that this was "the card [she] was dealt" was "upsetting, stressful, and disheartening."[120]

Former Governor Cuomo has not himself publicly denied that he engaged in the conduct described by Trooper #1.  First, the former Governor publicly admitted to making "some jokes about the negative consequences of married life" to the Trooper when she was getting married.[121]  He said he meant them to be "humorous."[122]  Of those remarks, he said, "She was offended, and she was right."[123]  With respect to Trooper #1's allegations that he touched her back and stomach, the former Governor said, "Now, I don't recall doing it, but if she said I did it, I believe her."[124]  Although he apologized for his behavior, the former Governor denied having any recollection of his behavior, stating: "I didn't do it consciously with the female trooper.  I did not mean any sexual connotation. I did not mean any intimacy by it.  I just wasn't thinking."[125]  The former Governor admitted the behavior identified by the Trooper was "insensitive," "embarrassing to her, and it was disrespectful."[126]

Despite these public statements, in a recent written submission in response to the NYAG Report, the former Governor's lawyer has sought to dispute that he engaged in the above-referenced conduct.  These *post hoc* arguments are unpersuasive.  The account of Trooper #1 was corroborated by other State Troopers, including those who witnessed the kissing and touching by the former Governor,[127] and those who recall Trooper #1 contemporaneously describing the then-Governor's conduct to them.[128]

We also note that Trooper #1 did not plan to come forward, but was identified to the NYAG by another Trooper as someone who had relevant information regarding the former Governor's behavior.  Trooper #1 has attempted throughout this process to remain anonymous: she indicated that throughout her life she has been uncomfortable in the spotlight, explaining that she did "not like picture day at school" or even "her

birthday."[129]  A person with this aversion to publicity had no incentive to become involved in an investigation of the former Governor of the State of New York.  When called by the NYAG, Trooper #1 responded truthfully to questions under oath.  She also cooperated with the Assembly's investigation.

### b.  Brittany Commisso

Brittany Commisso was an Executive Assistant in the Executive Chamber since December 2017.[130]  Since that time, she has provided administrative assistance to various members of the Executive Chamber, including the former Governor, whom she supported both in the Executive Chamber and, on occasion, at the Executive Mansion.[131]  Ms. Commisso described in detail an escalating pattern of conduct by the then-Governor that involved suggestive comments and inappropriate touching, including on her breast and buttocks.  According to Ms. Commisso, the former Governor engaged in the following conduct toward her:

- The then-Governor hugged her tightly and pulled her close so that her breasts pressed against his body.[132]  He also kissed her on the cheek and turned his head so that he brushed her lips.[133]

- The then-Governor made a number of inappropriate comments to Ms. Commisso, such as, "if you were single[,] the things I would do to you,"[134] referring to Ms. Commisso and another Executive Assistant, Alyssa McGrath, as "mingle mamas,"[135] and asking if they were traveling to Florida to "mingle" with men.[136]

- At the Executive Mansion on New Year's Eve 2019, the then-Governor asked Ms. Commisso to take a "selfie" with him.[137]  As Ms. Commisso held up the phone to take the "selfie," Ms. Commisso felt the then-Governor begin rubbing her buttocks.[138]  Ms. Commisso's hands became shaky, causing the photos to be blurry.[139]  Ms. Commisso told the then-Governor that she could not get a good picture, so he suggested they take a "selfie" on the couch and had her sit very close to him there.[140]  The then-Governor told Ms. Commisso to send the photo to Alyssa McGrath, which Ms. Commisso did.[141]  He then told her not to share the photo with anyone else.[142]

- On a different occasion in 2020, Ms. Commisso was summoned to the Executive Mansion for a brief assignment.[143]  After Ms. Commisso arrived at the then-Governor's office, he came out from behind his desk and pulled her close to him. [144]  She said he was going to "get [them] in trouble," and he replied that he did not care, and slammed the door shut.[145]  The then-Governor walked toward Ms. Commisso again, pulled her close, and reached under her blouse and groped her breast over her bra.[146]

- After the initial public allegations of sexual harassment were made against the former Governor, he told Ms. Commisso not to share "the things that have gone on," because it could get him in "big trouble."[147]

19

- Ms. Commisso recalled witnessing conversations among senior aides to the then-Governor after Lindsey Boylan's allegations were made public. [148] She described the aides as ruthless and working nonstop to try to discredit Ms. Boylan. Having recently been groped by the then-Governor, Ms. Commisso said she felt like a liability.

- Shortly after Ms. Bennett's allegations were made public, the then-Governor called the Executive Chamber and Ms. Commisso answered. Ms. Commisso recalled that during their brief exchange, the then-Governor asked her what she thought about the allegations against him. Ms. Commisso thought she was being tested by the former Governor about whether she would come forward with her own allegations, and responded along the lines that she was sure it was a difficult time for the then-Governor, but that "this too shall pass."[149]

- As a general matter, Ms. Commisso was intimidated by the former Governor, did not want to disagree with or upset him, and wanted to keep her job.[150] Ms. Commisso vowed to herself that she would take her story "to the grave."[151]

- Ms. Commisso explained that she liked her job[152] and when she initially began to be called upon to help the then-Governor, she felt proud and trusted, and she believed she was advancing in her career.[153] Ms. Commisso said that when the then-Governor began making sexually suggestive comments and advances, she felt taken advantage of.[154] She described feeling so uncomfortable and embarrassed at some of these comments that she would break out in hives, and reported instances in which she felt like the hives were "crawl[ing] up [her] neck."[155]

- Ms. Commisso described the incident in which the then-Governor groped her as surreal; she felt terrified that someone would see the interaction and lose respect for her, or that she would lose her job.[156] After the incident, she physically felt like her chest was "burning," and felt certain that her hives were visible and was fearful that others would notice when she returned to the Executive Chamber.[157] Ms. Commisso said that after the then-Governor groped her, she believed that she would not call anyone, tell her supervisor, or file a complaint.[158] She described feeling that in the face of the then-Governor's power, no one would believe her and that she would get fired for making allegations.[159] So she got in her car, drove back to the State Capitol and finished the rest of her day.[160]

Ms. Commisso's statements have been corroborated by other Executive Chamber employees and by contemporaneous text messages. Multiple Executive Chamber employees stated that in the wake of Charlotte Bennett coming forward publicly in March 2021 with allegations against the then-Governor, Ms. Commisso confided in them regarding the then-Governor's inappropriate conduct toward her, noting that she had been put in similar situations as those that Ms. Bennett described.[161] Contemporaneous text messages support that Ms. Commisso only disclosed this information because she "got

emotional" and then was asked. [162]  The information Ms. Commisso reported to her co-workers included describing how the then-Governor hugged her, touched her, turned his head and kissed her, placed his hand on her buttocks, and groped her breast.[163]  One witness recalled that Ms. Commisso was "hysterical" when describing the incidents, and said she recalled "holding Ms. Commisso because she was so upset."[164]

Though Ms. Commisso did not herself come forward initially due to fear of retaliation by the then-Governor, and in fact stated that she planned to take the incident "to her grave," two Executive Chamber employees in whom she had confided reported the then-Governor's conduct to counsel for the Executive Chamber.[165]

The former Governor has denied that he groped Ms. Commisso, touched her buttocks, or otherwise sexually harassed her.  The former Governor's initial defense largely focused on a single line in the NYAG Report, which stated that the groping incident occurred on November 16, 2020.[166]  The former Governor and his counsel created a timeline of November 16 in an effort to demonstrate that the groping incident could not have occurred on that date and therefore that Ms. Commisso is lying.[167]  However, the former Governor's focus on November 16 is misplaced, because Ms. Commisso has never said definitively that the incident occurred on that date.

Contrary to the assertions by counsel for the former Governor, in her on-the-record interview with the NYAG and in her interviews, Ms. Commisso has consistently made clear that she did not remember the exact date of the incident.[168]  As explained in a footnote to the NYAG's report, Ms. Commisso "did not remember the exact date of the incident, but recalled that it was around when she was tasked with photographing a document, and provided a copy of the photograph . . . that was dated November 16, 2020."[169]  Without the benefit of other evidence that the Committee was later able to obtain from other parties and entities, Ms. Commisso did recall the following specific details regarding the date on which the then-Governor groped her:

- Ms. Commisso was called to the Executive Mansion by Stephanie Benton on a weekday afternoon.[170]  Ms. Benton said that the then-Governor needed help with his iPhone.[171]

- When Ms. Commisso arrived at the Executive Mansion, the then-Governor asked her to copy text from an application on his iPhone, and to send it via text message to Ms. Benton.[172] Ms. Commisso recalled calling Ms. Benton after sending the text to confirm that Ms. Benton had received it.[173]

- The then-Governor had been traveling, and had recently returned from a press briefing.[174]

- The then-Governor was wearing a white button-down shirt and had removed his suit jacket.[175]

21

- Ms. Commisso spent only approximately ten to fifteen minutes at the Executive Mansion on this occasion.[176]

- Ms. Commisso returned to the Executive Chamber to continue her work day after she left the Executive Mansion.[177]

The evidence that Davis Polk subsequently obtained establishes that the events above occurred on December 7, 2020.  Specifically, the evidence shows that:

- At 9:21 a.m. Eastern time, then-Governor Cuomo, along with two of his family members and a senior Executive Chamber employee, left the Executive Mansion en route to the Albany helipad at Exit 23.[178]

- The then-Governor's schedule for December 7, 2020 indicates that the helicopter was scheduled to leave Albany at 9:20 a.m. Eastern time and arrive at New York City's East 34th Street helipad at 10:15 a.m. Eastern time.[179]  The then-Governor's flight manifest indicates that the helicopter departed the Exit 23 Helipad at 9:25 a.m. Eastern time.[180]  The manifest for the helicopter included the then-Governor, a senior Executive Chamber employee, two COVID-19 Task Force members, and two of the former Governor's family members. [181]

- The then-Governor held a COVID-19 press briefing at 11:00 a.m. Eastern time at 633 Third Avenue, New York, New York.  The briefing was televised.[182]

- During the then-Governor's COVID-19 press briefing, he was wearing a white button-down shirt with a suit jacket.[183]

- The flight manifest indicates that the helicopter departed the East 34th Street Helipad en route to the Albany Exit 23 Helipad at 12:33 p.m. Eastern time.  The flight manifest included the then-Governor, the senior Executive Chamber employee, and the two COVID-19 Task Force members (but not the then-Governor's family members).[184]

- The then-Governor's schedule for December 7, 2020 indicates that at a time "TBD" in the afternoon, the then-Governor would make the five-minute trip from the State Capitol to the Executive Mansion.[185]

- The senior Executive Chamber employee and two COVID-19 Task Force members, all of whom returned with the then-Governor to Albany from New York City, left the Executive Mansion between 1:36 p.m. Eastern time and 2:36 p.m. Eastern time.[186]

- At 3:41 p.m. Eastern time, Ms. Benton called Ms. Commisso's work-issued mobile phone.[187]

- Ms. Commisso arrived at the Executive Mansion at 3:51 p.m. Eastern time.[188]

- At 3:56 p.m. Eastern time, a text message, which appears to be draft portions of a memo, was sent from the then-Governor's iPhone to Stephanie Benton's iPhone.[189]

- Phone records indicate that at 3:56 p.m. Eastern time, a call was placed from Ms. Commisso's work-issued mobile phone to Ms. Benton.[190]

- Ms. Commisso departed the Executive Mansion at 4:07 p.m. Eastern time.[191]

- Ms. Commisso swiped back in to the State Capitol building at 4:12 p.m. Eastern time.[192]

The contemporaneous evidence collected establishes that the date Ms. Commisso described to us was December 7, 2020. This same evidence corroborates Ms. Commisso's recollection – details that she provided and about which she has remained consistent without the benefit of having access to the evidence cited above, which would have allowed her to reconstruct a timeline of the day. That Ms. Commisso independently recalled such specific details as what the then-Governor was wearing, that he had been traveling, her call to Ms. Benton, and how much time she spent in the Executive Mansion on that occasion indicates that an out-of-the-ordinary incident occurred on that date, and further corroborates Ms. Commisso's allegations.[193] We have turned this evidence over to law enforcement.

Recently, after the former Governor learned that a date in December had been identified as the correct date of the groping incident, he began making additional arguments, including that Ms. Commisso "gave various differing versions of her interactions with the Governor when describing those interactions to others, including the Investigators," and that Ms. Commisso "had a motive to fabricate and embellish her interactions with the Governor."[194] We have reviewed the transcripts, memoranda, and press articles reflecting the various occasions on which Ms. Commisso reported the former Governor's conduct, and have not identified any material inconsistencies in her description of the events. By way of example, as noted in the NYAG Report, in one of the many instances during which Ms. Commisso has detailed the former Governor's conduct toward her, she told the NYAG that the then-Governor groped her breast *before* slamming the door to his Executive Mansion office.[195] Ms. Commisso corrected that description during the very same interview with the NYAG, stating that the then-Governor groped her breast *after* slamming the door[196] – a statement consistent with those Ms. Commisso made to Davis Polk on April 23, 2021,[197] to the NYAG on March 12, 2021, to CBS News on August 9, 2019, and to the *Times Union* as reflected in its article of April 7, 2020.[198] We do not consider this to be a material inconsistency.

We have also reviewed the transcripts and memoranda reflecting the recollections of the Executive Assistants in whom Ms. Commisso confided regarding the then-

Governor's conduct toward her.  We have not identified any material inconsistencies between or among these various descriptions.  The types of minor inconsistencies we have observed do not indicate that Ms. Commisso is lying, or that the Executive Assistants are lying or were lied to by Ms. Commisso; on the contrary, they are the types of minor inconsistencies that are common among witnesses and often regarded as "the hallmarks of truth."[199]

The former Governor has likewise attempted to sully Ms. Commisso's reputation and suggest that she has a motive to lie.[200]  His counsel has stated that several individuals provided information to the NYAG regarding Ms. Commisso's motive to lie, and that any information in that regard should be fully explored.[201]  In short, we have reviewed the scant suggestions of potential motive, and have found no credible evidence to support these suggestions.

Because the former Governor has claimed that certain of the women had motives to fabricate allegations, or were seeking publicity or personal gain, we also find compelling that it was Ms. Commisso's co-workers, and not Ms. Commisso herself, who reported the former Governor's conduct to counsel for the Executive Chamber.[202]  Ms. Commisso was not planning to come forward due to her fear of retaliation by the then-Governor.[203]  Indeed, she told her co-workers in whom she confided that she planned to take the incidents "to [her] grave."[204]

The former Governor has also contended that he would never have groped Ms. Commisso on December 7, 2020 because Lindsey Boylan's public attacks on him were reported in the newspaper that day.[205]  However, as of December 7, Ms. Boylan had not made any allegations of sexual harassment against the former Governor.  As of that date, she had tweeted that the Executive Chamber had a "toxic team environment" that was "endlessly dispiriting."[206]  It was almost *one week later*, on December 13, 2020, that Ms. Boylan first made allegations of sexual harassment against the then-Governor.[207]  Later that day, after reading the public sexual harassment allegations by Ms. Boylan, several senior members of the Executive Chamber took a number of actions in an attempt to discredit her, including the public release of portions of her employment file – documents that, it is worth noting, are not relevant to the issue of whether the former Governor sexually harassed Ms. Boylan.[208]  Ms. Commisso has indicated that her fear of retaliation was based, in part, on this treatment of Ms. Boylan.[209]

The former Governor has argued that the disclosure of portions of Ms. Boylan's confidential personnel files to the media does not meet the legal definition of retaliation.[210]  Putting aside whether those who released Ms. Boylan's confidential employment files are legally culpable, contemporaneous documents indicate that the public release of these documents was intended to demean and embarrass Ms. Boylan, and it had the predictable effect of discouraging Ms. Commisso from coming forward.[211]

### 4.   *Additional Allegations Against Former Governor Cuomo*

As noted above, the allegations of Ms. Commisso and Trooper #1 are just two examples of the inappropriate nature of the former Governor's conduct.  Each of these

examples independently satisfies the definition of sexual harassment that the former Governor himself acknowledged: "unwanted verbal or physical advances, sexually explicit derogatory statements, or sexually discriminatory remarks . . . which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation," and "that consist[] of more than petty slights or trivial inconveniences."[212] These two examples – standing alone – establish sufficient evidence of sexual harassment by the former Governor, and, after consultation with the Committee, we find that detailing the repeated sexual harassment against two women is sufficient for purposes of this report.

To be clear, in highlighting these examples, we do not intend in any way to diminish the allegations of the other ten women who have come forward or suggest that we do not find them to be credible.  The former Governor has challenged these women's allegations, attempting to analyze them without context and dismissing single incidents as conduct that does not rise to the level of sexual harassment.  Such an approach obscures the totality of the former Governor's conduct toward women, not only in the Executive Chamber but in the workplace more broadly, and even toward his constituents.  We have carefully reviewed the former Governor's submissions, all of the arguments therein, and have independently reviewed the multitude of evidence – documentary and testimonial, including the former Governor's own statements – and find overwhelming support that the former Governor engaged in multiple instances of misconduct.

* * * * *

The Committee has provided relevant information from its investigation to law enforcement and will continue to cooperate with respect to any such investigation.

## IV. Publication of *American Crisis: Leadership Lessons from the COVID-19 Pandemic*

### A.   Overview

As part of the mandate from Speaker Heastie, we investigated whether the former Governor engaged in any misconduct in writing, publishing, and promoting his book, *American Crisis: Leadership Lessons from the COVID-19 Pandemic* (the "Book")*.*  Our investigation considered, for example, whether the then-Governor's use of his own time and that of state employees served to further his personal financial gain during a global pandemic, which required what the then-Governor touted as an "around-the-clock" government response.

To begin, there is no dispute that the former Governor wrote a book in 2020, during the pandemic which required an all-hands-on-deck government response.  The former Governor received approval from the Joint Committee on Public Ethics ("JCOPE") to proceed with the Book and, among other things, JCOPE required that "[n]o State property, personnel or other resources may be utilized for activities associated with the book."[213]

Evidence obtained in our investigation demonstrates that junior members of the Executive Chamber worked on the Book and that work was not voluntary.  Junior staff members were asked by senior Executive Chamber officials to perform tasks that were related to the Book as part of their regular course of work.

Certain senior members of the former Governor's Executive Chamber and other senior New York State officials worked extensively on the Book.  These senior officials attended meetings with agents and publishers, transcribed and drafted portions of the Book, coordinated the production and promotion of the Book, and participated in working sessions to review and finalize the Book.  One senior Chamber official in particular spent significant time working on the Book, including during normal work hours, and served as the key point person between former Governor Cuomo and the publisher throughout the entire process.  That senior official sent or received over 1,000 emails regarding the Book, from July to December 2020.  Another senior official sent or received over 300 emails regarding the Book in the same time frame.

The evidence obtained demonstrates that senior officials, and the former Governor, worked on the Book during the course of normal work routines.  One senior state official referred to work on the Book as no different from any other assignment he received from the Executive Chamber during COVID.  The state official explained that Book-related assignments were given by superiors and were expected to be completed like any other task.  He further explained that the work was not voluntary, as he was never asked to volunteer and was not aware of other officials being asked to volunteer.  Further, the state official was never told about any restrictions related to his work on the Book, from JCOPE or otherwise.  He explained that work on the Book differed from his prior work on political campaigns, where he would perform campaign work separate and apart from official state duties.  For example, previously, the senior official had taken several weeks of vacation time and moved to a separate office to volunteer on one of the former Governor's prior political campaigns.  In contrast, Book-related tasks were performed at times during the course of regular work hours and were not segregated in any way.

Another senior state official stated in an interview that work done on the Book was voluntary, but contemporaneous evidence suggests that this state official felt otherwise at the time.  In August 2020, this state official complained in a text message to a colleague that work on the Book was compromising his ability to work on other COVID-related matters.[214]  The colleague who received the message stated in an interview that he understood that the senior official who sent the text message was asked to work on the Book by those in charge, just as the colleague had been, and that the colleague did not understand the senior official's work to be voluntary.[215]

Further, whether the work on the Book by state officials was voluntary or not, the time and effort spent on the Book by both the then-Governor and other state officials necessarily detracted from their state duties during the intense period when the then-Governor, Executive Chamber employees and other state officials were continuously engaged in the pandemic response.  The then-Governor touted this period as requiring an around-the-clock government response.  In his Book, for example, the former Governor

stated that a key Executive Chamber official, who worked extensively on the Book, "never took a day off" during the pandemic response.[216]  Another state official noted that the State's response to COVID-19 involved nonstop work for senior members of the Executive Chamber – including during July and August 2020, a period during which the Book continued to be drafted and revised.

Former Governor Cuomo profited substantially from the Book, and he sought to downplay the money he earned from the Book.  The former Governor's book contract guaranteed payment to him of $5.2 million in royalty advances.[217]  Of the total guarantee, $3.12 million was paid to the former Governor by the time of publication, and the former Governor was scheduled to receive an additional $2.08 million in equal parts in October 2021 and October 2022.[218]  In public statements, the former Governor suggested otherwise.  For example, during a radio appearance on August 19, 2020, when asked if he received "a lot of money for doing" the Book, the then-Governor replied, "Well, only if [I] sell a lot of copies" and when asked if he was going to "make a lot," the then-Governor replied "[i]t depends on sales."[219]  Book sales only accounted for a portion of the former Governor's contractually guaranteed fees, and those payments would have been in addition to the initial $5.2 million payment.[220]

### B.    Investigative Steps

We reviewed documents from the Book's publisher and interviewed a number of its employees.  We also received documents from and conducted interviews of certain state employees who were involved in or had knowledge of the Book's production.

### C.    Former Governor's Lack of Cooperation and Response

The former Governor's counsel has made several requests to address the issues under investigation by the Committee and on September 13, 2021, the former Governor's counsel provided the Committee with a written submission, which included only a paragraph regarding the Book and did little to refute the evidence gathered.  The response noted that the former Governor "sought and received permission from JCOPE to write the book" and claimed that "[a] small number of state employees familiar with the events portrayed in his book voluntarily assisted," and that time spent on the Book "did not take away from their state duties, particularly given those employees regularly worked 80 to 100-hour weeks in their state jobs for a set salary."  The former Governor's counsel further stated that they would not be providing any further information at this time, due to the NYAG's ongoing criminal investigation.

As noted above, the former Governor failed to cooperate in any meaningful way with the Committee's investigation including with respect to the Book.  Key senior officials also declined to cooperate with our investigation or otherwise make themselves available.  While the former Governor has repeatedly asked for the production of evidence with respect to the Committee's investigation, he was personally involved in and well aware of the details of the drafting, production and promotion of his Book, and had personal access to evidence in that regard.  As such, the former Governor was well-

positioned – and arguably best positioned – to provide a detailed account of his role and that of others with respect to the Book, and he declined to do so.

### D.   Relevant Facts

#### 1.   *Initial Outreach, Auction and Contract Negotiations*

As early as March 19, 2020, a Penguin Random House ("PRH") employee reached out to a literary agent representing then-Governor Cuomo to see if the then-Governor was interested in writing a book.[221]  On July 1, 2020, the literary agent told a PRH representative that then-Governor Cuomo had been writing a book about his experiences during the first six months of the pandemic and his actions as Governor to respond to the crisis.[222]  The literary agent represented that the then-Governor already had 70,000 words written and that the book would contain leadership lessons for times of crisis, as well as details on interactions with members of the federal government, including the White House.[223]  The primary topic of the Book was the COVID-19 pandemic and New York State's response.

On July 6, 2020, then-Governor Cuomo and a senior Executive Chamber official participated in a meeting with PRH representatives concerning the content of his Book.[224]  As discussed below, July 6, 2020 is the same date that the DOH Report regarding the effect of COVID-19 on nursing home residents was released.  A PRH representative reported that on the call, it was made clear to the then-Governor that he would be on a strict deadline to publish the Book before the 2020 presidential election, and that the then-Governor and senior Executive Chamber official assured PRH that they would meet the deadline.[225]

An auction process for the Book began on July 8, 2020 and involved three publishers.[226]  PRH's bid started at $750,000, and, after several rounds, bidding escalated into the $5 million range.[227]

The winning publishing house, PRH, prevailed on July 10, 2020.[228]  The ensuing contract was negotiated over the next week, and guaranteed compensation of $5.2 million in royalty advances.[229]  As noted above, of the total guaranteed, $3.12 million was paid to the then-Governor by the time of publication and the former Governor was scheduled to receive an additional $2.08 million in equal parts in October 2021 and October 2022.[230]  The contract also provided for additional refresher bonuses of around $1.25 million, which would be triggered if certain earnings targets were reached.[231]

#### 2.   *Public Statements by Then-Governor Cuomo*

On July 10, 2020, the day the Book auction was completed, the then-Governor told WAMC Northeast Public Radio with Alan Chartock, "I am now thinking about writing a book about what we went through, lessons learned, the entire experience because if we don't learn from this then it will really compound the whole crisis that we've gone through."[232]  In subsequent public statements, the then-Governor sought to downplay his personal gain from the Book.  For example, during a radio appearance on

August 19, 2020, when asked if he got "a lot of money for doing" the Book, the then-Governor replied, "Well, only if [I] sell a lot of copies."  When asked again how much money he would make, the then-Governor continued to represent that "[i]t depends on sales."[233]  As noted, book sales account for only a portion of the former Governor's contractually negotiated fees, and would have been in addition to the $5.2 guaranteed million payment.[234]

### 3.   JCOPE Approval

On July 10, 2020, a state official who served as Special Counsel to the then-Governor sent a letter to JCOPE requesting outside activity approval for the then-Governor to "author a memoir book in the very near future, which will be a memoir of his professional and personal life since his last book, published in October 2014."  The request included a prior JCOPE approval letter for the then-Governor's first book from 2012.[235]  The request was sent on behalf of the then-Governor and requested review and approval to author a continuation of his previous book, *All Things Possible: Setbacks and Success in Politics and Life*.[236]  In the letter, the Special Counsel noted that the then-Governor would:

> [A]bide by all nine of the established requirements . . . .  Specifically, he will <u>write the book entirely on his own time, without the use of state resources or personnel</u>.  It will be written with the general public as its audience and will not identify the Governor as a State official on the cover of the book.  No State agency will promote, advertise or otherwise endorse the book and the Governor will not do so while performing his State functions.[237]  (Emphasis added.)

The letter requested expedited review, stating:

> [Given] <u>the Governor's commitment to scrupulous observance of the established factors for authorship of a book as an outside activity</u>, existing JCOPE precedent in the form of published Advisory Opinions, the 2019 Ethics Guidebook and approval of his prior similar book, and the strong public and First Amendment interests implicated by the contemplated memoir, JCOPE should grant the Governor's request for outside activity approval without delay.[238]  (Emphasis added.)

On July 13, 2020, the Special Counsel emailed a Deputy General Counsel at JCOPE to confirm approval for the then-Governor to negotiate with the publisher, and to confirm approval of the full outside activity once certain additional information discussed was provided.[239]

On July 16, 2020, the Special Counsel sent JCOPE a letter from PRH stating that the terms of the proposed contract with then-Governor Cuomo were usual and customary for the book publishing industry based on the surrounding facts and circumstances.[240]  That same day, JCOPE gave its final approval.[241]  In its approval letter, JCOPE

enumerated the nine requirements for then-Governor Cuomo related to the preparation, publication, and promotion of the Book.[242]  The requirements were as follows:

1.  The book must be written on the Governor's own time and not on State time;

2.  No State property, personnel or other resources may be utilized for activities associated with the book;

3.  The subject matter must be sufficiently unrelated to the Governor's official duties so that authorship or the advice or material provided in the book cannot be viewed as part of the Governor's job;

4.  The book may not be written for an organization or audience which is regulated by, regularly negotiates with, or has contracts with any State agency;

5.  The book must identify the author in his personal capacity (although a biography may cite his official State title);

6.  Neither the Executive Chamber nor any State agency may advertise or otherwise promote the Governor's book;

7.  The Governor may not advertise, or otherwise promote or endorse, the book when he is performing his State duties;

8.  Neither the Executive Chamber nor any State agency may use the book or make it available as part of any of its training programs; and

9.  The book must contain a disclaimer that the opinions and statements contained therein are those of the Governor only and do not represent those of any State agency.[243]  (Emphasis added.)

We have not seen any evidence that these JCOPE requirements were communicated to the members of the PRH team, although PRH was made aware of a pending ethics approval.[244]  Several PRH employees stated during their interviews that they were either not familiar with the specifics of the JCOPE limitations or were completely unaware of any limitations set on the former Governor.[245]

Also on July 16, 2020, the then-Governor officially entered into a contract with PRH.[246]  Metadata in the electronic agreement shows that a senior Executive Chamber official signed the former Governor's name on the contract on his behalf.[247]  Related documentation, such as payment processing information, included the email address of another senior Executive Chamber official, rather than the former Governor's own email.[248]  A senior Executive Chamber official also provided a rough draft manuscript to PRH that same day.[249]

### 4.    *Drafting Process*

The evidence obtained reflects that former Governor Cuomo's senior staff assigned certain tasks to junior staff on a non-voluntary basis.  Further, senior staffers themselves performed frequent work on the Book, including drafting and revising the Book in July and August 2020.

### a.    **Participation by Junior Staff**

We have gathered evidence that demonstrates that junior employees of the Executive Chamber were required to perform work on the Book on a non-voluntary basis. For example, a junior staffer recalled that late one evening, likely in June or early July, a senior Executive Chamber official instructed junior employees to compile materials related to then-Governor Cuomo's COVID press briefings on an urgent basis, a task that took approximately five junior employees several hours to complete.[250]  In hindsight, the junior staffer believes this work was related to the preparation of the Book.[251]  In interviews and attorney proffers, several other junior Executive Chamber employees described participating in activities that they understood to be related to the Book – including transcribing dictations, printing and personally delivering documents, and compiling documents.[252]

### b.    **Participation by Senior Staff in Drafting the Book**

Certain senior Executive Chamber officials and Task Force members spent significant time working on the Book.  One Task Force member explained that Book-related assignments were given in the same manner as other, state-related COVID work assignments.[253]  That Task Force member performed substantial work on the Book and did not recall ever volunteering to do so.[254]  The Task Force member was told to meet at certain times and locations (including at the Executive Mansion), was presented a copy of the Book manuscript, and was expected to participate in the editing and review process. This happened on multiple occasions and, according to the Task Force member, detracted from work on other pandemic issues – although the Task Force member said that much of his work on the Book was during nights and weekends.

Beginning on July 17, 2020, representatives from the publisher, the former Governor's literary agent, and a senior Executive Chamber official discussed a plan to move forward on the Book, including timelines and hiring a ghostwriter. [255]  A senior PRH employee noted in an email that the senior Executive Chamber official would "be an excellent - functional - partner" for the Book project.[256]  The PRH employee also noted that the senior Executive Chamber official was aware of the timing for an initial edit, and discussed setting up all-day meetings with PRH, the then-Governor and his staff in Albany the following Thursday through Sunday.[257]  Those meetings ultimately took place on Friday, July 24, 2020 and Saturday, July 25, 2020.

The same senior Executive Chamber official served as the key point of contact for the Book, and sent and received at least 1,000 emails regarding the Book during the period from July to December 2020 (while a variety of important COVID issues were

ongoing, as they were throughout the period during which the Book was drafted, published, and marketed).  The senior Executive Chamber official emailed the publisher and the then-Governor's ghostwriter, including emails in late July to provide information, statistics, articles, press conference transcripts, and pictures for the Book, and to exchange and comment on various sections or drafts of the manuscript.  In the Book, the former Governor described this official as central to Executive Chamber operations: "the quarterback on my team and [] responsible for managing all the pieces"[258] and who "never took a day off."[259]

Another senior Executive Chamber official also emailed PRH often, sending or receiving over 300 emails regarding the Book from July to December 2020.  These communications included relaying requests from the then-Governor, providing draft sections of the Book, and handling administrative tasks with respect to the Book.[260]  This senior Executive Chamber official also appears to have served as the primary point of contact for PRH's Director of Audio Production regarding scheduling and logistics for the audiobook recording sessions.[261]  Counsel for this senior Executive Chamber official has said that the official volunteered to work on the Book.

Between mid-July and mid-August 2020, senior Executive Chamber staff drafted and edited portions of the then-Governor's Book manuscript and spoke with the publisher's team about proposed revisions and drafts by email, over the phone, and in person, including on weekdays and during work hours.  During the drafting, there was particular attention paid to the nursing home section of the Book, and a senior Executive Chamber official noted that this section was "critically important."[262]

A Task Force member assisted in drafting and editing Chapter 6 of the Book, which touched on the issue of nursing homes during the pandemic.[263]  A senior Executive Chamber official requested the Task Force member's assistance, including relaying an instruction from the then-Governor to "keep fl[e]shing" out the Chapter.[264]  The Task Force member also provided information for the Book at the request of another senior Executive Chamber official, participated in several meetings at the Executive Mansion regarding the Book, and assisted with fact-checking and clarifying events related to the Book.

The same Task Force member also provided COVID-19 statistics for the Book and drafted sections of the Book consistent with this information.[265]  On one occasion, the Task Force member proposed changes to the language of a portion of the Book.  In so doing, the Task Force member noted that the language in a particular paragraph closely aligned with text from a "NY Forward Reopening" guide, which the Task Force member had also written, and which the then-Governor sent to localities during the pandemic.[266]

Contemporaneous emails and text messages indicate that two senior Executive Chamber officials made numerous requests to other senior staff members regarding the Book.  These communications and this work occurred during the week and on the weekend, during work hours and after-hours.  One Task Force member described the process as a "complete scramble" in the Chamber to provide edits and information

regarding the Book, with pressure to quickly provide information in response to requests from those in charge.[267]

In addition to their communications regarding the Book, senior members of the Chamber also attended at least three days of manuscript editing sessions at the Executive Mansion on Friday, July 24, 2020,[268] Saturday, July 25, 2020,[269] and Saturday, August 1, 2020,[270] and may have attended another meeting on Saturday, August 8, 2020.[271]  The Friday, July 24, 2020 session occurred midday and at least six senior officials were present and participated, along with the then-Governor and at least two representatives from the publisher.  One senior state official stated that for at least some of the editing sessions, the attendees gathered in the dining room of the Executive Mansion to review printed copies of the manuscript.[272]  When the official arrived at the Mansion, copies of the manuscript were laid out around the table and lunch was provided.  Portions of the manuscript were read aloud, and attendees made comments and proposed edits to the manuscript.[273]  Senior state officials were also asked to, and did, gather at the Executive Mansion on other days to do additional work on the Book.[274]

On the same day as the first drafting session, Friday, July 24, 2020, the then-Governor said in a press conference, "You cannot use government for political exploitation" and "[n]owhere in your oath of office does it say you can use government resources to advance political purposes," when calling for investigations into the federal government's politicization of the Trusted Traveler Program.[275]

### c.   Use of "Personal" and "Vacation" Leave in July and August 2020

As part of our investigation, we reviewed timesheets of employees who worked on the Book.  Because the timesheets show only whether a state employee recorded a full day of work on a particular day or took any leave that day, it is not possible to use the timesheets to account for how employees spent specific portions of their day.  Evidence reviewed in our investigation indicates that certain senior Executive Chamber staff took "personal," "vacation," and "sick" leave in July and August of 2020, which may have been meant to account for at least some of their time spent working on the Book.[276]  One senior Executive Chamber official took one to three hours of leave on multiple days in late July and early August.[277]  Another senior Executive Chamber official took off numerous days in July and August 2020, and spent time working on the Book on those days.[278]  Both of these officials declined to participate in interviews, and therefore we were not able to ask them about the reasons for their personal or vacation leave during this period.

One senior state official expressed the view that work on the Book was personal time and the official therefore took leave for certain days spent substantially working on the Book.[279]  On other days, when the official worked on the Book for shorter periods of time, he did not take leave.[280]  In a text message to a colleague in early August 2020, that state official expressed frustration for the time spent on the Book that could have been dedicated to work-related tasks responding to the pandemic.[281]

Another senior state official stated that – despite working on large portions of the Book – the official was never told to take leave for time spent working on the Book and eventually took three hours off for the July 24, 2020 meeting at the Mansion.[282]  The official did so after overhearing a conversation during which a senior Executive Chamber official suggested that all persons at the July 24 meeting should retroactively take leave for that day.[283]

Anticipating criticisms that the then-Governor could face about how he found time to write a book during the pandemic, PRH proposed including a streamlined form of an "Acknowledgments" section that recognized only the editorial team at PRH.[284]  PRH recommended that doing so would be an "elegant" way to proactively answer questions about how the then-Governor found time to write the Book, as well as associated questions about what writing the Book required in terms of his time.[285]  This advice was followed.  The Book's Acknowledgments recognized four PRH employees and the former Governor's literary agent.  There was no mention of any assistance by Executive Chamber officials or other state employees.

## 5.   *Audio Recording*

The then-Governor also recorded an audio version of the Book.  Recording sessions took place in the Executive Mansion and were coordinated by members of the Executive Chamber.  There were seven recording sessions at the Executive Mansion – each lasting multiple hours totaling approximately twenty-four hours – between Thursday, September 17, 2020 and Friday, September 25, 2020.  The first recording session took place on Thursday, September 17, 2020, starting in the late afternoon.[286]  Additional recording sessions were then scheduled for Saturday, September 19, 2020 at 12:00 p.m., Sunday, September 20, 2020 at 9:00 a.m., Monday, September 21, 2020 at 12:15 p.m., Tuesday, September 22, 2020 at 9:00 a.m., Wednesday, September 23, 2020 at 9:00 a.m., and Friday, September 25, 2020 at 9:00 a.m.[287]  Again, the scheduling was arranged by members of the then-Governor's executive staff.[288]  Often, a senior Executive Chamber official would reach out to a PRH employee when the then-Governor was ready to record, and the senior official and the PRH employee would confirm the time and coordinate relevant logistics.[289]  In contemporaneous emails with a colleague relating to the recording, the PRH employee described "bother[ing] the Gov's team daily" and that the Chamber team would be "happy [to] never . . . hear from me again!"[290]

## 6.   *Promotional Activities*

Beginning in late July 2020 and running through publication in October 2020 and beyond, members of the Executive Chamber also engaged in extensive correspondence with PRH and various other third parties regarding the marketing strategy, promotion, and sales of the Book.  Throughout, a senior Executive Chamber official continued to be the primary point of contact for PRH with regard to the Book.  In addition, other members of the Executive Chamber, typically using personal email accounts, were also part of communications relating to Book interviews and other public relations efforts.  Around this same time, a senior PRH employee emailed other PRH employees to remind

them to communicate with Executive Chamber staffers on personal email addresses to "keep it out of the Governor's office."[291]

As early as Thursday, July 30, 2020, the senior Executive Chamber official was planning a call with PRH to discuss the "book announcement strategy and timing."[292] Efforts to plan the marketing of the Book continued in August 2020 as the manuscript was completed.[293]

On Wednesday August 12, 2020, employees of PRH spoke with several Executive Chamber employees and a consultant regarding the Book announcement.[294] On Tuesday, August 18, 2020, the upcoming publication of the Book was announced and then-Governor Cuomo appeared at a virtual event for PRH, which two senior Executive Chamber officials attended "backstage."[295] That same day, the Book became available for preorder, including on Amazon.[296]

The senior Executive Chamber official immediately engaged with the then-Governor's literary agent and PRH to learn the meaning of certain rankings on Amazon, and to discuss how to raise the Book's profile on Amazon and thus boost preorders.[297] That Executive Chamber official also worked with PRH to ensure that the Book was easily identified in an Amazon search, and worked with another senior Executive Chamber official to set up multiple author accounts for the then-Governor on both Amazon and the PRH author portal, using one of their own personal email addresses to set up the then-Governor's Amazon profile.[298] This activity is an example of work related to the Book that was often done during standard work hours on weekdays.

Subsequently, the senior Executive Chamber official repeatedly sought updates regarding the Book's presales and expressed frustration when figures were not delivered promptly, ultimately asking to be sent the numbers "everyday."[299] Discussions regarding the Book's rollout continued through August 2020 among PRH and members of the Executive Chamber.[300] Following the Book's eventual release, the same senior Executive Chamber official sought updates on the sales.[301]

PRH's promotion efforts ramped up in September 2020, in the run-up to publication in October 2020. Senior Executive Chamber staff also corresponded directly with the media regarding the Book, and were involved in dealing with certain high-profile supporters. The key Executive Chamber official sent emails, oftentimes during the work week, related to asking public figures to attend events with the then-Governor to promote the Book.[302] PRH also asked that same Executive Chamber official to approve media engagements and make decisions regarding marketing on the then-Governor's behalf. For example, on Saturday, October 3, 2020, the Executive Chamber official raised concerns that a reporter who was planning to interview the then-Governor might not conduct a "positive interview" because the Chamber's "vetting team … did a check" and found unfavorable articles and tweets that the reporter had written about the then-Governor.[303]

As another example, one communication from Wednesday, October 7, 2020 reflects that an Executive Chamber employee spoke with representatives from a

prominent daytime talk show regarding interviewing the then-Governor to promote the Book.[304]  Chat messages from October 2020 between PRH employees and various Executive Chamber employees show numerous discussions regarding logistics for promotional events or interviews (e.g., attire, timing, questions to be asked, public reaction) – including for potential interviews on various prominent television shows.[305]

Documents reflect numerous emails, phone calls, and text messages from Executive Chamber employees about Book sales.[306]  For example, Executive Chamber employees also appeared focused on ensuring that bulk sales were counted toward *The New York Times* Best Sellers list's ranking of the Book.[307]  The Book did reach the Best Sellers list, though not as high as was hoped.[308]  In late October, email correspondence between a senior Executive Chamber official and individuals at PRH reflects frustration between the Cuomo side and PRH regarding obtaining up-to-date sales information on the Book.[309]

Then-Governor Cuomo was also involved in promoting the Book.  His contract guaranteed he would be available for ten days of media and appearances related to the Book, and at least one such appearance was scheduled during a typical workday.[310]  That is, notwithstanding the ongoing pandemic, the former Governor committed to be available for ten days to promote his Book.  In addition, the evidence suggests that then-Governor Cuomo's staff prepared him for media interviews and events promoting the Book.[311]

### E.    Conclusion

Our investigation evidences that the Book was the product of significant work performed by Executive Chamber staff during a time of a global pandemic requiring an around-the-clock response.  The Committee has cooperated with law enforcement with respect to the evidence gathered in connection with its Book investigation, and will continue to do so.

## V.  Disclosure of Nursing Home Information

### A.    Overview

We gathered evidence to assess whether the former Governor directed his staff to inappropriately withhold or misrepresent information regarding the effects of COVID-19 on New Yorkers, particularly with respect to nursing homes in New York State.  Our investigation focused on the preparation and publication of a report by DOH dated July 6, 2020 titled "Factors Associated with Nursing Home Infections and Fatalities in New York State During the COVID-19 Global Health Crisis" (the "DOH Report"), including events leading up to the preparation of the DOH Report.  We also examined whether the former Governor directed his staff to withhold information in response to requests in August 2020 from members of the New York State Legislature.  As noted, we did not conduct an independent medical review of the cause of nursing home infections and deaths during the pandemic and such a review was not within our mandate.

The evidence obtained in our investigation establishes that while the DOH Report was accurate in its disclosures, it was not fully transparent regarding the total number of nursing home residents who died as a result of COVID-19.  The Executive Chamber also delayed providing information requested by the Legislature, contrary to the advice of a senior DOH official and another senior state official.  We note that our investigation did not uncover evidence to suggest that the March 25, 2020 directive, which addressed the admission or readmission of nursing home residents who had been diagnosed with COVID-19 (the "March 25 Directive"), increased the number of COVID-19 fatalities in nursing homes.  Similarly, based on our investigation – which did not involve an independent medical assessment – we are not aware of any evidence that undermines the central conclusion of the DOH Report that COVID-19 was likely introduced into nursing homes by infected staff.  We note that many of the decisions regarding the pandemic and related policies were made in the context of a once-in-a-century event that was fast-moving and presented significant challenges.  As with other subjects addressed in this report, we note the ongoing law enforcement interest into nursing home issues, with which we have cooperated.

### B.    Investigative Steps

We reviewed documents produced by the Executive Chamber, DOH and several individuals, and spoke with a number of current and former DOH employees.  We also interviewed several Executive Chamber officials on these topics, but two officials declined, and a third did not make themselves available despite repeated requests.

### C.    Former Governor's Lack of Cooperation and Response

The former Governor and his counsel were given multiple opportunities to address the healthcare-related allegations under investigation.  In a September 13, 2021 written submission to the Committee, the former Governor's counsel stated only that "[n]othing about the conduct by individuals in the Executive Chamber in reporting data was unlawful," and encouraged the Committee to ask the outside counsel for the Executive Chamber for the "detailed and extensive written presentation . . .  regarding the reporting of data on COVID-19" that was provided to the U.S. Attorney's Office, "which makes clear that there was no wrongdoing."  We have carefully reviewed that written presentation.  Finally, we are mindful of ongoing law enforcement interest regarding these issues, and we continue to cooperate accordingly.

### D.    Background

The treatment of nursing home patients infected with COVID-19 and the reporting of their deaths became an issue early on in the pandemic.  On March 25, 2020, then-Governor Cuomo and DOH issued the March 25 Directive to nursing home administrators, directors of nursing, and hospital discharge planners.  Citing "an urgent need to expand hospital capacity in New York State," the March 25 Directive provided that:

> "No resident shall be denied re-admission or admission to
> the [nursing home] solely based on a confirmed or
> suspected diagnosis of COVID-19. [Nursing homes] are
> prohibited from requiring a hospitalized resident who is
> determined medically stable to be tested for COVID-19
> prior to admission or readmission. . . . As always, standard
> precautions must be maintained, and environmental
> cleaning made a priority, during this public health
> emergency." (Emphasis in original.)

On May 10, 2020, Governor Cuomo amended the March 25 Directive with Executive Order 202.30, which provided that:

> "Any . . . hospital shall not discharge a patient to a nursing
> home, unless the nursing home operator or administrator
> has first certified that it is able to properly care for such
> patient. . . . [A]ny . . . hospital shall not discharge a patient
> to a nursing home, without first performing a diagnostic
> test for COVID-19 and obtaining a negative result."[312]

Even after the March 25 Directive was amended, former Governor Cuomo and DOH were subject to public criticism regarding its potential effect on the spread of COVID-19 among residents of New York State nursing homes. The former Governor sought to rebut that criticism, including by directing DOH to produce a report defending the March 25 Directive.

### E.   Initial Reporting of Nursing Home Fatalities

In April 2020, DOH began publishing data regarding COVID-19 fatalities that occurred in nursing home facilities. After DOH had been publishing fatality data for several weeks, it became apparent that for a period of approximately two weeks in April and/or May 2020, certain fatalities in nursing home facilities due to COVID-19 were not included in the published data.[313] Specifically, deaths reported by nursing homes after approximately 5:00 p.m. each day were not included in totals for that day, and therefore the published data was incomplete.[314]

This underreporting was the subject of multiple discussions involving employees of the Executive Chamber, members of the Task Force, and others in April and/or May 2020.[315] While it appears that the underreporting was the result of difficulty in utilizing a new data collection process amidst a pandemic, there was some reluctance to admit error when it was discovered and to correct the published numbers immediately. For example, when an Executive Chamber employee alerted a Task Force member to the issue, the Task Force member responded by saying something to the effect of, "Do you want me to admit that we have been reporting deaths incorrectly?"[316]

Following those discussions, a team of DOH employees was assigned to conduct a re-review of the nursing home data.[317] That re-review resulted in a higher number of

reported fatalities than had previously been reported, as it included deaths for the full 24-hour time period each day.[318]  On or around May 6, 2020, revised statistics regarding fatalities in nursing home facilities were published on DOH's website.[319]

### F.    July DOH Report

Our investigation examined two issues related to the preparation and publication of the DOH Report: (1) identification of the data to be included in the DOH Report regarding nursing home fatalities and (2) the former Governor's and Executive Chamber's involvement in issuing the DOH Report, under the auspices of DOH.

#### 1.    *Disclosure of Nursing Home Fatalities*

The DOH Report was prepared in late June and early July 2020, and was published on July 6, 2020.  As discussed above, the former Governor began discussing a potential book deal with PRH and other book publishers during this same time period.

In preparing the DOH Report, officials from the Executive Chamber, the Task Force and DOH discussed which data to disclose regarding the number of nursing home fatalities.  A debate arose regarding whether to include a figure that included all deaths of nursing home facility residents (approximately 10,000 deaths), or a lower figure that included only deaths that occurred within nursing home facilities (approximately 6,500 deaths).  The distinction between the two figures was the location of the nursing home residents' death: whether one counts only the residents who died at the nursing home facility (also referred to as "in-facility" deaths), or whether one also counts residents who died after being transferred out of the nursing home facility, such as in a hospital (an "out-of-facility" death).  There was also an issue in counting deaths that were presumed to be related to COVID-19, as opposed to deaths that had been confirmed as COVID-related.

Prior to the issuance of the DOH Report, a draft scientific paper prepared by DOH medical officials had identified approximately 10,000 nursing home-related fatalities, a number which included both in-facility and out-of-facility deaths.[320] In drafting the DOH Report, members of the Executive Chamber, Task Force, and DOH utilized information from the draft scientific paper, and initially cited the approximately 10,000 figure as well.

In late June, members of the Executive Chamber and Task Force convened a call and discussed data in drafts of the DOH Report, including the approximately 10,000 deaths among nursing home residents.[321]  In an email exchange immediately following that call, a Task Force member expressed the understanding that the approximately 10,000 number was not public and should not be provided.[322]  Another Task Force member replied that the approximately 10,000 number should not be a "surprise, shock, or anything to folks," as it came from earlier drafts of the DOH Report and data provided by consultants who had been engaged to assist DOH with collecting and interpreting data.[323]  Subsequent drafts of the DOH Report included the approximately 6,500 figure, which reflected only in-facility deaths of nursing home residents.[324]

The published DOH Report disclosed only in-facility deaths, and did not explain the population of nursing home fatalities included in the report, nor did it explain why out-of-facility deaths were not disclosed.  The DOH Report cited data from *The New York Times*, and described the data as representing deaths "in nursing homes" and "at these facilities."[325]  The report also included a figure comparing the number of nursing home and non-nursing home deaths over time, and labeled the "nursing home" fatalities as including "confirmed and presumed fatalities, NH population only in NH facilities."[326]  Although the description of the data was technically accurate, the DOH Report could have been more transparent regarding the number of nursing home residents who had died as a result of COVID-19, by either disclosing out-of-facility deaths or explaining why those deaths were not included in the report.

Witnesses have stated that the same senior Executive Chamber official who served as the key point person for the Book made the decision that only in-facility deaths would be included in the DOH Report.  Certain witnesses have explained that there are multiple possible reasons for choosing to report in-facility deaths only, including questions regarding the reliability of data regarding out-of-facility deaths, which was more difficult to collect and verify than data regarding in-facility deaths,[327] other witnesses explained that a reason for including in-facility deaths only was because including the higher number would have distracted from the overall message of the DOH Report and would have also been inconsistent with data that had been publicly reported at the relevant time.[328]  Certain DOH officials believed that the proper reporting of the nursing home death totals should have included the total number of deaths – both in-facility and out-of-facility – with an explanation of how deaths were calculated, and that such an accounting would have been consistent with the manner in which medical reports of this type were produced.

## 2. Former Governor Cuomo's Involvement in the DOH Report

As noted above, the evidence obtained in our investigation demonstrates that former Governor Cuomo directed officials from the Executive Chamber, Task Force and DOH to prepare a report from DOH in order to combat criticism of the March 25 Directive.[329] The report was initiated by the then-Governor and influenced by members of the Executive Chamber and Task Force, then released under the auspices of DOH. Throughout the drafting process, the former Governor reviewed and edited the draft DOH Report on multiple occasions, and made edits to strengthen the defense of the March 25 Directive.[330]

DOH officials who worked on the DOH Report expressed a number of concerns regarding drafts of the report, including that drafts of the report used data that could not be independently verified by DOH, and that drafts included statements of causality and drew oversimplified conclusions, and did not explain the limitations of the data used in the DOH Report.[331] More generally, DOH officials were concerned that the DOH Report was directed by the Executive Chamber and Task Force, and was not in fact a scientific or medical report. While many of the DOH employees' most pressing concerns regarding drafts of the DOH Report were addressed prior to publication,[332] other concerns with the nature of the DOH Report remained.[333]

Separately, we also note that as a general matter, DOH officials expressed concern that the former Governor's COVID-19 response team was largely comprised of non-medical experts and felt that as a result, decisions were not always made based on scientific or medical advice.[334]  The COVID-19 Task Force was comprised of senior state officials from various state agencies, as well as former state officials.  There was only one healthcare professional on the Task Force, a senior DOH official, and that senior DOH official did not have regular meetings with the former Governor during the pandemic and found it difficult to speak directly with the former Governor, as senior Executive Chamber employees guarded access to the former Governor.[335]  Moreover, the senior DOH official did not feel able to speak freely to the former Governor or senior Executive Chamber employees, as advice that was contrary to the Chamber's views was often rejected.[336]  The senior DOH official felt that speaking up could result in an even more limited ability to provide advice going forward.[337]  DOH officials did credit the Task Force's ability to operationalize the pandemic response, which was challenging for DOH itself and not among their expertise.[338]

## G.   Executive Chamber Responses to Government Requests

In August 2020, DOH received requests for nursing home data from members of the New York State Legislature,[339] as well as a separate request from the Department of Justice.[340]

During testimony before the New York State Senate in August 2020, a senior Executive Chamber official, who was in the room where a senior DOH official was remotely testifying, wrote a message on a whiteboard suggesting that the senior DOH official testify in effect that the March 25 Directive was authored by DOH and that the Executive Chamber was not involved.[341]  This statement was not true, and the senior DOH official did not make such a statement in the testimony.[342]

Around August 2020, the same senior DOH official also prepared a letter to members of the Legislature reporting the full nursing home death numbers and provided it to the Executive Chamber for approval.[343]  To the senior DOH official's knowledge, the Executive Chamber never authorized releasing that letter.[344]  A Task Force member also advised releasing the full data set at this time, but the Executive Chamber did not do so – the Task Force member believed that it was because the Executive Chamber wanted to audit the data further.[345]

After asking for additional time to respond to the requests for information, the Cuomo Administration provided information in response to the requests from New York State legislators on February 10, 2021.[346]

## H.   Conclusion

The evidence obtained in our investigation indicates that the former Governor and his senior staff were not fully transparent with the public regarding the number of COVID-19 deaths among nursing home residents.  The Committee is cooperating with law enforcement with respect to these issues.

## VI.     Governor Mario M. Cuomo Bridge

Further to its mandate from Speaker Heastie, Davis Polk also investigated whether former Governor Cuomo "directed, or had knowledge of, executive personnel or others withholding information regarding safety concerns about New York State bridges" and whether he "directed or had knowledge of, executive personnel or others attempting to suppress or obstruct related investigations."

### A.     Overview

In 2016, an employee of Tappan Zee Constructors ("TZC"), which is the consortium responsible for designing and building the Governor Mario M. Cuomo Bridge (the "Bridge"), alleged that certain bolts used to construct the Bridge had physical defects that caused those bolts to break prematurely.  This employee whistleblower also alleged that other TZC employees had made secret bolt repairs to conceal broken bolts from quality control and/or quality assurance reviewers at the Bridge construction site.

The whistleblower's claims – and the associated safety concerns with the Bridge – have since been the subject of several related and overlapping investigations by various government authorities, including investigations by the New York Thruway Authority ("Thruway"), which is the agency charged with managing the Bridge project; the New York Inspector General's Office, which has oversight authority over the Thruway; and the New York Attorney General's Office.

On March 1, 2017, the whistleblower filed a *qui tam* action in New York state court, asserting claims against TZC under New York's False Claims Act.  In connection with this suit, the whistleblower's counsel retained several technical experts, who concluded in written reports that broken bolts on the Bridge showed signs of hydrogen embrittlement, a chemical process which causes weakening and fissures in bolts and that can cause bolts to break or lose clamping force.  The Thruway retained its own outside consulting firm to assist its review of the whistleblower's claims.  After a preliminary analysis of two broken bolts by a Thruway expert in April 2017 found that bolts used on the Bridge may be susceptible to hydrogen embrittlement, a follow-up report in December 2017 from a different Thruway expert concluded, among other things, that additional testing provided "confidence that the bolts in the [B]ridge will likely not experience delayed failure in the future," that the Bridge was fit for service, and that periodic maintenance and inspection of the Bridge would be sufficient to identify any additional bolt breaks.

The westbound/northbound span of the Bridge (i.e., the "first span") opened for public use on August 26, 2017, before the Thruway had completed its investigation of the alleged bolt defects.  The eastbound/southbound span of the Bridge (i.e., the "second span") opened on September 7, 2018, shortly before a New York gubernatorial Democratic primary.

The New York Attorney General, which intervened in the whistleblower's *qui tam* action on behalf of the State, settled the action in December 2020 for $2 million and a one-year extension by TZC of the warranty on the Bridge.

## B.   Investigative Steps

Consistent with the Committee's mandate, Davis Polk's review focused on whether former Governor Cuomo, or others acting at his direction, took steps to withhold safety information from the public regarding the Bridge, opened the Bridge or parts of the Bridge despite potential or known safety concerns, or obstructed investigations by state agencies into those concerns.  The question of whether the Bridge is actually safe or fit for service was therefore outside the scope of the review.

Davis Polk reviewed materials produced in response to voluntary document requests by various individuals and entities, including TZC, the Thruway, the whistleblower, and the New York Inspector General's Office.  Davis Polk also obtained access to a database maintained by TZC that contains additional records related to the Bridge construction project.  In addition, Davis Polk made voluntary document requests and later subpoenaed materials from the Executive Chamber in connection with the Bridge investigation, but received little to no documents in response to these requests.  Davis Polk received briefings or oral proffers from individuals and entities with relevant information, including TZC, the Thruway, the New York Inspector General's Office, other state agencies, and attorneys for the whistleblower, and we conducted several follow-up interviews with specific witnesses.

Below we have summarized certain relevant facts within the scope of the review, based on documents and other information obtained in the course of the investigation.

### 1.   The Opening of the First Span of the Bridge

Leading up to the opening of the first span in August 2017, Executive Chamber and Thruway officials engaged in numerous discussions regarding the Bridge and construction status.[347]  At the time of these discussions, the Thruway was aware of the whistleblower's allegations, but the communications available to Davis Polk between the Executive Chamber and Thruway relating to the opening of the first span did not reference bolts or safety issues.

Beginning in September 2017, approximately one month after the first span of the Bridge opened, members of the Executive Chamber and Thruway exchanged emails regarding a draft press release.  Specifically, the press release announced that traffic that had previously used the old Tappan Zee Bridge had now shifted to the first span of the new Bridge.  In response to an initial draft of this press release, a member of the Executive Chamber commented that "[we] need to frame [the release] more as[,] this is early" and that the earlier-than-anticipated shift of traffic from the old bridge to the new bridge "should be [in the] headline [of the release] and in subheads and woven entirely throughout."[348]

43

## 2. The Opening of the Second Span of the Bridge

The Executive Chamber and the Thruway also engaged in numerous discussions concerning the opening of the second span of the Bridge:

- In May 2018, members of the Thruway and the Executive Chamber circulated draft talking points for the then-Governor related to the anticipated opening of the second span.[349]  The initial draft talking points stated, "[W]e will be celebrating the opening of the second span [of the Bridge] this summer."[350]

- In response to the talking points circulated in May 2018, a communications official for the Thruway stated that "the [B]ridge will open in the fall not the summer."[351]  This official added that "we have tried to avoid a more specific timeframe" for the Bridge opening and that she could "offer more reasons offline."[352]  The Thruway official later acknowledged that the Thruway or the Governor's Office at one point may have said that the Bridge would open in the summer of 2018, but that "since that time there were three storms for which we were contractually obligated to offer them an extension."[353]  The storms referenced in the email related solely to Winter Storms Riley, Quinn, and Toby for which TZC was granted a time extension.  There was no mention of bolt or safety issues in these communications.

- In late August 2018, a senior Thruway official and members of the Executive Chamber discussed preparations for the opening of the second span.[354]  These discussions focused on issues including waterproofing, asphalt overlay, and rain, and made no mention of safety or bolt issues.

- Following the opening of the second span of the Bridge, *The New York Times* reported that Governor Cuomo's administration had offered TZC incentives to meet deadlines in order to open the Bridge early, in advance of the Democratic primary.[355]  In response to this reporting, a senior Thruway official prepared a draft response letter to *The New York Times* and circulated it to members of the Executive Chamber.[356]  This draft letter stated, among other things, that (i) TZC "was contractually obligated to finish the second span of the bridge by August 15, 2018 – a date that was set by [the senior Thruway official] and the contractor more than a year prior and without any consideration of any political primaries" and (ii) the senior Thruway official "did not consult with the Governor's office" before sending a letter to TZC directing it to complete construction by the contractual deadline.[357]

### 3. *Executive Chamber Knowledge of the Bolt-Related Safety Issues with the Bridge*

Although the Executive Chamber became aware of alleged deficiencies in the bolts used to construct the Bridge by no later than December 2018, the Thruway repeatedly informed the Executive Chamber (and announced publicly) that the Bridge was safe and fit for use.

On December 13, 2018, a news outlet reported that dozens of bolts used on the Bridge broke during construction and that workers allegedly tried to cover up the potential problem.[358] The same day the report was published, members of the Thruway and the Executive Chamber exchanged emails regarding the article, and a Thruway official stated in these emails that there was "no evidence of hydrogen embrittlement," "no safety issues" with the Bridge, and "no mention of gov" in the story.[359]

On March 7, 2021, the *Albany Times Union* published a report on the alleged bolt defects, noting that experts retained by the whistleblower believed the situation was likely to worsen as more bolts deteriorate and that critical testing had not been performed." [360] Later that day, a senior Thruway official sent a text to a member of the Executive Chamber, asking if she would like to "talk about" the article and adding that "[i]t's pretty bad but incredibly inaccurate."[361] The following day, the New York Inspector General issued a press release stating that it had conducted a significant investigation of the allegations in the *Albany Times Union* report, and that while it could not disclose the specific findings of its investigation, an independent testing laboratory retained by the Thruway had concluded that the bolts used during the Bridge construction process "did not compromise the safety of the bridge."[362] The Thruway then issued its own separate press release on March 22, stating that "we want to reiterate that the bridge is completely safe for the travelling public."[363] The Thruway also included a comment from the Federal Highway Administration in its release, which stated that the Bridge has been regularly and thoroughly inspected and that these inspections "have not revealed any safety issues with the bridge."[364]

### C.  Conclusion

In light of the former Governor's resignation and the fact that substantial further evidence would need to be gathered and analyzed, the Committee instructed Davis Polk not to pursue this investigation. The Committee will make all evidence that it has gathered available to appropriate authorities.

## VII.  Conclusion

We have carefully examined voluminous evidence, including approximately 600,000 pages of documents and witness materials related to proffers, interviews, or depositions for more than 200 individuals. We have also reviewed the statements made and writings by former Governor Cuomo and his counsel – opportunities of which they availed themselves despite, in the end, refusing to comply in any meaningful way with

the Committee's requests and subpoenas, despite public pledges of his cooperation on numerous occasions.

As detailed throughout this report, we collected and reviewed evidence that former Governor Cuomo:

- Engaged in multiple instances of sexual harassment, including by creating a hostile work environment and engaging in sexual misconduct;

- Utilized state resources and property, including work by Executive Chamber staff, to write, publish, and promote his Book regarding his handling of the COVID-19 crisis – a project for which he was guaranteed at least $5.2 million in personal profit; and at the same time

- Was not fully transparent regarding the number of nursing home residents who died as a result of COVID-19.

As noted, we are mindful of the ongoing law enforcement interests into several of the matters covered in this report.  We have prepared this report with those interests in mind and we are cooperating with any such investigations.

[1] A. Cuomo Tr. 39:14-41:1.

[2] NYAG Rep. at 1.

[3] *Id.*

[4] *See* N.Y. CONST. art. VI, § 24.

[5] N.Y. CONST. art. XIII, § 5.

[6] N.Y. JUD. Law § 240.

[7] *See* Impeachment Jurisdiction Memorandum of Law, Judiciary Committee, New York State Assembly, *available at* https://nyassembly.gov/write/upload/postings/2021/pdfs/20210813_0098640.pdf.

[8] *See People v. Carroll*, 148 N.E.2d 875, 876 (N.Y. 1958) (noting that "[t]he most compelling criterion in [constitutional construction] is . . . the language itself").

[9] Report of the Judiciary Comm. Relative to Power of Impeachment, N.Y. Assemb. Doc. No. 123, 76th Sess. 1 (June 23, 1853).

[10] Under the Federal Constitution, at least two officials have been impeached or tried following their departure from office (Secretary of War Belknap and President Trump, respectively), and in connection with the impeachment of President Trump, over 100 constitutional law scholars concluded that "the Constitution's text and structure, history, and precedent make clear that Congress's impeachment power permits it to impeach, try, convict, and disqualify former officers, including former presidents." *Constitutional Law Scholars on Impeaching Former Officers* at 3 (Jan. 21, 2021). This interpretation, however, is not universally accepted. *See, e.g.*, Harold J. Krent, *Can President Trump Be Impeached as Mr. Trump? Exploring the Temporal Dimension of Impeachments*, 95 Chi.-Kent L. Rev. 537, 540 (2021) ("[F]ocus on the language in the two impeachment clauses as well as on the structure of the Constitution as a whole lends strong support to the argument that impeachment should be confined to those occupying an office, and departure from that office deprives Congress of jurisdiction."). Moreover, the federal constitution uses materially different language to describe Congress's impeachment authority than does the New York State Constitution. *Compare* U.S. CONST. art. I, § 3 ("Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office") *with* N.Y. CONST. art. VI, § 24 ("Judgment in cases of impeachment shall not extend further than to removal from office, or removal from office and disqualification to hold and enjoy any public office."). At the state level, the results are somewhat mixed. In some cases, state courts have held that the state constitutions permitted impeachment proceedings following an official's departure from office. *See, e.g., Ferguson v. Maddox*, 263 S.W. 888 (Tex. 1924) (holding that the state senate has jurisdiction to convict a public official despite that official resigning during the impeachment trial); *see also* Vt. Const. Ch. II, § 58 ("Every officer of State, whether judicial or executive, shall be liable to be impeached by the House of Representatives, either when in office or after resignation or removal for maladministration."). In other state cases, when a public official resigned, the impeachment proceedings ended or were held to be unlawful. *See State v. Hill*, 55 N.W. 794, 796-96 (Neb. 1893); *Smith v. Brantley*, 400 So. 2d 443 (Fla. 1981) (holding that the Florida Constitution does not permit impeachment after an official left office). In one such case, the court held that the language of the state constitution providing that "all civil officers of this state shall be liable to impeachment" unambiguously foreclosed impeachment of *former* officers. *Hill*, 55 N.W. at 795.

[11] *See* Bill Mahoney, *Cuomo to cooperate with impeachment probe*, Politico (Aug. 5, 2021), https://www.politico.com/states/new-york/albany/story/2021/08/05/cuomo-to-cooperate-with-impeachment-probe-1389610.

[12] *See* Letter from Rita Glavin to Hon. Charles D. Lavine, Sept. 13, 2021 at 19 ("[W]e will not be producing documents pursuant to the subpoena issued as part of the impeachment investigation.").

[13] Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 "Report of Investigation Into Allegations of Sexual Harassment by Governor Andrew M. Cuomo,"

---

*available at*
https://www.andrewcuomo.com/sites/default/files/files/documents/2021.10.20SubmissiontoAG.pdf.

[14] C. Bennett Tr. 167:24-169:18.

[15] *Id.* 135:20-136:6, 171:14-172:2, 183:15-184:18.

[16] *Id.* 125:3-128:13; NYAG Rep. Ex. 35.  An excerpted portion of the audio of the call is publicly available at https://vimeo.com/582257128/adee5e6783.

[17] C. Bennett Tr. 156:14-158:11.

[18] L. Boylan Tr. 61:19-62:19, 118:3-19, 149:2-150:22, 198:17-199:18; L. Boylan DPW Interview.

[19] L. Boylan Tr. 118:3-19, 148:6-151:22, 153:12-16; L. Boylan DPW Interview.

[20] L. Boylan Tr. 61:19-62:19, 78:2-79:23, 88:12-93:10; L. Boylan DPW Interview.

[21] L. Boylan Tr. 66:3-67:7, 125:15-128:8; L. Boylan DPW Interview.

[22] L. Boylan Tr. 205:13-206:11, 210:20-211:22; L. Boylan DPW Interview.

[23] *See infra* Section E.3.

[24] B. Commisso Tr. 216:11-17; B. Commisso DPW Interview.

[25] A. Liss Tr. 13:7-15:7.

[26] *Id*. 79:6-22, 96:3-97:6, 102:4-13.

[27] *Id.* 79:6-22, 92:4-9, 114:6-21.

[28] *Id.* 86:18-88:21.

[29] A. McGrath Tr. 87:14-23, 95:15-19.

[30] *Id.* 50:13-52:3, 83:6-14, 101:12-103:13.

[31] *Id.* 50:13-52:17; A. McGrath DPW Interview.

[32] A. McGrath Tr. 56:13-57:25.

[33] *Id.* 62:11-64:2.

[34] *Id.* 62:11-64:24; A. McGrath DPW Interview.

[35] Kaitlin Tr. 24:7-25:20, 83:14-85:6, 86:16-87:13, 91:16-92:2, 95:21-97:16, 102:8-103:2.

[36] *Id.* 19:24-20:18, 21:3-25, 24:7-15.

[37] *Id.* 30:2-31:5, 35:23-36:14, 41:14-42:5, 44:22-45:8.

[38] *Id.* 32:14-33:10, 42:6-23.

[39] *Id.* 45:13-46:9.

[40] *Id.* 50:25-51:14.

[41] *Id.* 86:4-87:13.

[42] State Entity Employee #2 Tr. 158:16-159:17.

[43] *Id.* Tr. 159:18-161:2.

[44] *Id.* Tr. 180:9-182:20.

[45] *Id.* Tr. 183:25-184:9.

[46] Trooper #1 Tr. 20:22-25:4; Trooper #1 DPW Interview.

[47] Trooper #1 Tr. 25:5-16; Trooper #1 DPW Interview.

---

[48] Trooper #1 Tr. 15:13-15, 34:17-35:22.

[49] *Id.* 84:3-86:8; *see* Trooper #1 DPW Interview.

[50] State-Affiliated Entity Employee #1 Tr. 27:8-12.

[51] *Id.* 27:13-21.

[52] *Id.* 27:22-28:17, 32:18-34:20, 37:7-23.

[53] V. Limmiatis Tr. 18:17-19:19, 30:19-31:10.

[54] *Id.* 30:19-34:5.

[55] *Id.* 32:9-24.

[56] *Id.* 46:5-48:12.

[57] NYAG Rep. at 102.

[58] *Id.*

[59] *Id.*

[60] *Id.* at 103.

[61] S. Vill DPW Interview; NYAG Rep. 103 n. 915.

[62] S. Vill DPW Interview.

[63] S. Vill DPW Interview; NYAG Rep. 103 n. 915.

[64] S. Vill DPW Interview.

[65] S. Vill DPW Interview.

[66] S. Vill DPW Interview.

[67] *Id.*

[68] *Id.*

[69] Governor Andrew Cuomo, Resignation Speech (Aug. 10, 2021), *in* N.Y. Times, Aug. 2010. Governor Andrew Cuomo, Response to AG Sexual Harassment Report (Aug. 3, 2021), *in* NBCNewYork.com (Aug. 2021).

[70] A. Cuomo Tr. 167:15-168:5, 220:18-222:3, 225:1-21.

[71] *Id.* 167:20-168:5, 220:18-222:3.

[72] Statement from Governor Andrew M. Cuomo (Feb. 28, 2021), *in* https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-209.

[73] *See* Letter from Rita Glavin to Hon. Charles D. Lavine, Oct. 8, 2021 at 3 ("[E]ven if you were to accept every complaint as fact (which we do not), more than half of the complainant's allegations do not meet the standard of sexual harassment set forth in law.").

[74] A. Cuomo Tr. 38:21-41:1.

[75] *See* N.Y. Exec. Law § 296 (McKinney).

[76] *See, e.g.*, *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 310-11 (N.Y. Ct. App. 2004), citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993); *Minckler v. United Parcel Serv., Inc.*, 19 N.Y.3d 602, 604 (App. Div. 2015).

[77] *DeVito v. Sears, Roebuck & Co.*, 975 N.Y.S.2d 708 (Sup. Ct. 2013), citing *Hernandez v. Kaisman*, 957 N.Y.S.2d 53 (1st Dep't 2012).

[78] *Redd v. New York Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012); *see also Domingues v. Barton Chevrolet Cadillac*, No. 18-CV-07772 (PMH), 2021 WL 637016, at *4-5 (S.D.N.Y. Feb. 17, 2021) (holding that a single incident of a colleague touching plaintiff's breast qualified as "extraordinarily severe" and was sufficient to find that an objectively hostile work environment existed); *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 185 (E.D.N.Y. 2012) ("grabb[ing] and squeez[ing] one of [plaintiff's] breasts" was conduct sufficiently "severe to constitute a hostile work environment").

[79] *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 278 (3d Cir. 2001) (addressing harassment claims under the Title VII legal standard, which were "generally governed by the same standards" as the pre-2019 NYHRL, *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).

[80] *See, e.g., Manzo v. Sovereign Motor Cars, Ltd.,* No. 08-CV-1229, 2009 WL 3151094, at *4 n.11, *(E.D.N.Y. Sept. 29, 2009) (denying summary judgment on sexual harassment claims under the pre-2019 NYHRL standard where, *inter alia*, a supervisor defended that he asked plaintiff to his hotel room to tell him a "bedtime story" by saying he made the statement "in the context of joking"); *Guillebeaux v. Jewish Child Care Ass'n*, No. 03 CIV. 6577 (NRB), 2005 WL 1265906, at *2, *7 (S.D.N.Y. May 25, 2005) (finding sufficient evidence of sexual harassment claims under the pre-2019 NYHRL standard and NYCHRL even though the harasser defended against "patt[ing plaintiff] on the behind" because "it [was] the nature of his upbringing that his father used to jump behind his mother and just grab her like such"); *Carosella v. U.S. Postal Serv.*, 816 F.2d 638, 641 (Fed. Cir. 1987) (finding sufficient evidence supporting administrative finding that postal service employee had sexually harassed his subordinate despite employee's claimed justifications based on his intent and upbringing, including, *inter alia,* "[i]'m an Italian[;] I have a bad habit of maybe grabbing people by the arm or touching them in the back or something like that whether it's a female or male." (ellipses and brackets omitted)).

[81] *Governor Cuomo Signs Legislation Enacting Sweeping New Workplace Harassment Protections* (Aug. 12, 2019), *available at* https://dhr.ny.gov/newworkplaceharassmentprotections; N.Y. Exec. Law § 296 (McKinney).

[82] *Governor Cuomo Signs Legislation Enacting Sweeping New Workplace Harassment Protections* (Aug. 12, 2019), *available at* https://dhr.ny.gov/newworkplaceharassmentprotections.

[83] N.Y. Exec. Law § 296 (McKinney); *Franco v. Hyatt Corp.*, 137 N.Y.S.3d 34, 36 (1st Dep't 2020) (reversing summary judgment motion where plaintiff alleged supervisor made repeated sexual advances towards him, including reaching out to touch his face and holding his hand in an elevator while they were alone).

[84] A. Cuomo Tr. 37:16-42:3.

[85] *Id.* 39:21-40:12.

[86] *Id.* 40:13-41:1.

[87] *Id.* 41:2-12.

[88] Chamber_AG_00000652.

[89] *See, e.g.*, Governor Andrew Cuomo, Response to AG's Sexual Harassment Report (Aug. 3, 2021), *in* NBCNewYork.com, Aug. 2021; Rita M. Glavin, *Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 "Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo"* (Oct. 20, 2021).

[90] Luis Ferré-Sadurní and William K. Rashbaum, *Cuomo to Be Questioned in Sexual Harassment Inquiry*, N.Y. Times (Aug. 3, 2021), https://www.nytimes.com/2021/07/15/nyregion/cuomo-investigation-harassment.html.

[91] *See, e.g.*, Rita M. Glavin, *Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 "Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo"* (Oct. 20, 2021).

---

[92] *See generally* Rita M. Glavin, *Position Statement of Governor Andrew M. Cuomo Concerning the Sexual Harassment Allegations Made Against Him* (Aug. 3, 2021); Gov. Cuomo's outside counsel Rita Glavin holds virtual briefing, August 20, 2021, https://www.youtube.com/watch?v=UpmviENazuA.

[93] Trooper #1 Tr. 15:13-15, 34:17-35:22.

[94] *Id.* 86:22-89:11; Trooper #1 DPW Interview.

[95] Trooper #1 DPW Interview.

[96] Trooper #1 Tr. 96:16-98:9; Trooper #1 DPW Interview.

[97] Trooper #1 Tr. 96:16-98:9.

[98] Trooper #1 Tr. 97:10-98:9.

[99] Trooper #1 DPW Interview; *see* Trooper #1 Tr. 45:3-18.

[100] Trooper #1 Tr. 98:20-100:3; Trooper #1 DPW Interview.

[101] Trooper #1 Tr. 76:15-78:4; 79:11-81:24; 84:2-86:9; Trooper #1 DPW Interview.

[102] Trooper #1 Tr. 89:23-92:12; Trooper #1 DPW Interview.

[103] Trooper #1 Tr. 93:6-94:3; Trooper #1 DPW Interview.

[104] Trooper #1 Tr. 93:6-94:3; *see* Trooper #1 DPW Interview.

[105] Trooper #1 Tr. 94:8-20.

[106] Trooper #1 DPW Interview.

[107] *Id.*

[108] Trooper #1 Tr. 76:15-77:18; *see* Trooper #1 DPW Interview.

[109] Trooper #1 Tr. 78:19-79:4; Trooper #1 DPW Interview.

[110] Trooper #1 Tr. 57:22-60:16; Trooper #1 DPW Interview

[111] Trooper #1 Tr. 128:5-129:4; Trooper #1 DPW Interview.

[112] Trooper #1 Tr. 128:5-129:4.

[113] Trooper #1 Tr. 102:7-104:11; Trooper #1 DPW Interview.

[114] *Id.*

[115] Trooper #1 Tr. 84:3-86:8; *see* Trooper #1 DPW Interview.

[116] *Id.*

[117] Trooper #1 Tr. 84:3-86:8; *see* Trooper #1 DPW Interview.

[118] Trooper #1 Tr. 76:15-77:18, 79:11-81:24, 84:3-86:8; Trooper #1 DPW Interview.

[119] Trooper #1 Tr. 86:22-94:20; Trooper #1 DPW Interview.

[120] Trooper #1 DPW Interview.

[121] Governor Andrew Cuomo, Resignation Speech (Aug. 10, 2021), *in* N.Y. Times, Aug. 2010.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.*  The former Governor's counsel has recently claimed that his conduct was not gender-based, and was the same type of conduct that he engaged in with men.  We have seen no evidence that the former Governor

ever ran his finger down a male Trooper's back and said, "Hey you," that he ran his hand across the stomach of a male Trooper, or that he kissed male Troopers, among other conduct.  In short, we find this argument incredulous and reject it.  In any event, the former Governor himself agreed that his conduct was offensive and disrespectful, and that the Trooper's reaction to it was correct.

[126] *Id.*

[127] NYAG Rep. at 2-3, 38-39.

[128] NYAG Rep. at 36 n. 254, 37 n. 262, 38 n. 276, 39 n. 287.

[129] Trooper #1 DPW Interview.

[130] B. Commisso Tr. 12:12-20.

[131] *Id.* 14:3-15:24, 16:17-17:17, 18:11-19:25, 20:25-21:11.

[132] B. Commisso Tr. 111:4-18; B. Commisso DPW Interview.

[133] B. Commisso DPW Interview.

[134] B. Commisso Tr. 87:19-88:7; B. Commisso DPW Interview.

[135] B. Commisso Tr. 95:7-25; B. Commisso DPW Interview.

[136] A. McGrath Tr. 50:20-52:3.

[137] B. Commisso Tr. 119:4-120:23; B. Commisso DPW Interview.

[138] *Id.*

[139] *Id.*

[140] B. Commisso Tr. 119:4-120:18; B. Commisso DPW Interview.

[141] *Id.*

[142] *Id.*

[143] B. Commisso Tr. 139:13-140:18; B. Commisso DPW Interview.

[144] *Id.* 141:7-143:19; B. Commisso DPW Interview.

[145] B. Commisso Tr. 143:6-144:13, 215:22-216:10; B. Commisso DPW Interview.

[146] B. Commisso Tr. 143:6-145:4; B. Commisso DPW Interview.

[147] B. Commisso Tr. 216:11-17; *see also* B. Commisso DPW Interview.

[148] B. Commisso DPW Interview.

[149] B. Commisso DPW Interview.  *See also* B. Commisso Tr. 133:21-136:6.

[150] B. Commisso DPW Interview.

[151] B. Commisso Tr. 182:13-183:10; B. Commisso DPW Interview.

[152] *Id.* 181:13-182:12.

[153] B. Commisso DPW Interview.

[154] *See, e.g.*, B. Commisso Tr. 114:21-115:12, 216:18-23.

[155] *Id.* 114:21-115:12.

[156] *Id.* 141:7-146:15. B. Commisso DPW Interview.

[157] *Id.* 114:21-116:9; B. Commisso DPW Interview.

[158] *Id.* 141:7-146:15; B. Commisso DPW Interview.

[159] B. Commisso DPW Interview.

[160] *Id.*

[161] Executive Assistant #2 DPW Interview; Executive Assistant #3 DPW Interview.

[162] B. Commisso Tr. 182:13-183:10.

[163] Chamber Employee 2 DPW Interview; Executive Assistant #2 DPW Interview; Executive Assistant #3 DPW Interview; NYAG Rep. at 29-31; B. Commisso Tr. 184:16-186:6.

[164] Executive Assistant #3 DPW Interview.

[165] Executive Assistant #2 DPW Interview; Executive Assistant #3 DPW Interview.

[166] *See, e.g.*, Rita Glavin, *One-On-One With Governor Andrew Cuomo's Attorney*, CNN (Aug. 7, 2021).

[167] *See* Rita M. Glavin, *Position Statement of Governor Andrew M. Cuomo Concerning the Sexual Harassment Allegations Made Against Him* at 16-19 (Aug. 3, 2021); Rita M. Glavin, *Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 "Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo"* at 64-65 (Oct. 20, 2021).

[168] "Executive Assistant #1 did not remember the exact date of the incident, but recalled that it was around when she was tasked with photographing a document, and provided a copy of the photograph to us that was dated November 16, 2020." NYAG Rep. at 24 n.165 (citing B. Commisso Tr. 139:13-140:12). *See also* Brendan J. Lyons, *Cuomo faces new sexual harassment allegation, this time at the Executive Mansion*, Times Union (Mar. 9, 2021); B. Commisso DPW Interview.

[169] NYAG Rep. at 24 n.165.

[170] B. Commisso DPW Interview.

[171] *Id.*

[172] *Id.*

[173] B. Commisso DPW Interview.

[174] *Id.*

[175] *Id.*

[176] B. Commisso DPW Interview.

[177] *Id.*

[178] 7513852_00005151; *see* Troopers_NonEmail_00000001 at 9.

[179] CHAMBER_NYSA_00007525 at 1.

[180] 7513852_00006283 at 11.

[181] *Id.*

[182] *See* Governor Cuomo Directs State Department of Health to Begin Implementing 'Surge & Flex' Hospital Protocol (ny.gov).

[183] *Id.*

[184] 7513852_00006283 at 11.

[185] CHAMBER_NYSA_00007525 at 2.

[186] 7513852_00006064; 7513852_00004966; 7513852_00004860.

[187] Notice & Misdemeanor Crim. Compl. at 98, *People v. Cuomo* (Albany City Court, Crim. Part Oct. 28, 2021).

[188] 7513852_00005255.

[189] GAMC0000171.

[190] Notice & Misdemeanor Crim. Compl. at 95, *People v. Cuomo* (Albany City Court, Crim. Part Oct. 28, 2021).

[191] 7513852_00005254.

[192] 7513852_00006290 at 3.

[193] *See, e.g.*, *People v. Wise*, 46 N.Y.2d 321, 336 (N.Y. 1978); *People v. Harris*, 138 N.Y.S.3d 593, 603 (2d Dep't 2020).

[194] Rita M. Glavin, *Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 "Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo"* at 70, 90 (Oct. 20, 2021).

[195] NYAG Rep. at 24 n. 168 (citing B. Commisso Tr. at 152:3–14, 215:22–216:10).

[196] B. Commisso Tr. at 215:22–216:10.

[197] B. Commisso DPW Interview

[198] Brendan J. Lyons, *In her own words: Woman describes Cuomo's alleged groping at mansion*, Albany Times Union (Apr. 7, 2021), https://www.timesunion.com/news/article/cuomo-alleged-groping-victim-mansion-incident-16078748.php.

[199] *U.S. v. Currington*, 451 F. Supp. 39, 40-42 (S.D.N.Y. 1978).

[200] Rita Glavin, *One-On-One With Governor Andrew Cuomo's Attorney*, CNN (Aug. 7, 2021).

[201] *Id.  See also* Rita M. Glavin, *Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 "Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo* at 70, 90 (Oct. 20, 2021).

[202] B. Commisso Tr. 191:2-192:22; B. Commisso DPW Interview.

[203] B. Commisso DPW Interview.

[204] Executive Assistant #2 DPW Interview; Executive Assistant #3 DPW Interview.

[205] A. Cuomo Oct. 31, 2010 Response to Sheriff Apple and NYAG at 2, https://www.andrewcuomo.com/sites/default/files/files/documents/AppleJames_Cuomo_10.31.pdf.

[206] Lindsey Boylan (@LindseyBoylan), Twitter (Dec. 5, 2020, 1:00 PM), https://twitter.com/lindseyboylan/status/1335282911331950596

[207] *Compare* NYAG Rpt. Ex. 65 *with* NYAG Rpt. Exs. 63-64.

[208] B. Commisso Tr. 128:19-129:11, 130:20-131:4; B. Commisso DPW Interview. Chamber_AG_00000634; Chamber_AG_00000602; Chamber_AG_00000610; Chamber_AG_00000618; Chamber_AG_00000626.

[209] B. Commisso DPW Interview.

[210] Paul Fishman, *Transcript of Attorneys for Governor Cuomo speaking about N.Y. Attorney General's Independent Investigative Report* (Aug. 6, 2021).

[211] B. Commisso DPW Interview.

[212] A. Cuomo Tr. 39:21-41:1.

[213] OGNYS-COVID-314447.

[214] [TASK FORCE MEMBER 2]-ASSEMBLY-003281.

[215] Task Force Member 1 DPW Interview.

[216] Andrew M. Cuomo, *American Crisis: Leadership Lessons from the COVID-19 Pandemic* (2020) at pg. 196.

[217] PRH_NYASSEM_00000440.

[218] *Id*.

[219] Governor Cuomo on WAMC's Northeast Report, August 19, 2020, WAMC Northeast Public Radio (Albany, NY), at https://www.wamc.org/wamc-news/2020-08-19/gov-cuomo-on-wamcs-northeast-report-8-19-20.

[220] PRH_NYASSEM_00000440.

[221] PRH_NYASSEM_00044746.

[222] PRH_NYASSEM_00017564; PRH Employee 1 DPW Interview.

[223] PRH_NYASSEM_00002346; PRH Employee 1 DPW Interview.

[224] *See* PRH_NYASSEM_00002347.

[225] PRH Employee 2 DPW Interview.

[226] *See* PRH_NYASSEM_00017585.

[227] *See* PRH_NYASSEM_00017585; PRH_NYASSEM_00000582; PRH_NYASSEM_00039251; PRH_NYASSEM_00017633.

[228] *See* PRH_NYASSEM_00017633.

[229] *See* PRH_NYASSEM_00042727; PRH_NYASSEM_00000440.

[230] PRH_NYASSEM_00000440.

[231] *Id*.

[232] Governor Cuomo on WAMC's Northeast Report, July 10, 2020, WAMC Northeast Public Radio (Albany, NY), at https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-guest-wamc-northeast-public-radio-alan-chartock-7.

[233] Governor Cuomo on WAMC's Northeast Report, August 19, 2020, WAMC Northeast Public Radio (Albany, NY), at https://www.wamc.org/wamc-news/2020-08-19/gov-cuomo-on-wamcs-northeast-report-8-19-20.

[234] *See* PRH_NYASSEM_00000440.

[235] OGNYS-COVID-314074; OGNYS-COVID-314075; and OGNYS-COVID-314081.

[236] OGNYS-COVID-314075.

[237] *Id*.

[238] *Id*.

[239] *See* OGNYS-COVID-314436.

[240] *See* OGNYS-COVID-314440 and OGNYS-COVID-314441.

[241] *See* OGNYS-COVID-314438.

[242] OGNYS-COVID-314447.

[243] *Id*.

[244] *See* PRH_NYASSEM_00017676.

[245] PRH Employee 2 DPW Interview; PRH Employee 1 DPW Interview; PRH Employee 4 DPW Interview.

[246] *See* PRH_NYASSEM_00000439 and PRH_NYASSEM_00000440.

[247] *See* PRH_NYASSEM_00000440.

[248] *See* PRH_NYASSEM_00000528.

[249] *See* PRH_NYASSEM_00017680.

[250] Chamber Employee 1 DPW Interview.

[251] *Id.*

[252] Chamber Employee 2 DPW Interview; Chamber Employee 3 DPW Attorney Proffer.

[253] Task Force Member 1 DPW Interview.

[254] *Id.*

[255] *See* PRH_NYASSEM_00002391.  In contrast, the Governor effectively denied using a ghostwriter, noting on Wednesday, August 19, 2020, when asked if he was using a ghostwriter that "[i]t will be in the beautiful, eloquent language that you will know was unmistakably mine. My fine pen."  *See* Governor Cuomo on WAMC's Northeast Report, August 19, 2020, WAMC Northeast Public Radio (Albany, NY), at https://www.wamc.org/wamc-news/2020-08-19/gov-cuomo-on-wamcs-northeast-report-8-19-20.

[256] PRH_NYASSEM_00002391.

[257] *Id.*

[258] Andrew M. Cuomo, *American Crisis: Leadership Lessons from the COVID-19 Pandemic* (2020) at pg 3.

[259] *Id.* at pg. 196.

[260] *See, e.g.*, PRH_NYASSEM_00003157; PRH_NYASSEM_00003165; PRH_NYASSEM_00003154; PRH_NYASSEM_00004840; and PRH_NYASSEM_00011353.

[261] *See, e.g.*, PRH_NYASSEM_00000980; PRH Employee 3 DPW Attorney Proffer.

[262] PRH_NYASSEM_00012868.

[263] *See* [TASK FORCE MEMBER 2]-ASSEMBLY-002865 and [TASK FORCE MEMBER 2]-ASSEMBLY-002866.

[264] [TASK FORCE MEMBER 2]-ASSEMBLY-002858.

[265] *See e.g.,* [TASK FORCE MEMBER 2]-ASSEMBLY-001146; [TASK FORCE MEMBER 2]-ASSEMBLY-001165; and [TASK FORCE MEMBER 2]-ASSEMBLY-003281.

[266] PRH_NYASSEM_00011563.

[267] Task Force Member 2 DPW Interview.

[268] *See* PRH_NYASSEM_00003154; PRH_NYASSEM_00003392; and PRH_NYASSEM_00003611.

[269] PRH Employee 2 DPW Interview; PRH_NYASSEM_00003392; and PRH_NYASSEM_00003611.

[270] PRH_NYASSEM_00005167.

[271] [TASK FORCE MEMBER 2]-ASSEMBLY-003275.

[272] Task Force Member 1 DPW Interview.

[273] *Id.*

[274] *Id.*; Task Force Member 2 DPW Interview; [TASK FORCE MEMBER 2]-ASSEMBLY-003305.

[275] *See* Governor Cuomo Calls for Investigation into Federal Politicization of Trusted Traveler Program, July 24, 2020, https://www.youtube.com/watch?v=REMuqiFV448.

[276] *See* OGNYS-NYAG-COVID-00074057-61; OGNYS-NYAG-COVID-00074042-46; OGNYS-NYAG-COVID-00073965-68; and OGNYS-NYAG-COVID-00073949-53.

[277] *See* OGNYS-NYAG-COVID-00074044-45.

[278] The Chamber Official took August 21, 2020 as a "sick day" and sent emails to PRH at 8:48 a.m., 9:20 a.m., 9:43 a.m., 9:58 a.m., 10:10 a.m., 10:31 a.m., 10:47 a.m., 11:03 a.m., 11:16 a.m., and 11:26 a.m. that day.  OGNYS-NYAG-COVID-00074061; PRH_NYASSEM_00011961; PRH_NYASSEM_00011983; PRH_NYASSEM_00012027; PRH_NYASSEM_00012068; PRH_NYASSEM_00012089; PRH_NYASSEM_00012115; PRH_NYASSEM_00012140; PRH_NYASSEM_00012172; PRH_NYASSEM_00012211; and PRH_NYASSEM_00012243.

[279] *See* Task Force Member 2 DPW Interview. *See also* [TASK FORCE MEMBER 2]-ASSEMBLY-003274.

[280] *See* Task Force Member 2 DPW Interview.

[281] *See* [TASK FORCE MEMBER 2]-ASSEMBLY-003281.

[282] Task Force Member 1 DPW Interview.

[283] *Id.*

[284] *See* PRH_NYASSEM_00019575.

[285] *Id.*

[286] *See* PRH_NYASSEM_00000990.

[287] *See* PRH_NYASSEM_00001012; PRH_NYASSEM_00001068; PRH_NYASSEM_00001074; PRH_NYASSEM_00001099; and PRH_NYASSEM_00001147.

[288] *Id*.

[289] *Id*.

[290] PRH_NYASSEM_00001449.

[291] PRH_NYASSEM_00018454.

[292] PRH_NYASSEM_00017964.

[293] *See* PRH_NYASSEM_00039267.

[294] *See* PRH_NYASSEM_00011333.

[295] PRH_NYASSEM_00011552.

[296] *See* PRH_NYASSEM_00019094 and PRH_NYASSEM_00015813.

[297] *See, e.g.*, PRH_NYASSEM_00019084 and PRH_NYASSEM_00019098.

[298] *See, e.g.*, PRH_NYASSEM_00019084; PRH_NYASSEM_00011580; PRH_NYASSEM_00011584; MDR_NYLEG_016645; and MDR_NYLEG_016627.

[299] *See* PRH_NYASSEM_00019601; PRH_NYASSEM_00039972; and PRH_NYASSEM_00040028.

[300] *See, e.g.*, PRH_NYASSEM_00043971 and PRH_NYASSEM_00043972.

[301] *See* PRH_NYASSEM_00013931.

[302] *See, e.g.*, PRH_NYASSEM_00025072; PRH_NYASSEM_00042686; PRH_NYASSEM_00026124; and PRH_NYASSEM_00023614.

[303] PRH_NYASSEM_00023621.

[304] *See* PRH_NYASSEM_00025085.

[305] *See, e.g.*, PRH_NYASSEM_00043977; PRH_NYASSEM_00043984; PRH_NYASSEM_00043985; PRH_NYASSEM_00043995; PRH_NYASSEM_00044001; PRH_NYASSEM_00044004; and PRH_NYASSEM_00044005.

[306] *See, e.g.*, PRH_NYASSEM_00013930.

[307] *See* PRH_NYASSEM_00042618.

[308] *See* PRH_NYASSEM_00042593.

[309] PRH_NYASSEM_00013931.

[310] *See* PRH_NYASSEM_00000440.  One such event was a video conference on Thursday, October 1, 2020 with hundreds of law firm attorneys.  *See* PRH_NYASSEM_00023536.

[311] *See* PRH_NYASSEM_00032408.

[312] *See* N.Y. Exec. Order No. 202.30 (A. Cuomo) (May 10, 2020), https://www.governor.ny.gov/sites/default/files/atoms/files/EO202.30.pdf.

[313] Task Force Member 2 DPW Interview; Chamber Employee 4 DPW Interview.

[314] Task Force Member 2 DPW Interview.

[315] *Id.*; Chamber Employee 4 DPW Interview; Chamber Employee 5 DPW Attorney Proffer.

[316] *Id.*

[317] OGNYS-COVID-249103; Chamber Employee 6 DPW Attorney Proffer.

[318] OGNYS-COVID-249103.

[319] *Id.*

[320] *See* NYSDOH_ASSEMBLY_00083105 and NYSDOH_ASSEMBLY_00083111.

[321] Task Force Member 2 DPW Interview.

[322] OGNYS-COVID-249518.

[323] *Id.*

[324] Task Force Member 2 DPW Interview; Chamber Employee 4 DPW Interview.

[325] DOH Report at 7.

[326] *Id.* at 11.

[327] Morvillo Abramowitz Grand Iason & Anello PC, Memorandum of Law to Dissuade Further Investigation and Prosecution, *In re Grand Jury Investigation, F. #2021R00167*, July 29, 2021; Task Force Member 2 DPW Interview.

[328] DOH Employee 1 DPW Interview; DOH Employee 2 DPW Interview.

[329] OGNYS-COVID-172847.

[330] OGNYS-COVID-052915; OGNYS-COVID-052916; NYSDOH_ASSEMBLY_00078470; NYSDOH_ASSEMBLY_00078563; OGNYS-COVID-249494; OGNYS-COVID-053133; OGNYS-COVID-053134; OGNYS-COVID-053336 and OGNYS-COVID-053337.

[331] DOH Employee 1 DPW Interview; NYSDOH_ASSEMBLY_00076213; NYSDOH_ASSEMBLY_00081048; NYSDOH_ASSEMBLY_00079980; NYSDOH_ASSEMBLY_00076713.

[332] *See, e.g.*, NYSDOH_ASSEMBLY_00080918; NYSDOH_ASSEMBLY_00080238.

[333] *See, e.g.*, NYSDOH_ASSEMBLY_00077666.

[334] DOH Employee 1 DPW Interview; DOH Employee 2 DPW Interview; DOH Employee 3 DPW Interview.

[335] DOH Employee 2 DPW Interview.

[336] *Id.* at 3-6.

[337] *Id.* at 5.

[338] DOH Employee 2 DPW Interview; DOH Employee 1 DPW Interview.

[339] OGNYS-COVID-017505.

[340] *See* U.S. Department of Justice, *Department of Justice Requesting Data From Governors of States that Issued COVID-19 Orders that May Have Resulted in Deaths of Elderly Nursing Home Residents*, August 26, 2020, Department of Justice Press Release, https://www.justice.gov/opa/pr/department-justice-requesting-data-governors-states-issued-covid-19-orders-may-have-resulted.

[341] DOH Employee 2 DPW Interview.

[342] *Id.*

[343] *Id.*

[344] *Id.*

[345] Task Force Member 1 DPW Interview.

[346] Governor Andrew M. Cuomo, *Rush Transcript: February 10th Zoom Conference Call Between Members of Governor Cuomo's Administration and New York State Legislators*, February 11, 2021, accessible using Wayback Machine Internet Archive at https://www.governor.ny.gov/news/rush-transcript-february-10th-zoom-conference-call-between-members-governor-cuomos.

[347] *See, e.g.*, DPW000006303.

[348] DPW000006401.

[349] DPW000005348.

[350] *Id.*

[351] *Id.*

[352] *Id.*

[353] *Id.*

[354] DPW000005495.

[355] Shane Goldmacher, *Ahead of the Primary, Cuomo Administration Offered Sweeteners to Get New Bridge Open*, The New York Times (Sept. 10, 2018), https://www.nytimes.com/2018/09/10/nyregion/cuomo-bridge-contractor-tappan-zee.html.

[356] DPW000005381.

[357] *Id.*

[358] Jonathan Dienst, Jaxon Van Derbeken, and David Paredes, *I-Team: Whistleblower Alleges Cover-up of Past Bolt Failures on New Cuomo Bridge*, NBC New York (December 13, 2018, updated December 15, 2018).

[359] DPW000004999.

[360] Brendan J. Lyons, *Broken bolts: Structural problems on the Gov. Mario M. Cuomo Bridge were covered up*, Albany Times Union (Mar. 7, 2021), https://www.timesunion.com/news/article/mario-cuomo-bridge-structural-problems-covered-up-15594755.php.

[361] Chamber_AG_KC_00001567.

[362] *Statement From The New York State Inspector General's Office Regarding Investigation Of Bolts On The Mario M. Cuomo Bridge*, Office of the New York Inspector General (March 8, 2021).

[363] *Update on Bolts and the Safety of the Gov. Mario M. Cuomo Bridge – Statement by Thruway Authority Executive Director Matthew J. Driscoll and Project Director Jamey Barbas, P.E.*, New York State Thruway Authority (March 22, 2021) (underlining in original).

[364] *Update on Bolts and the Safety of the Gov. Mario M. Cuomo Bridge – Statement from Federal Highway Administration*, New York State Thruway Authority (March 22, 2021).