UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK (BROOKLYN)

```
----------------------------:
                            :
TROOPER 1,                  :   Case No.: 22-cv-0893
                            :
              Plaintiff,    :   Brooklyn, New York
                            :   December 12, 2023
         v.                 :   3:08 p.m. - 5:18 p.m.
                            :
NEW YORK STATE POLICE,      :
et al.,                     :
              Defendants.:
----------------------------:
```

TRANSCRIPT AND STATUS CONFERENCE HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:              WIGDOR LLP
                           BY:  Valdi Licul, Esq.
                                John S. Crain, Esq.
                           85 Fifth Avenue
                           New York, NY 10003

For Defendant:             GLAVIN PLLC
Andrew Cuomo               BY:  Rita M. Glavin, Esq.
                           156 West 56th Street - Suite 2004
                           New York, New York 10019

For Defendant:             SHER TREMONTE LLP
Andrew Cuomo               BY:  Theresa Trzaskoma, Esq.
                                Allegra Noonan, Esq.
                           90 Broad Street
                           New York, New York 10004

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    APPEARANCES CONTINUED

 2

 3    For Defendant:      MORVILLO, ABRAMOWITZ, GRAND, IASON
      Melissa DeRosa      & ANELLO P.C.
 4    Richard Azzopardi   BY:  Catherine Foti, Esq.
                          565 Fifth Avenue
 5                        New York, New York 10017

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                THE DEPUTY CLERK:  This is civil cause for
 2      a status conference, Docket 22-cv-893; Trooper 1
 3      versus New York State Police, et al.
 4                Will the parties please state their
 5      appearances for the record, starting with the
 6      plaintiff.
 7                MR. LICUL:  Good afternoon, Your Honor.
 8      Valdi Licul; Wigdor LLP, for Trooper 1.
 9                MR. CRAIN:  Good afternoon, Your Honor.
10      John Crain from Wigdor LLP for plaintiff, Trooper 1.
11                THE COURT:  Good afternoon.
12                MS. GLAVIN:  Good afternoon, Your Honor.
13      Rita Glavin of Glavin PLLC for our former governor,
14      Andrew Cuomo.
15                MS. TRZASKOMA:  Good afternoon, Your Honor.
16      Theresa Trzaskoma from Sher Tremonte LLP, also on
17      behalf of Governor Cuomo.
18                THE COURT:  Good afternoon.
19                MS. NOONAN:  Good afternoon, Your Honor.
20      Allegra Noonan from Sher Tremonte LLP, also on
21      behalf of Governor Cuomo.
22                THE COURT:  Thank you.
23                MS. FOTI:  Good afternoon, Your Honor.
24      Catherine Foti from Morvillo, Abramowitz, Grand,
25      Iason & Anello, on behalf of Melissa DeRosa and
```

1  Richard Azzopardi.

2         MR. PALERMO:  Good afternoon, Your Honor.

3  Daniel Palermo, Harris Beach PLLC, on behalf of the

4  New York State Police.

5         THE COURT:  Okay.  Good afternoon to

6  everybody.

7         So as everyone knows, we're here today for

8  another conference regarding discovery.  And as

9  everyone already knows, the discovery process in

10  this case seems to really almost have ground to a

11  grinding halt.

12         Is that fair, Mr. Licul?

13         MR. LICUL:  On the plaintiff's side, I

14  think that's fair.  Just -- Your Honor, just so you

15  know, we're done.  We just need the governor's

16  deposition.

17         THE COURT:  Okay.  Thank you.

18         Ms. Glavin?

19         MS. GLAVIN:  With respect to former

20  Governor Cuomo, the area that it has not come to a

21  grinding halt is we are proceeding with some

22  depositions.  So I think the last time we were here,

23  on September 26th -- I can't remember what the

24  number of depositions were that were -- that had

25  been completed.  We've taken several more, and we

1    have three more lined up; two this week and another

2    one in January, former New York State troopers.

3                THE COURT:  Okay.

4                MS. GLAVIN:  But there are -- with respect

5    to the status of discovery, in terms of what's at a

6    grinding halt, is we don't feel in a position to

7    take Trooper 1's deposition because of some disputes

8    on that related discovery, and then, certainly,

9    discovery related to third parties, including those

10   that are specifically mentioned dozens of times

11   within Trooper 1's complaint, but as well as -- and

12   I can summarize, if Your Honor wants me to, what

13   subpoenas there's been objections to, et cetera,

14   that relate to non-parties that are central to

15   Trooper 1's personal experiences; that type of

16   thing.

17                THE COURT:  So then that will be helpful

18   when we get to that point.  You know, I think that

19   notwithstanding my efforts to encourage the parties

20   to try to forge a path forward, we haven't really

21   gotten the type of movement, forward momentum that I

22   think is really needed to get the discovery done in

23   this case.

24                So, as you guys know, from the order that

25   we placed in the docket scheduling today's

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    conference, the goals for today are to try to come

2    up with some sort of a schedule to complete party

3    discovery.  And I do want to understand, Ms. Glavin,

4    what, you know, pieces of discovery are necessary as

5    a condition precedent to both plaintiff's deposition

6    and the governor's deposition -- former governor's

7    deposition.

8            In addition, I want to talk about a

9    framework for non-party discovery, specifically with

10   regard to the complainants.  As I'm sure the parties

11   know, several of the complainants came forward with

12   a proposal as to how to stage the timing.  I'd like

13   to hear your views on that with the candid

14   acknowledgment that I am inclined to delay the

15   depositions of the non-party complainants until

16   after party discovery is largely complete.  But I do

17   want to hear your views on that proposal.

18           And I also hope to discuss, kind of, how to

19   better clean up the docket in this case and make

20   filings more manageable for all involved.  This is

21   not an uncommon phenomenon in a hard-fought

22   discovery case, where the docket becomes almost

23   unusable in its unfriendliness in terms of figuring

24   out what relates to what.  So I think we need to

25   discuss bundling motions, just, sort of, docket

1    cleanup techniques that we can all benefit from

2    going forward.  But that's really footnotes for the

3    end of the conference.

4            So, in terms of party discovery, Mr. Licul,

5    your summary is, we're done, except we need to

6    depose Mr. Cuomo; is that correct?

7            MR. LICUL:  That's correct, Your Honor.

8    And I think we also submitted a letter that we agree

9    with the non-parties' proposal.

10           THE COURT:  Okay.  And where are you with

11    regard to discovery with respect to the other

12    defendants?  I know we're in this motion to dismiss

13    limbo.

14           MR. LICUL:  We have deposed them.

15           THE COURT:  You have deposed them.

16           MR. LICUL:  We have deposed them.  They

17    were deposed before --

18           THE COURT:  Okay.

19           MR. LICUL:  -- the district judge's order,

20    Judge DeArcy Hall's -- well, what -- decision.

21    There's no opinion yet.  And so we have deposed

22    them.  We've gotten the discovery we need from them.

23    So, like I said, the only thing -- barring something

24    unusual, all we need is the defendant's deposition.

25           THE COURT:  Okay.  And New York State

1    Police?

2              MR. LICUL:  We're done with that discovery

3    as well.

4              THE COURT:  Okay.  All right.

5              So, Ms. Glavin, what is outstanding with

6    regard to party discovery from your point of view?

7              MS. GLAVIN:  Sure.  Your Honor, is it okay

8    if I sit for this portion?  Because I want to follow

9    my notes.  I don't mean --

10             THE COURT:  Fine.  Yeah.  I know it's in

11   our blood to stand up, but, yes, you may sit.

12             MS. GLAVIN:  Okay.  So with respect to

13   party discovery, when you talk about just what we're

14   seeking from Trooper 1, I think we have -- the

15   parties have already exchanged documents.  I think

16   document production is complete.  And I -- and as, I

17   think, Mr. Licul and our side identifies additional

18   documents, we provide them to the other side.  But I

19   think, in our view, the document productions are

20   done.

21             With respect to party discovery, on the

22   issue of Trooper 1, Your Honor may recall that her

23   deposition was initially scheduled -- I think it was

24   for August 16th.  And after we took a deposition on

25   August 14th of one of the State Police troopers who

              AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    testified that she was very close friends with
 2    Trooper 1, and in connection with that deposition,
 3    on the day of her deposition and several days
 4    earlier, text messages were produced.
 5              THE COURT:  Is this Ms. Parrotta?
 6              MS. GLAVIN:  Yeah, Ms. Parrotta.
 7              And so because of that, our desire to get
 8    phone records -- and there were also some additional
 9    records that we got in July, you know, that were
10    health records -- we wanted to put off Trooper 1's
11    deposition until we could dig a little bit further.
12    We also wanted to get Ms. Parrotta's deposition
13    before we took Trooper 1's deposition.
14              In the interim --
15              THE COURT:  Have you done Ms. Parrotta's
16    deposition; is that complete?
17              MS. GLAVIN:  Yes.
18              THE COURT:  Okay.
19              MS. GLAVIN:  That was done on August 14th.
20              THE COURT:  I thought so, but I wasn't sure
21    if it was done, done.  Okay.  Thank you.
22              MS. GLAVIN:  I -- unless something else
23    comes up -- we have some other depositions coming
24    up, but we believe that that is complete.
25              What happened in the interim is a number
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1     of, you know, other depositions were taken, and

2     we've gotten additional documents, including -- and

3     I think this was in a letter that we put to the

4     Court -- we got text messages between Trooper 1 and

5     another former trooper.

6               THE COURT:  Is this Nevins?

7               MS. GLAVIN:  Nevins.  Yes, Your Honor.

8               Trooper 1 did not produce and does not

9     have, as we understand it, any of her text, you

10    know, communications going back to 2021 or 2022, and

11    that is what prompted us to issue a subpoena for

12    phone records, also phone records to Diane Parrotta.

13              But because of that, we are seeking --

14    like, for instance, we're taking Mr. Nevins'

15    deposition on Friday in Tennessee.  And because of

16    that, and because we don't have those text messages,

17    we are seeking such communications from other

18    parties, from third parties.  So I think as you're

19    thinking about party discovery, I think you're

20    thinking -- maybe I'm wrong.  I think you're

21    thinking about Trooper 1 and what she's specifically

22    saying because there's a bunch of non-parties

23    impacted by that, which is other former state

24    troopers, which is, you know, subpoenas to phone

25    records; that type of thing.  And we've made

1    additional document requests to the New York State

2    Police as things have come up.

3            THE COURT:  Okay.

4            MS. GLAVIN:  So those are all hanging out

5    there.  But also what's hanging out there -- it is

6    critically important to us before Trooper 1's

7    deposition to have the motion resolved with respect

8    to the interview memos that the Attorney General's

9    Office has.

10           From the privilege log that Your Honor

11   received a couple weeks ago, there were 28 troopers

12   that were interviewed for which there are interview

13   memos and, in particular, Trooper 1 herself.  As we

14   have seen -- I think Your Honor might remember,

15   we've seen some interview memos, but those were

16   solely as a result of discovery that we received

17   from the Albany County District Attorney's Office.

18           What we could tell from those interview

19   memos is a number of times witnesses would be

20   interviewed initially, and it would be a much

21   lengthier interview than when -- if they came back

22   for transcribed testimony -- which only affects 41

23   people -- it was much shorter.  We believe that

24   the -- Trooper 1's initial interview, which took

25   place in April of 2021, was much longer than what

1    was ultimately in her testimony.  That is critical

2    for us to get her prior statement.

3         THE COURT:  So I must, you know, have

4    misunderstood what the Attorney General's intentions

5    were, but I had thought that way back when they had

6    agreed to produce documents relevant to Trooper 1

7    specifically.

8         MS. GLAVIN:  No, they will not produce.  So

9    we sent to the Court recently -- and I can't

10   remember the date.  I think it may have been

11   November 10th -- a letter.  Hold on.  I will have it

12   for you.

13        We sent a status update to the Court.  So

14   we appeared on the 26th.  The issue -- the dispute

15   with the AG's Office -- and I know, just for the

16   record, that Michael Jaffe from New York State

17   Attorney General's Office is in the courtroom today.

18        THE COURT:  Okay.

19        MS. GLAVIN:  After we had the conference on

20   the 26th, we met and conferred in an effort to

21   narrow what we were seeking from the Attorney

22   General's Office, and agreement could not be

23   reached.  But we're seeking unredacted deposition

24   transcripts for a number of people, as well as --

25        THE COURT:  The November 10th letter.  I'm

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    just trying to track it down.  Is that on this
 2    docket or in 3044 docket?
 3              MS. GLAVIN:  It would -- no.  It would be
 4    in the OAG-AGAC docket.
 5              THE COURT:  The 3044?  Okay.
 6              I know them all off the top of my head.
 7              MS. GLAVIN:  I was about to say you're --
 8              THE COURT:  It's really quite disturbing.
 9              All right.  Okay.  Ms. Simon will track it
10    down.  She's working on that case.
11              Okay.  Thank you.
12              You can continue.
13              MS. GLAVIN:  Actually, we -- with respect
14    to the Trooper 1 interview memo, Ms. Trzaskoma is
15    correcting me, so I want to make sure the record is
16    accurate here -- is we understand that her interview
17    was -- actually may have been shorter than her
18    testimony.  In other words, that, in her testimony,
19    she apparently remembered more things than what she
20    had done in her initial interview, and that's very
21    important to us as to what the initial interview
22    memo was.  But, again, none of us have seen it, so
23    none of us can weigh in on it.
24              THE COURT:  Okay.
25              MS. GLAVIN:  The issue with the dispute
```

1    with the Attorney General's Office, which to us is

2    critically important before taking Trooper 1's

3    deposition, is to get those interview memos. We

4    have met and conferred with the Attorney General's

5    Office, and as is reflected on the docket -- 3044, I

6    think -- as is reflected on that, we cannot come to

7    agreement. And the Attorney General's Office has

8    said to us, under no circumstances will they produce

9    the interview memos, citing sovereign immunity as

10   well as other privileges. And I don't see that

11   being resolved.

12           And just so Your Honor is aware, in the

13   Bennett versus Cuomo docket in the Southern

14   District, we also just submitted a letter teeing the

15   exact same issue up. There is no resolution. They

16   will not produce interview memos, so it will have to

17   be briefed.

18           I think I mentioned this at the conference

19   on the 26th. We also did -- because the Attorney

20   General said, look, in the sovereign immunity

21   argument, that the proper way to go is through a

22   FOIL request, so we've done that as well. Our FOIL

23   appeal was denied for any interview memos in

24   September. We expect to be filing an Article 78.

25           But also so the Court is updated on this

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    with respect to the interview memos, we had served

2    subpoenas on Cleary Gottlieb and the Vladeck firm

3    for those interview memos.

4            THE COURT:  I recall.

5            MS. GLAVIN:  And it is our view that

6    sovereign immunity argument disappears with respect

7    to the firms.

8            THE COURT:  We talked about this last time.

9            MS. GLAVIN:  I know.

10           THE COURT:  I just respectfully disagree.

11   As an agent of those entities, not only are they

12   acting on behalf of those entities, they also enjoy

13   the privileges of those entities, so that's a

14   non-starter.  And they're not here.  We're not here

15   to argue the 3044 case.

16           MS. GLAVIN:  I get that, Your Honor.  I

17   just want to give you the status with respect to

18   that.  Obviously, we're going to agree to disagree.

19   It hasn't been briefed, but we want to proceed on

20   all tracks in order to get those memos because we

21   think they are critical to discovery.

22           Along that same lines, with respect to the

23   interview memos, so we tried to narrow -- we tried

24   to narrow the disputes with the AG's Office.  They

25   then, at the Court's direction, produced a privilege

1    log last month.  On that privilege log, I think it

2    reflected they had interviewed 28 troopers; ten of

3    whom are anonymized.  They just called, you know,

4    Trooper 1, 2, 3, 4, 5, 6, 7, 8, 9, 10.  We need to

5    know the names of those troopers because we may or

6    may not issue them subpoenas.

7            As Your Honor may recall, there are certain

8    witnesses that are cited as witnesses to events or

9    relevant to certain events in the Attorney General's

10   report.  We don't know all of their identities,

11   which is why we want a privilege log such that it

12   identifies those individuals so that we know what

13   witnesses we're talking about so that we can

14   complete that discovery.

15           THE COURT:  So it is your position, is this

16   correct, that you are holding out on the Trooper 1

17   deposition because you think that these interview

18   memos and other document discovery, including the

19   phone records, are necessary to complete her

20   deposition?

21           MS. GLAVIN:  Yeah.  There's also another

22   issue as well.  So it's interview memos.  It's our

23   not having -- so the Attorney General's Office, you

24   know, interviewed 28 troopers.  The identities of 18

25   were revealed in the privilege log.  Ten are not.

1    We're seeking those, the names of those individuals.

2           In addition, as you -- correct telephone

3    records.  And these are telephone records -- there

4    are two subpoenas that plaintiff objected to we

5    haven't been able to serve; one is for phone lines

6    related to Diane Parrotta, and the second is with

7    respect to Trooper 1.  And then there's another --

8           THE COURT:  And those were originally

9    briefed, I believe, in ECF 136, and then re-upped in

10   189; is that correct?

11          MS. GLAVIN:  I don't have them off the top

12   of my head, the numbers, but what I can tell you is

13   there was an initial letter, and then I think we

14   followed up with a letter recently based on the

15   Nevins texts.

16          THE COURT:  Yeah, I think it's 136 and 189.

17   Okay.  Thank you.  Go ahead.

18          MS. GLAVIN:  There's another area as well

19   that I want to bring to Your Honor's attention.  We

20   have done a subpoena to Trooper 1's fiancé, who is a

21   New York State Police officer -- or not New York

22   State -- New York City Police officer, as I

23   understand it, Charles Brown.  We did a subpoena for

24   both documents and his deposition.

25          We had a meet and confer, and there is

1    significant disagreement about the document

2    subpoena, and we are going to be teeing that up.

3    But given that Trooper 1 has not produced -- you

4    know, we only have a handful of texts, and there

5    were a handful of texts from May 2023 to now.  We

6    need the communications relating simultaneously to

7    Governor Cuomo, and we have a -- we have a dispute,

8    and so that is going to be teed up with Your Honor.

9    And we'd like to take his deposition as well before

10    Trooper 1, or maybe we're still figuring out the

11    order.

12           THE COURT:  Okay.  All right.  So is that

13    the universe of conditions or, you know, issues

14    precedent to taking Trooper 1's deposition as you

15    understand them right now?

16           MS. GLAVIN:  Yeah.  Let me just take a

17    look, talk to my colleague, make sure I got it.

18              (Discussion held off the record.)

19           MS. GLAVIN:  And, Your Honor, I should also

20    add that with respect to -- we actually would like

21    to take Lindsey Boylan and Charlotte Bennett's

22    deposition as well before Trooper 1.

23              With respect to Ms. Boylan, from her

24    testimony, what we -- we also learned things during

25    discovery, but from her testimony with the Attorney

1    General's Office, Ms. Boylan talks about knowing

2    about someone from the PSU detail as early as

3    Februaryish of 2021, and we are very interested to

4    know about how Ms. Boylan knew about that.  We are

5    aware that Ms. Boylan was in touch with members of

6    the PSU detail.  We've learned that during

7    discovery.  And we would like to explore that during

8    a deposition of Ms. Boylan.

9         With respect to Ms. Bennett, we also

10   understand that she had a number of interactions

11   with troopers, and we'd like to explore that as well

12   before we take Trooper 1's deposition.

13        THE COURT:  Okay.  So Ms. Boylan and

14   Ms. Bennett obviously have various pending issues in

15   and of themselves that I think differentiate them

16   from some of the other complainants, so it was my

17   hope, actually, to pick dates in a very short term

18   to follow up with those individuals, specifically at

19   a conference that would include their counsel.

20        So the dates we're looking at for that, Ms.

21   Green, what did we suggest might work for our

22   schedule?

23        THE DEPUTY CLERK:  January 11th.

24        THE COURT:  January 11th in the afternoon.

25   So if that date works for you, it is my hope that we

1    can try to address those specific individuals in the

2    afternoon of January 11th, obviously subject to

3    their counsel's availability.

4            Mr. Licul, does that work for you?

5            MR. LICUL:  It does, Your Honor.

6            THE COURT:  Thank you.  I saw you checking

7    something.

8            MR. LICUL:  I also have something to say

9    about --

10           THE COURT:  Sure.  Sure.  Let's just try

11   to --

12           MR. LICUL:  But I'll wait my -- yeah.

13           MS. GLAVIN:  Okay.  Yes, Your Honor, that

14   works for both of us.

15           THE COURT:  Okay.  Great.  So the

16   afternoon.  Reserve the afternoon; January 11, 2024.

17   I do want to set conferences specifically to talk

18   about Ms. Boylan and Ms. Bennett.  I think that the

19   two of them are differently situated from some of

20   the other complainants that are discussed both in

21   the complaint and in the various filings.

22           So that's all very helpful context in terms

23   of your goals with regard to what you'd like to do

24   to prepare for Trooper 1's deposition.

25           Where are we on scheduling Mr. Cuomo's

1    deposition, Ms. Glavin?

2              MS. GLAVIN:  So, Your Honor, here is

3    what -- we've been talking about this at length

4    because he was initially scheduled to be deposed --

5    it was in July, and then we proposed -- no.  It was

6    August.  And then we proposed September 27th.  And

7    then we had this conference and the date went away.

8              In terms of the -- our former governor's

9    deposition, here's, you know, a couple of things on

10   this.  One is we want to get -- there are document

11   subpoenas and some core depositions coming up from

12   the troopers that we want to get done, you know,

13   first, certainly before that, including the

14   deposition of Charlie Brown, as well as documents to

15   be produced by him.  And I think we are going to end

16   up -- you'll be getting a dispute letter, you know,

17   having to brief or argue that before Your Honor.

18             With respect to --

19             THE COURT:  That's the fiancé?  This is --

20             MS. GLAVIN:  That's the fiancé, yes.

21             THE COURT:  Okay.

22             MS. GLAVIN:  With respect to -- and then we

23   would also want to get whatever outstanding

24   documents we need, including documents for subpoenas

25   that were on hold.

1          In addition, we would also like, you know,

2    resolution on the issue of getting the interview

3    memos.

4          THE COURT:  I mean, I don't think you're

5    going to have resolution on the interview memos.

6    And you know this, we've been talking about this for

7    almost a year.

8          So, you know, I've received the privilege

9    log.  We've gone through it.  I intend to also

10   address at a different conference where the Attorney

11   General is on square notice, sort of, how we're

12   going to handle that.  And I actually am

13   anticipating ordering certain documents to be

14   reviewed in camera.  So looking at you back in

15   the -- for the Attorney General's Office, but none

16   of that is what we're here today to address.

17         MS. GLAVIN:  But part of this, Your Honor,

18   was what I --

19         THE COURT:  I mean, it's going to go to the

20   Circuit or the Supreme Court and back before we have

21   resolution on this.

22         MS. GLAVIN:  And that's -- oh, I'm aware of

23   it, Your Honor.  I'm aware, which is why I would

24   like to be able to proceed with enforcement of the

25   other subpoenas in which -- the Cleary, Vladeck

1   subpoenas.

2          THE COURT:  That same issue.  It's the same

3   issue.

4          MS. GLAVIN:  It is the same issue.  I think

5   it is a --

6          THE COURT:  You're picking the same fight

7   in three places.  That's not a good strategy.  It's

8   the same legal -- they have the same legal defenses

9   as the organization they were hired to work for.

10         MS. GLAVIN:  Okay.  Then with --

11         THE COURT:  And it's a waste of everybody's

12  time, Ms. Glavin, with respect.  Like, there is no

13  way to draw a distinction between an attorney who

14  was acting as an agent for their client and the

15  client in this regard.

16         MS. GLAVIN:  Your Honor, you and I can

17  argue about this and the wasting time.  I don't

18  think that it is because I actually -- I do disagree

19  with the Court because they are no longer an agent

20  for the Attorney General's Office.  The contract

21  expired some time ago, so to the extent they are

22  still in possession of those documents, sovereign

23  immunity doesn't apply to them.  They're private

24  parties.

25         THE COURT:  It's a non-starter.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MS. GLAVIN:  We -- you and I can agree to

2     disagree on this, but I think what may happen is

3     that it may get briefed because it's coming up in,

4     you know, Bennett versus Cuomo, and it may be

5     briefed on all fronts, but that's where we're at.

6          I wish that the Attorney General's Office

7     hadn't raised sovereign immunity.  As far as I can

8     tell, this is the first time they've done it, except

9     for one other case --

10          THE COURT:  The Long Island case, yeah.

11          MS. GLAVIN:  -- which only happened after

12     it was raised for the first time in this case.

13          I think it's unfortunate because the memos

14     have been redacted for privilege, as we now know.

15     They've been redacted -- I -- what I saw and

16     discovered in the Albany County District Attorney's

17     Office case is the redactions were done for work

18     product, the way, you know, we see them done in

19     criminal cases.  That's why I don't understand why

20     we're having the fight, you know.  There's a

21     protective order.  But we are where we are.

22          THE COURT:  They're not here to dispute

23     your last assertion.  I'm sure they take issue with

24     it.

25          MS. GLAVIN:  Here's the other issue with

1    the governor's deposition:  For it to go forward,

2    because we are essentially at a stop regarding the

3    other ten complainants in discovery, it would be

4    eminently unfair for the governor to have his

5    deposition taken and be asked about the other ten

6    complainants when we're not getting documents.

7    We -- very little is what we've gotten -- or

8    deposition testimony or subpoenas related to them.

9    I think Lindsey Boylan -- there's eight or nine

10   document subpoenas related to her that we haven't

11   been able to collect documents on.  It's just --

12            THE COURT:  No, I know.

13            MS. GLAVIN:  So there's that.  First,

14   there's that issue.

15            Second issue is what we have seen.  So

16   Ms. DeRosa and Mr. Azzopardi were deposed.  You

17   have -- you know, the complaint charges

18   discrimination, sexual harassment, hostile work

19   environment, but it also has the retaliation claim.

20   And the retaliation claim -- and it's at paragraphs

21   144 to 159.

22            The retaliation claim is essentially based

23   on behavior with respect to others.  And the

24   governor, to be prepared for that, has to be -- we

25   have a number, again, asking for documents from some

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    of the others.  I think he should not be able to be

2    asked about those things or the Attorney General's

3    report.

4            And what I can tell you from Ms. DeRosa and

5    Mr. Azzopardi's deposition is dozens and dozens of

6    questions were asked of them and topics coming up

7    about the Attorney General's report, about documents

8    collected, about why they believe certain people had

9    committed perjury, about why -- you know,

10   retaliation issues against certain -- alleged

11   retaliation against certain of the women.

12           And I think it is tremendously unfair when

13   we have not been able to get document discovery or

14   depositions.  I mean for him to go in.  I think it

15   deprives him of the ability to prepare himself and

16   to do a defense.  And I'll give you one example of

17   this.

18           THE COURT:  But, Ms. Glavin, why do you

19   think -- I take it from your comments, that you are

20   concerned about the complainant's suggestion that

21   they be deposed after party discovery is complete.

22   And what I would like to know is why.

23           MS. GLAVIN:  Yes.  Why --

24           THE COURT:  Because I mean, this is not a

25   criminal case.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1              MS. GLAVIN:  I get it.  But here's the --

2              THE COURT:  He either knows what happened

3     or he doesn't.

4              MS. GLAVIN:  No, Your Honor --

5              THE COURT:  It's within the scope of his

6     knowledge, and he doesn't get to tailor his

7     testimony, Ms. Glavin.

8              MS. GLAVIN:  Your Honor, the governor is

9     not tailoring his testimony.

10             THE COURT:  Then why does it matter when

11    he's deposed?

12             MS. GLAVIN:  Let me give you -- let me give

13    you an example.

14             THE COURT:  No, I'm serious.

15             MS. GLAVIN:  Let me give you an example.

16    Let me give you an example.

17             With respect to Ms. Bennett, she has not

18    produced a single document in this case.  Can I

19    please --

20             THE COURT:  Documents are different than

21    the depositions.

22             MS. GLAVIN:  Well, we would like to get the

23    document.  But let me just tell you about, with

24    respect to the documents, the importance of them and

25    the complainants.
```

1       With respect to Ms. Bennett, she has not

2  produced a single document in this case.  Friday of

3  last week, we got a -- the first document production

4  in the Bennett versus Cuomo case.  It's going to be

5  on a rolling basis.  What I can tell you is that in

6  that document production are critical e-mails and

7  text messages that are actually very important to

8  things that my client had remembered or refreshes

9  his recollection, and I can't explain to you how

10 critical they would be to him.

11      He is not sitting in the place where he has

12 access anymore to his full schedule from each of

13 these days; none of that.  Those documents could not

14 be more helpful to him.  We've already started

15 tagging the documents that are going to refresh:

16 This is what you were doing and what was happening

17 in January, when Ms. Bennett says that this

18 happened.  This is the document about -- it may -- I

19 think it may even have been a PowerPoint that she

20 was there to present him.  That stuff becomes really

21 critical to him.

22      I can also tell you with respect to the

23 importance of the governor needing discovery.  I

24 know that plaintiff is going to rely heavily on the

25 governor's statements that he made on August 3rd of

1    2021, when the AG's report came out -- he did a

2    video statement -- and then when the governor

3    announced his resignation on August 10th of 2021.

4              The statements he made at that time, he had

5    had no discovery documents, et cetera.  And, in

6    fact, his statement on August 10th, where he said

7    that he apologized.  And with respect to Trooper 1,

8    I think there was a comment that, if she said it

9    happened, I believe her.

10             Based on what he's learned, and we've

11   learned in the discovery now, he has a very, very

12   different view of Trooper 1 and what her motivations

13   were and what were happening behind the scenes.  And

14   had he known, for instance, about the extreme animus

15   that she had -- he did not even know that Trooper 1,

16   you know, was a complainant until the report came

17   out on August 3rd.

18             And so statements that he made that they

19   are relying on to prove their case with the benefit

20   of documents that he's never had or seen before, and

21   the testimony of certain people -- like, for

22   instance, Diane Parrotta -- become critical to his

23   ability to defend the case.

24             THE COURT:  I understand that.  And I also

25   understand the importance of documents to refresh

1    recollection.  My question is what the order of

2    depositions means to you in terms of why there would

3    be a problem with deposing your client before

4    deposing the other complainants, provided that we

5    work on the documentary discovery first.  And in

6    that regard, I do want to establish some sort of a

7    framework for reasonable scope of production with

8    regard to third-party complainants.

9           My inclination is to, you know, deny all

10   these motions to quash that are pending with regard

11   to the documentary discovery that you are seeking

12   from the complainants, but frame some sort of

13   reasonable rider that each complainant would be

14   expected to produce, and then get the party

15   depositions done once you resolve some of these

16   other issues.  And then, perhaps, depending upon

17   what's still live, again, depending on actions you

18   may or may not choose to take -- you've mentioned a

19   motion to strike some of the preparatory language in

20   the complaint multiple times.  We don't know whether

21   you're planning to do that.  There may or may not be

22   a need to take the depositions of some of these

23   complainants.

24          So my inclination is to grant some sort of

25   a hybrid approach that was suggested by the, you

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    know, complainants with regard to the timing.

2    Because what's happening now isn't working.

3            MS. GLAVIN:  I know.  I couldn't agree

4    more.

5            THE COURT:  So we need to get the party

6    discovery done.  And I want to unstick some of these

7    document subpoenas, both with regard to the

8    third-party document subpoenas for the phone

9    records; things like that.  I want to talk about the

10   dates that you're looking for.  And I'm prepared to

11   make rulings on 136 and 189.

12           I also want to talk about what scope of

13   documents you're seeking from the complainants.  And

14   you can go ahead and issue, you know, revised

15   subpoenas if we can come up with a revised scope.

16   But I don't see the need to take the depositions of

17   the complainants prior to Cuomo sitting for his

18   deposition.

19           MS. GLAVIN:  Here's the issue, Your Honor:

20   The plaintiff -- and if you just look through the

21   first few paragraphs of that -- their complaint --

22   is relying on an overall hostile work environment,

23   not just limited to Trooper 1, but paragraph 1 and 2

24   of the complaint is a mishmash of her own

25   experiences and other people's experiences.

1          THE COURT:  I'm aware.  And you know, we

2    talked about this last time, sort of this penumbra

3    of a work environment, moving around with Governor

4    Cuomo.

5          MS. GLAVIN:  But if plaintiff is going to

6    be making the argument that all of these third

7    parties, okay, is relevant to prove that, how is

8    Governor Cuomo to defend against what Valdi

9    thinks -- or Mr. Licul thinks is the hostile work

10   environment if he doesn't know what these ten other

11   complainants are saying?  That's --

12         THE COURT:  He does.

13         MS. GLAVIN:  Your Honor, he doesn't.

14   That's the problem.

15         THE COURT:  He largely does.

16         MS. GLAVIN:  No.  This is actually the

17   false part of this.  Those depositions, not only are

18   they redacted so that we don't have critical witness

19   names in a number of instances, but those

20   depositions had no follow-up.  I mean, one of

21   the biggest -- I mean, I was stunned during the Ana

22   Liss Jackson deposition when you followed up and

23   said, what is the basis for your knowledge for that,

24   the number of times it was just -- I -- it was

25   hearsay.  It was not what it was said it was to be.

1    Those depositions were in no way, shape or form

2    telling him what all of them say with respect to any

3    type of follow-up questions --

4             THE COURT:  But that's my point about how

5    he doesn't get to tailor his testimony.

6             MS. GLAVIN:  He's not going to tailor his

7    testimony.

8             THE COURT:  Then he can testify about what

9    he has personal knowledge about.

10            MS. GLAVIN:  Your Honor, he's already on

11   the record.  He already did testify.

12            THE COURT:  So what's the harm of doing it

13   again?  Part of the --

14            MS. GLAVIN:  What's the harm of the

15   complainants doing it again?

16            Your Honor, here -- this is my view about

17   this.  This is so odd to me that we have a

18   complaint.  Lindsey Boylan's name is mentioned 35

19   times.  Alyssa McGrath's name is mentioned 20 times.

20   She is a fact witness with respect to Brittany

21   Commisso, who's now filed an action in Albany.

22            Why is this case being treated differently

23   than any other case?  We have material witnesses

24   that the plaintiff is relying on.  Why can't we take

25   their depositions?  These have been pending for

1  months.  Why is this case differently?  Is it --

2           THE COURT:  Well, I mean, there's a host of

3  reasons why this case is different.

4           MS. GLAVIN:  I want to understand.

5           THE COURT:  The --

6           MS. GLAVIN:  Is it the subject matter?

7           THE COURT:  No.  It's because of all of the

8  precatory steps that you have been seeking to take,

9  despite for a year, discussions around the fact that

10  it's very unlikely that you're going to be getting

11  the Attorney General memoranda and interview memos,

12  insisting that those things happen before you can

13  proceed.

14           MS. GLAVIN:  He is being -- Governor Cuomo

15  is being deprived of the same discovery tools, the

16  robust discovery tools, that --

17           THE COURT:  No, he is not.  He's been

18  deprived of zero discovery tools, Ms. Glavin.

19           MS. GLAVIN:  Oh, absolutely.

20           THE COURT:  I have not granted or denied

21  any of your motions except your motion to compel

22  the production of those documents from the Attorney

23  General and from the AJC.  Exactly one -- one denial

24  of your requests.

25           MS. GLAVIN:  But, Your Honor, we --

1          THE COURT:  I'm asking about triage, which

2     is a different thing than saying that he's being

3     deprived of discovery tools.

4          MS. GLAVIN:  He is.

5          Your Honor, there have been document

6     disputes that have been sitting for months.  We have

7     not gotten any -- Lindsey Boylan got a deposition

8     notice on April 4th.  It is now December, and she's

9     mentioned 35 times, in which she produced 25

10    documents.

11         THE COURT:  As I said from the get-go, I do

12    think Lindsey Boylan and Charlotte Bennett are

13    differently situated than the remaining

14    complainants.

15         My question to you is, what is the problem

16    with Governor Cuomo sitting for his deposition prior

17    to deposing all of the complainants?

18         MS. GLAVIN:  I would split that up.  With

19    respect to Trooper 1, I think he could sit for an

20    interview, or he could sit for a deposition with

21    respect to just Trooper 1.  Once we get some of the

22    documents that we've been asking for and some more

23    depositions that are trooper related that we

24    discussed.

25         Then with respect to the other

1  complainants, there are certain other complainants

2  whose depositions we would want.  So I think you

3  could lop off State Entity Employee Number 2.

4  Ms. Limiatas, I think, could be lopped off as well.

5  We don't know who State Entity Employee Number 1 is,

6  and I don't think Mr. Licul knows that either.

7  We --

8           THE COURT:  So there's no risk that

9  person's getting subpoenaed for the trial, right?

10          Mr. Licul, do you know who it is?

11          MR. LICUL:  I don't know who it is.  And if

12  we did --

13          MS. GLAVIN:  Neither do we.

14          MR. LICUL:  -- we would say it.

15          But I do have -- I don't know if Ms. Glavin

16  is done.

17          MS. GLAVIN:  A couple more.

18          Anna Ruch, who's also mentioned in there,

19  we do her deposition afterwards.  The depositions we

20  do want to take are the ones that are involved, you

21  know, in core aspects of this, which are Lindsey

22  Boylan, Charlotte Bennett, Alyssa McGrath, Brittany

23  Commisso, and Kaitlin.  Those are the core.  They

24  are people that worked day in and day out in the

25  chamber.  They also have documents that I think are

1    material.

2          And with respect to -- and they also have

3    deposition transcripts that were redacted, and I

4    know topics discussed in the informal interview

5    memos that didn't make their way into the

6    depositions.  I mean, Ms. Boylan has, you know, a

7    number of pages of her deposition redacted.

8          THE COURT:  So I just want to loop back to

9    this question of whether or not you are, in fact,

10   seeking to file a motion to strike.  Because part of

11   the problem here, as we discussed at the September

12   conference, is the nature of how this complaint is

13   pled.  And you stated unequivocally at the September

14   conference that if the complaint were pleaded

15   differently, more narrowly, we would be in a

16   different situation entirely.

17         MS. GLAVIN:  We would.

18         THE COURT:  Tell me whether or not you -- I

19   mean, you've been talking about filing a motion to

20   strike for almost a year, and it has not been filed.

21         What is the plan with regard to that?

22         MS. GLAVIN:  We have actually spent a lot

23   of time talking about this.  I mean, as we sit here

24   right now, I think Your Honor should strike State

25   Entity Employee Number 1.  Nobody knows who she is.

```
 1   I think she should be stricken.  All right?
 2            With respect to the wedding guest, I think
 3   Your Honor should strike the wedding guest.  With
 4   respect to the others -- I mean, you have the five
 5   that we named and that -- we need more core
 6   discovery from them.  We need their depositions
 7   before we feel that we are in a position to make a
 8   motion to strike.  I don't --
 9            THE COURT:  Why?
10            MS. GLAVIN:  Unless Your Honor is saying
11   that she's inclined to grant it.
12            THE COURT:  No.  I mean, I just want to
13   know why.
14            MS. GLAVIN:  Because I want to have
15   further -- you know, with respect to Ms. Boylan and
16   Ms. Bennett and Ms. McGrath and Ms. Commisso, who
17   are all worked together within the chamber, for us
18   to be able to draw out why they are differently
19   situated, we need the depositions.  And the same
20   would apply for Kaitlin as well.
21            THE COURT:  And when you say to show that
22   they're "differently situated," are you talking
23   about within the, sort of, rubric of the *Perry* case
24   in terms of figuring out the scope of the work
25   environment?
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MS. GLAVIN:  I think there's that.  I think

2    it's, sort of, comparing their allegations much more

3    specifically and drilled down to Trooper 1's

4    allegation.  But when we make the motion,

5    Your Honor, we want to be in a position to win the

6    motion.

7          THE COURT:  Right.  Okay.

8          All right.  So in terms of the, sort of,

9    core five, we'll call them, Ms. Boylan, Ms. Bennett,

10   Ms. McGrath, Ms. Commisso and Kaitlin, those are the

11   ones that you think are critical to taking before

12   you think that you would be prepared for Mr. Cuomo

13   to sit for his deposition?

14         MS. GLAVIN:  Yeah.

15         The other aspect, too, is that those are

16   also individuals, you know, that had interactions

17   with the PSU as well.

18         THE COURT:  Okay.  All right.

19         I'm sure Mr. Licul has many things he would

20   like to say.

21         MR. LICUL:  Yeah.  Thank you, Your Honor.

22         First of all, I mean, I think the law is

23   crystal clear, and they've presented not a single

24   case to suggest that there's some kind of a

25   preference in discovery.  In fact, most judges will

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    do party discovery first in some cases as part of

2    their rules.

3            As far as Governor Cuomo's new complaint

4    that he's being deprived of discovery rights, that

5    could not be further from the truth.  I've been

6    doing this for a couple of minutes, and I don't know

7    of any defendant who has more information about his

8    accusers than the former governor.  In no case that

9    I've ever had has the defendant actually had sworn

10   testimony by each of his accusers that he has access

11   to.

12           THE COURT:  Yes, but he also can't have

13   access to the preliminary precatory lead-up to those

14   interviews.  And I understand the defendant's

15   frustration in that regard.

16           MR. LICUL:  But if the questions are asked

17   about his personal knowledge, he doesn't need

18   somebody else to tell him what happened.  If he

19   doesn't remember, he doesn't remember.  I've had

20   cases where a party has been deposed and then some

21   other piece of information comes out, and we do a

22   limited deposition on that piece.

23           And just to be clear, I think Ms. Glavin

24   represented that his deposition had been scheduled

25   and then it was rescheduled.  It was a little bit

1   more contentious than that.  It was scheduled and
2   then they canceled it, and they've given many
3   reasons why:  It would be more efficient.  He needs
4   more information.  But none of that carries the day.
5   He's a party and he should be deposed.
6           On the motion to strike, the motion to
7   strike what -- hasn't been made because it would be
8   frivolous.  A motion to strike is not a motion to
9   dismiss, nor is it a summary judgment motion.  It is
10  a motion that says that this information alleged in
11  the complaint is so scandalous or so irrelevant that
12  it should have nothing to do with the case.
13          They can't make that argument.  That's why
14  you don't have discovery for a motion to strike.
15  This would be effectively a motion for summary
16  judgment through the backdoor before we have had a
17  chance to depose the governor.
18          THE COURT:  I think it's more like a motion
19  in limine through the backdoor.
20          MR. LICUL:  Well, perhaps.  But I will say
21  that it's not a motion to strike.  It's not like
22  we're accusing the governor of -- you know, of lying
23  about the COVID numbers, right?  And putting that in
24  the complaint, right?  And then saying, well, that's
25  part of our case, right?  That might be, you know --

1    it's not part of the environment.  We disagree about

2    the penumbras, or we have disputes about that, but

3    it clearly is part of the case, especially if the

4    governor is going to get up on the witness stand and

5    say, this woman misinterpreted what I said.  I

6    didn't mean it this way.  I didn't mean it that way.

7    I mean, that's part of his defense.  It's fair game.

8            On the phone records, perhaps to take one

9    thing off the table in being productive here, we

10   have offered to give the governor the phone records,

11   the phone records that show communications between

12   Trooper 1 and Ms. Parrotta.  In other words, the

13   phone records won't necessarily show the substance

14   of the texts, but they will show when the texts

15   were -- you know, when the communications occurred.

16   And we've already given some of that to them.

17           If they want that with Trooper Nevins,

18   we'll give that to them as well.  And I believe we

19   did offer that.  I can't remember.  We've had lots

20   of meet and confers.  But I think we did offer that,

21   and the answer was, no, we want all the phone

22   records.  Well -- but that's really a fishing

23   expedition.  They want to know communications

24   between Trooper 1 and Trooper Nevins, Ms. Parrotta.

25           THE COURT:  So what is --

```
1                MR. LICUL:  Yeah?

2                THE COURT:  -- the problem with giving the

3    full phone records?  Without follow-up subpoenas to

4    get the identity information for every single

5    number, what's the harm?

6                MR. LICUL:  What's the harm in the full

7    phone records?

8                THE COURT:  Yes.

9                MR. LICUL:  Because they're phone -- the

10   phone conversations that she had with other people

11   have nothing to do with this case.

12               THE COURT:  And they won't know the numbers

13   without follow-up subpoenas --

14               MR. LICUL:  They might.

15               THE COURT:  -- so it doesn't really matter.

16               MR. LICUL:  I don't know because they

17   have -- in the past, we've gotten a subpoena that

18   says, you know, we want this person's phone records.

19   And we ask, and who is this person?  And they tell

20   us who it is.  I don't know how they know that

21   information.  I'm not suggesting anything nefarious.

22   All I'm saying is we don't know --

23               THE COURT:  But who cares?  I mean, what's

24   the harm in producing the full phone records?

25               MR. LICUL:  Well, no, the harm is that it's
```

1   a fishing expedition.

2            THE COURT:  That's not a harm.

3            MR. LICUL:  Yes, it is.  Sure, it is.

4            THE COURT:  Not really.  No.  It doesn't

5   intrude on her privacy necessarily.  Like, give me

6   an actual harm.

7            MR. LICUL:  Sure, it is.  Somebody's phone

8   records may show when they spoke to their doctor,

9   when they spoke to their accountant, when they spoke

10  to their lawyer.

11           THE COURT:  So what?  There's no

12  evidentiary value to any of those things.

13           MR. LICUL:  Well -- but, Your Honor, I

14  don't think that that's the way discovery works.

15  This -- what they -- they have to ask for material

16  that's both relevant and proportional.  We are

17  offering them the information that they're seeking:

18  How many times have you communicated with Trooper

19  Neville --

20           THE COURT:  Curated by you.  And their

21  concern is that previously these documents were not

22  disclosed, and they did not get full text messages

23  and other documents that they think show the

24  correspondence between Ms. Parrotta and Mr. Nevins.

25           MR. LICUL:  We don't have the text

1    messages.

2            THE COURT:  I understand that.  They want

3    the records to check how frequently they're in

4    contact.

5            MR. LICUL:  Your Honor, if you're

6    suggesting that we would somehow strike relevant --

7            THE COURT:  I'm not.  I'm not suggesting

8    that.  I'm saying they want to do an independent

9    check.  People make mistakes.  I've seen it before.

10            MR. LICUL:  Well, Your Honor, all I can say

11    is, then, we will do the same and subpoena the

12    governor's phone records because we're -- we'd be

13    entitled to that same thing.  And we've asked for

14    that, and they won't even give us his phone number,

15    even though he actually lost his phone in --

16            MS. GLAVIN:  They -- you have his phone

17    number.

18            MR. LICUL:  Okay.  All right.  I don't

19    think we --

20            THE COURT:  If there is relevancy shown.

21    What I want to talk about with regard to phone

22    records is dates; because, in my view, a limited

23    date range phone record subpoena is of limited

24    invasive effect, limited prejudice.  I'm asking you

25    sincerely what your argument is against that sort of

1    limited date range.

2              Have you given thought to a date range, Ms.

3    Glavin?

4              MS. GLAVIN:  Yes, Your Honor.

5              THE COURT:  What is your suggestion?

6              MS. GLAVIN:  January -- well, actually ...

7              THE COURT:  I'm just getting 136 out of my

8    binder here.

9              MS. GLAVIN:  Your Honor, I think what we

10   were planning to do for the phone records is we

11   initially wanted them for December of 2020 up to the

12   present, and we had marked December 2020 because

13   that's when Ms. Boylan first made her allegations;

14   however, given the testimony of Ms. Parrotta, I

15   think that we would ask for, you know, some key

16   dates, probably, you know, the month of phone

17   records for those dates.  So, for instance,

18   September 2019, I believe.

19             I don't have them off the top of my head.

20   We can tell Mr. Licul about it.  But limited to

21   dates around certain events because we've had

22   testimony about who Trooper 1 was communicating with

23   when certain events took place.

24             THE COURT:  And so please help me

25   understand, Mr. Licul, why this wouldn't be relevant

1    and proportional if it's limited.

2        MR. LICUL:  The text -- the communications

3    between Ms. Parrotta -- which we've already turned

4    over, by the way, some phone records because they

5    did give us a date range and we turned it over.

6        I'm not disputing that communications with

7    Ms. Parrotta and even Trooper Nevins would be

8    relevant.  All I'm saying is that communications

9    with everyone else are not.

10        THE COURT:  I understand what you're

11    saying.  I'm asking what the problem is.

12        MR. LICUL:  The problem is the other phone

13    communications.  They're not relevant.  They haven't

14    explained why they're relevant.  And if they're

15    looking for communications between Trooper 1 and

16    certain people, they should let us know that.  We'll

17    take a look at the phone records.  We will not

18    redact anything that's with those folks' numbers.

19        THE COURT: Ms. Glavin, why are

20    communications or records of communications with

21    Ms. Parrotta -- and I note Ms. Parrotta's relatives'

22    phone numbers -- and Mr. Nevins' insufficient?

23        MS. GLAVIN:  Because we think that

24    Trooper 1 -- those are just the two we know about

25    based on documents we got back in response to our

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    subpoenas.  We have other troopers that are coming

2    up.  We think she was communicating with a number of

3    other troopers around her testimony, around her

4    interview with the Attorney General's Office.  Based

5    on what we know today, we also think that she was in

6    touch with a reporter as well.

7            THE COURT:  What relevance does that have?

8            MS. GLAVIN:  Because there were articles

9    that were -- well, a couple of things.  One is that

10   there were articles that were written from one news

11   outlet that seemed to have inside information about

12   things that were happening on the PSU that would be

13   in violation of the nondisclosure agreement every

14   PSU officer signs.

15           THE COURT:  But what would be the relevance

16   of her communications with a reporter?

17           MS. GLAVIN:  Because we think that

18   Trooper 1, based on what -- the testimony of Diane

19   Parrotta, as well as documents that we now have from

20   former Major Nevins, establish an extreme animus

21   that she had towards Governor Cuomo.  And there were

22   articles as early as December of 2020 -- or

23   inquiries by the press as early as December 2020

24   that related to Trooper 1, and we want to see what

25   communication she was having at that period of time.

```
 1                THE COURT:  Mr. Licul?

 2                MR. LICUL:  If they want communications

 3     with other troopers, then they should give us that

 4     list.  We'll look through the phone records for

 5     that.

 6                THE COURT:  This is never going to end,

 7     Mr. Licul.  We're going to be working on the phone

 8     record subpoena for three months before we get even

 9     to further document requests.

10                MR. LICUL:  I don't think that's right,

11     Your Honor.  I actually think this will be a faster

12     way of doing it.  If they give us the names, we'll

13     take a look and we'll produce what the

14     communications are.  It's faster than having to

15     decide a motion regarding the phone records.

16                THE COURT:  Well, the phone records, I

17     don't have to decide -- I don't even know that I

18     need this to be fully briefed.  It's a relatively

19     straightforward relevancy question.

20                MS. GLAVIN:  Right.

21                THE COURT:  And to me, the phone records

22     seem very relevant.

23                MR. LICUL:  I think --

24                THE COURT:  Your objection is to the scope.

25                MR. LICUL:  Right.
```

```
 1                THE COURT:  And so my question is why?

 2     Given everything that Ms. Glavin just described, how

 3     is this not proportional to the needs of the case?

 4                MR. LICUL:  Because what they're talking

 5     about are communications between Trooper 1 and

 6     certain people.  And what they're asking for are all

 7     of her communications for years.

 8                THE COURT:  Right.  Because they're looking

 9     into whether she has an extreme animus.  So why

10     aren't they entitled to look through her phone

11     records and see if she's communicating with other

12     folks who would be supportive of that motive?

13                MR. LICUL:  That's a pure fishing

14     expedition.  That's not based on evidence.  That's

15     a --

16                THE COURT:  A fishing expedition is not a

17     legal conclusion.  It is not -- that is a phrase

18     people throw around in discovery all the time, and

19     it is not a defense to discovery.

20                MR. LICUL:  Well, no.  Respectfully,

21     Your Honor, I think it is.  I think it's --

22                THE COURT:  Relevance and proportionality

23     should be your focus.

24                MR. LICUL:  Right.  And if what you're

25     looking for are documents relevant to a case or a
```

```
1    defense, then you ask for those.  And if you can get

2    it from the party, then you do that.  You don't

3    serve third parties --

4              THE COURT:  I'm not going to have them ask

5    you for 20 numbers and you give them 20 versions of

6    the phone records.  That's just not efficient.

7              MR. LICUL:  Why -- respectfully,

8    Your Honor, I don't understand why that isn't

9    efficient and why it's more efficient --

10             THE COURT:  To just get the phone records

11   unredacted?  It's a lot more efficient.

12             MR. LICUL:  Well -- but now, they're

13   getting information that they haven't requested.

14   And now that that's --

15             THE COURT:  They requested it months ago --

16             MR. LICUL:  No.

17             THE COURT:  -- in ECF 136.

18             MR. LICUL:  Your -- I'm sorry, Your Honor.

19   I misspoke.  Not that they didn't request it, but

20   information that goes beyond the relevance argument

21   that they're making.

22             THE COURT:  I don't think that every single

23   piece of information on every single document has to

24   be relevant for the document to be relevant,

25   Mr. Licul.  What is your authority for that
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    proposition?

2              MR. LICUL:  Well, Your Honor, I do think

3    that there are cases about phone records.

4              THE COURT:  There are dozens.

5              MR. LICUL:  Yes.  And I do think some of

6    them say you don't get all the phone records and

7    that's really broad.

8              THE COURT:  I think it really depends on

9    the factual context.

10             MR. LICUL:  Right.  And in a situation

11   where they're saying, we need communications between

12   these people, and we're saying, okay, we'll show

13   that to you, we'll give that to you, I think it

14   makes the subpoena overbroad.  I do.

15             And I don't think this would take a lot of

16   time.  I don't -- we obviously have access to the

17   phone records, and we can do this fairly quickly.

18   And I just don't -- I was simply trying to get this

19   issue off the table by offering them what they asked

20   for and what their basis was for asking for it.  I

21   don't --

22             THE COURT:  I understood their basis to be

23   broader, based on the supplemental filing in 189.

24             MR. LICUL:  I'm not sure that that's right.

25   I think what they're saying is, somehow, because

                AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    people talk to each other, that they've now
 2    conspired with the rest of the world to attack their
 3    client.
 4              THE COURT:  No.  I think what they're
 5    saying is evidence of communications is a fertile
 6    area for cross-examination to ascertain whether or
 7    not people are, in fact, conspiring against their
 8    client.  That's my understanding of their motion and
 9    has been since they filed it months ago.
10              MR. LICUL:  Well, first of all, Your Honor,
11    let me just say this:  Their evidence of a
12    conspiracy is evidence of not a conspiracy.  What
13    they have is communications -- evidence of
14    communications from Ms. Parrotta to Trooper 1 and
15    Trooper 1 not responding.  That's not evidence of a
16    conspiracy.  That's evidence of a non-conspiracy.
17    Yet, they're trying --
18              THE COURT:  We're not here to debate the
19    merits.
20              MR. LICUL:  Well --
21              THE COURT:  We're here to figure out
22    whether or not the phone records, which may include
23    some calls with people who have nothing to do with
24    this case, are relevant.  And I get it, that
25    sometimes phone records have sensitive information.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. LICUL:  Right.

2          THE COURT:  If you actually have phone

3   numbers on there that you deem to be unduly

4   sensitive, I'd be willing to hear you on that.  I'd

5   even entertain an ex parte submission on that, but

6   that's not what I'm hearing from you.  All I'm

7   hearing from you is that it is a fishing expedition,

8   which is not a legal defense.

9          MR. LICUL:  Well, I don't mean to get into

10  it with Your Honor about the fishing expedition.

11  All I'm saying is, when one party says, I need this

12  information because, and the other side says, okay,

13  we'll give this to you, and they say, no, no, no, we

14  want everything, that's, by definition, overbroad.

15  That -- and I don't know what else --

16         THE COURT:  That's not what's happening

17  here.

18         MR. LICUL:  That's exactly what's

19  happening.

20         THE COURT:  They're saying we want phone

21  records for a specific period of time.

22         MR. LICUL:  Right.

23         THE COURT:  Which are very specific.

24         MR. LICUL:  No, they're not specific.

25  They're specific as to the time, but not as to the

1    communicators, right?  And that's the issue, right?

2              THE COURT:  I understand the issue, and I

3    just think that the way you're parsing this is

4    overly fine.

5              MR. LICUL:  Well, Your Honor, I just don't

6    see -- what's the harm?  I don't see that as being

7    the test.  The test is are they seeking relevant

8    information, in part --

9              THE COURT:  The answer is yes.

10             MR. LICUL:  Well, in part, Your Honor.  In

11   part.  Not entirely yes.  And we're offering to give

12   it to them.

13             THE COURT:  But you're not.  You're not

14   offering to give them the full scope of what they

15   want.

16             MR. LICUL:  Right.  Because the other

17   information is not relevant.

18             THE COURT:  Which we haven't actually

19   established because nobody's actually analyzed the

20   phone records number by number, which is part of the

21   problem with this entire discussion.

22             To the extent that there are phone numbers

23   on those records that you think are too sensitive or

24   too intrusive such that there's actually prejudice

25   to your client, I'm willing to entertain that, but

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1    unless there is some sort of prejudice, I find these

2    phone records to be relevant.  If we can get a

3    specific date range, I don't see them as

4    disproportionate to the needs of the case.  So they

5    have met their burden.  My question to you now is

6    whether there is some special interest that needs to

7    be protected.

8              MR. LICUL:  Well, I'd have to look at

9    the -- I have to go back and look at the phone

10   records.  I don't have --

11             THE COURT:  Right.

12             MR. LICUL:  Yeah, I don't know.

13             THE COURT:  And you, I'm sure, don't have

14   recall of all of the phone numbers.  Nobody could.

15   So that's, you know -- and this is the problem.  We

16   can't -- every single thing in this case becomes

17   this type of litigation --

18             MR. LICUL:  Well --

19             THE COURT:  -- where it's -- I've made a

20   finding.

21             MR. LICUL:  I understand.

22             THE COURT:  These phone records are

23   relevant, provided that the date range --

24             MR. LICUL:  Okay.

25             THE COURT:  -- is tailored.  I may well

1     also conclude that they're proportionate and need to

2     be turned over.  I'm giving you the opportunity to

3     illustrate whether or not there is some reason in,

4     sort of, as a motion to quash type analysis --

5              MR. LICUL:  Okay.

6              THE COURT:  -- that there was some undue

7     prejudice.

8              MR. LICUL:  Let us go back, Your Honor, and

9     take a look at the phone records, and we'll report

10    back to the Court.

11             THE COURT:  Okay.

12             MR. LICUL:  Okay?

13             THE COURT:  So, Ms. Glavin, in the interim,

14    your homework on the phone records piece is to

15    figure out the dates and the specifics there.  But I

16    do find, based on the briefing and the conversation

17    today and other conversations we've likely had about

18    these phone records, that they are clearly relevant

19    to the defendant's defenses and may well be

20    proportionate, provided that an appropriate date

21    range can be found.

22             And if they are, however, unduly -- if

23    production would be unduly prejudicial in some

24    fashion to the plaintiff, I will entertain some

25    redactions.  But at the end of the day, we're not

```
 1   going to have another motion every time they come up

 2   with a new name.  It's not going to happen, Mr.

 3   Licul.

 4           MR. LICUL:  I wasn't suggesting that,

 5   Your Honor.  I was even asking -- I was even

 6   suggesting that they give us the names of other

 7   troopers.  But I understand Your Honor's rulings and

 8   Your Honor has ruled.  I just ask them to give us a

 9   date.

10           THE COURT:  Yeah, certainly.

11           So, Ms. Glavin, how do you want to resolve

12   this narrow question?

13           MS. GLAVIN:  We'll send Mr. Licul a date

14   range, although I am expecting that you're going to

15   disagree, but I hope not.

16           MR. LICUL:  Well, I mean --

17           MS. GLAVIN:  We'll give him a date range,

18   Your Honor, and we will report back to the Court

19   within a week.

20           THE COURT:  Okay.

21           MR. LICUL:  The other -- well, I'm not sure

22   that we'll have been able to go through the phone

23   records in that week.

24           THE COURT:  It may depend upon how broad

25   the date range is.
```

```
 1                MR. LICUL:  Yeah.  Yeah.

 2                THE COURT:  So be mindful.

 3                MR. LICUL:  Just one more thing,

 4      Your Honor.

 5                Ms. Glavin talked about the retaliation

 6      claim, and I think she mischaracterized it.  Our

 7      retaliation claim against the governor is that after

 8      Trooper 1 brought her claims engaging in protected

 9      activity, he then accused her of extortion.  And

10      what discovery has revealed is that after she

11      brought her claims, he sat down with Mr. Azzopardi

12      and they drafted a tweet.  I guess it's no longer

13      called a tweet.  It was at that time.

14                THE COURT:  What is it called?

15                MR. LICUL:  It's an X.  I don't know

16      what -- but at the time, it was a tweet accusing her

17      of extortion.  And so that is the basis for the

18      retaliation claim.

19                So I don't think that the governor has to

20      know much or have many documents about what happened

21      during that -- during that exchange.  Mr. Azzopardi

22      already testified to it.  He testified that there

23      were no drafts; that they worked on the draft of the

24      tweet together.  It went out under Mr. Azzopardi's

25      name.  I just want to clarify the scope of the
```

1    retaliation claim is not as broad as Ms. Glavin made

2    it out to be.

3              MS. GLAVIN:  Okay.  But, Mr. Licul, here's

4    the problem, you're actually wrong on that.

5              MR. LICUL:  Right.

6              MS. GLAVIN:  Your paragraphs of the

7    retaliation claim --

8              MR. LICUL:  Yeah.

9              MS. GLAVIN:  Look at paragraphs -- they are

10   144 through 159.  And the complaint was filed on

11   February 17th.  You are also charging activity

12   before February 17 in 2022.

13             MR. LICUL:  That was as to Ms. DeRosa

14   and --

15             MS. GLAVIN:  And the governor.

16             MR. LICUL:  -- and talking to the

17   reporters.

18             MS. GLAVIN:  No, no, no, no.  Look at

19   paragraph 155, Mr. Licul.

20             MR. LICUL:  Well --

21             MS. GLAVIN:  You're charging other --

22   you're also charging that he enlisted his brother.

23             MR. LICUL:  Not as to Trooper 1.

24             MS. GLAVIN:  No, but this is all part of

25   your retaliation claim.

              AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. LICUL:  No.

 2              MS. GLAVIN:  The retaliation section --

 3              MR. LICUL:  I don't mean to get it --

 4    the --

 5              MS. GLAVIN:  It's a very broad 15

 6    paragraphs.

 7              MR. LICUL:  But it --

 8              MS. GLAVIN:  It's not one tweet.  I wish it

 9    were.

10              MR. LICUL:  The retaliation claim is taking

11    steps -- what the legal standard is:  Did he take

12    steps that could dissuade a reasonable person from

13    complaining?  That's the standard for retaliation

14    under the law.  Accusing someone of committing a

15    crime after they filed a complaint is the

16    retaliation that we're talking about.

17              MS. TRZASKOMA:  So do you agree to strike

18    all of the other paragraphs?

19              MS. GLAVIN:  I'm not striking anything.

20              MS. TRZASKOMA:  Well, then, that's the

21    problem, Mr. Licul.

22              MS. FOTI:  Your Honor --

23              THE COURT:  I'm pulling up the complaint.

24    Believe it or not, in all my binders, I don't have

25    the amended complaint handy.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MS. GLAVIN:  Your Honor?

 2              THE COURT:  Go ahead.

 3              MS. GLAVIN:  I have it.

 4              THE COURT:  Ms. Foti, is --

 5              MS. FOTI:  Just because I want to correct

 6    the record on Mr. Azzopardi's testimony.

 7              Mr. Azzopardi's testimony was that he did

 8    sit with the governor to draft posts, as they call

 9    it now, but it was not about their client.  It was

10    not about Trooper 1.  It was about the law firm.  I

11    think if you look at the post, you will see it's

12    about the law firm.

13              And I don't yet know what the Judge's

14    ruling is based on in terms of what was -- why

15    Mr. Azzopardi was dismissed, but I think that's a

16    good reason for dismissal, would be that the post

17    itself, on its face, did not have to do with the

18    plaintiff.

19              THE COURT:  Thank you for that, Ms. Foti.

20              And in terms of the paragraphs, Ms. Glavin,

21    that you were just --

22              MS. GLAVIN:  It's 144.  It starts on

23    paragraph 144, Your Honor, and goes through 159.

24              THE COURT:  Mr. Licul, I mean, I'm going

25    back to a point we discussed back in September by
```

1    including allegations with regard to everybody who

2    is discussed at length in the Attorney General's

3    report.

4           Although your theory of the case as to

5    Trooper 1 may be narrowly tailored vis-à-vis this

6    tweet activity, Ms. Glavin is clearly correct, that

7    the retaliation section, at least the factual

8    specifications in your retaliation section, pertain

9    to significantly longer volume of activities

10   relating to everybody else.

11          Mr. Licul, by determining to include all of

12   this, it is much more lengthy than a simple one hit

13   tweet type of retaliation.

14          MR. LICUL:  The adverse actions in relation

15   to Trooper 1 --

16          THE COURT:  I understand the law, sir, but

17   you have paragraph upon paragraph in your complaint

18   explaining how her fears were justified because of

19   all this prior history.

20          MR. LICUL:  Correct.  And that is an

21   anticipation of the defendants' arguing that she did

22   not complain, an anticipation of a Faragher-Ellerth

23   defense, which is that she could not take

24   appropriate measures to complain about the

25   discrimination when it occurred, and that's what

1    that's for.

2            THE COURT:  Right.  But given --

3            MR. LICUL:  That's --

4            THE COURT:  Given the nature of the way the

5    complaint is drafted, I don't think it can be fairly

6    characterized that the discovery relevant to

7    retaliation is one tweet.

8            MR. LICUL:  The discovery in relation to

9    retaliation as to the -- as to Trooper 1 is the

10   tweet.  That is the adverse act.

11           THE COURT:  I understand.

12           MR. LICUL:  The reason she did not complain

13   was because of the culture of fear by the governor

14   and in the governor's chambers about people -- for

15   people who would complain about him, but that's not

16   the adverse act.

17           THE COURT:  I understand.  I get it.

18           MR. LICUL:  So -- all right.

19           THE COURT:  But it's --

20           MR. LICUL:  I just wanted to make clear

21   because I thought that the allegation was -- or the

22   characterization was that her allegations of

23   retaliation related to other things that he --

24           THE COURT:  They do.  Your complaint

25   relates to a number of other things in connection

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1    with how she experienced the retaliatory act.

2              MR. LICUL:  The retaliatory act is the

3    tweet.

4              THE COURT:  I know, but because of her

5    lens, because of her experience, to the extent she

6    knew any of this stuff, you're saying that -- I

7    mean, did she know all of this stuff before --

8              MR. LICUL:  No.  It's -- but it --

9              THE COURT:  -- when she just chose not to

10   complain?

11             MR. LICUL:  It speaks to the culture of the

12   place.  And I was -- as I said, Your Honor, it

13   doesn't go to the retaliatory act against her by the

14   governor.  What it does is it goes to the

15   explanation for why she did not complain --

16             THE COURT:  But she didn't know any of

17   these things at the time?

18             MR. LICUL:  She knew about -- I mean, they

19   could depose her.  They had a chance to depose her.

20   They canceled it the day before.  And they can ask

21   her about that, about the culture of the place.

22             THE COURT:  I understand.  But in terms of

23   the precatory allegations that lead up to the

24   tweet --

25             MR. LICUL:  Right.

        AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              THE COURT:  -- and your position that her
 2    fears were justified because of all of these prior
 3    acts, did she know?
 4              MR. LICUL:  She may have known some of
 5    them.  I don't know, Your Honor.  But --
 6              THE COURT:  Fair enough.  Fair enough.
 7              MR. LICUL:  But all I'm saying is that that
 8    is the culture of the place.  The Faragher-Ellerth
 9    defense, at least under federal law, is an
10    affirmative defense, and they would have to prove
11    that there is a mechanism for her to complain and
12    she didn't.
13              THE COURT:  Right.  I don't think anybody
14    is confused about which action you're saying is the
15    basis for your retaliation claim, but I think what
16    has been confused in the conversation is how you
17    anticipate proving the culture surrounding the
18    allegedly retaliatory act.  So it's all part and
19    parcel of the retaliation claim.
20              MR. LICUL:  No, I agree with that.
21              THE COURT:  I think it's just --
22              MR. LICUL:  I just --
23              THE COURT:  -- shorthand.
24              MR. LICUL:  I agree with that.  I just
25    wanted to clarify what the exact retaliation against
```

1    Trooper 1 was.

2              THE COURT:  Okay.  Thank you.

3              MR. LICUL:  Sure.

4              THE COURT:  All right.  So I have a better

5    understanding of the defendant's position with

6    regard to the, sort of, order of operations, which

7    was part of what I was hoping to have an

8    understanding of.

9              In that regard, as I noted, we will set a

10   conference down for January 11th to talk about Ms.

11   Boylan, and another conference to talk about Ms.

12   Bennett, obviously, subject to their counsels'

13   availability.  We will put a note on the docket

14   scheduling those conferences, including a note in

15   the separate Boylan docket.

16             So the other phone records issues,

17   Ms. Glavin, since we were just talking about phone

18   records at length, I know there are some phone

19   record subpoenas out there for other folks.  What

20   other phone records are strictly pertinent to

21   Trooper 1?

22             Weren't you, at some point, seeking records

23   relating to Ms. Parrotta and some of her relatives?

24             MS. GLAVIN:  Yes.  Yes.

25             THE COURT:  And where are you on that?

1          MS. GLAVIN:  We haven't been able to serve

2     it because when we noticed it, plaintiff's counsel

3     objected and told us not to serve it.

4          THE COURT:  Okay.  And who all were you

5     seeking -- my recollection was that your basis for

6     that was that some of the text messages were through

7     a relative?

8          MS. GLAVIN:  Yes.  So, I mean,

9     Ms. Parrotta's phone line -- obviously, we want her

10    phone records because of what she testified to and

11    that she was in touch with Trooper 1 and spoke with

12    her every day simultaneously with some of these

13    actions.  We want -- so that will be a broader

14    request for Ms. Parrotta's phone records.

15         With respect to her relatives -- which it's

16    her husband and, I think, her daughter.  When she

17    reached out to Trooper 1, I think the sequence of

18    events is that Trooper 1's attorneys contacted

19    Ms. Parrotta.  She then reached out and sent a text

20    message using her own phone to Trooper 1, asking

21    her, you know, what she wanted her to say.

22         Trooper 1 didn't respond, so then she

23    switched -- or may have blocked her.  She then

24    switched and used, I think, her husband's phone to

25    do another text message, and then used her

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1    daughter's phone to do another text message.

2         Because of her switching of the phones, we

3    want to see if there were communications around that

4    time period between, you know, when Ms. Parrotta was

5    subpoenaed or in the weeks thereof, so I think we're

6    looking at records in 2023.

7         THE COURT:  For what period of time?

8         MS. GLAVIN:  2023 for -- I would have to

9    look.  We're probably looking in -- probably April

10   2023.

11        THE COURT:  What did Ms. Parrotta say at

12   her deposition in terms of how long of a period of

13   time they were having these discussions in the

14   lead-up to her deposition?

15        MS. GLAVIN:  Oh.  She -- well, she

16   initially said she had not had any communications

17   with Trooper 1, and then she reversed that after

18   being confronted with the texts, so -- which is why

19   we want to see what the phone records are when she

20   was contacted by plaintiff's counsel about

21   potentially doing an affidavit, which never

22   materialized.  So we want to see her husband's and

23   her child's for that period of time.

24        THE COURT:  And just to be clear, all of

25   these records would reflect contact with Trooper 1's

1    known phone.  You don't have evidence Trooper 1 was
2    using a second phone?
3            MS. GLAVIN:  Not that we know of,
4    Your Honor.
5            THE COURT:  Okay.  So, then, what's the
6    problem with just getting Trooper 1's records?
7            MS. GLAVIN:  Oh, that's true.  That may
8    solve the problem.  Unless -- I don't know if she
9    had another phone, but we can ask Mr. Licul about
10   it.
11           MR. LICUL:  I don't know of any.  And she
12   doesn't have another.
13           THE COURT:  Okay.  So it seems to me --
14           MS. GLAVIN:  And with respect to Parrotta,
15   we do want her phone records, in particular, for a
16   longer period of time because she was in
17   communication with Nevins when this OAG
18   investigation was beginning and when sexual
19   harassment allegations first began.  And we
20   understand through discovery and some other
21   information that Diane Parrotta was going around
22   calling other troopers to share their phone numbers.
23           We understand she was in contact with Major
24   Nevins, who I think we've discussed, who retired
25   from the PSU in -- I think it was may of 2017.  But

              AMM TRANSCRIPTION SERVICE - 631.334.1445

 1   we think it is material.  A big part -- one of our

 2   defenses that we think is valid and what we're

 3   exploring is that Major Nevins and Diane Parrotta

 4   played a core role in Trooper 1 coming forward.  And

 5   part of that was extreme dislike that they had for

 6   Governor Cuomo, which is -- we've now seen in text

 7   and e-mail exchanges and shared with Trooper 1.  And

 8   we want to see what Ms. Parrotta's communications

 9   were during core periods of time, critical periods

10   of time in this.  That's why we're seeking her phone

11   records.

12          THE COURT:  Right.  But how are her phone

13   records going to show you what you're looking for?

14          I mean, I assume you're doing phone work as

15   you go through it with your various witnesses, but,

16   you know, without the grand jury or administrative

17   subpoena power, quite candidly, how are you actually

18   going to be closing the loop on these phone records?

19   How is it getting you anywhere?

20          MS. GLAVIN:  Oh, we -- because we will --

21   we have a number of other people's phone numbers and

22   that we're interested, very much interested, if she

23   was in touch with them, including newspaper

24   reporters.

25          THE COURT:  This is Ms. Parrotta?

            AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MS. GLAVIN:  Yes.

2          THE COURT:  Mr. Licul?

3          MR. LICUL:  Well, I do -- don't think that

4    there's any reason for Ms. Parrotta's phone records.

5    I mean, we're -- we are -- we really don't

6    understand how any of this is relevant, frankly.  We

7    are talking about somebody that -- that the --

8    Trooper 1 refused to call back regarding testimony.

9    And now, we have a conspiracy with other troopers

10   that somehow involves the AG's Office and other -- I

11   mean, this is really going down that rabbit hole.

12   And I don't see why any of this -- how any of this

13   is relevant to what's happening here.

14          What they're doing here is essentially

15   trying to put the Attorney General's report --

16   trying to -- you know, to litigate.

17          THE COURT:  Of course they are, because

18   they're trying to gather discovery so that they can

19   move to preclude it.

20          MR. LICUL:  Right.  But there is --

21          THE COURT:  Which they're entitled to do.

22          MR. LICUL:  There is a -- I mean, right,

23   but just -- Your Honor, just so I may -- they've

24   sent out 23 deposition notices.  Under the rules,

25   they're limited to ten.

1    THE COURT:  I know.

2    MR. LICUL:  They've sent out 43 -- and I

3    don't know if these are exact numbers -- document

4    subpoenas, sometimes to a person more than once.

5    This is beyond the pale.  At some point in

6    civil discovery, you have to make decisions about

7    who the people are that are important, what the

8    records are that are important.

9    THE COURT:  One could also say that those

10   decisions have to be made in drafting a complaint.

11   MR. LICUL:  Yes.  And we made those

12   decisions and we made them properly.  And I will

13   stand by the complaint because the Second Circuit

14   law on this is clear.

15   THE COURT:  Your read of *Perry* and my read

16   of *Perry* are slightly different, but go ahead.

17   MR. LICUL:  Perhaps.  But my -- but I think

18   it's -- my read of *Perry* is at least fair.

19   THE COURT:  I agree, yeah.

20   MR. LICUL:  Which is -- and *Cruz*, and a

21   recent Second Circuit decision by Judge Chin in

22   *Banks v. General Motors*; all of which says that the

23   harassment of others, even if the plaintiff doesn't

24   know, is relevant.  And so that's -- and I think

25   that that's fair.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          But what we're talking about here is not

2    even attacking Trooper 1's credibility.  We're

3    talking about attacking another witness' credibility

4    through the use of other witnesses.  We're -- I

5    think Your Honor, last time, talked about, sort of,

6    going three and four --

7          THE COURT:  Degrees, yes.

8          MR. LICUL:  -- degrees deep here down the

9    rabbit hole, and I think we're there.

10         THE COURT:  Well, to some degree, there

11   are, sort of, areas of the case where we may be

12   there.  But when it comes to the factual predication

13   that I've seen so far raising Mr. Cuomo's concerns

14   about Ms. Parrotta's communications with your client

15   and the text message exchanges, you know, to the

16   extent that they have a good-faith basis to believe

17   that people were texting and calling each other with

18   regard to what they were going to tell the AG and

19   when and how and whether or not to reach out to

20   reporters; all of that could be evidence of bias,

21   no, Mr. Licul?

22         MR. LICUL:  I think that those are very

23   extreme inferences to draw.  What we have with

24   respect to Ms. Parrotta is a text message that asks

25   Trooper 1 to speak, Trooper 1 not responding,

1    Ms. Parrotta then trying to call Trooper 1 on her

2    husband's phone and her daughter's phone, and

3    Trooper 1 not responding.  I don't see how, then,

4    evidence of Diane Parrotta's communications with

5    other troopers is somehow going to take Trooper 1.

6    I mean, we're really down that rabbit hole.

7             MS. TRZASKOMA:  Your Honor, may I be heard

8    briefly on this?

9             THE COURT:  Let him finish.

10            MR. LICUL:  And then there -- you know, and

11   there is testimony from another trooper that they

12   deposed, Ms. Salazar, Trooper Salazar, who confirms,

13   essentially, that as these events were occurring

14   with Trooper 1, Trooper 1 confided in her

15   contemporaneously about these events with the

16   governor.

17            And so I just -- I don't know whose -- at

18   some point, I'm losing track of whose credibility

19   we're challenging here.  Is it Trooper 1's?  Is it

20   Diane Parrotta's?

21            THE COURT:  Well, there's several layers.

22            MR. LICUL:  Yeah.

23            THE COURT:  And I think that, first and

24   foremost, they want to kick out the AG report.

25            MR. LICUL:  Okay.

```
 1                    THE COURT:  So that would be my
 2       assumption --
 3                    MR. LICUL:  But --
 4                    THE COURT:  -- based on everything we've
 5       seen so far, right?
 6                    So if their goal, one of their goals is to
 7       make a motion in limine saying that the Attorney
 8       General's report -- I'm just spit-balling here --
 9       was politically motivated, it was unsound in its
10       methodology, included, you know, legal conclusions
11       in lieu of factual findings and cannot be admitted
12       into evidence before the jury, they need to take
13       discovery to make those arguments.
14                    MR. LICUL:  Well, on the last point,
15       Your Honor, about legal conclusions, you don't need
16       discovery for that, right?
17                    THE COURT:  It's clear.
18                    MR. LICUL:  That's a legal conclusion.
19                    I think, though, the question about the
20       803, I think it is, standard is not whether you like
21       how the report came out, but whether or not it was a
22       thorough investigation, or whether it was -- which
23       sometimes happens -- somebody complains to an agency
24       and they simply dismiss it without any further look.
25       Yeah.
```

1          THE COURT:  Right.  But there's so many

2    types of government reports, right.  So you have,

3    you know, the report of the Water Board where some

4    guy goes out and measures the depth of the reservoir

5    every day, okay.  Those reports are routine business

6    records almost, and those would come in pretty

7    readily.  Nobody would really question whether the

8    government has an interest in knowing the depth of

9    the reservoir, right?

10         MR. LICUL:  Right.

11         THE COURT:  Then you have the routine

12   reports where people walk into an NYPD precinct and

13   say, this horrible thing happened to me, and it's

14   just a normal police report.  Then you have reports

15   that are investigation and involve conclusions.  And

16   in this report, there are multiple layers of

17   hearsay, multiple investigative choices that have

18   been made.

19         And it is clear to me, and has been clear

20   to me since the outset of all of this discovery

21   practice, that one of the main motivations of this

22   discovery is to challenge the admissibility of the

23   report.  And that is something that they are

24   entitled to take discovery to do because it is

25   critical to their defense, Mr. Licul.

1           MR. LICUL:  Right.

2           THE COURT:  And the merits of your claim do

3    not weigh upon whether or not they can take

4    discovery to challenge the admissibility of some of

5    the evidence that you seek to introduce.  Many of

6    the discovery problems in this case are due to

7    choices that plaintiff has made with regard to how

8    to plead the complaint and otherwise.

9           That's why I asked for the Rule 26(a)

10   disclosures.  I've reviewed them with a fine-tooth

11   comb.  Many of the issues that we're presented with

12   right now are because of choices that are being made

13   by you, as well as choices they are making.

14           MR. LICUL:  Well --

15           THE COURT:  And we need to live with those

16   choices and figure out a way to unstick this mess.

17           MR. LICUL:  Your Honor, but the problem

18   with their attack on the report is what they're

19   trying to do is to say that the report was

20   politically motivated.  That is not the test.

21           THE COURT:  No, they're trying to say that

22   the complainants were unreliable.

23           MR. LICUL:  Right, but that's a different

24   issue than the report.

25           THE COURT:  It is part of the report.

          AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                MR. LICUL:  No.  The --

 2                THE COURT:  If the report is unreliable

 3    because it is filled with biased hearsay, that is a

 4    strong basis to argue that the introduction of that

 5    report's prejudicial value outweighs its probative

 6    value --

 7                MR. LICUL:  But it doesn't --

 8                THE COURT:  -- under 403.

 9                MR. LICUL:  It -- right.  I understand the

10    403 argument, but the 803 -- I think it's 803.  I'm

11    sorry.  I don't remember.

12                THE COURT:  803(8).

13                MR. LICUL:  803(8).  That's not it.

14                The authoritativeness of the report just

15    depends upon whether there was an investigation

16    done.  And I understand Your Honor's point, which is

17    that there are various kinds of reports, but this is

18    not new ground.  I mean --

19                THE COURT:  It actually is somewhat new

20    ground.

21                MR. LICUL:  Well --

22                THE COURT:  I have read every 803(8) case I

23    can find.

24                MR. LICUL:  Well --

25                THE COURT:  And this is a different
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    situation than most.

2            MR. LICUL:  But I don't understand why.

3    Let me just explain.

4            Every time somebody walks into this

5    courtroom, or 95 percent of the time somebody walks

6    into this courtroom with a discrimination complaint,

7    it usually has a Title VII, an ADA, an ADEA claim

8    attached to it for federal jurisdiction.  And in

9    every single one of those circumstances, they've

10   gone to the EEOC, and the EEOC may have done an

11   investigation or not.  Where the EEOC has done an

12   investigation, courts will allow that report to come

13   in.

14           THE COURT:  Sometimes.

15           MR. LICUL:  Well, where there's an actual

16   investigation; in other words, where they went out

17   and actually interviewed witnesses and did an

18   investigation.  Where it's just simply a charge

19   followed by a rebuttal letter from the employer, for

20   example, or no letter at all, then the courts won't

21   let it in.  That's what we're talking about here.

22   And here, we're talking about the same --

23           THE COURT:  We're not talking about an EEOC

24   investigation, Mr. Licul.

25           MR. LICUL:  Well, this is --

            AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                THE COURT:  This is so, so, so different.
 2   No, it is not.
 3                MR. LICUL:  Of course, it is.  It's --
 4                THE COURT:  No, it is not.
 5                MR. LICUL:  I -- Your Honor --
 6                THE COURT:  You're pre-litigating the
 7   motion in limine.  It's really not of any real value
 8   to today's proceedings.
 9                MR. LICUL:  Well, it is.
10                THE COURT:  Please understand that they can
11   correct me if I'm wrong in terms of the theories as
12   to why they're strategizing their discovery in the
13   way that they are.  But this report issue is
14   significant in terms of the breadth of discovery
15   that the Court is finding to be relevant.
16                MR. LICUL:  But that's because of the
17   breadth of the governor's conduct and the number of
18   women he victimized.
19                THE COURT:  Right.  And if you decide you
20   don't want to introduce the report, I think we'd
21   have a very different discovery posture.
22                MR. LICUL:  But I'm not going to do that
23   because it's a relevant and powerful piece of
24   evidence.  Now, if they want to say that the
25   governor --
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  Is it, though?

2          MR. LICUL:  Sure.

3          THE COURT:  I mean, at the end of the day,

4    it's a report full of what people said to each

5    other.  That's all that report really proves.

6          MR. LICUL:  Well, no.  It -- it's a report

7    based upon sworn testimony --

8          THE COURT:  Yes.

9          MR. LICUL:  -- which is much more than you

10   get in any other investigation where the reports are

11   actually admitted.

12          The EEOC, when it interviews folks, it

13   doesn't put them under oath.  It just interviews

14   them and comes out with a conclusion.  The State

15   Division of Human Rights, the New York City

16   Commission, also may not do that, right?  But in

17   this case, we have folks under oath who are -- who

18   have testified in a report.  We're entitled to talk

19   to them --

20          THE COURT:  Their testimony is documented,

21   like, six different times.  Why does it have to come

22   in through the report?  What about the report is

23   important to you?

24          MR. LICUL:  Because the report is a neutral

25   evaluation of what happened.  It's a government

```
 1    report of the misconduct of our governor, and one --

 2    and our client is the victim of that, one of those

 3    victims.  It's an important piece of evidence.  That

 4    doesn't mean they get to go down --

 5              THE COURT:  What's important in the report

 6    is that these witnesses are saying it.  And these

 7    are the same witnesses that you would have on the

 8    stand.  So I have many layers of questions about

 9    whether or not this report would come in in its

10    form.  But, again, this is like -- we're talking

11    about the motion in limine.

12              MR. LICUL:  I understand.  I do understand.

13    I --

14              THE COURT:  But the fact that you are

15    insistent on introducing the report, which is one of

16    the questions that I asked you in September, has

17    certainly informed the Court's view as to the

18    breadth of the necessary discovery here because all

19    of the things that are relevant to challenging the

20    reliability of that report become part of his

21    defense --

22              MR. LICUL:  No.

23              THE COURT:  -- because they need to be able

24    to prepare to file their motion.

25              MR. LICUL:  Right.  But I think where we
```

1    have gone afield is not that the -- not that the

2    investigation wasn't thorough, but that the governor

3    wanted the agency or the attorneys to ask other

4    questions.

5             THE COURT:  No, I don't think that's where

6    we are afield at all.

7             MR. LICUL:  That's absolutely true.  They

8    wanted to know who was talking to who behind the

9    scenes, not whether the governor stuck his hand up

10   someone's blouse.

11            THE COURT:  But it matters a great deal who

12   was talking behind --

13            MS. TRZASKOMA:  That is outrageous,

14   Mr. Licul.

15            MR. LICUL:  So --

16            MS. GLAVIN:  I actually have to be heard on

17   this because --

18            MR. LICUL:  No.  I'm not done yet.

19            MS. GLAVIN:  No, I do, because it -- it's

20   just -- Your Honor, put aside what people said.  The

21   Attorney General's investigators chose to put a

22   certain 41 people under oath, okay?  In terms of the

23   documents they collected -- and I just am going to

24   beat this horse to death -- Lindsey Boylan got a

25   subpoena for all of her communications.  The

             AMM TRANSCRIPTION SERVICE - 631.334.1445

1    Attorney General's Office subpoenaed her for all her

2    communications with other complainants about her

3    allegations, et cetera.

4         She produced 25 pages of documents.  She

5    withheld -- withheld -- her communications with

6    other complainants.  And we know that based on other

7    discovery we've gotten in the case.  You know who

8    else did the same thing?  We've just learned this.

9    Alyssa McGrath.

10         Alyssa McGrath, one of the complainants,

11   was given a subpoena for all of her communications

12   with other complainants.  She produced certain

13   documents --

14         MR. LICUL:  I'm not sure.  I think you're

15   mischaracterizing subpoenas.

16         MS. GLAVIN:  -- certain documents to the

17   AG's Office.

18         MR. LICUL:  I don't think that --

19         MS. GLAVIN:  Can I finish?

20         MR. LICUL:  No, because --

21         MS. GLAVIN:  Can I finish?

22         MR. LICUL:  -- you interrupted me.

23         I don't think those subpoenas asked for all

24   communications with those folks.

25         MS. GLAVIN:  Oh, they did.  I can quote the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    subpoenas chapter and verse.

2            THE COURT:  The subpoenas by the AG's

3    Office?

4            MS. GLAVIN:  Yes, subpoenas by the AG's

5    Office.

6            THE COURT:  Okay.  Look, I'm not here to

7    re-litigate what the subpoena --

8            MS. GLAVIN:  No.

9            THE COURT:  No.  Listen.  This is serious.

10   I don't want to hear any more about the sufficiency

11   of people's productions to the Attorney General.  I

12   do not care if the Attorney General reached

13   accommodations with specific witnesses.  It has no

14   relevance to this case.  What matters to this Court

15   is what documents you need to prepare your defense.

16           And so, Mr. Licul, we're going to have to

17   agree to disagree with regard to the scope of

18   relevance based upon certain litigation choices that

19   the parties have made.  But based on the briefing,

20   which, as you can see, I have reviewed very closely,

21   there seems to be many, many points in the discovery

22   process so far that the defendant believes bear upon

23   the reliability of the report, which, in my view,

24   goes directly to the 403 analysis and the threshold

25   question of admissibility as an 803(8) reliable

1    report.

2         So with all of that said, this is a great

3    transition to talking about the scope of discovery

4    with regard to third parties.  I recognize they're

5    not here.  I want to hear from the parties with

6    regard to, realistically, what types of documents

7    you are seeking from the, sort of -- I'll call them

8    the non-Boylan, non-Bennett group, with regard to

9    communications and whatnot.

10        There are very few actual subpoenas that

11   have been submitted to the Court, notwithstanding

12   all of the various motions to quash them.  I don't

13   actually have a lot of them.  I have some; very few.

14   So, you know, pulling a random one from the docket

15   to get a sense of the document requests.  Obviously,

16   we have the ones that have been submitted to Lindsey

17   Boylan and Ms. Bennett, but I, as I noted earlier,

18   do think they are somewhat differently situated.

19        How representative is the document requests

20   that were submitted to Ms. Biaggi?

21        MS. GLAVIN:  I think they're pretty

22   representative, Your Honor.  And we understand from

23   speaking to Ms. Biaggi's attorney that it's --

24   whatever responsive documents they have -- I think

25   it's in the joint letter -- is "not a lot."

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  Okay.  So as set forth in the
2   document requests that were submitted to Ms. Biaggi,
3   there's a couple of different times that the Biaggi
4   subpoena was docketed.  This particular version was
5   docketed at document 193-1 as part of a letter
6   regarding that issue.
7          So this document request would include,
8   "Between December 1, 2020 and November 30, 2021, all
9   non-privileged communications with or about Lindsey
10  Boylan or any representative of Boylan, including
11  her campaign staff, agents or consultants; Karen
12  Hinton, Charlotte Bennett, or Kaitlin, concerning
13  allegations of sexual harassment or misconduct
14  against Governor Cuomo."  That's document request 1.
15         Document request 2.  "For the time period
16  December 1, 2020 through November 30, 2021, all
17  non-privileged documents or communications
18  concerning any allegations by you, the respondent,
19  of sexual harassment or misconduct against Governor
20  Cuomo, including communications with OAG and any
21  documents or other materials provided by you to
22  OAG."
23         And third, "For the time period January 1,
24  2017 through November 30, 2021, all non-privileged
25  communications by you concerning the work

1    environment in the New York State Executive Chamber

2    under Governor Cuomo."

3            So how representative is that, Ms. Glavin

4    or Ms. Trzaskoma?

5            MS. GLAVIN:  I think with that one,

6    Your Honor, it -- it's -- I actually think it's

7    somewhat narrower.  I don't -- we think it's

8    narrower because we think that Ms. Biaggi had

9    communications with a more limited number of people.

10           THE COURT:  Sure.  With the exception of

11   the specific names in paragraph 1, is this,

12   generally speaking, the types of documents you are

13   seeking?

14           MS. TRZASKOMA:  I think those are generally

15   the types of documents.  I mean, I think for others,

16   we requested, for example, what the documents were

17   that they produced to the Attorney General's Office.

18   I'm just pulling up --

19           THE COURT:  You have --

20           MS. TRZASKOMA:  -- Kaitlin's, for example,

21   which I think is also fairly representative.

22           THE COURT:  Has that one been docketed?

23           MS. TRZASKOMA:  I think that has been

24   docketed.  We filed a motion to compel --

25           THE COURT:  Yeah, I'm just checking my

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    list.

2            MS. TRZASKOMA:  -- and that was, I believe

3    an attachment -- let me just --

4            MS. GLAVIN:  It's at ECF 140.

5            THE COURT:  140?  Yeah, that's what

6    I'm pulling up.

7            MS. GLAVIN:  Yes.  It's not fully briefed.

8            THE COURT:  Right.

9            MS. TRZASKOMA:  So that -- so I think that

10    would be representative.  But, again, it's five

11    categories, and I can read them to you if that would

12    be helpful.

13            THE COURT:  Is that 142-2?

14            MS. TRZASKOMA:  I believe that's right,

15    Your Honor.

16            THE COURT:  Okay.  So in addition to the

17    basic categories -- so the Biaggi one is more

18    narrow, so thank you for highlighting this one.

19            All right.  So looking at this one,

20    Mr. Licul, I don't know if you have it handy.  Do

21    you have a view on the scope of the document

22    requests to the -- not the other complainants.  I

23    recognize that your original motion to -- sort of

24    for a protective order pertained to what you

25    described as, you know, sort of, information

1    digging, looking for information that could be

2    precluded under Rule 412 with regard to sexual

3    histories.

4            Absent that category, which, you know, is a

5    separate point of discussion, do you have concerns

6    about the document request that would call for

7    communications between complainants in the executive

8    chamber, communications with media outlets,

9    communications relating to statements Governor Cuomo

10   or his representatives have made with regard to

11   sexual harassment and misconduct, communications

12   with the OAG and AGAC, including documents

13   produced -- "All documents or communications

14   concerning your personal interactions with Governor

15   Cuomo," without a time limit, seems problematic,

16   potentially, depending upon the person's tenure.

17           And paragraph 4,  "Any photographs, videos,

18   screenshots or images, including the metadata of you

19   with Governor Cuomo; any communications in which you

20   shared or referred to any such images, videos or

21   photographs, including, but not limited to,

22   communications on social media" also seems fairly

23   broad in terms of timing.

24           "For the period December 5, 2020 to the

25   present, all documents or communications concerning

1    Lindsey Boylan, Charlotte Bennett, Ana Liss, or

2    Karen Hinton concerning Governor Cuomo or any

3    investigation of Governor Cuomo."

4              So do you have a reaction to those

5    categories, Mr. Licul?

6              MR. LICUL:  Well, just to be clear, I'm

7    only speaking for Trooper 1 and not --

8              THE COURT:  Obviously.

9              MR. LICUL:  I don't mean to be object --

10   waive -- attempting to waive anybody's objections.

11             THE COURT:  Obviously.

12             MR. LICUL:  I don't have an objection to

13   those, other than the 412 and related issues we

14   briefed earlier, the sexual history information.

15             I would say, just if you're asking for my

16   general reaction, if the question is all

17   communications between person A and person B,

18   unmoored to anything in the complaint, I think that

19   that, as a general matter, is overly broad, but I'm

20   not sure that I have -- that, I have standing to

21   object to.

22             But as a general matter, all communications

23   between one person and another seems overly broad.

24   If it's narrowed by the allegations in the complaint

25   or something else about the investigation, I can see

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    how that would be relevant.

2            THE COURT:  Well, their communications

3    piece --

4            MR. LICUL:  I read that as

5    communications --

6            THE COURT:  It says the communications

7    between complainants is described as concerning

8    Governor Cuomo or any investigation of Governor

9    Cuomo, and there's a time limit.

10           MR. LICUL:  I suppose the "concerning

11   Governor Cuomo or the investigation" -- I think the

12   "concerning Governor Cuomo" seems somewhat broad.  I

13   mean, if it's not concerning the investigation, then

14   why would it be relevant?

15           THE COURT:  Because what if their one tweet

16   saying -- or one text message saying, Governor Cuomo

17   is the best, I love him so much.  And then six

18   months later, after 17,000 phone calls with somebody

19   else, they're saying he's the worst, let's go get

20   him.

21           MR. LICUL:  I suppose that that's right.  I

22   mean, I think that that would all probably be in the

23   context of the investigation.  But, again, I don't

24   have an objection.  I just -- really just want the

25   documents to be produced, whatever they are, and

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1   move forward.

2          THE COURT:  As do I.

3          MR. LICUL:  Yeah.

4          THE COURT:  As do I.  And so this is, kind

5   of, the other piece of what I wanted to talk about

6   today.

7          I have a very specific discovery rule that

8   requires the parties to, you know, try to meet and

9   confer as much as possible and include both sides'

10   position with respect to the dispute in a given

11   filing for a reason.

12          This is not the only case where the

13   discovery processes became the litigation and

14   derailed the productive and effective, efficient

15   transmission of information.  The problem with

16   motions to compel and motions to quash is that they

17   take time.  One side has to brief it, then I have to

18   wait for the response, then people want to reply.

19   And in the meantime, when there's 20 of them

20   pending, things get lost.

21          Some of these motions don't have responses.

22   Some of these motions literally aren't fully

23   briefed, even though they have been pending for a

24   period of time.  And I'm not being critical of

25   anyone.  I want to figure out a path forward.  Some

1   of the most recent ones did have the joint

2   statement, which I very much appreciated,

3   Ms. Trzaskoma.

4          But the challenge that the Court is now

5   facing is it's like breadcrumbs in the docket trying

6   to figure out, kind of, what is what.  And I wanted

7   to give the parties the opportunity to try to

8   resolve these issues through meet and confers, as

9   discussed at the September conference.  Perhaps I

10  was cautiously optimistic that some progress could

11  be made, and unfortunately, that did not come to

12  pass.  So here we are with a stack of motions to

13  decide, and we will decide them, but I need to give

14  people the opportunity to be heard.

15         And so that's, kind of, the timing problem

16  that is presented when people go and file a motion

17  without prior permission because I don't -- there's

18  no briefing schedule and I don't have the other

19  side's response, and then I have to order a

20  response, then I have to wait, and then you have to

21  reply.  It takes way too much time.  It ends up

22  eating up all the time in the world and wasting a

23  ton of resources.

24         So you look like you have some ideas,

25  Ms. Trzaskoma.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MS. TRZASKOMA:  Well, I just want to -- I
 2     want to explain that I think that part of the issue
 3     here is that we served the initial subpoenas on the
 4     AG's Office and the Assembly in the Southern
 5     District of New York, and they did not -- and so we
 6     started to enforce the subpoenas in the district in
 7     which they were served, and that had to be by motion
 8     to compel.  We had to open a miscellaneous action.
 9     We had to -- they consented to the transfer.
10              THE COURT:  Those motions are different.
11              MS. TRZASKOMA:  Well --
12              THE COURT:  Those motions are materially
13     different than what I'm talking about.
14              MS. TRZASKOMA:  But we had a -- we had a
15     similar situation, then, with Lindsey Boylan, and it
16     was not clear to us -- so we, now, are proceeding in
17     that way.  And with respect to -- I think there's
18     only one motion that was -- that's almost fully
19     briefed, but not fully briefed.
20              So the Boylan motion is fully briefed.
21     Bennett issues fully briefed.  Kaitlin is --
22     there's -- there are two -- there's a reply and then
23     a reply, which is also the other problem with the
24     motion because then there's a cross-motion to quash,
25     and then -- I mean -- so instead of, like --
```

1          THE COURT:  Yes.

2          MS. TRZASKOMA:  We don't want that either.

3     So I'm happy to proceed, but, you know, part of the

4     issue is some of these subpoenas were served in

5     other districts.

6          THE COURT:  Oh, I'm fully aware of the

7     procedural history of 3044, 3027 and the Boylan

8     docket.  I think it's 1547.  So --

9          MS. TRZASKOMA:  So I think we've gotten a

10    little bit of streamlining going on there.  And I do

11    want to say with respect --

12         THE COURT:  87.  1587.

13         MS. TRZASKOMA:  1587.  You're better than I

14    am.

15         The -- with respect to the requests and how

16    broad they are in terms of time period, I think one

17    of the -- we did not put a time period for some of

18    these because they're naturally bounded in time, in

19    terms of people didn't work in the executive chamber

20    for -- you know, there -- there's just a very short

21    period of time.  These are not 20-year employees.

22         So I think they may, on their face, appear

23    somewhat broad, but I think they are very limited.

24    And, you know, they are narrowly tailored.  And I

25    don't think -- I think the objections that we have

1    heard and that are in the briefing is -- they're

2    really two things:  One, we're a nonparty.  We don't

3    know Trooper 1.  We never worked with Trooper 1.  We

4    got nothing to do with Trooper 1.  You shouldn't be

5    able to take discovery from us.  Which, in my view,

6    is not a real objection -- or objection with any

7    merit.  And two, I'm a nonparty and I'm not having

8    my legal fees paid, so I shouldn't have -- so it's

9    an undue burden.

10          But we haven't gotten, from anyone that I

11   can think of, an actual burden argument like,

12   this -- responding to this subpoena would require me

13   to hire a vendor and spend $150,000 because I have

14   1.7 million potentially responsive e-mails.

15          I mean, we're talking about individuals

16   with their individual text messages and

17   communications.  I mean, some -- you know, and some

18   people -- to Your Honor's point, there were

19   communications -- we've seen them.  We've gotten

20   some of them, including in other litigation -- in

21   the other litigation -- where there are individuals

22   who, you know, on date X say, Governor Cuomo is the

23   best.  I love him.  Send him my best.  I wish I

24   still worked with him.  And then six months later,

25   they're saying -- they're complaining about him.

1          So those -- it's not too broad to ask for

2     everything that people -- you know, all their

3     communications about Governor Cuomo because there

4     are a lot of communications that reflect strong

5     affection and respect for him that, after all of

6     this happened are, you know, very different.

7          So -- and, you know, just on -- I did want

8     to be heard briefly on the subpoena for phone

9     records because Trooper 1, in her AG testimony,

10    under oath, told the Attorney General that she had

11    not talked about her -- the -- her allegations with

12    anyone.  She said that under oath.  We now know she

13    was, in fact, talking with people.  And as we

14    submitted to Your Honor -- I'm sure you have the ECF

15    number offhand -- but the -- with our Nevins 189, we

16    now know because Steve Nevins produced them to us --

17    he was texting with Trooper 1 in real time.  He was

18    communicating with her.  They had phone calls, we

19    know.

20         So -- and we only learned that because we

21    subpoenaed Trooper Nevins.  And I -- you know, we

22    also -- in response to interrogatories we served,

23    Trooper 1 said, I communicated with this list of 30

24    people about my communicate -- you know, about my

25    allegations, about my experience on the PSU and my

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    work with Governor Cuomo, my allegations.

2            We then asked for all of her communications

3    with those people, and the response was, that's too

4    broad.  So we gave -- we tried to do this a

5    different way.  And I do not know -- I don't have a

6    list, sitting here, of every person who Trooper 1

7    communicated with about Governor Cuomo or her

8    allegations during the investigation, after the

9    investigation.  I don't have that list because I

10   don't have any confidence that we know the universe

11   or that we know how often they were talking.

12           Diane Parrotta told us she was best friends

13   with Trooper 1 and that they talked all the time.

14   They did produce texts where Trooper 1 -- where

15   Diane Parrotta was trying to communicate with

16   Trooper 1 at the end of May of this year, but what

17   they didn't tell you is that prior to those texts,

18   at the beginning of May, Trooper 1 and Diane

19   Parrotta had lunch together.  We did not get any

20   communications about -- between Diane Parrotta and

21   Trooper 1, how they organized the lunch, whether

22   they had conversations after the lunch.

23           Like to the point of we don't have any

24   confidence, I would like to check --

25           THE COURT:  What did Ms. Parrotta say was

1    how they set it up?

2          MS. TRZASKOMA:  She could not recall.  And

3    she deletes all her text messages.  So I don't have

4    any confidence.  I don't know.  They probably --

5    maybe they had a phone call.  Maybe they did it by

6    courier pigeon.  I'm not sure.  But I think the

7    phone records will go somewhere to helping us figure

8    out this puzzle, along with, the day before

9    Trooper 1 goes in, how long did she talk to Steve

10   Nevins?  Did she talk to Diane Parrotta?  Did she

11   talk to Mr. Plaskocinski?  Did she talk -- who did

12   she talk to?

13          THE COURT:  I mean, I think I've made my

14   determination that the relevancy has been

15   established.  And this just affirms, you know, even

16   more so my conclusion, that the phone records are

17   relevant.

18          Mr. Licul, so what were you going to say?

19          MR. LICUL:  I was going to say we gave them

20   those phone records.  We gave them the phone records

21   of communications between Trooper 1 and

22   Ms. Parrotta, that -- and we added her to our

23   original discovery, you know, list, so there's

24   nothing we're trying to hide here.

25          As I understood, Your Honor was to be

          AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    asking a process question, I think.
 2              THE COURT:  Yes.
 3              MR. LICUL:  About how do we avoid motion --
 4    I mean, if I may, Your Honor, I have an idea.  I
 5    don't know if it will work.
 6              THE COURT:  Go for it.
 7              MR. LICUL:  At least as far as the parties
 8    go, I would not be opposed to having a rule for this
 9    case, which is simply that the parties meet and
10    confer and submit a joint letter, and then, Judge,
11    Your Honor can decide it on that joint letter rather
12    than following up with a motion, with a formal
13    motion.  I think it would streamline the process.
14    I'm -- I've seen it work in other cases and also
15    have some experience in -- on the chamber side and
16    the overwhelming docket hits that happen on ECF.
17    And just to have a --
18              THE COURT:  It is real.
19              MR. LICUL:  It can be overwhelming.  I
20    know.  I understand.
21              THE COURT:  There's a lot.  I mean, it's --
22    this is one case out of 400.
23              MR. LICUL:  Yeah.  No, I --
24              THE COURT:  So, you know, the number of
25    filings is a real phenomenon around here.
```

```
 1              MR. LICUL:  I'm fully familiar with the

 2    docket, especially in this courthouse.  I totally

 3    understand and sympathize.

 4              MS. GLAVIN:  Mr. Licul, are you referring

 5    to your law clerk experience?

 6              MR. LICUL:  Yeah, I am.  But all I'm saying

 7    is I understand how that bounces -- how that bounces

 8    here.  And so all I was saying is one document might

 9    help.

10              THE COURT:  I'm not trying to out you, but

11    I'm guessing, like me, that you clerked before ECF.

12              MR. LICUL:  No, no.

13              THE COURT:  No?  You clerked more recently?

14              MR. LICUL:  ECF was a thing.  We got the

15    bounces.

16              THE COURT:  So I clerked before ECF.

17              MR. LICUL:  Oh.

18              THE COURT:  And I think ECF has lowered

19    the amount -- like, made it so much -- the bar is so

20    much lower --

21              MR. LICUL:  The barrier to entry --

22              THE COURT:  -- to filing things --

23              MR. LICUL:  Yes.

24              THE COURT:  -- that people just file

25    anything that comes into their head.  It's amazing.
```

```
 1                  MR. LICUL:  I would just suggest,
 2     Your Honor, at least as far as the parties go --
 3                  THE COURT:  People had to, like, bring the
 4     document to the courthouse in the past.
 5                  MR. LICUL:  In the snow.
 6                  THE COURT:  Yeah, in the snow.  Uphill both
 7     ways.
 8                  MR. LICUL:  Yeah.  But just to have a --
 9     just -- I mean, we could do it by letter, a joint
10     letter.  We'll hash out our disputes, and if we
11     can't resolve them -- and, again, just doing it on
12     the letter may avoid some of the back and forth.
13                  THE COURT:  That could help.  You know,
14     usually, of course, if there's a need for an actual
15     ruling as opposed to an advisory kind of "here's
16     what I would do if this were fully briefed"
17     discussion, I would need to seek the parties'
18     permission to convert to a motion.
19                  So if you guys are willing to discuss this
20     option, I certainly think that could help streamline
21     things, because a lot of the delays in my being able
22     to react are the interrelatedness of the various
23     pending motions and the lack of being fully briefed.
24     Those two factors have created this snowball that we
25     now have, combined with wanting to give you time to
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    see if you could work things out in light of our

2    conversation of September.

3            MR. LICUL:  I would just say, Your Honor,

4    that practicing both in this courthouse and in

5    others in the Second Circuit it's -- Your Honor

6    probably knows this, but it's common, without the

7    parties' consent, for the judges just to simply rule

8    on letters.

9            THE COURT:  Yes.

10           MR. LICUL:  Yeah.

11           THE COURT:  Except the Second Circuit can

12    also reverse you for that.  So, you know, it needs

13    to be done very carefully --

14           MR. LICUL:  Fair.

15           THE COURT:  -- depending on what kind of

16    motion it is, whether it's actually a motion.

17           MR. LICUL:  Yeah.  Fair.

18           THE COURT:  Okay.  Thank you, Mr. Licul.

19           So I think that our next steps here include

20    you guys meeting and conferring with regard to the

21    dates of the phone subpoenas.  And, you know, I

22    really do hope that based on everything that we

23    discussed here today, the parties can reach a final

24    path forward on the phone subpoenas.

25           With regard to the non-party discovery, I

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    appreciate hearing more context from you,

2    Ms. Glavin, as to, sort of, your preferred order of

3    operations.  You know, I have not decided fully that

4    all five of those depositions are necessary in

5    advance of Governor Cuomo's deposition.

6            I do understand your argument with regard

7    to Ms. Boylan and Ms. Bennett.  I do hope to have

8    them on the calendar in the earliest date we could

9    fit them in, in January, which is January 11th, the

10   afternoon.  So we will enter a scheduling order as

11   to those two parties for January 11th.

12           In the meantime, I recognize that the OAG

13   investigation issues are, to some degree, sort of,

14   the tail that's wagging the dog with regard to

15   certain aspects of the discovery in this case.  And

16   I will be issuing an order to the Attorney General's

17   Office shortly with regard to certain documents that

18   I would like to review in camera.

19           And from there, you know, I do expect that

20   I would like to -- I want to get as much of the

21   party discovery done as we could possibly get done

22   before the depositions are taken by many of the

23   complainants.  And so, you know please think about

24   your order of operations and a timeline for getting

25   those depositions done.

```
 1              I don't think that the answer is after we
 2       have the Attorney General documents in our hands,
 3       because even if I were to rule in your favor on the
 4       sovereign immunity issue, my, you know, prediction
 5       is that that will not be the end of the story.  So I
 6       just don't think that these documents are going to
 7       be landing on your desk at any point in the near
 8       future.
 9              MS. GLAVIN:  If you ruled against us, I
10       don't think it would be the end of it.  That's
11       exactly where we are.
12              All right.  So, Judge, why don't we -- I
13       want to think about what you said about order of
14       operation in terms of the -- sort of, the five
15       depositions I clump together.  I want to think about
16       that a little more and talk with Ms. Trzaskoma as
17       well, and also with our team, in terms of, you know,
18       what we would prioritize out of those five.  And
19       then can we get back to you on that?
20              THE COURT:  Yeah.  How quickly can you get
21       back to me on that and also on the resolution -- I'm
22       going to call it a resolution of the phone records
23       issue?
24              MS. TRZASKOMA:  I would hope within a week
25       we could -- I mean, we have depositions the next --
```

1          MR. LICUL:  Yeah, I -- we just need the

2     dates, and then we have to actually go back and look

3     at the phone records.  So --

4          MS. TRZASKOMA:  We can get you the dates

5     tomorrow.

6          MR. LICUL:  Okay.

7          THE COURT:  Okay.

8          MR. LICUL:  And then we'll let you know.

9     Perhaps that's something, Your Honor, we can discuss

10    at -- on January 11th.

11         THE COURT:  I would like to know --

12         MR. LICUL:  Before then?

13         THE COURT:  -- before then because if we

14    actually -- if I have to review the phone records --

15    I mean, I just need to know where we are so that we

16    can figure out next steps.

17         MR. LICUL:  Okay.

18         THE COURT:  Putting it off a whole month

19    is just -- I know the holidays are in the interim

20    there, which is part of the reason the date is long.

21    It's a little too long to.  I really want to get

22    these subpoenas out the door.

23         MR. LICUL:  Okay.  Your Honor, can we do

24    it -- well, if they get us the date -- the dates

25    tomorrow, we will then probably have to have a call

1     about those dates.

2              MS. GLAVIN:  I look forward to it,

3     Mr. Licul.

4              THE COURT:  Please also answer the question

5     for me, Ms. Glavin, as to whether or not Trooper 1's

6     records are sufficient to reflect all the

7     communications that you're interested in based on

8     what you know so far with her.

9              Obviously, I recognize that Ms. Parrotta's

10    communications with others may be a different issue.

11    Is Ms. Parrotta represented?

12             MS. TRZASKOMA:  Yes.

13             MR. LICUL:  That's a complicated story.

14    Ms. Parrotta believed she was represented by the

15    State Police's lawyers at her deposition, when in

16    fact, she wasn't.

17             THE COURT:  I see.  Okay.

18             MS. TRZASKOMA:  I mean, she represented on

19    the record that she was represented by counsel,

20    so --

21             MS. GLAVIN:  Yes.

22             MS. TRZASKOMA:  -- if there was an issue --

23             MR. LICUL:  Well, they -- but the folks --

24    she believed it was the State Police's lawyers, and

25    we've since learned that they did not represent her.

```
 1    They just facilitated her deposition.  And so --

 2              MR. PALERMO:  I wasn't present for that.

 3              MS. GLAVIN:  That's news to me.

 4              MR. PALERMO:  -- I don't know that we have

 5    been representing people to the extent that it

 6    involved, you know, allegations while they were

 7    employed with the State Police.  So we may have

 8    represented her in that limited capacity during the

 9    deposition.  I would have to go back and confirm.

10              MR. LICUL:  Okay.  That's fair.  I mean, I

11    actually -- I'm pretty sure there's an e-mail from

12    somebody.  I'm not saying it was you.  Somebody from

13    Harris Beach saying that they did not represent her;

14    that they just facilitated her deposition.

15              At one point during Ms. Parrotta's

16    testimony, she asked to speak to her lawyers and was

17    denied.  She wanted to speak to her lawyers, I

18    think, about a privilege issue.

19              So, anyway, we're going a little bit far

20    afield.

21              MS. GLAVIN:  What?

22              MS. TRZASKOMA:  I don't think that's --

23              MR. LICUL:  Yeah, she does -- she does ask.

24    Believe me.  We've looked at this.  Ms. Parrotta

25    believed that she was represented by the State
```

1    Police, and she was not.

2              THE COURT:  Okay.  That sounds like --

3              MR. LICUL:  Yes.

4              THE COURT:  -- something that requires a

5    little further inquiry.

6              So one other question that I have, and this

7    is for Ms. Foti.  You've been so patient.  You've

8    been here all afternoon.

9              MS. FOTI:  Thank you.

10             THE COURT:  What are we doing with the

11   motions that have been filed on behalf of DeRosa and

12   Azzopardi; what is the status of those?

13             MS. FOTI:  Well, Your Honor, the --

14   Judge DeArcy Hall granted the motions, so --

15             THE COURT:  No.  I'm talking about the

16   discovery motions.

17             MS. FOTI:  Oh, the discovery motions.

18   Well, I think I did write a letter earlier to

19   Your Honor that, given the fact that we believe

20   we've been dismissed and we expect that that will be

21   with prejudice, we have not pursued the discovery

22   motions.

23             What we have done in an attempt to -- not

24   to delay what has already been a long delay, is we

25   continue to participate in the current discovery

             AMM TRANSCRIPTION SERVICE - 631.334.1445

1    that Governor Cuomo is taking.  A number of those

2    depositions would be depositions that we also would

3    request.  We have not pursued the other -- our own

4    subpoenas.  And we've talked to, for example,

5    Ms. Boylan's attorneys, Ms. Bennett's attorneys, and

6    said that we are holding off on that until we get

7    the decision from Judge Hall, DeArcy Hall.

8              I expected decision earlier than now.  And

9    I understand she -- I don't know when it will come

10   out.  She obviously has a lot on her plate.  If you

11   believe we should continue to pursue our subpoenas

12   separately in order not to delay this further, we

13   will do so.  I just -- I thought this was the best

14   way to go forward.

15             THE COURT:  No, I don't disagree, that, you

16   know, sort of, like, just having them be.  But not

17   pursuing them is a, sort of, sensible strategy in

18   the moment, especially given all of the other

19   discovery problems that we are experiencing in this

20   case.

21             My question is, sort of, almost like a

22   practical one, in terms of what, if anything, we

23   should do with them.  I mean, is this a situation,

24   like, for example, you have a premotion conference

25   regarding the motion to quash the subpoena served on

```
 1   Charlotte Bennett at ECF number 153.
 2            Do you need to be included at the
 3   conference for Charlotte Bennett on January 11th
 4   with regard to being heard on that motion, or can
 5   that motion be terminated as moot?
 6            What do you want to do as a practical
 7   matter?
 8            MS. FOTI:  Well, as a practical matter, I'm
 9   not available January 11th.  I actually was asking
10   my co-counsel if they could come, and I haven't
11   learned yet.  I did not want to delay this.
12            I think we -- if we still -- are still in
13   the case, I will have someone appear.  I do think we
14   should be included in that just because, again, if
15   we continue to be in the case going forward, we'd
16   obviously want to be heard and add our voice to
17   whatever -- you know, whatever the objections are.
18            THE COURT:  Okay.
19            Mr. Licul?
20            MR. LICUL:  Just on the -- no, I have
21   nothing further.
22            THE COURT:  Okay.  All right.  You look
23   like you really wanted to say something.
24            So is there anything else I should be
25   thinking about with regard to your situation,
```

1    Ms. Foti, with regard to --

2          MS. FOTI:  I just want to make sure that

3    it's clear that we're reserving our rights, you

4    know, to go forward with any discovery, if, in fact,

5    we are told we are not dismissed with prejudice.

6    You know, obviously, that will -- if we're not,

7    they -- I assume that's going to be in another

8    amended complaint, so that's going to be somewhere

9    down the road.  And I don't know what that amended

10   complaint would look like.

11         THE COURT:  I don't know.

12         MS. FOTI:  Yeah, so --

13         THE COURT:  It could turn on the basis for

14   the rationale of the decision.

15         MS. FOTI:  Right.

16         THE COURT:  And do you anticipate

17   amendments depending on --

18         MR. LICUL:  I --

19         THE COURT:  It's hard to -- impossible to

20   say.

21         MR. LICUL:  Really, I couldn't say.  I

22   don't know what -- depends on the ruling, I guess --

23         THE COURT:  Right.

24         MR. LICUL:  I was just going to say

25   something about the phone records that would be just

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  to Mr. Crain.

2          THE COURT:  Sure.

3          MR. LICUL:  We could -- if you get us the

4  dates tomorrow, we'll have a meet and confer if we

5  have any disagreements.  And we'll send you -- we

6  can probably get the phone records to you by the end

7  of next week.

8          MS. TRZASKOMA:  What are -- what -- I'm

9  not -- I don't understand.

10         THE COURT:  These are her phone records.

11         MR. LICUL:  Her phone records.

12         THE COURT:  Trooper 1's.

13         MR. LICUL:  So if you give -- my

14  understanding, Your Honor -- and correct me if I'm

15  wrong -- is that you will give us dates.  We will

16  then take a look at the phone records.  And to the

17  extent there is anything sensitive in those phone

18  records, any particularly sensitive communications,

19  we would then redact those, but -- and producing

20  everything else that's not sensitive.

21         THE COURT:  That would be what I think is

22  fair.

23         MR. LICUL:  That's my understanding of what

24  Your Honor has asked us to do.

25         THE COURT:  Yes.  And by "sensitive," we're

          AMM TRANSCRIPTION SERVICE - 631.334.1445

1    talking, you know, attorney-client, if she has --

2    going to the doctor, having nothing to do with this

3    case.

4            MR. LICUL:  Correct.  Right.  Okay.

5            And then -- so we would produce --

6            MS. TRZASKOMA:  With one caveat,

7    Your Honor.  I mean, I think attorney-client -- the

8    phone records don't reveal a -- like, the substance

9    of a communication.

10           THE COURT:  That's also irrelevant.

11           MS. TRZASKOMA:  Well, it's relevant if

12   Trooper 1 -- when Trooper 1 started talking to a

13   lawyer --

14           THE COURT:  Why?

15           MS. TRZASKOMA:  -- about her claims.

16           THE COURT:  Why?

17           MS. TRZASKOMA:  Because it goes to whether

18   she was afraid to raise them.  I don't know when she

19   first consulted with a lawyer.

20           MR. LICUL:  I think this is pretty clear.

21           THE COURT:  First of all, the scope of the

22   dates need to be clarified.  And, you know, to the

23   extent that you have concerns about when Trooper 1

24   contacted an attorney, you can ask her that at

25   deposition.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MS. TRZASKOMA:  Well, here -- just one
 2    point, Your Honor.
 3              Again, the substance of the communications
 4    will not be revealed, but we -- based on the
 5    discovery we have, we know that there were a small
 6    group of plaintiff's lawyers very early on in this
 7    case that included, not Mr. Licul, but his partner,
 8    who were out there speaking with potential claimants
 9    and urging people to come forward, and who were
10    acting -- and who were acting as, sort of,
11    intermediaries between and among the complainants.
12    And it is relevant to us if those attorneys were in
13    communication with Trooper 1 in this early time
14    period --
15              MR. LICUL:  Your Honor, I --
16              MS. TRZASKOMA:  -- and including through
17    the investigation.
18              For example, if Trooper 1 was speaking --
19    it is relevant whether she was in communication with
20    the lawyers who we know who were out there --
21              THE COURT:  No, it's not relevant because
22    you're making assumptions about the content of the
23    communications.
24              MS. TRZASKOMA:  The fact --
25              THE COURT:  And you don't ever get to learn
```

1    them.  So all it does is give you an argument that

2    would require her to waive attorney-client

3    privilege.

4             MS. TRZASKOMA:  Well, we don't even know if

5    there was an attorney-client relationship.

6             MS. GLAVIN:  Yeah.

7             THE COURT:  This is fishing.  I'm sorry.

8    I'm going to go back on my prior comment, and I'm

9    going to use the word myself.

10            MS. GLAVIN:  We should -- Your Honor, on

11   this particular issue --

12            THE COURT:  This is fishing.

13            MS. GLAVIN:  Okay.  But on this particular

14   issue, we have not raised this yet.  It will likely

15   come up.  It may come up in the Bennett lawsuit.

16   Just so you understand why we're raising this -- and

17   we know that, in December of 2020, Lindsey Boylan

18   was in touch with the Wigdor Law Firm and wanted to

19   put together a group of a number of other women.

20            And she then -- she also reached out to

21   Kaitlin in December of 2020 and said, will you

22   please talk to Wigdor?  And, in our view, we don't

23   think that was a protected communication.  We know

24   Kaitlin did.

25            We also know from Lindsey Boylan's

             AMM TRANSCRIPTION SERVICE - 631.334.1445

1    testimony that, in February of 2021, when she

2    published her Medium piece, she was in

3    communications -- and I think what she said in her

4    testimony is that her attorneys helped -- and I

5    don't know who her attorney was at the time -- draft

6    the essay.

7            Come March, when they announced there was

8    going to be an investigation, Charlotte Bennett is

9    in touch with other complainants and wanting them to

10   speak with Debra Katz.  And, you know, we now have

11   seen communications just based on production in the

12   Bennett case, which I might add, Ms. Bennett's

13   lawyers will not give permission for us to use in

14   the (inaudible).  But there are --

15           THE COURT:  I'm fully aware.  That's one of

16   the issues I'm going to be discussing with them on

17   January 11th.

18           MS. GLAVIN:  I know.  But in those

19   communications, there are communications between her

20   and Alyssa McGrath in early March of 2021.  And you

21   have, you know, Ms. McGrath saying, you know, she

22   was great.  Meeting Debra Katz was great.  She's

23   going to put me in touch with a big-shot

24   discrimination lawyer.

25           That's where this is relevant.  So we have,

1    now, seen this in the communications.

2              THE COURT:  But the --

3              MS. GLAVIN:  Your Honor, it goes to intent.

4    It goes to intent, and it goes to -- and one of the

5    things that we are exploring in the case, and will

6    be explored during depositions, not just in this

7    case, but in the Bennett case, is the role to which

8    plaintiff's attorneys in this were encouraging

9    people to come forward and telling them what to say,

10   what constituted this and that.  People switched

11   lawyers.

12             THE COURT:  But --

13             MR. LICUL:  Your Honor --

14             THE COURT:  Ms. Glavin, what you're trying

15   to do -- look, to the extent -- this is not a mob

16   lawyer situation, okay.

17             MS. GLAVIN:  No.  And I don't mean to

18   suggest that.

19             THE COURT:  To the extent that plaintiff's

20   attorneys are informing potential litigants of their

21   rights and the remedies that may be available to

22   them based on experiences they have had, that is

23   perfectly appropriate and lawful and really

24   irrelevant to the trial and to any discovery that

25   you may seek to take.

          AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1            Unless you have evidence that the
 2   plaintiff's attorneys were actually telling people
 3   what to say, your words, not mine, the transcript
 4   will reflect it, that is a serious allegation.  And,
 5   you know, unless there's evidence of that, I don't
 6   see the relevance.
 7            MS. GLAVIN:  Your Honor, with respect to
 8   the -- when I say "telling people what to say," I
 9   don't mean telling people to make stuff up and tell
10   lies.  Absolutely not.  And to the extent I
11   suggested that, I, you know, apologize.  That's not
12   where I'm going with this.
13            It's to the extent that there was a group
14   of people who were also thinking about lawsuits
15   against the State, there's all types of motives
16   involved in this, and we want to be able to explore
17   that.
18            THE COURT:  You can ask the witnesses, but
19   I don't know that that entitles you to have dates
20   and times of phone calls.
21            Mr. Licul?
22            MR. LICUL:  I just -- this is the problem
23   with conspiracies.  They tend to grow.
24            I can tell the Court, 100 percent, I know
25   the date that Trooper 1 -- that we were contacted
```

1    about Trooper 1.  I don't want to reveal anything

2    that's privileged.  I know the date.  And I can say

3    that it was completely independent of any of -- and

4    I'm not agreeing with the allegations, but

5    independent of that altogether.  And if the Court

6    wants, I can show the Court in camera the e-mail as

7    to how -- the genesis of Trooper 1 contact.

8              THE COURT:  I am not interested --

9              MR. LICUL:  Okay.

10             THE COURT:  -- at this juncture based on

11   this discussion of opening the floodgates to a

12   discovery avenue regarding a group of plaintiffs'

13   attorneys who may or may not have been discussing

14   people's legal options with them.  That is getting

15   very far afield and disproportionate.

16             MR. LICUL:  Thank you, Your Honor.

17             THE COURT:  So, you know, the redactions

18   that you can anticipate, Mr. Licul, that I think are

19   appropriate, would include the attorney-client

20   communications.

21             And is your client presenting any type of

22   medical evidence in this case, or --

23             MR. LICUL:  She has.

24             THE COURT:  -- therapist evidence?

25             MR. LICUL:  She has, yeah.

1      THE COURT:  The phone calls, that does not

2  seem relevant if she's on the phone with her

3  therapist.  I mean, you're going to have any

4  treatment records.

5      MS. GLAVIN:  Yes, that's fine.

6      THE COURT:  Okay.  So records of medical

7  treatment, therapy, phone calls; things along those

8  lines may be redacted.

9      MR. LICUL:  Okay.  And if there's another

10  category, we'll --

11      THE COURT:  Try to work it out.

12      MR. LICUL:  We'll try to work it out.

13  Believe me, there's a lot of stuff that we have

14  worked out.

15      MS. GLAVIN:  There is.

16      THE COURT:  I believe you.  I believe you.

17      MS. GLAVIN:  I will say, Your Honor, we

18  have a very good working relationship with

19  Mr. Licul.

20      MS. TRZASKOMA:  We'd like to talk about all

21  the motions we didn't file.

22      THE COURT:  You keep telling me that, but,

23  you know --

24      MS. GLAVIN:  Surprise.

25      THE COURT:  I recently had occasion to look

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    up the etymology of the phrase "the proof is in the

2    pudding."  Very odd etymology.  You should look it

3    up yourself.  It's very entertaining.

4         I'm glad to hear that there is this

5    representation that you have this working

6    relationship, but the proof is in the pudding.  So

7    now, go look it up.

8         MS. TRZASKOMA:  That's why we should talk

9    about the motions not filed.

10        MS. GLAVIN:  What we have not filed.

11        THE COURT:  Fair enough.

12        One of the criteria that, you know, we look

13   at with regards to our pro bono assistance project

14   is the lawsuits not filed by the pro bono counsel

15   that they give to pro bono litigants who come to the

16   court and, you know, want to file things that just

17   don't state federal claims or belong across the

18   street.  You know, so sometimes what didn't happen

19   is proof, too.  I'll give you that.

20        All right.  So we obviously have some

21   additional work to do.  You have some additional

22   work to do.  We will be issuing that scheduling

23   order I described, as well as, you know, I have some

24   documents I want to see from the Attorney General's

25   Office.  And we'll see where that takes us.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1            Unless we have a reason to change the date

2   or parties are unavailable, we will hope to see you

3   all on January 11th to discuss the specific granular

4   issues relating to Ms. Bennett, Ms. Boylan.  And

5   there may be additional docket activity between now

6   and then as we work through, you know, some of the

7   issues.

8            My anticipation is that, you know, my --

9   the general thinking on the non-parties, the

10  complainant non-parties, is that there are areas of

11  document discovery that are clearly relevant and

12  proportional and appropriate.  The issue is finding

13  the right rider for each person.

14           And so, you know, what I anticipate doing

15  is issuing an order that addresses some of the

16  motions in part, neither granting them in part nor

17  denying them fully in part, you know, simply because

18  I haven't seen all of these riders that are out

19  there that are causing agida for people.  And I

20  don't necessarily want to if the parties can reach a

21  resolution once I give a framework, which I am

22  prepared to do.

23           MS. TRZASKOMA:  That will be helpful,

24  Your Honor.

25           MS. GLAVIN:  Very.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  Okay.  So that way, the third

2     parties can understand, you know, sort of, how any

3     motion to quash would be received.  And I do think

4     that the document discovery is the way to start with

5     the third parties.  And we just need to get that

6     rolling and get some discoveries on the books --

7     some depositions, excuse me, on the books.  And I do

8     agree with the third-party complainants, that some

9     of their depositions can wait until after Governor

10    Cuomo.  Okay.

11         MS. GLAVIN:  Thank you, Your Honor.

12         MS. TRZASKOMA:  Thank you.

13

14                        0o0

15

16

17

18

19

20

21

22

23

24

25

1
2                          C E R T I F I C A T E
3
4        I, Adrienne M. Mignano, certify that the
5    foregoing transcript of proceedings in the case of
6    Trooper 1 v. New York State Police, et al.; Docket
7    Number: 22CV0893 was prepared using digital
8    transcription software and is a true and accurate
9    record of the proceedings.
10
11
12   Signature   __*Adrienne M. Mignano*__
13               ADRIENNE M. MIGNANO, RPR
14
15   Date:       December 14, 2023
16
17
18
19
20
21
22
23
24
25