1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - X
3                                        :
                                         :
4    TROOPER 1,                          : 22-CV-00893 (LDH)(TAM)
                                         :
5              Plaintiff,                :
                                         :
6                                        : United States Courthouse
     -against-                           : Brooklyn, New York
7                                        :
                                         : September 26, 2023
8                                        : 11:00 a.m.
     NEW YORK STATE POLICE, et           :
9    al.,                                :
                                         :
10             Defendants.               :
                                         :
11
- - - - - - - - - - - - - - - X
12                                       :
     ANDREW CUOMO,                       :
13                                       : 23-MC-1587 (LDH)(TAM)
               Plaintiff,                :
14                                       :
                                         :
15      -against-                        :
                                         :
16                                       :
               Defendants.               :
17                                       :
     LINDSEY BOYLAN,                     :
18                                       :
                                         :
19                                       :
     - - - - - - - - - - - - - -X
20
          TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
21          BEFORE THE HONORABLE TARYN A. MERKL
                UNITED STATES MAGISTRATE JUDGE
22
     A P P E A R A N C E S:
23
     For the Plaintiff      WIGDOR, LLP
24   Trooper 1:                   85 Fifth Avenue
                                  New York, New York 10003
25                          BY:  VALDI LICUL, ESQ.
                                 JOHN CRAIN, ESQ.

```
 1
 2   For the Defendant      GLAVIN, PLLC
     Cuomo:                       156 West 56th Street
 3                                New York, New York 10019
                           BY:  RITA GLAVIN, ESQ.
 4                              LEO KORMAN, ESQ.
                               KATHERINE PETRINO, ESQ.
 5
                           SHER TREMONTE, LLP
 6                               90 Broad Street
                                 New York, New York 10004
 7                         By:  THERESA TRZASKOMA, Esq.
 8   For the Defendant      HARRIS BEACH, PLLC
     New York State              99 Garnsey Road
 9   Police:                     Pittsford, New York 14534
                           BY:  DANIEL J. PALERMO, ESQ.
10
11   For the Defendants     MORVILLO ABRAMOWITZ GRAND IASON &
     Melissa DeRosa and     ANELLO,
12   Richard Azzopardi:          565 Fifth Avenue
                                 New York, New York 10017
13                         BY:  CATHERINE FOTI, ESQ.
14
15   For the interested     PERRY LAW
     party Lindsey               157 East 86th Street
16   Boylan:                     New York, New York 10028
                           BY:  E. DANYA PERRY, ESQ.
17                         BY:  DOUGLAS QUZACK, ESQ
18   For the interested     CAPEZZA HILL, LLP
     party State Enity           30 S. Pearl Street
19   Employee #2:                Albany, New York 12211
                           BY:  THOMAS A. CAPEZZA, ESQ.
20
21   For the interested     MORRISON & FOERSTER, LLP
     party Karen Hinton:         250 West 55th Street
22                               New York, NY 10019
                           BY:  CARRIE H. COHEN, ESQ.
23
24   For the interested     LAW OFFICE OF ALI NAJMI
     party Alessandra            32 Broadway
25   Biaggi:                     New York, New York 10004
                           BY:  ALI NAJMI, ESQ.
```

3

For the interested        EMERY CELLI BRINCKERHOFF & ABADY, LLP
party Kaitlin Doe:              75 Rockefeller Plaza, 20th Floor
                                New York, New York 10019

                          BY:  ZOE SALZMAN, ESQ.

For the interested        EISENBERG & SCHNELL, LLP
party Charlotte                 233 Broadway, Suite 2704
Bennett:                        New York, New York 10279

                          BY:  HERBERT EISENBERG, ESQ.


Court Reporter:  Michele D. Lucchese, RPR, CRR
                 Official Court Reporter
                 225 Cadman Plaza East
                 Brooklyn, New York 11201
                 (718) 613-2272
                 email:  MLuccheseEDNY@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                                    4

1          THE COURTROOM DEPUTY: All rise.

2          THE COURT:  Good morning, everybody.  You may be

3    seated.

4          THE COURTROOM DEPUTY:  This is civil cause for a

5    status conference, docket 22-CV-893, Trooper 1 versus New York

6    State Police, et al., and docket 23-MC-1587, Cuomo versus

7    Boylan.

8          Will the parties please state their appearances for

9    the record, starting with the plaintiff.

10         MR. LICUL:  Good morning, Your Honor.  Valdi Licul,

11   Wigdor, LLP for Trooper 1.

12         MR. CRAIN:  Good morning, Your Honor.  John Crain

13   Wigdor, LLP for Trooper 1.

14         MS. PERRY:  Danya Perry from Perry Law for nonparty

15   Lindsey Boylan.  With me is my colleague Doug Quzack from my

16   office.

17         MS. GLAVIN:  Good morning, Your Honor.  Rita Glavin,

18   along with my colleagues Leo Korman and Katherine Petrino.  We

19   are with Glavin, PLLC and we represent the former Governor

20   Andrew Cuomo.

21         MS. TRZASKOMA:  Good morning, Your Honor.  Theresa

22   Trzaskoma from Sher Tremonte, LLP, also on behalf of Governor

23   Cuomo, and my colleague Allegra Noonan is also here.  Thank

24   you.

25         MS. FOTI:  Good morning, Your Honor.  Catherine Foti

Proceedings                                                    5

1   from the firm Morvillo Abramowitz Grand Iason & Anello,

2   appearing with my colleagues Joseph Stern and Kayasha Lyons.

3   We represent Melissa DeRosa and Richard Azzopardi.

4              MR. PALERMO:  Good morning, Your Honor.  Daniel

5   Palermo from Harris Beach, PLLC, on behalf of the New York

6   State Police.

7              THE COURT:  Okay.  Good morning.

8              And it's also my understanding that we have counsel

9   for additional interested parties present.  I'm see some of

10  them nodding.  My courtroom deputy took your names.  I will

11  turning to the interested parties after I address the main

12  parties in the case.  So thank you all for being here.

13             As everybody knows, we are here today for a

14  discovery conference, as all who are involved in this

15  discovery process know, there are a number of pending motions

16  and complex issues at stake.  By last count, there were

17  something like 25 pending motions across three dockets.  It

18  might be more, because I think some were filed on Friday and

19  over the weekend.

20             Governor Cuomo, in a letter, recently characterized

21  the discovery situation in this case as a quagmire.  Sadly,

22  that characterization is pretty close to the mark.  There are

23  many issues at stake in this discovery process that have

24  extremely important ramifications for the integrity of our

25  governments, the integrity of investigations conducted by the

Proceedings                                                    6

1   State legislature, and the Attorney General's Office, and for

2   the complainants that came forward in those investigations.

3               Through the civil discovery in this case, Governor

4   Cuomo seeks a wide swath of discovery materials that were

5   generated in the course of those official Government

6   investigations into his conduct and in the discovery process

7   in this case, which is brought by a single plaintiff, is this

8   the correct forum to attempt to recreate that widespread

9   investigation?  The answer to that is no.  On the current

10  record, Governor Cuomo appears to be attempting to defend

11  against or attack the entirety of investigation conducted by

12  the Attorney General and the Assembly Judiciary Committee.

13              As I noted before, this strategy has very

14  significant implications for the complainants in the case,

15  many of whom are here.

16              Part of the problem, as I see it, rests with the

17  plaintiff in this case.  The parties and Trooper 1 and

18  Governor Cuomo have not meaningfully met and confer in an

19  effort to narrow what the discovery process should be in this

20  case.  They also have not, in my judgement, meaningfully met

21  and conferred prior to filing many of the motions that have

22  been filed in this case in direct contravention of my

23  individual rules.  This has to stop.

24              The record as presently developed provides no clear

25  boundary to the information from the investigative reports

Proceedings                                                        7

1    Trooper 1 seems to be seeking to introduce.  So, first, I want

2    to address with the parties the parameters of the anticipated

3    proof in the Trooper 1 case because this is critical to the

4    Court's evaluation of relevance overall and this is what has

5    been lacking from the conversation and from the briefing.

6           Another thing that is notably lacking from the

7    briefing is time-back discovery requests made by Governor

8    Cuomo to Trooper 1 and that is the deficiency I have seen

9    repeatedly in the defendant's papers.  Many of the papers are

10   speaking about the Attorney General's report in general

11   without specifically tying it to this case, and that needs to

12   stop as well.

13          So, first, I would like to hear from you, Mr. Licul,

14   as to which witnesses were included in your Rule 26(a)1

15   statement and how do you anticipate proving your case?

16          MR. LICUL:  Your Honor, thank you for the

17   opportunity.  We included all of the victims who are mentioned

18   in the AG's report and in the Assembly report and that's based

19   upon Black letter Second Circuit law that says that in a

20   hostile work environment case, the jury must hear the entirety

21   of the evidence, including the perpetrator's harassment of

22   other victims.  And that's the Perry case and that's the *Cruz*

23   case, and we are entitled to do that.

24          Your Honor, I understand that that means that there

25   are quite a number of victims here, but that is not

Proceedings                                          8

1   Trooper 1's one fault.  That is the fault of the Governor and

2   his conduct, and it would be wholly improper and unfair to

3   require Trooper 1 to litigate this case with the Governor

4   saying well, these were just petty slights and minor

5   inconveniences when his conduct was repeated over and over and

6   over again with other women who also took exception.

7          Trooper 1 is entitled to a fair trial.  As is the

8   Governor, but she's entitled to present that evidence of the

9   other victims in this case.

10         And, Your Honor, discovery is not yet complete.  I

11  understand that.  But what that strategy will be specifically

12  after the litigation, I think is for another day.

13         I do want to mention one thing, Your Honor, about

14  Your Honor's comment about us not narrowing.  And, Your Honor,

15  respectfully, I think that we have done everything.  We are

16  virtually complete on our end with discovery.  We just need

17  the Governor's deposition, and he refuses to be deposed.

18         We offered the defendants Trooper 1's deposition.

19  They cancelled it the day before.  So it's not that Trooper 1

20  is hiding anything.

21         There is no motion before this Court by any of the

22  defendants that Trooper 1 has not produced any documents, that

23  she has somehow shirked her responsibilities.  That's not

24  before the court, no one has accused us of that.

25         And, so, Your Honor I think that -- and where we've

Proceedings                                                      9

1    had the opportunity to discuss narrowing, in each instance --

2    we only have three motions pending out of the 25 or so that

3    are here.  We only have three:  One is to demand that the

4    Governor sit for his deposition.  He is a defendant.  He can't

5    not sit for his deposition; and two, that he do that before we

6    inconvenience the nonparties.  That's what we're asking for.

7          And to the extent that the Governor seeks to

8    subpoena, you know, who someone slept with or prior sexual

9    history or the phone records of a witness' daughter, his

10   deposition should come first, and he should learn what Trooper

11   1 has to say.  He cannot go directly to say -- to issuing 50

12   subpoenas or so.  I'm using that -- it's probably close to

13   that, but numerous subpoenas without complying with his own

14   obligations.

15         At each step, we have met and conferred.  We have

16   discussed, and we have resolved, and there were issues that

17   they had with our production.  We resolved each and every one

18   of them.

19         There were issues with the Governor conveniently

20   losing his phone in the Atlantic Ocean at one point.  He lost

21   it in August of 2021 just as discovery was beginning.  We

22   didn't make a motion.  We resolved the issue by trying to get

23   the information in a different way.

24         So I think I have gone beyond what the Court's

25   specific question was.  But I do think that we have, in every

Proceedings                                                          10

1    instance, narrowed this, tried avoid inconveniencing

2    nonparties and tried to get the discovery here resolved.  And

3    we're prepared to resolve it by the 16th, which is the

4    currently deadline.

5            THE COURT:  That clearly is not going to be the end

6    of that discovery given where we are.

7            But, Mr. Licul, you've represented that you've

8    included all the complainants in the reports, in your Rule

9    26(a)1 disclosures on the reliance on the theory that as a

10   hostile work environment case the instances it happened with

11   others may come in.  This is not the first time we have

12   discussed *Perry* in the context of this litigation.  There has

13   been argument on the other side that her work environment,

14   Trooper 1's work environment was different than the people who

15   worked directly in the executive chamber.  She worked for the

16   New York State Police.  She was on the PSU and it was a

17   different situation for her than some of the other

18   complainants who came forward.  And is this something we need

19   to resolve now in the discovery process before they seek to

20   depose eight or ten people as to whether or not the

21   information pertaining to these other complainants is likely

22   to be sufficiently analogous as to overcome 404(b) and Rule

23   403.

24           MR. LICUL:  I don't think so, Your Honor, because

25   the environment is the environment around the Governor,

Proceedings                                              11

1    whether somebody works for the State police, whether a woman

2    works for the PR department, whether she is a secretary, an

3    administrative assistant, whether she works for some other

4    State agency, the fact is that the environment we are talking

5    about is some level of circular sort of geographic and sort of

6    scope around the Governor.  How did he treat women who worked

7    around him?

8            The fact that somebody was there to protect him,

9    like Trooper 1, doesn't mean that his harassment of her is

10   different than his harassment of, say, somebody who works as a

11   briefer.

12           THE COURT:  Mr. Licul, by that analogy, how he

13   treats the woman around him, would the Governor then be

14   entitled to parade in all of the women who have said they

15   suffered no harassment to show how he treated the women around

16   him?

17           MR. LICUL:  I think that has limited utility, Your

18   Honor, because the case law is clear:  Just because don't

19   harass everyone, doesn't mean you didn't harass the victim.

20   It's the equivalent of a murder defendant saying I'd like to

21   introduce the people that I didn't kill, right.  I mean, that

22   is not relevant in this case.

23           THE COURT:  Well, by your theory of relevance,

24   you're saying that the environment is the environment setting

25   sort of a perimeter around the Governor, right.  If he has

Proceedings                                    12

1   essential right-hand people, which he did, who are female, who

2   are not mistreated, you know, how do you overcome that Rule

3   404(b), Rule 403 analysis and say you can do it but they

4   can't?

5           MR. LICUL:  I'm not necessarily saying that, Your

6   Honor.  I just don't think that's for today.

7           The Governor is not trying to depose people who are

8   going to exonerate him.  What he's trying to do here with

9   these 50 subpoenas or so is go after the people who had

10  adverse information.

11          THE COURT:  Right.  But by your theory of relevance,

12  you would be hard-pressed to oppose their depositions.

13          MR. LICUL:  They haven't asked for any and we

14  haven't.  So I guess --

15          THE COURT:  They subpoenaed many people for

16  deposition who were complainants in those reports.

17          MR. LICUL:  No, no.  I'm sorry, Your Honor.  I may

18  have misunderstood.

19          I meant if he wanted to subpoena somebody who's

20  going to say the Governor was wonderful, he never harassed me.

21  I don't know of such subpoena.  And to the extent one exists,

22  we haven't opposed.

23          THE COURT:  Right.  But do you opposed, based on

24  your theory of relevance, you filed a motion to quash in part

25  on behalf of Ms. Boylan, right?

Proceedings                                    13

1            MR. LICUL:  Yes.

2            THE COURT:  So how do you say they can't take

3     discovery as to Ms. Boylan under your theory of relevance?

4            MR. LICUL:  Our motion of Ms. Boylan is limited.

5            THE COURT:  It's only as to those documentary

6     evidence in the third-party subpoenas to --

7            MR. LICUL:  Right.  It is the Rule 412 analysis.

8            THE COURT:  So you're not objecting to the

9     depositions?  That's what I'm trying to clarify.

10           MR. LICUL:  We're not objecting to the depositions.

11     Obviously, we will defer to those witnesses who have

12     additional objections.  But we are objecting to the deposition

13     and the document request to the extent they seek prior sexual

14     history.  That's the scope.  That's the extent to which we are

15     joining in those two motions.

16            But other than that, our other two motions are to

17     have the Governor be deposed and to basically have that happen

18     first before he can do nonparty discovery and make him stop

19     intimidating witnesses.  I mean, there is a pretty healthy

20     record of some pretty disturbing behavior that started before

21     this case during the investigation and continues through June

22     of this year.  I mean, the most recent letter by Ms. Hinton

23     alleges that Cuomo directly threatened to release dirt that

24     her children would not want out there.  And I'm not saying

25     that she used the word dirt.  That's my paraphrasing of it.

1   But that's the gist of it.

2          And, Your Honor, I think there is a solution to

3   this.

4          Early on in this case we had an issue about what we

5   could do or what the scope of discovery was with respect to

6   Mr. -- as a party and Ms. DeRosa, both of whom are subject to

7   a motion to dismiss that is still pending.  And I think Your

8   Honor had a solution, which has worked out well.  They would

9   produce to us any documents that they produced to the AG as

10  part of the investigation, and to the extent more information

11  was needed, we would meet and confer on specific pieces of

12  information.  That worked out well.  We've completed our

13  discovery, essentially, of those two parties in this case.

14  The nonparties should not be treated any differently.  They're

15  sort of witnesses to the accident.

16         So, to the extent anyone should be burdened, it

17  should be the parties here.

18         Cuomo should be deposed.  And we think that it's a

19  pest solution to this problem.  I understand that many of

20  these witnesses have, in fact, already produced to the

21  Governor what they produced to the AG's Office.  And to the

22  extent there's something specific, the parties can meet and

23  confer.  But subpoenaing their phone records, husband's phone

24  records, daughter's phone records, school records, that's well

25  beyond the pale.

Proceedings                                                    15

1          THE COURT:  So you suggest a similar solution to the

2     one that we reached, the accommodation we reached as a party

3     undergoes, and that's proving workable based on the discovery

4     to date?

5          MR. LICUL:  There has been no motion practice

6     regarding that.

7          THE COURT:  That's true.

8          MR. LICUL:  So the proof is in the pudding, I

9     suppose.

10          But, yes, that's a perfectly sensible solution to

11     this.

12          THE COURT:  So you would anticipate these

13     depositions going forward as to the additional complainants?

14          MR. LICUL:  Your Honor, I think at some point there

15     is an overkill factor.  We already know what these folks have

16     said.

17          THE COURT:  They're planning to call them.  They

18     have a right.

19          MR. LICUL:  But this case is sui generis to the

20     extent they already have their testimony.

21          THE COURT:  In part --

22          MR. LICUL:  Well, understood --

23          THE COURT:  -- due to the other issues, which is

24     scheduled for noon today with the Attorney General's Office.

25          MR. LICUL:  Well --  but the problem here, Your

Proceedings                                                    16

1  Honor is -- we're not opposing any of those depositions.

2  Those other witnesses may have specific objections related to

3  that, for example, I think there's one witness who tried to --

4  who agreed to be deposed for two or three hours, which seems

5  like a perfectly sensible solution.  They already have the

6  testimony.  You'd have to fill in the gaps, as Your Honor

7  said, on these other issues.  But we're not opposing that as a

8  rule.  It goes above the 10-deposition rule.

9            THE COURT:  Right.

10            MR. LICUL:  And I know we understood from the

11  beginning that there would be some play in that rule.  I think

12  at some point it becomes overkill.

13            THE COURT:  Well, but not if you're not willing to

14  limit your case.  That is the dilemma that the Court is

15  facing.  The Court is facing a dilemma of respecting

16  plaintiff's ability to try to tell the case within the bounds

17  of the law -- *Old Chief*, my favorite case of all time -- and

18  really develop the record that you need to present the case as

19  you see fit to the jury.  But if that is the plan, then

20  Governor Cuomo shouldn't be entitled to an opportunity to

21  contest whether or not that information comes in at all, and

22  in order to do that, needs to develop some additional

23  information as to relevance.  And if those complainants do end

24  up on the stand, having taken the deposition is obviously

25  their preference.

Proceedings                                    17

1          MR. LICUL:  But that is 11 women, including Trooper 1.

2          THE COURT:  I'm aware.

3          MR. LICUL:  It's not the dozens or so that have been

4    either subpoenaed for documents or where there has been a

5    request for their depositions.  It's well beyond that.

6          THE COURT:  Okay.  Fair enough.  All right.  Is

7    there anything else you would like to add?

8          MR. LICUL:  No, Your Honor, just that to the extent

9    Your Honor has already -- hinted is the wrong word, but is

10   inclined to extend the discovery deadline, we want a firm

11   deadline and we would like it to be as soon as possible.

12         THE COURT:  Of course.  Thank you.  I understand.

13         All right.  Ms. Glavin, obviously there are many

14   issues on the table.  I'm curious at some point to hear your

15   take on Mr. Licul's suggestion that we take a similar approach

16   to what we took as a party in DeRosa because, as you yourself

17   have described, or maybe it was Ms. Trzaskoma --  I don't know

18   who the signatory was in the letter.  I assume it was joint

19   work product.  The discovery in this case is a mess and we are

20   trying to get done.

21         So what do you think we can do practically speaking,

22   and, of course, inform by our legal landscape?

23         MS. GLAVIN:  Judge, look, the first question that I

24   was going to pose when we started today is the one that he

25   posed, and I was going to say to plaintiff's counsel if they

Proceedings                                        18

1    drop these other 10 complainants which comprise some 73

2    paragraphs, more than that, of the Complaint, then this is

3    very simple and everybody sitting in the gallery can go home

4    if this is about the Trooper 1 lawsuit which, of course,

5    that's what we would prefer.

6            And, so, the reality we are facing -- and I want to

7    address -- there were three points, because I think the record

8    needs to be corrected.  Governor Cuomo by no means is refusing

9    to sit for his deposition.  In fact, was ready, willing, and

10   able to sit for his deposition.  We scheduled it for August

11   23rd.  Because we were not getting the documents that we

12   needed, because none of the complainants were producing

13   anything more, except for a couple, than what had been

14   produced to -- they had already produced to the Attorney

15   General's Office, we were simply not able to go forward.  We

16   were also getting new information from other depositions and

17   in particular, a former member of the PSU detail.

18           Because of the information that we were getting, we

19   said to plaintiff's counsel, look we need to push the

20   deposition.  It can't go forward.  We also have all of these

21   pending motions.  We have not gotten documents we need,

22   including from State Government entities, such as the

23   executive chamber, how about September 27th?  That was the

24   date that we offered Mr. Licul, and he summarily rejected it

25   and said that doesn't work for us, and we want to go ahead on

1   the 23rd.  The Governor is going to sit for his deposition,

2   but the reality is what is the scope of this case going to be,

3   and is he going to sit for his deposition and be questioned

4   about 10 other women, some of whom he didn't even know they

5   were making allegations when he was deposed two years ago

6   during that deposition and we have to prep him for that.

7            So what we have said to Mr. Licul is to the extent

8   you are including all of this in the case -- and we don't have

9   an evidentiary, you know, boundary to this.  We may.  I

10  strongly suspect we are going to be making a motion, but we

11  need more information about the other allegations to do that.

12  But if Mr. Licul is proposing let's just do discovery on

13  Trooper 1's core allegations as they relate to her, then yes,

14  if you want to do part one and part two.  But the Governor is

15  not going to sit for a deposition and be questioned about

16  allegations by 10 other women, many of whom we have not been

17  able to fully explore.  We have transcripts that got publicly

18  released that are heavily redacted.

19            THE COURT:  I wouldn't say heavily.  I don't agree

20  with that characterization.

21            MS. GLAVIN:  On a few of them there are large

22  swathes that are unredacted that talk about other people and

23  whose identities that we don't know what they're talking about

24  and they are important to our case.  So when you say large

25  swathes, maybe no, it's not 20 percent or 10 percent are

Proceedings                              20

1    redacted.  But they're talking about specific people, specific

2    witnesses and staffers and those names are blacked out.

3          We've already taken one deposition, and this is in

4    our paper, Ms. Liss-Jackson, and we went through some of the

5    names and she couldn't remember what she had said earlier.

6          I do -- I want to get back to relevance, but there

7    were just a couple of other points with respect to Mr. Licul:

8    One is Governor Cuomo is not refusing to sit for the

9    deposition.  Mr. Licul knows that.

10          With respect to Trooper 1's deposition, I want to

11    explain why we put off her deposition.  Two days before

12    Trooper 1 was to be deposed, we took the deposition testimony

13    of a former colleague of hers in the PSU Diane Perrotta.  On

14    the eve of her testimony, we were provided with text messages

15    that Diane Perrotta had with Trooper 1 discussing what it is

16    that Trooper 1 wanted Diane Perrotta to testify to.  And Mr.

17    Licul talks about well, you know, you're subpoenaing kids'

18    phones, her husband's phone.  Diane Perrotta used her

19    husband's telephone.

20          THE COURT:  I understood from the papers is that her

21    son?

22          MS. GLAVIN:  Her daughter and her husband.  She

23    doesn't have a son --

24          THE COURT:  A child.

25          MS. GLAVIN:  It's her daughter and her husband, to

Proceedings                                                    21

1    get in touch with Trooper 1 so that there wouldn't be a record

2    of it, and that is what caused us to get the phone records.

3    We were very concerned about these communications happening

4    when Diane Perrotta had been subpoenaed and in the weeks

5    before the deposition.  So that's why those phone records

6    subpoenas went out.  It was for a proper purpose, not meant to

7    harass.  It was what are the extent of these communications.

8    So we pushed off the deposition with consent of all counsel in

9    the case, State Police and with counsel for Ms. DeRosa and Ms.

10   Azzopardi because we had a reason.

11          The second is that we had gotten Trooper 1's medical

12   records only a couple weeks before and they were, you know,

13   somewhat voluminous going through, but given that state of

14   affairs, we knew that there were other troopers that we were

15   going to have to subpoena, that we wanted their depositions

16   before Trooper 1's.  So I don't want the Court to think that

17   we were canceling depositions.

18          I can tell you I got a very lengthy outline already

19   prepared for Trooper 1's deposition.  That changed drastically

20   after Diane Perrotta's deposition.

21          The third thing I want to address with respect to

22   plaintiff counsel discussing the Governor's cell phone, let's

23   just be clear, Governor Cuomo has had three phones that were

24   imaged.  Thousands of images have been produced, okay, to

25   Trooper 1 in this case that were responsive:  Two Blackberries

Proceedings                                                           22

1    and an iPhone.

2            What has been interesting to us is that we have not

3    received a single text message that Trooper 1 has had that

4    would be discussing the Governor, the case, the allegations,

5    other than the text messages that got produced on the eve of

6    Diane Perrotta's deposition where she is reaching out to

7    Trooper 1 saying, to the effect, I know you have been

8    brainwashed, tell me what to say, why are your lawyers

9    reaching out to us?  There's a series of maybe three text

10   exchanges.  And the representation we've got, when talking

11   about ESI, from plaintiff's counsel is Trooper 1 simply didn't

12   have electronic communications throughout the whole course of

13   this.  We'll explore that in the deposition.

14           But to be clear, we have produced I think 55,000

15   pages of documents, thousands of images from the Governor's

16   phones, and so I don't want the Court to think that in any way

17   -- not only have we not shirked the discovery obligations,

18   that we have gone back and actually re-reviewed images to make

19   sure that we're getting everything that's responsive.

20           On the issue of relevance and what the Court's --

21   what Your Honor said when you came out on the bench about the

22   AG report, to the extent that is the impression the Court has,

23   that we are somehow trying to re-litigate this, Judge,

24   honestly, at this point in time, I don't care about the AG

25   report.  I just want to get the discovery that we need so that

1    we are -- can prepare a case and whether it includes 73

2    paragraphs.

3         I mean, Lindsey Boylan, her name comes up 36 times

4    in this Complaint.  She's referenced in 26 paragraphs.  There

5    are documents that we need from Ms. Boylan that we know

6    exists.

7         The AG report, you know, with respect to --  and

8    I'll give you an example, with respect -- and we'll deal with

9    this with Ms. Boylan, but quite frankly, we need to take our

10   own discovery.  We are not trying to recreate the AG report

11   for a whole host of reasons, which I think you know that I

12   feel about the AG report.  We're not trying to recreate it.

13   We are trying to defend.

14        THE COURT:  At the prior or argument, there was a

15   lengthy discussion about to needing to reduplicate the AG

16   Office investigation, to be fair.

17        MS. GLAVIN:  No. But the reason that happened, and I

18   want to go back to that argument, both the Assembly Judiciary

19   Committee and the Attorney General at that argument repeatedly

20   told us to do it ourselves.  They said subpoena the women,

21   take their depositions, subpoena them for documents, do it

22   yourself, and that's exactly what we have been doing since we

23   had that argument.  And the Court recommended that we do that.

24   And that's what we've been doing.  And what has happened is

25   the morass that we are in now because no one wants to produce

Proceedings                                                    24

1   anything, and no one wants to sit for a deposition.  And so

2   the question that I keep posing and -- is what is the

3   relevance, because once we did, after the February conference,

4   to do our own investigation, to test the veracity allegations

5   and to prepare our defense is we got accused and continue to

6   get accused of harassment, retaliation.  I think maybe the

7   favorite accusation -- not the favorite, but the most

8   disappointing to me personally was that Ms. Trzaskoma and I

9   were churning because we get to bill by the hours.

10          All we're trying to do here is what we do in every

11  case, whether I do it as a criminal defense lawyer or civil

12  lawyer, I need to be able to defend my client, and right now

13  we don't and have a tenth of what we need if the case is this

14  multi-hydra-headed with ten other people.  I would prefer it

15  just be Trooper 1.

16          Here's where we are with discovery:  There have been

17  --  Trooper 1 has taken six depositions.  We have taken three.

18  We have had one complainant, and we have taken two troopers.

19  The one deposition we took of the complainant, which I think

20  goes to the importance of why we need to take the testimony of

21  all of the women in this case is that complainant, in her

22  testimony, not only repeatedly said that she was not sexually

23  harassed --

24          THE COURT:  Her legal conclusion is irrelevant.

25          MS. GLAVIN:  It's irrelevant, but she also said

Proceedings                                          25

1   repeated the Governor didn't touch her inappropriately.  It's

2   what a reasonable person would perceive.  She said the

3   Governor didn't touch her inappropriately, that a lot of what

4   she said to the Attorney General's Office was not based on

5   personal knowledge, it was based on hearsay.  We need to get

6   into those details.

7           She also said that when we received our subpoena she

8   actually did believe that it was a reckoning because she

9   became somewhat uncomfortable as to how her allegations had

10  taken on a life of their own.  And that is precisely why we

11  need to take these depositions, because after taking Ana

12  Liss-Jackson's deposition, there is no doubt in my mind that

13  if we do a motion to strike, she won't be part of this case.

14  And so that became the importance of that.  But that's the

15  only one.

16          What we also learned during Ms. Liss-Jackson's

17  testimony is that Ms. Boylan, as soon as she got a subpoena,

18  Ms. Boylan is texting Ana Liss-Jackson.  Ms. Boylan released

19  that subpoena to the *Wall Street Journal*.  She got in touch

20  with Ana Liss-Jackson by text.  There were repeated texts that

21  happened.  And those are the types things we're looking for

22  for Ms. Boylan.  Ms. Jackson produced them.  And she didn't

23  have a problem producing them.  She produced what she had.

24  And we think she was quite honest during her testimony about

25  this, about why she went to the press.  She testified that

 1   Lindsey Boylan told her and claimed to have personal knowledge

 2   that the Governor was having affairs with two to three

 3   staffers, which, of course, was not true when Ms. Jackson

 4   believed it.  She said that's one of the reasons she came

 5   forward, but that in her view she had not been sexually

 6   harassed.  She knows what the definition of sexual harassment

 7   is.  He didn't touch her in appropriately, and she rarely had

 8   personal contact with the Governor.  The story that we had

 9   understood going into the deposition is that she believed she

10   had been hired because of her looks.  But when you spend time

11   talking with her about it, she acknowledged that could have

12   been true.  She was hired by the Department of State for the

13   fellows program.  She wasn't even assigned to work on the

14   Governor's side of the hall.  She was working for the

15   Lieutenant Governor for months.  And then Howard Glaser hired

16   her to come work for him because she was impressed with her

17   work.  And she said, Well, I began to think I was hired for my

18   looks because other people told me that.

19        Our ability to drill down on this is so important.

20   Again, would prefer not to.  It would make this case a lot

21   more streamline.  So on the relevance front, I feel stuck.

22        Ms. Trzaskoma and I feel stuck, because with respect

23   to subpoenas that have gone out -- and Mr. Licul talks about

24   all the subpoenas that have gone out -- if you just had --

25   let's just say if you have Lindsey Boylan's allegations alone,

Proceedings                                             27

1   okay, which she's referenced in 20 paragraphs, her name is in

2   the Complaint 36 times, she made a very serious allegation

3   against the Governor, publicly told the world Governor Cuomo

4   sexually harassed me for years, others watched and knew what

5   was happening.  It's a very serious allegation.  If she had

6   sued him, that alone, for us to have issued 10, 15 subpoenas

7   for documents and get depositions, maybe two to three, that

8   would be pretty reasonable, and I feel we have to do that

9   because of what a large role she plays in the Complaint.

10             THE COURT:  Her college records?

11             MS. GLAVIN:  We're not asking for Lindsey Boylan's

12  college records.

13             THE COURT:  I'm sorry.  Is that Ms. Bennett?

14             MS. GLAVIN:  That's Ms. Bennett.  And actually, I

15  want to --  we can talk about that.  But with respect to Ms.

16  Bennett, she has independently sued the Governor in the

17  Southern District.  We actually issued a subpoena for the

18  college records.  I think we are coming to an agreement.

19  We're very close to an agreement with plaintiff's counsel.  So

20  that may all be for naught because of that other lawsuit.

21             With respect to Ms. Boylan, because of the

22  allegations she made, which she told the world that she left,

23  she implied to the world over a series of tweets in a week

24  that she left because the Governor sexually harassed, that she

25  wouldn't sign a non-disclosure agreement, that she was

Proceedings                                                    28

 1    privileged and she could opt out.  Once all the statements

 2    were made, what we know is that none of that was true.  We

 3    know why she left.  There are three memos documenting why she

 4    left.  And in the eight months before she left, she had to

 5    have meetings twice with the Governor's counsel, one over a

 6    Complaint about her relationship with the head of ESD, Howard

 7    Zemsky, that they were involved in a sexual relationship and

 8    that there was an interaction in front of other ESD employees

 9    and there was a complaint, and then six to seven months later,

10    counsel for the Empire State Development Corporation,

11    Elizabeth Fine, and two others asked that she be removed from

12    the ESD payroll because of massive complaints within the

13    agency, on an agency-wide basis.  That was the reason she

14    left.  And when she was brought to a meeting, she resigned.

15    And then four days came back and tried to get her job back and

16    said I love the Governor, I want to keep working there.

17            So it was a shock to everyone that Ms. Boylan is

18    doing a series of tweets in the middle of a political

19    campaign, that she left for a different reason that was a lie.

20    We have to be able to explore that.  I don't care who Lindsey

21    Boylan slept with.  I really don't care.  What I do care is if

22    this case is going to be about her allegations of sexual

23    harassment, her telling the world that I left because of the

24    Governor's Cuomo harassment and everybody saw it, we have to

25    explore this because that's not why she left.

Proceedings                                29

1          So I feel very stuck here.

2          And if Your Honor wants to take those allegations

3   out, I think everybody here would breathe a big sigh of relief

4   and the case would be narrow.  I wish the Complaint wasn't

5   drafted this way.  So, on the relevance front, again, the

6   Attorney General's report, I don't care.  What I care about

7   is, the only thing I care about in report and the defense

8   right now is, one, we don't want it coming in during trial.

9   And the frustrating part is that in several depositions, the

10  depositions of Ms. DeRosa and Mr. Azzopardi have just been

11  taken, I can't tell you how many times the Attorney General's

12  report came up in the depositions.  Plaintiff's counsel asked

13  each of them what about the report -- the investigators, in

14  the manner they conducted it, was unethical?  That was part of

15  the line of questioning.  And so, as a result of that, we had

16  to then go through several hours of what they believed was

17  problematic with the report.  We don't want it to be a part of

18  the case.  But the reality it has been asked by plaintiff's

19  counsel.

20          And I fully expect that in Governor's Cuomo

21  deposition they're going to ask a lot of questions about the

22  Attorney General's investigation, and I would prefer it not be

23  part of the case because I don't think very much of that

24  report, as the world knows.  Let's not make it part of the

25  case.  But I have to deal with the allegations that were

Proceedings                                          30

1    dealt.  I have to be a defense lawyer.

2              And the last point I'm going to make is after all of

3    the letters that went flying through over the last three

4    weeks, over the number of meet-and-confers that I've had

5    where, I kid you not, I feel like I have to put earplugs on to

6    the degree at which I get yelled at by other lawyers.  That is

7    what actually happens during these.

8              I know now why some of my colleges from the Justice

9    Department hates civil discovery.  It's pretty brutal.  All

10   the letters flying back and forth.  I just want to cut to the

11   chase, tell us what you have that's responsive, how many

12   documents do you have.

13             With each of these meet-and-confers, what happens is

14   you have to tell us how it's relevant, and I'm like do you

15   have responsive documents?  Have you talked to your client?

16   Who was your client talking to about the allegation?  We are

17   not getting those answers, which makes it so hard for us to

18   narrow the subpoena.  I would like to have these conversations

19   in good faith.

20             I mean, take, for example, the subpoena to Lindsey

21   Boylan.  The irony of it is the subpoena we served to Lindsey

22   Boylan looks pretty close to what the AG subpoena was to

23   Lindsey Boylan.  There are several categories that we have

24   since learned about that we have asked about with respect to

25   how she used the sexual harassment allegation to further her

Proceedings                                                    31

1    campaign, because we think that was the motive, but what was

2    so -- what's interesting to me.  And why I don't care too much

3    about what the Attorney General's report says or what she did

4    is that Lindsey Boylan got subpoenaed from the AG's Office

5    asking for all documents or communications concerning her or

6    any other complainants about the Governor.  All of her docs

7    and communications reference contacts with the media, okay.

8    Lindsey Boylan didn't produce any of that.  She produced 25

9    pages.  None of those 25 pages included her text messages back

10   and forth, for instance, with Charlotte Bennett.

11           Then she testifies to the AG, despite having her

12   only produced these 25 pages, she testifies to the AG, yeah, I

13   texted with Charlotte all the time.  And no one asked her for

14   the texts.  I can criticize the AG, but this is why I have to

15   enforce our own subpoena, because what that produced there we

16   know is incomplete.

17           There's nothing in her production.  She published an

18   article on *Medium*, *My Story Working for Governor Cuomo.*  We

19   now know, in the weeks leading up to that article, she texts

20   Kaitlin -- and I do want to be heard, because I want the

21   ability to use Kaitlin's last name, because I don't think its

22   right or it's fair given what her allegations are, but she

23   texts Kaitlin like two or three weeks before she writes the

24   article asking her:  Do you know where the 2016 holiday party

25   was for the Governor?  The reason she's asking that is because

Proceedings                                              32

 1   she's trying to put it in her article and it does appear in

 2   her article.

 3          Why was none of this produced when it was already

 4   subpoenaed the first time?  Put that to the side.  We have to

 5   get it this time.

 6          So, again, I would love for this to be out of the

 7   case.  I'm asking for your help.

 8          THE COURT:  I can't kick the allegations out of the

 9   case in the absence of a motion, as you well know.

10          MS. GLAVIN:  Yes.

11          THE COURT:  So part of my question for the parties

12   today, and this is sincere, Mr. Licul, are there some

13   boundaries that the parties are willing to work out in terms

14   of what this case is going to look like at trial?

15          I understand you don't want to pre-litigate your

16   case in motion practice during discovery.  But this may be the

17   rare case where the interest of the third-parties and the

18   totality of the circumstances call for some of that litigation

19   in an effort to discover the bounds of appropriate relevance.

20          If Ana Liss-Jackson's went as badly for you as Ms.

21   Glavin represented, I would be surprised if you want to call

22   her in your case.  You may have a completely different take on

23   how she's relevant or why you want to call her.  I have no

24   idea.  Similar to some of the other complainants, if these

25   complainants have a lot of other collateral issues that are

Proceedings                                              33

 1  going to be sources of rich cross-examination, do you actually

 2  plan to call them?  Because if you don't, putting them through

 3  this discovery process is wrong.

 4           MR. LICUL:  May I be heard, Your Honor?

 5           THE COURT:  Yes.

 6           MR. LICUL:  A couple of things.  One is we have

 7  every right to put these witnesses on if we choose to

 8  strategically and we don't have to make that decision right

 9  now.

10           THE COURT:  No, you don't know, but there may be

11  motion practice, in which case it will be pre-litigated.  I'm

12  giving you --

13           MR. LICUL:  I understand.

14           THE COURT:  -- the opportunity to discuss it with

15  them and figure out whether or not there may be a boundary

16  that you can live with.

17           MR. LICUL:  Let me just say this, okay, this is not

18  a case -- I can't speak to the other lawyers -- where the

19  plaintiffs and the defendants' lawyers are at each other

20  throats.

21           MS. GLAVIN:  Oh, yes.  I should make that clear.

22  It's not.  I should make that clear, Your Honor.

23           THE COURT:  Good to know.

24           MS. GLAVIN:  We actually -- we have been able to

25  work, I think, quite collaboratively to come up with

Proceedings                                34

1    solutions.  The -- I think the most difficult part has been

2    with some of the nonparties.  And I think the tenor of the

3    discussions have been, frankly, disappointing, not with all of

4    them.

5         THE COURT:  I'm sure they feel re-traumatized to the

6    extent that they originally experienced trauma.  And that's

7    part of the problem with this strategy, Mr. Licul.  With all

8    respect to Trooper 1's ability to present this case, if this

9    is not really a viable strategy legally, it's not ethically

10   right to put them through this, and you know that.

11        MR. LICUL:  Your Honor, I have an ethical obligation

12   to zealously try my client's case.

13        THE COURT:  Correct.  Within the bounds of the law.

14   And if there are significant questions that touch upon whether

15   or not this information is going to come in, I'm wondering if

16   this is the rare case where we need to do things in a

17   different order.

18        MR. LICUL:  Let me just -- because Ms. Glavin has

19   given some examples where she said they've acted unreasonably,

20   and as much as I like Ms. Glavin, she's just wrong.

21        Let's take Ms. Perrotta.  They have subpoenaed her

22   phone records.  Her husband's phone records and her daughter's

23   phone records.

24        THE COURT:  She was collaborating with Trooper 1 on

25   her testimony, that seems like a fair swath of subpoenas.

```
                      Proceedings                    35
```

1          MR. LICUL:  Your Honor, if I may --

2          THE COURT:  And she included them in her papers, by

3    the way, those texts.

4          MR. LICUL:  We provided those texts.

5          THE COURT:  Yes.

6          MR. LICUL:  I understand.  The allegation is that

7    Ms. Perrotta reached out to Trooper 1 and Trooper 1 never

8    picked up her call.  Now, that's not evidence of some grand

9    conspiracy.  That's evidence of no conspiracy.  But let me

10   tell you what we did offer to avoid any burden on Ms.

11   Perrotta.  We've offered to produce to Cuomo's camp the phone

12   records that the correspondence -- phone number to phone

13   number, between Trooper 1 and -- and Ms. Perrotta and her

14   husband, and her daughter.  In other words, we've said we will

15   give you those records.  We have them.  We'll give them to

16   you.  Not good enough, that seems like a perfect sensible

17   solution to the problem.

18          Why don't they do it?  Because they want the full

19   phone records.  They want to go on a fishing expedition.  Let

20   me talk a little bit about the reasons why Governor Cuomo

21   won't be deposed.

22          THE COURT:  Governor Cuomo will be deposed.

23          MR. LICUL:  No.  But he wants to go last, Your

24   Honor.  He has no right to go last.  There is not a single

25   case in this district or in this Circuit that says that a

Proceedings                                              36

1    defendant has a right to wait it out.  And the cases go other

2    way.  He is a party -

3               THE COURT:  I'm sorry.  We are not addressing the

4    timing of Governor Cuomo's deposition today.  We have a

5    gallery full of third-parties.  This is not the appropriate

6    time to talk about the exact timing of Governor Cuomo's

7    deposition.  There are a myriad other pressing discovery

8    issues in this case.  I assure you that Governor Cuomo will be

9    deposed.  Defense counsel knows that.  The question of timing

10   is one that is factually complex and not necessary to talk

11   about today when we have all these other folks waiting.

12              MR. LICUL:  I understand, Your Honor.  It is the

13   subject of one of our motions.

14              THE COURT:  I recognize that.

15              I started to say there's no motion and then I

16   remember there was, so I stopped.  But I do recognize that's

17   one of your motions.  The motion is not ripe because there's

18   so many discovery issues outstanding.  I wouldn't want to take

19   their deposition if I were their counsel either, and I'm

20   surprised you do, because if you don't have all of the other

21   information that may be coming in, I would imagine there would

22   be a number of things that you would like to ask him about.

23              MR. LICUL:  We are prepared to take his deposition.

24   We have been prepared to take his deposition.  He is a party,

25   I've always litigated these cases that the parties go first.

Proceedings                                              37

1    In fact, some of your colleagues, Your Honor, put that in

2    their rules, that the parties go first, and I think it's a

3    perfectly sensible solution.

4         Let me just talk about Ana Liss-Jackson for one

5    second.  And I understand Your Honor said that her legal

6    conclusion is irrelevant, and I agree.  What Ms. Liss-Jackson

7    said was that she thought the environment was Mad Menesque and

8    that she was treated less well because she's a woman.  That is

9    the very definition of discrimination.

10        Now, with respect to the report, they say they don't

11   want to touch the report.  That is untrue.  Just last week

12   they subpoenaed the Cleary firm and the Vladeck firm for all

13   of their documents concerning the AG's.

14        MS. GLAVIN:  That's not so.  That's not --

15        MR. LICUL:  Why would they do that?  They were

16   appointed as attorney -- as Deputy Attorney Generals to do the

17   investigation.  Your Honor, denied the request to turn over

18   the AG's records, yet they went ahead and subpoenaed the firms

19   anyway.

20        THE COURT:  Is that the billing records?

21        MS. GLAVIN:  No, Your Honor.  We subpoenaed them.

22   We're trying to get the interview memos, which are up on

23   motion for reconsideration before the Court.

24        THE COURT:  That's not -- that's for later.

25        MS. GLAVIN:  Yes.

Proceedings                                38

1          THE COURT:  This is for 12:00.  You're welcome to

2    stay when the Attorney General's Office is here.

3          MR. LICUL:  Thank you, Your Honor.

4          THE COURT:  Things touching upon the Attorney

5    General's Office are scheduled for 12:00.

6          MR. LICUL:  I was just responding to Ms. Glavin's

7    argument that they have been acting reasonably and they don't

8    care about the report.  It's just not true.  Anyway, Your

9    Honor I don't know that I have anything else unless Your Honor

10   has a question for me.

11         THE COURT:  No.  What I'm lacking is solutions,

12   right.  Everyone agrees this is a mess, Mr. Licul has

13   suggested a process similar to the one we have employed for

14   defendants Mr. Azzopardi and Ms. DeRosa, but, you know, I

15   don't know if something similar would work for the

16   third-parties.

17         MS. GLAVIN:  So I wanted to understand precisely

18   what the process is.  Is the proposal on the table that

19   there's no discovery with respect to the nonparties and it's

20   just discovery on the Trooper case?

21         THE COURT:  That was not his suggestion.  As I

22   understood the suggestion, correct me if I am wrong, Mr.

23   Licul, is that the third-parties, at a minimum, would give you

24   the documents that were provided to the Attorney General's

25   Office and from there, meet and confer in an effort to

Proceedings                                                        39

1   determine what additional documents are needed.

2          MS. GLAVIN:  So here's the issue, we have gotten --

3   so Lindsey Boylan produced to us what she produced to the

4   Attorney General's Office:  25 pages.  We know that she has

5   had extensive communications with the press about her

6   allegations, with other complainants about her allegations,

7   including, you know, up to recently.  We need those.  We've

8   looked at the 25 pages and it's just relatively worthless to

9   us.

10         We got a production of documents from, I think it's

11  Kaitlin and Ana Liss.  Ana Liss gave us more than what she

12  gave the AG's Office.

13         That's basically what the proposal has been for all

14  of the nonparties.  But there's very little in those, and we

15  don't know the degree to which the Attorney General's Office

16  renegotiated those.  For instance, Charlotte Bennett hasn't

17  produced to us any of the documents that she produced to the

18  Attorney General's Office.

19         THE COURT:  You also mentioned that Charlotte

20  Bennett is the plaintiff in the Southern District case.  What

21  is the status of the discovery there?  I don't believe her

22  counsel is here today.  What is the status?

23         MS. GLAVIN:  Yes.

24         MR. COHEN:  I represent Charlotte Bennett.

25         THE COURT:  I'm sorry.  What was your name, sir?

Proceedings                                          40

1        MR. EISENBERG:  Herbert Eisenberg.

2        THE COURT:  Herbert Eisenberg.  Okay.  Thank you.

3        MS. GLAVIN:  Discovery has just started.  Document

4   requests were made and the parties are making objections.

5   There are different parties in that case, additional

6   defendants in that case.  The discovery deadline now is set

7   for June of 2024.

8            One of the reasons we subpoenaed Ms. Bennett is

9   because we were facing this discovery deadline in this case

10  for the 26th.  I think we can work a lot of this stuff out,

11  and I'm amenable to doing that with Ms. Bennett, the problem

12  is I can't speak for Ms. DeRosa and Mr. Azzopardi, who are

13  defendants in this case.  You know, there are going to be some

14  different issues in the two cases.

15           THE COURT:  The other defendants are not named in

16  the --

17           MS. GLAVIN:  One is not.  Ms. DeRosa is.  There is a

18  motion to dismiss pending for all of the claims against Ms.

19  DeRosa, but I can let Ms. Foti address that.

20           THE COURT:  Ms. Foti, can we resolve the Charlotte

21  Bennett matters in the Charlotte Bennett case or is there a

22  risk of conflicting rulings?  That's my concern.

23           MS. FOTI:  Well, I think there's certainly a risk of

24  conflicting rulings.  But I will tell you why I don't think we

25  can resolve it just by the Charlotte Bennett case.  Unless Mr.

Proceedings                                                          41

1   Licul removes from his Complaint reliance on Charlotte Bennett

2   as a reason why my client Ms. DeRosa would have been on notice

3   of sexual harassment, we have to depose Ms. Bennett.  We have

4   to get her documents.

5           Right now, I have to tell you, the people who are

6   suffering the most prejudice in this case -- I hear the

7   parties saying they're suffering prejudice.  It's my clients.

8   My clients -- Melissa DeRosa say hello and goodbye to Trooper

9   1.  Richard Azzopardi doesn't know Trooper 1.  There's no

10  claim that they did anything to participate in Governor Cuomo

11  harassment.  That is the requirement; they did something, that

12  they knew something.  There's no claim in the Complaint that

13  any of that is true.  Notwithstanding that, they're

14  participating.  They have sat through their depositions.

15  Nothing came out during the depositions to suggest that they

16  did anything to participate in the sexual harassment.

17          Notwithstanding that, we have to depose all of

18  third-parties as well because, as I understand the theory of

19  the plaintiff's case, is that because all these other

20  individuals claim that they were harassed.  Ms. DeRosa must

21  have known.  And Mr. Azzopardi, even in their answers to the

22  motion to dismiss, say maybe Mr. Azzopardi participated --

23  aided and abetted in Governor Cuomo's sexual harassment as

24  well.  We have to have an opportunity to question that.

25          If Mr. Licul wants to drop our clients, that would

Proceedings                                                    42

1    be great.  We have been waiting for a decision on the motion

2    to dismiss because we don't think there's sufficient

3    allegations against our clients in the Complaint.  If they

4    want to drop, then we need nothing further in this case.

5         If he wants to continue to say that Melissa DeRosa

6    and Richard Azzopardi were aiders and abettors and enabled

7    Governor Cuomo's alleged sexual harassment, then we need to

8    have responses to the subpoenas as well.  Our subpoenas are

9    very limited.  But what's interesting to me is that we can't

10   just say well, if we're going to negotiate the subpoenas for

11   Governor Cuomo, that's it.  We need to be able to question the

12   -- all these third-parties on what they apparently think Ms.

13   DeRosa knew, what they think Ms. DeRosa saw, what they believe

14   Mr. Azzopardi may have done to enable Governor Cuomo's sexual

15   harassment.

16        So I'm not positive the negotiated -- you know, this

17   concept of negotiating something similar to what we have done,

18   I'm not positive how that would work.  We have very limited

19   document requests and a number of the third-parties have said

20   they don't have documents responsive.  We're asking for

21   documents relating to Melissa DeRosa and Richard Azzopardi.

22   We're not asking for every document in the world.  A number of

23   them have said that they don't have those documents or they

24   have already produced them in response to Governor Cuomo's

25   subpoenas.  And we have been working with the third-parties to

Proceedings                                                        43

1   say okay, if that's the case, we're not going to pursue that,

2   but we need to pursue the deposition of the third-party.

3              THE COURT:  Thank you.

4              MS. FOTI:  I'm not sure how we can negotiate a

5   settlement without having them testify.

6              THE COURT:  I understand.

7              And on behalf of the New York State Police, Mr.

8   Palermo, what do you think as to this proposal?  Would this

9   work for you?

10             MR. PALERMO:  Your Honor, are you talking about the

11  proposal of providing the documents from the AG initially --

12             THE COURT:  And then meeting and conferring and

13  trying to resolve things prior to filing -- the problem with

14  motions to compel -- there are many, many problems with

15  motions to compel.  One of them is they take a really long

16  time because you have to file it and then they have to respond

17  and then people sometimes file a reply.  Whether that is

18  really all permitted under our local rules, it is not.  People

19  still do it.  And it takes weeks.  In the meantime, other

20  motions are getting file and then they cross apply to issues.

21  It's an extremely insufficient process.

22             My individual rules require a joint statement of

23  each dispute, jointly stated in one filing so that everybody

24  knows what the universe of information for that dispute is.

25  That method, which is in my individual rules, really hasn't

Proceedings                                              44

1    been followed in this case, with the exception of, in the

2    beginning, there was one small issue that bubbled up and we

3    had a conference and then resolved it in that conference.

4            But there are so many problems with motions to

5    compel and they are extraordinarily inefficient.  So my goal

6    is to try to find some guidelines for the parties and the

7    nonparties to sort of just better move through this discovery

8    process.  As the attorneys for the nonparties are hearing, I

9    know many of your clients likely think that Governor Cuomo is

10   trying to continue to harass or victimize them.  The issues

11   that the Court is struggling with in this case, as you've

12   heard, are these wide scope of the plaintiff's allegations in

13   the Complaint.  And if that is the universe of information

14   that Governor Cuomo is being asked to defend against.  There's

15   a lot of discovery that he may need to take in order to move

16   to strike those allegation, move to narrow the discovery that

17   come in at trial, or defend himself if all of those witnesses

18   are ultimately called.  That's the problem.  I would think

19   that all of you, as advocates for the third-parties, would

20   also be very interested in meeting and conferring with Mr.

21   Licul and Ms. Glavin in an effort to narrow what this case is

22   going to look like, because if this case is really going to be

23   all 11 complainants coming into court testifying this

24   discovery process is going to be quite laborious and

25   unfortunately further expose your clients to addition process.

Proceedings                                45

1        Anyway, back to the New York State Police.

2        MR. PALERMO:  Thank you, Your Honor.  Given the

3   stance we find ourself in right now, we would be amenable to

4   proceeding with that proposal.  I suppose having some

5   production at least to get things going might be beneficial

6   since we're not moving very quickly anywhere.

7        A lot of information being sought in the subpoenas

8   isn't necessarily relevant to the allegations specifically

9   against the New York State Police, so we don't necessarily

10  take a position one way or the other on a lot of the

11  subpoenas.  But, you know, our client would be amenable to

12  cooperating with that proposal if we want to move forward in

13  that direction.

14       THE COURT:  Thank you.

15       Mr. Licul, do you have an idea?

16       MR. LICUL:  I have an idea or I just have a

17  clarification in response to Ms. Foti and her client.

18       The allegations against Mr. Azzopardi are limited.

19  He is being accused of retaliating against Trooper 1 and

20  aiding and abetting the Governor's retaliation against her by

21  calling her an extortionist.  He is not being accused of being

22  an aider and abettor to the sexual harassment.  And what we

23  learned from Mr. Azzopardi's deposition is that when Trooper 1

24  filed this action, he and the Governor sat down together and

25  drafted a tweet that called her an extortionist.  The tweet

Proceedings                                             46

1   was sent out under Mr. Azzopardi's name presumably so no one

2   could trace it back to the Governor.  But that is what the

3   allegations are against Mr. Azzopardi.

4           The allegations against Ms. DeRosa are twofold:  One

5   is that she too at some point sent out a tweet accusing

6   Trooper 1 of committing a crime of extortion; and two, that

7   she aided and abetted the sexual harassment because, among

8   other things, she buried a story about how it was that Trooper

9   1 got on to the PSU.  She had specific involvement in that.

10  Okay.  And, so -- and, so, I want to be clear about those

11  allegations.

12          With respect to the Governor, there is no reason on

13  this good earth that the Governor could not testify.  He

14  already has, in fact, testified about his interactions with

15  each of the victims.  He knows what happened.  He doesn't need

16  their testimony.  He's already got it anyway.  He doesn't need

17  it.  What he's trying to do is trying to attack their

18  credibility extraneously with outside evidence.  I think that

19  that's the problem.  But I'm not sure if that was the

20  solution.

21          THE COURT:  That's clear, but that's part of

22  defending our case.

23          MR. LICUL:  To an extent.

24          THE COURT:  It's your position they're not entitled

25  to discover impeachment material?  I'm not understanding your

Proceedings                                                     47

1   argument.

2           MR. LICUL:  No.  I think that the scope of the

3   impeachment material will depend, right.  It depends on how

4   far you're going to go.  Are you going to dig under every

5   single rock for every witness and see everything that they've

6   ever done?

7           THE COURT:  Well, you were, just a moment ago,

8   taking the position that you need to zealously advocate for

9   your client.

10          MR. LICUL:  I understand that, but there are limits

11  to zealous advocacy and at some point the zealous advocacy

12  crosses the line and the information you're looking at, you're

13  just not going to get in, right.

14          THE COURT:  Agreed, and that is why I am asking you

15  to also look hard at your case and truly evaluate whether or

16  not this evidence is going to come in and have meaningful meet

17  and confers with the litigants who are the third-parties here,

18  because putting them through this deposition process and

19  continuing to re-traumatize some of these individuals when

20  this stuff may or may not come in depending upon what temporal

21  proximity, overlapping work environment, all of the things

22  that one would look at to establish whether or not there is a

23  404(b) exception and/or it comes in under the hostile work

24  environment discussion outlined in the *Perry* case.

25          It is not at all clear to me, Mr. Licul, and I don't

Proceedings                                                    48

1    think it would be clear to any jurist on the basis of the

2    current record that all of these victim's testimonies are

3    going to come in.  So what I implore you to do, sir, is

4    exactly what you just described you would like to the Cuomo

5    people to do, and I would like you to do it to.  You need to

6    be strategic and you need to re- evaluate what you think is

7    coming in.  And if you're willing to cut some stuff, great.

8            Similarly, if the Cuomo people, if they can stop you

9    know, looking -- I mean, subpoenaing all of the phone records

10   under the sun is not going to happen, and I think Ms. Glavin

11   knows that.  But some discovery of impeachment, and certainly

12   if there is any collusion, they're going to be entitled to

13   some leverage of discovery there.

14           MR. LICUL:  If they think that Ms. Perrotta

15   concluded with Trooper 1, they could have asked Trooper 1 at

16   her deposition.  I mean, that's the first place to look,

17   right?  What did you say to Diane Perrotta?  Right.  I don't

18   understand going after her, you know, everything else about

19   her.  And accusing her of perjury is pretty heavy-handed.

20   They don't have any evidence that she perjured herself.  It is

21   intended to intimidate a witness.

22           Now, with respect to Your Honor's first point on the

23   scope of the evidence that's get in, they have not cited to us

24   a single case where other harassment by the perpetrator was

25   not admitted.  That's not what we are talking about.  All the

Proceedings                                    49

1    other cases say that perhaps discrimination by others in the

2    employment world, another supervisor or another co-employee

3    may not be relevant to the employer's knowledge or some other

4    -- but where we're talking about the actual perpetrator, I

5    haven't found that case, and I welcome them to show it to me.

6    We can talk about it.  I have no problem talking to Ms. Glavin

7    about anything.  But that's just not the law.

8              And I think that they know what these witnesses are

9    going to say.  They've already testified under oath.  There

10   may be some latitude there.  I just don't see that it's this

11   broad.

12             Anyway, I understand Your Honor's instruction.

13             THE COURT:  One other question.

14             MR. LICUL:  Sure.

15             THE COURT:  Do you anticipate seeking to introduce

16   portions of the report?

17             MR. LICUL:  Yes.

18             THE COURT:  And I assume that's under Rule 803(8).

19             MR. LICUL:  Yes.

20             THE COURT:  What portions?

21             MR. LICUL:  I'm not sure just yet, Your Honor.

22   That's not been teed up.  But I think there are portions of

23   the report, and perhaps the Assembly report, that would be

24   relevant under 803(8).

25             And there's also a second piece of this, which is

Proceedings                                        50

1  because we have the State here as a defendant, there may be a

2  party admission pact to getting the report in as well.

3          THE COURT:  I mean, as you know under 803(8), the

4  admissibility in a civil context is limited to --

5          MR. LICUL:  It's the factual findings, Your Honor --

6          THE COURT:  Factual findings.  Exactly.

7          MR. LICUL:  -- from a legally authorized

8  investigation.

9          THE COURT:  Right.

10          MR. LICUL:  This was a legally authorized

11  investigation.

12          THE COURT:  I don't think that's going to be

13  contested.  But what are factual findings in the context of

14  hearsay?

15          MR. LICUL:  I'm not sure all of this is hearsay,

16  Your Honor.

17          THE COURT:  The facts, as I read the report, are

18  that these people told things to the investigators.

19          MR. LICUL:  Right.

20          THE COURT:  That doesn't make what they told the

21  investigators true, I mean.  So what are the facts that you

22  are seeking to introduce?

23          MR. LICUL:  Well, what they told the investigators,

24  the factual findings, what the investigators found, in other

25  words, the holdings of the investigators --

Proceedings                                          51

1          THE COURT:  That's the investigators' conclusion and

2     those are mixed questions of law and fact and that's really

3     what I'm getting at.  Under the 803(8), the legal conclusions

4     are not likely to come in, as you know.  And I think a lot of

5     what's blurring the lines here is this belief that people have

6     an understanding of their own experience of sexual harassment

7     that may comport with legal definitions.  It doesn't

8     necessarily.  And it is highly, highly prejudicial under Rule

9     403.  803(8), doesn't throw 403 out the window.

10         MR. LICUL:  That's right, Your Honor.

11         THE COURT:  So the question then is they don't know

12    what portion of the report you plan to introduce and if

13    you're, in fact, seeking to introduce the factual findings,

14    whatever they are, which is really unclear to me, they're in

15    very uncertain terrain in the discovery process here.

16         MR. LICUL:  Well, I mean, this is like no different

17    than any other case where the EEOC --

18         THE COURT:  There is no other case like this, Mr.

19    Licul.

20         MR. LICUL:  That may be true.

21         With respect to this point, Your Honor, the Second

22    Circuit has clearly said that investigations are not per se

23    admissible.

24         THE COURT:  Exactly.

25         MR. LICUL:  They are still subject to the balancing

Proceedings                                    52

1    test of 403, but they're not per se inadmissible.

2            THE COURT:  Legal conclusions are pretty

3    inadmissible under the language of the rule and the case law.

4            MR. LICUL:  No, but the factual findings are not, so

5    if the --

6            THE COURT:  Sexual harassment is not a factual

7    finding.

8            MR. LICUL:  No, but a factual finding that something

9    happened on a particular day.

10           THE COURT:  Maybe.  Maybe.  But it is still hearsay.

11           MR. LICUL:  It wouldn't be hearsay because this is

12   not hearsay.

13           THE COURT:  It's a hearsay exception.

14           MR. LICUL:  But it's not an exception.  It's

15   actually not hearsay, Your Honor.

16           THE COURT:  So there's layers of complexity to this,

17   is the point.

18           MR. LICUL:  That I agree.

19           THE COURT:  And Ms. Glavin and Ms. Trzaskoma, as

20   discussed at length in the hearing we had regarding the

21   Attorney General's report and the AJC report, you know,

22   there's a lot of issues inherent in introducing this report

23   that they can't fully test because they can't get the

24   underlying investigative materials to it due to various

25   rulings I have made so far.  We're revisiting some of those

Proceedings                                            53

1  questions at noon.  It will probably be a little later than

2  noon, if Mr. Amer is here.

3            So you know, this is a really complicated question

4  and because the way this discovery is going may again need to

5  be addressed earlier in the process than in motion in limine

6  perhaps right before trial.  I mean, is this something we need

7  to deal with?  Do we need to deal with the universe of

8  witnesses and the scope of the admissibility of the report

9  now?

10            MR. LICUL:  No.

11            THE COURT:  Because I don't see a way forward, Mr.

12  Licul, other than continue what they are doing.  Those are

13  sort of options that seem to be on the table.

14            MR. LICUL:  I don't understand why an 803(8)

15  analysis would allow them to do the discovery that they are

16  asking for.  Let's say, for example, a witness says Governor

17  did this to me on this day and, let's say, the report says we

18  find --

19            THE COURT:  Let me give you one clue, 803(B), the

20  opponent -- this is a record or a statement of a public office

21  can come in if the opponent does not show that the source of

22  information or other circumstances indicate a lack of

23  trustworthiness.  I'm quite certain, based on our prior

24  discussions in this case, that they're seeking to establish

25  that the report lacks trustworthiness.

Proceedings                                    54

1        MR. LICUL:  But they have the sworn testimony of the

2   witnesses upon which the findings are based.

3        THE COURT:  And based on their one complainant's

4   deposition so far, they take issue with how the report

5   characterizes their testimony.

6        MR. LICUL:  Okay.  We take issue with their

7   characterization of it.

8        THE COURT:  Of course you do.

9        MR. LICUL:  I understand.

10       THE COURT:  This is why this is front and center in

11  their discovery efforts.

12       MR. LICUL:  No, but, Your Honor, if what they're

13  saying -- typically, when we're talking about trustworthiness

14  in this context of discrimination, it will be an EEOC finding

15  that's one page long with no investigation, and then it's

16  often the defendant who will say we have a no probable cause

17  finding, we would like to introduce this to the jury, and the

18  judge says no, it lacks trustworthiness because there was no

19  investigation, nothing happened.  That's the scope of the

20  trustworthiness rule.

21       In this particular case, they cannot argue that.

22  They can argue that Tish James wanted to be the governor, that

23  Preet Bharara was out to get him.

24       THE COURT:  No one wants this trial to be about

25  that.  I can assure you that Judge DeArcy Hall does not want

Proceedings                                55

1    this trial to be about that.

2         MR. LICUL:  Neither do we, but the point is, Your

3    Honor, that's their attack on trustworthiness.  Their attack

4    on trustworthiness is not you didn't do an investigation, you

5    didn't interview people, you didn't, you know -- you didn't do

6    the inquiry you're supposed to do.

7         THE COURT:  Their argument as to Jackson is that the

8    conclusions of the investigators were wrong.

9         MR. LICUL:  But Ana Liss-Jackson's testimony they

10   have.  And Ana Liss-Jackson testified about her interactions

11   with the Governor.  And Ana Liss-Jackson's testimony,

12   regardless of what her legal conclusions are, is the very

13   definition of a hostile work environment where woman are

14   supposed to act a certain way, look a certain way, where they

15   get attention from the Governor, a wink from the Governor

16   because they are women, and attractive women.  It is the

17   boilerplate definition of sexual harassment.  She described it

18   as Mad Menesque.  I cannot think of what else that would mean

19   other than we are going back to the 50s in terms of the

20   environment.  That's what we are talking about here.

21        Anyway, we can argue about what Jackson's said.

22        THE COURT:  Correct.  That's the problem.  There's

23   so many layers of factual complexity here, trying to rule on

24   evidentiary parameters on the basis of the present record is

25   very, very difficult, if not impossible, without having

Proceedings                                          56

1   full-blown evidentiary hearings on this motion to compel and

2   nobody wants to do that either.  So that's why I'm trying to

3   find some sort of strategy that the parties can employ to

4   meaningfully engage and narrow these disputes in an effort to

5   move this discovery process along.

6              In the meantime, the third-parties are here.  I see

7   many lawyers waiting.  They have an important interest at

8   stake as well.

9              MR. LICUL:  Your Honor, I will -- lacking any

10  creativity here, I will just repeat what I said earlier, which

11  is they can produce what the witnesses produced to the AG's

12  Office.  And if there are gaps, they can have that discussion

13  with the witnesses and explain why they need more.  It worked

14  for DeRosa and Azzopardi.  I don't see any reason why it

15  wouldn't work here.

16             THE COURT:  Let me ask the third-parties what they

17  have produced, what they are prepared to produce, and whether

18  or not they consent to the Attorney General's release of their

19  information.  Those are some of the questions that I have for

20  the third-parties, because that is another way that I need to

21  -- again, I don't know if the Attorney General's Office is

22  going to be amenable to my suggestion in the order that I

23  issued in connection with the prior opinion in this case.  But

24  they seem to be, so we will see.

25             My understanding, and please let me know if there

Proceedings                                    57

1   are additional attorneys who have come and who have not stated

2   their appearance.  I have a Mr. Capezza for State employee 2,

3   Ms. Cohen here for Ms. Hinton.  And is that a colleague

4   sitting next to you?

5           MS. WANG:  I represent Ms. Limmiatis and Ms.

6   McGrath.

7           THE COURT:  Could you spell your last name for me?

8           MS. WANG:  W-A-N-G.

9           THE COURT:  Okay.  And then Mr. Eisenberg has

10  introduced himself.

11          I recognize Mr. Najmi.

12          And then is there anybody else on behalf of

13  third-parties?

14          MS. SALZMAN:  Zoe Salzman on behalf of non-party

15  Kaitlin Doe.

16          THE COURT:  All right.  Mr. Capezza --

17          MS. PERRY:  Your Honor --

18          THE COURT:  Yes, of course.  You've put your

19  appearance on the record already.

20          All right.  So Ms. Boylan has obviously been the

21  subject of a lot of conversation today.  Ms. Perry, you are

22  sitting by a microphone.

23          Mr. Capezza, if you wouldn't mind just holding on

24  one, Ms. Boylan's attorneys probably have a lot they would

25  like to say in response to many of the things that have been

Proceedings                                                   58

1    said today.

2            Ms. Perry, would you like to start?

3            I have three basic questions for all of the

4    third-parties, which is one, what, if anything, have you given

5    in response to subpoenas?

6            Two, what are you willing to give?

7            Three, do you have an objection to the release of

8    information that the Attorney General's Office has regarding

9    your client, including the unredacted transcript, and anything

10   that was provided to the Attorney General's Office?

11           Their interview memos are something that the Cuomo

12   people are also seeking.  Whether or not those are protected

13   by other privileges is a separate question.  But I'm curious

14   what your client's position is with regard to the release of

15   interview memos.

16           MS. PERRY:  Your Honor, I do have a lot to say and I

17   hope we will get to it, but as to that narrow question, we

18   have already produced, as counsel has said, documents that

19   have been produced to the AG's Office.  We, of course, have no

20   problem with that.  Ms. Glavin seemed to insinuate that Ms.

21   Boylan had underproduced, but she also acknowledged that she

22   was not party to the back and forth between Ms. Boylan's

23   counsel and the AG's Office.  That was an agreed upon

24   accommodation and she produced what she produced to the

25   satisfaction of the AG's Office.  So, of course, we would be

Proceedings                                                    59

1    amenable to that suggestion, that we -- you know, that is the

2    limit of what would be produced.

3            THE COURT:  That's all your willing to provide?

4            MS. PERRY:  Well, we did have a meet and confer with

5    counsel.  I did not yell at Ms. Glavin --

6            MS. GLAVIN:  She did not.

7            MS. PERRY:  And we had made clear an openness to

8    producing additional categories of documents, specifically --

9    and I can go through the exact document request, but documents

10   that broadly spoke to or where Ms. Boylan and others spoke to

11   the specific allegations that Ms. Boylan has made in the past

12   against Mr. Cuomo.  But we said if the parties -- if the

13   defendants were willing to make that comprise, we would be

14   done, and we would not produce other documents pursuant to the

15   other requests.  They rejected that.  But we were very clear,

16   and I'm clear here today, that we do not agree and never will

17   agree to produce documents that go to all these other

18   categories:  Ms. Boylan's sexual history, her campaign

19   fundraising, her, you know, employment records, and complaints

20   that were allegedly made against her.  We do not agree and we

21   spoke about that extensively in our papers.

22           THE COURT:  Is it true that Ms. Boylan made public

23   statements that the harassment is why she left?

24           MS. PERRY:  Yes, she did.  She was the first person

25   to tweet about her experience of sexual harassment, by the

Proceedings                                    60

1   Governor and she made public statements about why she had

2   left.  That was explored by the Attorney General and she

3   produced any documents that were agreed upon between her and

4   the AG's Office.

5           THE COURT:  If there are other documents shedding

6   light on additional reasons she left or was asked to leave,

7   why wouldn't that be relevant in light of that public tweet?

8           MS. PERRY:  The problem here -- there is, of course,

9   under Rule 26, a relevance component and proportionality, and

10  we are so far outside of any universe of proportionality here.

11  When they're trying to explore that and they're saying they

12  are entitled to get communications between someone who worked

13  on her campaign and Ms. Boylan about why this other person

14  resigned hoping that may be it goes to something having to do

15  with her political motivations, that is way too far afield.

16          Just within the past month, Ms. Boylan's college

17  intern on her campaign was subpoenaed by all the defendants in

18  this case.  This is way too far afield.  Your Honor has talked

19  about boundaries.  There are none in this case.

20          And so, I couldn't agree more with Your Honor's

21  admonition or suggestion that perhaps the parties should work

22  this out.  I think all of the victims would agree with Your

23  Honor's characterization that they have been re-traumatized by

24  this.  Ms. Boylan certainly feels that way.  I think there is

25  plenty of blame on both sides of the aisle for that.

Proceedings                                          61

1          If the parties could agree on what the limits are,

2     what the boundaries are, I'm sure everybody -- I certainly can

3     speak for my client -- would appreciate that.

4          Some of the questions Your Honor has raised about

5     well, these other allegations of sexual harassment, if they

6     have nothing to do with Trooper 1's workplace, do they come

7     in?  I understand that plaintiff might not have to do that

8     now.

9          Your Honor spoke about moral and ethical, you know,

10    reasons, and I actually think that should be the consideration

11    here.  When you are talking about 11 women who are being

12    dragged in here kicking and screaming who want rest and

13    repose, to put this behind them.

14         Ms. Glavin said in her statement something to the

15    effect of well, if Ms. Boylan had sued the Governor, then we

16    would be entitled to these 15 subpoenas or I don't -- I've

17    lost count, actually, because there are others that we don't

18    even know about.  That might be right.  But she didn't.

19         She decided -- she made allegations.  It had, of

20    course, a domino effect, and we all know what happened, and

21    she was dragged through the mud.  Her name -- I mean, even up

22    to this day in this courtroom in the papers she's labeled a

23    bully, a liar, an adulterer.  She wants to be done with it.

24    So if there are accommodations and agreements that the parties

25    could make, I couldn't agree with Your Honor more.  I think

Proceedings                                          62

1   that would be very welcome by all the victims, including my

2   client.

3           I know I went a little farther outside of what Your

4   Honor asked and it will go to the ultimate questions in our

5   motion to quash.

6           But -- so with respect -- I just want to get to the

7   last component of the very narrow question Your Honor just

8   posed to each of the complainants.  I actually don't know

9   exactly what the AG's Office has, what these interview memos

10  and the like are, so it's hard for me to say, and I suppose,

11  you know, we can meet and confer again and see if there's any

12  sense or understanding.

13          THE COURT:  The interview memos are sort of a third

14  tier of discovery from the Attorney General's Office, that

15  there will be any from the Attorney General's.

16          The first question is the unredacted transcript.  Do

17  you object to the release of the unredacted transcript?

18  Obviously, personal identifying would still remain redacted.

19  But to the extent there are redactions of other witness'

20  names, specific things -- I mean, I do understand what Ms.

21  Glavin is saying.  Occasionally, it is hard to follow the

22  transcript.  But by and large, they're not that heavily

23  redacted, in my view.

24          So the first question is transcript.

25          MS. PERRY:  We would certainly be willing to

Proceedings                                                63

1    consider that.  I can't say standing on my feet right now,

2    because I would have to consult with my client, I have to look

3    at the specific redactions.  But that's certainly something we

4    would be willing to consider.

5            Just to be very clear, Ms. Boylan stands by all of

6    her allegations.  She's not embarrassed by her allegations.

7    She's not worried that she's going to be made to look a liar

8    for having accused the Former Governor of harassment because

9    he did that.  So I think I would be very open to that

10   discussion, but I'm not in a position where I can commit to

11   that right here right now.

12           THE COURT:  Okay.  Thank you.

13           MS. GLAVIN:  Your Honor, if I might be heard on a

14   couple of the points with the subpoena.

15           THE COURT:  What about them?

16           MR. PARK:  With respect to the subpoenas, I just

17   want the Court to be aware.

18           THE COURT:  Which subpoenas?

19           MR. PARK:  The subpoena Ms. Perry referred to, Ms.

20   Boylan's college intern.

21           The subpoena was to Ms. Boylan's campaign director

22   of media relations.  And the reason we subpoenaed her is that

23   Ms. Boylan would dictate messages to this woman, I think her

24   name is Stephanie Parish, which that woman then communicated

25   to other complainants in the case.  We have several examples

Proceedings                                                    64

1    of that.

2          The reason we subpoenaed her is because we were not

3    getting -- Ms. Boylan was refusing to produce her

4    communications with others, with particular complainants

5    relating to the allegations.  And we knew from production by

6    another party that there were these messages.  I think the

7    director of media relations had access to Ms. Boylan's Twitter

8    account and she would communicate with others on it.  So you

9    would have a hi, it's Steph, here's a message from Lindsey,

10   boom, and there would be, you know, things she wanted, you

11   know, this person to know.  That's why we subpoenaed that

12   particular person.  It was once we saw that in documents we

13   got from others, we subpoenaed her, because we wanted to get

14   to those communications.

15         THE COURT:  And you subpoenaed that person for

16   communications?

17         MS. GLAVIN:  I actually can't even remember what the

18   subpoena was, but it was for documents.

19         And then with respect to Ms. Boylan, I want the

20   record to be clear, she's not a victim of sexual harassment.

21   The Governor --

22         THE COURT:  We're not trying the case today, Ms.

23   Glavin.

24         MS. GLAVIN:  But given the statement that was made,

25   I have to make clear what the Governor's position is, is that

Proceedings                                                        65

1    he never sexually harassed Lindsey Boylan, and that is one of

2    the reasons that we need to get discovery.

3                THE COURT:  Thank you.

4                MS. PERRY:  Your Honor, I never said -- I know this

5    is a bit of a sideshow at this point.

6                The, quote/unquote, director of media relations was

7    a college intern.  And they're saying they had to subpoena her

8    because Ms. Boylan wouldn't produce.  That is the subject of

9    this motion.

10               We did ask -- with respect to once we got wind that

11   they were continuing to issue this battery of subpoenas, we

12   asked the Court to direct the defendants to stop essentially

13   issuing or, at least, did not seek enforcement, and they've

14   just continued to do it.

15               So even though a resolution of these issues would

16   put to bed, you know, the scope of what they can do, they're

17   just continuing.  So hopefully we will be able to resolve them

18   and the barrage will stop.

19               THE COURT:  Well, the challenge that the Court has,

20   which I'm glad you see perhaps more clearly today based on the

21   conference with both sides, is that to the extent Ms. Boylan

22   will be called as a witness, if there's any truth to the

23   notion that she's involved in discussing with other

24   complainants what to say or discussions of the investigation

25   with other complainants, those will be ripe areas for

Proceedings                                                    66

1    cross-examination.

2              MS. PERRY:  Well, I do take issue with that and --

3              THE COURT:  I don't think that's disproportionate.

4              MS. PERRY:  Did Your Honor want to take that up now

5    or do you --

6              THE COURT:  Please.  You're here.

7              MS. PERRY:  So, again, we had agreed to some limited

8    production that would go directly to Ms. Boylan's allegations.

9    So I do think if they were willing to accept that and walk

10   away from those other categories that we have argued over and

11   over and strenuously as possible, that they are not

12   appropriate and they are disproportionate, then I think we can

13   have a conversation.  But the levels to which they're going to

14   impeach a non-party, has been found over and over in this

15   district to be too far.  She's a nonparty.

16             THE COURT:  This isn't just average impeachment of a

17   person who is like a bystander.

18             Mr. Licul is seeking to use these other victims and

19   complainants, as they are characterized in the papers, to

20   establish this hostile culture around Governor Cuomo.  That's

21   not a sort of minor third-party witness.

22             MS. PERRY:  But our point is that they then don't

23   have the right -- if Mr. Licul is going to press forward with

24   that theory, then they can cross-examine her about her

25   allegations and the voluminous public record that they have

Proceedings                                              67

1   and what she's willing to produce.

2          Do they get to ask about her sexual history and

3   about the reasons -- you know, about complaints that may have

4   been made about her allegedly at her place of work?  We think

5   that is too far.  So there are separate categories.  You know,

6   we can go through them.  We have tried to do that in our

7   papers.

8          THE COURT:  You have your papers on those issues,

9   for sure.

10          The challenge, again, is to the extent that the

11   argument is that she has taken the public position that she

12   left due to the harassment and that's not true.  Some of these

13   other categories are blurring into potential relevance for

14   impeachment purposes, aren't they?

15          MS. PERRY:  I agree.  I mean, there has been

16   discussions about boundaries here.  They are boiling the

17   ocean.  They are looking under every rock, and that is not

18   allowed under the law.  There is not precedent for what they

19   are doing here.  She is not a party.  She's not a plaintiff

20   here.  So, Ms. Glavin's statement, well, if she were, we could

21   do this, is not apropos here.  So what are the boundaries

22   obviously is the challenge for Your Honor, that is in front of

23   Your Honor.

24          I think they could ask about that and they could

25   seek documents that go directly to that.  But subpoenaing all

Proceedings                                          68

1    these additional third-parties for that really tests the

2    limits of what's allowed or goes well beyond those limits.

3              THE COURT:  Fair enough.  I understand your

4    argument.

5              I see Mr. Amer has arrived hopeful that his

6    conference will start at noon.  It will not, Mr. Amer.

7              MR. AMER:  I've been so advised.

8              THE COURT:  Ms. Glavin, one minute, and then I want

9    to go to Mr. Capezza, Ms. Cohen and the other --

10             MS. GLAVIN:  Sure.

11             One other point that I forgot to raise with Your

12   Honor with respect to Ms. Boylan, what we are interested in is

13   exploring the relationship with her superior at the Empire

14   State Development Corporation and we want that for three

15   reasons:  One is it goes to the circumstances of her leaving

16   her employment, because they were both brought in and

17   counseled on it.

18             The second reason that it becomes relevant is

19   because when Lindsey Boylan went public with her allegations,

20   including one about claiming falsely that the Governor asked

21   her to play strip poker on an airplane and there were three or

22   four other people present, Howard Zemsky was on some flights

23   where Ms. Boylan may have been on, Howard Zemsky signed on to

24   a public statement in February of 2021 disputing what Ms.

25   Boylan said.

Proceedings                                                69

1              The same day that that public statement went out,

2    Ms. Boylan, who had been in a sexual relationship with Mr.

3    Zemsky, sent him a text message on a self-deleting application

4    called Confide, where she said to him, I can't wait to destroy

5    your life, you shit-follower.  She made that relationship

6    relevant because she was threatening him as her allegations

7    were becoming public, when she was asking for an investigation

8    for not backing her up.  She threatened a witness in the case.

9    And he's not the only witnessed that she threatened.  There

10   were several others.

11             And one of the reasons why we need to explore these

12   is it goes to Lindsey Boylan's motive and intent in making

13   being the allegations.

14             Mr. Zemsky, after he got that threat, said oh, maybe

15   I heard something on the plane.  And the funny part about it

16   was Lindsey Boylan said she didn't even think he was on the

17   plane.

18             THE COURT:  Ms. Glavin, now I have to give Ms. Perry

19   one more minute, and then Ms. Perry, and then that is it on

20   this issue.

21             MS. PERRY:  I think Ms. Glavin has proven my point.

22   She is going down a rabbit hole trying to re-litigate --

23   essentially to litigate these issues, but my client is not a

24   party and doesn't have to litigate whether or not she had this

25   alleged sexual relationship with Howard Zemsky.  How does that

Proceedings                                                    70

1    relate to the issues of whether or not Trooper 1 --

2            THE COURT:  The more concerning question is whether

3    or not she threatened a witness, with all due respect, Ms.

4    Perry.  Can you address that?

5            MS. PERRY:  Of course our position is that she

6    didn't.  But this really -- again, we are talking about, you

7    know, if all of this is allowed in, if there are no limits and

8    if the parties cannot follow Your Honor's, you know,

9    suggestion, I'll call it, you know, that they try and set

10   some, then we go down this hole, you know -- I mean, I don't

11   know how many rabbit holes we're going to have to go down,

12   because every single witness is going to have to fight tooth

13   and nail about motivations, bias, impeachment.

14           As Your Honor noted, you know, college records are

15   being sought, my client's phone records, which are different

16   than the phone records that have been discussed, because they

17   have nothing to do, you know, with anything other than they

18   just want to know who she's talking to and when.  That is just

19   way too far.

20           Our main argument, we don't think this is relevant.

21   We've made that very clear.  But this is so disproportionate.

22   And, then, of course, we have talked about the burden and

23   harassment, you know, all those other considerations under

24   Rule 45.  But under Rule 26, it was not relevant, and Mr.

25   Cuomo's counsel has said that.  They don't think any of these

1    allegations are relevant.  They're trying to, you know, turn

2    all of this whole process on its head.  And so that's the

3    issue.

4              THE COURT:  They would like them to be precluded,

5    but because of the plaintiff's determination of how to plead

6    this case and Mr. Licul's presentation this morning, I think

7    it's very clear to you why they are seeking discovery.

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                                72

1    (Continuing.)

2            MS. PERRY:  I do understand and that's the problem.

3    And, you know, we have had conversations with Mr. Licul about

4    that.  We understand, you know, maybe there will be

5    conversations between the parties, maybe there can be some

6    narrowing.  But we certainly understand that for now, all of

7    this, as much as it may hurt all of these complainants is

8    being kept in the case.

9            And so, we do still think a lot of it is not

10   relevant to Trooper 1 proving her allegation.  My client never

11   met her, never talked to her, does not even know her identity.

12   So how she can, she who worked in a very different workplace,

13   you know, could possibly -- her allegations could really speak

14   to Trooper 1's allegations are beyond me.

15           But again, Your Honor, the proportionality one where

16   if the parties cannot agree on what the limits are, we would

17   ask that extremely reasonable ones that does not, you know,

18   put my client back in this very, very dark place that she had

19   to live in when she was being dragged through the mud the

20   first time around.

21           THE COURT:  I appreciate your comments.  Thank you.

22           All right, Mr. Capezza.  Thank you.

23           MR. CAPEZZA:  Your Honor, thank you for the

24   opportunity to address the Court.  I represent State Entity

25   Employee Number 2.

*Proceedings*                                                        73

1          To get very clear to the point, she wants nothing to

2    do with this, never asked for this, never asked to be included

3    in a Complaint.

4          She served her state in the Department of Health

5    during the pandemic.  In and of itself, that would be an

6    exhausting experience.  When you couple that with the

7    allegations that are memorialized in 200 pages of testimony

8    that's publicly available, the experience for her was

9    traumatizing.

10          She left public service to go home, frankly, to

11   heal, and she wants no part of this to be brought in.

12          That said, to the extent that the Court wants to

13   know if we would agree to release the transcript unredacted,

14   we will, provided that it doesn't get into any personal

15   information about her, her family, or her friends.  Having sat

16   through that interview, I don't believe much has been

17   redacted, maybe just for personal references only.

18          It's important to note she's not only not party in

19   this case, she's not a party in any case.  She never sued.

20   She never brought suit.  She has no factual overlap with any

21   of the other victims as they relate to their victim

22   experiences.  She has no factual overlap with any of the

23   allegations as they relate to Trooper 1, doesn't know

24   Trooper 1.  She's a standalone who worked in the Department of

25   Health, had an experience with the Governor on one day during

*Proceedings*                                                    74

1    a press conference, before and during that press conference.

2    That's what she testified to.  And the Court -- if the Court

3    wants to release the unredacted report, I'm fine with that,

4    provided it doesn't make reference to conversations with her

5    husband or her friends, the personal aspects of which have

6    nothing to do with the events of Trooper 1.

7            We provided no documents to the parties because,

8    frankly, we weren't asked for documents.  And I hesitate to

9    say that because I don't want to be served with a subpoena for

10   documents, but the fact is that she was served with two

11   subpoenas and to use the word retraumatized, that's exactly

12   what it is.

13           She went back.  She went home.  She went home to

14   heal.  And for the last few years everything was fine, but

15   then all of a sudden this starts up.  And she didn't ask to be

16   included in that Complaint.  She's named in one paragraph in

17   that Complaint, nothing else.  It seems to memorialize what's

18   already been said by way of her public testimony.

19           She has nothing to add to Trooper 1.  She doesn't

20   know Trooper 1.  She doesn't know any of the other victims or

21   their experiences.  And so to be dragged into this is not

22   proportional to anything and it retraumatizes her.

23           If there are any other questions the Court has, I am

24   happy to answer them.

25           THE COURT:  Thank you very much.  I appreciate your

*Proceedings*                                                                75

1    remarks.

2              Ms. Cohen, would you like to be heard on behalf of

3    Ms. Hinton?

4              MS. COHEN:  Yes.  Thank you, Your Honor.

5              So, Ms. Hinton, unlike some of the other

6    complainants, did not -- was not in the work environment for

7    the State.  She was not in the perimeter around the Governor

8    in the workplace.  She worked for the Governor thirty years

9    ago when he was at HUD.  She was subpoenaed for documents and

10   testimony related to, purportedly, her support of other women

11   who came forward with what they endured, in terms of sexual

12   harassment by defendant Cuomo.  She was publicly outspoken in

13   her support of those women.  She came forward publicly and

14   there was a newspaper article in <u>The Washington Post</u> that she

15   had been touched by defendant Cuomo when she worked for him

16   thirty years ago in the federal government.

17             But as to Trooper 1's allegations, she doesn't know

18   Trooper 1.  She doesn't know anything about the facts or

19   circumstances surrounding those allegations.  She never met

20   Trooper 1.  She never communicated to Trooper 1.

21             Nevertheless, Ms. Hinton did comply with the

22   document subpoena on her, at least in relevant part, in that

23   we have produced about a hundred pages of documents to

24   defendant Cuomo, which we understand has been shared with the

25   other defendants in this case.

*Proceedings*                                                                76

1          She produced 50 pages of documents related to

2     Ms. Boylan, which consists primarily of texts and words of

3     support about Ms. Boylan's allegations, as well as help that

4     Ms. Hinton provided to Ms. Boylan in her job search because

5     she was unable to get any employment after she came forth

6     publicly.

7          Ms. Hinton produced more than thirty pages of

8     documents related to Ms. Bennett.  Again, words of

9     encouragement to Ms. Bennett when Ms. Bennett came forward

10    with her allegations against defendant Cuomo, and also helped

11    with Ms. Bennett's job search.

12         A few pages of communications with Ms. Liss of the

13    same nature, and she produced calendar entries showing her

14    appointment to speak with investigators for the Attorney

15    General's report.

16         There are no other documents that are even arguably

17    relevant.  Nevertheless, the subpoena had called for all

18    documents related to Ms. Hinton's conversation with the press,

19    all documents related to drafts of a book she wrote, and other

20    documents that have no relevance to the purported reason for

21    the subpoena, which is to the extent the three complainants,

22    Ms. Boylan, Ms. Bennett and Ms. Liss, spoke to Ms. Hinton

23    about their allegations and said something different to

24    Ms. Hinton than that they would -- what they would testify

25    about in the hypothetical situation where they were allowed to

*Proceedings*                                                          77

1    be called as witnesses in Trooper 1's trial, that then

2    Ms. Hinton could be called as a witness to impeach the

3    credibility of those two women.

4         Ms. Hinton is a nonparty here.  There is really

5    nothing more Ms. Hinton can provide.  We tried to be -- we

6    tried to provide the documents we thought were tangentially

7    and arguably relevant.  We produced those.  Those documents

8    were way beyond what was produced to the Attorney General's

9    office.

10        I did not represent Ms. Hinton when she went and

11   spoke with the investigator with the Attorney General's

12   office.  I don't believe she produced any documents to the

13   Attorney General, but if there are such documents, I, at

14   least, have not seen them and Ms. Hinton no longer possesses

15   them.

16        To answer Your Honor's questions, we have nothing

17   more that we are willing to produce as even potentially

18   relevant to this litigation.

19        We were also subpoenaed for a deposition, which

20   given the review of the documents we did produce, there is

21   absolutely no relevance and no reason to be taking

22   Ms. Hinton's deposition, other than to continue to harass

23   Ms. Hinton who has been a publicly outspoken supporter of

24   women who have come forward with Mr. Cuomo's behavior toward

25   them, as well as the incident that she has publicly disclosed

*Proceedings*                                                                      78

1    against her that occurred, again, thirty years ago.

2          To the last part of Your Honor's question, would we

3    agree to the public release of whatever information Ms. Hinton

4    provided to the Attorney General, as well as how an unredacted

5    or less redacted portion of her interview with the Attorney

6    General's office, subject to discussing it with my client and

7    being able to review it myself, we would consider that.

8          I would also say that as to the witnesses named in

9    the 26(a) disclosure, Ms. Hinton is not individually one of

10   those witnesses.  She is only there by -- her name is not

11   there in the 26(a) disclosures, other than number 18, which

12   the plaintiff referred to all witnesses named or interviewed

13   by the Attorney General, and Ms. Hinton was interviewed by the

14   Attorney General.

15          THE COURT:  Thank you very much, Ms. Cohen.

16          MS. COHEN:  Thank you.

17          THE COURT:  Ms. Wang, would you like to be hard?

18          MS. WANG:  Yes.  Thank you, Your Honor.

19          As I said earlier, I represent Ms. Virginia

20   Limmiatis and Alyssa McGrath.

21          Ms. Limmiatis had a single incident of harassment by

22   then Governor Cuomo in May 2017.  Ms. McGrath worked actually

23   for the executive office, but the then Governor pulled her and

24   others in because of what they looked like and because they're

25   women to work closely with him, and in that regard between

*Proceedings*                                                                    79

1   2018 and approximately early 2020 experienced some of the

2   sexual harassment that has been written about and is

3   documented in the AG report.

4            Both are full-time working individuals.  One is a

5   single mother of a small child.  They have not brought

6   lawsuits.  They are not parties to any lawsuits.  They are

7   nonparties with few resources and very limited time.  Both

8   testified in the AG matter, and their depositions are actually

9   in the public domain on the public website of the AG.

10           We have tried to work with defendants and we

11  received first document and deposition subpoenas, I believe

12  back in April, and we produced hundreds of pages of documents.

13  We produced everything that we gave to the AG.  And I believe

14  we gave a bit more than that, in fact.  And to the extent that

15  there was more being sought, we have tried to confer

16  repeatedly with defense counsel on those issues.

17  Specifically, with respect to the lack of boundaries that are

18  being drawn, the types of requests that are being asked, which

19  we're always being told is relevant, but then when we ask why

20  it's relevant, ti's simply, the answer is:  Well, you were in

21  the Complaint, that's why it's relevant.  For example, all --

22  any and all communications ever about any allegation against

23  the Governor or anything about the AG has to be produced,

24  which would mean looking through thousands of texts for

25  amorphous and unclear terms to see whether somebody sought out

*Proceedings*                                                                80

1   Virginia Limmiatis and expressed support for her.  You know,

2   anything at all about these allegations.

3          I just want to point out that at some point in the

4   summer of 2021, Ms. Glavin held press conferences speaking at

5   length disparaging both of my clients.  Ms. Limmiatis, showing

6   pictures of Ms. Limmiatis smiling or discussing Ms. McGrath

7   and her then ex-husband or her soon-to-be ex-husband.  They

8   were in the middle of a divorce.  Ms. Glavin held press

9   conferences disparaging my clients.

10         So, in theory, I believe what defendants would be

11  seeking is if somebody sent a text to Ms. Limmiatis saying:

12  Do you see what they're doing to you?  And she said:  Oh, my

13  God.  We would have to go and look for those texts,

14  presumably, and produce them.  Those are the types of things

15  that they're asking for.  They want us to look through all of

16  their texts for anything regarding Mr. Cuomo or the AG,

17  regardless of whether it has anything to do with their

18  credibility or not, and there is no limitation on that at all.

19         We don't -- we didn't have a problem producing those

20  documents and even looking in the limited fashion for

21  additional documents, but that's not -- there's been no limit

22  to additional requests on documents for Ms. Limmiatis or

23  Ms. McGrath.  And, in fact, after having two meet-and-confers

24  with defense counsel, they've even gone backwards on some of

25  the limitations.  In the first meet-and-confer in July, there

*Proceedings*                                                                                  81

1    seemed to be an indication that they really just wanted

2    substantive conversations about the allegations.  Later on,

3    they said that no, we want everything, any -- any

4    communication, even if some stranger or a fourth grade -- a

5    fourth-grade classmate said Thank you for coming forward,

6    we -- we want you to look for those and find out if they're --

7    if they're substantive.

8             That's just not proportionate to a nonparty.  We

9    shouldn't have to look through thousands of texts.

10            Ms. Glavin has said that Ms. McGrath is in a

11   different place because her position in the Governor's office

12   at some point was in a position of being able to see more of

13   the working environment, which is true.  But, for instance, in

14   that scenario, what the -- what the discovery that's being

15   sought from Ms. McGrath is really about Ms. Commisso, who is

16   another nonparty, Brittany Commisso.  Brittany Commisso and

17   Alyssa McGrath were extraordinarily close friends who talked

18   about everything all the time, and very little about the

19   Governor, in fact; much more just about being best friends.

20   And in this -- because of their relationship, Ms. Glavin is

21   now seeking things like all photographs that Ms. McGrath took

22   of her birthday party on March 6th, 2021, because, apparently,

23   the birthday photos of Ms. McGrath are relevant to see, I

24   don't know what.  Nothing happened there about -- allegedly,

25   Ms. Commisso may have spoken to somebody about what Mr. Cuomo

*Proceedings*                                                                82

1    did to her when she was away from the party, but Ms. Glavin

2    wants every photo from that evening.

3         This is -- this is the definition of a fishing

4    expedition and of harassment.  It has nothing to do with

5    Trooper 1 at this point.  It doesn't even, in my view, have

6    anything to do with credibility of Ms. McGrath.  It is just

7    harassing a nonparty, who is a working single mom, who is

8    trying to get on with her life and not to have to think about

9    the defendant anymore.

10        With respect to your specific questions, I believe

11   there wouldn't be a problem with respect to redactions.  I

12   would just ask the same courtesy as everyone else, which is I

13   just need to be reminded of what they are before I agree and

14   to talk to my client.  But I don't think there would be any

15   problem with that.

16        And I presume they would be subject to the

17   protective order in this case, to the extent there's any

18   private issue or private information.

19        I do want to just add one other thing with respect

20   to the depositions.

21        Ms. Glavin indicated that she would depose -- she

22   would agree to depose Ms. Limmiatis for, quote, only four

23   hours, but that Ms. McGrath has to be the full seven hours.

24   And that Ms. Limmiatis could be done by Zoom, but Ms. McGrath

25   has to be done in person.

*Proceedings*                                                          83

1          Once again, even for -- even for Ms. Limmiatis to be

2    subjected to four hours of deposition testimony for a single

3    incident from May 2017 is not reasonable.  I mean there's

4    plenty of caselaw, you know, indicating that proportionality

5    for a single incident in 2017, that shouldn't even be four

6    hours.  But then on top of it, if you're willing to take her

7    deposition in a limited fashion by Zoom, why can't you take

8    another -- the other nonparty's witness testimony by Zoom and

9    why can't you also, likewise, limit it, limit it to a specific

10   number of hours.  It's just, it's just too much.

11         And then on top of it, after all of these

12   meet-and-confers, we have then gotten more deposition -- more

13   subpoenas from the other nonparties.  So, which we have just

14   received and we have to start looking at as well.

15         So, we ask that Your Honor please place limits on

16   this, on this fishing expedition really.

17         Thank you.

18         THE COURT:  Appreciate that, thank you very much.

19         Mr. Eisenberg on behalf of Ms. Bennett.

20         Do you represent her in the Southern District case

21   as well, sir?

22         MR. EISENBERG:  Yes, we do.

23         THE COURT:  Okay.  Thank you.

24         A couple of questions for you that are different

25   than the other parties, given that there is an S.D.N.Y. case

*Proceedings*                                                                    84

1    pending as to her.

2            What is your view on the question that I raised

3    prior to defendants as to whether or not the discovery

4    disputes pertaining to Ms. Bennett could be sort of resolved

5    in the Southern District case?

6            Do we need to resolve them separately here?

7            And also, is there a protective order in that case

8    or can the information be used in both cases?

9            What is the State of play, from your perspective, on

10   behalf of Ms. Bennett with regard to those questions?

11           MR. EISENBERG:  First, let me thank the Court for

12   its sensitivity to the potential conflicting rulings in both

13   matters.

14           There is presently a protective order in place that

15   is being renegotiated.  We actually have a meet-and-confer

16   this Thursday regarding some of the alterations or edits to

17   the protective order.

18           As far as whether that protective order would adhere

19   to what happens in this court, I can't tell this Court what to

20   do, but it is imperative that my client's confidentiality and

21   designated confidential documentation be maintained.  And we

22   would ask that the protective order that we eventually enter

23   into, in addition to the one that's already so ordered by

24   Judge Broderick, be adhered to.

25           With regard to the discovery disputes, our case

*Proceedings*                                                    85

1   isn't as old as this one.  So, we are earlier in the process,

2   though, we are -- we have served discovery and we have

3   received discovery requests.  We have filed or tendered

4   objections from both sides.  We are in the process of trying

5   to get documents served and move things along.

6           And I, too, have not yelled at Ms. Glavin.

7           And, you know, we're just trying to make the things

8   work.  We are particularly concerned that doing discovery in

9   this Trooper 1 matter will have an adverse impact on our

10  ability to do things smoothly, efficiently, in our own case.

11  And we would ask the sensitivity to potential conflicting

12  rulings be maintained.

13          With regard to the status of the protective order

14  here and any documentation that is tendered, I have not

15  honestly seen the protective order here, but we are concerned

16  about the use of documents in this case.

17          Surely, we will be eminently reasonable if things

18  make sense to be utilized in this case by either Ms. Glavin or

19  Governor Cuomo's counsel and Trooper 1's counsel.  We will

20  work with them to make things work, but there are certain

21  things in this case that make no sense to us.

22          Like many of the others, my client doesn't know

23  Trooper 1, didn't interact with Trooper 1, didn't observe any

24  of the allegations with regard to Trooper 1.  And in her

25  listing of witnesses with information, it is notable that her

*Proceedings*                                                    86

1   information is specifically related to her experiences, not

2   Trooper 1's.

3          With regard to the -- Mr. Licul made some reference

4   as to why Ms. DeRosa and Ms. Bennett -- other parties are

5   named as parties here.  My client has nothing whatsoever to do

6   with them, and she shouldn't be burdened with a deposition and

7   document requests by Ms. DeRosa and Mr. Azzopardi's counsel.

8          When asked:  Aren't you going to depose her?  As

9   Ms. DeRosa is a named defendant in our Southern District case,

10  the response was:  I'm not her counsel in that case.  But it

11  is not counsel that governs, it is the client.  And, of

12  course, Ms. DeRosa will depose Ms. Bennett in our Southern

13  District case, as we will depose Ms. DeRosa.

14         With regard to the Hamilton College frolic and

15  detour.  We feel strongly that that is nothing but a frolic

16  and detour.  It really is inapposite, certainly has no role

17  whatsoever in Trooper 1's case.  We think it has limited role

18  in our own case.  We are in the process of trying to work out

19  parameters of a protective order that would govern the receipt

20  of documentation that is provided by Hamilton College, if any.

21  And that is something that is on the table.  As I said, we'll

22  be speaking about that later this week.  We think Hamilton

23  College has no role whatsoever to play in the case in the

24  Eastern District.

25         THE COURT:  So --

*Proceedings*                                                                 87

1      MR. EISENBERG:  If the Court has any other

2  questions, I'm happy to answer them.

3      THE COURT:  So, the questions I had for all include

4  your position on disclosure of unredacted transcripts from the

5  AG's Office and/or interview memos and notes.  Not previewing

6  any ruling, Mr. Eisenberg, I just asked everybody that

7  question to set the table for your conference.

8      MR. EISENBERG:  With regard to the unredacted

9  testimony, I don't think we have a problem with it.  I'd love

10 to see it before we agree.

11     With regard to interview notes, similarly an

12 opportunity to review those documents would inform our ability

13 to answer the question certainly speaking to our client would

14 do so as well.

15     In principle, I don't think we have a problem with

16 it, presuming that these items are, again, subject to a

17 protective order.  We are concerned that our client will be

18 publicly shamed and -- and her allegations will be discredited

19 in press conferences, as they have been previously, we want to

20 minimize the harm to her.

21     THE COURT:  Thank you very much.

22     MR. EISENBERG:  Thank you.

23     THE COURT:  Mr. Najmi.

24     MR. NAJMI:  Yes, thank you.  Thank you, Your Honor.

25     I represent Alessandra Biaggi, who, as you know,

*Proceedings*                                                                    88

1    Your Honor, was a state senator from 2019 to 2022.

2              She received a subpoena from Governor Cuomo's

3    attorneys.  And what's interesting is my client is separate

4    and apart from -- can be distinguished from all the other

5    third-party -- the nonparty witnesses, in that she's never

6    made an allegation of sexual harassment against the Governor.

7    She stated that publicly.  And she's not mentioned in the

8    plaintiff's Complaint at all.  And so, there is certainly a

9    glaring relevance issue there that -- with respect to the

10   subpoena on Ms. Biaggi.

11             We did have two meet-and-confers with defendant

12   Cuomo's counsel.  I also did not yell at anybody.

13             We stated that with respect to the time periods in

14   which she's a senator, you know, if any communications are

15   with respect to the legislative privilege, in that they're

16   communicating to her really because she's a state senator.

17   She is an outspoken advocate for women when she was in the

18   chamber for workplace issues.  In fact, after this entire

19   incident with the Governor, she voted on a legislative package

20   that included reforms to workplace harassment issues and --

21   and workplace issues that came out of this entire thing.  And

22   she -- and we are citing that privilege.

23             We did respond to the subpoena by giving written

24   objections to defendant Cuomo's counsel.  And we are citing

25   the legislative privilege for the entire time that she is a

*Proceedings*                                                    89

1    senator.  And, Your Honor, with respect to -- you know, so we

2    have not handed over any documents or correspondences.

3            And with respect to the AG's interview notes -- our

4    client was, in fact, interviewed by the AG -- we would want to

5    review those materials and discuss it with our client.

6            One of the questions that we had, Your Honor, was,

7    you know, we -- we would anticipate to file a motion to quash.

8    We, obviously, didn't want to do it before this conference.

9    Part of that motion would include relevance arguments that are

10   already the subject, identical arguments that are subject to

11   motions that are already pending before the Court.  So we

12   would want to know whether it would be prudent for us to wait

13   until those are resolved.  And I did see that other counsel

14   did seek leave from Your Honor to file a motion to quash, but

15   I don't know that that's part of the rules.

16           THE COURT:  So, most people have just been filing

17   motions with no pre-motion conference letter of any kind.  And

18   I haven't sort of brought down the hammer on anybody because

19   we are dealing with a lot of third-parties.  These issues are

20   fraught.

21           And I am sensitive to everybody's interest in being

22   heard without requiring third-parties, in particular, to jump

23   through a bunch of procedural hoops.  So, to the extent I

24   haven't been like:  You did not get permission to file this

25   motion; there are reasons that I have been, basically,

*Proceedings*                                                              90

1    privately waiving my personal rules.

2              So, with regard to the legislative privilege issues

3    that you mentioned, Mr. Najmi, as I am sure you are aware, the

4    Court previously had an occasion to address legislative

5    privilege in this very case.  And, of course, the legislative

6    privilege is not an absolute privilege as interpreted in the

7    federal courts for state legislators.

8              So, to the extent your position is that some of the

9    messages or reach out that she received from persons who felt

10   affected by the Governor's actions was part of her information

11   gathering in furtherance of legislative efforts, I understand

12   there may well be a privilege that attaches.

13             If, however, she's also engaged in constituent

14   services discussing what happened with people in a more

15   constituent-related capacity, it may not be covered.

16             And this is going to be a very fact, it would be a

17   very fact-intensive analysis potentially.  So, if you are

18   asserting legislative privilege, you will, of course, need to

19   provide a detailed privilege log --

20             MR. NAJMI:  Yes.

21             THE COURT:  -- not a categorical one --

22             MR. NAJMI:  Okay.

23             THE COURT:  -- to Governor Cuomo's people in an

24   effort to meet and confer and meaningfully narrow those

25   issues.

*Proceedings*                                                               91

1          You guys have small benefit, in that I previously

2    had to review the legislative privileges of applicability in

3    this very case, but the Assembly Judiciary Committee is very

4    differently situated than an individual legislator in terms of

5    what they were seeking in the context of that subpoena being

6    very different than an individual legislator's actions that

7    may or may not be covered in full.

8          So, a detailed non-categorical privileged log would

9    need to be prepared.  And I don't want to volunteer it because

10   I want the parties to try to work it out as much as possible,

11   but it could come to privilege review, which is, of course, a

12   very, very cumbersome and slow process that, again, no one

13   wants to deal with.

14         So, I encourage you to meet-and-confer -- and I am

15   stressing this to Governor Cuomo's people as well -- be

16   reasonable in terms of what you are seeking from Ms. Biaggi.

17   If she is, in fact, gathering information in furtherance of

18   legislation, you know what the outcome is going to be and you

19   can save yourselves hundreds of pages of briefing.

20         MS. GLAVIN:  Yes.

21         THE COURT:  All right.

22         MS. GLAVIN:  Judge, just on that one point.

23         One thing that I do think is relevant is that

24   Ms. Biaggi worked in the executive chamber for Governor Cuomo

25   in 2019.  And that is the reason that the Attorney General's

*Proceedings*                                                                 92

1    office interviewed her to discuss her experience there.  And

2    she also overlapped and worked during the same time as

3    Kaitlin, whose last name I am not allowed to use.  I object to

4    that.  As well as Lindsey Boylan.  And they contacted, as we

5    understand it, Ms. Biaggi to talk with her about her

6    experiences and whether she'd come forward.

7              And, in fact, Ms. Biaggi gave an interview to a

8    publication in which Ms. Boylan and Kaitlin also gave

9    interviews.  And so, to the extent she knows them, was

10   communicating with them about their experiences, which has

11   nothing to do, to the extent she worked with them and was

12   discussing with them coming forward and herself coming

13   forward, she was interviewed not as a legislator, but as a

14   witness.

15             THE COURT:  I understand.

16             So, Mr. Najmi, additional points for your discussion

17   with Governor Cuomo in terms of the meet-and-confer.

18             If she was, in fact, having discussions with regard

19   to positioning for press purposes, how to present information

20   in a way that could be, I am just taking Devil's advocate

21   here, detrimental to Governor Cuomo and is counseling -- they

22   are counseling each other on what they are going to say, it

23   could be that that information is arguably relevant.  It might

24   be disproportionate -- and I am looking at you, Ms. Glavin --

25   but it certainly may be relevant.

*Proceedings*                                                         93

1          So, please, be very granular in your analysis of

2   what information Ms. Biaggi may have in your conversation with

3   Mr. Cuomo.

4          MR. NAJMI:  Your Honor, I just have one correction.

5          She worked in the, Ms. Biaggi worked in the

6   executive chamber not in 2019.  She was a state senator in

7   2019.

8          MS. GLAVIN:  2017.

9          MR. NAJMI:  She worked in 2017 up until middle of

10  2018 before she left to run her campaign.

11         THE COURT:  Thank you.

12         MR. NAJMI:  I understand everything you said, Your

13  Honor, and we will confer further with defendant's counsel.

14         THE COURT:  Thank you very much.  I appreciate it.

15         All right, and I believe we have Ms. Salzman as

16  well.

17         MS. SALZMAN:  Thank you, Your Honor.

18         Thank you, Your Honor.  As mentioned, we represent

19  nonparty Kaitlin.  And Kaitlin is also not a plaintiff in this

20  or in any case.  She also chose not to sue.

21         She worked in the executive chamber for one year

22  from 2017 to early 2018.  During that period of time

23  Trooper 1, it is our understanding, was not employed in the

24  PSU.  Certainly, Kaitlin did not know Trooper 1, has never

25  communicated with her and has never communicated about her.

*Proceedings*                                                    94

1            In 2018 Kaitlin left the executive chamber.  Over

2    three years later, in 2021, she was subpoenaed by the Attorney

3    General to provide documents relevant to their investigation

4    into the now former Governor.  She complied.  We produced

5    almost 250 pages of documents to the Attorney General.

6            And to answer your first question, Your Honor, every

7    single one of those pages has been turned over to the defense

8    in this case for many months now.

9            Two-and-a-half years later, now, in 2023, the

10   defense has subpoenaed her in this case.  There is no

11   allegation by the Attorney General's office, or by the

12   defendants in this case, that Kaitlin's production to the

13   Office of the Attorney General was in any way incomplete.  I

14   heard some specific examples from Ms. Glavin today about other

15   nonparties, that their production to the OAG had gaps or holes

16   in it.

17           I have asked Ms. Glavin repeatedly:  Are you saying

18   that Kaitlin's production to the AG, and now to you, is

19   incomplete in some way?  Point me to those gaps.  Maybe we can

20   fill them.  That is what a meet-and-confer is supposed to be

21   about.  Not a single gap or hole was identified.

22           Instead, what Ms. Glavin told me they were focused

23   on was:  What happened after your production to the AG's

24   Office in May 2021?  Were there documents that post date

25   May 2021, which Kaitlin received or exchanged with others that

*Proceedings*                                                                 95

1    might be relevant to the Trooper 1 case?

2            Okay.  That, again, is something I think we can

3    meet-and-confer about.  And we did meet-and-confer with them,

4    Your Honor.  I had the same thinking that Your Honor

5    suggested, let's start with the OAG production and then point

6    me, Defense Counsel, to some specific examples of what else

7    Kaitlin might have that would be relevant and proportionate to

8    the Trooper 1 case.

9            But again and again, over the course of more than

10   half a dozen meet-and-confers, Your Honor, for a nonparty who

11   does not have any resources to be engaged in this process,

12   again and again I was met with defense counsel saying things

13   like:  You must comply with the subpoena as drafted.  Your

14   client has relevant discovery to the claims and allegations in

15   this case.  Boilerplate, in other words.

16           Finally, in August, in our penultimate

17   meet-and-confer with Ms. Glavin, she said:  Well, what we're

18   really interested in is communications between Kaitlin and the

19   other AG complainants after May 2021.

20           Finally, I said, this is something concrete we can

21   go and look for.

22           Like Ms. Wang explained, my client, because she was

23   named in the OAG report, received a lot of text messages and

24   outreach from friends and family when that report became

25   public and garnered a lot of public attention of people

*Proceedings*                                                                96

1    reaching out to her like:  Oh, my God, I'm so sad to hear what

2    happened to you.  Are you okay?  How are you coping?  How have

3    things been?

4          Trolling through all of that is incredibly

5    burdensome and disproportionate to the needs of the case.  And

6    Ms. Glavin acknowledged that.  She said:  We don't want that

7    kind of communication, we want communications between Kaitlin

8    and Lindsey Boylan, Charlotte Bennett, and the other

9    complainants in the AG report.

10         The very same day I responded to Ms. Glavin that

11   Kaitlin has no such communications after May 2021, except some

12   text messages with Lindsey Boylan.  And I am aware from the

13   docket in this case that Ms. Boylan has made a motion to quash

14   and it was already pending in August.

15         So I said to Ms. Glavin:  I can't backdoor around a

16   pending motion to quash and a forthcoming ruling from the

17   Court.  If Your Honor says Ms. Boylan's motion to quash is

18   granted, you can't get those communications from Kaitlin.  If

19   Your Honor says that the motion to quash is denied and those

20   communications are discoverable, we will produce them.

21         But beyond communications with other AG

22   complainants, the defense in this case has never been able to

23   identify with any granularity, with any specificity, what else

24   they could possibly want from Kaitlin.  And that continues to

25   this very day.  And each time we tried to use a

*Proceedings*                                                    97

1    meet-and-confer to narrow the scope of the subpoena, to

2    understand what they were really looking for, to try to

3    address it, they would renege on what they said in the

4    meet-and-confer.

5          So, Ms. Glavin wrote me an e-mail on August 17th.

6    She wrote it to me saying:  What we want before your client's

7    deposition are her communications with the other complainants.

8          Once I said:  We have nothing, except these messages

9    with Ms. Boylan, suddenly that was no longer the agreement,

10   they wanted more.  But, again, no specificity as to what.

11         So what have we given?  Everything we gave the AG.

12         What are would he prepared to give?  What they've

13   asked for.  Communications with the other complainants that we

14   have, which is only Ms. Boylan, once the Court has ruled on

15   Ms. Boylan's motion to quash.  We have nothing else that is

16   relevant, much less proportionate to the allegations in this

17   case.

18         In terms of Your Honor's -- and I should mention one

19   other thing, Your Honor.

20         After all these many meet-and-confers with us, I

21   learn on the same day that Ms. Glavin tells me all she wants

22   is communications between us and the other AG complainants, on

23   that same day I learn that she has subpoenaed Verizon for

24   three-and-a-half years of my client's phone records and all

25   her account information.  I asked Ms. Glavin in writing, this

*Proceedings*                                                              98

1    is Exhibit 11 to her declaration:  How could that possibly be

2    relevant and proportionate to the Trooper 1 case?  There's not

3    a single allegation in this case that my client's phone

4    records have anything to do with anything.

5           She said, boilerplate again:  They're relevant to

6    the claims and allegations in this case.

7           Not once in over half a dozen meet-and-confers did

8    the defense in this case tell me:  We need phone records

9    because there was this call made on this date and we're

10   entitled to know if it happened or not.  Right.  Had that

11   happened, we could have taken that under advisement, gone and

12   looked at the phone records, produced some redacted phone

13   records if that was truly an issue in this case.  They never

14   mentioned phone records to me once, much less given me an

15   opportunity to consider are there actually phone records we

16   have that might be relevant and proportionate to this case.

17          So, again, that subpoena, Your Honor,

18   three-and-a-half years of a nonparty's cell phone records when

19   they can't tell me a single phone call is relevant and

20   proportionate to there case, it's been unlike any

21   meet-and-confer process I have ever seen, as a plaintiff, as a

22   defendant or as a nonparty.

23          So, that subpoena, in our view, Your Honor, should

24   be quashed.  And that is the subject of motion practice that

25   is going on now between us and Governor Cuomo, and we are sort

*Proceedings*                                                                    99

1    of in the midst of that briefing.

2              In terms of Your Honor's question about releasing

3    the OAG interview memos.  I have not seen those.  We do not

4    have them.  I don't know what they contain.

5              In terms of Kaitlin's deposition transcript, which,

6    of course, the Governor has, there the redactions are two

7    kinds, Your Honor.

8              The first is what Your Honor alluded to, the names

9    of other witnesses.  And there we have no objection to

10   removing the redactions from the names of other state

11   employees.  I don't represent those employees.  I don't

12   represent the Office of the Attorney General.  They may have a

13   different view, but from our perspective that's not the

14   sensitive or confidential matter for Kaitlin.

15             What is confidential, however, are the other set of

16   redactions in the AG's deposition.  And those consist of

17   redactions to Kaitlin's full name, which we have never made

18   public.  The only person who has ever publicized that is

19   defendant Cuomo, himself.

20             And second, other personal information about her.

21   Her work history before she worked for Governor Cuomo; a

22   personal matter between her and a romantic partner in her past

23   that came up when she was asked to explain what she thought

24   sexual harassment was; things like that, which are extremely

25   personal, extremely sensitive, and have no relevance to a

*Proceedings*                                                    100

1  hostile work environment while working for Governor Cuomo.

2  Those redactions we do believe should remain in place.  And we

3  would certainly want the protections of the confidentiality

4  order in this case to remain in place and continue to protect

5  Kaitlin's name, unless and until the defense makes a motion,

6  as they are entitled to do, under the confidentiality order,

7  to lift that designation.  In which case, we'll respond.  And

8  we can tee that issue up for Your Honor.  But as of now, her

9  name and her identifying information is confidential under the

10 confidentiality order.

11             THE COURT:  Agreed.

12             So, thank you for that.

13             MS. GLAVIN:  May I just be heard briefly?

14             THE COURT:  Ms. Glavin, it is 12:30.  Mr. Amer is

15 here.  I do not have the bulk of the afternoon available for

16 this case.  So, I do need to turn to some other matters.

17             How much time are you seeking?

18             MS. GLAVIN:  One minute.

19             THE COURT:  Okay.

20             MS. GLAVIN:  Your Honor, with respect to Kaitlin's

21 counsel's recitation of the meet-and-confers, I couldn't

22 disagree more about what happened.  We have our reply papers

23 due on the motion, and we will layout the recitation.  For

24 each of those calls, I had witnesses on those calls.  We

25 couldn't even get them to agree to provide to us what they

1    produced to the AG.

2            With respect --

3            THE COURT:  Are you saying you don't have it?

4            MS. GLAVIN:  We now do.  But after the first two

5    meet-and-confers, no, they wouldn't even give --

6            THE COURT:  But you now have what was produced to

7    the AG?

8            MS. GLAVIN:  To the AG.

9            Secondly, with respect to the claim that there was

10   any reneging, there wasn't.  Kaitlin's deposition was coming

11   up and we had no documents.  And so what I asked was:  Let's

12   start with this, can you please produce, at least, what the

13   communications were with complainants?  And we can revisit the

14   stuff at a later date.  Because we wanted to get something

15   before that deposition because we had no documents.

16           We tried to be reasonable throughout this.  When we

17   asked, we were repeatedly asked by Kaitlin's counsel:  Well,

18   tell me what's relevant.

19           And we're like:  Do you have responsive documents?

20   Have you talked to your client about who she may have had

21   discussions with?  And let's start from there.

22           We couldn't even get that.

23           But that will be in my papers.  But I don't want the

24   Court to think we went into these meet-and-confers and at

25   every point it was:  Why am I producing this?

*Proceedings* 102

1          And we would keep asking:  Well, what do you have?

2    And then let's work from there.

3          It will be in my papers.

4          THE COURT:  This is part of the reason, we were

5    joking about this before, but this is part of the reason

6    motion-to-compel practice is terribly time intensive and

7    burdensome for all.

8          MS. GLAVIN:  Yes.

9          THE COURT:  You guys have starkly different

10   recollections of what happened in these meet-and-confers.

11         I do not want either of you sitting in the witness

12   box telling me what happened in the meet-and-confer.  I do not

13   want to look backward.  I want to look forward and I want to

14   find solutions, and I want to find some guide rails because

15   this, as we know, is off the rails.

16         So --

17         MS. FOTI:  I'm sorry.  Can I just say something?

18         THE COURT:  Yes, absolutely, Ms. Foti.

19         MS. FOTI:  The only thing I want to say, Your Honor,

20   is there's been a lot of comments about Governor Cuomo's

21   subpoenas and the discussions between the parties and Governor

22   Cuomo's counsel, which I think indicates that we really are a

23   third wheel.  I'm not certain why we're here, but we have been

24   dragged in here.

25         And I cannot take representations from the various

*Proceedings*                                                                103

1   counsel that they don't have anything to say about my client

2   as a basis to not go forward with their testimony.

3           I think it's very clear that we still need their

4   testimony if we are continuing to be in the case and if

5   Mr. Licul continues to insist that whatever those other

6   individuals have to say about their hostile work environment

7   somehow implicates Ms. DeRosa and/or Mr. Azzopardi, although I

8   appreciate Mr. Azzopardi is not really part of the case except

9   for a tweet.

10          And just on that, to correct the record, the tweet

11  Mr. Azzopardi put out was about the Wigdor firm.  It was not

12  about the plaintiff, it was about the Wigdor firm, calling

13  them ambulance chasers saying they extorted -- they were

14  extortionists, not about the plaintiff.

15          Thank you.

16          THE COURT:  Thank you.

17          And thank you, Ms. Salzman.  I look forward to

18  receiving all of the briefing.

19          So, obviously, we've been at it for quite a while.

20  I am assuming that people might need a short break.  So, if we

21  could take five and then start the argument involving the

22  Office of Attorney General.

23          Please reconvene by 12:35.

24          (Recess taken.)

25          (Matter adjourned.)

## 1

**1** [59] - 1:4, 1:24, 4:5, 4:11, 4:13, 6:17, 7:1, 7:3, 7:8, 8:3, 8:7, 8:19, 8:22, 9:11, 11:9, 17:1, 18:4, 20:12, 20:15, 20:16, 21:1, 21:25, 22:3, 22:7, 22:11, 24:15, 24:17, 34:24, 35:7, 35:13, 41:9, 45:19, 45:23, 46:6, 46:9, 48:15, 70:1, 72:10, 73:23, 73:24, 74:6, 74:19, 74:20, 75:18, 75:20, 82:5, 85:9, 85:23, 85:24, 93:23, 93:24, 95:1, 95:8, 98:2
**1's** [16] - 8:1, 8:18, 10:14, 19:13, 20:10, 21:11, 21:16, 21:19, 34:8, 61:6, 72:14, 75:17, 77:1, 85:19, 86:2, 86:17
**10** [5] - 18:1, 19:4, 19:16, 19:25, 27:6
**10-deposition** [1] - 16:8
**10003** [1] - 1:24
**10004** [2] - 2:6, 2:24
**10017** [1] - 2:12
**10019** [3] - 2:2, 2:21, 3:3
**10028** [1] - 1:24
**10279** [1] - 3:6
**11** [4] - 17:1, 44:23, 61:11, 98:1
**11201** [1] - 3:11
**11:00** [1] - 1:8
**12211** [1] - 2:18
**12:00** [2] - 38:1, 38:5
**12:30** [1] - 100:14
**12:35** [1] - 103:23
**14534** [1] - 2:9
**15** [2] - 27:6, 61:16
**156** [1] - 2:2
**157** [1] - 2:15
**16th** [1] - 10:3
**17th** [1] - 97:5
**18** [1] - 78:11

## 2

**2** [3] - 2:18, 57:2, 72:25
**20** [2] - 19:25, 27:1
**200** [1] - 73:7
**2016** [1] - 31:24
**2017** [6] - 78:22, 83:3, 83:5, 93:8, 93:9, 93:22
**2018** [4] - 79:1, 93:10, 93:22, 94:1
**2019** [4] - 88:1, 91:25, 93:6, 93:7
**2020** [1] - 79:1
**2021** [9] - 9:21, 68:24, 80:4, 81:22, 94:2, 94:24, 94:25, 95:19, 96:11
**2022** [1] - 88:1
**2023** [2] - 1:7, 94:9
**2024** [1] - 40:7
**20th** [1] - 3:2
**22-CV-00893** [1] - 1:4
**22-CV-893** [1] - 4:5
**225** [1] - 3:10
**23-MC-1587** [2] - 1:13, 4:6
**233** [1] - 3:5

**23rd** [2] - 18:11, 19:1
**25** [7] - 5:17, 9:2, 31:8, 31:9, 31:12, 39:4, 39:8
**250** [2] - 2:21, 94:5
**26** [4] - 1:7, 23:4, 60:9, 70:24
**26(a** [2] - 78:9, 78:11
**26(a)1** [2] - 7:14, 10:9
**26th** [1] - 40:10
**2704** [1] - 3:5
**27th** [1] - 18:23

## 3

**30** [1] - 2:18
**32** [1] - 2:24
**36** [2] - 23:3, 27:2

## 4

**403** [5] - 10:23, 12:3, 51:9, 52:1
**404(b** [3] - 10:22, 12:3, 47:23
**412** [1] - 13:7
**45** [1] - 70:24

## 5

**50** [3] - 9:11, 12:9, 76:1
**50s** [1] - 55:19
**55,000** [1] - 22:14
**55th** [1] - 2:21
**565** [1] - 2:12
**56th** [1] - 2:2

## 6

**613-2272** [1] - 3:11
**6th** [1] - 81:22

## 7

**718** [1] - 3:11
**73** [2] - 18:1, 23:1
**75** [1] - 3:2

## 8

**803(8** [4] - 50:3, 51:3, 51:9, 53:14
**803(8)** [2] - 49:18, 49:24
**803(B** [1] - 53:19
**85** [1] - 1:24
**86th** [1] - 2:15

## 9

**90** [1] - 2:5
**99** [1] - 2:8

## A

**a.m** [1] - 1:8

**ABADY** [1] - 3:2
**abetted** [2] - 41:23, 46:7
**abetting** [1] - 45:20
**abettor** [1] - 45:22
**abettors** [1] - 42:6
**ability** [6] - 16:16, 26:19, 31:21, 34:8, 85:10, 87:12
**able** [11] - 18:10, 18:15, 19:17, 24:12, 28:20, 33:24, 42:11, 65:17, 78:7, 81:12, 96:22
**Abramowitz** [1] - 5:1
**ABRAMOWITZ** [1] - 2:11
**absence** [1] - 32:9
**absolute** [1] - 90:6
**absolutely** [2] - 77:21, 102:18
**accept** [1] - 66:9
**access** [1] - 64:7
**accident** [1] - 14:15
**accommodation** [2] - 15:2, 58:24
**accommodations** [1] - 61:24
**account** [2] - 64:8, 97:25
**accusation** [1] - 24:7
**accused** [6] - 8:24, 24:5, 24:6, 45:19, 45:21, 63:8
**accusing** [2] - 46:5, 48:19
**acknowledged** [3] - 26:11, 58:21, 96:6
**act** [1] - 55:14
**acted** [1] - 34:19
**acting** [1] - 38:7
**action** [1] - 45:24
**actions** [2] - 90:10, 91:6
**actual** [1] - 49:4
**add** [3] - 17:7, 74:19, 82:19
**addition** [2] - 44:25, 84:23
**additional** [13] - 5:9, 13:12, 15:13, 16:22, 39:1, 40:5, 57:1, 59:8, 60:6, 68:1, 80:21, 80:22, 92:16
**address** [9] - 5:11, 7:2, 18:7, 21:21, 40:19, 70:4, 72:24, 90:4, 97:3
**addressed** [1] - 53:5
**addressing** [1] - 36:3
**adhere** [1] - 84:18
**adhered** [1] - 84:24
**adjourned** [1] - 103:25
**administrative** [1] - 11:3
**admissibility** [2] - 50:4, 53:8
**admissible** [1] - 51:23
**admission** [1] - 50:2
**admitted** [1] - 48:25
**admonition** [1] - 60:21
**adulterer** [1] - 61:23
**adverse** [2] - 12:10, 85:9
**advised** [1] - 68:7
**advisement** [1] - 98:11
**advocacy** [2] - 47:11
**advocate** [3] - 47:8, 88:17, 92:20
**advocates** [1] - 44:19
**affairs** [2] - 21:14, 26:2
**affected** [1] - 90:10

**afield** [2] - 60:15, 60:18
**afternoon** [1] - 100:15
**AG** [28] - 14:9, 22:22, 22:24, 23:7, 23:10, 23:12, 23:15, 30:22, 31:11, 31:12, 31:14, 43:11, 79:3, 79:8, 79:9, 79:13, 79:23, 80:16, 89:4, 94:18, 95:19, 96:9, 96:21, 97:11, 97:22, 101:1, 101:7, 101:8
**AG's** [16] - 7:18, 14:21, 31:4, 37:13, 37:18, 39:12, 56:11, 58:19, 58:23, 58:25, 60:4, 62:9, 87:5, 89:3, 94:23, 99:16
**agency** [3] - 11:4, 28:13
**agency-wide** [1] - 28:13
**ago** [5] - 19:5, 47:7, 75:9, 75:16, 78:1
**agree** [18] - 19:19, 37:6, 52:18, 59:16, 59:17, 59:20, 60:20, 60:22, 61:1, 61:25, 67:15, 72:16, 73:13, 78:3, 82:13, 82:22, 87:10, 100:25
**agreed** [6] - 16:4, 47:14, 58:23, 60:3, 66:7, 100:11
**agreement** [4] - 27:18, 27:19, 27:25, 97:9
**agreements** [1] - 61:24
**agrees** [1] - 38:12
**ahead** [2] - 18:25, 37:18
**aided** [3] - 3:13, 41:23, 46:7
**aider** [1] - 45:22
**aiders** [1] - 42:6
**aiding** [1] - 45:20
**airplane** [1] - 68:21
**aisle** [1] - 60:25
**AJC** [1] - 52:21
**al** [2] - 1:9, 4:6
**Albany** [1] - 2:18
**Alessandra** [2] - 2:24, 87:25
**ALI** [2] - 2:23, 2:25
**allegation** [11] - 27:2, 27:5, 30:16, 30:25, 35:6, 44:16, 72:10, 79:22, 88:6, 94:11, 98:3
**allegations** [51] - 19:5, 19:11, 19:13, 19:16, 22:4, 24:4, 25:9, 26:25, 27:22, 28:22, 29:2, 29:25, 31:22, 32:8, 39:6, 42:3, 44:12, 45:8, 45:18, 46:3, 46:4, 46:11, 59:11, 61:5, 61:19, 63:6, 64:5, 66:8, 66:25, 68:19, 69:6, 69:13, 71:1, 72:13, 72:14, 73:7, 73:23, 75:17, 75:19, 76:3, 76:10, 76:23, 80:2, 81:2, 85:24, 87:18, 95:14, 97:16, 98:6
**alleged** [2] - 42:7, 69:25
**allegedly** [3] - 59:20, 67:4, 81:24
**alleges** [1] - 13:23
**Allegra** [1] - 4:23
**allow** [1] - 53:15
**allowed** [5] - 67:18, 68:2, 70:7, 76:25, 92:3
**alluded** [1] - 99:8
**almost** [1] - 94:5
**alone** [2] - 26:25, 27:6
**alterations** [1] - 84:16

**Alyssa** [1] - 78:20, 81:17
**ambulance** [1] - 103:13
**amenable** [5] - 40:11, 45:3, 45:11, 56:22, 59:1
**AMER** [1] - 68:7
**Amer** [4] - 53:2, 68:5, 68:6, 100:14
**amorphous** [1] - 79:25
**Ana** [10] - 25:11, 25:18, 25:20, 32:20, 37:4, 39:11, 55:9, 55:10, 55:11
**analogous** [1] - 10:22
**analogy** [1] - 11:12
**analysis** [4] - 12:3, 13:7, 53:15, 90:17, 93:1
**ANDREW** [1] - 1:12
**Andrew** [1] - 4:20
**ANELLO** [1] - 2:11
**Anello** [1] - 5:1
**answer** [7] - 6:9, 74:24, 77:16, 79:20, 87:2, 87:13, 94:6
**answers** [2] - 30:17, 41:21
**anticipate** [4] - 7:15, 15:12, 49:15, 89:7
**anticipated** [1] - 7:2
**anyway** [6] - 37:19, 38:8, 45:1, 46:16, 49:12, 55:21
**apart** [1] - 88:4
**appear** [1] - 32:1
**appearance** [2] - 57:2, 57:19
**appearances** [1] - 4:8
**appearing** [1] - 5:2
**applicability** [1] - 91:2
**application** [1] - 69:3
**apply** [1] - 43:20
**appointed** [1] - 37:16
**appointment** [1] - 76:14
**appreciate** [6] - 61:3, 72:21, 74:25, 83:18, 93:14, 103:8
**approach** [1] - 17:15
**appropriate** [3] - 32:19, 36:5, 66:12
**appropriately** [1] - 26:7
**April** [1] - 79:12
**apropos** [1] - 67:21
**areas** [1] - 65:25
**arguably** [3] - 76:16, 77:7, 92:23
**argue** [3] - 54:21, 54:22, 55:21
**argued** [1] - 66:10
**argument** [12] - 10:13, 23:14, 23:18, 23:19, 23:23, 38:7, 47:1, 55:7, 67:11, 68:4, 70:20, 103:21
**arguments** [2] - 89:9, 89:10
**arrived** [1] - 68:5
**article** [6] - 31:18, 31:19, 31:24, 32:1, 32:2, 75:14
**aspects** [1] - 74:5
**Assembly** [5] - 6:12, 7:18, 23:18, 49:23, 91:3
**asserting** [1] - 90:18
**assigned** [1] - 26:13
**assistant** [1] - 11:3
**assume** [2] - 17:18, 49:18

**assuming** [1] - 103:20
**assure** [2] - 36:8, 54:25
**Atlantic** [1] - 9:20
**attaches** [1] - 90:12
**attack** [4] - 6:11, 46:17, 55:3
**attempt** [1] - 6:8
**attempting** [1] - 6:10
**attention** [2] - 55:15, 95:25
**attorney** [1] - 37:16
**Attorney** [41] - 6:1, 6:12, 7:10, 15:24, 18:14, 23:19, 25:4, 29:6, 29:11, 29:22, 31:3, 37:16, 38:2, 38:4, 38:24, 39:4, 39:15, 39:18, 52:21, 56:18, 56:21, 58:8, 58:10, 60:2, 62:14, 62:15, 76:14, 77:8, 77:11, 77:13, 78:4, 78:5, 78:13, 78:14, 91:25, 94:2, 94:5, 94:11, 94:13, 99:12, 103:22
**attorneys** [4] - 44:8, 57:1, 57:24, 88:3
**attractive** [1] - 55:16
**August** [5] - 9:21, 18:10, 95:16, 96:14, 97:5
**authorized** [2] - 50:7, 50:10
**available** [2] - 73:8, 100:15
**Avenue** [2] - 1:24, 2:12
**average** [1] - 66:16
**avoid** [2] - 10:1, 35:10
**aware** [4] - 17:2, 63:17, 90:3, 96:12
**Azzopardi** [18] - 2:12, 5:3, 21:10, 29:10, 38:14, 40:12, 41:9, 41:21, 41:22, 42:6, 42:14, 42:21, 45:18, 46:3, 56:14, 103:7, 103:8, 103:11
**Azzopardi's** [3] - 45:23, 46:1, 86:7

## B

**backdoor** [1] - 96:15
**backing** [1] - 69:8
**backward** [1] - 102:13
**backwards** [1] - 80:24
**badly** [1] - 32:20
**balancing** [1] - 51:25
**barrage** [1] - 65:18
**based** [9] - 7:18, 12:23, 15:3, 25:4, 25:5, 53:23, 54:2, 54:3, 65:20
**basic** [1] - 58:3
**basis** [4] - 28:13, 48:1, 55:24, 103:2
**battery** [1] - 65:11
**BEACH** [1] - 2:8
**Beach** [1] - 5:5
**became** [3] - 25:9, 25:14, 95:24
**becomes** [2] - 16:12, 68:18
**becoming** [1] - 69:7
**bed** [1] - 65:16
**BEFORE** [1] - 1:21
**began** [1] - 26:17
**beginning** [3] - 9:21, 16:11, 44:2
**behalf** [9] - 4:22, 5:5, 12:25, 43:7, 57:12, 57:14, 75:2, 83:19, 84:10
**behavior** [2] - 13:20, 77:24

behind [1] - 61:13
belief [1] - 51:5
bench [1] - 22:21
beneficial [1] - 45:5
benefit [1] - 91:1
Bennett [25] - 3:6, 27:13, 27:14, 27:16, 31:10, 39:16, 39:20, 39:24, 40:8, 40:11, 40:21, 40:25, 41:1, 41:3, 76:8, 76:9, 76:22, 83:19, 84:4, 84:10, 86:4, 86:12, 96:8
Bennett's [1] - 76:11
best [1] - 81:19
better [1] - 44:7
between [12] - 35:13, 58:22, 60:3, 60:12, 72:5, 78:25, 95:18, 96:7, 97:22, 98:25, 99:22, 102:21
beyond [7] - 9:24, 14:25, 17:5, 68:2, 72:14, 77:8, 96:21
Bharara [1] - 54:23
Biaggi [9] - 2:24, 87:25, 88:10, 91:16, 91:24, 92:5, 92:7, 93:2, 93:5
bias [1] - 70:13
big [1] - 29:3
bill [1] - 24:9
billing [1] - 37:20
birthday [2] - 81:22, 81:23
bit [3] - 35:20, 65:5, 79:14
Black [1] - 7:19
Blackberries [1] - 21:25
blacked [1] - 20:2
blame [1] - 60:25
blown [1] - 56:1
blurring [2] - 51:5, 67:13
boilerplate [3] - 55:17, 95:15, 98:5
boiling [1] - 67:16
book [1] - 76:19
boom [1] - 64:10
boundaries [6] - 32:13, 60:19, 61:2, 67:16, 67:21, 79:17
boundary [3] - 6:25, 19:9, 33:15
bounds [3] - 16:16, 32:19, 34:13
box [1] - 102:12
Boylan [54] - 2:15, 4:7, 4:15, 12:25, 13:3, 13:4, 23:3, 23:5, 23:9, 25:17, 25:18, 25:22, 26:1, 27:21, 28:17, 28:21, 30:21, 30:22, 30:23, 31:4, 31:8, 39:3, 57:20, 58:21, 59:10, 59:11, 59:22, 60:13, 60:24, 61:15, 63:5, 63:23, 64:3, 64:19, 65:1, 65:8, 65:21, 68:12, 68:19, 68:23, 68:25, 69:2, 69:16, 76:2, 76:4, 76:22, 92:4, 92:8, 96:8, 96:12, 96:13, 97:9, 97:14
BOYLAN [1] - 1:17
Boylan's [14] - 26:25, 27:11, 57:24, 58:22, 59:18, 60:16, 63:20, 63:21, 64:7, 66:8, 69:12, 76:3, 96:17, 97:15
brainwashed [1] - 22:8
break [1] - 103:20
breathe [1] - 29:3
briefer [1] - 11:11

briefing [5] - 7:5, 7:7, 91:19, 99:1, 103:18
briefly [1] - 100:13
BRINCKERHOFF [1] - 3:2
Brittany [2] - 81:16
Broad [1] - 2:5
broad [1] - 49:11
broadly [1] - 59:10
Broadway [2] - 2:24, 3:5
Broderick [1] - 84:24
Brooklyn [2] - 1:6, 3:11
brought [6] - 6:7, 28:14, 68:16, 73:11, 73:20, 79:5, 89:18
brutal [1] - 30:9
bubbled [1] - 44:2
bulk [1] - 100:15
bully [1] - 61:23
bunch [1] - 89:23
burden [2] - 35:10, 70:22
burdened [2] - 14:16, 86:6
burdensome [2] - 96:5, 102:7
buried [1] - 46:8
BY [10] - 1:25, 2:3, 2:9, 2:13, 2:16, 2:16, 2:19, 2:22, 2:25, 3:7
bystander [1] - 66:17

# C

Cadman [1] - 3:10
calendar [1] - 76:13
camp [1] - 35:11
campaign [7] - 28:19, 31:1, 59:18, 60:13, 60:17, 63:21, 93:10
canceling [1] - 21:17
cancelled [1] - 8:19
cannot [6] - 9:11, 54:21, 55:18, 70:8, 72:16, 102:25
capacity [1] - 90:15
CAPEZZA [3] - 2:17, 2:19, 72:23
Capezza [5] - 57:2, 57:16, 57:23, 68:9, 72:22
care [9] - 22:24, 28:20, 28:21, 29:6, 29:7, 31:2, 38:8
CARRIE [1] - 2:22
case [136] - 5:12, 5:21, 6:3, 6:7, 6:14, 6:17, 6:20, 6:22, 7:3, 7:11, 7:15, 7:20, 7:22, 7:23, 8:3, 8:9, 10:10, 11:18, 11:22, 13:21, 14:4, 14:13, 15:19, 16:14, 16:16, 16:17, 16:18, 17:19, 19:2, 19:8, 19:24, 21:9, 21:25, 22:4, 23:1, 24:11, 24:13, 24:21, 25:13, 26:20, 28:22, 29:4, 29:18, 29:23, 29:25, 32:7, 32:9, 32:14, 32:16, 32:17, 32:22, 33:11, 33:18, 34:8, 34:12, 34:16, 35:25, 36:8, 38:20, 39:20, 40:5, 40:6, 40:9, 40:13, 40:21, 40:25, 41:6, 41:19, 42:4, 43:1, 44:1, 44:11, 44:21, 44:22, 46:22, 47:15, 47:24, 48:24, 49:5, 51:17, 51:18, 52:3, 53:24, 54:21, 56:23, 60:18, 60:19, 63:25, 64:22,

69:8, 71:6, 72:8, 73:19, 75:25, 82:17, 83:20, 83:25, 84:5, 84:7, 84:25, 85:10, 85:16, 85:18, 85:21, 86:9, 86:10, 86:13, 86:17, 86:18, 86:23, 90:5, 91:3, 93:20, 94:8, 94:10, 94:12, 95:1, 95:8, 95:15, 96:5, 96:13, 96:22, 97:17, 98:2, 98:3, 98:6, 98:8, 98:13, 98:16, 98:20, 100:4, 100:7, 100:16, 103:4, 103:8
caselaw [1] - 83:4
cases [5] - 36:1, 36:25, 40:14, 49:1, 84:8
categorical [2] - 90:21, 91:8
categories [6] - 30:23, 59:8, 59:18, 66:10, 67:5, 67:13
Catherine [1] - 4:25
CATHERINE [1] - 2:13
CAUSE [1] - 1:20
caused [1] - 21:2
cell [2] - 21:22, 98:18
CELLI [1] - 3:2
center [1] - 54:10
certain [5] - 53:23, 55:14, 85:20, 102:23
certainly [13] - 40:23, 48:11, 60:24, 61:2, 62:25, 63:3, 72:6, 86:16, 87:13, 88:8, 92:25, 93:24, 100:3
challenge [5] - 65:19, 67:10, 67:22
chamber [7] - 10:15, 18:23, 88:18, 91:24, 93:6, 93:21, 94:1
changed [1] - 21:19
characterization [4] - 5:22, 19:20, 54:7, 60:23
characterized [2] - 5:20, 66:19
characterizes [1] - 54:5
Charlotte [11] - 3:5, 31:10, 31:13, 39:16, 39:19, 39:24, 40:20, 40:21, 40:25, 41:1, 96:8
chase [1] - 30:11
chasers [1] - 103:13
Chief [1] - 16:17
child [2] - 20:24, 79:5
children [1] - 13:24
choose [1] - 33:7
chose [1] - 93:20
churning [1] - 24:9
Circuit [3] - 7:19, 35:25, 51:22
circular [1] - 11:5
circumstances [4] - 32:18, 53:22, 68:15, 75:19
cited [1] - 48:23
citing [2] - 88:22, 88:24
civil [5] - 4:4, 6:3, 24:11, 30:9, 50:4
CIVIL [1] - 1:20
claim [4] - 41:10, 41:12, 41:20, 101:9
claimed [1] - 26:1
claiming [1] - 68:20
claims [3] - 40:18, 95:14, 98:6
clarification [1] - 45:17
clarify [1] - 13:9
classmate [1] - 81:5

clear [20] - 6:24, 11:18, 21:23, 22:14, 33:21, 33:22, 46:10, 46:21, 47:25, 48:1, 59:7, 59:15, 59:16, 63:5, 64:20, 64:25, 70:21, 71:7, 73:1, 103:3
clearly [3] - 10:5, 51:22, 65:20
Cleary [1] - 37:12
client [28] - 24:12, 30:15, 30:16, 41:2, 45:11, 45:17, 47:9, 58:9, 61:3, 62:2, 63:2, 69:23, 72:10, 72:18, 78:6, 82:14, 85:22, 86:5, 86:11, 87:13, 87:17, 88:3, 89:4, 89:5, 95:14, 95:22, 101:20, 103:1
client's [7] - 34:12, 58:14, 70:15, 84:20, 97:6, 97:24, 98:3
clients [8] - 41:7, 41:8, 41:25, 42:3, 44:9, 44:25, 80:5, 80:9
close [5] - 5:22, 9:12, 27:19, 30:22, 81:17
closely [1] - 78:25
clue [1] - 53:19
co [1] - 49:2
co-employee [1] - 49:2
COHEN [4] - 2:22, 39:24, 75:4, 78:16
Cohen [4] - 57:3, 68:9, 75:2, 78:15
collaborating [1] - 34:24
collaboratively [1] - 33:25
collateral [1] - 32:25
colleague [4] - 4:15, 4:23, 20:13, 57:3
colleagues [3] - 4:18, 5:2, 37:1
college [7] - 27:10, 27:12, 27:18, 60:16, 63:20, 65:7, 70:14
College [3] - 86:14, 86:20, 86:23
colleges [1] - 30:8
collusion [1] - 48:12
coming [9] - 27:18, 29:8, 36:21, 44:23, 48:7, 81:5, 92:12, 101:10
comment [1] - 8:14
comments [2] - 72:21, 102:20
Commisso [4] - 81:15, 81:16, 81:25
commit [1] - 63:10
Committee [3] - 6:12, 23:19, 91:3
committing [1] - 46:6
communicate [1] - 64:8
communicated [4] - 63:24, 75:20, 93:25
communicating [2] - 88:16, 92:10
communication [2] - 81:4, 96:7
communications [23] - 21:3, 21:7, 22:12, 31:5, 31:7, 39:5, 60:12, 64:4, 64:14, 64:16, 76:12, 79:22, 88:14, 95:18, 96:7, 96:11, 96:18, 96:20, 96:21, 97:7, 97:13, 97:22, 101:13
compel [5] - 43:14, 43:15, 44:5, 56:1, 102:6
complainant [3] - 24:18, 24:19, 24:21
complainant's [1] - 54:3
complainants [31] - 6:2, 6:14, 10:8, 10:18, 10:21, 12:16, 15:13, 16:23, 18:1, 18:12, 31:6, 32:24, 32:25, 39:6, 44:23, 62:8, 63:25, 64:4, 65:24, 65:25, 66:19, 72:7, 75:6, 76:21, 95:19, 96:9,

96:22, 97:7, 97:13, 97:22, 101:13
Complaint [15] - 18:2, 23:4, 27:2, 27:9, 28:6, 29:4, 41:1, 41:12, 42:3, 44:13, 73:3, 74:16, 74:17, 79:21, 88:8
complaint [1] - 28:9
complaints [3] - 28:12, 59:19, 67:3
complete [2] - 8:10, 8:16
completed [1] - 14:12
completely [1] - 32:22
complex [2] - 5:16, 36:10
complexity [2] - 52:16, 55:23
complicated [1] - 53:3
complied [1] - 94:4
comply [2] - 75:21, 95:13
complying [1] - 9:13
component [2] - 60:9, 62:7
comport [1] - 51:7
comprise [2] - 18:1, 59:13
Computer [1] - 3:13
Computer-aided [1] - 3:13
computerized [1] - 3:13
concept [1] - 42:17
concern [1] - 40:22
concerned [4] - 21:3, 85:8, 85:15, 87:17
concerning [3] - 31:5, 37:13, 70:2
concluded [1] - 48:15
conclusion [3] - 24:24, 37:6, 51:1
conclusions [4] - 51:3, 52:2, 55:8, 55:12
concrete [1] - 95:20
conduct [3] - 6:6, 8:2, 8:5
conducted [3] - 5:25, 6:11, 29:14
confer [21] - 6:18, 14:11, 14:23, 38:25, 59:4, 62:11, 79:15, 80:25, 84:15, 90:24, 91:14, 92:17, 93:13, 94:20, 95:3, 95:17, 97:1, 97:4, 98:21, 102:12
CONFERENCE [1] - 1:20
conference [12] - 4:5, 5:14, 24:3, 44:3, 65:21, 68:6, 74:1, 87:7, 89:8, 89:17
conferences [1] - 80:4, 80:9, 87:19
conferred [2] - 6:21, 9:15
conferring [2] - 43:12, 44:20
confers [13] - 30:4, 30:13, 47:17, 80:23, 83:12, 88:11, 95:10, 97:20, 98:7, 100:21, 101:5, 101:24, 102:10
Confide [1] - 69:4
confidential [4] - 84:21, 99:14, 99:15, 100:9
confidentiality [4] - 84:20, 100:3, 100:6, 100:10
conflicting [4] - 40:22, 40:24, 84:12, 85:11
connection [1] - 56:23
consent [2] - 21:8, 56:18
consider [4] - 63:1, 63:4, 78:7, 98:15
consideration [1] - 61:10
considerations [1] - 70:23
consist [1] - 99:16
consists [1] - 76:2

conspiracy [2] - 35:9
constituent [2] - 90:13, 90:15
constituent-related [1] - 90:15
consult [1] - 63:2
contact [1] - 26:8
contacted [1] - 92:4
contacts [1] - 31:7
contain [1] - 99:4
contest [1] - 16:21
contested [1] - 50:13
context [5] - 10:12, 50:4, 50:13, 54:14, 91:5
continue [6] - 24:5, 42:5, 44:10, 53:12, 77:22, 100:4
continued [1] - 65:14
Continued [1] - 71:8
continues [3] - 13:21, 96:24, 103:5
Continuing [1] - 72:1
continuing [4] - 47:19, 65:11, 65:17, 103:4
contravention [1] - 6:22
conveniently [1] - 9:19
conversation [5] - 7:5, 57:21, 66:13, 76:18, 93:2
conversations [5] - 30:18, 72:3, 72:5, 74:4, 81:2
cooperating [1] - 45:12
coping [1] - 96:2
core [1] - 19:13
Corporation [2] - 28:10, 68:14
correct [5] - 6:8, 34:13, 38:22, 55:22, 103:10
corrected [1] - 18:8
correction [1] - 93:4
correspondence [1] - 35:12
correspondences [1] - 89:2
counsel [34] - 5:8, 17:25, 18:19, 21:8, 21:9, 21:22, 22:11, 27:19, 28:5, 28:10, 29:12, 29:19, 36:9, 36:19, 39:22, 58:18, 58:23, 59:5, 70:25, 79:16, 80:24, 85:19, 86:7, 86:10, 86:11, 88:12, 88:24, 89:13, 93:13, 95:12, 101:17, 102:22, 103:1
Counsel [1] - 95:6
counsel's [1] - 100:21
counseled [1] - 68:17
counseling [2] - 92:21, 92:22
count [2] - 5:16, 61:17
couple [7] - 18:13, 20:7, 21:12, 33:6, 63:14, 73:6, 83:24
course [20] - 6:5, 17:12, 17:22, 18:4, 22:12, 26:3, 54:8, 57:18, 58:19, 58:25, 60:8, 61:20, 70:5, 70:22, 86:12, 90:5, 90:18, 91:11, 95:9, 99:6
COURT [142] - 1:1, 4:2, 5:7, 10:5, 11:12, 11:23, 12:11, 12:15, 12:23, 13:2, 13:5, 13:8, 15:1, 15:7, 15:12, 15:17, 15:21, 15:23, 16:9, 16:13, 17:2, 17:6, 17:12, 19:19, 20:20, 20:24, 23:14, 24:24, 27:10, 27:13, 32:8, 32:11, 33:5, 33:10,

33:14, 33:23, 34:5, 34:13, 34:24, 35:2, 35:5, 35:22, 36:3, 36:14, 37:20, 37:24, 38:1, 38:4, 38:11, 38:21, 39:19, 39:25, 40:2, 40:15, 40:20, 43:3, 43:6, 43:12, 45:14, 46:21, 46:24, 47:7, 47:14, 49:13, 49:15, 49:18, 49:20, 50:3, 50:6, 50:9, 50:12, 50:17, 50:20, 51:1, 51:11, 51:18, 51:24, 52:2, 52:6, 52:10, 52:13, 52:16, 52:19, 53:11, 53:19, 54:3, 54:8, 54:10, 54:24, 55:7, 55:22, 56:16, 57:7, 57:9, 57:16, 57:18, 59:3, 59:22, 60:5, 62:13, 63:12, 63:15, 63:18, 64:15, 64:22, 65:3, 65:19, 66:3, 66:6, 66:16, 67:8, 68:3, 68:8, 69:18, 70:2, 71:4, 72:21, 74:25, 78:15, 78:17, 83:18, 83:23, 86:25, 87:3, 87:21, 87:23, 89:16, 90:21, 90:23, 91:21, 92:15, 93:11, 93:14, 100:11, 100:14, 100:19, 101:3, 101:6, 102:4, 102:9, 102:18, 103:16

**Court** [27] - 3:9, 3:10, 8:21, 16:14, 16:15, 21:16, 22:16, 22:22, 23:23, 37:23, 44:11, 63:17, 65:12, 65:19, 72:24, 73:12, 74:2, 74:23, 84:11, 84:19, 87:1, 89:11, 90:4, 96:17, 97:14, 101:24

**court** [3] - 8:24, 44:23, 84:19

**Court's** [3] - 7:4, 9:24, 22:20

**courtesy** [1] - 82:12

**Courthouse** [1] - 1:6

**COURTROOM** [2] - 4:1, 4:4

**courtroom** [2] - 5:10, 61:22

**courts** [1] - 90:7

**covered** [2] - 90:15, 91:7

**CRAIN** [2] - 1:25, 4:12

**Crain** [1] - 4:12

**creativity** [1] - 56:10

**credibility** [4] - 46:18, 77:3, 80:18, 82:6

**crime** [1] - 46:6

**criminal** [1] - 24:11

**critical** [1] - 7:3

**criticize** [1] - 31:14

**cross** [4] - 33:1, 43:20, 66:1, 66:24

**cross-examination** [2] - 33:1, 66:1

**cross-examine** [1] - 66:24

**crosses** [1] - 47:12

**CRR** [1] - 3:9

**Cruz** [1] - 7:22

**culture** [1] - 66:20

**cumbersome** [1] - 91:12

**CUOMO** [1] - 1:12

**Cuomo** [46] - 2:2, 4:6, 4:20, 4:23, 5:20, 6:4, 6:10, 6:18, 7:8, 13:23, 14:18, 16:20, 18:8, 20:8, 21:23, 27:3, 28:24, 29:20, 31:18, 35:20, 35:22, 36:8, 41:10, 42:11, 44:9, 44:14, 48:4, 48:8, 58:11, 59:12, 66:20, 75:12, 75:15, 75:24, 76:10, 78:22, 80:16, 81:25, 91:24, 92:17, 92:21, 93:3, 98:25, 99:19, 99:21, 100:1

**Cuomo's** [17] - 35:11, 36:4, 36:6, 41:23, 42:7, 42:14, 42:24, 70:25, 77:24, 85:19, 88:2, 88:12, 88:24, 90:23, 91:15, 102:20, 102:22

**curious** [2] - 17:14, 58:13

**current** [2] - 6:9, 48:2

**cut** [2] - 30:10, 48:7

# D

**DANIEL** [1] - 2:9

**Daniel** [1] - 5:4

**DANYA** [1] - 2:16

**Danya** [1] - 4:14

**dark** [1] - 72:18

**date** [5] - 15:4, 18:24, 94:24, 98:9, 101:14

**daughter** [4] - 9:9, 20:22, 20:25, 35:14

**daughter's** [1] - 14:24, 34:22

**days** [2] - 20:11, 28:15

**deadline** [5] - 10:4, 17:10, 17:11, 40:6, 40:9

**deal** [5] - 23:8, 29:25, 53:7, 91:13

**dealing** [1] - 89:19

**dealt** [1] - 30:1

**DeArcy** [1] - 54:25

**decided** [1] - 61:19

**decision** [2] - 33:8, 42:1

**declaration** [1] - 98:1

**defend** [5] - 6:10, 23:13, 24:12, 44:14, 44:17

**Defendant** [2] - 2:1, 2:8

**defendant** [15] - 9:4, 11:20, 36:1, 50:1, 54:16, 75:12, 75:15, 75:24, 76:10, 82:9, 86:9, 88:11, 88:24, 98:22, 99:19

**defendant's** [2] - 7:9, 93:13

**defendants** [14] - 8:18, 8:22, 38:14, 40:6, 40:13, 40:15, 59:13, 60:17, 65:12, 75:25, 79:10, 80:10, 84:3, 94:12

**Defendants** [3] - 1:10, 1:16, 2:11

**defendants'** [1] - 33:19

**defending** [1] - 46:22

**defense** [13] - 24:5, 24:11, 29:7, 30:1, 36:9, 79:16, 80:24, 94:7, 94:10, 95:12, 96:22, 98:8, 100:5

**Defense** [1] - 95:6

**defer** [1] - 13:11

**deficiency** [1] - 7:8

**definition** [5] - 26:6, 37:9, 55:13, 55:17, 82:3

**definitions** [1] - 51:7

**degree** [2] - 30:6, 39:15

**deleting** [1] - 69:3

**demand** [1] - 9:3

**denied** [2] - 37:17, 96:19

**Department** [4] - 26:12, 30:9, 73:4, 73:24

**department** [1] - 11:2

**depose** [9] - 10:20, 12:7, 41:3, 41:17,

82:21, 82:22, 86:8, 86:12, 86:13

**deposed** [9] - 8:17, 13:17, 14:18, 16:4, 19:5, 20:12, 35:21, 35:22, 36:9

**deposition** [53] - 8:17, 8:18, 9:4, 9:5, 9:10, 12:16, 13:12, 16:24, 18:9, 18:10, 18:20, 19:1, 19:3, 19:6, 19:15, 20:3, 20:9, 20:10, 20:11, 20:12, 21:5, 21:8, 21:19, 21:20, 22:6, 22:13, 24:1, 24:19, 25:12, 26:9, 29:21, 36:4, 36:7, 36:19, 36:23, 36:24, 43:2, 45:23, 47:18, 48:16, 54:4, 77:19, 77:22, 79:11, 83:2, 83:7, 83:12, 86:6, 97:7, 99:5, 99:16, 101:10, 101:15

**depositions** [20] - 12:12, 13:9, 13:10, 15:13, 16:1, 17:5, 18:16, 21:15, 21:17, 23:21, 24:17, 25:11, 27:7, 29:9, 29:10, 29:12, 41:14, 41:15, 79:8, 82:20

**deputy** [1] - 5:10

**Deputy** [1] - 37:16

**DEPUTY** [2] - 4:1, 4:4

**DeRosa** [25] - 2:11, 5:3, 14:6, 17:16, 21:9, 29:10, 38:14, 40:12, 40:17, 40:19, 41:2, 41:8, 41:20, 42:5, 42:13, 42:21, 46:4, 56:14, 86:4, 86:7, 86:9, 86:12, 86:13, 103:7

**described** [3] - 17:17, 48:4, 55:17

**designated** [1] - 84:21

**designation** [1] - 100:7

**despite** [1] - 31:11

**destroy** [1] - 69:4

**detail** [1] - 18:17

**detailed** [2] - 90:19, 91:8

**details** [1] - 25:6

**determination** [1] - 71:5

**determine** [1] - 39:1

**detour** [2] - 86:15, 86:16

**detrimental** [1] - 92:21

**develop** [2] - 16:18, 16:22

**developed** [1] - 6:24

**Development** [2] - 28:10, 68:14

**Devil's** [1] - 92:20

**Diane** [8] - 20:13, 20:15, 20:16, 20:18, 21:4, 21:20, 22:6, 48:17

**dictate** [1] - 63:23

**different** [18] - 9:23, 10:14, 10:17, 11:10, 28:19, 32:22, 34:17, 40:5, 40:14, 51:16, 70:15, 72:12, 76:23, 81:11, 83:24, 91:6, 99:13, 102:9

**differently** [2] - 14:14, 91:4

**difficult** [2] - 34:1, 55:25

**dig** [1] - 47:4

**dilemma** [2] - 16:14, 16:15

**direct** [2] - 6:22, 65:12

**direction** [1] - 45:13

**directly** [5] - 9:11, 10:15, 13:23, 66:8, 67:25

**director** [3] - 63:21, 64:7, 65:6

**dirt** [2] - 13:23, 13:25

**disagree** [1] - 100:22

**disappointing** [2] - 24:8, 34:3

Case 1:22-cv-00893-LDH-TAM    Document 215    Filed 01/07/24    Page 109 of 121 PageID
#: 5651
All Word // 09262023 Trooper v. NYS Police 22-cv-893 (TAM)
6

**disclosed** [1] - 77:25
**disclosure** [3] - 27:25, 78:9, 87:4
**disclosures** [2] - 10:9, 78:11
**discover** [2] - 32:19, 46:25
**discoverable** [1] - 96:20
**discovery** [59] - 5:14, 5:15, 5:21, 5:23, 6:3, 6:4, 6:6, 6:19, 7:7, 8:10, 8:16, 9:21, 10:2, 10:6, 10:19, 13:3, 13:18, 14:5, 14:13, 15:3, 17:10, 17:19, 19:12, 22:17, 22:25, 23:10, 24:16, 30:9, 32:16, 33:3, 36:7, 36:18, 38:19, 38:20, 39:21, 40:3, 40:6, 40:9, 44:7, 44:15, 44:16, 44:24, 48:11, 48:13, 51:15, 53:4, 53:15, 54:11, 56:5, 62:14, 65:2, 71:7, 81:14, 84:3, 84:25, 85:2, 85:3, 85:8, 95:14
**discredited** [1] - 87:18
**discrimination** [3] - 37:9, 49:1, 54:14
**discuss** [4] - 9:1, 33:14, 89:5, 92:1
**discussed** [4] - 9:16, 10:12, 52:20, 70:16
**discussing** [8] - 20:15, 21:22, 22:4, 65:23, 78:6, 80:6, 90:14, 92:12
**discussion** [5] - 23:15, 47:24, 56:12, 63:10, 92:16
**discussions** [7] - 34:3, 53:24, 65:24, 67:16, 92:18, 101:21, 102:21
**dismiss** [4] - 14:7, 40:18, 41:22, 42:2
**disparaging** [2] - 80:5, 80:9
**disproportionate** [5] - 66:3, 66:12, 70:21, 92:24, 96:5
**dispute** [2] - 43:23, 43:24
**disputes** [3] - 56:4, 84:4, 84:25
**disputing** [1] - 68:24
**distinguished** [1] - 88:4
**DISTRICT** [2] - 1:1, 1:1
**District** [7] - 27:17, 39:20, 83:20, 84:5, 86:9, 86:13, 86:24
**district** [2] - 35:25, 66:15
**disturbing** [1] - 13:20
**divorce** [1] - 80:8
**docket** [3] - 4:5, 4:6, 96:13
**dockets** [1] - 5:17
**docs** [1] - 31:6
**document** [8] - 13:13, 40:3, 42:19, 42:22, 59:9, 75:22, 79:11, 86:7
**documentary** [1] - 13:5
**documentation** [3] - 84:21, 85:14, 86:20
**documented** [1] - 79:3
**documenting** [1] - 28:3
**documents** [62] - 8:22, 14:9, 17:4, 18:11, 18:21, 22:15, 23:5, 23:21, 27:7, 30:12, 30:15, 31:5, 37:13, 38:24, 39:1, 39:10, 39:17, 41:4, 42:20, 42:21, 42:23, 43:11, 58:18, 59:8, 59:9, 59:14, 59:17, 60:3, 60:5, 64:12, 64:18, 67:25, 74:7, 74:8, 74:10, 75:9, 75:23, 76:1, 76:8, 76:16, 76:18, 76:19, 76:20, 77:6, 77:7, 77:12, 77:13, 77:20, 79:12,

80:20, 80:21, 80:22, 85:5, 85:16, 87:12, 89:2, 94:3, 94:5, 94:24, 101:11, 101:15, 101:19
**Doe** [2] - 3:2, 57:15
**domain** [1] - 79:9
**domino** [1] - 61:20
**done** [9] - 8:15, 17:20, 42:14, 42:17, 47:6, 59:14, 61:23, 82:24, 82:25
**doubt** [1] - 25:12
**Doug** [1] - 4:15
**DOUGLAS** [1] - 2:16
**down** [6] - 26:19, 45:24, 69:22, 70:10, 70:11, 89:18
**dozen** [2] - 95:10, 98:7
**dozens** [1] - 17:3
**drafted** [3] - 29:5, 45:25, 95:13
**drafts** [1] - 76:19
**dragged** [5] - 61:12, 61:21, 72:19, 74:21, 102:24
**drastically** [1] - 21:19
**drawn** [1] - 79:18
**drill** [1] - 26:19
**drop** [3] - 18:1, 41:25, 42:4
**due** [5] - 15:23, 52:24, 67:12, 70:3, 100:23
**during** [13] - 13:21, 19:6, 25:16, 25:24, 29:8, 30:7, 32:16, 41:15, 73:5, 73:25, 74:1, 92:2, 93:22

## E

**e-mail** [1] - 97:5
**early** [3] - 14:4, 79:1, 93:22
**earplugs** [1] - 30:5
**earth** [1] - 46:13
**East** [2] - 2:15, 3:10
**Eastern** [1] - 86:24
**EASTERN** [1] - 1:1
**edits** [1] - 84:16
**EEOC** [2] - 51:17, 54:14
**effect** [3] - 22:7, 61:15, 61:20
**efficiently** [1] - 85:10
**effort** [6] - 6:19, 32:19, 38:25, 44:21, 56:4, 90:24
**efforts** [2] - 54:11, 90:11
**eight** [2] - 10:20, 28:4
**Eisenberg** [5] - 40:1, 40:2, 57:9, 83:19, 87:6
**EISENBERG** [8] - 3:5, 3:7, 40:1, 83:22, 84:11, 87:1, 87:8, 87:22
**either** [5] - 17:4, 36:19, 56:2, 85:18, 102:11
**electronic** [1] - 22:12
**Elizabeth** [1] - 28:11
**email** [1] - 3:12
**embarrassed** [1] - 63:6
**EMERY** [1] - 3:2
**eminently** [1] - 85:17
**Empire** [2] - 28:10, 68:13

**employ** [1] - 56:3
**employed** [2] - 38:13, 93:23
**employee** [2] - 49:2, 57:2
**Employee** [2] - 2:18, 72:25
**employees** [3] - 28:8, 99:11
**employer's** [1] - 49:3
**employment** [4] - 49:2, 59:19, 68:16, 76:5
**enable** [1] - 42:14
**enabled** [1] - 42:6
**encourage** [1] - 91:14
**encouragement** [1] - 76:9
**end** [3] - 8:16, 10:5, 16:23
**endured** [1] - 75:11
**enforce** [1] - 31:15
**enforcement** [1] - 65:13
**engage** [1] - 56:4
**engaged** [2] - 90:13, 95:11
**Enity** [1] - 2:18
**enter** [1] - 84:22
**entire** [3] - 88:18, 88:21, 88:25
**entirety** [2] - 6:11, 7:20
**entities** [1] - 18:22
**entitled** [7] - 7:23, 8:7, 8:8, 11:14, 16:20, 46:24, 48:12, 60:12, 61:16, 98:10, 100:6
**Entity** [1] - 72:24
**entries** [1] - 76:13
**environment** [18] - 7:20, 10:10, 10:13, 10:14, 10:25, 11:4, 11:24, 37:7, 47:21, 47:24, 55:13, 55:20, 75:6, 81:13, 100:1, 103:6
**equivalent** [1] - 11:20
**ESD** [3] - 28:6, 28:8, 28:12
**ESI** [1] - 22:11
**ESQ** [14] - 1:25, 1:25, 2:3, 2:3, 2:4, 2:9, 2:13, 2:16, 2:16, 2:19, 2:22, 2:25, 3:4, 3:7
**Esq** [1] - 2:6
**essential** [1] - 12:1
**essentially** [3] - 14:13, 65:12, 69:23
**establish** [3] - 47:22, 53:24, 66:20
**et** [2] - 1:8, 4:6
**ethical** [2] - 34:11, 61:9
**ethically** [1] - 34:9
**evaluate** [2] - 47:15, 48:6
**evaluation** [1] - 7:4
**eve** [2] - 20:14, 22:5
**evening** [1] - 82:2
**events** [1] - 74:6
**eventually** [1] - 84:22
**evidence** [9] - 7:21, 8:8, 13:6, 35:8, 35:9, 46:18, 47:16, 48:20, 48:23
**evidentiary** [2] - 19:9, 55:24, 56:1
**ex** [2] - 80:7
**ex-husband** [2] - 80:7
**exact** [2] - 36:6, 59:9
**exactly** [6] - 23:22, 48:4, 50:6, 51:24, 62:9, 74:11

examination [2] - 33:1, 66:1
examine [1] - 66:24
example [5] - 16:3, 23:8, 30:20, 53:16, 79:21
examples [4] - 34:19, 63:25, 94:14, 95:6
except [4] - 18:13, 96:11, 97:8, 103:8
exception [5] - 8:6, 44:1, 47:23, 52:13, 52:14
exchanged [1] - 94:25
exchanges [1] - 22:10
executive [7] - 10:15, 18:23, 78:23, 91:24, 93:6, 93:21, 94:1
exhausting [1] - 73:6
Exhibit [1] - 98:1
exists [2] - 12:21, 23:6
exonerate [1] - 12:8
expect [1] - 29:20
expedition [3] - 35:19, 82:4, 83:16
experience [6] - 51:6, 59:25, 73:6, 73:8, 73:25, 92:1
experienced [2] - 34:6, 79:1
experiences [5] - 73:22, 74:21, 86:1, 92:6, 92:10
explain [3] - 20:11, 56:13, 99:23
explained [1] - 95:22
explore [6] - 19:17, 22:13, 28:20, 28:25, 60:11, 69:11
explored [1] - 60:2
exploring [1] - 68:13
expose [1] - 44:25
expressed [1] - 80:1
extend [1] - 17:10
extensive [1] - 39:5
extensively [1] - 59:21
extent [25] - 9:7, 12:21, 13:13, 13:14, 14:10, 14:16, 14:22, 15:20, 17:8, 19:7, 21:7, 22:22, 34:6, 46:23, 62:19, 65:21, 67:10, 73:12, 76:21, 79:14, 82:17, 89:23, 90:8, 92:9, 92:11
extorted [1] - 103:13
extortion [1] - 46:6
extortionist [2] - 45:21, 45:25
extortionists [1] - 103:14
extraneously [1] - 46:18
extraordinarily [2] - 44:5, 81:17
extremely [5] - 5:24, 43:21, 72:17, 99:24, 99:25

## F

facing [4] - 16:15, 18:6, 40:9
fact [19] - 11:4, 11:8, 14:20, 18:9, 37:1, 46:14, 51:2, 51:13, 74:10, 79:14, 80:23, 81:19, 88:18, 89:4, 90:16, 90:17, 91:17, 92:7, 92:18
fact-intensive [1] - 90:17
factor [1] - 15:15
facts [3] - 50:17, 50:21, 75:18
factual [11] - 50:5, 50:6, 50:13, 50:24, 51:13, 52:4, 52:6, 52:8, 55:23, 73:20,

73:22
factually [1] - 36:10
fair [6] - 8:7, 17:6, 23:16, 31:22, 34:25, 68:3
faith [1] - 30:19
falsely [1] - 68:20
family [2] - 73:15, 95:24
far [10] - 47:4, 52:25, 54:4, 60:10, 60:15, 60:18, 66:15, 67:5, 70:19, 84:18
fashion [2] - 80:20, 83:7
fault [2] - 8:1
favorite [3] - 16:17, 24:7
February [2] - 24:3, 68:24
federal [2] - 75:16, 90:7
feet [1] - 63:1
fellows [1] - 26:13
felt [1] - 90:9
female [1] - 12:1
few [4] - 19:21, 74:14, 76:12, 79:7
Fifth [2] - 1:24, 2:12
fight [1] - 70:12
figure [1] - 33:15
file [6] - 43:16, 43:17, 43:20, 89:7, 89:14, 89:24
filed [5] - 5:18, 6:22, 12:24, 45:24, 85:3
filing [4] - 6:21, 43:13, 43:23, 89:16
fill [2] - 16:6, 94:20
finally [2] - 95:16, 95:20
findings [7] - 50:5, 50:6, 50:13, 50:24, 51:13, 52:4, 54:2
fine [2] - 74:3, 74:14
Fine [2] - 28:11
firm [6] - 5:1, 17:10, 37:12, 103:11, 103:12
firms [1] - 37:18
first [21] - 7:1, 7:13, 9:10, 10:11, 13:18, 17:23, 32:4, 36:25, 37:2, 48:16, 48:22, 59:24, 62:16, 62:24, 72:20, 79:11, 80:25, 84:11, 94:6, 99:8, 101:4
fishing [3] - 35:19, 82:3, 83:16
fit [1] - 16:19
five [1] - 103:21
flights [1] - 68:22
Floor [1] - 3:2
flying [2] - 30:3, 30:10
focused [1] - 94:22
FOERSTER [1] - 2:20
folks [2] - 15:15, 36:11
follow [2] - 62:21, 70:8
followed [1] - 44:1
follower [1] - 69:5
FOR [1] - 1:20
forgot [1] - 68:11
former [4] - 4:19, 18:17, 20:13, 94:4
Former [1] - 63:8
forth [4] - 30:10, 31:10, 58:22, 76:5
forthcoming [1] - 96:16
forum [1] - 6:8
forward [20] - 6:2, 10:18, 15:13, 18:15,

18:20, 26:5, 45:12, 53:11, 66:23, 75:11, 75:13, 76:9, 77:24, 81:5, 92:6, 92:12, 92:13, 102:13, 103:2, 103:17
FOTI [6] - 2:13, 4:25, 40:23, 43:4, 102:17, 102:19
Foti [5] - 4:25, 40:19, 40:20, 45:17, 102:18
four [5] - 28:15, 68:22, 82:22, 83:2, 83:5
fourth [2] - 81:4, 81:5
fourth-grade [1] - 81:5
frankly [4] - 23:9, 34:3, 73:10, 74:8
fraught [1] - 89:20
Friday [1] - 5:18
friends [5] - 73:15, 74:5, 81:17, 81:19, 95:24
frolic [2] - 86:14, 86:15
front [5] - 26:21, 28:8, 29:5, 54:10, 67:22
frustrating [1] - 29:9
full [7] - 35:18, 36:5, 56:1, 79:4, 82:23, 91:7, 99:17
full-blown [1] - 56:1
full-time [1] - 79:4
fully [3] - 19:17, 29:20, 52:23
fundraising [1] - 59:19
funny [1] - 69:15
furtherance [2] - 90:11, 91:17

## G

gallery [2] - 18:3, 36:5
gap [1] - 94:21
gaps [4] - 16:6, 56:12, 94:15, 94:19
garnered [1] - 95:25
Garnsey [1] - 2:8
gathering [2] - 90:11, 91:17
general [1] - 7:10
General [12] - 6:12, 23:19, 60:2, 77:13, 78:4, 78:13, 78:14, 94:3, 94:5, 94:13, 99:12, 103:22
General's [28] - 6:1, 7:10, 15:24, 18:15, 25:4, 29:6, 29:11, 29:22, 31:3, 38:2, 38:5, 38:24, 39:4, 39:15, 39:18, 52:21, 56:18, 56:21, 58:8, 58:10, 62:14, 62:15, 76:15, 77:8, 77:11, 78:6, 91:25, 94:11
Generals [1] - 37:16
generated [1] - 6:5
generis [1] - 15:19
geographic [1] - 11:5
gist [1] - 14:1
given [11] - 10:6, 21:13, 31:22, 34:19, 45:2, 58:4, 64:24, 77:20, 83:25, 97:11, 98:14
glad [1] - 65:20
glaring [1] - 88:9
Glaser [1] - 26:15
Glavin [38] - 4:17, 4:19, 17:13, 32:21, 34:18, 34:20, 44:21, 48:10, 49:6, 52:19, 58:20, 59:5, 61:14, 62:21,

64:23, 68:8, 69:18, 69:21, 80:4, 80:8, 81:10, 81:20, 82:1, 82:21, 85:6, 85:18, 92:24, 94:14, 94:17, 94:22, 95:17, 96:6, 96:10, 96:15, 97:5, 97:21, 97:25, 100:14

**GLAVIN** [36] - 2:1, 2:3, 4:17, 17:23, 19:21, 20:22, 20:25, 23:17, 24:25, 27:11, 27:14, 32:10, 33:21, 33:24, 37:14, 37:21, 37:25, 38:17, 39:2, 39:23, 40:3, 40:17, 59:6, 63:13, 64:17, 64:24, 68:10, 91:20, 91:22, 93:8, 100:13, 100:18, 100:20, 101:4, 101:8, 102:8

**Glavin's** [2] - 38:6, 67:20
**goal** [1] - 44:5
**God** [2] - 80:13, 96:1
**goodbye** [1] - 41:8
**govern** [1] - 86:19
**Government** [2] - 6:5, 18:22
**government** [1] - 75:16
**governments** [1] - 5:25
**governor** [1] - 54:22
**Governor** [91] - 4:19, 4:22, 5:20, 6:3, 6:10, 6:18, 7:7, 8:1, 8:3, 8:8, 9:4, 9:7, 9:19, 10:25, 11:6, 11:13, 11:25, 12:7, 12:20, 13:17, 14:21, 16:20, 18:8, 19:1, 19:14, 20:8, 21:23, 22:4, 25:1, 25:3, 26:2, 26:8, 26:15, 27:3, 27:16, 27:24, 28:16, 31:6, 31:18, 31:25, 35:20, 35:22, 36:4, 36:6, 36:8, 41:10, 41:23, 42:7, 42:11, 42:14, 42:24, 44:9, 44:14, 45:24, 46:2, 46:12, 46:13, 53:16, 55:11, 55:15, 60:1, 61:15, 63:8, 64:21, 66:20, 68:20, 73:25, 75:7, 75:8, 78:22, 78:23, 79:23, 81:19, 85:19, 88:2, 88:6, 88:19, 90:23, 91:15, 91:24, 92:17, 92:21, 94:4, 98:25, 99:6, 99:21, 100:1, 102:20, 102:21

**Governor's** [11] - 8:17, 21:22, 22:15, 26:14, 28:5, 28:24, 29:20, 45:20, 64:25, 81:11, 90:10

**governs** [1] - 86:11
**grade** [2] - 81:4, 81:5
**GRAND** [1] - 2:11
**grand** [1] - 35:8
**Grand** [1] - 5:1
**granted** [1] - 96:18
**granular** [1] - 93:1
**granularity** [1] - 96:23
**great** [2] - 42:1, 48:7
**guess** [1] - 12:14
**guide** [1] - 102:14
**guidelines** [1] - 44:6
**guys** [2] - 91:1, 102:9

# H

**half** [5] - 94:9, 95:10, 97:24, 98:7, 98:18
**hall** [1] - 26:14
**Hall** [1] - 54:25

**Hamilton** [3] - 86:14, 86:20, 86:22
**hammer** [1] - 89:18
**hand** [1] - 12:1
**handed** [2] - 48:19, 89:2
**happy** [2] - 74:24, 87:2
**harass** [5] - 11:19, 21:7, 44:10, 77:22
**harassed** [7] - 12:20, 24:23, 26:6, 27:4, 27:24, 41:20, 65:1
**harassing** [1] - 82:7
**harassment** [35] - 7:21, 11:9, 11:10, 11:15, 24:6, 26:6, 28:23, 28:24, 30:25, 41:3, 41:11, 41:16, 41:23, 42:7, 42:15, 45:22, 46:7, 48:24, 51:6, 52:6, 55:17, 59:23, 59:25, 61:5, 63:8, 64:20, 67:12, 70:23, 75:12, 78:21, 79:2, 82:4, 88:6, 88:20, 99:24
**hard** [6] - 12:12, 30:17, 47:15, 62:10, 62:21, 78:17
**hard-pressed** [1] - 12:12
**harm** [1] - 87:20
**Harris** [1] - 5:5
**HARRIS** [1] - 2:8
**hates** [1] - 30:9
**head** [2] - 28:6, 71:2
**headed** [1] - 24:14
**heal** [2] - 73:11, 74:14
**Health** [2] - 73:4, 73:25
**healthy** [1] - 13:19
**hear** [5] - 7:13, 7:20, 17:14, 41:6, 96:1
**heard** [9] - 31:20, 33:4, 44:12, 63:13, 69:15, 75:2, 89:22, 94:14, 100:13
**hearing** [2] - 44:8, 52:20
**hearings** [1] - 56:1
**hearsay** [8] - 25:5, 50:14, 50:15, 52:10, 52:11, 52:12, 52:13, 52:15
**heavily** [3] - 19:18, 19:19, 62:22
**heavy** [1] - 48:19
**heavy-handed** [1] - 48:19
**held** [2] - 80:4, 80:8
**hello** [1] - 41:8
**help** [2] - 32:7, 76:3
**helped** [1] - 76:10
**HERBERT** [1] - 3:7
**Herbert** [1] - 40:1
**herbert** [1] - 40:2
**herself** [2] - 48:20, 92:12
**hesitate** [1] - 74:8
**hi** [1] - 64:9
**hiding** [1] - 8:20
**highly** [2] - 51:8
**HILL** [1] - 2:17
**himself** [3] - 44:17, 57:10, 99:19
**hinted** [1] - 17:9
**Hinton** [19] - 2:21, 13:22, 57:3, 75:3, 75:5, 75:21, 76:4, 76:7, 76:22, 76:24, 77:2, 77:4, 77:5, 77:10, 77:14, 77:23, 78:3, 78:9, 78:13
**Hinton's** [2] - 76:18, 77:22
**hired** [4] - 26:10, 26:12, 26:15, 26:17

**history** [5] - 9:9, 13:14, 59:18, 67:2, 99:21
**holding** [1] - 57:23
**holdings** [1] - 50:25
**hole** [3] - 69:22, 70:10, 94:21
**holes** [2] - 70:11, 94:15
**holiday** [1] - 31:24
**home** [4] - 18:3, 73:10, 74:13
**honest** [1] - 25:24
**honestly** [2] - 22:24, 85:15
**Honor** [92] - 4:10, 4:12, 4:17, 4:21, 4:25, 5:4, 7:16, 7:24, 8:10, 8:13, 8:14, 8:25, 10:24, 11:18, 12:6, 12:17, 14:2, 14:8, 15:14, 16:1, 16:6, 17:8, 17:9, 22:21, 29:2, 33:4, 33:22, 34:11, 35:1, 35:24, 36:12, 37:1, 37:5, 37:17, 37:21, 38:3, 38:9, 43:10, 45:2, 49:21, 50:5, 50:16, 51:10, 51:21, 52:15, 54:12, 55:3, 56:9, 57:17, 58:16, 60:18, 61:4, 61:9, 61:25, 62:4, 62:7, 63:13, 65:4, 66:4, 67:22, 67:23, 68:12, 70:14, 72:15, 72:23, 75:4, 78:18, 83:15, 87:24, 88:1, 89:1, 89:6, 89:14, 93:4, 93:13, 93:17, 93:18, 94:6, 95:4, 95:10, 96:17, 96:19, 97:19, 98:17, 98:23, 99:7, 99:8, 100:8, 100:20, 102:19
**Honor's** [10] - 8:14, 48:22, 49:12, 60:20, 60:23, 70:8, 77:16, 78:2, 97:18, 99:2
**HONORABLE** [1] - 1:21
**hoops** [1] - 89:23
**hope** [1] - 58:17
**hopeful** [1] - 68:5
**hopefully** [1] - 65:17
**hoping** [1] - 60:14
**host** [1] - 23:11
**hostile** [7] - 7:20, 10:10, 47:23, 55:13, 66:20, 100:1, 103:6
**hours** [8] - 16:4, 24:9, 29:16, 82:23, 83:2, 83:6, 83:10
**Howard** [5] - 26:15, 28:6, 68:22, 68:23, 69:25
**HUD** [1] - 75:9
**hundred** [1] - 75:23
**hundreds** [2] - 79:12, 91:19
**hurt** [1] - 72:7
**husband** [6] - 20:22, 20:25, 35:14, 74:5, 80:7
**husband's** [4] - 14:23, 20:18, 20:19, 34:22
**hydra** [1] - 24:14
**hypothetical** [1] - 76:25

# I

**IASON** [1] - 2:11
**Iason** [1] - 5:1
**idea** [3] - 32:24, 45:15, 45:16
**identical** [1] - 89:10
**identified** [1] - 94:21
**identify** [1] - 96:23

**identifying** [1] - 62:18, 100:9
**identities** [1] - 19:23
**identity** [1] - 72:11
**imaged** [1] - 21:24
**images** [3] - 21:24, 22:15, 22:18
**imagine** [1] - 36:21
**impact** [1] - 85:9
**impeach** [2] - 66:14, 77:2
**impeachment** [6] - 46:25, 47:3, 48:11, 66:16, 67:14, 70:13
**imperative** [1] - 84:20
**implicates** [1] - 103:7
**implications** [1] - 6:14
**implied** [1] - 27:23
**implore** [1] - 48:3
**importance** [2] - 24:20, 25:14
**important** [5] - 5:24, 19:24, 26:19, 56:7, 73:18
**impossible** [1] - 55:25
**impressed** [1] - 26:16
**impression** [1] - 22:22
**improper** [1] - 8:2
**inadmissible** [2] - 52:1, 52:3
**inapposite** [1] - 86:16
**inappropriately** [2] - 25:1, 25:3
**incident** [5] - 77:25, 78:21, 83:3, 83:5, 88:19
**inclined** [1] - 17:10
**include** [2] - 87:3, 89:9
**included** [8] - 7:14, 7:17, 10:8, 31:9, 35:2, 73:2, 74:16, 88:20
**includes** [1] - 23:1
**including** [8] - 7:21, 17:1, 18:22, 19:8, 39:7, 58:9, 62:1, 68:20
**incomplete** [3] - 31:16, 94:13, 94:19
**inconvenience** [1] - 9:6
**inconveniences** [1] - 8:5
**inconveniencing** [1] - 10:1
**incredibly** [1] - 96:4
**independently** [1] - 27:16
**indicate** [1] - 53:22
**indicated** [1] - 82:21
**indicates** [1] - 102:22
**indicating** [1] - 83:4
**indication** [1] - 81:1
**individual** [5] - 6:23, 43:22, 43:25, 91:4, 91:6
**individually** [1] - 78:9
**individuals** [4] - 41:20, 47:19, 79:4, 103:6
**inefficient** [1] - 44:5
**inform** [2] - 17:22, 87:12
**information** [34] - 6:25, 9:23, 10:21, 12:10, 14:10, 14:12, 16:21, 16:23, 18:16, 18:18, 19:11, 34:15, 36:21, 43:24, 44:13, 45:7, 47:12, 53:22, 56:19, 58:8, 73:15, 78:3, 82:18, 84:8, 85:25, 86:1, 90:10, 91:17, 92:19, 92:23, 93:2, 97:25, 99:20, 100:9

**inherent** [1] - 52:22
**inquiry** [1] - 55:6
**insinuate** [1] - 58:20
**insist** [1] - 103:5
**instance** [5] - 9:1, 10:1, 31:10, 39:16, 81:13
**instances** [1] - 10:10
**instead** [1] - 94:22
**instruction** [1] - 49:12
**insufficient** [1] - 43:21
**integrity** [2] - 5:24, 5:25
**intended** [1] - 48:21
**intensive** [2] - 90:17, 102:6
**intent** [1] - 69:12
**interact** [1] - 85:23
**interaction** [1] - 28:8
**interactions** [2] - 46:14, 55:10
**interest** [3] - 32:17, 56:7, 89:21
**interested** [11] - 2:14, 2:17, 2:20, 2:23, 3:2, 3:5, 5:9, 5:11, 44:20, 68:12, 95:18
**interesting** [4] - 22:2, 31:2, 42:9, 88:3
**intern** [3] - 60:17, 63:20, 65:7
**interpreted** [1] - 90:6
**interview** [13] - 37:22, 55:5, 58:11, 58:15, 62:9, 62:13, 73:16, 78:5, 87:5, 87:11, 89:3, 92:7, 99:3
**interviewed** [5] - 78:12, 78:13, 89:4, 92:1, 92:13
**interviews** [1] - 92:9
**intimidate** [1] - 48:21
**intimidating** [1] - 13:19
**introduce** [7] - 7:1, 11:21, 49:15, 50:22, 51:12, 51:13, 54:17
**introduced** [1] - 57:10
**introducing** [1] - 52:22
**investigation** [16] - 6:9, 6:11, 13:21, 14:10, 23:16, 24:4, 29:22, 37:17, 50:8, 50:11, 54:15, 54:19, 55:4, 65:24, 69:7, 94:3
**investigations** [4] - 5:25, 6:2, 6:6, 51:22
**investigative** [2] - 6:25, 52:24
**investigator** [1] - 77:11
**investigators** [8] - 29:13, 50:18, 50:21, 50:23, 50:24, 50:25, 55:8, 76:14
**investigators'** [1] - 51:1
**involved** [3] - 5:14, 28:7, 65:23
**involvement** [1] - 46:9
**involving** [1] - 103:21
**iPhone** [1] - 22:1
**irony** [1] - 30:21
**irrelevant** [3] - 24:24, 24:25, 37:6
**issue** [15] - 9:22, 14:4, 22:20, 39:2, 44:2, 54:4, 54:6, 65:11, 66:2, 69:20, 71:3, 82:18, 88:9, 98:13, 100:8
**issued** [3] - 27:6, 27:17, 56:23
**issues** [25] - 5:16, 5:23, 9:16, 9:19, 15:23, 16:7, 17:14, 32:25, 36:8, 36:18, 40:14, 43:20, 44:10, 52:22, 65:15, 67:8, 69:23, 70:1, 79:16, 88:18, 88:20,

88:21, 89:19, 90:2, 90:25
**issuing** [2] - 9:11, 65:13
**items** [1] - 87:16
**itself** [1] - 73:5

## J

**Jackson** [9] - 20:4, 25:18, 25:20, 25:22, 26:3, 37:4, 37:6, 55:7, 55:10
**Jackson's** [6] - 25:12, 25:16, 32:20, 55:9, 55:11, 55:21
**James** [1] - 54:22
**job** [3] - 28:15, 76:4, 76:11
**John** [1] - 4:12
**JOHN** [1] - 1:25
**joining** [1] - 13:15
**joint** [2] - 17:18, 43:22
**jointly** [1] - 43:23
**joking** [1] - 102:5
**Joseph** [1] - 5:2
**Journal** [1] - 25:19
**judge** [2] - 54:18, 91:22
**JUDGE** [1] - 1:21
**Judge** [4] - 17:23, 22:23, 54:25, 84:24
**judgement** [1] - 6:20
**Judiciary** [3] - 6:12, 23:18, 91:3
**July** [1] - 80:25
**jump** [1] - 89:22
**June** [2] - 13:21, 40:7
**jurist** [1] - 48:1
**jury** [3] - 7:20, 16:19, 54:17
**Justice** [1] - 30:8

## K

**Kaitlin** [19] - 3:2, 31:20, 31:23, 39:11, 57:15, 92:3, 92:8, 93:19, 93:24, 94:1, 94:25, 95:7, 95:18, 96:7, 96:11, 96:18, 96:24, 99:14
**Kaitlin's** [9] - 31:21, 94:12, 94:18, 99:5, 99:17, 100:5, 100:20, 101:10, 101:17
**Karen** [1] - 2:21
**Katherine** [1] - 4:18
**KATHERINE** [1] - 2:4
**Kayasha** [1] - 5:2
**keep** [3] - 24:2, 28:16, 102:1
**kept** [1] - 72:8
**kick** [1] - 32:8
**kicking** [1] - 61:12
**kid** [1] - 30:5
**kids'** [1] - 20:17
**kill** [1] - 11:21
**kind** [2] - 89:17, 96:7
**kinds** [1] - 99:7
**knowledge** [3] - 25:5, 26:1, 49:3
**known** [1] - 41:21
**knows** [9] - 5:13, 20:9, 26:6, 29:24, 36:9, 43:24, 46:15, 48:11, 92:9
**Korman** [1] - 4:18
**KORMAN** [1] - 2:3

# L

**labeled** [1] - 61:22
**laborious** [1] - 44:24
**lack** [2] - 53:22, 79:17
**lacking** [4] - 7:5, 7:6, 38:11, 56:9
**lacks** [2] - 53:25, 54:18
**landscape** [1] - 17:22
**language** [1] - 52:3
**large** [4] - 19:21, 19:24, 27:9, 62:22
**last** [12] - 5:16, 30:2, 30:3, 31:21, 35:23, 35:24, 37:11, 57:7, 62:7, 74:14, 78:2, 92:3
**latitude** [1] - 49:10
**law** [8] - 7:19, 11:18, 16:17, 34:13, 49:7, 51:2, 52:3, 67:18
**Law** [1] - 4:14
**LAW** [2] - 2:14, 2:23
**lawsuit** [2] - 18:4, 27:20
**lawsuits** [2] - 79:6
**lawyer** [3] - 24:11, 24:12, 30:1
**lawyers** [5] - 22:8, 30:6, 33:18, 33:19, 56:7
**layers** [2] - 52:16, 55:23
**layout** [1] - 100:23
**LDH)TAM** [2] - 1:4, 1:13
**leading** [1] - 31:19
**learn** [3] - 9:10, 97:21, 97:23
**learned** [3] - 25:16, 30:24, 45:23
**least** [5] - 45:5, 65:13, 75:22, 77:14, 101:12
**leave** [2] - 60:6, 89:14
**leaving** [1] - 68:15
**left** [16] - 27:22, 27:24, 28:3, 28:4, 28:14, 28:19, 28:23, 28:25, 59:23, 60:2, 60:6, 67:12, 73:10, 93:10, 94:1
**legal** [7] - 17:22, 24:24, 37:5, 51:3, 51:7, 52:2, 55:12
**legally** [3] - 34:9, 50:7, 50:10
**legislation** [1] - 91:18
**legislative** [9] - 88:15, 88:19, 88:25, 90:2, 90:4, 90:5, 90:11, 90:18, 91:2
**legislator** [2] - 91:4, 92:13
**legislator's** [1] - 91:6
**legislators** [1] - 90:7
**legislature** [1] - 6:1
**length** [2] - 52:20, 80:5
**lengthy** [2] - 21:18, 23:15
**Leo** [1] - 4:18
**LEO** [1] - 2:3
**less** [4] - 37:8, 78:5, 97:16, 98:14
**letter** [5] - 5:20, 7:19, 13:22, 17:18, 89:17
**letters** [2] - 30:3, 30:10
**level** [1] - 11:5
**levels** [1] - 66:13
**leverage** [1] - 48:13
**liar** [2] - 61:23, 63:7
**LICUL** [70] - 1:25, 4:10, 7:16, 10:24,

11:17, 12:5, 12:13, 12:17, 13:1, 13:4, 13:7, 13:10, 15:5, 15:8, 15:14, 15:19, 15:22, 15:25, 16:10, 17:1, 17:3, 17:8, 33:4, 33:6, 33:13, 33:17, 34:11, 34:18, 35:1, 35:4, 35:6, 35:23, 36:12, 36:23, 37:15, 38:3, 38:6, 45:16, 46:23, 47:2, 47:10, 48:14, 49:14, 49:17, 49:19, 49:21, 50:5, 50:7, 50:10, 50:15, 50:19, 50:23, 51:10, 51:16, 51:20, 51:25, 52:4, 52:8, 52:11, 52:14, 52:18, 53:10, 53:14, 54:1, 54:6, 54:9, 54:12, 55:2, 55:9, 56:9
**Licul** [27] - 4:10, 7:13, 10:7, 11:12, 18:24, 19:7, 19:12, 20:7, 20:9, 20:17, 26:23, 32:12, 34:7, 38:12, 38:23, 41:1, 41:25, 44:21, 45:15, 47:25, 51:19, 53:12, 66:18, 66:23, 72:3, 86:3, 103:5
**Licul's** [2] - 17:15, 71:6
**lie** [1] - 28:19
**Lieutenant** [1] - 26:15
**life** [3] - 25:10, 69:5, 82:8
**lift** [1] - 100:7
**light** [2] - 60:6, 60:7
**likely** [3] - 10:21, 44:9, 51:4
**likewise** [1] - 83:9
**limine** [1] - 53:5
**limit** [5] - 16:14, 59:2, 80:21, 83:9
**limitation** [1] - 80:18
**limitations** [1] - 80:25
**limited** [11] - 11:17, 13:4, 42:9, 42:18, 45:18, 50:4, 66:7, 79:7, 80:20, 83:7, 86:17
**limits** [7] - 47:10, 61:1, 68:2, 70:7, 72:16, 83:15
**Limmiatis** [11] - 57:5, 78:20, 78:21, 80:1, 80:5, 80:6, 80:11, 80:22, 82:22, 82:24, 83:1
**Lindsey** [21] - 2:15, 4:15, 23:3, 26:1, 26:25, 27:11, 28:20, 30:20, 30:21, 30:23, 31:4, 31:8, 39:3, 64:9, 65:1, 68:19, 69:12, 69:16, 92:4, 96:8, 96:12
**LINDSEY** [1] - 1:17
**line** [2] - 29:15, 47:12
**lines** [1] - 51:5
**Liss** [15] - 20:4, 25:12, 25:16, 25:18, 25:20, 32:20, 37:4, 37:6, 39:11, 55:9, 55:10, 55:11, 76:12, 76:22
**Liss-Jackson** [6] - 20:4, 25:18, 25:20, 37:4, 37:6, 55:10
**Liss-Jackson's** [5] - 25:12, 25:16, 32:20, 55:9, 55:11
**listing** [1] - 85:25
**litigants** [1] - 47:17
**litigate** [6] - 8:3, 22:23, 32:15, 69:22, 69:23, 69:24
**litigated** [2] - 33:11, 36:25
**litigation** [4] - 8:12, 10:12, 32:18, 77:18
**live** [2] - 33:16, 72:19
**LLP** [9] - 1:23, 2:5, 2:17, 2:20, 3:2, 3:5, 4:11, 4:13, 4:22

**local** [1] - 43:18
**log** [2] - 90:19, 91:8
**look** [18] - 17:23, 18:19, 32:14, 44:22, 47:15, 47:22, 48:16, 55:14, 63:2, 63:7, 80:13, 80:15, 81:6, 81:9, 95:21, 102:13, 103:17
**looked** [3] - 39:8, 78:24, 98:12
**looking** [9] - 25:21, 47:12, 48:9, 67:17, 79:24, 80:20, 83:14, 92:24, 97:2
**looks** [3] - 26:10, 26:18, 30:22
**losing** [1] - 9:20
**lost** [2] - 9:20, 61:17
**love** [3] - 28:16, 32:6, 87:9
**Lucchese** [1] - 3:9
**Lyons** [1] - 5:2

# M

**Mad** [2] - 37:7, 55:18
**MAGISTRATE** [1] - 1:21
**mail** [1] - 97:5
**main** [2] - 5:11, 70:20
**maintained** [2] - 84:21, 85:12
**manner** [1] - 29:14
**March** [1] - 81:22
**mark** [1] - 5:22
**massive** [1] - 28:12
**material** [2] - 46:25, 47:3
**materials** [3] - 6:4, 52:24, 89:5
**matter** [5] - 79:8, 85:9, 99:14, 99:22, 103:25
**matters** [3] - 40:21, 84:13, 100:16
**McGrath** [13] - 57:6, 78:20, 78:22, 80:6, 80:23, 81:10, 81:15, 81:17, 81:21, 81:23, 82:6, 82:23, 82:24
**mean** [20] - 11:9, 11:19, 11:21, 13:19, 13:22, 23:3, 30:20, 48:9, 48:16, 50:3, 50:21, 51:16, 53:6, 55:18, 61:21, 62:20, 67:15, 70:10, 79:24, 83:3
**meaningful** [1] - 47:16
**meaningfully** [4] - 6:18, 6:20, 56:4, 90:24
**means** [2] - 7:24, 18:8
**meant** [2] - 12:19, 21:6
**meantime** [2] - 43:19, 56:6
**media** [4] - 31:7, 63:22, 64:7, 65:6
**medical** [1] - 21:11
**Medium** [1] - 31:18
**meet** [31] - 14:11, 14:22, 30:4, 30:13, 38:25, 47:16, 59:4, 62:11, 80:23, 80:25, 83:12, 84:15, 88:11, 90:24, 91:14, 92:17, 94:20, 95:3, 95:10, 95:17, 97:1, 97:4, 97:20, 98:7, 98:21, 100:21, 101:5, 101:24, 102:10, 102:12
**meet-and-confer** [12] - 80:25, 84:15, 91:14, 92:17, 94:20, 95:3, 95:17, 97:1, 97:4, 98:21, 102:12
**meet-and-confers** [12] - 30:4, 30:13, 80:23, 83:12, 88:11, 95:10, 97:20, 98:7, 100:21, 101:5, 101:24, 102:10

**meeting** [3] - 28:14, 43:12, 44:20
**meetings** [1] - 28:5
**Melissa** [5] - 2:11, 5:3, 41:8, 42:5, 42:21
**member** [1] - 18:17
**memorialize** [1] - 74:17
**memorialized** [1] - 73:7
**memos** [8] - 28:3, 37:22, 58:11, 58:15, 62:9, 62:13, 87:5, 99:3
**Menesque** [2] - 37:7, 55:18
**mention** [2] - 8:13, 97:18
**mentioned** [6] - 7:17, 39:19, 88:7, 90:3, 93:18, 98:14
**MERKL** [1] - 1:21
**mess** [2] - 17:19, 38:12
**message** [3] - 22:3, 64:9, 69:3
**messages** [9] - 20:14, 22:5, 31:9, 63:23, 64:6, 90:9, 95:23, 96:12, 97:8
**met** [6] - 6:18, 6:20, 9:15, 72:11, 75:19, 95:12
**method** [1] - 43:25
**Michele** [1] - 3:9
**microphone** [1] - 57:22
**middle** [3] - 28:18, 80:8, 93:9
**midst** [1] - 99:1
**might** [10] - 5:18, 45:5, 61:7, 61:18, 63:13, 92:23, 95:1, 95:7, 98:16, 103:20
**mind** [2] - 25:12, 57:23
**minimize** [1] - 87:20
**minimum** [1] - 38:23
**minor** [2] - 8:4, 66:21
**minute** [3] - 68:8, 69:19, 100:18
**mistreated** [1] - 12:2
**misunderstood** [1] - 12:18
**mixed** [1] - 51:2
**MLuccheseEDNY@gmail.com** [1] - 3:12
**mom** [1] - 82:7
**moment** [1] - 47:7
**month** [1] - 60:16
**months** [4] - 26:15, 28:4, 28:9, 94:8
**moral** [1] - 61:9
**morass** [1] - 23:25
**morning** [9] - 4:2, 4:10, 4:12, 4:17, 4:21, 4:25, 5:4, 5:7, 71:6
**MORRISON** [1] - 2:20
**Morvillo** [1] - 5:1
**MORVILLO** [1] - 2:11
**most** [5] - 13:22, 24:7, 34:1, 41:6, 89:16
**mother** [1] - 79:5
**motion** [35] - 8:21, 9:22, 12:24, 13:4, 14:7, 15:5, 19:10, 25:13, 32:9, 32:16, 33:11, 36:15, 36:17, 37:23, 40:18, 41:22, 42:1, 53:5, 56:1, 62:5, 65:9, 89:7, 89:9, 89:14, 89:17, 89:25, 96:13, 96:16, 96:17, 96:19, 97:15, 98:24, 100:5, 100:23, 102:6
**motion-to-compel** [1] - 102:6
**motions** [15] - 5:15, 5:17, 6:21, 9:2,

13:15, 13:16, 18:21, 36:13, 36:17, 43:14, 43:15, 43:20, 44:4, 89:11, 89:17
**motivations** [2] - 60:15, 70:13
**motive** [2] - 31:1, 69:12
**move** [6] - 44:7, 44:15, 44:16, 45:12, 56:5, 85:5
**moving** [1] - 45:6
**MR** [90] - 4:10, 4:12, 5:4, 7:16, 10:24, 11:17, 12:5, 12:13, 12:17, 13:1, 13:4, 13:7, 13:10, 15:5, 15:8, 15:14, 15:19, 15:22, 15:25, 16:10, 17:1, 17:3, 17:8, 33:4, 33:6, 33:13, 33:17, 34:11, 34:18, 35:1, 35:4, 35:6, 35:23, 36:12, 36:23, 37:15, 38:3, 38:6, 39:24, 40:1, 43:10, 45:2, 45:16, 46:23, 47:2, 47:10, 48:14, 49:14, 49:17, 49:19, 49:21, 50:5, 50:7, 50:10, 50:15, 50:19, 50:23, 51:10, 51:16, 51:20, 51:25, 52:4, 52:8, 52:11, 52:14, 52:18, 53:10, 53:14, 54:1, 54:6, 54:9, 54:12, 55:2, 55:9, 56:9, 63:16, 63:19, 68:7, 72:23, 83:22, 84:11, 87:1, 87:8, 87:22, 87:24, 90:20, 90:22, 93:4, 93:9, 93:12
**MS** [64] - 4:14, 4:17, 4:21, 4:25, 17:23, 19:21, 20:22, 20:25, 23:17, 24:25, 27:11, 27:14, 32:10, 33:21, 33:24, 37:14, 37:21, 37:25, 38:17, 39:2, 39:23, 40:3, 40:17, 40:23, 43:4, 57:5, 57:8, 57:14, 57:17, 58:16, 59:4, 59:6, 59:7, 59:24, 60:8, 62:25, 63:13, 64:17, 64:24, 65:4, 66:2, 66:4, 66:7, 66:22, 67:15, 68:10, 69:21, 70:5, 72:2, 75:4, 78:16, 78:18, 91:20, 91:22, 93:8, 93:17, 100:13, 100:18, 100:20, 101:4, 101:8, 102:8, 102:17, 102:19
**mud** [2] - 61:21, 72:19
**multi** [1] - 24:14
**multi-hydra-headed** [1] - 24:14
**murder** [1] - 11:20
**must** [3] - 7:20, 41:20, 95:13
**myriad** [1] - 36:7

## N

**nail** [1] - 70:13
**NAJMI** [8] - 2:23, 2:25, 87:24, 90:20, 90:22, 93:4, 93:9, 93:12
**najmi** [1] - 92:16
**Najmi** [3] - 57:11, 87:23, 90:3
**name** [13] - 23:3, 27:1, 31:21, 39:25, 46:1, 57:7, 61:21, 63:24, 78:10, 92:3, 99:17, 100:5, 100:9
**named** [7] - 40:15, 74:16, 78:8, 78:12, 86:5, 86:9, 95:23
**names** [5] - 5:10, 20:2, 20:5, 62:20, 99:8, 99:10
**narrow** [10] - 6:19, 29:4, 30:18, 44:16, 44:21, 56:4, 58:17, 62:7, 90:24, 97:1
**narrowed** [1] - 10:1

**narrowing** [3] - 8:14, 9:1, 72:6
**nature** [1] - 76:13
**naught** [1] - 27:20
**necessarily** [4] - 12:5, 45:8, 45:9, 51:8
**necessary** [1] - 36:10
**need** [41] - 8:16, 10:18, 16:18, 18:19, 18:21, 19:11, 22:25, 23:5, 23:9, 24:12, 24:13, 24:20, 25:5, 25:11, 34:16, 39:7, 42:4, 42:7, 42:11, 43:2, 44:15, 46:15, 46:16, 47:8, 48:5, 48:6, 53:4, 53:6, 53:7, 56:13, 56:20, 65:2, 69:11, 82:13, 84:6, 90:18, 91:9, 98:8, 100:16, 103:3, 103:20
**needed** [3] - 14:11, 18:12, 39:1
**needing** [1] - 23:15
**needs** [4] - 7:11, 16:22, 18:8, 96:5
**negotiate** [2] - 42:10, 43:4
**negotiated** [1] - 42:16
**negotiating** [1] - 42:17
**never** [19] - 12:20, 35:7, 59:16, 65:1, 65:4, 72:10, 72:11, 73:2, 73:19, 73:20, 75:19, 75:20, 88:5, 93:24, 93:25, 96:22, 98:13, 99:17
**nevertheless** [2] - 75:21, 76:17
**NEW** [2] - 1:1, 1:8
**new** [1] - 18:16
**New** [28] - 1:6, 1:24, 2:2, 2:6, 2:8, 2:9, 2:12, 2:15, 2:18, 2:21, 2:24, 3:3, 3:6, 3:11, 4:5, 5:5, 10:16, 43:7, 45:1, 45:9
**newspaper** [1] - 75:14
**next** [2] - 57:4, 71:8
**nobody** [1] - 56:2
**non** [4] - 27:25, 57:14, 66:14, 91:8
**non-categorical** [1] - 91:8
**non-disclosure** [1] - 27:25
**non-party** [2] - 57:14, 66:14
**none** [5] - 18:12, 28:2, 31:9, 32:3, 60:19
**nonparties** [11] - 9:6, 10:2, 14:14, 34:2, 38:19, 39:14, 44:7, 44:8, 79:7, 83:13, 94:15
**nonparty** [11] - 4:14, 13:18, 66:15, 77:4, 81:8, 81:16, 82:7, 88:5, 93:19, 95:10, 98:22
**nonparty's** [2] - 83:8, 98:18
**noon** [4] - 15:24, 53:1, 53:2, 68:6
**Noonan** [1] - 4:23
**notable** [1] - 85:25
**notably** [1] - 7:6
**note** [1] - 73:18
**noted** [2] - 6:13, 70:14
**notes** [3] - 87:5, 87:11, 89:3
**nothing** [19] - 31:17, 41:15, 42:4, 54:19, 61:6, 70:17, 73:1, 74:6, 74:17, 74:19, 77:5, 77:16, 81:24, 82:4, 86:5, 86:15, 92:11, 97:8, 97:15
**notice** [1] - 41:2
**notion** [1] - 65:23
**notwithstanding** [2] - 41:13, 41:17
**number** [10] - 5:15, 7:25, 30:4, 35:12, 35:13, 36:22, 42:19, 42:22, 78:11,

83:10
**Number** [1] - 72:25
**numerous** [1] - 9:13
**NY** [1] - 2:21

## O

**OAG** [4] - 94:15, 95:5, 95:23, 99:3
**oath** [1] - 49:9
**object** [2] - 62:17, 92:3
**objecting** [3] - 13:8, 13:10, 13:12
**objection** [2] - 58:7, 99:9
**objections** [5] - 13:12, 16:2, 40:4, 85:4, 88:24
**obligation** [1] - 34:11
**obligations** [2] - 9:14, 22:17
**observe** [1] - 85:23
**obviously** [8] - 13:16, 16:24, 17:13, 57:20, 62:18, 67:22, 89:8, 103:19
**occasion** [1] - 90:4
**occasionally** [1] - 62:21
**occurred** [1] - 78:1
**ocean** [1] - 67:17
**Ocean** [1] - 9:20
**OF** [3] - 1:1, 1:20, 2:23
**offer** [1] - 35:10
**offered** [3] - 8:18, 18:24, 35:11
**Office** [29] - 6:1, 14:21, 15:24, 18:15, 23:16, 25:4, 31:4, 38:2, 38:5, 38:25, 39:4, 39:12, 39:15, 39:18, 56:12, 56:21, 58:8, 58:10, 58:19, 58:23, 58:25, 60:4, 62:9, 62:14, 87:5, 94:13, 94:24, 99:12, 103:22
**office** [9] - 4:16, 53:20, 77:9, 77:12, 78:6, 78:23, 81:11, 92:1, 94:11
**OFFICE** [1] - 2:23
**official** [1] - 6:5
**Official** [1] - 3:10
**often** [1] - 54:16
**old** [1] - 85:1
**Old** [1] - 16:17
**once** [9] - 24:3, 28:1, 64:12, 65:10, 83:1, 97:8, 97:14, 98:7, 98:14
**one** [69] - 8:1, 8:13, 8:24, 9:3, 9:17, 9:20, 12:21, 15:2, 16:3, 17:24, 19:14, 20:3, 20:8, 23:25, 24:1, 24:18, 24:19, 25:15, 26:4, 28:5, 29:8, 31:13, 33:6, 36:10, 36:13, 36:17, 37:4, 38:13, 40:8, 40:17, 43:15, 43:23, 44:2, 45:10, 46:1, 46:4, 47:22, 49:13, 53:19, 54:3, 54:15, 54:24, 57:24, 58:4, 65:1, 68:8, 68:11, 68:15, 68:20, 69:11, 69:19, 72:15, 73:25, 74:16, 78:9, 79:4, 82:19, 84:23, 85:1, 89:6, 90:21, 91:12, 91:22, 91:23, 93:4, 93:21, 94:7, 97:18, 100:18
**ones** [1] - 72:17
**open** [1] - 63:9
**openness** [1] - 59:7
**opinion** [1] - 56:23
**opponent** [2] - 53:20, 53:21

**opportunity** [8] - 7:17, 9:1, 16:20, 33:14, 41:24, 72:24, 87:12, 98:15
**oppose** [1] - 12:12
**opposed** [2] - 12:22, 12:23
**opposing** [2] - 16:1, 16:7
**opt** [1] - 28:1
**options** [1] - 53:13
**order** [17] - 16:22, 34:17, 44:15, 56:22, 82:17, 84:7, 84:14, 84:17, 84:18, 84:22, 85:13, 85:15, 86:19, 87:17, 100:4, 100:6, 100:10
**ordered** [1] - 84:23
**originally** [1] - 34:6
**ourself** [1] - 45:3
**ourselves** [1] - 23:20
**outcome** [1] - 91:18
**outline** [1] - 21:18
**outlined** [1] - 47:24
**outreach** [1] - 95:24
**outside** [3] - 46:18, 60:10, 62:3
**outspoken** [3] - 75:12, 77:23, 88:17
**outstanding** [1] - 36:18
**overall** [1] - 7:4
**overcome** [2] - 10:22, 12:2
**overkill** [2] - 15:15, 16:12
**overlap** [2] - 73:20, 73:22
**overlapped** [1] - 92:2
**overlapping** [1] - 47:21
**own** [6] - 9:13, 23:10, 24:4, 25:10, 31:15, 51:6, 85:10, 86:18

## P

**package** [1] - 88:19
**pact** [1] - 50:2
**page** [2] - 54:15, 71:8
**pages** [15] - 22:15, 31:9, 31:12, 39:4, 39:8, 73:7, 75:23, 76:1, 76:7, 76:12, 79:12, 91:19, 94:5, 94:7
**pale** [1] - 14:25
**Palermo** [2] - 5:5, 43:8
**PALERMO** [4] - 2:9, 5:4, 43:10, 45:2
**pandemic** [1] - 73:5
**paper** [1] - 20:4
**papers** [12] - 7:9, 20:20, 35:2, 59:21, 61:22, 66:19, 67:7, 67:8, 100:22, 101:23, 102:3
**parade** [1] - 11:14
**paragraph** [1] - 74:16
**paragraphs** [4] - 18:2, 23:2, 23:4, 27:1
**parameters** [3] - 7:2, 55:24, 86:19
**paraphrasing** [1] - 13:25
**Parish** [1] - 63:24
**PARK** [2] - 63:16, 63:19
**part** [26] - 6:16, 12:24, 14:10, 15:21, 19:14, 25:13, 29:9, 29:14, 29:17, 29:23, 29:24, 32:11, 34:1, 34:7, 46:21, 69:15, 73:11, 75:22, 78:2, 89:9, 89:15, 90:10, 102:4, 102:5, 103:8

**participate** [2] - 41:10, 41:16
**participated** [1] - 41:22
**participating** [1] - 41:14
**particular** [6] - 18:17, 52:9, 54:21, 64:4, 64:12, 89:22
**particularly** [1] - 85:8
**parties** [50] - 4:8, 5:9, 5:11, 5:12, 6:17, 7:2, 14:13, 14:17, 14:22, 32:11, 32:13, 32:17, 36:5, 36:25, 37:2, 38:16, 38:23, 40:4, 40:5, 41:7, 41:18, 42:12, 42:19, 42:25, 44:6, 44:19, 47:17, 56:3, 56:6, 56:16, 56:20, 57:13, 58:4, 59:12, 60:21, 61:1, 61:24, 68:1, 70:8, 72:5, 72:16, 74:7, 79:6, 83:25, 86:4, 86:5, 89:19, 89:22, 91:10, 102:21
**partner** [1] - 99:22
**party** [27] - 2:15, 2:18, 2:21, 2:24, 3:2, 3:5, 13:6, 14:6, 15:2, 17:16, 31:24, 36:2, 36:24, 43:2, 50:2, 57:14, 58:22, 64:6, 66:14, 66:21, 67:19, 69:24, 73:18, 73:19, 81:22, 82:1, 88:5
**past** [3] - 59:11, 60:16, 99:22
**payroll** [1] - 28:12
**Pearl** [1] - 2:18
**pending** [10] - 5:15, 5:17, 9:2, 14:7, 18:21, 40:18, 84:1, 89:11, 96:14, 96:16
**penultimate** [1] - 95:16
**people** [27] - 10:14, 10:20, 11:21, 12:1, 12:7, 12:9, 12:15, 19:22, 20:1, 24:14, 26:18, 41:5, 43:17, 43:18, 48:5, 48:8, 50:18, 51:5, 55:5, 58:12, 68:22, 89:16, 90:14, 90:23, 91:15, 95:25, 103:20
**per** [2] - 51:22, 52:1
**perceive** [1] - 25:2
**percent** [2] - 19:25
**perfect** [1] - 35:16
**perfectly** [3] - 15:10, 16:5, 37:3
**perhaps** [5] - 49:1, 49:23, 53:6, 60:21, 65:20
**perimeter** [2] - 11:25, 75:7
**period** [1] - 93:22
**periods** [1] - 88:13
**perjured** [1] - 48:20
**perjury** [1] - 48:19
**permission** [1] - 89:24
**permitted** [1] - 43:18
**perpetrator** [2] - 48:24, 49:4
**perpetrator's** [1] - 7:21
**Perrotta** [11] - 20:13, 20:15, 20:16, 20:18, 21:4, 34:21, 35:7, 35:11, 35:13, 48:14, 48:17
**Perrotta's** [2] - 21:20, 22:6
**Perry** [11] - 4:14, 7:22, 10:12, 47:24, 57:21, 58:2, 63:19, 69:18, 69:19, 70:4
**PERRY** [19] - 2:14, 2:16, 4:14, 57:17, 58:16, 59:4, 59:7, 59:24, 60:8, 62:25, 65:4, 66:2, 66:4, 66:7, 66:22, 67:15, 69:21, 70:5, 72:2
**person** [9] - 25:2, 59:24, 60:13, 64:11,

64:12, 64:15, 66:17, 82:25, 99:18
**personal** [11] - 25:5, 26:1, 26:8, 62:18, 73:14, 73:17, 74:5, 90:1, 99:20, 99:22, 99:25
**personally** [1] - 24:8
**persons** [1] - 90:9
**perspective** [2] - 84:9, 99:13
**pertaining** [2] - 10:21, 84:4
**pest** [1] - 14:19
**PETRINO** [1] - 2:4
**Petrino** [1] - 4:18
**petty** [1] - 8:4
**phone** [28] - 9:9, 9:20, 14:23, 14:24, 20:18, 21:2, 21:5, 21:22, 34:22, 34:23, 35:11, 35:12, 35:19, 48:9, 70:15, 70:16, 97:24, 98:3, 98:8, 98:12, 98:14, 98:15, 98:18, 98:19
**phones** [3] - 20:18, 21:23, 22:16
**photo** [1] - 82:2
**photographs** [1] - 81:21
**photos** [1] - 81:23
**picked** [1] - 35:8
**pictures** [1] - 80:6
**piece** [1] - 49:25
**pieces** [1] - 14:11
**Pittsford** [1] - 2:9
**place** [8] - 48:16, 67:4, 72:18, 81:11, 83:15, 84:14, 100:2, 100:4
**Plaintiff** [3] - 1:5, 1:13, 1:23
**plaintiff** [12] - 4:9, 6:7, 6:17, 21:22, 39:20, 61:7, 67:19, 78:12, 93:19, 98:21, 103:12, 103:14
**plaintiff's** [11] - 16:16, 17:25, 18:19, 22:11, 27:19, 29:12, 29:18, 41:19, 44:12, 71:5, 88:8
**plaintiffs** [1] - 33:19
**plan** [3] - 16:19, 33:2, 51:12
**plane** [2] - 69:15, 69:17
**planning** [1] - 15:17
**play** [4] - 16:11, 68:21, 84:9, 86:23
**plays** [1] - 27:9
**Plaza** [2] - 3:2, 3:10
**plead** [1] - 71:5
**plenty** [2] - 60:25, 83:4
**PLLC** [4] - 2:1, 2:8, 4:19, 5:5
**point** [25] - 9:20, 15:14, 16:12, 17:14, 22:24, 30:2, 46:5, 47:11, 48:22, 51:21, 52:17, 55:2, 65:5, 66:22, 68:11, 69:21, 73:1, 80:3, 81:12, 82:5, 91:22, 94:19, 95:5, 101:25
**points** [4] - 18:7, 20:7, 63:14, 92:16
**poker** [1] - 68:21
**POLICE** [1] - 1:8
**police** [1] - 11:1
**Police** [8] - 2:9, 4:6, 5:6, 10:16, 21:9, 43:7, 45:1, 45:9
**political** [2] - 28:18, 60:15
**portion** [2] - 51:12, 78:5
**portions** [3] - 49:16, 49:20, 49:22

**pose** [1] - 17:24
**posed** [2] - 17:25, 62:8
**posing** [1] - 24:2
**position** [12] - 45:10, 46:24, 47:8, 58:14, 63:10, 64:25, 67:11, 70:5, 81:11, 81:12, 87:4, 90:8
**positioning** [1] - 92:19
**positive** [2] - 42:16, 42:18
**possesses** [1] - 77:14
**possible** [3] - 17:11, 66:11, 91:10
**possibly** [3] - 72:13, 96:24, 98:1
**Post** [1] - 75:14
**post** [1] - 94:24
**potential** [2] - 67:13, 84:12, 85:11
**potentially** [2] - 77:17, 90:17
**PR** [1] - 11:2
**practically** [1] - 17:21
**practice** [5] - 15:5, 32:16, 33:11, 98:24, 102:6
**pre** [3] - 32:15, 33:11, 89:17
**pre-litigates** [1] - 32:15
**pre-litigated** [1] - 33:11
**pre-motion** [1] - 89:17
**precedent** [1] - 67:18
**precisely** [2] - 25:10, 38:17
**precluded** [1] - 71:4
**Preet** [1] - 54:23
**prefer** [4] - 18:5, 24:14, 26:20, 29:22
**preference** [1] - 16:25
**prejudice** [2] - 41:6, 41:7
**prejudicial** [1] - 51:8
**prep** [1] - 19:6
**prepare** [2] - 23:1, 24:5
**prepared** [7] - 10:3, 21:19, 36:23, 36:24, 56:17, 91:9, 97:12
**present** [7] - 5:9, 8:8, 16:18, 34:8, 55:24, 68:22, 92:19
**presentation** [1] - 71:6
**presently** [2] - 6:24, 84:14
**press** [10] - 25:25, 39:5, 66:23, 74:1, 76:18, 80:4, 80:8, 87:19, 92:19
**pressed** [1] - 12:12
**pressing** [1] - 36:7
**presumably** [2] - 46:1, 80:14
**presume** [1] - 82:16
**presuming** [1] - 87:16
**pretty** [8] - 5:22, 13:19, 13:20, 27:8, 30:9, 30:22, 48:19, 52:2
**previewing** [1] - 87:5
**previously** [3] - 87:19, 90:4, 91:1
**primarily** [1] - 76:2
**principle** [1] - 87:15
**private** [2] - 82:18
**privately** [1] - 90:1
**privilege** [11] - 88:15, 88:22, 88:25, 90:2, 90:5, 90:6, 90:12, 90:18, 90:19, 91:11
**privileged** [2] - 28:1, 91:8
**privileges** [2] - 58:13, 91:2

**probable** [1] - 54:16
**problem** [20] - 6:16, 14:19, 15:25, 25:23, 34:7, 35:17, 40:11, 43:13, 44:18, 46:19, 49:6, 55:22, 58:20, 60:8, 72:2, 80:19, 82:11, 82:15, 87:9, 87:15
**problematic** [1] - 29:17
**problems** [2] - 43:14, 44:4
**procedural** [1] - 89:23
**proceeding** [1] - 45:4
**Proceedings** [1] - 3:13
**process** [23] - 5:15, 5:23, 6:6, 6:19, 10:19, 33:3, 38:13, 38:18, 43:21, 44:8, 44:24, 44:25, 47:18, 51:15, 53:5, 56:5, 71:2, 85:1, 85:4, 86:18, 91:12, 95:11, 98:21
**produce** [16] - 14:9, 23:25, 31:8, 35:11, 56:11, 56:17, 59:14, 59:17, 64:3, 65:8, 67:1, 77:17, 77:20, 80:14, 96:20, 101:12
**produced** [43] - 3:13, 8:22, 14:9, 14:20, 14:21, 18:14, 21:24, 22:5, 22:14, 25:22, 25:23, 31:8, 31:12, 31:15, 32:3, 39:3, 39:17, 42:24, 56:11, 56:17, 58:18, 58:19, 58:24, 59:2, 60:3, 75:23, 76:1, 76:7, 76:13, 77:7, 77:8, 77:12, 79:12, 79:13, 79:23, 94:4, 98:12, 101:1, 101:6
**producing** [5] - 18:12, 25:23, 59:8, 80:19, 101:25
**product** [1] - 17:19
**production** [11] - 9:17, 31:17, 39:10, 45:5, 64:5, 66:8, 94:12, 94:15, 94:18, 94:23, 95:5
**program** [1] - 26:13
**proof** [2] - 7:3, 15:8
**proper** [1] - 21:6
**proportional** [1] - 74:22
**proportionality** [4] - 60:9, 60:10, 72:15, 83:4
**proportionate** [6] - 81:8, 95:7, 97:16, 98:2, 98:16, 98:20
**proposal** [6] - 38:18, 39:13, 43:8, 43:11, 45:4, 45:12
**proposing** [1] - 19:12
**protect** [2] - 11:8, 100:4
**protected** [1] - 58:12
**protections** [1] - 100:3
**protective** [10] - 82:17, 84:7, 84:14, 84:17, 84:18, 84:22, 85:13, 85:15, 86:19, 87:17
**proven** [1] - 69:21
**provide** [6] - 59:3, 77:5, 77:6, 90:19, 94:3, 100:25
**provided** [10] - 20:14, 35:4, 38:24, 58:10, 73:14, 74:4, 74:7, 76:4, 78:4, 86:20
**provides** [1] - 6:24
**providing** [1] - 43:11
**proving** [3] - 7:15, 15:3, 72:10
**proximity** [1] - 47:21

**prudent** [1] - 89:12
**PSU** [5] - 10:16, 18:17, 20:13, 46:9, 93:24
**public** [18] - 53:20, 59:22, 60:1, 60:7, 66:25, 67:11, 68:19, 68:24, 69:1, 69:7, 73:10, 74:18, 78:3, 79:9, 95:25, 99:18
**publication** [1] - 92:8
**publicized** [1] - 99:18
**publicly** [10] - 19:17, 27:3, 73:8, 75:12, 75:13, 76:6, 77:23, 77:25, 87:18, 88:7
**published** [1] - 31:17
**pudding** [1] - 15:8
**pulled** [1] - 78:23
**purported** [1] - 76:20
**purportedly** [1] - 75:10
**purpose** [1] - 21:6
**purposes** [2] - 67:14, 92:19
**pursuant** [1] - 59:14
**pursue** [2] - 43:1, 43:2
**push** [1] - 18:19
**pushed** [1] - 21:8
**put** [12] - 20:11, 30:5, 32:1, 32:4, 33:7, 34:10, 37:1, 57:18, 61:13, 65:16, 72:18, 103:11
**putting** [2] - 33:2, 47:18

**Q**

**quagmire** [1] - 5:21
**quash** [9] - 12:24, 62:5, 89:7, 89:14, 96:13, 96:16, 96:17, 96:19, 97:15
**quashed** [1] - 98:24
**questioned** [2] - 19:3, 19:15
**questioning** [1] - 29:15
**questions** [16] - 29:21, 34:14, 51:2, 53:1, 56:19, 58:3, 61:4, 62:4, 74:23, 77:16, 82:10, 83:24, 84:10, 87:2, 87:3, 89:6
**quickly** [1] - 45:6
**quite** [7] - 7:25, 23:9, 25:24, 33:25, 44:24, 53:23, 103:19
**quote** [1] - 82:22
**quote/unquote** [1] - 65:6
**QUZACK** [1] - 2:16
**Quzack** [1] - 4:15

**R**

**rabbit** [1] - 69:22, 70:11
**rails** [2] - 102:14, 102:15
**raise** [1] - 68:11
**raised** [2] - 61:4, 84:2
**ramifications** [1] - 5:24
**rare** [2] - 32:17, 34:16
**rarely** [1] - 26:7
**re** [7] - 22:18, 22:23, 34:5, 47:19, 48:6, 60:23, 69:22
**re-litigate** [2] - 22:23, 69:22
**re-reviewed** [1] - 22:18
**re-traumatize** [1] - 47:19

**re-traumatized** [2] - 34:5, 60:23
**reach** [1] - 90:9
**reached** [3] - 15:2, 35:7
**reaching** [3] - 22:6, 22:9, 96:1
**read** [1] - 50:17
**ready** [1] - 18:9
**reality** [3] - 18:6, 19:2, 29:18
**really** [23] - 16:18, 28:21, 34:9, 43:15, 43:18, 43:25, 44:22, 51:2, 51:14, 53:3, 68:1, 70:6, 72:13, 77:4, 81:1, 81:15, 83:16, 86:16, 88:16, 95:18, 97:2, 102:22, 103:8
**reason** [16] - 21:10, 23:17, 28:13, 28:19, 31:25, 41:2, 46:12, 56:14, 63:22, 64:2, 68:18, 76:20, 77:21, 91:25, 102:4, 102:5
**reasonable** [7] - 25:2, 27:8, 72:17, 83:3, 85:17, 91:16, 101:16
**reasonably** [1] - 38:7
**reasons** [11] - 23:11, 26:4, 35:20, 40:8, 60:6, 61:10, 65:2, 67:3, 68:15, 69:11, 89:25
**receipt** [1] - 86:19
**received** [9] - 22:3, 25:7, 79:11, 83:14, 85:3, 88:2, 90:9, 94:25, 95:23
**receiving** [1] - 103:18
**recent** [1] - 13:22
**recently** [2] - 5:20, 39:7
**recess** [1] - 103:24
**recitation** [2] - 100:21, 100:23
**reckoning** [1] - 25:8
**recognize** [3] - 36:14, 36:16, 57:11
**recollections** [1] - 102:10
**recommended** [1] - 23:23
**reconsideration** [1] - 37:23
**reconvene** [1] - 103:23
**record** [14] - 4:9, 6:10, 6:24, 13:20, 16:18, 18:7, 21:1, 48:2, 53:20, 55:24, 57:19, 64:20, 66:25, 103:10
**recorded** [1] - 3:13
**records** [32] - 9:9, 14:23, 14:24, 21:2, 21:5, 21:12, 27:10, 27:12, 27:18, 34:22, 34:23, 35:12, 35:15, 35:19, 37:18, 37:20, 48:9, 59:19, 70:14, 70:15, 70:16, 97:24, 98:4, 98:8, 98:12, 98:13, 98:14, 98:15, 98:18
**recreate** [3] - 6:8, 23:10, 23:12
**redacted** [7] - 19:18, 20:1, 62:18, 62:23, 73:17, 78:5, 98:12
**redactions** [8] - 62:19, 63:3, 82:11, 99:6, 99:10, 99:16, 99:17, 100:2
**reduplicate** [1] - 23:15
**reference** [3] - 31:7, 74:4, 86:3
**referenced** [2] - 23:4, 27:1
**references** [1] - 73:17
**referred** [2] - 63:19, 78:12
**reforms** [1] - 88:20
**refuses** [1] - 8:17
**refusing** [3] - 18:8, 20:8, 64:3
**regard** [12] - 58:14, 78:25, 84:10, 84:25,

85:13, 85:24, 86:3, 86:14, 87:8, 87:11, 90:2, 92:18
**regarding** [5] - 15:6, 52:20, 58:8, 80:16, 84:16
**regardless** [2] - 55:12, 80:17
**rejected** [2] - 18:24, 59:15
**relate** [4] - 19:13, 70:1, 73:21, 73:23
**related** [8] - 16:2, 75:10, 76:1, 76:8, 76:18, 76:19, 86:1, 90:15
**relating** [2] - 42:21, 64:5
**relations** [3] - 63:22, 64:7, 65:6
**relationship** [7] - 28:6, 28:7, 68:13, 69:2, 69:5, 69:25, 81:20
**relatively** [1] - 39:8
**release** [8] - 13:23, 56:18, 58:7, 58:14, 62:17, 73:13, 74:3, 78:3
**released** [2] - 19:18, 25:18
**releasing** [1] - 99:2
**relevance** [19] - 7:4, 11:23, 12:11, 12:24, 13:3, 16:23, 20:6, 22:20, 24:3, 26:21, 29:5, 32:19, 60:9, 67:13, 76:20, 77:21, 88:9, 89:9, 99:25
**relevant** [34] - 11:22, 30:14, 32:23, 45:8, 49:3, 49:24, 60:7, 68:18, 69:6, 70:20, 70:24, 71:1, 72:10, 75:22, 76:17, 77:7, 77:18, 79:19, 79:20, 79:21, 81:23, 91:23, 92:23, 92:25, 94:3, 95:1, 95:7, 95:14, 97:16, 98:2, 98:5, 98:16, 98:19, 101:18
**reliance** [2] - 10:9, 41:1
**relief** [1] - 29:3
**remain** [3] - 62:18, 100:2, 100:4
**remarks** [1] - 75:1
**remember** [3] - 20:5, 36:16, 64:17
**reminded** [1] - 82:13
**removed** [1] - 28:11
**removes** [1] - 41:1
**removing** [1] - 99:10
**renege** [1] - 97:3
**reneging** [1] - 101:10
**renegotiated** [2] - 39:16, 84:15
**repeat** [1] - 56:10
**repeated** [3] - 8:5, 25:1, 25:20
**repeatedly** [6] - 7:9, 23:19, 24:22, 79:16, 94:17, 101:17
**reply** [2] - 43:17, 100:22
**report** [37] - 7:10, 7:18, 22:22, 22:25, 23:7, 23:10, 23:12, 29:6, 29:7, 29:12, 29:13, 29:17, 29:24, 31:3, 37:10, 37:11, 38:8, 49:16, 49:23, 50:2, 50:17, 51:12, 52:21, 52:22, 53:8, 53:17, 53:25, 54:4, 74:3, 76:15, 79:3, 95:23, 95:24, 96:9
**Reporter** [2] - 3:9, 3:10
**reports** [3] - 6:25, 10:8, 12:16
**repose** [1] - 61:13
**represent** [12] - 4:19, 5:3, 39:24, 57:5, 72:24, 77:10, 78:19, 83:20, 87:25, 93:18, 99:11, 99:12
**representation** [1] - 22:10

representations [1] - 102:25
represented [2] - 10:7, 32:21
request [4] - 13:13, 17:5, 37:17, 59:9
requests [8] - 7:7, 40:4, 42:19, 59:15, 79:18, 80:22, 85:3, 86:7
require [2] - 8:3, 43:12
requirement [1] - 41:11
requiring [1] - 89:22
resigned [2] - 28:14, 60:14
resolution [1] - 65:15
resolve [7] - 10:3, 10:19, 40:20, 40:25, 43:13, 65:17, 84:6
resolved [7] - 9:16, 9:17, 9:22, 10:2, 44:3, 84:4, 89:13
resources [2] - 79:7, 95:11
respect [34] - 14:5, 20:7, 20:10, 21:21, 23:7, 23:8, 26:22, 27:15, 27:21, 30:24, 34:8, 37:10, 38:19, 46:12, 48:22, 51:21, 62:6, 63:16, 64:19, 65:10, 68:12, 70:3, 79:17, 82:10, 82:11, 82:19, 88:9, 88:13, 88:15, 89:1, 89:3, 100:20, 101:2, 101:9
respectfully [1] - 8:15
respecting [1] - 16:15
respond [3] - 43:16, 88:23, 100:7
responded [1] - 96:10
responding [1] - 38:6
response [5] - 42:24, 45:17, 57:25, 58:5, 86:10
responses [1] - 42:8
responsibilities [1] - 8:23
responsive [6] - 21:25, 22:19, 30:11, 30:15, 42:20, 101:19
rest [1] - 61:12
rests [1] - 6:16
result [1] - 29:15
retaliating [1] - 45:19
retaliation [2] - 24:6, 45:20
retraumatized [1] - 74:11
retraumatizes [1] - 74:22
review [6] - 77:20, 78:7, 87:12, 89:5, 91:2, 91:11
reviewed [1] - 22:18
revisit [1] - 101:13
revisiting [1] - 52:25
rich [1] - 33:1
Richard [5] - 2:12, 5:3, 41:9, 42:6, 42:21
right-hand [1] - 12:1
ripe [2] - 36:17, 65:25
rise [1] - 4:1
risk [2] - 40:22, 40:23
Rita [1] - 4:17
RITA [1] - 2:3
Road [1] - 2:8
rock [2] - 47:5, 67:17
Rockefeller [1] -
role [4] - 27:9, 86:16, 86:17, 86:23
romantic [1] - 99:22
RPR [1] - 3:9

Rule [11] - 7:14, 10:8, 10:22, 12:2, 12:3, 13:7, 49:18, 51:8, 60:9, 70:24
rule [6] - 16:8, 16:11, 52:3, 54:20, 55:23
ruled [1] - 97:14
rules [7] - 6:23, 37:2, 43:18, 43:22, 43:25, 89:15, 90:1
ruling [7] - 87:6, 96:16
rulings [5] - 40:22, 40:24, 52:25, 84:12, 85:12
run [1] - 93:10

## S

S.D.N.Y [1] - 83:25
sad [1] - 96:1
sadly [1] - 5:21
Salzman [3] - 57:14, 93:15, 103:17
SALZMAN [3] - 3:4, 57:14, 93:17
sat [3] - 41:14, 45:24, 73:15
satisfaction [1] - 58:25
save [1] - 91:19
saw [3] - 28:24, 42:13, 64:12
scenario [1] - 81:14
scheduled [3] - 15:24, 18:10, 38:5
SCHNELL [1] - 3:5
school [1] - 14:24
scope [11] - 11:6, 13:14, 14:5, 19:2, 44:12, 47:2, 48:23, 53:8, 54:19, 65:16, 97:1
screaming [1] - 61:12
se [2] - 51:22, 52:1
search [2] - 76:4, 76:11
seated [1] - 4:3
Second [2] - 7:19, 51:21
second [5] - 21:11, 37:5, 49:25, 68:18, 99:20
secondly [1] - 101:9
secretary [1] - 11:2
see [18] - 5:9, 6:16, 16:19, 47:5, 49:10, 53:11, 56:6, 56:14, 56:24, 62:11, 65:20, 68:5, 79:25, 80:12, 81:12, 81:23, 87:10, 89:13
seek [5] - 10:19, 13:13, 65:13, 67:25, 89:14
seeking [13] - 7:1, 49:15, 50:22, 51:13, 53:24, 58:12, 66:18, 71:7, 80:11, 81:21, 91:5, 91:16, 100:17
seeks [2] - 6:4, 9:7
seem [2] - 53:13, 56:24
self [1] - 69:3
self-deleting [1] - 69:3
senator [5] - 88:1, 88:14, 88:16, 89:1, 93:6
sense [3] - 62:12, 85:18, 85:21
sensible [4] - 15:10, 16:5, 35:16, 37:3
sensitive [3] - 89:21, 99:14, 99:25
sensitivity [2] - 84:12, 85:11
sent [4] - 46:1, 46:5, 69:3, 80:11
separate [3] - 58:13, 67:5, 88:3

separately [1] - 84:6
September [2] - 1:7, 18:23
series [3] - 22:9, 27:23, 28:18
serious [2] - 27:2, 27:5
served [6] - 30:21, 73:4, 74:9, 74:10, 85:2, 85:5
service [1] - 73:10
services [1] - 90:14
set [4] - 40:6, 70:9, 87:7, 99:15
setting [1] - 11:24
settlement [1] - 43:5
seven [2] - 28:9, 82:23
several [5] - 29:9, 29:16, 30:23, 63:25, 69:10
sexual [27] - 9:8, 13:13, 26:6, 28:7, 28:22, 30:25, 41:3, 41:16, 41:23, 42:7, 42:14, 45:22, 46:7, 51:6, 52:6, 55:17, 59:18, 59:25, 61:5, 64:20, 67:2, 69:2, 69:25, 75:11, 79:2, 88:6, 99:24
sexually [5] - 24:22, 26:5, 27:4, 27:24, 65:1
shamed [1] - 87:18
shared [1] - 75:24
shedding [1] - 60:5
SHER [1] - 2:5
Sher [1] - 4:22
shirked [2] - 8:23, 22:17
shit [1] - 69:5
shit-follower [1] - 69:5
shock [1] - 28:17
short [1] - 103:20
show [3] - 11:15, 49:5, 53:21
showing [2] - 76:13, 80:5
side [3] - 10:13, 26:14, 32:4
sides [3] - 60:25, 65:21, 85:4
sideshow [1] - 65:5
sigh [1] - 29:3
sign [1] - 27:25
signatory [1] - 17:18
signed [1] - 68:23
significant [2] - 6:14, 34:14
similar [6] - 15:1, 17:15, 32:24, 38:13, 38:15, 42:17
similarly [2] - 48:8, 87:11
simple [1] - 18:3
simply [3] - 18:15, 22:11, 79:20
sincere [1] - 32:12
single [15] - 6:7, 22:3, 35:24, 47:5, 48:24, 70:12, 78:21, 79:5, 82:7, 83:2, 83:5, 94:7, 94:21, 98:3, 98:19
sit [9] - 9:4, 9:5, 18:9, 18:10, 19:1, 19:3, 19:15, 20:8, 24:1
sitting [4] - 18:3, 57:4, 57:22, 102:11
situated [1] - 91:4
situation [3] - 5:21, 10:17, 76:25
six [2] - 24:17, 28:9
slept [2] - 9:8, 28:21
slights [1] - 8:4
slow [1] - 91:12

**small** [3] - 44:2, 79:5, 91:1
**smiling** [1] - 80:6
**smoothly** [1] - 85:10
**solution** [9] - 14:2, 14:8, 14:19, 15:1, 15:10, 16:5, 35:17, 37:3, 46:20
**solutions** [3] - 34:1, 38:11, 102:14
**someone** [2] - 9:8, 60:12
**sometimes** [1] - 43:17
**somewhat** [2] - 21:13, 25:9
**son** [2] - 20:21, 20:23
**soon** [3] - 17:11, 25:17, 80:7
**soon-to-be** [1] - 80:7
**sorry** [5] - 12:17, 27:13, 36:3, 39:25, 102:17
**sort** [12] - 11:5, 11:25, 14:15, 44:7, 53:13, 56:3, 62:13, 66:21, 84:4, 89:18, 98:25
**sought** [5] - 45:7, 70:15, 79:15, 79:25, 81:15
**source** [1] - 53:21
**sources** [1] - 33:1
**Southern** [6] - 27:17, 39:20, 83:20, 84:5, 86:9, 86:12
**speaking** [5] - 7:10, 17:21, 80:4, 86:22, 87:13
**specific** [14] - 9:25, 14:11, 14:22, 16:2, 20:1, 46:9, 59:11, 62:20, 63:3, 82:10, 83:9, 94:14, 95:6
**specifically** [6] - 7:11, 8:11, 45:8, 59:8, 79:17, 86:1
**specificity** [2] - 96:23, 97:10
**spell** [1] - 57:7
**spend** [1] - 26:10
**spoken** [1] - 81:25
**staffers** [2] - 20:2, 26:3
**stake** [3] - 5:16, 5:23, 56:8
**stance** [1] - 45:3
**stand** [1] - 16:24
**standalone** [1] - 73:24
**standing** [1] - 63:1
**stands** [1] - 63:5
**starkly** [1] - 102:9
**start** [7] - 58:2, 68:6, 83:14, 95:5, 101:12, 101:21, 103:21
**started** [4] - 13:20, 17:24, 36:15, 40:3
**starting** [1] - 4:9
**starts** [1] - 74:15
**STATE** [1] - 1:8
**State** [21] - 2:8, 2:18, 4:6, 5:6, 6:1, 10:16, 11:1, 11:4, 18:22, 21:9, 26:12, 28:10, 43:7, 45:1, 45:9, 50:1, 57:2, 68:14, 72:24, 75:7, 84:9
**state** [8] - 4:8, 21:13, 73:4, 88:1, 88:16, 90:7, 93:6, 99:10
**statement** [8] - 7:15, 43:22, 53:20, 61:14, 64:24, 67:20, 68:24, 69:1
**statements** [3] - 28:1, 59:23, 60:1
**STATES** [2] - 1:1, 1:21
**States** [1] - 1:6

**status** [4] - 4:5, 39:21, 39:22, 85:13
**STATUS** [1] - 1:20
**stay** [1] - 38:2
**stenography** [1] - 3:13
**step** [1] - 9:15
**Steph** [1] - 64:9
**Stephanie** [1] - 63:24
**Stern** [1] - 5:2
**still** [7] - 14:7, 43:19, 51:25, 52:10, 62:18, 72:9, 103:3
**stop** [6] - 6:23, 7:12, 13:18, 48:8, 65:12, 65:18
**stopped** [1] - 36:16
**Story** [1] - 31:18
**story** [2] - 26:8, 46:8
**stranger** [1] - 81:4
**strategic** [1] - 48:6
**strategically** [1] - 33:8
**strategy** [5] - 6:13, 8:11, 34:7, 34:9, 56:3
**streamline** [1] - 26:21
**Street** [5] - 2:2, 2:5, 2:15, 2:18, 2:21, 25:19
**strenuously** [1] - 66:11
**stressing** [1] - 91:15
**strike** [2] - 25:13, 44:16
**strip** [1] - 68:21
**strongly** [2] - 19:10, 86:15
**struggling** [1] - 44:11
**stuck** [3] - 26:21, 26:22, 29:1
**stuff** [4] - 40:10, 47:20, 48:7, 101:14
**subject** [14] - 14:6, 36:13, 51:25, 57:21, 65:8, 78:6, 82:16, 87:16, 89:10, 98:24
**subjected** [1] - 83:2
**subpoena** [32] - 9:8, 12:19, 12:21, 21:15, 23:20, 23:21, 25:7, 25:17, 25:19, 27:17, 30:18, 30:20, 30:21, 30:22, 31:15, 63:14, 63:19, 63:21, 64:18, 65:7, 74:9, 75:22, 76:17, 76:21, 88:2, 88:10, 88:23, 91:5, 95:13, 97:1, 98:17, 98:23
**subpoenaed** [21] - 12:15, 17:4, 21:4, 31:4, 32:4, 34:21, 37:12, 37:18, 37:21, 40:8, 60:17, 63:22, 64:2, 64:11, 64:13, 64:15, 75:9, 77:19, 94:2, 94:10, 97:23
**subpoenaing** [4] - 14:23, 20:17, 48:9, 67:25
**subpoenas** [24] - 9:12, 9:13, 12:9, 13:6, 21:6, 26:23, 26:24, 27:6, 34:25, 42:8, 42:10, 42:25, 45:7, 45:11, 58:5, 61:16, 63:16, 63:18, 65:11, 74:11, 79:11, 83:13, 102:21
**substantive** [2] - 81:2, 81:7
**sudden** [1] - 74:15
**suddenly** [1] - 97:9
**sue** [1] - 93:20
**sued** [4] - 27:6, 27:16, 61:15, 73:19
**suffered** [1] - 11:15
**suffering** [2] - 41:6, 41:7

**sufficient** [1] - 42:2
**sufficiently** [1] - 10:22
**suggest** [2] - 15:1, 41:15
**suggested** [2] - 38:13, 95:5
**suggestion** [7] - 17:15, 38:21, 38:22, 56:22, 59:1, 60:21, 70:9
**sui** [1] - 15:19
**suit** [1] - 73:20
**Suite** [1] - 3:5
**summarily** [1] - 18:24
**summer** [1] - 80:4
**sun** [1] - 48:10
**superior** [1] - 68:13
**supervisor** [1] - 49:2
**support** [4] - 75:10, 75:13, 76:3, 80:1
**supporter** [1] - 77:23
**suppose** [3] - 15:9, 45:4, 62:10
**supposed** [3] - 55:6, 55:14, 94:20
**surely** [1] - 85:17
**surprised** [2] - 32:21, 36:20
**surrounding** [1] - 75:19
**suspect** [1] - 19:10
**swath** [2] - 6:4, 34:25
**swathes** [2] - 19:22, 19:25
**sworn** [1] - 54:1

**T**

**table** [5] - 17:14, 38:18, 53:13, 86:21, 87:7
**talks** [2] - 20:17, 26:23
**tangentially** [1] - 77:6
**TARYN** [1] - 1:21
**tee** [1] - 100:8
**teed** [1] - 49:22
**telephone** [1] - 20:19
**temporal** [1] - 47:20
**ten** [2] - 10:20, 24:14
**tendered** [2] - 85:3, 85:14
**tenor** [1] - 34:2
**tenth** [1] - 24:13
**terms** [10] - 32:13, 55:19, 75:11, 79:25, 91:4, 91:16, 92:17, 97:18, 99:2, 99:5
**terrain** [1] - 51:15
**terribly** [1] - 102:6
**test** [3] - 24:4, 52:1, 52:23
**testified** [6] - 25:25, 46:14, 49:9, 55:10, 74:2, 79:8
**testifies** [2] - 31:11, 31:12
**testify** [4] - 20:16, 43:5, 46:13, 76:24
**testifying** [1] - 44:23
**testimonies** [1] - 48:2
**testimony** [22] - 15:20, 16:6, 20:12, 20:14, 24:20, 24:22, 25:17, 25:24, 34:25, 46:16, 54:1, 54:5, 55:9, 55:11, 73:7, 74:18, 75:10, 83:2, 83:8, 87:9, 103:2, 103:4
**tests** [1] - 68:1
**text** [10] - 20:14, 22:3, 22:5, 22:9, 25:20,

All Word // 09262023 Trooper 5602 NYS Police 22-cv-893 (TAM)

31:9, 69:3, 80:11, 95:23, 96:12

**texted** [1] - 31:13

**texting** [1] - 25:18

**texts** [11] - 25:20, 31:14, 31:19, 31:23, 35:3, 35:4, 76:2, 79:24, 80:13, 80:16, 81:9

**THE** [144] - 1:21, 4:1, 4:2, 4:4, 5:7, 10:5, 11:12, 11:23, 12:11, 12:15, 12:23, 13:2, 13:5, 13:8, 15:1, 15:7, 15:12, 15:17, 15:21, 15:23, 16:9, 16:13, 17:2, 17:6, 17:12, 19:19, 20:20, 20:24, 23:14, 24:24, 27:10, 27:13, 32:8, 32:11, 33:5, 33:10, 33:14, 33:23, 34:5, 34:13, 34:24, 35:2, 35:5, 35:22, 36:3, 36:14, 37:20, 37:24, 38:1, 38:4, 38:11, 38:21, 39:19, 39:25, 40:2, 40:15, 40:20, 43:3, 43:6, 43:12, 45:14, 46:21, 46:24, 47:7, 47:14, 49:13, 49:15, 49:18, 49:20, 50:3, 50:6, 50:9, 50:12, 50:17, 50:20, 51:1, 51:11, 51:18, 51:24, 52:2, 52:6, 52:10, 52:13, 52:16, 52:19, 53:11, 53:19, 54:3, 54:8, 54:10, 54:24, 55:7, 55:22, 56:16, 57:7, 57:9, 57:16, 57:18, 59:3, 59:22, 60:5, 62:13, 63:12, 63:15, 63:18, 64:15, 64:22, 65:3, 65:19, 66:3, 66:6, 66:16, 67:8, 68:3, 68:8, 69:18, 70:2, 71:4, 72:21, 74:25, 78:15, 78:17, 83:18, 83:23, 86:25, 87:3, 87:21, 87:23, 89:16, 90:21, 90:23, 91:21, 92:15, 93:11, 93:14, 100:11, 100:14, 100:19, 101:3, 101:6, 102:4, 102:9, 102:18, 103:16

**theory** [8] - 10:9, 11:23, 12:11, 12:24, 13:3, 41:18, 66:24, 80:10

**Theresa** [1] - 4:21

**THERESA** [1] - 2:6

**they've** [6] - 34:19, 47:5, 49:9, 65:13, 80:24, 97:12

**thinking** [1] - 95:4

**third** [25] - 13:6, 21:21, 32:17, 36:5, 38:16, 38:23, 41:18, 42:12, 42:19, 42:25, 43:2, 44:19, 47:17, 56:6, 56:16, 56:20, 57:13, 58:4, 62:13, 66:21, 68:1, 88:5, 89:19, 89:22, 102:23

**third-parties** [18] - 32:17, 36:5, 38:16, 38:23, 41:18, 42:12, 42:19, 42:25, 44:19, 47:17, 56:6, 56:16, 56:20, 57:13, 58:4, 68:1, 89:19, 89:22

**third-party** [4] - 13:6, 43:2, 66:21, 88:5

**thirty** [4] - 75:8, 75:16, 76:7, 78:1

**THOMAS** [1] - 2:19

**thousands** [4] - 21:24, 22:15, 79:24, 81:9

**threat** [1] - 69:14

**threatened** [4] - 13:23, 69:8, 69:9, 70:3

**threatening** [1] - 69:6

**three** [21] - 5:17, 9:2, 9:3, 16:4, 18:7, 21:23, 22:9, 24:17, 26:2, 27:7, 28:3, 30:3, 31:23, 58:3, 58:7, 68:14, 68:21, 76:21, 94:2, 97:24, 98:18

**three-and-a-half** [2] - 97:24, 98:18

**throats** [1] - 33:20

**throughout** [2] - 22:12, 101:16

**throw** [1] - 51:9

**Thursday** [1] - 84:16

**ti's** [1] - 79:20

**tier** [1] - 62:14

**time-back** [1] - 7:7

**timing** [3] - 36:4, 36:6, 36:9

**Tish** [1] - 54:22

**today** [14] - 5:13, 12:6, 15:24, 17:24, 32:12, 36:4, 36:11, 39:22, 57:21, 58:1, 59:16, 64:22, 65:20, 94:14

**together** [1] - 45:24

**took** [6] - 5:10, 8:6, 17:16, 20:12, 24:19, 81:21

**tooth** [1] - 70:12

**top** [2] - 83:6, 83:11

**totality** [1] - 32:18

**touch** [7] - 21:1, 25:1, 25:3, 25:19, 26:7, 34:14, 37:11

**touched** [1] - 75:15

**touching** [1] - 38:4

**toward** [1] - 77:24

**trace** [1] - 46:2

**transcript** [7] - 58:9, 62:16, 62:17, 62:22, 62:24, 73:13, 99:5

**TRANSCRIPT** [1] - 1:20

**Transcript** [1] - 3:11

**Transcription** [1] - 3:13

**transcripts** [2] - 19:17, 87:4

**trauma** [1] - 34:6

**traumatize** [1] - 47:19

**traumatized** [2] - 34:5, 60:23

**traumatizing** [1] - 73:9

**treat** [1] - 11:6

**treated** [3] - 11:15, 14:14, 37:8

**treats** [1] - 11:13

**TREMONTE** [1] - 2:5

**Tremonte** [1] - 4:22

**trial** [8] - 8:7, 29:8, 32:14, 44:17, 53:6, 54:24, 55:1, 77:1

**tried** [11] - 10:1, 10:2, 16:3, 28:15, 67:6, 77:5, 77:6, 79:10, 79:15, 96:25, 101:16

**trolling** [1] - 96:4

**TROOPER** [1] - 1:4

**Trooper** [75] - 1:24, 4:5, 4:11, 4:13, 6:17, 7:1, 7:3, 7:8, 8:1, 8:3, 8:7, 8:18, 8:19, 8:22, 9:10, 10:14, 11:9, 17:1, 18:4, 19:13, 20:10, 20:12, 20:15, 20:16, 21:1, 21:11, 21:16, 21:19, 21:25, 22:3, 22:7, 22:11, 24:15, 24:17, 34:8, 34:24, 35:7, 35:13, 38:20, 41:8, 41:9, 45:19, 45:23, 46:6, 46:8, 48:15, 61:6, 70:1, 72:10, 72:14, 73:23, 73:24, 74:6, 74:19, 74:20, 75:17, 75:18, 75:20, 77:1, 82:5, 85:9, 85:19, 85:23, 85:24, 86:2, 86:17, 93:23, 93:24, 95:1, 95:8, 98:2

**troopers** [2] - 21:14, 24:18

**true** [11] - 15:7, 26:3, 26:12, 28:2, 38:8, 41:13, 50:21, 51:20, 59:22, 67:12, 81:13

**truly** [2] - 47:15, 98:13

**trustworthiness** [7] - 53:23, 53:25, 54:13, 54:18, 54:20, 55:3, 55:4

**truth** [1] - 65:22

**try** [6] - 16:16, 34:12, 44:6, 70:9, 91:10, 97:2

**trying** [26] - 9:22, 12:7, 12:8, 13:9, 17:20, 22:23, 23:10, 23:12, 23:13, 24:10, 32:1, 37:22, 43:13, 44:10, 46:17, 55:23, 56:2, 60:11, 64:22, 69:22, 71:1, 82:8, 85:4, 85:7, 86:18

**TRZASKOMA** [2] - 2:6, 4:21

**Trzaskoma** [5] - 4:22, 17:17, 24:8, 26:22, 52:19

**turn** [3] - 37:17, 71:1, 100:16

**turned** [1] - 94:7

**turning** [1] - 5:11

**tweet** [7] - 45:25, 46:5, 59:25, 60:7, 103:9, 103:10

**tweets** [2] - 27:23, 28:18

**twice** [1] - 28:5

**Twitter** [1] - 64:7

**two** [24] - 9:5, 13:15, 13:16, 14:13, 16:4, 19:5, 19:14, 20:11, 21:25, 24:18, 26:2, 27:7, 28:11, 31:23, 40:14, 46:6, 58:6, 74:10, 77:3, 80:23, 88:11, 94:9, 99:6, 101:4

**two-and-a-half** [1] - 94:9

**twofold** [1] - 46:4

**tying** [1] - 7:11

**types** [3] - 25:21, 79:18, 80:14

**typically** [1] - 54:13

## U

**ultimate** [1] - 62:4

**ultimately** [1] - 44:18

**unable** [1] - 76:5

**uncertain** [1] - 51:15

**unclear** [2] - 51:14, 79:25

**uncomfortable** [1] - 25:9

**under** [21] - 13:3, 43:18, 46:1, 47:4, 47:23, 48:10, 49:9, 49:18, 49:24, 50:3, 51:3, 51:8, 52:3, 60:9, 67:17, 67:18, 70:23, 70:24, 98:11, 100:6, 100:9

**undergoes** [1] - 15:3

**underlying** [1] - 52:24

**underproduced** [1] - 58:21

**understood** [5] - 15:22, 16:10, 20:20, 26:9, 38:22

**unethical** [1] - 29:14

**unfair** [1] - 8:2

**unfortunately** [1] - 44:25

**UNITED** [2] - 1:1, 1:21

**United** [1] - 1:6

**universe** [4] - 43:24, 44:13, 53:7, 60:10

**unless** [3] - 38:9, 40:25, 100:5
**unlike** [2] - 75:5, 98:20
**unreasonably** [1] - 34:19
**unredacted** [9] - 19:22, 58:9, 62:16, 62:17, 73:13, 74:3, 78:4, 87:4, 87:8
**untrue** [1] - 37:11
**up** [18] - 16:24, 23:3, 29:12, 31:19, 33:25, 35:8, 37:22, 39:7, 44:2, 49:22, 61:21, 66:4, 69:8, 74:15, 93:9, 99:23, 100:8, 101:11
**utility** [1] - 11:17
**utilized** [1] - 85:18

### V

**VALDI** [1] - 1:25
**Valdi** [1] - 4:10
**various** [2] - 52:24, 102:25
**veracity** [1] - 24:4
**Verizon** [1] - 97:23
**versus** [2] - 4:5, 4:6
**viable** [1] - 34:9
**victim** [3] - 11:19, 64:20, 73:21
**victim's** [1] - 48:2
**victimize** [1] - 44:10
**victims** [10] - 7:17, 7:22, 7:25, 8:9, 46:15, 60:22, 62:1, 66:18, 73:21, 74:20
**view** [6] - 26:5, 62:23, 82:5, 84:2, 98:23, 99:13
**Virginia** [2] - 78:19, 80:1
**virtually** [1] - 8:16
**Vladeck** [1] - 37:12
**voluminous** [2] - 21:13, 66:25
**volunteer** [1] - 91:9
**voted** [1] - 88:19

### W

**W-A-N-G** [1] - 57:8
**wait** [3] - 36:1, 69:4, 89:12
**waiting** [3] - 36:11, 42:1, 56:7
**waiving** [1] - 90:1
**walk** [1] - 66:9
**Wall** [1] - 25:19
**WANG** [3] - 57:5, 57:8, 78:18
**Wang** [2] - 78:17, 95:22
**wants** [16] - 23:25, 24:1, 29:2, 35:23, 41:25, 42:5, 54:24, 56:2, 61:23, 73:1, 73:11, 73:12, 74:3, 82:2, 91:13, 97:21
**Washington** [1] - 75:14
**watched** [1] - 27:4
**website** [1] - 79:9
**week** [3] - 27:23, 37:11, 86:22
**weekend** [1] - 5:19
**weeks** [6] - 21:4, 21:12, 30:4, 31:19, 31:23, 43:19
**welcome** [3] - 38:1, 49:5, 62:1
**West** [2] - 2:2, 2:21
**whatsoever** [3] - 86:5, 86:17, 86:23

**wheel** [1] - 102:23
**whole** [3] - 22:12, 23:11, 71:2
**wholly** [1] - 8:2
**wide** [3] - 6:4, 28:13, 44:12
**widespread** [1] - 6:8
**Wigdor** [4] - 4:11, 4:13, 103:11, 103:12
**WIGDOR** [1] - 1:23
**willing** [13] - 16:13, 18:9, 32:13, 48:7, 58:6, 59:3, 59:13, 62:25, 63:4, 66:9, 67:1, 77:17, 83:6
**wind** [1] - 65:10
**window** [1] - 51:9
**wink** [1] - 55:15
**wish** [1] - 29:4
**witness** [13] - 16:3, 47:5, 48:21, 53:16, 65:22, 66:21, 69:8, 70:3, 70:12, 77:2, 83:8, 92:14, 102:11
**witness'** [2] - 9:9, 62:19
**witnessed** [1] - 69:9
**witnesses** [22] - 7:14, 13:11, 13:19, 14:15, 14:20, 16:2, 20:2, 33:7, 44:17, 49:8, 53:8, 54:2, 56:11, 56:13, 77:1, 78:8, 78:10, 78:12, 85:25, 88:5, 99:9, 100:24
**woman** [6] - 11:1, 11:13, 37:8, 55:13, 63:23, 63:24
**women** [18] - 8:6, 11:6, 11:14, 11:15, 17:1, 19:4, 19:16, 23:20, 24:21, 55:16, 61:11, 75:10, 75:13, 77:3, 77:24, 78:25, 88:17
**wonderful** [1] - 12:20
**wondering** [1] - 34:15
**word** [3] - 13:25, 17:9, 74:11
**words** [5] - 35:14, 50:25, 76:2, 76:8, 95:15
**workable** [1] - 15:3
**workplace** [6] - 61:6, 72:12, 75:8, 88:18, 88:20, 88:21
**works** [4] - 11:1, 11:2, 11:3, 11:10
**world** [7] - 27:3, 27:22, 27:23, 28:23, 29:24, 42:22, 49:2
**worried** [1] - 63:7
**worthless** [1] - 39:8
**writes** [1] - 31:23
**writing** [1] - 97:25
**written** [2] - 79:2, 88:23
**wrote** [3] - 76:19, 97:5, 97:6

### Y

**year** [2] - 13:22, 93:21
**years** [10] - 19:5, 27:4, 74:14, 75:8, 75:16, 78:1, 94:2, 94:9, 97:24, 98:18
**yell** [2] - 59:5, 88:12
**yelled** [2] - 30:6, 85:6
**YORK** [2] - 1:1, 1:8
**York** [28] - 1:6, 1:24, 2:2, 2:6, 2:8, 2:9, 2:12, 2:15, 2:18, 2:21, 2:24, 3:3, 3:6, 3:11, 4:5, 5:5, 10:16, 43:7, 45:1, 45:9
**yourself** [2] - 17:16, 23:22

**yourselves** [1] - 91:19

### Z

**zealous** [2] - 47:11
**zealously** [2] - 34:12, 47:8
**Zemsky** [6] - 28:7, 68:22, 68:23, 69:3, 69:14, 69:25
**ZOE** [1] - 3:4
**Zoe** [1] - 57:14
**Zoom** [3] - 82:24, 83:7, 83:8