1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3                                      :
4  TROOPER 1,                          : 22-CV-00893 (LDH)(TAM)
5              Plaintiff,              :
                                       :
6                                      : United States Courthouse
       -against-                       : Brooklyn, New York
7                                      :
                                       : January 11, 2024
8                                      : 2:00 p.m.
   NEW YORK STATE POLICE, et          :
9  al.,                                :
                                       :
10             Defendants.            :
                                       :
11
   - - - - - - - - - - - - - - - X
12                                     :
   ANDREW CUOMO,                       :
13                                     : 23-MC-1587 (LDH)(TAM)
               Plaintiff,             :
14                                     :
                                       :
15     -against-                       :
                                       :
16                                     :
               Defendants.            :
17                                     :
   LINDSEY BOYLAN,                     :
18                                     :
                                       :
19                                     :
   - - - - - - - - - - - - - -X
20
       TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
21        BEFORE THE HONORABLE TARYN A. MERKL
            UNITED STATES MAGISTRATE JUDGE
22
   A P P E A R A N C E S:
23
   For the Plaintiff    WIGDOR, LLP
24 Trooper 1:                85 Fifth Avenue
                         New York, New York 10003
25                       BY:  VALDI LICUL, ESQ.
                              JOHN CRAIN, ESQ.

2

```
 1
    For the Defendant      GLAVIN, PLLC
 2  Cuomo:                      156 West 56th Street
                                New York, New York 10019
 3                          BY:  RITA GLAVIN, ESQ.

 4                          SHER TREMONTE, LLP
                                90 Broad Street
 5                              New York, New York 10004
                            BY:  ALLEGRA NOONAN, ESQ.
 6                          BY:  THERESA TRZASKOMA, Esq.

 7
    For the Defendant      HARRIS BEACH, PLLC
 8  New York State             99 Garnsey Road
    Police:                    Pittsford, New York 14534
 9                          BY:  DANIEL J. PALERMO, ESQ.

10
    For the Defendants     MORVILLO ABRAMOWITZ GRAND IASON &
11  Melissa DeRosa and     ANELLO,
    Richard Azzopardi:         565 Fifth Avenue
12                              New York, New York 10017
                            BY:  KATHLEEN CASSIDY, ESQ.
13                          BY:  KAYASHA LYONS, ESQ.

14
    For the interested     PERRY LAW
15  party Lindsey              157 East 86th Street
    Boylan:                    New York, New York 10028
16                          BY:  E. DANYA PERRY, ESQ.
                            BY:  KRISTA OEHLKE, ESQ
17                          BY:  JULIE GERCHIK, ESQ   (by phone)

18

19

20

21  OFFICIAL COURT REPORTER:   Michele D. Lucchese, RPR, CRR
                                225 Cadman Plaza East
22                              Brooklyn, New York 11201
                                (718) 613-2272
23                              e-mail:  MLuccheseEDNY@gmail.com
    Proceedings recorded by computerized stenography.  Transcript
24  produced by Computer-aided Transcription.

25
```

```
                        Proceedings                          3
```

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Civil cause for a status conference,

3    case number 22-cv-893, Trooper 1 versus New York State Police,

4    et al. and case number 23-mc-1587, Cuomo versus Boylan.

5          Will the parties state their appearances, starting

6    with the plaintiff.

7          MR. LICUL:  Good morning, Your Honor.  Valdi Licul

8    and John Crain, Wigdor, LLP for the plaintiff.

9          THE COURT:  Good afternoon.

10          MR. GLAVIN:  Good morning, Your Honor.  Rita Glavin,

11    Glavin, PLLC for former Governor Andrew M. Cuomo.

12          MS. TRZASKOMA:  Good morning, Your Honor.  Theresa

13    Trzaskoma from Sher Tremonte, LLP on behalf of former Governor

14    Andrew M. Cuomo.

15          MS. NOONAN:  Good afternoon, Your Honor.  Allegra

16    Noonan from Scher Tremonte, LLP on behalf of Governor Cuomo.

17          THE COURT:  Good afternoon.

18          MS. CASSIDY:  Good afternoon, Your Honor.  On behalf

19    of Melissa DeRosa and Richard Azzopardi, you have Kathleen

20    Cassidy and Kayasha Lyons from Morvillo Abramovitz.

21          THE COURT:  Good afternoon.

22          MR. PALERMO:  Good afternoon, Your Honor.  Daniel

23    Palermo, Harris Beach on behalf of the New York State Police.

24          THE COURT:  Good afternoon.

25          And we also are here, as the parties know, for the

Proceedings                                                  4

1  first session of our two-part session.  This afternoon is

2  concerning the issues pertaining to the deposition and

3  document requests related to Lindsey Boylan.

4          Are Lindsey Boylan's counsel here?

5          MS. PERRY:  Yes, Your Honor.  Good afternoon.  Dayna

6  Perry from Perry Law, with my associate Krista Oehlke.  I'm

7  sorry, and my co-counsel Julie Gerchik is on the phone.

8          THE COURT:  That's what I wanted to confirm.  So

9  she's on the phone, but I think it will be somewhat

10 challenging to be switching back and forth.

11         Are you taking the lead today, Ms. Perry?

12         MS. PERRY:  I am.

13         THE COURT:  So we will begin with the motions

14 pertaining to Ms. Boylan.  And as everyone know, there are

15 many.  And then after that, we will turn to the issues

16 pertaining to Ms. Bennett.  Technically, that was calendared

17 for a different conference time.  I do see counsel for Ms.

18 Bennett in the back.

19         So good afternoon to you all.

20         As the parties know and as the nonparties know, the

21 discovery issues in this case are so complicated and in some

22 ways, in my opinion, unparalleled in their complexities.  I

23 preside over many cases with very complex discovery issues,

24 this one takes the cake.

25         We are here today to attempt to unravel various

Proceedings                                                    5

1    subpoenas seeking information about Ms. Boylan.  As the

2    parties know, they are the subject of multiple motions,

3    including portions of them that are subject to a motion to

4    quash by Trooper 1, as well a motion brought by Ms. Boylan,

5    both in the mc docket and in the 893 case docket involving

6    Trooper 1.  And her motion covers various document subpoenas.

7             I would like to hear from her first because we are

8    going to be taking up her motion first.  So the motion to

9    quash the Boylan document subpoena is your motion, Ms. Perry.

10   I do have various questions specifically as to certain of the

11   granular items in the subpoena attachments.  But as it is your

12   motion, I would like to give you the first word.

13            MS. PERRY:  Thank you, Your Honor.  As Your Honor

14   has noted, there has been a lot of briefing on this.  And I

15   don't want to belabor any point too much.  As Your Honor

16   knows, I've put in a brief letter yesterday and I did feel as

17   though I was in someways beating a dead horse because I keep

18   coming back over and over again to my main point, which is I

19   cannot see the relevance of Ms. Boylan to this case.

20            I argued that just last week in front of Magistrate

21   Judge Cave in the companion case, *Bennett versus Cuomo*.

22   There, Judge Cave saw the point and ordered only

23   communications between Ms. Boylan and Ms. Bennett to be

24   produced.

25            Here, there are no such communications because Ms.

Proceedings                                                        6

1  Boylan did not know Trooper 1, never met Trooper 1, had no

2  communications with her, does not even know her identity.  So

3  there are no relevant documents.

4          And what I have heard, and I've only pieced this

5  together through, you know, having looked through the docket

6  to some degree, but I don't have the benefit, of course, of

7  the complete landscape of this case, my understanding is

8  there's some conspiracy theory that relates to Ms. Boylan,

9  that she somehow was the instigator, that she made a public

10  complaint against Mr. Cuomo.  She was the first to do so, and

11  that somehow unleashed a kind of domino effect, and that she

12  lied, and that created a daisy chain of other women who then

13  lied, and that's what essentially undid the governor.  The

14  problem with that theory, that conspiracy theory is the women

15  in that circle had nothing to do with Trooper 1.

16          Now, I would have of course dispute hotly that there

17  were any lies and, of course, the OAG report corroborated

18  everything that Ms. Boylan said.  And I don't want to get into

19  the OAG report because I don't think it's relevant, I don't

20  think it would be admissible.  And Your Honor, of course there

21  is always some skepticism about that.  I also have looked at

22  the 803(a) cases in this Circuit.  I don't see how it comes

23  in.  I'll get to that later.

24          But even if it were all a huge massive conspiracy

25  and everything there were lies, I don't see how that has

Proceedings                                                      7

1   anything to do with Trooper 1.  She has made allegations.  Let

2   them stand or fall on their own weight.

3         Anything Ms. Boylan said and any of the women she

4   talked to have nothing to do with the allegations that Trooper

5   1 made against Governor Cuomo, the harassment and the

6   retaliation.

7         And so I think on relevance grounds alone, nothing

8   that they are asking for -- and they don't even ask about any

9   communications or any allegations relating to Trooper 1 in

10  their document requests, both to Ms. Boylan and the -- I have

11  lost count -- maybe 13 other satellite subpoenas that they

12  have issued yet to additional nonparties, third-parties.  They

13  have nothing to do with Trooper 1 simply because Ms. Boylan

14  has nothing to add about Trooper 1.  So that's the relevance

15  argument.

16        Then, of course, we go to proportionality.  Ms.

17  Boylan is not a party.  She decided, although she would have,

18  I think any plaintiff's lawyer, and I believe Mr. Licul's firm

19  reached out to her to take her on contingency, she would have

20  excellent claims for harassment and retaliation, but she

21  decided not to take on former Governor Cuomo because of this.

22  She did not want the brutality of the harassment and the

23  retaliation that would come with.  And yet, she's suffering

24  exactly those things despite that she did not bring claims.

25        They have -- every time there's a proceeding or a

Proceedings                                                    8

1   filing, her name is dragged through the mud again and again

2   and again.  They came after her.  They released her personnel

3   file unlawfully.  And every time there is some proceeding, she

4   gets dragged again and again, her family, her husband, her

5   name again and again.  Why?  She's not in this case.  She's

6   not a plaintiff and she's certainly not a defendant.  And she

7   cannot withstand it any long.  Yet, it keeps happening,

8   despite she's not a plaintiff and she's not a defendant.

9          It is not just document requests to her, but it is

10  to her former campaign manager, her former employer.  Somebody

11  who claims they had a relationship with.  The list goes on and

12  on, as though she were a party.

13         So there is no relevance.  There is no

14  proportionality and the burden is extreme.  She's a private

15  citizen.  She has had to retain us.  We are not cheap.  This

16  is not a contingency case, of course.  And this is not on a

17  taxpayer's dime, of course.  And she has to expend a

18  tremendous amount of money just to fight for her privacy and

19  her good name.  We have been here for many, many months now

20  fighting this fight and she shouldn't have to because she has

21  nothing to do with the case.

22         I know I have said this time and time again, and I

23  guess I am now perhaps testing Your Honor's patience, because

24  I know you have read all of the papers very, very carefully,

25  and I do really appreciate that.  So I know Your Honor has

Proceedings                                    9

1    said that you have specific questions.  Of course I'm happy to

2    answer any and all of them.  We can go through specific

3    categories of course, but there are specific arguments with

4    respect to specific categories.  But I do have that overall

5    umbrella argument that Ms. Boylan shouldn't be here,  because

6    there really is no relevance.

7              THE COURT:  So one point I want to follow up on with

8    you, Ms. Perry, is in your letter that was filed overnight or

9    this morning, it looks like it was filed on the 10th,

10   yesterday --

11             MS. PERRY:  I apologize that.  We got the transcript

12   from last week's proceedings yesterday and I did think that

13   was useful to have that in front of Your Honor today.

14             THE COURT:  I understand.  I appreciate the

15   additional information.  My one question to you is the

16   sentence at the bottom of the first page, you say this is an

17   indistinguishable case from the case in the Southern District.

18             In the Southern District, is Ms. Boylan included in

19   the parties' Rule 26(a) disclosure and is she likely to be

20   called by the parties or has an accommodation been reached?

21             MS. PERRY:  My understanding is she was included in

22   the disclosures, but the plaintiff's counsel in that case, Ms.

23   Bennett's counsel, Ms. Katz, who is here, has told us she does

24   not intend to call Ms. Boylan as a witness.

25             THE COURT:  And that information has been

Proceedings                                    10

1   communicated to Judge Cave?

2           MS. PERRY:  Yes, it has.

3           THE COURT:  That's the key distinction,

4   unfortunately, Ms. Perry.  To that end, I appreciate the

5   sentiments in your letter and the sentiments that you raised

6   here today with regard to the lack of the relevance as to Ms.

7   Boylan's knowledge as to the events alleged pertaining to

8   Trooper 1.

9           But as I'm sure you have seen, the Complaint in this

10  case is broad and dry.  It contains numerous allegations that

11  appear to be largely lifted from the OAG report and similar

12  documents and Ms. Boylan is squarely in the case.

13          I have repeatedly asked plaintiff's counsel if they

14  would be willing to narrow the witnesses that they anticipate

15  calling to prove the hostile environment and have been

16  repeatedly told no.

17          So the Court is really left with a bind, because Mr.

18  Licul has stated unequivocally his intention to prove up the

19  harassment in the sort of circle around Governor Cuomo in his

20  efforts to establish the hostile environment.

21          Mr. Licul, is that still your intention?

22          MR. LICUL:  Your Honor, it is, especially given the

23  defense, which is likely to be, as anticipated, that Mr.

24  Cuomo's conduct was not pervasive and also that to the extent

25  some of these things happened, the victims were

Proceedings                                                        11

1   misinterpreting what his motive and his intentions and this

2   was at best a mistake.

3           THE COURT:  Right.

4           MR. LICUL:  So long as that is the defense, I don't

5   see how we could -- I mean, if Mr. Cuomo choses to waive that

6   defense, that's different.  But, nonetheless, I don't mean to

7   be going afield of Your Honor's question.  I think the

8   information is relevant.  I do, however, think that the Court

9   can and should strike the proper balance to protect Ms.

10  Boylan.  I think that is -- that proper balance is in the

11  letters that some of the nonparties have filed, the letters

12  that some of the nonparties have filed about how to proceed,

13  and that is party discovery, Mr. Cuomo's deposition, see what

14  the documents say.  That's what Magistrate Judge Cave did,

15  across the river, and then deal with the depositions.

16          THE COURT:  To be clear, Judge Cave did or did not

17  direct the order of depositions vis-à-vis the parties and

18  nonparties?

19          MR. LICUL:  She did not direct the orders, but

20  forgive me, Your Honor, I believe what she did was to direct a

21  limited amount of document discovery and then, based on that,

22  decide whether or not the depositions were necessary, the

23  deposition was necessary.

24          THE COURT:  I've reviewed her order.  So I do

25  understand what she ruled with regards to Ms. Boylan.  I just

Proceedings                    12

1   wasn't clear on whether or not you had intended it to imply

2   that she had indicated that the parties needed to be deposed

3   first.

4          MR. LICUL:  No, I don't think that issue was

5   reached.  I just meant that that she has not yet decided the

6   issue of the deposition.

7          THE COURT:  I did see that that was being held

8   pending Ms. Boylan's Complaint for the rulings as to the

9   documents camp.

10          So the document subpoenas that Ms. Boylan has raised

11   in her motion include a subpoena to her, of course, as well as

12   a subpoena to one Harold Zemsky, a subpoena to the executive

13   chamber, a subpoena to the Empire State Development

14   Corporation, and a subpoena to Elizabeth Fine.  Is that the

15   universe of subpoenas in your opening motion, Ms. Perry?

16          MS. PERRY:  That was in the opening motion, but

17   since then there have been any other number of other

18   subpoenas.  We didn't want to keep making sequential motions.

19   But there was one as recently I believe as last week.  So we

20   held, obviously both for, you know, judicial resources and Ms.

21   Boylan's, we didn't want to keep making motions, but I assume

22   Your Honor's -- well, they're the same type of documents that

23   are being requested in each.

24          THE COURT:  There is a lot of overlap in terms of

25   some of the requests.

Proceedings                                        13

1          MS. PERRY:  Yes.

2          THE COURT:  So given the situation that the Court is

3    presented with vis-à-vis the way that the Complaint is

4    charged, the parties' representations to date, the very

5    significant likelihood that unless there is a dramatic change

6    of strategy by the plaintiff or defendant, or both, Ms. Perry,

7    I do think Ms. Boylan is going to be potentially called as a

8    witness in this case and Mr. Cuomo is entitled to take some

9    discovery from her.  So that then leads to my questions as to

10   some of the underlying requests themselves.

11         Ms. Glavin, who is best situated to go line by line

12   on these documents subpoena requests?

13         MR. GLAVIN:  I am.

14         THE COURT:  Okay.  If we can turn to the Boylan

15   document subpoena, document request 1A requests documents,

16   basically all documents regarding any of your personal

17   interactions with Governor Cuomo.  This seems incredibly vague

18   to me.

19         Can you shed some light on what that subpoena

20   request is supposed to mean?

21         MR. GLAVIN:  Sure, Your Honor.  Ms. Boylan, our

22   understanding, talked about interactions with Governor Cuomo

23   with other people and talked about them in very favorable ways

24   and that's sort of what we were aimed at getting at and then

25   suddenly changed her tune in 2020.

1          I don't know sort of what -- you know, I don't know

2     what Ms. Boylan has with respect to anything regarding her

3     interactions, but to the extent she's talking about -- I mean,

4     she published an essay on February 24th of 2021 entitled, My

5     Story of Working for Governor Cuomo, and in it she details

6     about, you know, her allegations, which, of course, we

7     proposition is completely false, but interactions about the

8     Governor trying to keep tabs on her, which was not true, but

9     that's what she stated, that the Governor touched her arms,

10    her lower back, her legs.

11         If she has communications, particularly any

12    contemporaneous communications about her interactions, whether

13    he physically touched her, her interactions with him on the

14    plane.  It relates to her allegations.  She's very specific

15    about some interactions and that's what we are trying to

16    capture.

17         But we're also, importantly, trying to capture the

18    very favorable things she was saying about Governor Cuomo

19    contemporaneously with working with him and in the year after.

20         THE COURT:  How are these personal interactions that

21    go to your comments about touching or inappropriate

22    interactions different from Subsection B of the same request,

23    which is any and all documents regarding allegations of sexual

24    harassment and misconduct?

25         MR. GLAVIN:  The way I think it is different, Your

1  Honor, is that to the extent she was saying favorable things

2  about Governor Cuomo, which she was publicly as well -- so we

3  have tweets that was talking about so proud to work with

4  Governor Cuomo, et cetera, but to the extent she talks about

5  interactions that are contrary to sexual harassment, like I

6  met with the Governor today, it was a great meeting, the

7  Governor invited me to X, Y, and Z.  Now, she may not have

8  these.  These may be all be with the Empire State Development

9  Corporation, which is why we have a subpoena to them as well.

10  But she may not have any of these, or she might have personal

11  communications where she's saying favorable things about him

12  to her friends.

13        I mean, one other thing is through the discovery

14  that we've gotten that I have called Trooper 1 centric

15  discovery, like we know that Ms. Boylan reached out to Vinny

16  Straface, who was head of the PSU detail around 2019.  She

17  sent him a message saying, you know, please say hello to the

18  governor for me, checking in.  That was a positive message.

19  It is that type of thing that we're looking for where she has

20  favorable things to say him.

21        THE COURT:  This is request 1A and B.  Ms. Perry,

22  would you like to be heard?

23        MS. PERRY:  Yes, Your Honor.  This is the issue with

24  going through -- what they are trying to do obviously with

25  each of these 16 requests is impeach Ms. Boylan.  So it is

Proceedings                                    16

1  going to be a mini trial.  This is just the first.  There's

2  obviously going to be I guess 10 other complainants they are

3  going to try to do this with.  If the issue here is -- first

4  of all, I want to correct something.  If Your Honor is

5  distinguishing this case from the Bennett case because Mr.

6  Licul refuses to say that he won't call Ms. Boylan, in fact,

7  in that case the defendant has said that he will call Ms.

8  Boylan.  So she's going to be a witness apparently in both

9  cases.  SO I don't think there is a distinction.  She's going

10 to be a witness in both cases.

11         But if the point here is to just show -- if Mr.

12 Licul wants to show there was harassment of other women, the

13 OAG report points out -- we have a footnote in my letter of

14 yesterday -- that there are plenty of well-documented,

15 corroborated instances of harassment against Ms. Boylan.  And

16 they even say, because there they did have an opportunity to

17 impeach Ms. Boylan and the AG concluded even if you don't

18 believe some of these contested incidents, like the

19 strip-poker incident that is so hotly contested, here's what

20 we have in writing, this incident where he says she's prettier

21 than his ex-girlfriend, this incident where he wrote this or

22 this or that.

23         So there are plenty of completely corroborated

24 incidents where it was completely inappropriate workplace

25 conduct.  So why do we have to have these -- we have to go

Proceedings                                                  17

1    back and forth, where we have to go back five years where she

2    said nice things about Mr. Cuomo and upset her entire life and

3    then have his counsel and Mr. Cuomo pick through all of her

4    private communications with her friends and, you know, God

5    knows who, and then have that, you know, again be scrutinized

6    in the press and in the public.  Why?

7             THE COURT:  Because bias is always relevant.

8             MS. PERRY:  For a nonparty, there's plenty --

9             THE COURT:  And Mr. Licul plans to call her.

10            MS. PERRY:  Well --

11            THE COURT:  It's different.  If they choose to call

12   her, I have no idea why they'd want to do that.

13            MS. PERRY:  Or pick through her entire life to

14   impeach her when it's not clear exactly what the issues are

15   going to be, they are going to be narrowed before trial, but

16   to allow them to scrutinize her entire life under a microscope

17   does not seem in -- I do think public policy should come into

18   this at this some point.  She is a victim.

19            THE COURT:  I am here.

20            MS. PERRY:  I know you understand that, Your Honor.

21            THE COURT:  I'm here in an effort to narrow these

22   subpoenas as much as possible.  I understand the policy

23   rationale.  I understand the policy implications.  And I fully

24   share and appreciate your concerns outlined in your letter,

25   including the concern outlined in footnote four where you

Proceedings                                          18

1    describe how the subpoenas has been a living nightmare for

2    her.  I truly am sympathetic to that.  The problem I am faced

3    with Ms. Perry is that bias is always relevant under the case

4    law for impeachment.  And if there is evidence of bias,

5    evidence of changed attitudes and evidence that can be gleaned

6    from these communications, they have a right to cross-examine

7    her about that.  I want to work on narrowing this as much as

8    possible.  That's why we are here.

9            So in terms of these documents, Ms. Glavin, what

10   timeframe is appropriate for these documents?  Because that is

11   another thing I found lacking in all of the subpoenas, was

12   appropriate limits on the timeframe and that we are going to

13   be putting limits on each category that I find relevant, and

14   I'm not going to find most them relevant.  Let's just start

15   with that premise.

16           I do see that the documents regarding certainly her

17   allegations as to sexual harassment and her misconduct

18   Subsection 1B of your request relevant.  Starting with that,

19   what is the timeframe, Ms. Glavin, that you are seeking?

20           MR. GLAVIN:  Your Honor, with respect to the

21   timeframe, it is a self-limiting timeframe because she first

22   makes her allegations, at least as far as we know, in December

23   of 2020.  That said, we have seen documents from Ms. Boylan

24   talking about, you know, the Governor.  She worked for ESD

25   from 2014 until September of 2018.  So there's necessarily a

Proceedings                                                    19

1    self limiting because of certain events.

2              THE COURT:  Right.  Answer the question, please.

3    What timeframe are you seeking documents with respect to 1B?

4              MR. GLAVIN:  With respect to 1B of any allegations

5    of sexual harassment, this would have to go back to when she

6    first started working.

7              THE COURT:  Until when?

8              MR. GLAVIN:  2014.  She started working for ESD in

9    2014.  To the extent she was making contemporaneous

10   allegations about Governor Cuomo when she was working for him,

11   that's what her claims said.  She went public in December.

12   But to the extent she said anything privately about him while

13   she was working for him, we are entitled to that because this

14   is all about her claim that she was sexually harassed in the

15   workplace.

16             THE COURT:  Do you have any good-faith basis for the

17   notion that there are such documents preceding December 2020?

18             MR. GLAVIN:  Yes.  Absolutely, Your Honor.

19   Absolutely, Your Honor, because we see in her production for

20   the AG's office, she has documents she claim corroborate her

21   allegations as early as 2017 or 2016.  If you look at her

22   media article, she claims that the Governor by inviting her to

23   his office at a holiday party in 2016 was part of sexual

24   harassment.

25             She claims that she was at a meeting in the mansion

Proceedings                                                    20

1   in February of 2017 where she classified that as sexual

2   harassment.

3           We believe all of that is false.  Let me put it this

4   way:  I will be surprised if we see allegations of sexual

5   harassment by Ms. Boylan because Ms. Boylan is lying.  This

6   did not happen.

7           This is also very important.  Ms. Boylan doesn't

8   have anybody that corroborates her allegations, because to the

9   extent that she has taken that position, that is what was

10  always glaring to us, is that nobody saw what Ms. Boylan

11  claimed.

12          Ms. Boylan said lots of people saw me sexually

13  harassed but nobody corroborates her.

14          THE COURT:  What is the end date for this request?

15          MR. GLAVIN:  Up to the date of the subpoena, which

16  is March of 2023.  But one of the reasons we are asking for

17  this is because Ms. Boylan, we know from the deposition of Ana

18  Liss, that when Ms. Boylan received her subpoena, she

19  contacted Ana Liss.  We've seen it in the texts.  She also --

20          THE COURT:  We will talk about Ms. Liss later.  I

21  really need to --

22          MR. GLAVIN:  Until the date of the subpoena.

23          THE COURT:  Ms. Perry, what is your reaction to 2016

24  to March of 2023 with regards to document request one of the

25  Boylan document subpoena?

Proceedings                                        21

1          MS. PERRY:  I think, A, it's way too broad.  She

2    worked with him for years or for him for years, so, I mean, I

3    just think that's casting the net way too far.

4          So allegations of sexual harassment or misconduct,

5    again, I don't think any of this is relevant because she's not

6    in the case, but I think, you know, that at least would cabin

7    it a little bit more narrowly.

8          THE COURT:  And the years that she has proposed,

9    she's saying as early as 2016 to March 2023.

10          MS. PERRY:  I mean, I think -- I mean, under their

11    theory, it is very hard for me to buy this logic.  But I guess

12    under their theory, I can't really fight back.

13          THE COURT:  All right.  So turning next to request

14    two through five, which pertain -- documents regarding the OAG

15    investigation, the AJC investigations, and documents

16    reflecting communications with Ms. Boylan and the news media.

17          Ms. Glavin, what would be the timeframe of that?

18          MR. GLAVIN:  So for -- let's just focus on two and

19    three, the investigations.  I do think it is necessarily a

20    self limiting because we know when the investigations

21    happened.  So we would do it from, you know, the beginning of

22    2021.  The investigates started -- the referral was March 1st,

23    but there was discussion about that publicly in the press in

24    the weeks before that.  I would put it in the January 2021

25    through the release of all of the testimony and the

Proceedings                                    22

1    transcripts, which ended in January of 2022.

2           THE COURT:  And No. 4 is potentially very broad.  I

3    would be surprised if Ms. Boylan had not been contacted by

4    multiple members of the media speaking to talk to her.  And to

5    the extent that members of the news media are seeking to talk

6    to her and she's blowing them off or not responding, it's

7    irrelevant.

8           MR. GLAVIN:  Yeah, but she didn't do that, Your

9    Honor.

10          THE COURT:  Well, that may or may not be so.  To

11   seek all documents reflecting communications between Ms.

12   Boylan and the news media implies incoming.  It's not just

13   outgoing.  To the extent that the news media is calling her

14   off the hook and she's not answering some of those calls,

15   which I suspect did happen, it's irrelevant, isn't it?

16          MR. GLAVIN:  With respect to -- if I might have a

17   moment to confer with co-counsel.

18          THE COURT:  Yes.

19          MR. GLAVIN:  Your Honor, we'd limit this one to any

20   journalist that she responded to.

21          THE COURT:  Ms. Perry, would you like to be heard

22   about these requests, two, three, and four?

23          MS. PERRY:  Yes, Your Honor.

24          I would take strong exception to all of them.  With

25   respect to -- I mean, two and three, anything that she would

Proceedings                                          23

1   have would be privileged and would, you know, to the extent we

2   have to comb through all of it I think would be burdensome, to

3   have to go through all of it and create a privilege log, I

4   don't think that the -- what's the expression?  That the juice

5   would be worth the squeeze.

6           As far as the media outlets, I think they are going

7   to be, you know -- anything that she would have said, they

8   already have as publicly available, and I don't think there's

9   going to be a lot more there.  So I also think it's the same

10  thing.  It's relevance/burden analysis.  I don't think it's

11  fair to make her go through all of that when there's really

12  not going to be much there in terms of relevance.

13          So if we are trying to do, you know, this fairly to

14  her, I think it is -- you know, you have given them very broad

15  discovery with respect to number one, there is not going to be

16  anything truly additive with two, three, and four.

17          THE COURT:  Let me just ask you a question, Ms.

18  Perry, in terms of procedural history here.  Has the

19  production that she made to the OAG been provided in full?

20          MS. PERRY:  It has and they have certainly.

21          THE COURT:  They have critiqued it?

22          MS. PERRY:  They have.  That's fair to say.

23          THE COURT:  And did you also provide the request

24  that was provided by the OAG and/or the AJC?

25          MS. PERRY:  I think they have the request, yes.  So

Proceedings                                                    24

1    we -- they have the request and we provided them with

2    everything that was provided to the AG's office and that the

3    AG accepted without complaint.  So that was the accommodation

4    that was made with the AG's office.

5            THE COURT:  Okay.  I don't want to hear about the

6    motion with regards to the accommodation with the AG's office,

7    but I do want to understand whether or not you agree that you

8    have in your possession the OAG request and the AJC request.

9            MR. GLAVIN:  No, I don't have the Assembly Judiciary

10   Committee's request.  I have the OAG subpoena to Ms. Boylan

11   and we have 25 pages that she produced under the alleged

12   accommodation.  I'm sorry.  I couldn't help that.

13           I will tell you what we're looking for, Your Honor.

14           We know that there were communications, and maybe

15   this is going to be covered with category number one, we know

16   there were communications amongst the complainants and others

17   about the investigation.  Communications with people before

18   they went in and were interviewed.  We know there were

19   communications after people went in and were interviewed by

20   the AG's office.  We also know that there were communications

21   when the report came out, sort of what it said, what it didn't

22   say.  We know that there were communications when the

23   transcripts were released.

24           So just so Your Honor is aware, the Attorney General

25   released the transcripts publicly, she also released

Proceedings                                                 25

1    videotapes publicly.  To my knowledge, the AG's office didn't

2    tell the women that they were going to be releasing this.  And

3    Ms. Perry can correct me if I am wrong, is that boom, these

4    just came out.  And we know there was chatter amongst the

5    women about that, about their testimony.  We are very focused

6    on that.

7              Also, to the extent there are e-mail exchanges

8    between the attorneys and the AG investigate, like, for

9    instance, I think there were follow-up questions that may have

10   been posed to attorneys, and if there were statements to that,

11   we're very interested in that.

12             THE COURT:  Okay.  So back up.  How are the

13   communications that you say you're seeking with regard to the

14   OAG and the AJC investigation vis-à-vis the complainants

15   speaking with one another not subsumed within request five?

16             MR. GLAVIN:  Let me just take a look.  Just to the

17   extent Ms. Boylan, because request five talks about the

18   executive chamber and former employees.  If she was discussing

19   her interview with her people subsequent to the interview,

20   what she said, what she didn't say, so it's a limited universe

21   on five.  So if she had conversations with other people about

22   what she told the AG's office and what she didn't tell the

23   AG's office.

24             THE COURT:  Okay.  So with regard to all documents

25   regarding the OAG investigation, the AJC investigation, I

Proceedings                                    26

1    certainly don't think it is appropriate to make Ms. Boylan

2    reproduce the productions that she has already given you that

3    were provided to those entities.

4              Do you have the AJC request, Ms. Perry?

5              MS. PERRY:  I do not.

6              THE COURT:  This question as to communications

7    pertaining to the statements made to the OAG and/or the AJC,

8    what is your reaction?

9              MS. PERRY:  I'm sorry, that's not -- that's not in

10   the document request.

11             THE COURT:  She is saying that that's part of all

12   documents regarding the OAG investigation.

13             MS. PERRY:  So pertaining to -- I mean, look, I

14   think document request one is -- that Your Honor has just

15   ordered that we produce, I think will capture what they are

16   looking for, including -- we kind of peaked ahead to request

17   five as well, but many -- so I don't know, you know, why we

18   need to go much further pertaining to the AG investigation.

19             Certainly I'm not really understanding why -- how

20   communications between counsel and the AG's offices could

21   possibly be captured within the document request.  I mean,

22   that's not something that would be produced under this

23   subpoena.  I may be missing exactly what they're looking for

24   here, but I don't see how that would be.

25             THE COURT:  Ms. Glavin, would you like to clarify?

Proceedings                                             27

1          MR. GLAVIN:  Yes.  Absolutely.

2          To the extent there were communications back and

3    forth between counsel about what documents she has and doesn't

4    have, they might have a follow-up from her interview:  We have

5    two follow-up questions, can you pose this to your client?

6          I mean, I can tell you I know from having lived

7    through that investigation that, you know, there would be

8    communications about when documents are coming, do you have

9    more documents, you mentioned this in your testimony, can you

10   produce X to us.  Yes, we're very interested in that.

11         THE COURT:  Does this exist, Ms. Perry?

12         MS. PERRY:  I didn't represent Ms. Boylan at the

13   time.  But if there are communications between counsel that

14   were not then -- if they were forwarded then to the client, I

15   mean, that arguably would be privileged if it's --

16         THE COURT:  She is not seeking your client

17   communications.  She's seeking attorneys' communications with

18   the investigators.

19         MS. PERRY:  But why would that be covered by this

20   subpoena?  Are you subpoenaing counsel?

21         MR. GLAVIN:  No.  It's covered by the subpoena

22   because the definition of you, the definition includes Ms.

23   Boylan's representatives.  But to the extent Ms. Boylan's

24   attorneys made representations to the Attorney General's

25   investigators on her behalf about her allegations, the

Proceedings                                    28

1   documents she was producing yes, we absolutely want those.

2          MS. PERRY:  I don't know if there are any such

3   communications.  As I said, I didn't represent Ms. Boylan.  So

4   I don't know.  But, I mean, my objection is going to be time

5   and time again that they're going so far afield.  From day

6   one, you know, they are trying to get underneath the AG's

7   Office investigation, and, you know, they've been saying we

8   create it and undermine it, and they're trying to do that now

9   through the vehicle of Ms. Boylan.  I do think that is

10  completely appropriate.  They don't need to -- if Your Honor

11  thinks it's appropriate in some way for them to be able to

12  impeach Ms. Boylan, they don't need to impeach the entire AG

13  Office investigation as well.

14         THE COURT:  But the problem also is Mr. Licul's

15  inclusion of the allegations of the OAG report in the

16  Complaint and he stated his intentions to introduce it at

17  trial.  Because, as we have discussed in prior proceedings, I

18  have every confidence that Ms. Glavin is going to seek to

19  preclude it.  And in order to do so, she needs to be

20  proffering strong factual arguments to the trial judge.  So

21  we've been going around and around.  I'm laying the foundation

22  as to why things may be irrelevant, Ms. Perry.  And the

23  further we dig into the record, unfortunately, this is where

24  we are.  And this is not just simply a matter of impeachment;

25  it's also a matter of preparing his defenses, and one of his

Proceedings                                                    29

1   defenses is this report shouldn't come in.

2        MS. PERRY:  And that does get to -- and, you know,

3   many nonparties have made this argument, and we've made it as

4   well.  Perhaps Your Honor implicitly is ruling, but we have

5   asked to stage discovery of course in someway.  A lot of these

6   issues --

7        THE COURT:  I'm not ruling today on staging

8   discovery specifically.  I'm trying to narrow these subpoenas

9   to get the documents rolling so that we can then eventually be

10  in a position to discuss.  So we need to get all these

11  documents production issues unstuck, which is why I want to

12  focus on the document subpoenas today.  I'm not intending to

13  order her deposition instantly.  We have to get the document

14  subpoenas up and going.

15       I may well decide to order parties depositions

16  first.  That's not what we are here to talk about.  We are

17  here to talk about, while I have all of you here, are these

18  subpoenas, so we can narrow them as much as possible.

19       MS. PERRY:  Well, I don't think any of these

20  documents related to the AG investigation, AJC's or any media

21  outlet have any relevance.  We have agreed, or Your Honor has

22  ruled, that we would produce documents relevant to harassment,

23  allegations of misconduct, allegations against Governor.  So

24  to the extent that is subsumed within two, three, and four,

25  obviously we are going to be producing them.  But I think when

Proceedings                                          30

1    you're getting so in the weeds, it becomes more burdensome and

2    that would outweigh the relevance.  That is my argument.

3          THE COURT:  Thank you.  I do understand the

4    argument.

5          Ms. Glavin, if I were to direct Ms. Boylan to search

6    for the documents -- I'm not saying that I am going to -- but

7    if I were to direct her to search for the documents reflecting

8    these communications you are concerned about and including the

9    communications in request five, what would be the appropriate

10   timeframe?

11         December 2020, starting?  When the investigation

12   started?

13         MR. GLAVIN:  No, Your Honor.  I just want to throw

14   out, at a minimum, we would need it going back to at least

15   March of 2020 because that's when Ms. Boylan sent two

16   threatening texts to members of Governor Cuomo's staff.  These

17   are the texts where my memory is long and so are my resources,

18   the future is coming after A holes.

19         MS. PERRY:  That's not when the investigation

20   started.

21         MR. GLAVIN:  Your Honor, it goes to her credibility

22   and her bias and why she made these allegations up.

23         THE COURT:  How is that even -- how does that fall

24   within any of these categories?

25         MR. GLAVIN:  I want to go back and take a look and

Proceedings                                                          31

1   let me just --

2           THE COURT:  Right.  But the text you're describing,

3   literally, which category would they fall under?

4           MR. GLAVIN:  It would fall under number five.

5           THE COURT:  Who were they sent to?

6           MR. GLAVIN:  They were sent to I believe Anabel

7   Walsh, and I can't remember -- it's in our moving papers, Your

8   Honor.

9           But, you know, one of the defenses of Governor Cuomo --

10          THE COURT:  She was in the executive chambers.

11          MS. PERRY:  I didn't realize that we were talking

12   about five.  I have some serious objections to five.

13          THE COURT:  I asked her timeframe and I'm trying to

14   get that answer for five.

15          MS. PERRY:  I'm sorry.

16          THE COURT:  For communications with the other people

17   and for five, I want a timeframe, and then it's your

18   opportunity.

19          MR. GLAVIN:  Your Honor, I screwed up on who those

20   two texts were.  It was to Danni Lever -- D-A-N-N-I L-E-V-E-R

21   --  and Robert Mujica, M-U-J-I-C-A.

22          THE COURT:  Do you already have these texts?

23          MR. GLAVIN:  I don't know if there are more.  Those

24   are the two that we know about.  Yes, we have those texts and

25   they are in our papers.

Proceedings                                           32

1          THE COURT:  And they're from 2020?

2          MR. GLAVIN:  They are from March of 2020.

3          Just one moment.

4          To the extent, you know, it's not covered by one,

5     okay, which is any allegations or other misconduct about

6     Governor Cuomo, I think we want these going back to -- I think

7     we would go back to January of 2020.  She announced that she

8     was running against Congressman Nadler in 2019.  She was going

9     to primary him.  And, you know, one of our theories is she

10    wanted the support of the Governor's office in that raise.

11    She didn't get it.  COVID happened.  The Governor issued an

12    executive order of March of 2020.  That goes to request

13    number --

14         THE COURT:  Let's just be really clear, Ms. Glavin:

15    We are not giving you many of the subpoena requests that are

16    included herein.  We are not going to be proving up extrinsic

17    evidence of everything that Ms. Boylan did in 2020, 2021, and

18    2022.  It's is not realistic.

19         MR. GLAVIN:  I understand.

20         THE COURT:  So some of these categories are so, so

21    afield from the issues in this case, I need a timeframe.

22         MR. GLAVIN:  January 1st of 2020.

23         THE COURT:  To when?

24         MR. GLAVIN:  To the present.

25         THE COURT:  Ms. Perry, I'd like to hear your

Proceedings                                                    33

1  response to January 1, 2020 to the present with regard to

2  document request number five.

3          MS. PERRY:  Well, first of all, not to the present,

4  to the issuance of the subpoena.  But also I think -- you

5  know, Your Honor has ruled with respect to category one.  This

6  is going to be incredibly overbroad.  She has relationships

7  with a lot of these women.  I mean, they have made what is

8  normal and healthy support for other women who are victimized

9  into something disgusting and nefarious.  They speak amongst

10 themselves.  They're a network of survivors and they talk to

11 each other, and they are friends, many of them.  So there are

12 going to be a lot of communications where they send each other

13 a happy face emoji, okay.

14         We're not going to go through all of these.  If

15 there is an allegation of sexual harassment or misconduct,

16 we've already, you know, said that that's going to be

17 produced.  But all communications between -- with the

18 executive chamber, any of its current or former employees

19 really is a bridge too far, including all of these people.

20 Laying bear all of these communications seems insane.  I'm

21 sorry to put it so bluntly.

22         Again, number one, okay, again, not relevant to this

23 case, but okay.  But why are we, you know, opening this whole

24 Pandora's box, including a million things that are not going

25 to be relevant, but that are very private and very intrusive.

Proceedings                                                          34

1          So okay with category one.  But really, do we have

2     to go this far into peoples' personal relationships.

3          MR. GLAVIN:  Your Honor, it's self limiting.  It's

4     concerning Governor Cuomo.

5          MS. PERRY:  That's not -- I mean, there's a lot

6     about Governor Cuomo.

7          MR. GLAVIN:  Okay.  So it's going to capture a

8     smiley face.

9          MS. PERRY:  These are people within the executive

10    chamber.

11         THE COURT:  Well, it does say regarding Cuomo.  It

12    just says regarding Cuomo.  I mean, it's very broad.  These

13    are people literally working in the executive chamber.  All

14    communication regarding Governor Cuomo?  They're all working

15    there day to day at times.

16         MR. GLAVIN:  Your Honor, if you are looking at what

17    this is, Charlotte Bennett, she didn't work with Governor

18    Cuomo in the executive chamber.  She's a complainant.  To the

19    extent she has had communication Charlotte Bennett, what we

20    are --

21         THE COURT:  You're seeking these from everybody.

22    This is the tip of the iceberg, right.

23         MR. GLAVIN:  At a minimum, we need it with any of

24    the complainants, any communications with any of the

25    complainants.  So these are the people that are mentioned.  We

Proceedings                                                    35

1    want the communications with Alessandra Biaggi, because we've

2    already seen communications with both Lindsey Boylan reaching

3    out to her in December of 2020.  Biaggi is a former executive

4    chamber employee, reaching out to her to get support to back

5    her up.  So it is all of the women.

6              THE COURT:  When you say getting support to back her

7    up, what language did this witness use, allegedly, in the

8    text?

9              MR. GLAVIN:  I can't -- it's basically I just spoke

10   to Biaggi, she wants to speak to you, meaning Charlotte

11   Bennett.  We see this in December 2020.

12             THE COURT:  So why?

13             MR. GLAVIN:  That's very important.  It goes to Ms.

14   Boylan -- her allegations are false.  We're going to start

15   with the premise, because I've heard a lot over there, but

16   please allow me to --

17             THE COURT:  I understand your position.

18             MR. GLAVIN:  They're false.  She made up her

19   allegations because she was running for Manhattan borough

20   president.  She was basically fired, de facto fired from the

21   executive chamber.

22             THE COURT:  You have ample impeachment opportunity

23   and you have a good-faith basis for all of the things you're

24   saying to me to impeach her.  But none of this is going to be

25   provable by extrinsic evidence under 608(b).

Proceedings                                          36

1         Why do you need every single text and every single

2    document, Ms. Glavin?  It is just too much with nonparty

3    witnesses.

4         MR. GLAVIN:  With the complainants, absolutely.

5    They are all named in this Complaint.  How is it not relevant

6    that Charlotte Bennett and Lindsey Boylan are talking.  And

7    Lindsey Boylan -- what we have now seen in discovery in

8    Bennett case is that Lindsey Boylan was lying to Charlotte

9    Bennett to get her to come forward.  Provably false statement

10   that Boylan made to Charlotte to get her to come forward.

11        Again, I'm now limited because we got a production

12   two nights ago of three dozen videos that Charlotte Bennett

13   took of herself talking about -- in some of them -- there's

14   five of them where she's talking about her conversations with

15   Lindsey Boylan and Lindsey Boylan's lying to her.  I would

16   like to be able to -- they've been marked confidential, but

17   there is like a very -- what we've seen in the videos is

18   incredibly exculpatory and we think consistent with all of our

19   defenses and undermines Boylan tremendously, what Charlotte

20   Bennett's talking about what Boylan is telling her.

21        THE COURT:  There has to be a way to narrow this,

22   whether it is by date range or topics, but all documents

23   reflecting communications with the executive chamber or its

24   former employees, I don't even know how she identifies who

25   that would include, that's A.  B, it's just a lot.  So please

Proceedings                                        37

1    make a suggestion.

2             MR. GLAVIN:  Okay.

3             MS. PERRY:  How is that not subsumed by request one?

4    That's what they're looking for.  If she made an allegation of

5    sexual harassment to Charlotte Bennett or --

6             THE COURT:  Unfortunately, it says regarding Cuomo

7    including.

8             MR. GLAVIN:  Your Honor, Ms. Boylan testified to the

9    Attorney General's office that she began reaching out to women

10   current and former employees of the executive chamber

11   repeatedly to try to get other people to come forward to the

12   point that one woman, you know, I can tell we are looking for

13   text messages with -- her name is not public.

14            THE COURT:  There's nothing nefarious about

15   encouraging a survivor of sexual harassment to come forward.

16   There's nothing nefarious about that, Ms. Glavin.  Please

17   stop implying that there is.

18            MR. GLAVIN:  Your Honor, there is something

19   nefarious to try to get someone to come forward that has not

20   been sexually harassed.  That's the difference.  To state

21   something to embellish and to lie to come forward --

22            THE COURT:  Of course.

23            MR. GLAVIN:  -- so I take exception.

24            THE COURT:  Every argument that you're making

25   presumes that your theory of the case is correct.  And of

Proceedings                                              38

1    course you are entitled to zealous advocacy.  But there are

2    many, many, many perspectives on this story --

3                MR. GLAVIN:  Agreed.

4                THE COURT:  -- as evidenced by the OAG report --

5                MR. GLAVIN:  Agreed.

6                THE COURT:  -- and all of the witnesses.

7                MR. GLAVIN:  Agreed.

8                I have to be heard on this.  Your Honor, the OAG

9    report is not worth the paper its written on.  That report is

10   a joke.

11               THE COURT:  I know your views.

12               MR. GLAVIN:  It is a joke and it is an embarrassment

13   to legitimate law enforcement.

14               THE COURT:  And I have posited my skepticism, that

15   it is likely to be introduced at trial, but yet here we are.

16               MR. GLAVIN:  Yes.

17               THE COURT:  So let's focus.

18               MR. GLAVIN:  Okay.

19               THE COURT:  Is there anything that we can do to

20   narrow request five.

21               MR. GLAVIN:  Yes.  We have already agreed to January

22   of 2020.

23               THE COURT:  To March 23?

24               MR. GLAVIN:  To March 23.

25               THE COURT:  All communications with all of these

Proceedings                                                      39

1    people regarding Cuomo writ large?

2            MR. GLAVIN:  No.  First of all, let's start with the

3    complainants, okay.

4            MS. PERRY:  Your Honor, can I interject?

5            THE COURT:  Yes.

6            MS. PERRY:  I don't understand if she's just

7    speaking with one of these individuals about Cuomo but it's

8    not about a sexual harassment allegation, why is that

9    relevant?  I haven't understood the theory of this document

10   request.

11           THE COURT:  The papers and various other arguments

12   strewn throughout the case suggest that some of these women

13   have changed their tune.  They were times they loved him.

14   They were times he advanced their careers, and then they

15   turned on them.  That's part of their theory of the case.

16           So you know, an emoji chain that he's the best,

17   heart, heart, I'm not saying that exists, I have no idea,

18   could be probative for impeachment purposes and/or to prove

19   this change of attitude or bias.  Ms. Glavin and I have,

20   unfortunately, been down this conversation before.  I feel

21   like I have seen this movie before.  So, I mean, that's part

22   of the issue.

23           MS. PERRY:  There has to be some proportionality.

24   To require her to go through all of her documents when she has

25   a lot of communications with these people, to suss out if

Proceedings                                    40

1    there is anything regarding Governor Cuomo so they can see if

2    at some point someone sent a heart emoji about him, to prove,

3    you know, this convoluted theory, it is so, so far-fetched.

4    They have a lot to work with, as they have said.  They have

5    productions from lots of other people.  There is obviously a

6    balancing.

7           They have a lot here.  We're giving them everything

8    that she has ever said about sexual harassment.  So, I mean,

9    this is a person who has spent hundreds of thousands of

10   dollars on attorneys, I'm sorry to say.  I think I'm worth it,

11   but it's a lot.  And now that she has to do this document

12   review and go through all of this, it is a lot.  And it does

13   need to be considered.  To find what?  If someone said

14   something nice about Governor Cuomo at some point.  They

15   worked for him.  Surely they did.  That's so far down a road.

16          You know, they are getting a lot here already.

17          THE COURT:  All right.  I understand the arguments.

18          MR. GLAVIN:  Added to this is Ms. Boylan has a

19   documented history of threatening witnesses, including former

20   people in the chamber.  So, Howard Zemsky, this would be

21   captured when she said I can't wait to destroy your life.

22   Okay.  We want to make sure we're getting that.

23          There was another witness, Melissa Quesada, who is a

24   very close friend of Ms. Boylan's.  We have seen her interview

25   or -- we have seen her interview memo, and she was shocked by

Proceedings                                                          41

1   Ms. Boylan's sexual harassment allegations because she was

2   very good friends with her when they were working in the

3   chamber together and would have expected her to say something

4   and didn't.  And when Lindsey Boylan reached out to Ms.

5   Quesada in the spring of March of 2021 and Ms. Quesada did not

6   respond to her, she called her a bitch.

7              MS. PERRY:  Your Honor --

8              MR. GLAVIN:  We want to get those -- Lindsey Boylan

9   was threatening people in the chamber.

10             MS. PERRY:  I think Ms. Glavin is undercutting her

11  argument, not supporting it.  She's saying all of these

12  instances where they can show that Ms. Boylan had threatened

13  this person or lied about this.  Great.  So they have a lot to

14  impeach her about.  Why do they need to impose on her to go

15  through hundreds of thousands of documents to impeach a person

16  who may not be a witness when they have all of this already.

17  Great.  She's going to be perhaps --

18             MR. GLAVIN:  We don't --

19             MS. PERRY:  -- one witness at trial.  I mean, you

20  don't need -- she's one witness at trial, which is not even a,

21  you know, material witness in Trooper 1's case.  She has never

22  met Trooper 1.  So how much is the judge going to allow at

23  trial to impeach a nonparty?

24             THE COURT:  I don't think it is going to be a

25  multi-day sideshow and the discovery issues alone have been

Proceedings                                           42

1    multiple days, right.

2              MS. PERRY:  Yes.

3              THE COURT:  So it's really hard to figure out how to

4    balance it.  I understand --

5              MS. PERRY:  At some point enough has to be enough.

6              MR. GLAVIN:  And there's another aspect to this as

7    well, Your Honor, with respect to Ms. Boylan and Trooper 1, is

8    that somehow Ms. Boylan became aware of Trooper 1 before

9    anyone else did, including Governor Cuomo.

10             She testified to OAG in May of 2021 that she was

11   aware of a trooper.  We want to capture and know how she

12   became of Trooper 1 and what conversations --

13             MS. PERRY:  Her request about that --

14             THE COURT:  There is no request about that.  That

15   sounds like a deposition question if there is a deposition.

16   You're not going to necessarily find a needle in the haystack.

17   Some of the names you've mentioned today, folks, are the first

18   time I'm hearing about them.  I don't know if Ms. Perry is

19   aware of all former employees that you think would be captured

20   within this request.  The request is not narrowly drawn.  It

21   is not drawn in such a fashion that I necessarily think it's

22   getting you what you want.  I think it's a blunderbuss, when

23   you need a scalpel.

24             (Continued on next page.)

25

43

1          MS. GLAVIN:  Okay.  So, Your Honor, with respect to

2     the name that you just heard for the first time, we actually

3     referred to her and quoted it in our motion papers.  We just

4     did not use her name because it wasn't public

5          THE COURT:  Fair enough.

6          MS. GLAVIN:  But it is in our motion papers.

7          I think what we need to do, we're focused on the

8     reach-out that Ms. Boylan was doing and that she testified to

9     the AG's office about, the reach-out of contacting people on

10    her LinkedIn or through Instagram or whatever means, but the

11    reach-out that she was doing, because she was also reaching

12    out because she wanted to put the Wigdor law firm in touch

13    with other people and get them to speak to the Wigdor firm.

14         So we're very interested in that reach-out.  We're

15    very interested to threats that she made because we know that

16    Ms. Boylan makes threats.  And just on this whole point, like,

17    honestly, Your Honor, the reason Ms. Boylan is fighting so

18    hard to avoid the subpoena is because we are going to find a

19    gold mine.  I'm very confident of that because Ms. Boylan lied

20    and she knows it.

21         And to the extent you're having the argument about

22    public policy and weighing the back and forth, I think it's a

23    very different case.  Take the doctor who did the COVID tests

24    on Government Cuomo.  I think she has a much better argument

25    about being a private citizen and not being bothered by this.

44

1  Ms. Boylan's problem is she made herself a public figure.  She

2  made herself the face of this.  She ran a political campaign

3  based on this.  She has been part of a chapter of a book.  She

4  is repeatedly out there.  She's tweeting about Janice Dean.

5        So to the extent that this idea that Ms. Boylan is

6  some, trying to maintain her private life, all public tweets

7  and commentary to the contrary, but it's an important point to

8  make.

9        THE COURT:  It is, I understand what you're saying,

10  but the part of this issue that I think we really need to keep

11  in mind is the proportionality concern.  Right?  Because at

12  the end of the day, she is a non-party witness who, as

13  Ms. Perry very eloquently articulated at the outset of this

14  proceeding, chose not to file a lawsuit against Governor Cuomo

15  because she did not want to walk into this circus and this

16  type of situation and yet, she's being pulled here not even as

17  a sideshow but in center stage.  Right?  And that is not

18  proportionate to the needs of this case.

19        Trooper 1's claims are specific, they are narrow,

20  and the way that the complaint is drawn is different, but

21  Trooper 1, her actual claims are specific and limited.  And

22  the concern that, you know, I think we can all share is that

23  this has become, you know, a high drop and there's like a

24  million heads and every time we try to cut off a head, six

25  more heads grow, and that's where the discovery problems lie.

45

1    The proportionality point is serious because you have insane

2    amounts of cross-examination based upon your motion papers.

3         MS. GLAVIN:  I have insane amounts?

4         THE COURT:  Of cross-examination fodder based upon

5    your motion papers.  And at some point, enough is enough.  You

6    don't need all these extrinsic documents to do your cross.

7    They're not coming in.

8         MS. GLAVIN:  Her prior statements are going to come

9    in.

10        THE COURT:  You can cross her on them.

11        MS. GLAVIN:  Yes.

12        THE COURT:  You're not proving them up with

13   extrinsic evidence.

14        MS. GLAVIN:  No, because we think a lot of them are

15   going to be false.

16        THE COURT:  Maybe.  A lot of the things you're

17   seeking to explore are not going to be coming in extrinsically

18   and you know it.  You're looking at specific instances of

19   untruthfulness.  You're just looking under 608(b).  You're not

20   getting this in extrinsically.  So what do you actually need?

21        MS. GLAVIN:  We just propose this.  So with

22   respect -- limit the dates to January 2020 to the date of the

23   subpoena which is March 2023.

24        THE COURT:  And what you're concerned about

25   primarily here is communication to file a complaint?

46

1          MS. GLAVIN:  Yes.  And to the extent, and the

2    reach-out to other Executive Chamber employees asking people

3    to come forward and any threats.

4          But one thing, Your Honor, I just have to respond

5    to.

6          THE COURT:  That's from the eyes of the beholder

7    unfortunately.  They're vague.

8          MS. GLAVIN:  But we know she was doing it.  It's

9    very obvious.  But, Your Honor --

10          THE COURT:  How is one to search for threats?

11          MS. GLAVIN:  Ms. Boylan, I think, has a pretty good

12    idea of some of the things she said.

13          THE COURT:  I'm sure they would not agree with you

14    that some of these things are threats.

15          MS. GLAVIN:  Okay.

16          One thing though I do have to say is as Ms. Boylan

17    has a client and we are on the public record, I have a client

18    too.  And when you commented, Your Honor, about Ms. Perry

19    eloquently relaying why Ms. Boylan did not sue Governor Cuomo,

20    let's be quite clear.  The reason that she did not sue

21    Governor Cuomo is because it is a lie and she knows it.

22          THE COURT:  You've made that point.  Moving on.

23          MS. PERRY:  Your Honor, can I make a proposal?

24          You know, we had, as Your Honor knows, one week ago

25    a conference in front of Magistrate Judge Cave and what she

47

1  did was, in the first instance, ordered the production of

2  communications between Ms. Boylan and Ms. Bennett and did say,

3  as Your Honor has the transcript, you know, we'll see what

4  happens with those documents and, you know, with the case, if

5  issues are narrowed or if not, if something comes up, they can

6  come back.

7          What I would propose, as Your Honor has already

8  ruled, they can have the documents in request 1.  There's

9  also -- request 11 is communications with Governor Cuomo.

10  Request 16 is videos, images and photographs of Governor Cuomo

11  with Ms. Boylan.  I think those will encompass the vast, a

12  large universe of what they're looking for and, frankly, a lot

13  of this other stuff, you know, will be subsumed, and perhaps

14  that would be -- I mean if we were able to meet and confer

15  productively, that's what I think we would offer and I think

16  we'd capture a lot of this.  A lot of these, as Your Honor has

17  kind of previewed, a lot of this other stuff is just so out

18  of, you know, just out of whack, but those at least would

19  allow them to get a lot of what they're looking for, I think,

20  and is the only real thing that has any relevance,

21  proportionality to the allegations in this case.

22          So that's what I would offer.  I mean, again, I do

23  think, Your Honor, we talked about staging and, Your Honor, we

24  talked about deposition being staged.  I still think that this

25  stuff should be staged because if the report comes out, you

48

1   know, then I think all of this would come out, but I

2   understand Your Honor wants to move forward with this and is

3   not allowing --

4           THE COURT:  There's no motion to preclude the report

5   and there won't be for who knows how long.

6           MS. PERRY:  So that's what I would offer now.  I

7   think I know they're not going to, but I would ask that

8   Your Honor rule to allow that.  I think that gives them a

9   tremendous amount.  There are going to be a lot of documents

10  that relate to Ms. Boylan's allegations of sexual harassment

11  that relate to, you know, her communications with

12  Governor Cuomo and, you know, and the like.

13          So that's what I would offer and I just think we get

14  too sticky and in the weeds on all of these other, all of

15  these other categories.

16          THE COURT:  Ms. Glavin, what's your reaction to that

17  proposal?

18          MS. GLAVIN:  Your Honor, I don't agree with it.

19  We're now -- the subpoena was served in March.

20          THE COURT:  I'm aware.

21          MS. GLAVIN:  This will then take -- we have not had

22  productive meet-and-confers and I just want to get this over.

23          THE COURT:  I know.  We tried.

24          MS. GLAVIN:  So I want to just continue item by

25  item.

49

1          THE COURT:  Okay.  I unfortunately have zero faith

2     there will be any productive value to any further

3     meet-and-confers with any of the parties in this case so

4     that's why we are here.

5          So moving right along, there's been a lot of talk

6     about this Medium essay.  The Medium essay is out there in the

7     world.  How on earth are documents including drafts and

8     communications regarding it relevant and proportional?

9          MS. GLAVIN:  We want the drafts because we believe

10    that the story changed and what we have -- we've seen at least

11    one text.

12         So you're looking at a time period, Your Honor, of

13    February of 2021, and we see -- it was published on

14    February 4, 2021.  We think that Ms. Boylan engaged a

15    consultant to write it for her and we want to see how the

16    story morphed because we have seen Ms. Boylan reach out to

17    another complainant about where a holiday party in 2016 was.

18         THE COURT:  What is your evidence or good faith

19    basis for the assertion that the story has changed?

20         MS. GLAVIN:  Because it's changed throughout.

21         Ms. Boylan -- oh, my goodness.  So Ms. Boylan had a

22    recent tweet about how, I think she was talking about Alphonso

23    David, the Governor's counsel, and how the governor, I think,

24    slapped him on the back or the butt and she said, That's what

25    happened to me all the time.

1          That's not true.  That's the first time she ever

2    said that.  Her tweets about what was happening in the chamber

3    over the last three years, they vary, absolutely.

4          THE COURT:  That has nothing to do with the Medium

5    article.

6          MS. GLAVIN:  No.  The Medium article is "My story of

7    working with Governor Cuomo."

8          THE COURT:  I'm aware.  What is your basis or good

9    basis that the Medium drafts changed?  That was your

10   assertion.

11         MS. GLAVIN:  Yes, that because she reached out --

12   she was talking about the holiday party.  She didn't even

13   remember where it was.  She reached out to another complainant

14   to ask where it was.  And she portrays it in the Medium piece

15   of having been seared into her brain.

16         The strip poker comment that she alleges for the

17   first time in this, no one else corroborates.  We want to know

18   when all of a sudden, she first mentions that that happened.

19   Not even Howard Zemsky corroborated it.  And Ms. Boylan didn't

20   even remember Howard Zemsky being on the plane, yet after she

21   threatened to destroy his life, he's, like, Oh, I may remember

22   something like that.

23         THE COURT:  Ms. Perry, would you like to be heard

24   regarding the Medium article?

25         MS. PERRY:  Yes.  It has nothing to do with

51

1    anything.  I don't know what else to say.  Nothing has

2    anything to do with anything.

3            She has no evidence that it changed.  None.  So I

4    mean, all of this -- I mean you keep going and it keeps, this

5    is all going to be an impeachment trial of Lindsey Boylan when

6    it's really about the very specific allegations that have been

7    made by Trooper 1.

8            THE COURT:  I understand the arguments on both

9    sides.

10           With regard to item 7, the communication with Karen

11   Hinton, time frame, please?

12           MS. GLAVIN:  We think it's self-limiting because I

13   don't think she was in touch with Karen Hinton until around

14   February of 2021 after she published her Medium piece and then

15   was in touch with her.  Karen Hinton is a public, PR relations

16   person and political consultant and Karen Hinton then comes

17   forward I think several days after Ms. Boylan with her own

18   claim for the very first time about Governor Cuomo, an

19   incident with him in a hotel room back in, 20 years earlier.

20           THE COURT:  I'm familiar with it, yes.

21           MS. GLAVIN:  From what we have seen in the

22   discovery, Ms. Hinton was organizing media appearances.  She

23   also was promoting her book.  Ms. Boylan appears with her to

24   help promote the book.

25           THE COURT:  Time frame?

1          MS. GLAVIN:  2021 -- oh, December 2020 when Lindsey

2    Boylan first made her allegations.

3          THE COURT:  Until?

4          MS. GLAVIN:  The date of the subpoena.

5          THE COURT:  Have you received those communications

6    already from Ms. Hinton?  I know that Ms. Cohen has been

7    working on that subpoena.

8          MS. GLAVIN:  Yes.  We have communications with

9    Ms. Hinton, but we don't know if that's the extent of them or

10   if she deleted them.

11         THE COURT:  Ms. Hinton did provide her

12   communications with Ms. Boylan.

13         MS. GLAVIN:  Some.

14         THE COURT:  Some.

15         MS. GLAVIN:  So to the extent there are others,

16   that's what we're looking for.

17         THE COURT:  All right.  Ms. Perry?

18         MS. PERRY:  So Ms. Hinton is not featured in the

19   complaint at all, didn't work for Governor Cuomo during this

20   time, and from what I remember from Ms. Cohen's quashing

21   papers, what she says is very different from what Ms. Glavin

22   says.  She says that the communications were supportive ones

23   between two people who experienced something similar, not ones

24   where Ms. Boylan is trying to ask someone to lie or, you know,

25   make false allegations.

53

1          So very different.  Nothing to do -- would not, you

2     know, be impeachment material and, again, have nothing to do

3     with the allegations here.  So, again, bridge way, way, way,

4     way too far.

5          THE COURT:  Is there any suggestion that

6     communications that you do have from Ms. Hinton's production

7     touch upon the prior concerns that you raised, Ms. Glavin,

8     vis-à-vis encouraging people to come forward, change stories,

9     et cetera?

10         MS. GLAVIN:  I actually don't remember.  I haven't

11    looked at those communications.

12         THE COURT:  If they did, you would remember.

13         MS. GLAVIN:  No, I actually -- I found them helpful

14    because one -- one of the things that happened is Ms. Boylan

15    in this timeline, Ms. Boylan writes her Medium essay.  She

16    publishes that in February 24th of 2021.  And then Charlotte

17    Bennett, I think, comes forward a day or two later.

18         At that point in time, Andrea Stewart-Cousins, who

19    is the head of the Senate, said if one more woman comes

20    forward, you know, it's a problem for the Governor.  And then

21    the very next day, Karen Hinton and Ana Liss come forward and

22    we know that Ms. Boylan was in touch with Ana Liss.

23         We know part of the Governor's defense is these

24    allegations -- and Ana Liss has basically said that, you know,

25    I don't believe I was sexually harassed, I don't think the

54

1    Governor touched me inappropriately.

2           A lot of what she had to say in her deposition is

3    hearsay.  She also said in her deposition, and this is very

4    important, is that Ms. Boylan was influencing her and she's

5    also telling Ms. Liss lies to get her to come forward.

6    Included amongst those lies is that Ms. Boylan was telling her

7    falsely that Governor Cuomo was sleeping with Melissa DeRosa

8    which was just not true.  And Ms. Liss-Jackson was very clear

9    in her testimony that she came forward because of this.

10          THE COURT:  So the answer to my question as to

11   whether or not Ms. Hinton's communications provided evidence

12   to encourage Ms. Boylan to come forward is you don't know?

13          MS. GLAVIN:  No, I actually think it was consistent

14   with our theory.  But I don't know -- the one thing I will

15   tell Your Honor is I expected to see more communications and

16   we don't know if Ms. Hinton deleted them.  That's part of the

17   problem that we're facing here, is that some of people deleted

18   them.  Trooper 1 deleted all of her text messages.  And I also

19   know that Ms. Boylan was using encrypted apps to communicate

20   with people, using Signal, a self-deleting app, and they used

21   Confide.

22          To the extent people don't have those

23   communications, we want them from Ms. Boylan.  I think

24   Ms. Boylan, one of the reasons she has so many responsive

25   documents is she saved everything.

1          MS. PERRY:  Can we --

2          THE COURT:  Ms. Perry?

3          MS. PERRY:  Sorry.  This continued character

4   assassination, I mean Ms. Glavin knows this case in and out.

5   I don't.  I was here to move to quash a subpoena.  So, you

6   know, from what I've seen, what I recall, Ms. Cohen's papers

7   say something very different.  I believe she says no, this was

8   just a supportive communication between two women.

9          I can't respond tit-for-tat for everything if she

10  takes every opportunity to take potshots at Ms. Boylan and I

11  don't think that's appropriate.  That's not what we're trying

12  to do here, I don't think.  What we're trying to do is

13  establish relevance, proportionality and burden.

14         So it's not really fair, I'm at a real disadvantage

15  here, but I don't think it's true.  I mean Ms. Liss'

16  deposition, she has perspective as an advocate.  I have a very

17  different read of it.  I don't think she was saying she was

18  never, that there was no sexual harassment in that office.

19  She has, I think Mr. Licul's characterization is a

20  Mad Men-esque environment.

21         MR. LICUL:  She testified that she was treated

22  differently because she's a woman.

23         THE COURT:  I've read the depositions.

24         MR. LICUL:  That it was Mad Men-esque.

25         So those are fact questions.

1          THE COURT:  But fact questions are for a jury.  Her

2     opinion --

3          MS. PERRY:  I don't think it's fair.

4          THE COURT:  Let's be really clear, Ms. Glavin.  Her

5     opinion as to whether certain things are or are not, you know,

6     inducive or creative of a hostile work environment is a

7     question of fact.  Her legal conclusion is not for her to

8     make.  It's for the jury to decide if Ms. Liss is a witness.

9     But we're not here to talk about that.  What I'm trying to do

10    is ascertain a date range for the communications with Karen

11    Hinton and their relevancy and, instead, we're talking about

12    17 other things.  So I understand the arguments on both sides

13    as they have been put forward.

14         Next group of documents.  Document 9 describes

15    fundraising or other communications on Ms. Boylan's campaign

16    related to her allegations against Cuomo.

17         Any documents alleging allegations against Cuomo

18    would be subsumed within document request one, correct?

19         Ms. Glavin?

20         MS. GLAVIN:  As long as Ms. Perry agrees with me

21    because I want, we want to capture that.  And the reason the

22    fundraising becomes important is because --

23         MS. PERRY:  We've heard.

24         MS. GLAVIN:  -- when Ms. Boylan announced her

25    campaign for Manhattan Borough President, she was trying to

1   get matching funds.

2          THE COURT:  I know.

3          MS. GLAVIN:  And the matching funds are a function

4   of how many donors you have.  So as of December 4th, okay,

5   which is the day before Ms. Boylan started making her

6   allegations, she didn't have anywhere near the number of

7   donors that she needed and she also was close to last in terms

8   of fundraising for the Manhattan Borough President race.

9          One of our defenses is that Ms. Boylan made this

10  stuff up, one, to get a fundraising boost, two, because she

11  did not want to come out the true circumstances of why she

12  left the Executive Chamber which would have been a killer to

13  her campaign which is that she was, she resigned after being

14  confronted with allegations of her balling and her abusive

15  behavior and also she had two counseling meetings by the

16  counsel to the Executive Chamber, Alphonso David, one in

17  January 2018, about her having a sexual relationship, an

18  allegation that had been raised about that, with her boss, and

19  then also nine months later, again about the balling and the

20  bad behavior and there had been plenty of complaints.

21         THE COURT:  I'm very familiar with your relevancy

22  arguments as to the campaign funds and the Executive Chamber

23  allegations.  You do not need to reiterate them.  My question

24  was very straightforward.

25         Ms. Perry, do you agree or disagree that the

1    documents regarding fundraising and other communications by

2    Ms. Boylan's campaigns relating to her allegations against

3    Cuomo are subsumed within document request one to some

4    significant extent, if not entirely?

5            MS. PERRY:  I mean we're going to produce documents

6    that relate to allegations of sexual harassment and misconduct

7    that she's made.  I'm not sure what concerning fundraising.  I

8    mean she's not going to comb through her campaign records.

9            THE COURT:  That's what they're seeking, yes.

10           MS. PERRY:  I don't even know if she has her

11   campaign records.  I don't think she's kept them.  So I don't

12   think that's the body of documents that we've even gathered.

13           THE COURT:  Okay.  So if she does have her campaign

14   records and contained therein include communications,

15   communications by Ms. Boylan regarding her allegations against

16   Cuomo, wouldn't those be included in your production under

17   document request one?

18           MS. PERRY:  What -- well, let me, I guess, take a

19   step backwards.

20           To the extent she made public statements, they have

21   those.

22           THE COURT:  I agree.

23           MS. PERRY:  So what more do they need?  I mean if

24   she has internal documents that were within the now defunct

25   campaign, is she supposed to get them from whoever the

59

1   repository is or campaign treasurer, whatever, and sift

2   through those as well?

3           THE COURT:  There's a subpoena for "Lindsey for

4   New York."

5           MS. PERRY:  We haven't gotten there.  I guess that's

6   a separate -- I don't even know who the, who that would be.

7           THE COURT:  So my question to you is more narrow

8   which is really simply if she has the records relating to her

9   fundraising --

10          MS. PERRY:  Yes.

11          THE COURT:  -- or other communications by her

12  campaign that touch upon her allegations against Cuomo, would

13  those be included within the request?

14          MS. PERRY:  Yes, Your Honor.  If she has them, yes.

15          THE COURT:  So if that is the case, Ms. Glavin, the

16  proportionality of requests 8 through 15 -- 8 not through 15

17  because I do agree with Ms. Perry as to 11.  It does seem

18  relevant and proportional.  I do want to establish a time

19  frame for it.  But other than 11, 8 through 15 really do seem

20  to lack proportionality at this stage of the case.

21          Is there anything specific you would like to be

22  heard on?

23          MS. GLAVIN:  Yes.

24          THE COURT:  That is my preliminary assessment based

25  upon everything that I've read.

60

1        MS. GLAVIN:  Yes, Your Honor.

2        One thing on 7.  I want to clarify the record with

3  respect to communications with Karen Hinton.  And Ms. Cohen

4  marked, designated confidential a couple of text messages.  I

5  don't think that they are confidential.  I would like to tell

6  the Court about those text messages but I don't want to get in

7  trouble, no.  Basically the text messages, they're talking

8  about what they told investigators, she and Ms. Hinton.

9        THE COURT:  I understand.  Ms. Hinton is in the

10 past.

11       MS. GLAVIN:  Okay.

12       THE COURT:  Now we're looking at document request 8,

13 9, 10, 12, 13, 14 and 15.

14       MS. GLAVIN:  Okay.  With respect to 8, it could not

15 be more relevant.

16       Ms. Boylan was asked about her relationship with

17 Howard Zemsky by the AG's Office and she perjured herself and

18 it goes directly to why Ms. Boylan left ESD.  It goes directly

19 to -- she writes in her Medium piece, the February 24, 2021

20 Medium piece that her boss, that would be Howard Zemsky,

21 commented to Lindsey that Governor Cuomo had a crush on me.

22       THE COURT:  Pause.

23       MS. GLAVIN:  Yes.

24       THE COURT:  The factual predication for the

25 relevancy is not my question.

61

1           MS. GLAVIN:  No.

2           THE COURT:  My question goes to proportionality.

3           MS. GLAVIN:  Okay.

4           THE COURT:  Because at the end of the day, as we've

5    been discussing at length, this is all basically impeachment

6    material and you have ample good faith basis to cross-examine

7    her on a myriad of these topics.  It's apparent from your

8    papers.

9           So what additional affirmative proof do you actually

10   need?  Because it's not admissible under 608(b) and you know

11   it.  So getting a document --

12          MS. GLAVIN:  Unless it's a prior inconsistent

13   statement that's documented or it's admissible for the fact

14   that it was said, not for the truth of the assertion.

15          THE COURT:  So what are you actually looking for?

16   Because any and all communications regarding an alleged prior

17   sexual relationship is so problematic and overbroad, it's not

18   even funny.

19          MS. GLAVIN:  If Ms. Boylan is prepared, you know, in

20   her deposition to answer truthfully the question -- I mean is

21   Ms. Perry going to make a representation?  Because it goes to

22   why she threatened Howard Zemsky on a self-deleting app, a

23   witness in the case, to get him to change his story.  And she

24   lied to the AG's Office about it.

25          It goes exactly to why she left the Empire State

1  Development Corp., why she resigned.  She told the world

2  repeatedly that she resigned because the Governor sexually

3  harassed her for years and people watched and did nothing

4  about it.

5          THE COURT:  They often have mixed motives.

6          Ms. Perry, do you have a reaction to all of this?

7          MS. PERRY:  I think I was very clear in our papers.

8  I think it's totally inappropriate and totally

9  disproportionate.  I couldn't agree -- I mean I agree with

10 Your Honor, I think this is --

11         THE COURT:  Mr. Licul is itching to say something.

12         MR. LICUL:  Yes.  I would just add that that also is

13 prior sexual conduct, sexual history, that's barred by 412.

14         THE COURT:  Right.  And I'm certainly cognizant of

15 your motion to quash at ECF 82 trying to address Ms. Perry's

16 arguments and then I wanted to go back to you to see if there

17 was anything else you wanted to add vis-à-vis the Rule 412

18 arguments which I do understand.

19         So, preliminarily, at this point, I understand the

20 arguments as briefed as to the document subpoena items listed

21 at 8, 9, 10, 12, 13, 14, 15.  I do have some skepticism that

22 they are proportional to the needs of the case but, at the

23 same time, I also recognize that they may be become more

24 proportional depending upon how the discovery plays out.

25         With regard to 11 and 16, however, Ms. Perry, you

63

1  previously posited that those may be relevant and

2  proportional.

3           Would you like to be heard further on 11 and 16,

4  Ms. Perry?

5           MS. PERRY:  Yes, Your Honor.

6           Consistent -- I don't believe that they are, but

7  consistent with Your Honor's ruling with respect to document

8  request one, I would think that -- I'm not going to make too

9  strenuous of an argument with respect to those.

10          THE COURT:  Thank you.

11          MS. GLAVIN:  Your Honor, just --

12          THE COURT:  But to you, Ms. Glavin, time frame.

13          MS. PERRY:  Your Honor, I guess that -- since it's

14 all communications, I guess, while they were working together,

15 I don't think she has many from the time she worked there, so

16 I guess that's, that's my only caveat there.

17          MS. GLAVIN:  Okay.  Just one last point with respect

18 to 8, Your Honor.

19          THE COURT:  Uh-huh.

20          MS. GLAVIN:  With respect to Howard Zemsky.  We also

21 want any communications she had with him concerning the

22 Governor because she cites to Howard Zemsky as a corroborating

23 witness.

24          THE COURT:  I understand the argument.

25          MS. GLAVIN:  Okay.

64

1          THE COURT:  Time frame on 11 through 16, please.

2          MS. GLAVIN:  Okay.  With respect to 11, I'm assuming

3    she doesn't have a lot of these, but that's one of the reasons

4    why we subpoenaed ESD, but to the extent she had them, you

5    know, she has them, we would like them.

6          And, I don't know, I mean does she have any?

7          MS. PERRY:  I mean I don't believe she does.

8          MS. GLAVIN:  Okay.

9          MS. PERRY:  But --

10         THE COURT:  But I suspect she does have some videos?

11         MS. PERRY:  She might.

12         THE COURT:  All right.  So that is the 16 items

13   included in the Boylan document subpoena.

14         Your motion also touched upon the Zemsky subpoena,

15   Ms. Perry.  Some of these are duplicative of the items that

16   we've already discussed.  One through 5, for example, are

17   things we've largely discussed.

18         Is there anything else you would like to add with

19   regard to 1 through 5, Ms. Perry?

20         MS. PERRY:  No, Your Honor.  I really don't want to

21   belabor the point.  I know Your Honor has heard it many times.

22   So I do think those, the subpoenas on which we've already

23   moved additional non-party subpoenas, I do think Your Honor

24   has argument and has understood them.  So unless Your Honor

25   has specific questions, I don't want to figure out --

65

1          THE COURT:  I don't have questions about 1 through 5

2     although I suspect Ms. Glavin would like to argue about them.

3          MS. PERRY:  I mean if --

4          MS. GLAVIN:  I thought we had moved --

5          THE COURT:  This is the Zemsky subpoena.

6          MS. GLAVIN:  Oh, the Zemsky subpoena?  Hold on.

7          MS. PERRY:  I may come back if she does but I do

8     think that, you know -- if she comes back and says the same

9     exact things about how she's a liar and adulterer and, you

10    know, all these things, I probably will have to say something.

11         THE COURT:  So I would like you to just focus your

12    arguments on proportionality here with regards to document

13    requests 1 through 5 as to Mr. Zemsky.

14         MS. GLAVIN:  I'm guessing he doesn't have much.

15         So with respect to number 1, the reason we're asking

16    for that is because she threatened him when he, you know,

17    denied, didn't corroborate her the way she wanted to, so any

18    communications about that.  And I think that would be

19    self-limiting, time frame, February 2021.

20         With respect --

21         THE COURT:  Isn't document 1 request as to

22    Mr. Zemsky specific to the Medium essay?

23         MS. GLAVIN:  Yes.

24         THE COURT:  Go ahead.

25         MS. GLAVIN:  But it's concerning her essay.  We

66

1    believe that after -- she published this essay.  Either the

2    same day or next day, a statement was issued from the

3    Executive Chamber that Howard Zemsky signed on to that he

4    never heard any such comment on a plane.  And the same day,

5    Ms. Boylan sent him in the self-deleting app:  I can't wait to

6    destroy your life.  You're a shit follower.

7              THE COURT:  Do you have that text?

8              MS. GLAVIN:  I do not have that text and Mr. Zemsky

9    doesn't have that text, but we're curious if Ms. Boylan has

10   it.

11             THE COURT:  Ms. Perry, do you know if she has it?

12             MS. PERRY:  I don't know that this happened.  It's,

13   by definition, a self-deleting text.  I don't know why

14   Ms. Glavin believes this happened.  She certainly repeated

15   this allegation time and time again.

16             So I don't, I don't -- she certainly is not agreeing

17   that this happened and by mere repetition, I'm not convinced

18   that it has happened so no.

19             MS. GLAVIN:  Mr. Zemsky testified to this under

20   oath.

21             THE COURT:  I understand that but if it's

22   self-deleting, it's self-deleting.  I can't order anybody to

23   produce it.

24             MS. GLAVIN:  Agreed.  If she doesn't have it, she

25   doesn't have it.

67

1          THE COURT:  Well, this is Mr. Zemsky.  He already

2    said he doesn't have it, correct?

3          MS. GLAVIN:  Yes, but to the extent Ms. Boylan had

4    any other communications with him about that Medium piece

5    where she cites to Mr. Zemsky, yes, we would like that.

6          THE COURT:  Okay.  Any other arguments as to 2

7    through 5?

8          MS. GLAVIN:  Yes.  With respect to number 2 again,

9    Ms. Boylan cites to Mr. Zemsky in her Medium piece as

10   corroborating her.  So to the extent that she had any

11   communications with Howard Zemsky regarding misconduct by

12   Governor Cuomo, this is her boss, does Mr. Zemsky still have

13   these?  I don't know, and it may very well just be in ESD

14   e-mails if there's anything responsive.

15         THE COURT:  Okay.

16         MS. GLAVIN:  With respect to number 3, Mr. Zemsky

17   testified -- well, he told the OAG they didn't ask about

18   everything he told them in the formal interview, but that --

19         MS. PERRY:  Your Honor, may I be heard on this

20   perhaps at sidebar?  I don't know what Ms. Glavin is about to

21   say but if it's about something that was redacted in the

22   publicly filed deposition, I would ask that she not speak

23   about this publicly.

24         THE COURT:  You may approach.

25         MS. PERRY:  I don't know what you are going to say.

68

1          MS. GLAVIN:  I'm actually referring to Howard

2   Zemsky's interview memo which we were provided in discovery.

3          MS. PERRY:  As long as you're not going to speak

4   about something that was redacted from the interview memo.

5          MS. GLAVIN:  She wasn't asked about it -- no, it

6   wasn't redacted in the interview memo.

7          MS. PERRY:  Okay.  Then no.

8          THE COURT:  Okay.  Go ahead.

9          MS. GLAVIN:  Mr. Zemsky testified that when -- one,

10  we want the meeting with Alphonso David, counsel to the

11  Executive Chamber, on January 18th, about any communications

12  he and Ms. Boylan had around that meeting because they both

13  essentially agreed to lie to Alphonso David.  And it goes to,

14  one, it goes to Ms. Boylan's credibility; two, it goes to why

15  she left the chamber; three, it goes to when she's saying

16  Mr. Zemsky is going to corroborate some of this.

17         THE COURT:  Your basis for saying that they

18  basically agreed to lie is which --

19         MS. GLAVIN:  Howard Zemsky's interview memo.

20         THE COURT:  The interview memo from the OAG?

21         MS. GLAVIN:  Yes.

22         THE COURT:  So you already have it.

23         MS. GLAVIN:  I have the interview memo.

24         THE COURT:  Right.

25         MS. GLAVIN:  I'd like to see if there are any

69

1    documents or communications because we already know that

2    Ms. Boylan is taking issue with things Mr. Zemsky said

3    happened.

4              THE COURT:  Okay.  Mr. Zemsky is obviously not here.

5              Number 4 and number 5?

6              MS. GLAVIN:  Number 4?  Yes, number 4.  Again, I

7    don't know that Mr. Zemsky is going to have anything.  He's

8    been not working for the State for some period of time, but to

9    the extent it goes to the complaints about Ms. Boylan's

10   conduct, it's the reason why she left ESD.  We're very focused

11   on that, when she told the world she left for one reason and

12   there was another reason and the truth was something else.

13             Number 5, the contribution toss her campaign.

14   Mr. Zemsky, his wife, his daughter were contributors to

15   Ms. Boylan's campaign.  We are interested to see what

16   Ms. Boylan said and asked Mr. Zemsky to get him to contribute

17   to her campaign.

18             THE COURT:  Ms. Perry, do you want to say anything

19   in regards to these topics?  I understand, obviously,

20   Mr. Zemsky is not here.  I have no idea what views he has on

21   these issues and/or what his position will ultimately be, but

22   why is Ms. Boylan seeking to quash these five items?

23             MS. PERRY:  Well, she certainly has a privacy

24   interest here and we've just spent a lot of time going through

25   the invasion of Ms. Boylan's privacy and relevance,

1   proportionality, all of those things with respect to the

2   subpoena on Ms. Boylan.  Now we're going out in concentric

3   circles, people who were in Ms. Boylan's orbit, and they are

4   incredibly invasive.

5          You know, Your Honor, you know, in talking about

6   proportionality and talking about what they need to impeach

7   her motives and her credibility, this is the definition of, of

8   excess.  It truly is.  They already have so much.  They keep

9   touting how much they have to impeach Lindsey Boylan.  Over

10  and over and over and over, ad nauseam, we hear about it.

11         So they have to impeach, they have to impeach her

12  through the issuance of 13, 14 subpoenas?  Again, I've lost

13  count.  And they have to keep going to people who she knows

14  some of them vaguely, some of them, you know, as her

15  supervisors, her bosses, people who she supervised?  At what

16  point is enough enough?  I really think we have reached it

17  with the subpoena to Ms. Boylan, yes, but this, I mean I, I'm,

18  this rarely happens but I truly am at a loss for words.

19         THE COURT:  Mr. Licul, this subpoena was also a

20  topic of your motion seeking to quash it in part, at least,

21  under Rule 412.  Would you like to be heard on this one?

22         MR. LICUL:  I don't want to repeat what's in my

23  papers.

24         I will just add that I concur with Ms. Perry and

25  that is that we are going around in concentric circles.  I

71

1    think the Court has the authority to quash if it feels that

2    the purpose here is to harass some of these witnesses.  I

3    think it's pretty clear that that's the purpose.  We know that

4    because the Cuomo camp said it:  If you come after us, we're

5    going to file perjury charges and we're going to file ethics

6    charges.  And this is sort of the equivalent.

7              Anyway, I do think that -- I don't, again, I don't

8    have anything else to say on 412.  I think all of this stems

9    from some belief that there's a conspiracy because Ms. Boylan

10   had a relationship with Mr. Zemsky and she got him to lie,

11   none of which is corroborated at all and we're so far afield,

12   that it's ridiculous.

13             THE COURT:  Okay.  Thank you for that.

14             MS. CASSIDY:  Your Honor?

15             THE COURT:  Who said that?

16             MS. CASSIDY:  Kathleen Cassidy on behalf of Melissa

17   DeRosa and Rich Azzopardi.

18             THE COURT:  Yes.

19             MS. CASSIDY:  So with respect to our clients, we had

20   served a very narrowly tailored subpoena to Ms. Perry for

21   documents from Ms. Boylan really focused on documents that

22   were communications with or about our clients specifically.

23             We did not have a chance to finish the

24   meet-and-confer process with Ms. Perry because of the position

25   that we are in this case, having, we had decided last time

1  that we would kind of hold in abeyance our subpoenas, but to

2  the extent that the Court is going to enter an order, I think

3  some of our requests will be subsumed within Governor Cuomo's,

4  but we would ask that Ms. Boylan be requested to search for

5  documents, the documents that are listed in our narrow

6  subpoena.

7          THE COURT:  I'm very aware of your subpoena and your

8  documents are filed at ECF 154.  We're still in the middle of

9  her motion to quash.  So do you need to leave?

10          MS. CASSIDY:  No.

11          THE COURT:  So sit tight.

12          All right.  Ms. Perry -- I'm sorry.  Back to you,

13  Ms. Glavin.

14          MS. GLAVIN:  Yes.

15          THE COURT:  I don't know if there's anything you

16  would like to say in response with regard to items 1 through 5

17  on the Zemsky subpoena, but I do want to ask as to item 6 --

18          MS. GLAVIN:  Yes.

19          THE COURT:  -- on the Zemsky subpoena, do you

20  already have documents, communications regarding the OAG

21  investigation report, et cetera, and the documents Mr. Zemsky

22  provided to the OAG or no?

23          MS. GLAVIN:  No, we don't.  We have not served the

24  subpoena because of the objection.  We'd like to serve the

25  subpoena and it may be that Mr. Zemsky doesn't have anything.

73

1          THE COURT:  Right.

2          MS. GLAVIN:  But we haven't been able to have that

3    conversation.

4          I do though, you know, I want to respond with

5    respect to item 6 on this.  It also becomes very important

6    because Mr. Zemsky said something entirely different to the

7    OAG than what Ms. Boylan testified to and Ms. Boylan has

8    become aware of it because we made a submission to the

9    Attorney General in October of 2020 asking -- October of 2021

10   asking the Attorney General to amend, correct and supplement

11   the report.

12          To the extent there are communications where

13   Ms. Boylan is angry about what Mr. Zemsky said, you know, or

14   disagrees with it or he tells her that, you know, heads up,

15   I'm going to tell the truth, we want to know about that,

16   particularly after, you know, the testimony was released and

17   after we got discovery from the Albany County District

18   Attorney's Office.

19          With respect, I just do want to respond --

20          THE COURT:  If I were inclined, I'm not saying I am

21   necessarily inclined, but if I were inclined to tailor the

22   Zemsky subpoena in some fashion, what would be the time frame

23   for communications between Ms. Zemsky and Ms. Boylan that you

24   would want?

25          MS. GLAVIN:  I would certainly want, well, one,

74

1  during the time they worked together, if he has any of those

2  communications.  I'm guessing he doesn't but he might, so

3  during the time that they worked together because Ms. Boylan

4  cites to Mr. Zemsky as a corroborating witness.

5       THE COURT:  Their working is also totally, totally

6  far afield.  I mean that's just beyond the pale.

7       So communications regarding allegations of sexual

8  misconduct, sexual harassment and other misconduct is one

9  thing.

10      MS. GLAVIN:  Yes.

11      THE COURT:  Day-to-day operational work e-mails is,

12  like, useless.

13      MS. GLAVIN:  Agreed.

14      THE COURT:  So I need a time frame.

15      MS. GLAVIN:  Agreed.  So the time frame has to be,

16  A, when they were working together.  So she worked with him

17  2014 to 2018.  So anything concerning allegations or

18  misconduct about Governor Cuomo.  And then secondly, we are

19  very interested in the time period after Ms. Boylan came

20  public, we would say March 20th to February of 2022.

21      THE COURT:  Okay.

22      MS. GLAVIN:  And also with respect -- I have to

23  lodge this objection, Your Honor.  It's just -- the law is

24  that Ms. Boylan does not have standing.  It is very, very

25  clear that she does not have standing to object to the

1  subpoena to Mr. Zemsky and this hasn't even been served.  We

2  would like to just serve the subpoena and start the process

3  but Ms. Boylan has objected to that.  I take issue with the

4  fact that we did not serve the subpoena and Ms. Trzaskoma and

5  I went back and forth on this.  I think we just serve the

6  subpoenas and start the process.

7       The same with ESD.  The subpoena hasn't been served

8  on ESD because of her objections.  I'd like to serve it on

9  ESD, who is represented by counsel, Boyd Johnson at Wilmer

10 Hale, and I'd like to start engaging Mr. Johnson because I

11 think we will narrow it.

12      THE COURT:  And I think he's probably going to say

13 sovereign immunity like all of your other friends in State

14 government.

15      MS. GLAVIN:  No, actually it's amazing.  The only

16 person claiming sovereign immunity is Letitia James.  The

17 Executive Chamber has produced a lot of documents to us.  The

18 only category they have not produced because they've been

19 waiting on this is Lindsey Boylan related documents.

20      THE COURT:  That is the topic of the next topic, the

21 Executive Chamber subpoena.  So can that subpoena be narrowed?

22      MS. GLAVIN:  They've already been produced.  The

23 only thing that they didn't produce --

24      THE COURT:  I want to just clarify precisely what is

25 still pending with regard to the Executive Chamber subpoena.

1    Mr. Licul had included it in his motion, in part.

2    Ms. Perry had included it in hers.  So I just want to

3    understand what category, like, if you have them by request

4    number, the items that they have not yet reached, that will

5    certainly streamline the conversation about that subpoena.

6        MS. GLAVIN:  Sure.

7        THE COURT:  Is it 8, Category 8th?

8        MS. GLAVIN:  Let me just take a look.

9        THE COURT:  Category 7.  Category 6, 7 and 8?

10        MS. GLAVIN:  Anything related to Boylan.  It was

11    anything related to Boylan.

12        THE COURT:  So 5 up to 9.  Quite a lot, actually.

13        MS. GLAVIN:  Yes.

14        THE COURT:  Five and up, it looks like.

15        MS. GLAVIN:  Yes.  And the Executive Chamber,

16    counsel of the Chamber has been very cooperative with us on

17    producing documents and they did not raise sovereign immunity.

18    That is Letitia James.

19        THE COURT:  Did they produce communications between

20    Ms. Boylan and Governor Cuomo or no?

21        MS. GLAVIN:  No.

22        THE COURT:  Okay.

23        MS. GLAVIN:  Your Honor, that's why we want to serve

24    ESD.  I am not certain that the Chamber would necessarily have

25    those because I don't know on what servers --

77

1          THE COURT:  I understand.

2          MS. GLAVIN:  -- are e-mails.

3          THE COURT:  So Ms. Perry, do you want to be heard on

4    Ms. Glavin's assertion that you don't have standing to

5    challenge these subpoenas?

6          MS. PERRY:  Your Honor, we briefed this.  We cited a

7    number of cases in this District and the Circuit that says

8    that we do have a legitimate privacy interest.  It's hard to

9    imagine a greater privacy interest than in personnel files,

10   and in sexual relationships.

11         So I mean I can -- you have our papers, but courts

12   in the Second Circuit have recognized numerous privacy

13   interests that give a party standing to challenge a subpoena

14   issued to a non-party.  I'm not sure why they believe we don't

15   given the very clear case law.  So, and, and they've properly

16   stood by while this issue has been pending.  I don't know what

17   more to say other than what I've said and Your Honor can read

18   the case law just as I have.  I think it's pretty clear cut.

19         THE COURT:  Absolutely.  I just want to give you the

20   opportunity to respond.

21         MS. PERRY:  Yes.  I have nothing more to say because

22   they're not citing any case law.

23         MS. GLAVIN:  But on the issue, Ms. Perry, and the

24   cases that are cited, Your Honor, these are public agencies

25   that we're subpoenaing these records for and the

78

1  communications.

2       To the extent Ms. Boylan -- there's no privacy

3  interest in what she -- if she's communicating on a work

4  computer and work servers, the privacy interest just isn't

5  there.

6       MS. PERRY:  Well, first of all, Mr. Zemsky is not

7  obviously a State entity.  You subpoenaed him in his

8  individual capacity.  And e-mail aside, you're also asking for

9  personnel files.  Those I think there are legitimate privacy

10  interests and the courts have so found.

11       Whether they're a private entity or a public entity,

12  her personnel files including, you know, whether there were

13  personnel issues, of course there are privacy interests in

14  that.  I mean, of course, you guys have already, you know, put

15  that all out there and the AG's Office has found those

16  inappropriate and retaliatory but, regardless, she still has a

17  very clear, very real privacy interest in those documents and

18  that is exactly why we have standing.

19       MS. GLAVIN:  Your Honor, personnel files in a sexual

20  harassment case could not be more relevant.

21       With respect to -- and I have to respond to this and

22  it's, like, it's, like, paining me, but on that front, her

23  personnel files were not released.  There were three memos

24  that were released detailing the circumstances, the truthful

25  circumstances of Ms. Boylan's decision to leave State

1  employment and then, four days later, try and get her job

2  back, all of it was documented, and it was simply released to

3  correct the record from what Ms. Boylan was publicly saying.

4           MS. PERRY:  That's not accurate.  That's not

5  accurate.

6           MS. GLAVIN:  Let me finish.

7           MS. PERRY:  You don't have to finish when you're

8  dragging her through the mud.

9           MS. GLAVIN:  Your Honor?

10           MS. PERRY:  You don't have to.

11           MS. GLAVIN:  Your Honor?

12           MS. PERRY:  It's not relevant.

13           MS. GLAVIN:  Your Honor, Ms. Boylan has dragged

14  Governor Cuomo through the mud for three years.  She continues

15  to do so and she continues to tweet to this day.  I am sick

16  and tired of hearing that Ms. Boylan is a victim.

17           Governor Cuomo has had false sexual harassment

18  allegations by Lindsey Boylan that has gone on for years.  He

19  has never had an opportunity to test them.  There are now 36

20  mentions of Lindsey Boylan in a federal lawsuit.  He has to

21  test them.

22           MS. PERRY:  Your Honor, this is not his opportunity

23  to test them.  This is brought by Trooper 1.  That's exactly

24  the problem.

25           THE COURT:  I wish that were true, Ms. Perry.  I

1    have made it so clear at so many conferences that I question

2    the strategy here in terms of having all of these complaints

3    included in the case.  It's not my call.

4            MR. LICUL:  Your Honor --

5            THE COURT:  Mr. Licul --

6            MR. LICUL:  If I may be heard on that.  I just --

7            THE COURT:  Mr. Licul, I'm not finished.

8            That's where we are.  And I'm not in any way

9    faulting Mr. Licul and his strategy.  He's shared his views as

10   to the Second Circuit's Perry case and the manner in which he

11   chooses to prove a hostile environment is ultimately up to him

12   depending upon the in limine rulings that precede the trial.

13           At this juncture, discovery is broader than the

14   evidence that will come in at trial and the court --

15   Governor Cuomo, Mr. Cuomo, former Governor Cuomo has to have

16   an opportunity to find the evidence necessary to defend his

17   case.

18           Mr. Licul, I want to be clear.  I'm not critiquing

19   your strategy choices.  What I've said on the record and what

20   I will say again is that survivors of sexual harassment being

21   retraumatized through a discovery process is difficult for

22   them and I'm trying to minimize the additional damage by

23   trying to narrow this as much as possible but it's very

24   difficult given the way that the complaint is drawn.

25           Again, Old Chief is my favorite case.  I think I've

1   shared that with you in the past.  It's a really important

2   case and it is what sets a playback for trial lawyers.  Right?

3   You get to tell your story and how you choose to tell it and I

4   respect those choices, but I also really want to reiterate my

5   concerns about the survivors --

6            MR. LICUL:  May I be heard?

7            THE COURT:  -- and individuals who say that they

8   were injured.

9            MR. LICUL:  May I be heard?

10           THE COURT:  Yes.

11           MR. LICUL:  Trooper 1 is a victim and survivor as

12   well.

13           THE COURT:  Of course.

14           MR. LICUL:  And it becomes very difficult for her to

15   have folks suggest that somehow this is her fault.

16           She is entitled to prove her case, she's entitled

17   under the law to anticipate the defenses, and what we've heard

18   for the first time today, I did not know this, but,

19   apparently, whether we included Ms. Boylan in the complaint or

20   not or whether we chose to do what Charlotte Bennett did which

21   is to say they won't call her, they're calling her anyway and

22   I think that -- and we even proffered a way to limit that and

23   they refused.  Okay?  So I think that there needs to be some

24   balance when we're talking about why this is broad in not

25   suggesting that we're somehow overreaching.  Okay?

82

1          We've thought very carefully about this and we

2    understand his defense.  His defense is going to be either, A,

3    these people are out to get me, sort of several conspiracies

4    happening at once that converge into one big conspiracy and

5    resignation, and, two, you misinterpreted what I did and what

6    I said.  And I don't know how to defend against that

7    defense --

8          THE COURT:  I understand.

9          MR. LICUL:  -- without -- if a jury sits there and

10   hears this is what happened, I brushed up against her,

11   Trooper 1, and it was a mistake, and then you hear that he did

12   the same thing to numerous other women, that's not a fair

13   trial if a jury doesn't get to hear that.

14          As far as the report goes, my view on the report, I

15   know we have many different views, we have five lawyers and 18

16   opinions, but not only is it admissible as a public report, it

17   is an admission of liability by one of the defendants.  The

18   New York State Police is a defendant here.  It is an agency of

19   the State and it has admitted that Trooper 1 was the victim of

20   discrimination and sexual harassment.  It's important

21   evidence.

22          Now, getting back to the 412 issue, I didn't mean to

23   go too far afield.

24          THE COURT:  Yes.

25          MR. LICUL:  The 412 issue is very clear concerning

1  sexual misconduct.  The personnel file issue is also very

2  clear.  I'm not sure what cases they're talking about.

3          THE COURT:  I also --

4          MR. LICUL:  The cases are clear that personnel

5  records, prior personal records are confidential and I think

6  that, I don't want to say, I don't want to speak in absolutes

7  because I always get in trouble when I do that, but virtually

8  every case that I'm aware of says that the employee has a

9  privacy right in his or her prior personnel records.  I don't

10  know what cases say the opposite.  They're not public records.

11  And just for the record, the memos that Ms. Glavin referred to

12  were stamped "confidential personnel file" or something like

13  that.  It's clear that they're confidential.

14          MS. GLAVIN:  Can I respond to Mr. Licul?

15          THE COURT:  Please try to keep it --

16          MS. GLAVIN:  My good colleague across the floor who

17  is smiling at me for the record.  Your Honor, a couple of

18  things.

19          Number one, about Trooper 1, the Governor didn't

20  sexually harass her, period, did not sexually harass her.

21  That will be the evidence.  And the reason that all of these

22  other documents and all of these other people become relevant

23  is because Mr. Licul has already said repeatedly he's going to

24  put in the Attorney General's report which was a sham and a

25  farce and a political document.  Okay?  We are going to

84

1  challenge it but I have to be able to get the evidence to be
2  able to do that.  That's number one.  So his choice is on the
3  report.
4        Number two, he included ten other people in the
5  complaint and the reason he included ten other people in the
6  complaint is that Trooper 1's allegations standing alone are
7  not sexual harassment.  So he's doing it, to me, clearly, for
8  a prejudice issue, but you brought all of this into the case.
9  Trooper 1 made a decision to do this.
10       I do not believe that Trooper 1, quote, unquote --
11 Your Honor, I have to be heard on this because Your Honor made
12 a comment too and I have to comment on it.
13       You called Trooper 1 a survivor and I hope
14 Your Honor has not prejudged this case.
15       THE COURT:  I have not prejudged this case but I
16 have certainly believe that people who come forward with
17 regard to allegations of mistreatment, misconduct, sexual
18 harassment, sexual abuse, things along those lines, are
19 entitled to respect and are entitled to being treated with
20 humanity.
21       MS. GLAVIN:  I agree.
22       THE COURT:  And much of what has been said in this
23 litigation is disgusting.
24       MS. GLAVIN:  I disagree.
25       THE COURT:  And I am troubled by the tone that

85

1    today's conversation has taken on both sides, and we need to

2    turn it around and we need to focus on why we are here which

3    is an effort to narrow these subpoenas.

4            As we said at the outset, Ms. Boylan is a non party

5    to this case.  I don't know how many subpoenas are pending

6    about her in the world.  Before me today, we have many

7    subpoenas that she has moved to quash or that Mr. Licul has

8    raised as issues with regard to needing to quash and any

9    comments that I make about folks as survivors or victims is,

10   frankly, based upon my history of working with survivors and

11   victims and my preference to call victims "survivors."  It's

12   not a prejudgment that they were, in fact, abused.  It's a

13   point of reference.  Instead of calling people victims and

14   characterizing them as in some way weakened by that, I choose

15   to use the more heartening term "survivors" based on my decade

16   or so of working with people who had been sexually abused,

17   many of whom were human-trafficked.

18           MS. GLAVIN:  I understand.

19           THE COURT:  So just to be clear, my use of words in

20   determining to use the word "survivor" is a replacement for

21   the word "victim."  These people are complainants, victims,

22   whatever you want to call it, that's how they are

23   characterized in OAG report.  I understand that that may be

24   loaded and may, to you, suggest a factual determination by me.

25   It does not.  It's merely an effort to identify the group of

1  people we're talking about.

2          MS. GLAVIN:  I understand that.  I believe they're

3  witness, Your Honor, and --

4          THE COURT:  But there are so many witnesses we need

5  to wade through.  We can call them "complainants."

6          MS. GLAVIN:  "Complainants."  Let's call them

7  "complainants."

8          THE COURT:  We will all call them "complainants."

9          MS. GLAVIN:  My client has been prejudged from day

10  one by the media and by the press.

11          THE COURT:  Not by me.

12          MS. GLAVIN:  And it caused him to leave office

13  because of the prejudgment.

14          He is now being sued in two different lawsuits and

15  he may be sued in a third one in Albany.  He needs to be able

16  to defend himself.  He has a right to due process and to the

17  extent that Trooper 1 has included in her complaint everyone

18  under the sun and the kitchen sink, we have to get discovery

19  and to the extent --

20          THE COURT:  Ms. Glavin --

21          MS. GLAVIN:  -- but I'm tired of people --

22          THE COURT:  -- I think you heard me channel some of

23  your arguments to Ms. Perry today as to why these documents

24  are relevant and why we are here.  If I thought that they were

25  irrelevant, we would have quashed the subpoenas already.

1           MS. GLAVIN:  Thank you, Your Honor.

2           THE COURT:  I understand your arguments.  We're

3   trying to narrow because my concern at this juncture is

4   proportionality and many of your requests are seeking relevant

5   documents, but we've got to keep focused on the task at hand

6   so that we can get the documents flowing and we can get these

7   depositions started.

8           So, please --

9           MS. GLAVIN:  Judge?

10          THE COURT:  -- going forward, we'll all use the term

11  "complainants."  It's a fair point, Ms. Glavin.  Please do not

12  in any way use my reflexive vocabulary as evidence of what I

13  view the facts of this case to be.  Everyone is entitled to

14  make their case and posit their defenses and I fully get that.

15          MS. GLAVIN:  Judge?

16          THE COURT:  Yes.

17          MS. GLAVIN:  Thank you.

18          THE COURT:  You need a break?

19          MS. GLAVIN:  I was going to say thank you and I do

20  need to use the restroom.

21          THE COURT:  I can tell by your face.

22          MS. GLAVIN:  Okay.

23          THE COURT:  All right.  We're going to take five

24  minutes.

25          (Recess taken.)   (Continued on next page.)

Proceedings                                          88

1   (Continuing)

2           THE COURT:  You may be seated.

3           We are going to go back on the record.  And we were

4   last talking about the executive chamber subpoena.

5           Ms. Glavin indicated they had complied with the

6   subpoena in part except as to those categories relevant to Ms.

7   Boylan.  This led to the question of you standing to quash the

8   subpoenas.  We then started talking about personnel records.

9   It's my understanding, Ms. Perry, she was an employee of the

10  Empire State Development Corporation, not the executive

11  chamber.  Is that correct or incorrect?

12          MS. PERRY:  That is my understanding.

13          THE COURT:  So the personnel records arguments posed

14  as to the Empire State Development Corporation, I understand.

15  I also certainly understand your briefing with regard to your

16  privacy interests related to these subpoenas.  Some of the

17  topics of the subpoenas in the executive chamber subpoena are

18  somewhat duplicative with some of the other topics.

19          Just so I really understand what has been produced

20  so far, Ms. Glavin, do you have the basics as to document

21  requests one through three?

22          MR. GLAVIN:  Let me just check.

23          THE COURT:  And what about four?

24          MR. GLAVIN:  So here's the thing:  We are still

25  reviewing, because the production was quite voluminous from

Proceedings                                    89

1    the chamber.  So we are still reviewing.  But I think we got

2    one and two.  We need to go back with them.  I think on three,

3    I think we have some.

4             We are reviewing what we have because we just got

5    these, I don't know, in the last month or so, and it is a lot.

6    So we are going to go back with follow up to the chamber.  I'm

7    not sure that it is done or complete.

8             THE COURT:  Okay.  So it certainly seems as though

9    -- as to Ms. Boylan's interest in the subpoena that item four

10   as to her, which touches upon allegations of sexual

11   harassment, other misconduct by Governor Cuomo, Ms. Perry, is

12   there a genuine basis to seek to quash item 4B of the

13   executive chamber subpoena?

14            MS. PERRY:  Consistent with Your Honor's ruling with

15   respect to the subpoena of Ms. Boylan, I guess not.

16            THE COURT:  What they have does not impose a burden

17   on Ms. Boylan.

18            MS. PERRY:  I understand that.

19            THE COURT:  They are in possession of statements

20   that she made.  I don't understand how that wouldn't be

21   relevant.

22            MS. PERRY:  Understood.

23            THE COURT:  With regard to Subsection 4A of the

24   overtime issues, can you just shed a little bit more light on

25   the relevance of that, Ms. Glavin?

Proceedings                                    90

1          MR. GLAVIN:  That doesn't relate to Boylan, Your

2   Honor.

3          THE COURT:  That's just overtime scheduling?

4          MR. GLAVIN:  That's not with respect to Ms. Boylan.

5   It relates to two other complaints concerning times that they

6   were working for the governor.

7          But just to be clear, the subpoena of the executive

8   chamber, it is much broader than Lindsey Boylan.

9          THE COURT:  All right.  I understand.  I'm trying to

10  focus on the things that I perceived to be potentially related

11  to Ms. Boylan.  I wasn't sure if there was any overtime issues

12  as to her, but it didn't make sense to me since I didn't she

13  worked there.  I just want to understand if there was a

14  relevancy issue as to 4A.

15         MR. GLAVIN:  No.

16         THE COURT:  With regard to five, if they're in

17  possession of documents, we have discussed at length the

18  relevance of documents as to her relationship with Howard

19  Zemsky, as well as allegations of sexual harassment and other

20  misconduct, comments by her as to whether Mr. Cuomo was

21  handsome, things along those lines.

22         Ms. Perry, would you like to be heard on document

23  request five?

24         MS. PERRY:  I would just be repeating myself.  I

25  think it is all over the top and invasive, and, I mean, again,

Proceedings                                                91

1    it's -- I would be repeating myself.

2              THE COURT:  How is it invasive if it is in the

3    possession of a state entity?

4              MS. PERRY:  Well, because it relates to her privacy

5    concerns.

6              THE COURT:  If she was making references to Mr.

7    Cuomo's conduct and the environment of the work at the

8    executive chamber and all of these communications are

9    occurring on government servers and devices, how is that

10   invasive as to Ms. Boylan?

11             MS. PERRY:  There are so many subcategories, I guess

12   some of them are invasive and some of them aren't.

13             THE COURT:  That's what I'm trying to untangle.

14             MS. PERRY:  So the first one, with personal and/or

15   sexual relationship with Mr. Zemsky of course is.  The second

16   one, allegation of sexual harassment, is not.  With reference

17   to his appearance, if she called him handsome, I suppose is

18   not.

19             References to his conduct toward Ms. Boylan is not.

20             So I suppose it is just the first.

21             THE COURT:  The first category?

22             MS. PERRY:  Well, then we get into -- I mean, again,

23   it is her kind of -- it is all mixed together, but then we get

24   into her resignation, her efforts to -- you know, alleged

25   efforts to keep her job, efforts to resign, and her meeting

Proceedings                                                92

1  with Alphonso David, that's her personnel file.  Both I and

2  Mr. Licul have made arguments that's not appropriate.

3          THE COURT:  So the first item and the last three

4  sort of subsections are the main areas of concern for you?

5          MS. PERRY:  Yes, Your Honor, beginning with her

6  resignation.

7          THE COURT:  Okay.  And knowing that I know this is

8  in your broad 12 brief and that I have read it carefully, is

9  there anything that you would like to add as to this issue,

10 Mr. Licul?

11         MR. LICUL:  No, Your Honor.

12         THE COURT:  Thank you.  All right.  So I understand

13 the arguments there.

14         With regard to items 8 through 16, Ms. Glavin, 15 --

15 I'm sorry, 15 appears to include images and videos and things

16 along those lines.  What is all that about?

17         MR. GLAVIN:  Because these are -- they pertain to

18 some other complainants to specific events.

19         THE COURT:  Yes.

20         MR. GLAVIN:  That are, like, for instance, December

21 12, 2016, the fundraising event, that's where Kaitlin, you

22 know, alleges first meeting the Governor.

23         THE COURT:  Understood.  Understood.  So all of that

24 stuff is -- I will just ask Ms. Perry, do you object to 15 at

25 all?

Proceedings                                    93

1           MS. PERRY:  No, Your Honor.

2           THE COURT:  All right.  Now, moving right along,

3    with regard to items 8, 9, 10, 11, 12, 13, 14, 15, 16.  If you

4    would like to add anything to your arguments.  All comms of

5    Governor Cuomo, it is very similar to what we've already

6    discussed.  No. 11.  We can skip that.  But 8, 9, 10, 11, 13,

7    14, and 15, proportionality.

8           MR. GLAVIN:  Yes.  Your Honor, first of all, my

9    guess is that there are not going to be a lot of documents in

10   response to 10.  But again, it goes to Ms. Boylan publicly

11   telling the world this is why she left, and it wasn't true.

12   Again, on 11, documents concerning her resignation, I think

13   11, 12, and 13 are all the same thing pretty much.

14           THE COURT:  11 is different.

15           MR. GLAVIN:  All concerning her resignation.

16           THE COURT:  I'm sorry, yes, go ahead.

17           MR. GLAVIN:  It's about the resignation.

18           THE COURT:  Yes.

19           MR. GLAVIN:  12, 13, all of this relates to her

20   resignation and what Ms. Boylan publicly said about it and

21   what the truth was.  My guess is there's not going to be a ton

22   of documents.  I sort of have some idea of what might be there

23   in terms of e-mail correspondence about this and documenting

24   Ms. Boylan's reach out.  So she re-signed from State

25   employment on September, I think it was the 26th, and then

Proceedings                                                    94

1    several days later reached out to Alphonso David to rescind

2    her resignation.  She reached out to the Governor's assistant

3    asking to speak to him and have him call back.  The Governor

4    did not return Ms. Boylan's call after speaking with Alphonso

5    David.  But to the extent there are documents in the chamber,

6    we want to get all of that.

7            THE COURT:  All right.  I understand the argument.

8            MR. GLAVIN:  With respect to 14, again, my guess is

9    that there may not be much, but there was a complaint lodged

10   by somebody in ESD, and I think it went to Elizabeth Fine and

11   then Ms. Fine gave it to Alphonso David.  And on that score,

12   we want to get that information about what led up to the

13   meeting in January 2018 because we think that's one of the

14   reasons that she left after being counseled.  But it also goes

15   to Ms. Boylan and Mr. Zemsky's relationship is also relevant

16   to the extent Ms. Boylan says oh, my boss told me that the

17   Governor had a crush on me.  Well, her boss, if she's having

18   an affair with her boss, there's alternative reasons for him

19   to be saying that.

20           THE COURT:  I understand the arguments about Mr.

21   Zemsky, and I think we are getting pretty far afield as to

22   him.

23           The ESD subpoena, which is included in Ms. Boylan's

24   motion to quash at 88, it is much more narrowly tailored.

25   88-5, much more narrowly tailored than many of the others.

Proceedings                                        95

1            MR. GLAVIN:  I'm sorry, we are on to?

2            THE COURT:  The ESDC.  As to items one through

3    three, Ms. Perry, what is your position?

4            MS. PERRY:  I think we now have some rulings where I

5    think Your Honor is going.  So I think the main objections are

6    going to be to the later ones, which relate to, you know,

7    their theories of the case about Mr. Zemsky and the personnel

8    files and all of that.  So those ones, if Your Honor can

9    narrowly tailor them, you know, I don't think there is --

10           THE COURT:  This is one through three?

11           MS. PERRY:  Yes, Your Honor.

12           THE COURT:  Ms. Glavin, is there a timeframe that's

13    appropriate as to document requests one through three for the

14    ESDC subpoena?

15           MR. GLAVIN:  Your Honor, there is a time period in

16    the definition, So if you go above the document request.

17           THE COURT:  You're right.  March 1, 2020 up until

18    the date of the subpoena.

19           MR. GLAVIN:  Yes.  But we would like to serve the

20    subpoena and engage with Empire State, because they may have

21    ideas to narrow things as well or say they don't have things.

22           THE COURT:  Understood.

23           MR. GLAVIN:  I don't know what they've produced to

24    the AG's office.

25           THE COURT:  I understand.  I do think that items one

Proceedings                                                        96

1   through three are a good starting point.  I'm less sold, as

2   you've heard over the course of the afternoon, on the

3   proportionality of some of these other categories, but I do

4   see the relevance on proportionality at minimum to document

5   requests one through three.

6          Four to nine, I'm a little bit less sold.

7          Is there anything in particular there, Ms. Glavin,

8   that you would like to highlight?

9          MR. GLAVIN:  Again, it goes to the circumstances of

10  her leaving.  We're aware -- I think there were a lot of

11  communications about this, about the request to have her

12  terminated.  And actually Howard Zemsky, a least according to

13  a memo that I have seen, Howard Zemsky is the one that

14  approved Ms. Fine's request to terminate Ms. Boylan from the

15  payroll.  We do want to see the documents around that, about

16  what the complaints were, because, again, it goes directly to

17  Ms. Boylan telling the world repeatedly and to this day that's

18  why she left the executive chamber and it's a lie.

19         THE COURT:  I understand the argument.

20         Moving on to document request 10, you have sort of a

21  numerous requests sort of mushed together, including

22  allegations of sexual harassment, misconduct by Cuomo,

23  references to Cuomo's appearance, references to Cuomo's

24  conduct toward Boylan, et cetera, et cetera.

25         Ms. Perry, are there any specific items in 10 as to

Proceedings                                                97

1   to which you would like to be heard further?

2          MR. GLAVIN:  Judge, just so you know, this request

3   matches the subpoena of the executive chamber, the last one we

4   just went over.

5          THE COURT:  I know.  My very amazing law clerk put

6   together this very detailed chart.  We have matched them all

7   up.

8          Is there anything specifically as to 10 that you

9   would like to be heard more about?

10         MS. PERRY:  Your Honor, it would just be the same

11  issues that I took with the last one.  I think really there

12  would be just the last one, the January 2018 meeting with Mr.

13  David.  I think the rest of them, to be consistent, with what

14  we've discussed, I think -- oh, I think the rest of them are

15  okay.

16         THE COURT:  Thank you.  This one does have a time

17  limit built in; correct, Ms. Glavin?

18         MR. GLAVIN:  Yes, Your Honor.

19         THE COURT:  So the very next subpoena included in

20  Ms. Boylan's motion to quash pertains to the employee you just

21  mentioned, Ms. Glavin, Elizabeth Fine.  We haven't spoken

22  about her much in the past.  She comes up from time to time in

23  the briefing.  Some of the issues here again relate to the

24  sexual relationship involving Mr. Zemsky, informal complaints

25  regarding Boylan's conduct while she was employed, et cetera.

Proceedings                                                    98

1         Is there anything that you would like to add, Ms.

2    Glavin?

3         MR. GLAVIN:  The subpoena to Ms. Fine, it's only to

4    the extent that has documents in her personal possession that

5    aren't covered by the ESD subpoena.  I will say that, because

6    we do think Ms. Fine is a material witness to, one, the

7    request to terminate Ms. Boylan; two, to Ms. Boylan's -- the

8    fact that she was having an affair with her boss ESD and

9    issues that that caused.

10        I will tell the Court that we did serve Ms. Fine in

11   Bennett case and she came back -- her lawyer said she didn't

12   have responsive documents, because we were only seeking if she

13   had them in her personal possession.

14        THE COURT:  Ms. Perry, I understand your arguments

15   with regard to the Zemsky situation.  Is there anything you

16   would like to say in response to Ms. Glavin's remarks?

17        MS. PERRY:  It sounds like it may not be an issue.

18   We take exception both to the Zemsky documents and also to the

19   employment documents.  So I think that would cover the entire

20   of the documents that they're seeking from Ms. Fine.  So we

21   would object to this subpoena in its entirety.

22        THE COURT:  Okay.  Thank you.  All right.  So the

23   related motion to your motion to quash, at least related in my

24   mind, Ms. Perry, relates to Mr. Cuomo's motion filed at ECF

25   177, which was the motion filed by Ms. Trzaskoma, I believe,

Proceedings                                                        99

1  regarding the issue as to whether or not there was some sort
2  of an accommodation with the Attorney General's Office and
3  requesting the Court direct you, Ms. Perry, to confirm whether
4  Ms. Boylan and the OAG, in fact, had some sort of agreement to
5  limit her production to 25 pages and to state the terms of any
6  such agreement.
7          Whether or not there was an agreement between Ms.
8  Boylan and the Attorney General's Office as to the scope of
9  production really does seem somewhat irrelevant, but I would
10  like you to have an opportunity to be heard on the response to
11  their request, Ms. Perry.
12          MS. PERRY:  I guess that's my response, I think that
13  it's completely irrelevant what agreement Ms. Boylan's
14  previous counsel worked out with the Attorney General's
15  Office.  Obviously it was to the satisfaction of the Attorney
16  General's Office.  So I don't see what -- they are seeking
17  documents now.  Your Honor is ruling on that now.  So I really
18  don't see how that has anything to do with the issues in this
19  case at this point.
20          THE COURT:  To your knowledge, Ms. Perry, is there
21  any contemporaneous documentation or memorialization of any
22  such agreement or do you have a different understanding as to
23  what happened vis-à-vis the back and forth between Ms. Boylan
24  and the AG's office investigators?
25          MS. PERRY:  My understanding is there's not any

Proceedings                                            100

1   written communication about that.

2          THE COURT:  Okay.  Ms. Trzaskoma, what I was sort

3   of, or Ms. Glavin, whoever is addressing this one, I wasn't

4   sure what to make of it, because I don't know that you're

5   going to find a written agreement.  Even if you did, I don't

6   know what probative value that would truly have in this case

7   where the issues are different and we are making more granular

8   rulings as to the subpoenas that exist now.

9          MS. TRZASKOMA:  Your Honor, just a couple of points.

10  We submitted that letter after the prior conference where Ms.

11  Perry made that representation about the existence of an

12  accommodation.  That was in the context of an argument on

13  behalf of Ms. Boylan that we should just accept that whatever

14  was good for the AG should be good enough for us.  And our

15  point was the AG subpoena was very broad, broader than our

16  subpoena, and that we don't know why it is or how it came to

17  be that Ms. Boylan produced only 25 pages of documents given

18  that, according to Ms. Boylan, she has 550,000 potentially

19  relevant communications or documents.  So that was really in

20  response that.  But I think it does go, Your Honor, to a

21  broader point.  Again, it might not be relevant had Trooper 1's

22  complaint not -- you know, if she weren't relying on the

23  Attorney General's report.  But if the argument is this was,

24  you know, and the allegation is by Trooper 1, the AG's

25  investigation was exhaustive and it was independent.  If there

1  were no accommodations -- so those are two things:  One, did

2  the AG stand down on its subpoena at the request of Ms. Boylan

3  for, you know, a particular reason, and did the AG not seek

4  documents that could have gone to her credibility, for

5  example, we would like to know that.

6           THE COURT:  It sounds like a deposition topic, not a

7  document subpoena.

8           MS. TRZASKOMA:  Well, it goes -- there was a

9  representation made to Your Honor about the existence of an

10  accommodation.  I think that has been walked back somewhat,

11  that there was -- now what I have heard is that the AG was

12  satisfied.  I don't actually know that the AG was satisfied.

13          THE COURT:  And you never will.

14          MS. TRZASKOMA:  Well, I don't know that.

15          THE COURT:  You're never going to get to depose Joon

16  Kim.

17          MS. TRZASKOMA:  Your Honor, we obviously don't know

18  and maybe the answer will be clear from the communications

19  that Ms. Boylan produces between Ms. Boylan's counsel, who was

20  not Ms. Perry, but Ms. Boylan's counsel and the AG

21  investigators about Ms. Boylan's production.  I don't know.  I

22  mean, in a normal --

23          THE COURT:  This is the problem:  This is a fishing

24  expedition.  There's nothing before me to suggest that there's

25  a document that would answer this question that can be

Proceedings                                          102

1  produced that is even -- that is sufficiently relevant to make

2  the fishing expedition proportional.

3          MS. TRZASKOMA:  Well, Your Honor, I don't think it

4  is a fishing expedition.

5          THE COURT:  It's irrelevant.

6          MS. TRZASKOMA:  Well, it --

7          THE COURT:  The jury will never know or care if the

8  Attorney General's Office had an accommodation.  I understand

9  how this could be relevant to your arguments to preclude the

10 Attorney General report, but I don't know that Ms. Boylan is

11 the tree to be barking up for this issue.

12         MS. GLAVIN:  Might I just have one moment with

13 counsel.

14         (Pause.)

15         MS. TRZASKOMA:  Well, putting aside what the jury is

16 going to hear, I don't think any of us in this courtroom know

17 right now what evidence will be in front of the jury.

18         THE COURT:  And you certainly may cross her on this

19 topic:  Didn't you get this broad subpoena from the AG and you

20 gave them this paltry production.  Like that I could see

21 happening easily.

22         MS. TRZASKOMA:  But if Ms. Boylan's response is what

23 the response was in this courtroom, which is yes, I had an

24 accommodation from the Attorney General's Office, I would like

25 to have in hand any documentation concerning any such alleged

Proceedings                                                    103

1   accommodation.  Again, it may be there is none, but if Ms.

2   Boylan deliberately withheld communications with other

3   complainants that were called for by the AG's subpoena -- and

4   we've seen some of them.  I mean, as Ms. Glavin referenced, we

5   now have productions of documents from Ms. Bennett, the

6   Bennett case.

7            THE COURT:  I understand.  I certainly think this is

8   a ripe area for cross.  I just don't know what you expect them

9   to produce.

10           Ms. Perry, I'm really at a loss here, because I do

11  understand the arguments that Mr. Cuomo is posing, and yes,

12  there was representation made to the Court that there was some

13  sort of an accommodation.

14           How did you arrive at that understanding?

15           MS. PERRY:  It was just by the fact that she had

16  been represented during the process that she had gotten a

17  subpoena, that she had made this production and that she had

18  continued down this process and that there had been no

19  concern, no questions, no problems.  So my understanding had

20  been they had been satisfied and that had been an

21  accommodation and understanding that had been reached between

22  the AG's office and counsel.

23           THE COURT:  At this juncture, I just don't I think

24  there is sufficient information for the Court to conclude that

25  there's some evidence that is producible with regard to this

Proceedings                                    104

1   issue at this time.  Should circumstances change, for example,

2   following Ms. Boylan's deposition, where something comes to

3   light, that there were communications with her counsel and the

4   Attorney General investigators on this topic or something

5   along those lines, perhaps my view will be changed.  But it

6   seems to be to have been an evolution in Ms. Boylan's

7   understanding as to the expectation and the Attorney

8   General's, in your view, failure to follow up.  I don't know.

9   Unless there's something more presented as to what may exist,

10  I don't know who to order to produce what.

11          MS. TRZASKOMA:  Your Honor, going back, the

12  subpoena, as Ms. Glavin indicated, the subpoena to Ms. Boylan

13  includes her agents and documents in her custody and control,

14  which we believe includes documents in her attorneys's custody

15  and control and --

16          THE COURT:  We are not getting into attorney-client

17  communications.

18          MS. TRZASKOMA:  We definitely have not asked for

19  that, Your Honor.  What we talked about with respect to the

20  subpoena to Ms. Boylan is communications on Ms. Boylan's

21  behalf by her lawyers with the AG's investigators.  I don't

22  want the communications between her lawyer and her.  I want

23  the communications with the AG's investigators about Ms.

24  Boylan's compliance with the subpoena and whether Ms. Boylan

25  represented, for example, that this is everything, there's

Proceedings                                          105

1    nothing else.

2              And if the Attorney General's office followed up in

3    any way, if she promised we're going to get you a certificate

4    of compliance, which she never did.  I don't know what

5    communications there are.  But that would certainly be

6    encompassed in the subpoena to her and in particular the

7    subpoena to Ms. Boylan, and in particular, the document

8    requests that calls for materials related to the AG's

9    investigation.

10             THE COURT:  How is this proportional?

11             MS. TRZASKOMA:  Your Honor, first of all, I don't

12   know if it exists.  But it is absolutely not a burden to seek

13   that information.

14             THE COURT:  Burden is not a question of

15   proportionality.  My question is whether this is proportional

16   to the needs of the case?

17             MS. TRZASKOMA:  It is, Your Honor.  Trooper 1 is

18   planning to rely on the Attorney General report.  And she is

19   saying it is exhaustive.  It was not exhaustive, and we are

20   entitled to prove that.  And the way we are going to prove

21   that is by showing that the Attorney General, for one of the

22   key complainants in this case, failed to -- accepted a 25-page

23   production from someone who told them under oath that she had

24   been communicating with many other people about her

25   allegations.  So that's a very critical issue in terms of is

Proceedings                                      106

1    it exhaustive.

2         THE COURT:  Then you depose her and information

3    comes to light that there may be a record of this so-called

4    accommodation that could change the analysis.  But at this

5    juncture, Ms. Trzaskoma, I don't know that there's sufficient

6    information to know whether this information even exists, as

7    you have conceded.

8         MS. TRZASKOMA:  But that's the problem here, Your

9    Honor.  It's not a fishing expedition.  We have been put in

10   this position where we are defending a subpoena on burden and

11   proportionality ground, and we don't even know do these

12   documents exist.

13        THE COURT:  There's no subpoena.  This is a letter

14   requesting the Court to direct her counsel to do work,

15   essentially.  And I don't have a good-faith record.  I'm not

16   saying you're not acting in good faith, but I don't have a

17   record that this information exists.

18        Ms. Perry has explained the basis for her in-court

19   representation and I am satisfied by it.  I understand why she

20   would have drawn that conclusion.  Perhaps her word choice was

21   not exactly what she would have said had she known it would

22   have been scrutinized to this degree.  But at this juncture,

23   Ms. Trzaskoma, I don't think I'm going to be directing her

24   counsel to do this; it's not proportionate.

25        MS. TRZASKOMA:  To the extent Your Honor is

Proceedings                                              107

1    construing that letter as anything other than a request that

2    the record before this Court be corrected in terms of whether

3    there was or was not an accommodation, that's all we were

4    asking for in -- that's all we were asking for, is for the

5    record to be cleared up, because the argument before Your

6    Honor was we made this production to the AG, the AG was

7    satisfied by it, and they should be too, it's enough.

8              THE COURT:  And I don't actually care whether the AG

9    was satisfied by it because the issues in this case are

10   different and the subpoenas before me are specific, and I'm

11   trying to reach a discovery process that could maybe

12   eventually yield evidence in this case.

13             MS. TRZASKOMA:  I guess this is my point, Your

14   Honor, to the extent you were construing that as separate and

15   apart from the subpoena to Ms. Boylan herself, I believe that

16   Your Honor's questioning of Ms. Perry on this clears up the

17   record that there was no like clear accommodation.  So we will

18   just proceed with the subpoena to Ms. Boylan according to Your

19   Honor's order today.

20             THE COURT:  Okay.  It might not be t day.  It is

21   already 4:50.

22             MS. TRZASKOMA:  Eventual.

23             THE COURT:  Thank you for that clarification.  I do

24   appreciate it.

25             I know that the Bennett people are here and you have

Proceedings                                           108

1    been very patient.  I apologize that this has been taking so

2    long.  I should have put you first.  Your subpoenas are much

3    shorter.  Had we thought that through back in December, we

4    would have put you first.  My apologies for that.  I wasn't

5    actually expecting you to come at the beginning of the

6    proceedings, Mr. Eisenberg.

7              Lindsey for New York is the topic of Trooper 1's

8    motion, subpoena at docket ECF 82-7.  I don't think that this

9    was a topic within your motion to quash, Ms. Perry; is that

10   correct?

11             MS. PERRY:  It is a little muddled for me, Your

12   Honor, but I think that's correct.

13             THE COURT:  Mr. Licul, I fail to see how this

14   presents a concrete Rule 412 issue.  Would you like to be

15   heard on that as to request number one?  I'm talking about the

16   lack of Rule 412 issue with respect to request number one.

17   The basis for your motion, Mr. Licul, was Rule 412.

18             Does that argument attend to every subsection of the

19   document requests or to some?

20             MR. LICUL:  It does to the extent the information

21   sought is about a relationship.  That's it.  I agree with Your

22   Honor.  I don't construe one as asking for that, but that's

23   all.  It is sort of a carveout argument.

24             THE COURT:  I see.

25             MR. LICUL:  The subpoena should be quashed to the

Proceedings                                        109

1  extent it is asking for this category.

2          THE COURT:  All right.  I appreciate that.

3          Is there anything you would like to say in response

4  to this issue, Ms. Glavin?

5          MS. GLAVIN:  On the Lindsey for New York?

6          THE COURT:  Correct.  82-7.

7          MS. GLAVIN:  In respect to this, I mean, I don't

8  think Mr. Zemsky is mentioned on the 412 issue.  The reason we

9  are asking for it is because we understand there were

10 communications --

11         THE COURT:  The entire motion is based on 412.

12         MS. GLAVIN:  Done.  Go.

13         THE COURT:  So do you have anything you would like

14 to say?

15         MS. GLAVIN:  On the 412?

16         THE COURT:  Yes.

17         MS. GLAVIN:  No, because I don't think this is a 412

18 issue.

19         MS. PERRY:  Your Honor, just to be cleared, I think

20 this one maybe postdated our motions, so we didn't want to

21 duplicate previous motions.  But we stand on our arguments.

22 We have the same arguments for this that we did for everything

23 else.  So we would ask that Your Honor rule consistently, of

24 course, on this one as we have with the same privacy interests

25 and therefore the same -- I think the same standing arguments

Proceedings                                                     110

1   as we do with respect to the other additional nonparty

2   subpoenas.  So we would just have the same -- you know, I

3   would rest on those arguments.

4            THE COURT:  All right.  Understand.

5            MS. PERRY:  Thank you.

6            THE COURT:  The question for you, Ms. Glavin, is

7   there a timeframe as to this subpoena?

8            MS. GLAVIN:  Yes.  This could be limited.  To the

9   extent it is her campaign, it's during the campaign.  So it

10  would be covered by -- she announced in November, I think

11  mid-November of 2020 is when she announced, and I think -- I'm

12  trying to think when the election was.  But it is necessarily

13  limited by the length of the campaign.  The election was in

14  2021.  So it covers late 2020 to 2021.

15           THE COURT:  The Verizon subpoenas, do you want to

16  confirm whose phone number this is?  This is document 82-9,

17  Ms. Glavin.

18           MS. GLAVIN:  I'm sorry, one second.

19           (Pause.)

20           MS. GLAVIN:  Your Honor, the last point, the primary

21  was June 2021, so it is necessarily limited from November 2020

22  to June 2020.

23           THE COURT:  Okay.  Thank you.

24           MS. GLAVIN:  Yes.

25           THE COURT:  So this too, this phone records subpoena

Proceedings                                    111

1  was included in Mr. Licul's motion to quash to the extent that

2  it implicated Rule 412 issues, but since it is phone records,

3  it's hard for the Court to see how Rule 412 would be

4  implicated.

5           Mr. Licul, would you like to be heard on that?

6           MR. LICUL:  Yes, Your Honor.  I think that -- not to

7  bring back something that happened a week ago, but when we are

8  talking about phone records, I think we outlined there that

9  the courts do not just turn over phone records because people

10 want to see whose talking to whom.  We interpreted this under

11 412 that they are asking for phone records concerning Ms.

12 Boylan's communications with Mr. Zemsky as it relates to some

13 allegation that she and Mr. Zemsky had a relationship.

14          THE COURT:  Well, the dates of this doesn't

15 necessarily line up there as far as I understand the history,

16 Ms. Glavin will correct me if I am wrong.

17          MS. GLAVIN:  No, I think that's it.  I don't know

18 that they had a relationship after Ms. Boylan left ESD in

19 2018.  What this would cover with Mr. Zemsky is that when she

20 threatened him in February of 2021, if there are phone calls

21 around that, or if she spoke with Mr. Zemsky after the release

22 of his testimony and after it was made public that he had told

23 the Attorney General's Office that he was disputing what Ms.

24 Boylan said in her testimony, did she have communications with

25 him.

Proceedings                                    112

1          But on the 412 issue, I just don't see how it's

2    implicated.

3          THE COURT:  All right.  I understand.

4          Ms. Perry.

5          MS. PERRY:  But it would also cover all the calls

6    she made to her husband, to her trauma therapist, to her

7    daughter, to every other person that she has called, it is the

8    most overreaching, excessive subpoena that I can possibly

9    imagine to try to get to something that again is so far afield

10   that I barely know how to even make this argument.

11

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Well, the situation as currently posed

2     is, you know, Mr. Licul had raised the issue before the court.

3     I don't believe that it was included in your motion.  I

4     understand the timing concerns and your legitimate concern --

5          MS. PERRY:  Yes.

6          THE COURT:  -- about, you know, piling on to the

7     motions that were already pending before the court and I

8     appreciate that, but I also left without briefing from you as

9     to this topic.  I'm not necessarily inviting it.  If you'd

10    like to just make some arguments now.

11         MS. PERRY:  Yes.  Right.  They had come in.  I think

12    we made arguments only with respect to four additional

13    non-party subpoenas and I think these and this one and three

14    others, I guess, came in after we didn't have the opportunity

15    to, and then since then, of course, a number of others have

16    come in.

17         THE COURT:  Right.

18         MS. PERRY:  So you can anticipate our arguments at

19    this point.  I fear I'm becoming very repetitive.

20         THE COURT:  So, Ms. Glavin, your purposes of this

21    subpoena from your perspective were to, in an effort to pin

22    down this communication to Mr. Zemsky that you're

23    characterizing as a threat?

24         MS. GLAVIN:  Yes, but there's more for the purposes

25    of the subpoena.

114

1          So it's meant to cover Ms. Boylan's reach-out that

2    she has testified about.  So it's meant to see who she was

3    calling in December 2020.  It's also meant to cover who she

4    was communicating with before and after she spoke with the

5    AG's Office as well as other witnesses because we know they

6    were communicating about it.

7          I mean I know from Ms. Hinton's production that, you

8    know, there was a back and forth about, you know, whether or

9    not, did you tell the interviewers about Melissa and the

10   Governor, that type of thing.

11         We want to see was she calling people after they

12   went in and testified to get information or people getting

13   their stories straight.  So we're very interested in that and

14   we're particularly interested in the calls around

15   December 2020, January, March, as she was calling people and

16   texting people.

17         THE COURT:  So this is the situation with the phone

18   subpoena as I see it, Ms. Perry.

19         Similar to the phone subpoena that we had discussed

20   at length vis-à-vis Trooper 1, there may be certain evidence

21   of communications as to particular people and particular time

22   frames that I think could potentially be relevant and

23   proportional to the case.  The problem is nobody knows until

24   they actually look at the phone records.

25         To that extent, in the Trooper 1 main case, the

1  party discovery, the phone records are now in the case, sort

2  of.  Ms. Glavin had obtained them from the phone company

3  directly through subpoena through the Bennett case and what we

4  had discussed was having Mr. Licul review them first to redact

5  communications with therapists and doctors and others

6  unrelated to any claims of emotional distress.  Obviously, as

7  a non-party, that would not be all of her treatment providers

8  there has been.  Her children, you know, personal close

9  relationships I don't think would even be remotely relevant.

10       What I think could be relevant, I'm not saying it is

11  necessarily since I have no idea what's in the records, is

12  evidence to corroborate text messages, cellular communications

13  regarding communications with other complainants.  I don't

14  know because I don't know what the phone records include.

15       So although notwithstanding my prior comment that

16  the meet-and-confers had not been particularly productive in

17  this case, I think this is one of those rare instances where

18  the parties really need to drill down on whether or not there

19  is some accommodation that could be reached, both with regard

20  to date range and the numbers and/or individuals as to whom

21  the records are truly being sought, because I agree with

22  Ms. Perry that all phone records for a three year period is

23  very, very broad and not proportional given her status as a

24  non-party.

25       MS. GLAVIN:  Okay.

116

```
1            THE COURT:  So on that one, you guys are going to
2   need to meet and confer.
3            MS. PERRY:  Your Honor, may I just ask --
4            MS. GLAVIN:  I can't wait.
5            MS. PERRY:  -- with respect to the other cell phone
6   records, was that just for the plaintiff or were there third
7   parties?
8            THE COURT:  This is the first one other than the
9   plaintiff where there's been -- that I have before me.  It
10  doesn't mean that hasn't been sent to Verizon.  I just don't
11  know about it.  I don't know.
12           MS. PERRY:  I mean I can only imagine how I would
13  feel if someone subpoenaed all my cell phone records as a
14  non-party.  It just feels so incredibly invasive.  But, of
15  course --
16           THE COURT:  I'm not directing them to be produced at
17  this juncture, Ms. Perry.
18           MS. PERRY:  Yes.
19           THE COURT:  I'm trying to figure out if there's a
20  way to limit it.
21           If, for example, Ms. Boylan is able to get her call
22  detail herself, some people have that capacity depending on
23  their carrier, there may be certain date ranges with certain
24  groups of individuals with whom she was in contact would be
25  sufficient given what Ms. Glavin just described as the purpose
```

1  of this subpoena which is to track down the alleged threats to

2  Mr. Zemsky, communications regarding the so-called reach-out

3  to other complainants.

4      MS. PERRY:  But she's speaking with other

5  complainants.  We've talked about this.  She had a network, a

6  support network.  So she reached out to people.  So what does

7  that tell them?  They know she was talking to them.

8      THE COURT:  I need you to meet and confer about it.

9      MS. PERRY:  Yes, Your Honor.  We'll do that.

10     THE COURT:  Okay.  Cade Leebron.  Again, this

11  subpoena was raised in Mr. Licul's papers.

12     To the extent that it implicates Rule 412 issues,

13  Mr. Licul, is there anything else you would like to say about

14  it?

15     MR. LICUL:  No, the same thing that I said about the

16  other subpoenas.

17     THE COURT:  Okay.  Ms. Perry, would you like to say

18  anything?

19     MS. PERRY:  Nothing more than what I've said

20  already.

21     THE COURT:  Ms. Glavin?

22     MS. GLAVIN:  Do you want to know who Cade Leebron is

23  and why we subpoenaed her?  I don't think it implicates a 412

24  issue, but Cade Leebron was a paid consultant to Lindsey

25  Boylan's campaign and she is a writer who focuses on writing

1    about sexual abuse and sexual violence and we think that she

2    played a role in the drafting and framing of the essay, the

3    Boylan essay.  There was a payment to her.

4            So we want any communications dealing with that

5    essay or dealing, you know, sort of with messaging for

6    Ms. Boylan's campaign as it related to her, to her allegations

7    of sexual harassment.

8            THE COURT:  Is there anything you would like to say

9    in response, Ms. Perry?

10           MS. PERRY:  No, Your Honor.

11           THE COURT:  Okay.

12           MS. PERRY:  The only thing that I would say is, I

13   think there's one more perhaps that's in front of Your Honor,

14   but as I've mentioned quite a few times now, there are many,

15   many others that Your Honor is not yet aware of.  So I mean I

16   gather we will get an order from Your Honor that hopefully

17   will give the parties some guidance, I'm sure it will, and

18   then I imagine Your Honor will require the parties to meet and

19   confer then with respect to the other subpoenas perhaps and

20   then we can hopefully not be in front of Your Honor again.

21           THE COURT:  I mean, ideally, if you are able to meet

22   and confer and work out any kind of accommodation on the basis

23   of your divination of sort of where I might go with regard to

24   these issues, I would encourage you to do so.

25           To the extent you cannot reach agreement, I strongly

1   encourage you to utilize the joint letter protocol that would

2   bring both sides' arguments to the court at the same time

3   because one of the sources of delay was a lot of these motions

4   going back and forth without any pre-motion schedule or

5   anything.  It's like waiting to hear what the other side has

6   to say takes time and then to have replies and all the

7   briefing itself just takes weeks and weeks.  So my individual

8   rules lay out a framework for providing joint letters and it's

9   much more efficient.

10        So I would prefer to proceed in that fashion if you

11  do take issue you with some of the other third-party subpoenas

12  touching upon your client's privacy concerns and that if you

13  can't reach an accommodation, to proceed in that fashion.

14        All right.  So that covers my questions with regard

15  to the Boylan issues.

16        Ms. Bennett's issues, as I noted before, are far

17  fewer.  I really do apologize to the Bennett folks and thank

18  you for your patience.

19        Is there anything you would like to say before we

20  close out the Ms. Boylan conference, Ms. Perry?

21        MS. PERRY:  May I speak Mr. Licul for one moment?

22        THE COURT:  Yes.

23        (Pause.)

24        THE COURT:  Ms. Perry, yes?

25        MS. PERRY:  Your Honor, just in terms of trying to

120

1    narrow the scope and ease the burden a little bit, we had

2    talked a little bit about time frame and we talked about

3    ending the time frame for searching for documents with a date

4    of issuance of the subpoena.

5         In speaking with counsel, I actually think it

6    probably makes more sense and I hope counsel, I hope counsel

7    will agree, the date that the AJC report which I guess was the

8    second one seems to me a logical point in time to end our

9    search.  I don't think there's really anything that really

10   comes after that or maybe a short time after that, but I think

11   if we continue it in time until the date of issuance, there's

12   not going to be a lot that goes on after that.  I really think

13   that should be what they're looking for, but I see some

14   shaking of heads so I'm probably being overly optimistic.

15        THE COURT:  That may work with regard to the items

16   framed around the OAG investigation and the AJC investigation

17   but communications amongst the complainants, I think, is

18   probably a different issue but I will let Ms. Glavin speak for

19   herself.

20        MS. GLAVIN:  Yes.  No, it doesn't work because the

21   Assembly report comes out in November, I think November 22nd

22   of 2021.  Ms. Boylan becomes, should have become publicly

23   aware in January of 20, January, February of 2022 that Howard

24   Zemsky told the Attorney General's Office something very

25   different than what Ms. Boylan told the Attorney General's

1    Office and so I'm sure she had a reaction to that and

2    Ms. Boylan is a prolific communicator on social media and

3    electronically and I'm sure she had things to say about that.

4           It also goes to -- we want to cover the release of

5    transcripts.  I think the -- I can't remember when the Zemsky

6    transcript was released, but I think it was released after the

7    Assembly report came out.

8           We also want to cover Trooper 1 filed her lawsuit in

9    February of 2022.  That had, you know, Ms. Boylan named 36

10   times on that.  We want to capture her communications around

11   that lawsuit and around, you know, when we made very clear

12   that we were going to be subpoenaing complainants and we know

13   she was speaking with complainants about it.

14          We also want to capture her communications because

15   she began going to the press.  She went to the Wall Street

16   Journal in the spring of last year when she got a subpoena.

17   This is the person who wants to keep her privacy but she runs

18   to the Wall Street Journal to tell them she got a subpoena and

19   she gets Ana Liss to confirm it to the Wall Street Journal as

20   well.

21          MS. PERRY:  How is that relevant?

22          MS. GLAVIN:  That's after the subpoena.

23          MS. PERRY:  So perhaps the date that Trooper 1 filed

24   the complaint.

25          I mean her telling the Wall Street Journal that she

1    got a subpoena, how is that -- I mean, that's not -- I mean we

2    could go on forever then, why not until today.  I mean I think

3    the date of this -- I take the point about, you know, the

4    filing of the reports coming out, but I just think we can go

5    on forever.

6           I think the date that this complaint was filed, why

7    shouldn't that be the logical conclusion?

8           MS. GLAVIN:  The complaint was filed in February of

9    2022.  We know Ms. Boylan gets her subpoena in March of 2023.

10   She then sends some horribly vile texts about Melissa DeRosa

11   to Ana Liss and Ana Liss actually, after the subpoenas go out,

12   and Ana Liss actually thought during her testimony that, it

13   occurred to her, is Lindsey sending me these texts so I have

14   to, because she knows they're going to get produced because

15   she wanted to send a message.

16          I also think it becomes very relevant --

17          THE COURT:  What were the date of those texts?

18          MS. GLAVIN:  They were April of 2023.

19          MS. PERRY:  Your Honor, it's just diminishing

20   returns at some point.  And, again, viewed against

21   proportionality and burden, I mean it's more of the same and

22   they have this stuff.  So if they really want to know about

23   her allegations of sexual harassment and retaliation, then

24   they're going to get that in the time frame that they're

25   looking for until the date that this complaint was filed.

1          MS. GLAVIN:  There's one other thing too.  From the

2    Bennett discovery, we also have indications that Lindsey

3    Boylan may be writing a book.  So to the extent she's talking

4    about those allegations and she has drafts of that within the

5    last, you know, since she got the subpoena, of course we want

6    that, of course we want to see that.

7          THE COURT:  Is that subject to a subpoena right now?

8          MS. GLAVIN:  If she began writing the book as of the

9    date of the subpoena, March 2023, yes.

10         THE COURT:  The subpoena -- we've been talking about

11   the subpoena date range closing at the date of the subpoena.

12         MS. GLAVIN:  Uh-huh, and that's the range, to March

13   of 2023.

14         THE COURT:  I thought you said she was writing the

15   book after she got the subpoena.

16         MS. GLAVIN:  Oh, no.  I thought it was actually

17   before.

18         MR. LICUL:  Your Honor, I think if we're going to go

19   down this road, Ms. DeRosa wrote a book.  And Ms. DeRosa, I

20   asked her during her deposition about it, about certain

21   things, and she refused to answer questions.

22         If we're going to go down the road -- I don't mean

23   this as a tit-for-tat.  I just mean it as a perspective.  If

24   we're going to go down the road did you write a book, were you

25   thinking about writing a book, this is going to go on forever.

1    I mean this is so far afield, I can't even follow how this is

2    at all relevant.

3            If the argument is Ms. Boylan is not telling the

4    truth, they have her sworn testimony, they have what she

5    produced to the AG's Office, they'll get some other stuff, but

6    whether she spoke to somebody else, whether she's writing a

7    book, I mean, at this point, this is why women don't come

8    forward.

9            THE COURT:  I know.

10            MR. LICUL:  This is why they don't.  And the more we

11    let this happen, the more -- it's just -- I think at one

12    point, Your Honor mentioned in one of our prior hearings

13    about, you know, sort of jumping down a rabbit hole and how

14    many rabbit holes are we going to jump down.  I mean we're

15    down a lot of rabbit holes here.  I just don't see how it's

16    connected.

17            MS. GLAVIN:  Can I just respond on this point?

18            THE COURT:  I actually really don't want you to

19    because Mr. Eisenberg and his team have been waiting for three

20    hours and to reargue relevance now at 5:15, it really is kind

21    of neither here nor there.

22            MS. GLAVIN:  But, Judge --

23            THE COURT:  We have been talking about these issues

24    all afternoon.  I understand both sides' positions.  The whole

25    goal of the day was to try to narrow things as much as

1    possible.  I had many questions.  Many of them have been

2    answered.  You know, we're going to go back and review all the

3    details, some of the new details, some of the additional

4    contacts that I was provided today and I'm going to make

5    rulings.  Discovery is a process.  Discovery is messy and some

6    of those rulings may or may not cover the dates that you think

7    are relevant or they may be slightly overbroad and,

8    unfortunately, that's how discovery works sometimes.

9         I don't know that putting this date limit is

10   necessarily even in your best interests, Ms. Perry, because

11   when something comes out of her deposition that brings it

12   current, and they have post-EBT demands, you are going to be

13   doing the same document search twice.

14        MS. PERRY:  I'll take that risk.

15        THE COURT:  And that's part of the problem.  Right?

16        MS. PERRY:  Yes.

17        THE COURT:  I'm trying to maximize the time.  I know

18   this seems inefficient because it is inefficient, it feels

19   inefficient, but at the same time, going in circles and doing

20   the tiny baby steps and only giving this much and then giving

21   this much and giving this much when a broader universe may be

22   relevant and proportional and that's why I've been trying to

23   focus on proportionality.

24        I fully recognize your status as a non-party.

25   Unfortunately, she's squarely in this complaint, she's

1    squarely in the AG report, and the challenge to that AG report

2    is squarely relevant to Mr. Cuomo's defenses.  As Mr. Licul

3    has pointed out, they may seek to call her even if he doesn't,

4    if they take the same strategy as in the Bennett case.

5         MS. PERRY:  There's no way.  No way.  We all know

6    that.

7         MS. GLAVIN:  I wouldn't be so sure, Ms. Perry.  I

8    would not be so sure.

9         MS. PERRY:  I'm pretty sure.  You want to make a

10    gentlewoman's bet?

11         MS. GLAVIN:  What?

12         MS. PERRY:  We can make a gentlewoman's bet.

13         THE COURT:  I hear you, I do, but I don't know --

14    I've not yet heard a principled date limit other than the date

15    of the subpoena that would necessarily be sufficient.

16         With regard to the communications with other

17    complainants, I hear your concerns.  I'm certainly not

18    ordering that the entire universe of the communications she's

19    had with other complainants be produced.

20         MS. PERRY:  Thank you, Your Honor.

21         THE COURT:  All right.  With that, is there anything

22    else you would like to add?

23         MS. PERRY:  No.

24         THE COURT:  Mr. Licul, anything on Ms. Boylan?

25         MR. LICUL:  No, Your Honor.

127

1          THE COURT:  Okay.  Ms. Glavin, anything final on

2    Ms. Boylan?

3          MS. GLAVIN:  No, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          MS. PERRY:  Are we excused, Your Honor?

6          THE COURT:  You are -- but wait, no, because of

7    Ms. DeRosa's subpoena.  My apologies.  The DeRosa subpoena at

8    154-1.

9          So this subpoena is more limited.  This subpoena

10   sought documents regarding communications with DeRosa as a

11   party or about DeRosa as a party.  You know, candidly, a lot

12   of these documents do seem, you know, relevant and

13   proportional if we can find appropriate date limitations.

14         Is there anything you would like to say with regard

15   to the DeRosa subpoena, Ms. Perry?

16         MS. PERRY:  Just one moment, Your Honor.

17         THE COURT:  It's document, it's filed at

18   Document 154-1, I believe, in the Trooper 1 case.

19         MS. CASSIDY:  Your Honor, I think that may be the

20   Bennett subpoena.

21         THE COURT:  I'm sorry.

22         MS. CASSIDY:  It is almost identical but there's --

23   I don't believe there's anything on the docket about the

24   Boylan subpoena because we've never completed the

25   meet-and-confer.

1          MS. PERRY:  We didn't meet and confer about this.

2          THE COURT:  So am I just conflating my subpoenas?

3          MS. CASSIDY:  That's okay.

4          THE COURT:  Because you had raised it in the middle

5     so I thought it was her.

6          MS. CASSIDY:  We do have a subpoena outstanding to

7     Ms. Boylan and to the extent that Ms. Boylan's counsel is

8     going through the effort of searching documents, we suggest

9     that it would be probably be most efficient to search for our

10    request at the same time, but we agree that there is no issue

11    that is ripe for the Court's adjudication at this point and I

12    think that we can productively meet and confer about our

13    subpoena based on the guidance from Your Honor today.

14         THE COURT:  Okay.  Thank you.

15         Do you concur in that, Ms. Perry?

16         MS. PERRY:  Yes, I do, Your Honor.

17         THE COURT:  Thank you.  And you're absolutely right.

18    In my notes, it's very clear that this 154-1 is Bennett, but

19    not Ms. Boylan, but since you had raised it, I connected the

20    two.

21         MS. CASSIDY:  Thank you.

22         THE COURT:  With that, we are done with Ms. Boylan

23    and we'd ask the attorneys for Ms. Bennett to step forward.

24         (Matter concluded.)

25