1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3                                    :
4  TROOPER 1,                        : 22-CV-00893 (LDH)(TAM)
                                     :
5           Plaintiff,               :
                                     :
6                                    : United States Courthouse
      -against-                      : Brooklyn, New York
7                                    :
                                     : January 11, 2024
8                                    : 5:15 p.m.
   NEW YORK STATE POLICE, et         :
9  al.,                             :
                                     :
10          Defendants.              :
                                     :
11
   - - - - - - - - - - - - - - - X
12
          TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
13         BEFORE THE HONORABLE TARYN A. MERKL
               UNITED STATES MAGISTRATE JUDGE
14
   A P P E A R A N C E S:
15
   For the Plaintiff      WIGDOR, LLP
16 Trooper 1:                85 Fifth Avenue
                             New York, New York 10003
17                        BY:VALDI LICUL, ESQ.
                             JOHN CRAIN, ESQ.
18
   For the Defendant      GLAVIN, PLLC
19 Cuomo:                   156 West 56th Street
                             New York, New York 10019
20                        BY:RITA GLAVIN, ESQ.

21                        SHER TREMONTE, LLP
                             90 Broad Street
22                           New York, New York 10004
                          BY:  ALLEGRA NOONAN, ESQ.
23                        BY:  THERESA TRZASKOMA, Esq.

24 For the Defendant      HARRIS BEACH, PLLC
   New York State           99 Garnsey Road
25 Police:                  Pittsford, New York 14534
                          BY:  DANIEL J. PALERMO, ESQ.
```

2

A P P E A R A N C E S :

```
For the Defendants      MORVILLO ABRAMOWITZ GRAND IASON &
Melissa DeRosa and         ANELLO,
Richard Azzopardi:            565 Fifth Avenue
                             New York, New York 10017
                        BY:  KATHLEEN CASSIDY, ESQ.
                        BY:  KAYASHA LYONS, ESQ.


For the interested      EISENBERG & SCHNELL, LLP
party Charlotte              233 Broadway, Suite 2704
Bennett:                     New York, New York 10279
                        BY:  HERBERT EISENBERG, ESQ.
                        BY:  LAURA SCHNELL, ESQ.




OFFICIAL COURT REPORTER: Michele D. Lucchese, RPR, CRR
                         225 Cadman Plaza East
                         Brooklyn, New York 11201
                         (718) 613-2272
                         e-mail:  MLuccheseEDNY@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.
```

1           THE CLERK:  Civil cause for status conference, case

2    number 22-CV-893, Trooper 1 versus New York State Police,

3    et al.

4           Counsel, beginning with plaintiff, please state your

5    appearances for the record.

6           MR. LICUL:  Valdi Licul and John Crain, Wigdor LLP,

7    for Trooper 1.

8           THE CLERK:  For the defendant Andrew Cuomo, please

9    state your appearances.

10          MS. GLAVIN:  Yes.  Rita Glavin of Glavin PLLC for

11   former Governor Cuomo.

12          THE CLERK:  New York State Police, please state your

13   appearance.

14          MR. PALERMO:  Daniel Palermo, Harris Beach PLLC, on

15   behalf of the New York State Police.

16          THE CLERK:  For Defendants DeRosa and Azzopardi,

17   state your appearance.

18          MS. CASSIDY:  Kathleen Cassidy and Kayasha Lyons on

19   behalf of both Defendants DeRosa and Azzopardi.

20          THE CLERK:  And for Interested Party Charlotte

21   Bennett, please state your appearance.

22          MR. EISENBERG:  Herbert Eisenberg and Laura Schnell,

23   Eisenberg & Schnell, on behalf of Charlotte Bennett.

24          Together with us today are our co-counsel in the

25   Bennett case, Debra Katz and Kayla Morin from Katz Banks

4

1    Kumin.  Both Ms. Katz and Ms. Morin are not admitted in the

2    Eastern District and I just want to point that out.  They're

3    not going to speak unless required to.

4            THE COURT:  Okay.  Could you just tell me how to

5    spell "Katz"?

6            MR. EISENBERG:  K-A-T-Z.

7            THE COURT:  The traditional spelling.  I just want

8    to make sure.  The second counsel, what was her first name?

9            MR. EISENBERG:  Kayla, K-A-Y-L-A, M-O-R-I-N.

10           THE COURT:  Okay.  Thank you.

11           And I note for Defendant Cuomo's benefit that we are

12   starting a new transcript because the prior issues were

13   pertinent to two dockets and you only noted your appearance,

14   Ms. Glavin.  Would you like to note the appearance of your

15   co-counsel?

16           MS. GLAVIN:  Oh, I'm so sorry, Your Honor.  And my

17   invaluable co-counsel Theresa Trzaskoma from Sher Tremonte

18   along with Allegra Noonan from Sher Tremonte.

19           THE COURT:  Thank you.  Yes, we decided to split it

20   into two transcripts so as not to confuse the issues on

21   23-MC-1587 docket.

22           So we are here today with regard to a couple of

23   motions pertaining to complainant Charlotte Bennett.  There is

24   a deposition subpoena as to Ms. Bennett and a document

25   subpoena as to Ms. Bennett.  There's also this issue

5

1  pertaining to the subpoena that was issued to Hamilton

2  College.

3          So the motion to quash that was filed on behalf of

4  Ms. Bennett is obviously your motion, Mr. Eisenberg.  Would

5  you like to start?

6          MR. EISENBERG:  Well, it is late in the day so I'll

7  try to be succinct.

8          I was planning to do a very different presentation,

9  quite honestly, but I think for the purpose of moving us

10  along, as you well know, Ms. Bennett has her own case against

11  former Governor Cuomo, against Melissa DeRosa, against a

12  couple of other defendants who are not parties to this matter.

13  In that case, discovery has proceeded.  We have provided close

14  to 10,000 documents.  We have depositions that have been

15  noticed for all parties and things have been moving along.  A

16  protective order was entered into many months ago.  That

17  protective order was specific to our case pending in the

18  Southern District of New York.

19          For the purposes of trying to address the subpoenas

20  in this case, we are willing to expand the universe of the

21  document production and the depositions in our case to

22  encompass this matter presuming that we can all agree on a

23  protective order that mirrors the one in our case and that all

24  parties to this matter, so Mr. Licul would be, everybody would

25  have to agree that he could participate in both that discovery

1  and in those depositions.

2        I think that would resolve or should resolve the

3  issue of these subpoenas insofar as the subpoenas in our case

4  are actually a bit more expansive, I believe, than the ones

5  that have been served on us in this case and we have complied

6  with those subpoenas and provided documents and are still in

7  the process of doing so but we're very close to the end of our

8  production.

9        THE COURT:  Now I feel even worse about not calling

10 your case first.

11       MR. EISENBERG:  Yes.  Okay.  I'm with you.

12       That doesn't address Hamilton College which I would

13 like to speak to.

14       THE COURT:  Yes, we do need to address Hamilton

15 College.

16       So with regard to that proposal, Ms. Glavin, what's

17 your reaction?

18       MS. GLAVIN:  With respect to the document subpoena,

19 that's actually exactly what we wanted.  We wanted to be able

20 to use the documents that have been produced to us by

21 Ms. Bennett in that case for purposes of Trooper 1 to the, you

22 know, yes, and subject to protective orders.  That's fine with

23 us.

24       With respect to the deposition, I don't think that

25 we can agree to one deposition because we are on different

7

1    discovery schedules.  There are different parties.  So, you

2    know, I am sure that defendants Judy Mogul in the Charlotte

3    Bennett case, defendant Jill DesRosiers who is a defendant in

4    that case and Melissa DeRosa who's a defendant in that case

5    are, you know, going to want to take Ms. Bennett's deposition

6    and it may happen, you know, much sooner perhaps than this

7    case because she's a party.  And Ms. DeRosa is no longer, for

8    the time being, it would appear not to be a party in this

9    case, however, we don't have a decision and we don't know if

10   it's going to be appealed and if it was with prejudice.

11        So the deposition, I think, is more problematic but

12   it does resolve the document issue.

13        THE COURT:  I'm smiling because Ms. Katz is like

14   what's going on with Ms. DeRosa on her face.

15        So, Mr. Eisenberg, would you like to respond to this

16   issue as to the deposition timing and scope?

17        MR. EISENBERG:  Sure.

18        Our client shouldn't have to sit for more than one

19   deposition with former Governor Cuomo participating in both,

20   with Melissa DeRosa participating in both presuming she still

21   has a foot in the door in this room.  With regard to the other

22   two defendants, they have a right to depose our client and

23   shall do so.

24        There is certainly the burden on our client to sit

25   for more than one deposition.  The issue of her not being a

8

1   party here, she is not a party here, and the proportionality

2   issues, they get everything they need by doing the deposition

3   in our case.  They've noticed her deposition.  Things can move

4   quickly, there's no reason they shouldn't.

5           I do note that there are 375 docket entries between

6   our two cases which is remarkable.  At this table --

7           THE COURT:  And how many of them are in ours?

8           MR. EISENBERG:  Two hundred thirteen, I believe.

9           At this table, we have probably over a century of

10  employment law experience and we've never seen a case like

11  this.  We've never seen a case that has been so litigated with

12  such overreach, and I would say that is overreach.  You

13  commenced this morning or this morning's hearing --

14          THE COURT:  It felt like this morning.

15          MR. EISENBERG:  -- talking about the parallel

16  complexity.  We are concerned that that complexity is a

17  product of a desire to make what should be a relatively

18  straightforward couple of cases into those that are much more

19  complex than need be.

20          There are -- Ms. Perry talked about a conspiracy

21  theory about her client.  Ms. Katz is present here because the

22  last time I was here, I believe, in September, there was talk

23  about her being one of the conspirators who masterminded

24  former Governor Cuomo's downfall.  Doug Wigdor became a part

25  of that conspiracy too.  And Mr. Licul talked about Mr. Kim

9

1   and Ms. Clarke from the AG's Office being a separate

2   conspiracy as well.  Each of these things spin out into

3   further and further discovery that goes much far afield from

4   the underlying merits of these cases and it is truly

5   troublesome.  Certainly, for our client, it is troublesome.

6   We know it's troublesome for the other third parties as well.

7          We appreciate that the Court is trying to address

8   some of that.  We might handle some things differently in the

9   other courthouse but that's neither here nor there.  We're

10  trying to make things as smooth as possible as we can in both

11  our case and for us in this room.

12         THE COURT:  Well, I certainly appreciate that

13  sentiment and I also, you know, had, were you not a party,

14  would love to hear how to clear the underbrush and figure out

15  how to get this case unstuck in terms of your ideas about how

16  the court could have managed the case and I mean that

17  sincerely.  Unfortunately, I can't consult you because you're

18  here in an adversarial capacity but I would love to know.

19         Mr. Licul, in terms of this accommodation with

20  regard to the document subpoena issues, some of which you did

21  touch upon as well in your Rule 412 motion, you know, do you

22  concur --

23         MR. LICUL:  We agree.

24         THE COURT:  -- to Mr. Eisenberg's proposal?

25         MR. LICUL:  We finally agree on something and I

1    think the document subpoena is fine, we will agree with that.

2          As far as -- what I'm not understanding from the

3    Cuomo side's objections is who is prejudiced.

4          In other words, we are not going to be taking

5    Ms. Bennett's deposition.  I don't understand who is

6    prejudiced if Ms. Bennett is deposed.  If Cuomo,

7    Governor Cuomo's side gets to depose her and all the other

8    defendants in that case get to depose her as well, I'm not, I

9    don't understand who would be prejudiced by that concept.  No

10   one is denied the opportunity to depose Ms. Bennett.

11         THE COURT:  So Mr. Eisenberg, what is the

12   anticipated timing of the depositions in the other case?

13         MR. EISENBERG:  I actually apologize.  I don't know

14   the deposition.  The discovery cutoff is the end of February.

15   I believe the notice was for a date prior to that.  We will be

16   ready to go as soon as our document production is complete and

17   they're ready to go.

18         Let me just add one other thing which I think is

19   important.  I've said this both in writing and twice in this

20   courtroom.  Our client doesn't know Trooper 1.  Our client

21   never had any interaction with Trooper 1.  Our client is not

22   privy to the allegations that Trooper 1 has made.  There are

23   no different questions that would ever be asked of our client,

24   Ms. Bennett, in this case than there would be in our own case.

25   There couldn't be.  And so there's no reason to put her

1    through that more than once.

2              THE COURT:  Ms. Glavin, would you like to respond?

3              MS. GLAVIN:  I think we should deal with getting the

4    documents first before dealing with the deposition because

5    then I think it also raises, with respect to Governor Cuomo,

6    him doing one deposition as opposed to two.  So same issues

7    that you're raising.  One deposition in the two cases.

8              MR. EISENBERG:  By they are not the same issues,

9    Ms. Glavin.

10             MS. GLAVIN:  What's different?

11             MR. EISENBERG:  Our client's experience with former

12   Governor Cuomo is significantly, as far as I can tell in

13   looking at the allegations in Trooper 1's complaint, entirely

14   different.

15             MS. GLAVIN:  No.  No.  I think the point I'm making

16   is that the questions, is that basically all the lawyers then

17   do one deposition with Governor Cuomo in the Bennett case and

18   this case.

19             MR. EISENBERG:  Your Honor --

20             THE COURT:  It's not a tit-for-tat.

21             MS. GLAVIN:  I think it's premature.

22             MR. EISENBERG:  Not only that, our client is not a

23   party in this room.

24             THE COURT:  It's not a tit-for-tat, Ms. Glavin.  The

25   issues in the cases are very different.  I obviously don't in

1  any way -- no accommodation as to whether or not Ms. Bennett

2  should have one deposition or two has any bearing on the

3  question of whether Cuomo should have one deposition.

4          MS. GLAVIN:  Okay.

5          THE COURT:  They're separate and discrete inquiries.

6  So let's not conflate the issues, please.

7          With regard to the deposition timing, do you --

8  discovery is supposed to close by the end of February.

9          MS. GLAVIN:  It's not, Your Honor.  Judge Cave made

10  that very clear at -- I think we had a conference on

11  January 4th and she said it's very clear that that's not

12  happening.

13          We're supposed to get together.  We had talked with

14  counsel for Bennett about getting together to discuss a

15  workable discovery schedule because we don't have anything

16  close.  Like, we got a lot of documents within the last

17  24 hours from Ms. Bennett.  We should be producing a huge

18  amount of documents within the next week to complete our

19  productions.  We also have been speaking with counsel for the

20  other defendants that don't mirror each other in that case

21  about what is a workable schedule.  We actually have a call,

22  you know, with the defense lawyers this week to talk about

23  people's various schedules.  So it's not going to be the 27th.

24  Judge Cave made that clear it's not going to be done by the

25  27th.  So I just, I think all of the parties need to get

1    together.  I mean I think I want to talk, going to talk to the

2    other defense counsel.

3          I would also note that Ms. Bennett has sued the

4    State in State Court with the same allegations.  And I would

5    also note that the State and State Court, when it came to the

6    Attorney General's report, their answer, the State of New

7    York's counsel disputed the findings in the Attorney General's

8    report.  So I just, it's going to be a little more complicated

9    and I'd rather address the deposition question when I have a

10   chance to talk to counsel in the other case as well as with

11   Ms. DeRosa and Mr. Azzopardi's counsel in this case.

12         THE COURT:  Okay.  So I think we'll need to defer

13   the question -- the timing of Ms. Bennett's deposition and the

14   question of whether or not a single deposition could

15   accommodate the needs of both cases.

16         I do note, Ms. Glavin, as Mr. Eisenberg accurately

17   points out, she's a non-party.  She never met Trooper 1

18   allegedly.  If that's true, it's hard to know what additional

19   scope would be needed at a second deposition for Ms. Bennett.

20   So I do think that in the interests of efficiency and treating

21   any human being with, you know, just the dignity and respect

22   of not putting them through two depositions if we don't need

23   to, that we should seriously consider that as an option.

24         So I would ask the parties to meet and confer about

25   that.  Timing, of course, will need to be determined.  So I'm

14

1    not going to rule as to the timing for any depositions today.

2          Mr. Eisenberg?

3          MR. EISENBERG:  If I can make one offer.  Surely

4    were they to take Ms. Bennett's deposition in our case and

5    were they to believe that they needed something else in this

6    matter, at that point, we could meet and confer and have that

7    discussion.  I like to think we'll be able to resolve that

8    very quickly.

9          I also have one other thing I want to point out

10   which is troublesome to our team.  There have been a number of

11   subpoenas in our case that relate directly to Trooper 1 and as

12   I have repeatedly stated, Trooper 1, Ms. Bennett doesn't know

13   Trooper 1.  She doesn't know who she is.  I don't know that

14   they have a relationship but they don't.  They don't know one

15   another.

16         So, for example, there was a telephone record

17   subpoena served in our case with just the phone number.  We

18   didn't know whose phone number it was.  It turned out that was

19   Trooper 1's phone number.  We didn't challenge it.  We didn't

20   know who it was and they would say we didn't have standing to

21   challenge it.

22         THE COURT:  This issue did come to my attention last

23   week.  I understand they have the phone records.

24         MR. EISENBERG:  So that is troublesome.  They're

25   using discovery in my case, my client's case, to advance their

1   needs in this case without the Court's supervision.  The same

2   thing happened with the subpoena of June Kim and Clark where

3   they sought, in their subpoenas of those two individuals

4   Trooper 1 documentation.

5          Trooper 1 is not part of Charlotte Bennett's case.

6   Charlotte Bennett shouldn't be part of Trooper 1's case.

7          MS. GLAVIN:  So, Your Honor, on this point,

8   Trooper 1 is listed in the Rule 26 disclosures.  There was no

9   representation made by Charlotte Bennett's attorneys that

10  Trooper 1 would not be part of their case until the

11  January 4th conference before Judge Cave.

12         All of the subpoenas that had anything to do with

13  Trooper 1 in the Bennett case were based on the fact she's

14  listed as a witness in their Rule 26 disclosure.  We heard for

15  the first time on the 4th, after the phone records subpoena

16  had been served and we got returns, that is the first time a

17  representation was made in court that Ms. Bennett is not going

18  to rely on anyone else's allegations.  It's the first time we

19  heard it.

20         MR. LICUL:  Well --

21         MS. GLAVIN:  So the question is why did they include

22  Trooper 1 in their Rule 26 disclosures.

23         MR. EISENBERG:  Trooper 1 doesn't appear in our

24  complaint at all and there were representations made in this

25  court and by letter that my client doesn't know Trooper 1.  To

16

1  ask for phone records of Trooper 1 in Charlotte Bennett's case

2  doesn't go to anything that is probative in our case.

3         THE COURT:  Is she listed in your Rule 26(a)?

4         MR. EISENBERG:  I believe she is.

5         MR. LICUL:  Your Honor, the other thing is, and I do

6  give credit to my adversaries here for letting me know they

7  got the phone records and not reviewing them but, nonetheless,

8  we sat here on December 12th and had an oral argument about

9  the phone records and about the scope, and Your Honor directed

10  us to meet and confer on it.  Obviously, we couldn't reach a

11  conclusion but it would have been helpful to know that they

12  had been subpoenaed in another case.  I mean, I think, you

13  know, I think Your Honor last time ruled on the phone records

14  and there was sort of an argument that, well, what's done is

15  done.  I'm not -- those are not literally the words.

16         THE COURT:  No.  I said I can't possibly rule on the

17  granularity of the phone records that nobody has reviewed.

18  Those are my words.

19         MR. LICUL:  Well, right, but by that rationale --

20         THE COURT:  And you have the first opportunity to

21  review that for objections.

22         MR. LICUL:  I understand.

23         THE COURT:  That's the why we left it because that's

24  how the chips fell.

25         (Continued on next page.)

Proceedings                                    17

1   (Continuing)

2        MR. LICUL:  Understood.  But clearly, Mr. Cuomo's

3   side knew that we were objecting to the subpoena of our

4   clients's phone records in this case, and it would have been

5   helpful for them to know we objected to them in the other

6   case.

7        THE COURT:  Certainly.

8        Ms. Glavin, why didn't you disclose that to Mr.

9   Licul and/or the Court?

10       MS. GLAVIN:  With respect to the phone records,

11  actually, I will tell you this, Your Honor, we had done so

12  many subpoenas in the Charlotte Bennett case that I didn't

13  remember.  But the one thing that I was conscious of is that

14  we had had other parties that get notice from the phone

15  companies.  We fully expected that Trooper 1 would get the

16  notice other people have gotten and objected.

17       THE COURT:  Look, as I said on the phone with regard

18  to trying to narrow the date range and/or the communications

19  that could be culled from those phones records, it's

20  unfortunate -- it's probably not a strong enough word -- that

21  this happened the way it did.  Please don't let it happen

22  again.  Please maintain communicating with Mr. Licul if you

23  know there is something pending before this Court or is

24  subject of active litigation.  I can understand the concerns

25  that Mr. Licul and Mr. Eisenberg has raised.

Proceedings                                          18

1          That being said, what's done is done.  I can't undo

2     it, the phone records now exist.  Mr. Licul is getting first

3     crack at them.  As we discussed on the phone the other day,

4     you will let me know if you have motions related to the phones

5     after you had an opportunity to discuss with Ms. Glavin what

6     you would like to hold back.

7          MR. LICUL:  Thank you, Your Honor.

8          THE COURT:  All right.  With regard to the Hamilton

9     College subpoena, Mr. Eisenberg.  First of all, thank you for

10    raising your concern with regard to the discovery issues and

11    the parallel nature of the items sought.  This leads somewhat

12    into the Hamilton College situation.

13         Mr. Eisenberg, I fully understand your argument as

14    to why you believe that the Hamilton College information is

15    intrusive and irrelevant in this case.  Mr. Licul has also

16    moved to quash the Hamilton College subpoena on Rule 12

17    grounds.  As we've discussed today, one of the bases for Rule

18    12 is, of course, privacy concerns.  Given the accommodation

19    that has been reached in the Southern District case, I'm

20    wondering what additional considerations I should be

21    considering, what additional arguments you have with regard to

22    Hamilton College subpoena now that the information is out

23    there.

24         MR. EISENBERG:  I would put a capital R on the word

25    relevancy.  I also must note Hamilton College subpoena was

Proceedings                    19

1   responded to by Hamilton College I guess about a month ago.

2   We haven't heard anything since.  My presumption is it wasn't

3   a fruitful endeavor.

4           MS. GLAVIN:  It was a very fruitful endeavor,

5   actually, from our perspective.  But the point being is we

6   have the documents.

7           THE COURT:  Please let him finish.

8           MR. EISENBERG:  They certainly haven't renewed the

9   efforts to depose the president of Hamilton College, which was

10  one of the things that was going to occur.  And, so, Charlotte

11  Bennett's situation at Hamilton College, while she was a

12  student in her late teens, early 20s, perhaps, is of no moment

13  in this room, in this courthouse.  We don't think it has

14  anyplace in our case.  We surely think it has less of a place

15  in Trooper 1's case.

16          THE COURT:  For purposes of discovery, we are

17  obviously here to determine sort of rules of the road for

18  exchange of information, not relevance as to whether or not

19  things are going to come in at trial, right.  So without

20  prejudice to any arguments you may seek to make under

21  relevance, Rule 412, prior bad acts, anything whatsoever, any

22  arguments you would choose to make to preclude

23  cross-examination or further discussion of Hamilton College in

24  this courthouse would remain available to you whether it is

25  deemed part of the discovery in this case or not.  So what I

Proceedings                                                    20

1    am trying to understand sincerely is this fight over Hamilton

2    College something we can resolve with papers and protective

3    orders.  It exists in the discovery file with no finding as to

4    relevancy in the current case because it is already in the

5    discovery file in a parallel -- parallel is not the right word

6    for it.  But my issue is this fight seems somewhat esoteric

7    now that he has this stuff.

8              MR. EISENBERG:  Your Honor, I'm going to quote you,

9    if I might, you characterized the efforts to get Hamilton

10   College's documentation as scorched-earth litigation.

11             THE COURT:  And I still think that's right with

12   regard to the relevance.

13             MR. EISENBERG:  When you talk about rules of how we

14   are going to run things in this room, that should inform your

15   judgment.

16             THE COURT:  But there's nothing to quash.  They

17   already have the documents.  So what I'm not understanding

18   literally is the esoteric question of what you're asking me to

19   do here.

20             MR. EISENBERG:  I would suggest that insofar as we

21   are in a different forum across the river there be a firewall

22   on this issue notwithstanding the fact they have already seen

23   those documents subject to our protective order in the

24   Southern District.

25             THE COURT:  Ms. Glavin.

Proceedings                                                21

1          MS. GLAVIN:  The problem with the firewall is again

2     if we have one deposition.  So I just -- I don't think Your

3     Honor needs to rule on the Hamilton College documents.  If and

4     when they come up in this case, we can deal with it.

5          THE COURT:  I mean, they are not part of the

6     discovery in this case necessarily and that's the issue

7     because they are subject to a protective order in the Southern

8     District case.  I assume that protective order, Mr. Eisenberg,

9     includes no outside use of the information for any purpose.

10         MR. EISENBERG:  That is correct.

11         THE COURT:  So the standard for modifying the

12    protective order is not low in the Second Circuit.

13         MS. GLAVIN:  It's not what?

14         THE COURT:  Not low, the standard for modifying a

15    protective order.  So to me this issue has morphed from a

16    question of whether or not former Governor Cuomo can sort of

17    get the documents to see them in connection with these cases

18    to a question of whether they can be used in this case, and I

19    am just trying to ask you the question, Mr. Eisenberg, if that

20    determination can wait for motions in limine practice or

21    whether it needs to be part of the discovery practice?

22         MR. EISENBERG:  Give me one second.

23         THE COURT:  Please.

24         (Pause.)

25         MR. EISENBERG:  Your Honor, the only issue that

Proceedings                        22

1   concerns us is we don't have standing to make motions in

2   limine argument in this forum.

3            THE COURT:  No, you don't.  You have to wait for the

4   trial.

5            MR. EISENBERG:  No, even for the trial here.

6            THE COURT:  Mr. Licul does, and you can be heard as

7   an interested party.

8            MR. EISENBERG:  With that representation and the

9   opportunity to be heard on that issue, we will await the trial

10  and the motions in limines with regard to Hamilton College.

11           THE COURT:  Does that work for you, Ms. Glavin?

12           MS. GLAVIN:  It does, Your Honor.  There was one

13  request that I had is the ability to share the Hamilton

14  documents with the parties in the case, in this case, subject

15  to the protective order as a confidentiality designation.

16           Do you have an issue with us sharing with the State

17  Police counsel in terms of this case, the Hamilton documents?

18           THE COURT:  If you would like to go for one

19  deposition, that may be prudent.  I don't know.  Discuss

20  amongst yourselves.

21           MS. GLAVIN:  You can --

22           MR. EISENBERG:  Well, we need to rework the

23  protective order.

24           MS. GLAVIN:  That's fine.

25           MR. EISENBERG:  Then I think we are okay with it.

Proceedings                                                    23

1          THE COURT:  Are you willing to work on reworking the

2   protective order?

3          MR. EISENBERG:  Of course.

4          THE COURT:  So subject to re-working of the

5   protective order or extension of the protective order or a

6   change of the protective order in this case, whatever

7   protective orders you need to to facilitate that, the Court

8   is, of course, available.  If you have a revised a protective

9   order as to this specific issue, you should feel free to

10  submit it.  We can give a deadline of a couple of weeks, Mr.

11  Eisenberg.

12         MR. EISENBERG:  I think that would be fine.

13         THE COURT:  So if there are any revisions in the

14  protective order, but we will include that in the order to be

15  issued.  And I will note that this ruling is subject to --

16  certainly preserving all available rights to argue against the

17  admissibility of these records in the event of trial made by

18  both counsel for Trooper 1 and counsel for the complainant

19  and.  I think that that's a very reasonable strategy.

20              I'm very sensitive to the Rule 412 considerations

21  that you have raised, and I still view this subpoena as a

22  scorched-earth impact with regard to this particular

23  complainant given the age of those records and the age that

24  she was at the time and all of the other considerations that

25  come into play with regard to Rule 412, but not my call with

Proceedings                                             24

1   regard to whether it's going to come in at trial.

2          Ms. Glavin, is there anything else we should discuss

3   with regard to Ms. Bennett?

4          MS. GLAVIN:  No, Your Honor.

5          I do want to make one observation, the age of the

6   records on Hamilton College.  Just so Your Honor knows, Ms.

7   Bennett went to go work for the governor within a year or so

8   after she was at Hamilton.  They are very close in time.  And,

9   you know, contrary to what Mr. Eisenberg said, we think

10  they're very helpful, certainly to our defense in the Bennett

11  case.  But we can address that in front of Judge Cave.

12  Fortunate for you.  It's good to see you.

13         THE COURT:  Is there anything else that we should

14  address as to the motions that are here now.

15         Poor Mr. Palermo has been sitting here patiently for

16  four hours.  Is there anything you would like to raise, sir?

17         MR. PALERMO:  No, nothing for the State Police.

18         THE COURT:  Ms. Cassidy, is there anything further

19  on behalf of Mr. DeRosa and Mr. Azzopardi.

20         MS. CASSIDY:  One quick thing, Mr. Azzopardi is not

21  a party to the Bennett case and I don't believe that there

22  have been -- that the documents that reference him or that are

23  with him would have been a part of the discovery in that case.

24         MR. EISENBERG:  I don't believe so either.

25         MS. CASSIDY:  I don't know that any exist.

Proceedings                                              25

1        MR. EISENBERG:  We also don't believe he is a party

2   in this case.

3        MS. CASSIDY:  We don't believe so either.

4        THE COURT:  The future is unclear as to Mr.

5   Azzopardi, because he has been dismissed, obviously, but we

6   don't know if that has been without prejudice.  As we've

7   discussed, it's a little murky at the moment.

8            So in terms of your document 154-1 applying the

9   correct subpoena to the correct case, thank you for that

10  correction earlier, the subpoena that you had issued -- that

11  had been issued on behalf, I should say, Defendants DeRosa and

12  Azzopardi, sought documents reflecting communications with

13  those two defendants, including, but not limited to,

14  communications with the Attorney General's Office,

15  communications with a certain other complainants, reporters,

16  social media posts, et cetera, Mr. Eisenberg, have you had an

17  opportunity to meet and confer with counsel as to this

18  subpoena?

19       MR. EISENBERG:  I must say no, we haven't.  However,

20  arguments that I made with regard to the former Governor Cuomo

21  are exactly the same.  We have supplied documents to Ms.

22  DeRosa at the same time as we had supplied them to former

23  Governor Cuomo.

24           With regard to Mr. Azzopardi, again, if I recall

25  what the allegations in Trooper 1's case vis-à-vis Mr.

Proceedings                                                        26

1  Azzopardi, they are even further afield than Ms. Bennett.

2  She's got nothing with regard to Mr. Azzopardi.  She's got

3  nothing.

4          THE COURT:  That very well may be the situation, Ms.

5  Cassidy.  So rather than torturing ourselves with regard to

6  trying to ascertain whether or not any of this is

7  proportional, the answer may be that there's just nothing to

8  produce.  The allegations in the Azzopardi case are narrow.

9  There is no suggestion, and Mr. Licul can correct me, that Ms.

10 Bennett was involved with Mr. Azzopardi in any way.  Do you

11 know of --

12         MR. LICUL:  There isn't.

13         THE COURT:  So I think the factual nexus as to these

14 particular issues, nonparty Ms. Bennett and quasi party Mr.

15 Azzopardi are very likely to be nothing.  I doubt there is any

16 connection.

17         MR. EISENBERG:  Your Honor, I must step back a

18 moment.  We will check to make certain that my representations

19 are actually accurate.  We believe that to be the case.  There

20 might be some concern of post-termination disparagement of Ms.

21 Bennett and we need to see whether there is any documentation

22 of that.

23         THE COURT:  Mr. Eisenberg, if you and your team

24 could please review.  Azzopardi is obviously an exceptional

25 unique search term, a beautiful thing.  So if you could please

Proceedings                                                    27

1    search for any sort of information that may exist as to Mr.

2    Azzopardi and confer with Ms. Cassidy.  I think the issues as

3    to that document request are easily resolved.

4              MS. CASSIDY:  Thank you.

5              THE COURT:  So we could leave it -- I'm not sure if

6    this is pending as an official motion.  Is this pending as an

7    official motion or is this kind of like an FYI situation?

8              MS. CASSIDY:  There was a letter, a joint letter

9    filed at document 153.  That was before the dismissal.  So

10   nothing more has happened since then.

11             MR. EISENBERG:  Right.

12             THE COURT:  I see.  It was originally docketed as a

13   motion to file something under seal, and I believe we granted

14   that motion, and then there is no additional motion pending.

15   If something comes to light that the parties cannot reach an

16   accommodation on -- I'm sorry, not the parties, that these two

17   people who are still involved in this case who are not

18   actually parties, Ms. Bennett and Mr. Azzopardi, if there is a

19   live dispute, if you could please utilize my --

20             MR. EISENBERG:  I will close that circle up, Your

21   Honor.

22             THE COURT:  We can close it up quickly, I imagine.

23             Anything else we should address today, Mr. Licul?

24             MR. LICUL:  I know this is not on the calendar for

25   today.  I want to get a sense of -- we have two motions

Proceedings                                                28

1   pending to compel Mr. Cuomo's deposition.

2            THE COURT:  Yes.

3            MR. LICUL:  Pending since August.

4            We propose another date.  Obviously, the Court

5   understands our position is that he doesn't get to wait until

6   the end.  I want to make sure this is not a situation where

7   that's happening sort of by default.

8            THE COURT:  My actual intention is to work on

9   resolving these motions and then the discussion we had in

10  December with regard to working to resolve some of the other

11  motions pertaining to the other complainants to provide some

12  guidance as to how we're going to be handling the sort of

13  order of discovery.

14           The concern I had about the timing considerations

15  with regard to the joint deposition for Ms. Bennett is that

16  actually may be inconsistent with some of the timing

17  considerations that we had anticipated and had discussed in

18  December, which was working on get party discovery done and

19  then turning to nonparty discovery.  But, of course, if it is

20  in the interest of, you know, both cases to have that

21  deposition be a joint deposition, things can go slightly out

22  of order.  But the timing of Mr. Cuomo's deposition is very

23  much on top of my mind in terms of staging this discovery.

24           MR. LICUL:  Thank you, Your Honor.

25           MS. GLAVIN:  Your Honor, with respect to that too as

Proceedings                                              29

1    well, one of the reasons is we want to get documents, like we

2    just got like the executive chamber, we just got them and

3    we're not even a quarter of the way through.  There's a lot of

4    them and it's causing us to go back for followup requests,

5    because if they have a lot of stuff that he doesn't have and

6    it dealt with what he was doing in 2015, 2016, 2017, that he

7    doesn't remember.

8              THE COURT:  I know.  And that's part of the

9    challenge, Mr. Licul.  As we talked about in December, having

10   enough documents in hand on both sides of the aisle to conduct

11   depositions.

12             MR. LICUL:  But other depositions aren't going

13   forward, that is my concern.

14             THE COURT:  Not from plaintiffs, right?

15             MR. LICUL:  I don't know.  We have been coordinating

16   at least on scheduling things.

17             MS. GLAVIN:  No, we took the deposition of Ana

18   Liss-Jackson.

19             MR. EISENBERG:  Is it okay that a couple of us are

20   excused?

21             MS. GLAVIN:  Like, Your Honor, I would like to

22   certainly revisit the deposition order.  We just want to get

23   some documents.

24             THE COURT:  I know.  We are trying to get these

25   subpoenas out.

Proceedings                                    30

1          MS. GLAVIN:  Thank you.

2          THE COURT:  I'm certainly not planning to get

3    involved in scheduling depositions date by date, but I do

4    think that the general principle that we have to get the

5    documents flowing and get some of these documents exchanged

6    prior to party depositions is understandable.  I also think

7    that it is not unreasonable to have the nonparty depositions,

8    for the most part, follow the party depositions.  But

9    ultimately this stuff is really up to you guys.

10          I should not be involved in deciding when you are

11   going to depose whom.  The motion to compel is clearly

12   meritorious.  He has to sit for deposition.  He is a party.

13   The question is when.

14          MR. LICUL:  Exactly.  I think where we disagree is

15   whether he gets to wait it out and wait until the end.  Our

16   position, and I think some of the nonparties have also

17   proposed this, is to schedule the parties deposed followed by

18   the non-parties.  I only raise that to remind the Court that

19   that is still outstanding.  I have no problem with waiting to

20   depose the Governor until after documents are produced.

21   That's fine.

22          THE COURT:  Right.

23          MR. LICUL:  It's the latter part that I anticipate

24   about having him wait until everyone else is deposed that I

25   have an issue with.

Proceedings                                                31

1         THE COURT:  I fully understand.  I certainly have

2    not lost track of that issue.

3         Anything else, Mr. Licul?

4         MR. LICUL:  No, thank you very much.

5         THE COURT:  Ms. Glavin?

6         MS. GLAVIN:  No, Your Honor.

7         On the Governor's deposition, of course he is going

8    to be deposed.  There may be some nonparties, a couple in

9    particular that we want, but I don't think that's before the

10   Court today.

11        THE COURT:  It's not before the Court.  I'm not

12   going to issue advisory opinions as to who should be deposed

13   before we get these documents problems untangled.

14        All right.  Thank you guys.  Have a good night.

15        MR. LICUL:  Thank you, Your Honor.

16        MS. CASSIDY:  Thank you, Your Honor.

17        MS. GLAVIN:  Thank you.

18        (Matter concluded.)

19

20

21

22

23

24

25