# EXHIBIT A

# Law Office of

## DONALD G. REHKOPF, JR.

31 East Main Street, 4th Floor (Philippone Suite)
Rochester, New York 14614-1914

_____
(585) 363-5903
usmilitarylaw@gmail.com
Not For Motion Practice or Pleadings

10 February 2024

***VIA EMAIL ONLY***

**TO COUNSEL FOR THE PARTIES:**
Rita Glavin, Esq., Counsel for Andrew Cuomo
Theresa Trzaskoma, Esq., Counsel for Andrew Cuomo
Catherine Foti, Esq., Counsel for Melissa DeRosa and Richard Azzopardi
Daniel Moore, Esq., Counsel for NY State Police
Valdi Licul, Esq., Counsel for Plaintiff, Trooper 1

**TO COUNSEL FOR MS. BOYLAN:**
Alexander Miller, Esq.
Krista Oehlke, Esq.
Alaina Bird, Esq.

**RE:** *Trooper 1 v. NY State Police, et al., 22-CV-00893 (E.D. NY)(LDH) (TAM);*
*Response of Non-party Witness, Ana Liss-Jackson*

Dear Counsel:

On behalf of my client, Ms. Ana Liss-Jackson, this letter incorporates our objections to any further release of the *unredacted* portions of her "Confidential" deposition by the Office of the New York Attorney General (OAG), to include private and personal text messages between Ms. Boylan and Ms. Liss-Jackson, as set forth in our letter of 9 August 2023 (copy attached). It also further explains the foundations and legal rationales for such on-going objections herein.

We also take exception to Defense Counsels' characterizations in their respective Letter Challenges herein dated January 17th and 22nd of 2024, alleging that Ms. Liss-Jackson's OAG deposition testimony was "public testimony." As demonstrated below, it was not–indeed the OAG repeatedly insisted that it was "Confidential" and that the only person she could discuss it with was her counsel. That admonishment has ***not*** been rescinded to the undersigned's knowledge.

## PROLOGUE

This is a continuing objection to any proposed changes to the Court's Protective Orders presently in place. Additionally, the U.S. Department of Justice (DoJ) announced–but did not

Counsel Letter, 10 FEB 2024, Page 2

release– the results of its Title VII investigation into the allegations of both sexual harassment and a hostile (toxic) workplace in the NY Executive Chambers while Defendant Cuomo was governor. That investigation substantiated those claims as well as corroborating Ms. Liss-Jackson's claims of the Executive Chamber being a hostile work environment within the parameters of Title VII, while she was employed there from September 2013 until she resigned (early) in June of 2015.

## I.
## THE NY ATTORNEY GENERALS DEPOSITION

With respect to Ms. Liss-Jackson's deposition by the NY Office of the Attorney General (OAG) on **June 4, 2021**, again, she does ***not*** consent to any further public release of that transcript or to any release of information redacted by the OAG. There are a number of reasons for this which include, but are not limited to, the following:

!    At the beginning of that deposition, she was advised as follows:

Q.    Executive Law Section 63(8), a provision under which this investigation is being conducted, prohibits you as well as your counsel from revealing anything about what we ask or what you say during your testimony to anyone. If anyone asks you to disclose any such information, please let us know, including any reason they provide for seeking such information and we will discuss with you whether any disclosure will be permitted. *Id.* at 9-10.

!    At the conclusion of that deposition, she was further advised:

MS. PARK:        Ms. Liss, let me just add this too as well: As Abena told you at the beginning, under Executive Law 63(8), you may not share what – your testimony here today with anyone. Do you understand?

THE WITNESS:  Yes, I understand. *Id.* at 228.

!    Finally, the cover-page of the *transcript* of that deposition is marked **"CONFIDENTIAL"**, and under the case-style on the same page, the following is noted:

**CONFIDENTIAL** REMOTE VIDEOTAPED INVESTIGATION of WITNESS 6-4-21, taken by the New York Attorney General's Office, pursuant to Executive Order 63(8), before Theresa Tramondo, AOS, CLR, a Notary Public of the State of New York. (Emphasis added).

Ms. Liss-Jackson thus had a reasonable expectation that her deposition would remain "CONFIDENTIAL," and thus, private. Additionally, prior to the OAG publicly releasing a redacted version of that transcript, the OAG never sought her consent to the public release of that redacted transcript and continues to object to the release of any of the portions redacted by the OAG in the *Trooper 1* and related lawsuits herein.

Counsel Letter, 10 FEB 2024, Page 3

To the best of the undersigned counsel's knowledge, the OAG redacted areas in the transcript which contain:

!   Privileged HIPAA medical information;

!   Personal Privacy matters to include, but not limited to, matters involving her husband and son;

!   Her right of privacy in the context of the First Amendment, to include her right to associate and communicate with Ms. Boylan via text messages or other wise. *See, e.g., Griswold v. Connecticut,* 381 U.S. 479, 484 (1965), and its progeny:

> The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. (Citation omitted) Various guarantees create zones of privacy. The right of association contained in the penumbra of the ***First Amendment*** is one, as we have seen. . . .   [And] The ***Ninth Amendment*** provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.' (Emphasis added).

The text messages at issue herein have no relevance to either of the lawsuits at issue herein as they occurred *years* after Ms. Liss-Jackson left the Executive Chambers in Albany. Her right to associate and communicate in concert after-the-fact with Ms. Boylan–another citizen similarly concerned about an important public issue, i.e., allegations that resulted in Mr. Cuomo's resignation as governor–without irrelevant intrusion by defendants in civil lawsuits of which *neither* Ms. Liss-Jackson nor Ms. Boylan are parties to, is constitutionally protected. Public access, while ultimately part of the equation, is *not* applicable at this stage of this litigation, nor does it outweigh Ms. Liss-Jackson's privacy rights as a *non-party.*

## II.
## THE DEPARTMENT OF JUSTICE'S TITLE VII INVESTIGATION

According to a U.S. DoJ Press Release dated January 26, 2024, [available at: https://www.justice.gov/opa/pr/justice-department-secures-settlement-agreement-state-new-york-executive-chamber-resolve] its Office of Civil Rights Division and the U.S. Attorney's Office for the Eastern district of NY, they began a Title VII investigation into the allegations of sexual harassment and maintaining a hostile work environment in the Executive Chambers of then Governor Cuomo and other senior officials in his office in August of 2021. Neither Ms. Liss Jackson nor her undersigned counsel have seen that report as it does not appear to be publicly available. Thus, whether that (or related) documents were prepared in anticipation of litigation herein–the "Work-Product" privilege–is unknown.

Any information concerning the DoJ investigation or the contents of its final report can be obtained by other means than harassing Ms. Liss-Jackson about it, to wit:

Counsel Letter, 10 FEB 2024, Page 4

!  A Order by the courts herein;

!  A federal FOIA request; or

!  A properly submitted *Touhy* request.

### III.
### ADDITIONAL MATTERS MERITING FURTHER NON-DISCLOSURES AND MODIFICATIONS TO THE EXISTING *PROTECTIVE ORDERS*.

**A.  Intrusions Into Ms. Liss-Jackson's and Her Families Privacy Interests.**

As noted above, Ms. Liss-Jackson has a *bona fide* constitutional interest in protecting her (and her family's) privacy interests, to include any rights applicable under New York's *Personal Privacy Protection Law* (Public Officers Law, Article 6-A, sections 91-99).

1.  The subpoenas issued to her dated April 19, 2023, were overly broad and vague, extremely burdensome to respond to and clearly requested to embarrass her and relitigate the 2021 OAG report. She does not know nor has she ever known or knowingly been in the vicinity of Trooper 1, and had no direct or indirect knowledge of the events detailed in her complaint. Therefore, complying with the subpoena was superfluous, expensive, extremely burdensome, and inappropriate. It was an intrusion on her privacy in that her compliance with the subpoena exposed her to unwanted public harassment and mudslinging on the internet, in a book, and in the news media after the defendants released the contents of her presumptively *confidential* deposition to journalists and social media supporters of the defendants as soon as it was available in print.

2.  She was deposed by Rita Glavin, Esq. and attorneys for Defendants DeRosa and Azzopardi on July 10th for 8.5 hours with one bathroom break and one 30-minute break for lunch. She had to take a day off from work to comply. In advance of this, she spent at least 24 hours combing through her physical and digital records to come up with whatever she needed to comply with the document subpoena, which was highly unnecessary and clearly immaterial to this case. The only thing that she turned over that seems to be of keen interest to the defendants is a brief text exchange with Lindsay Boylan that was dated **April 19, 2023.** On this date, gossip news website Page Six published an article prompted by publicists for one of the defendants that Defendant DeRosa was coming out with a "tell-all" book. In light of all of the online harassment she received after initially coming out with her complaint in 2021 and then complying with the OAG report, she then reached out to Lindsey Boylan via text before receiving the subpoena from Defendant Cuomo. This was a private and personal text exchange about a matter that had absolutely nothing to do with the Trooper 1's case.

3.  Ms. Boylan, who did not have a prior relationship with Ms. Liss-Jackson, reached out to Ms. Liss-Jackson in March 2021. Ms. Boylan led Ms. Liss-Jackson "to believe that there was a bigger story brewing" and urged her to "perhaps consider lending [her] own experience to what was being discussed in the public arena in the interest of blowing a whistle on what was a toxic or hostile workplace environment." Trzaskoma Decl. Ex. 3 at 191:4-192:5.

Counsel Letter, 10 FEB 2024, Page 5

**B.    The Harassment of Ms. Liss-Jackson.**

1.  Washington Post's Erik Wemple, a columnist, called her at work on 8/2/23 indicating that he had received a copy of her July 10, 2023 deposition by the defendants, and wanted to talk to her about it on the record in light of her testimony at the defendants' deposition about how she felt that her comments and case were misrepresented by the news media. His subsequent published piece on 8/30/23, was sub-headed "Ana Liss-Jackson rips media that wrote about her" and focused on a New York Post story about Defendant Cuomo's personal life in which she was misquoted. Wemple falsely portrayed her as a charlatan and a liar. She finally had to turn off her social media notifications and avoid it altogether. That was nothing but on-line abuse and harassment.

2.  The "Free Lance," a blog published by an ex-convict, ran at least 3 posts focused on her, her credibility and reputation, and despite his blog being grassroots and not functioning as an actual news media publication, his posts were shared and re-shared by Defendants DeRosa, Azzopardi, their supporters.

3.  Defendant DeRosa's book – which she and her publisher continue to push into the public forum – includes passages about her, her character and her career that paint Ms. Liss-Jackson as a failure and a liar alongside the other women who spoke out against Defendant Cuomo in 2020 and 2021.

**IV.**
**MEMORANDUM OF LAW**

**A.    Federal Rules of Evidence [FRE]:**

R. 102. *Purpose*

> "These rules should be construed so as to administer every proceeding
> fairly, eliminate unjustifiable expense and delay. . . ."

!    Nothing to date remotely suggests that any of the defendants have done anything to "eliminate unjustifiable expense and delay. . . ." Their 8.5 hour deposition of Ms. Liss-Jackson, as a non-party, is a prime example.

R. 401–*Test for Relevant Evidence:*

> "Evidence is relevant if:
> (a) it has any tendency to make a fact more or less probable
> than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action."

The incidents alleged by Trooper 1's amended Complaint herein, occurred long after Ms. Liss-Jackson left the Executive Chambers in Albany. Indeed, she does not know the name

Counsel Letter, 10 FEB 2024, Page 6

or identity of Trooper 1, nor (to her knowledge) has she ever had any personal interaction(s) with the Trooper. Ms. Liss-Jackson has no *non-hearsay* knowledge of any relevant facts "of consequence" to the case herein. Furthermore, there is nothing "relevant" in either the redacted portions of the OAG deposition or in *her* exchanges with Ms. Boylan. Thus, Trooper 1's allegations can neither be proved nor disproved by Ms. Liss-Jackson, her redacted testimony, or the text exchanges with Ms. Boylan.

R. 402–*General Admissibility of Relevant Evidence:*

"Relevant evidence is admissible unless any of the following provides otherwise:
• the United States Constitution;
• a federal statute;
• these rules; or
• other rules prescribed by the Supreme Court.
Irrelevant evidence is not admissible."

HIPAA is such a statute and its implementing rules hold that (with few inapplicable exceptions herein) protected health information may not be disclosed. 45 C.F.R. § 164.502(a). *But see* 45 C.F.R. § 164.512(e).

R. 801– *Definitions That Apply to This Article; Exclusions from Hearsay*

"(c) **HEARSAY**. ''Hearsay'' means a statement that:
(1) the declarant does not make while testifying at the current trial or hearing; and
(2) a party offers in evidence to prove the truth of the matter asserted in the statement."

Ms. Liss-Jackson's deposition testimony *vis-a-vie* Ms. Boylan and their text messages are, in the context of Trooper 1's Complaint, simply hearsay with no applicable exceptions.

## B.   Federal Rules of Civil Procedure [FRCivP].

R. 26(b)   **Discovery Scope and Limits.**

(1) *Scope in General*. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Counsel Letter, 10 FEB 2024, Page 7

(2) *Limitations on Frequency and Extent.*

(C) *When Required*. On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

(iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

The Court has issued Protective Orders covering the disputed and redacted portions of Ms. Liss-Jackson's deposition testimony and the Boylan text messages. Furthermore, the

requested information is clearly "outside of the scope" of permissible discovery.

R. 30(d)     ***Duration; Sanction; Motion to Terminate or Limit.***
(1) *Duration*. Unless otherwise stipulated or ordered by the court, a deposition is limited to one day of 7 hours.  . . . .

As noted above, the defendants deposed Ms. Liss-Jackson for 8.5 hours. That was facially abusive, but in discussing the matter with her, we declined to object as that would only have delayed the deposition, potentially causing her to have to take off more time from her work, along with additional legal fees. Surely, Ms. Liss-Jackson has endured enough torture in this process, especially since she possesses no relevant evidence pertaining to Trooper 1's lawsuit.

## C.   Relevant Case Law.

*Mirlis v. Greer*, 952 F.3d 51 (2ⁿᵈ Cir. 2020):

On review of a district court's order to seal or unseal documents, an order in many respects analogous to the present situation, "we examine the court's factual findings for clear error, its legal determinations *de novo*, and its ultimate decision to seal or unseal for abuse of discretion." (Citation omitted). *Id.* at 58.

Circuit precedent further establishes that the public's presumptive right of access to judicial records is also independently secured by the First Amendment. (Citation omitted) . . . [But] the U.S. Constitution ***has not*** generally been held to compel public access to ***deposition transcripts and recordings***, at least not as a matter of course. (Emphasis added). *Id.* at 58, n.5.

Countervailing considerations that courts may consider include "the danger of impairing *law enforcement* or judicial efficiency" and "the privacy interests of those resisting disclosure." (Citation omitted). If, at the end of this process, the balance of the factors tips against permitting public access, then the court may deny disclosure. (Emphasis added). *Id.* at 59.

[!   Whether or not the DoJ's Title VII investigation falls withing the parameters of "law enforcement," is unknown, but the failure to release its Report publicly is suggestive of such. It further validates Ms. Liss-Jackson's claims of a hostile work environment within the Executive Chambers.]

Counsel Letter, 10 FEB 2024, Page 8

Foremost among the competing concerns that a court weighing disclosure must consider is "the privacy interest of the person resisting disclosure." *Amodeo II*, 71 F.3d at 1050 (reiterating that "the privacy interests of innocent third parties ... should weigh heavily in a court's balancing equation"). Such interests establish a "venerable common law exception to the presumption of access." *Id.* at 1051. *Id.* at 61.

[T]he availability of a transcript of the deposition does not in our view necessarily eliminate or even diminish a party's privacy interest in the publication or copying of a video of those proceedings. *Id.* at 65.

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984):

This case presents the issue whether parties to civil litigation have a First Amendment right to disseminate, in advance of trial, information gained through the pretrial discovery process. *Id.* at 22.

The [protective] order prohibited petitioners from publishing, disseminating, or using the information in any way except where necessary to prepare for and try the case. By its terms, the order did not apply to information gained by means other than  the discovery process. (Footnote omitted). *Id.* at 27.

[P]retrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, (Citation omitted) and, in general, they are conducted in private as a matter of modern practice. (Footnote omitted). *Id.* at 33.

Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information. *Id.*

Finally, it is significant to note that an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny. *Id.*

There is an opportunity, therefore, for litigants to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy. *Id.* at 35.

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2nd Cir. 2006):

Before any such common law right [of public access] can attach, however, a court must first conclude that the documents at issue are indeed "judicial documents." *Id.* at 119.

[T]he documents may be kept under seal if "countervailing factors" in the common law framework or "higher values" in the First Amendment framework so demand. *Id.* at 124.

Counsel Letter, 10 FEB 2024, Page 9

## CONCLUSION

Three reasons respectfully compel our continuing objections to any further release of the *unredacted* portions of Ms. Liss-Jackson's "Confidential" deposition by the Office of the New York Attorney General (OAG), to include private and personal text messages between Ms. Boylan and Ms. Liss-Jackson, which are as noted above, totally irrelevant in *Trooper 1*. The current Protective Orders (to the extent that they are honored) should remain "as is."

*First,* as described in more detail above, Ms. Liss-Jackson's (and her family's) *privacy* interests have been thoroughly trampled herein–further intrusions are simply not warranted, especially at this juncture.

*Second,* as detailed above, the deposition extracts which have been redacted and the text messages are totally irrelevant to any of Trooper 1's complaints. My client did not observe anything with Trooper 1, as she had left Albany long before Trooper 1's assignment to the then Governor's personal Security Detail, and anything that she heard, is clearly inadmissible hearsay.

*Third,* both Ms. Liss-Jackson and Ms. Boylan are *non-parties* to the *Trooper 1* case. Hence, the discovery "rights" are more limited that those pertaining to parties, notwithstanding the Defendants' protestations to the contrary. Both Second Circuit and U.S. Supreme Court precedent as cited above counter the Defendants' claims herein.

Respectfully, the *status quo* should continue on these issues.

Respectfully submitted,

/eS/ Donald G. Rehkopf, Jr.

**DONALD G. REHKOPF, JR., Esq.**
THE LAW OFFICE OF DONALD G. REHKOPF, JR.
31 East Main Street, 4th Floor (Philippone Suite)
Rochester, New York 14614
(585) 363-5903 - voice
usmilitarylaw@gmail.com

Attachments

DGR/1

# Law Office of

## DONALD G. REHKOPF, JR.

31 East Main Street, 4th Floor (Philippone Suite)
Rochester, New York 14614-1914

_____
(585) 363-5903
usmilitarylaw@gmail.com
Not For Motion Practice or Pleadings

9 August 2023

***VIA EMAIL ONLY***

**TO:**  Rita Glavin, Esq., Gavin PLLC, Counsel for Andrew Cuomo
Theresa Trzaskoma, Esq., Sher Termonte LLP, Counsel for Andrew Cuomo

Catherine Foti, Esq., Morvillo Abramowitz Grand Iason & Anello, P.C., Counsel for Melissa
DeRosa and Richard Azzopardi

Daniel Moore, Esq., Harris Beach PLLC, Counsel for NY State Police

Valdi Licul, Esq., Wigdor LLP, Counsel for Plaintiff, Trooper 1

Douglas Jackson-Quzack, Esq., Counsel for Lindsay Boylan.

**SUBJECT:**  *Trooper 1 v. NY State Police, et al.,* 22-CV-00893 (E.D. NY)(LDH) (TAM);
Response of Non-party Witness, *Ana Liss-Jackson* to Order of 1 August 2023.

## INTRODUCTION

1.      The undersigned represents Ms. Ana Liss-Jackson, a non-party witness in the above-styled lawsuit, and has represented her since the Spring of 2021. Specifically, that was in conjunction with an investigation conducted under the auspices and authority of the New York Attorney General [NYAG], involving Defendant Cuomo, then the Governor of New York.

2.      On or about 19 April 2023, Defendant Cuomo caused two subpoenas–one demanding considerable documentation, the other for Ms. Liss-Jackson's deposition.

3.      With respect to the documentation, she complied to the extent possible with one major exception: portions of Ms. Liss-Jackson's 2021 testimony before the NYAG's (which had been publicly released *without* her consent and which was marked "**CONFIDENTIAL**" on the cover

Trooper 1, Response, Page 2

page) were redacted by the NYAG. We advised counsel for the defendants that we lacked standing

to consent to the release of any portion of the AG's report including Ms. Liss-Jackson's redacted

testimony, and that while we would take no position as to anything not involving personal privacy

matters, that the defense needed to address that with the NYAG or seek judicial intervention.

4.    Ms. Liss-Jackson, understands that the "sealing" of records is a *judicial* function separate

and apart from confidentiality agreements or orders. We respectfully submit that the issue(s) pending

herein are governed by the holdings in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), where

the Court concluded:

> [P]retrial depositions and interrogatories are not public components of a civil
> trial. Such proceedings were not open to the public at common law [footnote
> and citation omitted]. and, in general, they are conducted in private as a
> matter of modern practice. [citations omitted] . . .   Therefore, restraints
> placed on discovered, ***but not yet admitted***, information are not a restriction
> on a traditionally public source of information. *Id.* at 33 [Emphasis added].

The Court's *Amended Confidentiality Order* (Doc. 68) is such a legitimate, pretrial restraint.

> Finally, it is significant to note that an order prohibiting dissemination
> of discovered information before trial is not the kind of classic prior restraint
> that requires exacting First Amendment scrutiny. *Id.* [Citation omitted].

The Court in *Rhinehart* continued:

> It is clear from experience that pretrial discovery by depositions and
> interrogatories has a significant potential for abuse. This abuse is not limited
> to matters of delay and expense; ***discovery also may seriously implicate***
> ***privacy interests of litigants and third parties***. The Rules do not distinguish
> between public and private information. Nor do they apply only to parties to
> the litigation, as relevant information in the hands of third parties may be
> subject to discovery. *Id.* 34-35 [Emphasis added].

From the very beginning of this litigation, Ms. Liss-Jackson has asserted her privacy interests, to

include but not limited to, the fact that (a) she has *never* accused Mr. Cuomo of sexual harassment;[1]

(b) she was relying on the *Amended Confidentiality Order*, except for information was already in the

---

[1] Her allegations focused on the Executive Chambers as being a "hostile" or "toxic" workplace.

Trooper 1, Response, Page 3

public domain; and (c) consistent with the *Amended Confidentiality Order*, that she was relying on

that and was ***not*** consenting to anything else being released which was covered by that Order.

*Rhinehart* provides her rationale:

> There is an opportunity, therefore, for litigants to obtain—incidentally or ***purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy***. *Id.* at 35 [Emphasis added].

That was and remains her primary concern–her "reputation and privacy."

5. Furthermore, our position is guided by the decision in *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016), which addresses this issue quite specifically:

> By way of background, there is a stark difference between so called "protective orders" entered pursuant to the discovery provisions of Federal Rule of Civil Procedure 26, on the one hand, and orders to seal court records, on the other. Discovery concerns the parties' exchange of information that might or might not be relevant to their case. "Secrecy is fine at the discovery stage, before the material enters the judicial record." *Baxter Int'l, Inc. v. Abbott Labs*., 297 F.3d 544, 545 (7th Cir. 2002). *Id.* at 305.
>
> \* \* \* \* \*
>
> "At the adjudication stage, however, very different considerations apply." *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982). The line between these two stages, discovery and adjudicative, is crossed when the parties place material in the court record. *Id.*[2]

# WHAT WE ARE *NOT* OBJECTING TO.

6. Ms. Liss-Jackson does *not* object to the public release of the following:

a. The *unredacted* portions of her 2021 deposition testimony (to include the Exhibits previously released publicly) before the NY Attorney General's investigation;[3]

b. Matters previously (prior to 10 July 2023) released to the media regarding this case;

---

[2] *See generally* Rhinehart, *Planning for Sealing of Information in Federal Court*, The Federal Lawyer 6 (January / February 2019), available at: https://www.fedbar.org/wp-content/uploads/2019/01/At-Sidebar-pdf-1.pdf [Last accessed: 8 AUG 23.

[3] At the time, we were assured that her testimony and tendered exhibits were "confidential"–indeed, the cover page of that transcript is marked "Confidential." Ms. Liss-Jackson was never asked if she consented to the release of those materials and objects to the further dissemination of such, redacted or not, consistent with and pursuant to the Court's *Amended Confidentiality Order* or subsequent Order(s) herein.

Trooper 1, Response, Page 4

# WHAT WE DO OBJECT TO PUBLICLY RELEASING AND WHY.

7.   Ms. Liss-Jackson *objects* to the public release of the following:

   a.   The entire contents of her deposition testimony in the *Trooper 1* case herein to include exhibits tendered by her;[4]

   b.   Any and all text messages between witness Lindsey Boylan (another non-party witness) as those were and remain *private* communications;

   c.   Any and all matters from Ms. Liss-Jackson's NY personnel files which are *not* releasable pursuant to the NY *Freedom of Information Laws* ["FOIL"];

   d.   Absent a ruling by this Court or the consent of the NYAG, the *redacted* portions of her, NYAG testimony.

8.   Rule 102, *Federal Rules of Evidence* ["FRE"] states that the purpose of the FRE's is:

   These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination.[5]

The litigation herein pertaining to Ms. Liss-Jackson has done nothing but *create* "unjustifiable expense" for her,[6] and contributes nothing to "ascertain[] the truth" involving Trooper 1's lawsuit. Ms. Liss-Jackson left her then position in the Executive Office long before Trooper 1 became a uniformed member of the NY State Police ["NYSP"], and far longer from the time Trooper 1 became part of the then Governor's protection detail. Ms. Liss-Jackson does not know Trooper 1,

---

[4] The Court is advised that notwithstanding the fact that Defendant Cuomo sought permission, and was granted leave to file Ms. Liss-Jackson's Deposition *under seal* herein, as well as the provisions of the *Amended Confidentiality Order* herein, person(s) unknown released a copy of her deposition to a reporter for the *Washington Post* and to a pro-Cuomo social media group which has been trashing her on-line. *See* Rule 26(c)(1)(F), *Federal Rules of Civil Procedure* ["FRCivP"].

[5] *Compare* Rule 1, FRCivP, which reads in relevant part:

   These rules . . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.

[6] Unlike Mr. Cuomo, Ms. Liss-Jackson is not being reimbursed for her legal expenses by the State of New York in this matter.

Trooper 1, Response, Page 5

does not know her identity, has not (to her knowledge) ever met or communicated in any way with Trooper 1 and thus, does not and cannot offer anything relevant to the allegations in Trooper 1's Amended Complaint.

9.    As such, we respectfully submit that, other than hearsay, Ms. Liss-Jackson has nothing relevant to offer in this lawsuit. While perhaps premature, we respectfully note that Rule 104(b), FRE, provides:

> ***Relevance That Depends on a Fact.*** When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.

Here, the *factual* nexus for any relevancy from Ms. Liss-Jackson would be facts pertaining to the allegations in Trooper 1's amended Complaint against the Defendants–all of which occurred, as noted above, long after she left the Executive Chambers, of which she has no direct or personal knowledge.

10.    Ms. Liss-Jackson has reviewed this document for factual accuracy and consents to its release to the Court and counsel.

**DATED:** This 9th Day of August, 2023

Respectfully submitted,

/eS/ Donald G. Rehkopf, Jr.

**DONALD G. REHKOPF, JR., Esq.**
THE LAW OFFICE OF DONALD G. REHKOPF, JR.
31 East Main Street, 4th Floor (Philippone Suite)
Rochester, New York 14614
    (585) 363-5903 - voice
usmilitarylaw@gmail.com



**ANDREW CUOMO** | MAR. 12, 2021

# Abuse and Power Andrew Cuomo's governorship has been defined by cruelty that disguised chronic mismanagement. Why was that celebrated for so long?

 *By Rebecca Traister, writer-at-large for New York Magazine and the Cut*

Governor Andrew Cuomo at a coronavirus briefing in April 2020. Photo: George Etheredge

*This article was featured in* <u>One Great Story</u>, New York*'s reading recommendation newsletter.* <u>Sign up here</u> *to get it nightly.*

**J**oel Wertheimer took a job in Andrew Cuomo's administration in February 2017, straight from his position in Barack Obama's White House. He came on alongside almost 30 other new hires, many of whom had also worked for the outgoing president or on Hillary Clinton's campaign and were seeking a progressive professional path through the Trump years. Some saw New York State government as a bulwark against what they feared Trumpism would bring. Others hoped it could be a laboratory for ideas that might become a model for federal policy.

Early in their employment, a few of these staffers were invited to a party at the governor's mansion in Albany. Partway through the bash, there was a roast of Cuomo's top aide, Melissa DeRosa, then the chief of staff but soon to be promoted to secretary to the governor. The roast, said Wertheimer, entailed projecting photos of prominent state officials, "then asking Melissa if she knew their names, and her not knowing." The newcomers whispered and huddled together while everyone else laughed. "We were saying to each other, 'This is fucking weird,'" said one former staffer. "This was not ha-ha funny," Wertheimer explained. "This was, 'You guys are bad at your job!' And, 'You're mean!'"

Four years later, and one year after he began his star turn as "America's Governor," steering his state through COVID via daily, reassuringly matter-of-fact press briefings, Andrew Cuomo's third term as governor of New York is suddenly deeply imperiled. In January, State Attorney General Letitia James released a report showing that his administration had underreported COVID deaths in nursing homes by as much as 50 percent. In February, liberal State Assembly member Ron Kim, who had criticized the governor in the wake of that report, spoke publicly about how Cuomo called him at home and threatened his career. Then the floodgates opened: His adversary Mayor Bill de Blasio called the bullying "classic Andrew Cuomo"; state legislators Alessandra Biaggi and Yuh-Line Niou began openly suggesting that the governor's hard-knuckled approach to politics is simply abusive. And since last month, when Cuomo's former aide and candidate for Manhattan borough president, Lindsey Boylan, published an article on Medium accusing him of sexually harassing and kissing her against her will, five more women have come forward with tales of harassment, objectification, and inappropriate touching. As of publication, dozens of Democratic members of the State Assembly and Senate, and 11 Democratic members of Congress, have called for his resignation.

That Andrew Cuomo is being characterized by fellow Democratic politicians as a lecherous tyrant who empowers his staff to threaten and intimidate should not, in some ways, come as a surprise. During his decade as governor, he has often strutted his thuggish paternalism while his top aides disparaged those who challenged him. Two years ago, a Cuomo spokesman called three female state lawmakers in his party "fucking idiots." In 2013, Cuomo created the Moreland Commission to investigate public corruption, only to shut it down abruptly less than a year later amid allegations that he had obstructed its work; one of Cuomo's closest associates, Joe Percoco, is serving a six-year term in federal prison on bribery charges.

But until now, none of this left a lasting mark on the governor. If anything, it burnished his reputation: Cuomo was a bully, but he was *our* bully. Over the course of the past year, however, as he took his show national as Governor Covid, the political dynamics in Cuomo's own state were shifting. Now, the venal toxicity that has buttressed his career has, at least temporarily, been exposed for what it is.

Though the multiple scandals erupting in Albany seem to toggle between sexualized harassment stories and evidence of mismanagement, what is emerging is in fact a single story: That through years of ruthless tactics,

deployed both within his office and against anyone he perceived as an <u>adversary, critic, or competitor</u> for authority, Cuomo has fostered a culture that supported harassment, cruelty, and deception. And while some have continued to defend Cuomo's commitment to "creating the perception of strength," and his mastery of "brutalist political theater" (as Mayor de Blasio's former spokesman told the New York *Times* last month), his tough-guy routine has in fact worked to obscure governing failures; it is precisely what has permitted Cuomo and his administration to spend a decade being, to borrow Wertheimer's assessment, both mean and bad at their jobs. As one former Cuomo staffer told me, "The same attitude that emboldens you to target a 25-year-old also emboldens you to scrub a nursing-home report."

Cuomo's leadership style often confuses ruthlessness with greatness, abuse with strength. Interviews with dozens of former Cuomo employees and those who have worked with or adjacent to his administration reveal a governing institution that has been run, at times, like a cultish fraternity, and at others, like a high-school clique — a state executive chamber in which the maintenance of power, performance of pecking orders, and pursuit of competitive resentments matter as much as policy. As Wertheimer said of many of those who entered the Cuomo administration alongside him: "People came in, looked around, and did the Grampa Simpson meme; we just turned back around and left." Wertheimer quit seven months after he started. "It's this total toxic masculine bullshit that disguises a very poorly run place."



"We all knew that this was only because of what I looked like," said Kaitlin. "Why else would you ask someone to come in two days after you had a two-minute interaction at a party?"

Once she started, Kaitlin said, there wasn't much direction about what she was supposed to do, except to "be a sponge," learn from senior women in the office, and react to the governor's capricious moods. Some mornings, Kaitlin would hear her BlackBerry ping with the message that Cuomo had left his Mount Kisco home earlier than scheduled; she would have to rush out of the shower to sprint — with wet hair, in heels — across town to be at the Manhattan office, at 633 Third Avenue, when he arrived. On those mornings, he would comment on why she didn't look put together. "'You decided not to get ready today?' Or, 'You didn't put makeup on today?'"

In speaking with 30 women about their experiences with Cuomo, almost all who worked for him commented on the extreme pressure applied by both the governor and his top female aides to dress well and expensively; some were told explicitly by senior staff that they had to wear heels whenever he was around. Kaitlin was still paying off her student loans. "I did what I could with my clothes," she said, "and it wasn't good enough for them. I didn't have designer stuff." She remembered wearing a red plaid Gap button-down shirt she'd thought was cute, but the governor remarked that she looked "like a lumberjack." (According to a Cuomo spokesperson, "There is not now, nor has there ever been, an expectation to wear certain clothing or high heels.")

The governor never touched Kaitlin inappropriately or made any explicit sexual overtures, she said, but his reactions would sometimes make her feel self-conscious, such as when she asked him if he wanted her personal

cell-phone number: "I thought that was a normal thing to offer your boss," she said, but he behaved as if she'd come on to him. Like other women who have come forward, she remembered him asking questions about her dating life. Once, in Albany, he brought her in to show her a room adjacent to his office; it was cold, and he was standing very close to her in a way that made her feel so profoundly uncomfortable that she remembers shaking.

On a different day, in Manhattan, Cuomo asked her to come into his office and look up car parts on eBay. "He sat at his desk and angled his chair around." It was a tight space, with Kaitlin standing between the seated governor and the computer he was asking her to work on. "So I was standing there, in a skirt and heels, having to bend over his computer, with him looking at me, and me looking up car parts." (In response, Cuomo's spokesperson noted: "The governor is notoriously technologically inept — male and female staffers have for years assisted the governor with his computer.")

Not long after she started, she said, Cuomo's people rented out Dorrian's for a Super Bowl party. At the end of the night, after the bar opened to the public, Cuomo was sitting in the back room talking to a young woman with a dove tattooed on her hand. At a staff meeting the next morning, Kaitlin said, Cuomo asked his aides to find the woman with the dove tattoo and to consider offering her a job. Kaitlin described the uncanny realization that this was likely how it had gone the morning after she'd met him.

After every public event, Kaitlin sorted through photographs of Cuomo posing with guests, selecting images to which he would append personal notes. She said he always paid special attention to pictures of himself with pretty women. If he didn't like how he looked in them, he would yell at Kaitlin. "I got screamed at for a lot of bad photos," she told me.

Kaitlin described a culture in which dishonest power plays were frequent. The phones at the office had push-tone keys that would stick, and sometimes she'd lose a call as she transferred it. She recalled that Cuomo once said, "You can't figure out the fucking phones — I'm going to end your career." Miserable, Kaitlin began to consider how she might get out. It was widely rumored the Cuomo administration would impede one's efforts to find a new job and could get an offer rescinded. "I can't tell anybody," Kaitlin says she thought at that time. "But I couldn't keep doing what I was doing. I'd cry all the time. I thought I didn't know how to do anything anymore — not even basic life skills."

Kaitlin did not know whether her experience with Cuomo met the legal definition of sexual harassment, though she did feel that she had been "verbally and mentally abused by him and his staff" and said that she has described the work style — to friends and a therapist — "as a form of coercive control." When she finally interviewed for a job at the state authority where she now works, she cried.

Over the past few weeks, there has been a slow drip of reporting on Cuomo's allegedly inappropriate behavior toward women: 25-year-old Charlotte Bennett told the *Times* that this summer, when she was working for him, he made invasive comments about her experience of sexual assault and suggestively asked whether she would date older men; Anna Ruch recalled him touching her back, grabbing her cheeks and asking if he could kiss her at a wedding; a recently resurfaced video shows Cuomo summoning a television reporter to his table at the 2016 New York State Fair and urging her to "eat the whole sausage," joking as she takes a selfie of them with a sandwich, "There's too much sausage in that picture"; most recently, an unnamed Albany staffer has lodged a complaint that the governor put his hand up her shirt after she was called to the governor's mansion to help him with an IT problem (that complaint has now been referred to the Albany police).

 

o with reporter Beth Cefalu. Photo: YouTube/Vesa; Cuomo with Anna Ruch. Photo: Courtesy of Ruch.

The stream of stories has been both upsetting and disorienting. Some of the reports are clear cut. Others have attempted to force stories of discrimination and misconduct into the rubric of sexual harassment via a blunt tallying of violations that are graded on a scale: a kiss on lips or cheeks; an inappropriate touch at work or at a wedding; a hand on a shoulder or the small of a back. More than three years after the reporting on Harvey Weinstein's violent predation and the reckoning it provoked, we have been conditioned to draw bright lines around certain inarguably bad actions. This has led to a revolutionary shift in workplace culture, ending the careers of many powerful people who had abused women (and men) with impunity, while fundamentally changing our language and understanding of professional misconduct. Still, the very extremity of bad behavior exposed in the wake of Weinstein has, ironically, limited the conversation around workplace harassment. We are sometimes too quick to apply flat metrics to judge isolated incidents, and thereby miss the opportunity to fully assess and address the harm, inequity, and discrimination that happens on a subtler, but no less pervasive, scale.

Cuomo's treatment of some of the young women who worked for and around him demonstrated a kind of diminishment and tokenization that may take a sexualized form, and may involve objectification and flirtation, but which didn't always entail explicitly sexualized contact or connection. In fact, Cuomo may be a textbook example of how sexual harassment, like sexual assault, isn't about sex at all; it's about power. In Cuomo's case, it was one manifestation of his obsession with performing dominance, emphasizing the gulf of authority between the governor and those around him, making himself feel big and conveying to others that they were small.

Ana Liss, 35, who told *The Wall Street Journal* of her experiences of feeling devalued by Cuomo, entered his administration fresh from her beloved hometown of Rochester in 2013, full of "Pollyanna thinking," she said, about how to make her state a better place. On one of her first days on the job, she told me, Cuomo approached her and asked, "Do you have a boyfriend?"

He came up with nicknames for her — "Sparky," "Blondie," "Sweetheart," and "Honey" — and, she said, "he was just flirtatious." (Boylan has also claimed the governor called her by the name of a rumored ex-girlfriend he said she resembled; Kaitlin said he called her "Sponge.") Liss remembered an executive assistant in Cuomo's office,

someone who had worked in the capital for decades, once telling her, "He thinks you're cute; the governor likes you."

She did find it odd, she said, that "there was nobody that was unattractive. I felt like I was in *Stepford Wives* but with younger women. His briefers were always beautiful, leggy young women right out of college." The same executive assistant advised her, she said, that "when the governor is here, you need to look really good."

During her two-year tenure, Liss was asked to participate in certain special events: a Father's Day party the year Mario Cuomo died and a "pinning ceremony" at the governor's mansion. She was given a state trooper's card and a badge that said EXECUTIVE CHAMBER. She tried to tell herself these trinkets and invitations were merit-based. But, Liss said, "I did know in my heart of hearts that it's because the governor thinks I'm cute." At parties, when Cuomo would put his hand on her back, she was always torn, she said: "On the one hand, I was like, *Wow, look at me*; then I felt gross about it. I didn't know if he actually even knew my name. He just thought I looked good in that dress."

At the time, Liss didn't think of these experiences as sexual harassment. She still values her mementos: the pin, the badge, the card, and a duffel bag from that Father's Day party emblazoned with the words CUOMO 52 AND 56. But the governor's coy remarks during their time working together often left her unsure of what to do or say. "When he looked at you — you know that scene in *Jurassic Park* when the *Tyrannosaurus rex* peeks into the car? It was like that."

Liss became depressed, lost weight. "I felt gross, like I was just an ornament." She said that she had "never felt more depleted by the male gaze" than the time she spent in Albany. "Melissa DeRosa had Louboutins, and there were legs everywhere, and I just felt stupid. I was living in a place that was full of people who were mean and predatory. It ground me down to the lowest point of my life, like I was a piece of nothing and my career was going nowhere."







be the beg...
share r...
seeking...
n they f...
any we...

...merican...
three c...
Kennedy...
ndra Le...

y Weinstein as "the original 'Magic Man'" and "a

t crimes that Weinstein committed, he shares other
nstein's famously bad temper and difficult
ms of his genius, somehow permissible because
n; it was just "Harvey being Harvey." Cuomo's
just a powerful man being powerful. Like
a phalanx of senior women whom he uses as a
conference after the allegations that "we have more
istration in history."

s, many high up in Cuomo's employ repeat and
le I spoke to about their relationships with the
ted by senior female colleagues, especially Melissa
DeRosa.

Powerful white women have often benefited from, and thus worked to uphold, abusive patriarchal power systems. DeRosa might be a perfect specimen. She is, those who have worked for and alongside her say, the person who has most absorbed from the governor his talent for ferocity and is eerily skilled at conveying his presence and asserting dominance over whomever she's dealing with.

Like her boss, she often does this under the guise of girl power. Both Cuomo and DeRosa, who heads New York's Council on Women and Girls, regularly wield feminist language as a cudgel against feminist critics. On March 8, DeRosa took to Twitter to tout Cuomo's high approval ratings with women as defense against allegations of harassment. And at the briefing when Cuomo first addressed harassment claims, DeRosa was at his side, spouting a word cloud of pseudo-feminist obfuscation about the administration's work to "further women's rights, to expand protections for women in the workplace, maternal health, reproductive health" (claims complicated by the administration's cuts to Medicaid eligibility and long delays in pushing through the Reproductive Health Act). She touted the number of women appointed to senior staff, claiming that "we've promoted each other and we've supported one another."

But many women who worked with DeRosa recalled her as the opposite of supportive, describing her instead as territorial and unkind. When Kaitlin arrived at Cuomo's offices, she said, the senior women "didn't like that the governor liked me" and that Cuomo seemed to take pleasure in this. "He would ask, 'How are the mean girls?'" she said. One male staff member told me, "If you weren't in the Melissa, Jill, and Stephanie crew, you didn't really exist." Another woman described an instance in the ladies' room, "when Melissa looked at me; I could not have felt like less of a human being."

In March 2019, Camille Rivera, former political director of the Retail, Wholesale and Department Store Union, who had a cordial — if delicate — relationship with the administration, was growing irritated by what she viewed as Cuomo adviser Rich Azzopardi's habit of publicly directing vitriol toward women. When she saw him belittling Andrea Stewart-Cousins on Twitter, she lost patience and replied, "'This is what happens with men of white privilege; someone else would have been called out for attacking the majority leader of the Senate, who is a Black woman.'"

It was not long before she heard from DeRosa, screaming at her to take her tweet down. The fight got so intense, Rivera said, that DeRosa was yelling, "'What are you going to do about it?' and I was like, 'You're the one with the black Suburban; you come over here and tell me what you're going to do about it.'" In the midst of their argument, Rivera got a call from her boss, who was in Europe and extremely confused about why he was getting angry calls from high-level state officials. (They agreed that the tweet wasn't worth it; she took it down.) When asked about this event, DeRosa said, "I was defending a staff member who was doing his job and was being maligned. It's well known I've had plenty of tough conversations with men and women over the years, and to attempt to somehow paint this as gendered is demonstrably false."

The administration still seems unaware of the irony: The very point Rivera had been making about Azzopardi — that his white male privilege insulated him from repercussion when he attacked women of color — was proved by the wrath the administration brought down on Rivera, a woman of color.

Cuomo aide Melissa DeRosa to State Senator Alessandra Biaggi on May 23, 2020 demonstrate a culture of bullying and harassment. Of this exchange, DeRosa
 ...emic was a very stressful time for everyone involved and yes, I was very frustrated."

**I**n 2015, Camonghne Felix was a 23-year-old activist and poet, trying to figure out how to make change in the world after her work with Occupy Wall Street and Black Lives Matter, when a friend told her that the governor was looking to hire a speechwriter who had a background in poetry. Felix imagined that her organizing background would kill her chances.

But Mario Cuomo had recently died, and one of his most famous proclamations had been that you "campaign in poetry; you govern in prose." His son, mourning a father whose legacy he has long been obsessed with besting, wanted poetry. Felix was told she would be hired within 24 hours of her interview. "I probably wrote about 30 speeches or sets of remarks for him, and I think he used one," she says now. "My desk was close to his office. He loved to see me, but he didn't listen to a single word I ever said."

Felix was the first Black woman to work as a speechwriter for Cuomo and was the only Black person on the press team, where she later worked in communications after accepting that he was never going to use her speeches. "It's a very subtle form of racialized abuse," she said. "You know I am beneficial to you. I fill a quota. It looks good on paper, and we made sure to put press releases out. But you don't intend to incorporate me into government. You just like to show me to people."

Partway through her tenure, Felix got a new boss, a man she said was treated horribly by his superiors. One day, Felix made a mistake on a press release. "He called me and said, 'What the fuck is wrong with you? How fucking could you?' The first thing I thought was, *Oh, this must be how Cuomo talks to him*. Because it didn't even make sense. It didn't seem natural to this guy. Like, *I don't know where you got all that bass in your voice*."

"Azzopardi, Melissa … it's like he inhabits them," said Bill Lipton, a founder of the Working Families Party. "When they call, you can feel his presence. They're screaming at you, and either he's right there or you can feel that he's just yelled at them and they're giving it to you." When asked to provide comment on the claims made in this article, Azzopardi, their spokesperson, responded, "There is no secret these are tough jobs, and the work is demanding, but we have a top-tier team with many employees who have been here for years and many others who have left and returned because they know the work we do matters."

Felix believed that in certain instances, Cuomo — and certainly the people who worked for him — had good ideas. "But you were never able to implement any of them because the culture within his staff was so violent and corrosive that people can't get anything done without cheating, without cruelty, without bribery." Days before news broke that Cuomo's staff had altered the nursing-homes report, Felix had observed to me: "You have to imagine that people do bad things, corrupt things, because they feel like they don't have a choice. There's so much fear all the time. That's bad because it stops not just progress; it stops government from efficient governing."

"It's how you are groomed to do the job," another longtime administration veteran told me. "If you need to publicly shame someone, that's okay. If you need to berate someone in front of their peers, that's acceptable." She described the explicit ethos as: "Either you can win, or you can lose."

**F**or Cuomo, many people told me, a big part of winning means lying. "I was taught that it was totally fine to lie," said Ana Liss. "Even as a peon, I was part of some of the lies and mischaracterization." After the story of the nursing-home scandal broke, DeRosa was caught on tape acknowledging that data had been hidden to avoid attacks from the Trump administration, and subsequent reporting has shown that she and two of Cuomo's other close advisers purposefully altered documents to obscure the truth.

"He makes things up like I've never seen anyone do before," said Lipton. "He makes people who disagree with him feel like they're crazy." It's a pattern that — like his narcissism, theatrical bombast, love of cameras, hatred of "experts," and the fact that, as one national reporter who covered him said, "I don't think he believes in much, except that he wants to be powerful"—makes Cuomo not the anti-Trump that many imagined him, but rather the 45th president's Democratic twin. Or, as one person put it to me, they are "the same person" but for "two major exceptions: Fred Trump was Donald Trump's father, and Mario Cuomo was Andrew Cuomo's father."

Cuomo's Jedi Mind Trick approach to public narrative undergirds his ongoing feud with New York's WFP. The minor party — which is allowed to cross-endorse candidates, creating pressure from the left without having to run spoilers — has been critical of Cuomo since his first term, when, after running as a progressive, he enacted corporate-friendly economic policy, obstructed Mayor de Blasio's attempt to tax the city's wealthiest residents, capped property taxes at 2 percent, and, many of his critics alleged, tacitly allied with state Republicans and the Democratic Independent Conference (IDC), a cabal of conservative Democrats, to keep the State Legislature out of Democratic control. It was an arrangement that — along with the tax caps that kept shrinking the state's budget — permitted Cuomo to blame the stagnation of progressive initiatives on a snarled Legislature. (Cuomo has long denied that he supported either Republican or IDC control of the Legislature).

In 2014, after almost endorsing his primary opponent, Zephyr Teachout, the WFP cut a deal with Cuomo in which, in exchange for their support, he promised that he'd work to dissolve the IDC, raise the minimum wage, make the Dream Act state law, and expand abortion access in the state. But he simply didn't follow through on his vows, and in the wake of the WFP's endorsement, he acted like he'd landed a knockout punch rather than submitted to an agreement, telling a reporter, "You either win or you lose, and I won." Cuomo then launched his own minor party, naming it the Women's Equality Party, or WEP, perhaps to confuse voters and sap power from the WFP. Though the WEP endorsed Cuomo over Teachout (a woman) and would in 2018 endorse him over Cynthia Nixon (also a woman), it branded itself as committed to women's equality by commandeering a pink-striped bus.

When, in 2018, the WFP supported a group of candidates, many of them young, many female, many candidates of color, who finally defeated the IDC and put the Legislature back in Democratic hands, Cuomo responded by raising the threshold of votes that a minor party needs to stay on the ballot. "When we elected a new class of leaders who had a very different orientation to power," said Sochie Nnaemeka, director of the WFP, "the governor struck back by trying to kill the party."

It didn't work. The 2018 cycle would mark a turning point in Cuomo's ability to terrify his would-be challengers into silence and submission.

**I**n 2016, <u>Alessandra Biaggi,</u> a lawyer who had interned for Joe Crowley, worked on the Clinton campaign, and was the granddaughter of the late New York congressman Mario Biaggi, took a job for Cuomo's then–chief counsel, Alphonso David. She entered the administration, she said, thinking, "*I'm a lawyer for the governor of New York, now the progressive beacon of the world.*"

Within a couple of weeks of joining the administration, she was at a party at the governor's mansion. "The governor comes over to me and grabs my elbow," she said. "He didn't say 'Welcome' or 'Thank you for being here.' He said 'Nice dance moves' and walked away." The male colleague standing next to her said, "'What the fuck was that?'"

Biaggi said that she did not feel in that moment that she was being sexually harassed. "I just felt like it was so weird. That was my first interaction with him, and I didn't know what to think except, *Okay, this is the governor of New York, and I am here to do my job.*"

The job was a lot less beacon-of-progressivism-y than Biaggi had anticipated. She was focused on an immigration bill and on the Reproductive Health Act, which would codify *Roe* v. *Wade* as state law and expand access to abortion care. Biaggi and others believed that the law was finally going to pass in the wake of Trump's victory; it was never even brought to the floor. At the time, she couldn't quite figure out why. "Part of what makes Cuomo powerful," she said, "is that there's no information sharing. It allows him to evade responsibility; nobody really knows what's going on."

Biaggi said she asked her boss about it. "I remember Alphonso saying, 'Yeah, you know, that's Albany.'" She was put off by what she saw as a sluggish disconnect from the urgency of the moment, especially within an administration that was supposedly mounting vigorous opposition to Trumpism. "Every day, Donald Trump was pushing some executive order and no one in this office was taking it seriously," said Biaggi. "They were yanking around all the advocates and pretending to care, but nothing ever got anywhere. It was just showmanship, the veneer of governance."

After learning more about the IDC, led by Jeff Klein, the conservative Democrat who had also been accused of sexual harassment by a staffer (a claim he denies), Biaggi had coffee with Mike Gianaris, a Democratic state senator who was understood by members of the administration to be strategizing to unseat the IDC. They discussed the possibility of Biaggi running against Klein. "I was full of rage after 2016, Trump being president, Hillary losing. I was dying to use my brain to do good work."

When members of the administration found out about the coffee, they did not respond warmly. Biaggi's boss, she said, called her 20 times in a single weekend, quizzing her aggressively about her coffee with Gianaris. "The incessantness of the calls was scary," she said. Then, in a Monday meeting, she remembered, her colleagues laughed at the idea of her challenging Klein. "I swear to God that was the moment when I was like, *I don't care, I'm running.*" (David does not recall making 20 calls in one weekend.)

After leaving Cuomo's office to launch her campaign, Biaggi didn't see the governor until August 2018, when they both attended a wedding. "He says 'Hi, Alessandra,' pulls me in, and kisses my head twice and then my eye. He's holding on to my arm, and he looks at my fiancé and says, 'Are you jealous?'" Again, Biaggi said, "I didn't feel sexually harassed. I felt like he was trying to make me feel uncomfortable, to disarm me."

Biaggi won her primary against Klein in September 2018; she didn't hear from Cuomo. But on the day before the general election, she got a call from his office, telling her that the governor wanted to see her. Biaggi brought two campaign staffers along with her, but Cuomo's staff did not permit them to accompany her into the room, where he was sitting with DeRosa. Biaggi said that most of her conversation with Cuomo was normal and nice, until the end when "his whole demeanor changed and he sat back in his chair, looked at me, and said, 'Tell me again how your grandfather's career ended?'"

Mario Biaggi's career ended with a 26-month prison term for having accepted an illegal gratuity and obstructing justice. Thirty years later, his granddaughter said she stared at the governor of New York and willed herself not to "freak out, because he wants you to freak out." Biaggi felt sure that Cuomo had been conveying a threat, though its specific contours were confusing. "What is he telling me? That he's going to send me to prison? That he's so powerful he could end my career?"

**T**he sheer amount of interpersonal drama, anxiety, and rancor that former Cuomo staffers described was wholly exhausting, like something from *The Devil Wears Prada*.

Multiple people told me that they began therapy and antidepressants for the first time in their lives while working for Cuomo. Ana Liss said that she "started pursuing mental-health services when I was there because I thought I was going crazy. My parents thought I was going nuts. I was angry and crying all the time, and I went on Lexapro." At one point, she said, "I did call in to a suicide hotline because I felt like such a friggin' nobody."

On December 31, Cuomo lavishly opened Moynihan Train Hall; the $1.6 billion conversion of the former post office had been overseen by Michael Evans, who had faced steadily mounting pressure to finish it and who took his own life in March 2020. Evans' partner, Brian Lutz, told me that "it would be unfair to lay all of the blame for Michael's death at the feet of Andrew Cuomo. Michael made a lot of choices over the course of his life that served as kindling, but Governor Cuomo and his administration lit the match." The governor, Lutz said, caused his late partner "psychological terror" and made him feel "constantly afraid." In some of the last texts of his life, Lutz said, Michael told him that he was "afraid they would destroy his career." (A Cuomo spokesperson responded that Evans had met directly with Cuomo five times in the three years before his death, cited appreciative statements made by the governor at the Moynihan Hall, and noted that "he has a plaque in his honor at the station.")

Those beaten down by the vicious workplace were also depressed that none of their misery was in service of effective governance or better policy. In fact, many told me, there was little interest in policy. "It was policy-making like paint-by-numbers," said one former staffer. "The goal was superficial, as opposed to changing people's lives. It was heartbreaking." That didn't mean that policy didn't get enacted, she said, but it was second to and in service of optics. "Someone from the inner circle would call and say, 'The governor wants to go to Orange County. What can we announce?'"

Wertheimer, who put together the governor's daily briefing book and said that Cuomo rarely even read policy memos, agreed. Cuomo and his senior staff were obsessed, said several sources, with the annual "State of the State" book, which showcased task forces, pilot programs, and funding commitments, some of which were only tenuously rooted in reality. "The whole endeavor seemed to be about size," said one person who worked on it. "Like if you have a big book, it shows you're going to do a lot of things." She said that the notion that "governing was

about solving problems and making people's lives better was not what drove people inside that building... but when you objected to the shoddiness of a job or refused to do something unethical, it was because you couldn't hang. I was like, *Fuck you. It's not that I can't hang. It's that you all are terrible people.*"

The idea that you had to be able to submit to abuse in order to work with New York's executive branch drove out not just staffers but external experts. Andy Byford, the British transportation guru hired in 2018 to update New York City's crumbling subway system, left just two years later, making it clear that Cuomo had made the job impossible. "I was not going to be allowed to get done what needed to be done," he told the press at the time. "I just would not accept the fact that my people were being yelled at."

One former staffer who worked in the administration described a morning on which she'd been awakened at six; she spent the workday, till 11 p.m., too afraid to leave her computer "even to eat or go to the bathroom," getting steadily castigated over email by DeRosa. A week later, she said, DeRosa came into the office "and introduced herself for the fourth time. I had worked with her for two years at that point."

Not knowing people's names wasn't just incompetence; it was another signal of dominance. When Cuomo ran against progressive law professor Zephyr Teachout in 2014, he pointedly refused to say her name, make eye contact, or shake her hand at a parade. "It's embarrassing to have somebody treat you like that, like you don't exist," Teachout told me.

It often worked, instilling a conviction in many that they had no worth and that therefore there would be no point in fighting back or speaking out. Most people who spoke for this story told me that they were hesitant to come forward precisely because they could imagine how their accounts would be rebutted by the administration: that no one remembered that they'd even existed. Some who worried about this were staffers who'd worked alongside DeRosa and Cuomo every day for years.

This was how people in the administration were taught to behave, said Camonghne Felix. "You had to subjugate someone." These are, of course, the strategies that reinforce capitalism and brutal political regimes: Authority is created and strengthened through the diminishment and depletion of others. Too often, those in power wind up spending more time performing muscularity than actually doing whatever it is they're supposed to be dominant at doing. As Felix said, "The state gets trapped in this cyclical nonsense. You look up and see that nothing is getting done. And not only that: Things are getting broken."

nt of Cuomo's Manhattan office on March 2. Photo: Brittainy Newman/AP/Shutterstock

**H**ow could so much of Cuomo's bad behavior have remained normalized, even admired, through three terms? He has stayed extremely popular with the public, his approval soaring through COVID. Even some of his harshest critics are careful to acknowledge good things about him, mentioning the legalization of same-sex marriage, his work to protect nail-salon workers, an early expansion of Medicaid to undocumented immigrants (he has since pushed punishing cuts to eligibility). Others commend him for closing multiple prisons and his willingness to raise the minimum wage.

But critics point out that many of his accomplishments — including the minimum-wage hike, the eventual passage of the Reproductive Health Act, and his investment in offshore wind — only happened after years of delay, where Cuomo himself played obstructionist as people and the environment suffered, until a time came when glory could redound to him personally.

Cuomo's conduct could also remain camouflaged in a state capital known for the grotesquely antiquated and unjust hierarchies it thrives on. As one woman who worked in Cuomo's counsel office early in his tenure told me, "Albany felt like a seedy adult summer camp."

Yuh-Line Niou, a staffer for Assemblymember Kim before winning office herself (doubling Asian American representation in Albany), spoke of how she had her ass grabbed in an elevator by an elected official within her first week in town; she was 27 and also recalled an assemblymember who approached her and Kim at a fund-raiser and said, "'I can't believe you guys haven't fucked, I would fuck both of you and I would pay to see you two fuck; I would pay to join.'" She said that Kim was so conscious of how much harassment she endured that when they were in Albany, he'd always offer to grab her lunch so she wouldn't have to venture out alone.

If the town is rough, the press corps that covers it doesn't offer enlightened salvation. "You walk into the Legislative Correspondents Association, and it's largely men and largely white men," said Amy Spitalnick, who worked as the New York attorney general's communications director and senior policy adviser from 2016 to 2019. "There are very tangible impacts of that on how our government is covered: what is deemed permissible and what rises to the level of attention. Which is why all of this has been an open secret for so long." There are women in the press corps, but, Spitalnick said, "they can get burned out," in part because of the aggression they face from Cuomo. In 2012, it was reported that the administration kept a 35-page dossier on journalist Liz Benjamin, who two years ago left her job hosting *Capital Tonight*. Another reporter, Lindsay Nielsen, wrote recently about how, in 2017, she left her job covering politics for the Albany-based News10 after five years of "threatening" and "incessant bullying" from the Cuomo administration.

As the story of Cuomo's tactics gets reported in a more critical light, Josefa Velásquez, a 29-year old senior reporter for The City, said that she sometimes considers how some colleagues, including some of those now covering Cuomo's troubles, "never used the power that they had to defend anyone else before this." She's referring to both reporters and some of the governor's advisers. "No one checked him. He's the governor of New York who has consolidated all this power and has all these political allies. But his aides and the men in the press corps, some of them are just as complicit in this behavior."

There are a few hundred people at least — insiders in Albany, in media, in labor — who have known how Cuomo operates for years. And then there are tens of millions who just really love him on TV.

**I**t may have been the television adoration that precipitated the fall. In March, Cuomo began conducting his daily press briefings, performing charismatic calm in the face of panicky instability, ticking off daily numbers to combat the unknown; his updates became a soothing ritual. As Trump lied and tantrumed and overrode experts, Cuomo — a man of similar habits — was received as a competent balm.

His long-simmering power contest with Mayor de Blasio crested in March and into April, as they locked antlers over when to shut businesses, whether to shut schools. In April, Cuomo joked on *Ellen* about people calling themselves "Cuomosexuals," and in May, appeared on the cover of *Rolling Stone,* solemn pandemic rock star. In a June briefing, he unveiled a foam replica of the COVID curve — "the mountain that New Yorkers climbed" — and in July, his administration printed the NEW YORK TOUGH posters featuring himself and DeRosa, who was labeled "Magnificent Melissa." In August, he announced a book deal, reportedly worth seven figures, to write about his experience leading through COVID. In October, as his book, *American Crisis,* was published, his name was floated to be Joe Biden's AG. In November, he won an Emmy for his briefings.

Behind the scenes in those first weeks of COVID, Cuomo was making the unprecedented move of expanding his emergency powers beyond those of any New York governor since Nelson Rockefeller. Into the massive state budget, he inserted an immunity provision for hospitals and nursing homes; the provision had been drafted by the Greater New York Hospital Association, an organization that, in 2018, donated over a million dollars to the New York State Democratic Committee (which funded Cuomo's reelection campaign) and was repped by Bolton-St. Johns, a powerful firm where the chief lobbyist is Giorgio DeRosa, Melissa DeRosa's father. In a particularly bitter irony for those who'd envisioned New York State government as the lab for progressive federal policy, the state's "gold standard" corporate immunity law would indeed wind up a model — for Mitch McConnell.

Cuomo pooh-poohed "experts" in science and medicine, eventually driving out nine of the state's top public-health officials. A Columbia University study would show that his dickering with de Blasio and ensuing delay in locking down New York likely cost 17,000 lives. In June, his aides were reportedly altering the nursing-home documents. That same month, Charlotte Bennett alleges that Cuomo was asking her whether or not she had ever had sex with older men.

Just as Cuomo, who had long exerted such punishing and obsessive control over so many, was coming close to what he had always sought — the expansion of his power, the eclipse of his father's legacy, a firm spot on the national stage and in the American imagination — he was starting to lose his grip on the political forces within his own state.

**W**hen Biaggi beat Klein in 2018, she was part of a group of new legislators — including Jessica Ramos, Zellnor Myrie, Rachel May, John Liu, Julia Salazar, and Robert Jackson (all backed by the Working Families Party) — who finally rid the state of the IDC. "People are not impressed by political machines anymore," said WFP's Nnaemeka. "They are inspired by leaders who are connected to the community." What is

threatening, she said, "to this masculinist closed-door politics is democratic participation, leaders propelled by people and not by institutional ladders ... The day of those politics is over."

"Part of my healing," said one former member of Cuomo's staff, "came when Alessandra won and when she started to confront him and not fear him." Many in Cuomoland saw the victory of Biaggi as a stand-in for victory over Cuomo himself.

It's not just the young left wiggling out from under his thumb. After eight years in which State Senate Republicans, with help from the IDC and Cuomo, kept Democrats from control of the Legislature, and their leader Andrea Stewart-Cousins out of budget meetings, Stewart-Cousins is now in power. On March 6, she called for Cuomo's resignation.

Then there's Tish James. When James was first elected to City Council in 2003, she was the first candidate ever to win a race solely on the WFP ticket and stayed affiliated with the party through her tenure as public advocate. When she ran for attorney general in 2018, James accepted Cuomo's powerful backing in exchange for not running on the WFP line. Now in office, she has not behaved like a politician bought and paid for by Cuomo. James released the nursing-homes report and is one of the candidates who could, should Cuomo survive this period, mount a formidable challenge to the fourth term he has been hell-bent on pursuing.

Cuomo is also being challenged by his former staffers, who are now speaking out. They are a reminder that the problem with dismissive assumptions about hierarchical power is that you often underestimate those you are oppressing and overestimate your ability to suppress them; a reliance on divisive mean-girl machinations can keep you from seeing how women might one day come together to challenge your power.

Niou told me of how long she'd spent, even after winning office in 2016, feeling exactly what Cuomo wanted her to feel: like a nobody. "They could just knock me out, the only Asian woman, and nobody would notice. They've known they can say something and that I have to grin and bear it because I don't have any power over them. That's the stuff they tell you to believe." What's changing, Niou said, "is that I am now part of a cohort of people who are speaking up. And it's starting to matter."

New York's newer model of politics surely is not perfect, nor immune to abuse, nor made of inherently finer stuff; Biaggi is, after all, the product of a political dynasty herself. But it is indisputably built around a different posture toward power.

That posture alters the dynamics of dependence and fear. In very practical terms, these new politicians do not owe Cuomo or his administration anything; their power was gained in spite of him, and while his administration can still starve their districts in retribution, an ability to describe that openly gives them a freedom previous generations have not had. Biaggi told me that she has even blocked DeRosa's number. "I don't want that bad energy," she said.

ne impression that emerges from Cuomo's ten years in office is of an immense amount of time wasted. Biaggi said that on the day after Amazon pulled out of its deal to open in New York City, she received a call at 9:30 a.m. from Cuomo, upset at her for having been critical of his handling of the deal. What struck her

was that "he was more concerned with calling me than with the aftermath of Amazon leaving. He spends his days yelling at people who say bad things about him, rather than governing."

For an awfully long time, we have accepted the indignities and mediocrity of brute white patriarchy as our only option, both because we couldn't imagine better and because even the act of pointing out that it *should* be better felt futile. And so this kind of power could be petty, corrupt, threatening, skeezy; it could be handsy at weddings and harassing at the office; it could lie and cover up and be sent to jail and still it would be our norm and all we had to turn to in a storm, through a pandemic. We had to pin our hopes on it as a refuge from other, worse brutal white patriarchs. And so we learned to love it, to tune in to its daily briefings and allow its self-assuredness to wash over us.

While I was reporting this article, I spoke to one woman who told me of a time Cuomo hit on her at a party years ago. It wasn't the story of anything illegal, just an invasive and brash move, made a few feet from where his then-wife was standing. She described to me how he'd learned her name before approaching her, how he'd taken hold of her hand and not let go, had whispered close into her ear, how he'd come on to her: "It was clear when he grabbed me that he was used to taking what he wanted."

In an earlier era, I could imagine that line being used in a romance novel, an affirmative description of sex appeal. In this era, in which we have been offered new language, more autonomy, and better therapy, such a description has lost its sexiness for many women, including the woman in question, who did not respond warmly to Cuomo's overture but rather froze, because his attitude — even in this comparatively ordinary interaction — had given her terrible flashbacks to the sexualized violence of her past.

Until this week — when an allegation of groping was referred to police and Democrats in the Legislature initiated the first step toward impeachment — it seemed quite possible that Cuomo's governorship would survive. So far, Cuomo has refused to entertain calls for his resignation, instead requesting an investigation and circulating a statement, which he asked female lawmakers to sign, suggesting that calls on him to step down are tantamount to undermining Tish James. It's a classic Cuomo defensive deployment of feminism and one of many signs that he is not going down without a probably very ugly fight. As he has so often in the past, Cuomo might well win that fight. But with more than 55 lawmakers in his party calling on him to step down, it is harder than it has ever been to imagine him winning a fourth term, or fashioning himself into a national political figure, or continuing to exert the stranglehold on his state and party that he has become accustomed to. In that sense, what we are witnessing, after a year of meteoric rise, is the extraordinary, crashing two-month fall of a man whose power, for a decade, has been almost total.

The brutality that Andrew Cuomo has brought to politics — connected as it has long been to his authority and his ability to take whatever he wants from his staff and his state — has, like his sexualized advances, been drained of a lot of its appeal.

We didn't know we had an alternative. Now, it seems, we might have many.

*Additional reporting by Jane Starr Drinkard and Amelia Schonbek.*

*Want more stories like this one?* **Subscribe now** *to support our journalism and get unlimited access to our coverage. If you prefer to read in print, you can also find this article in the March 15, 2021, issue of* New York *Magazine.*

**MORE ON ANDREW CUOMO**

➤➤ Charlotte Bennett Hits Andrew Cuomo With a Sexual-Harassment Lawsuit

➤➤ Liberals Have the Chance to Reshape a Conservative High Court (Not That One)

➤➤ Lis Smith Loves Politics (If Not All Politicians)

SEE ALL ➤➤

TAGS: ANDREW CUOMO   POLITICS   NEW YORK   SEXUAL HARASSMENT   MORE

💬 116 COMMENTS



## THE **Intelligencer** FEED

**12:41 P.M.** ROYALS

### Harry and Meghan's 'Near Catastrophic' Car Chase: Everything We Know

*By Margaret Hartmann*

Mayor Eric Adams called out the "reckless and irresponsible" paparazzi who chased the royals through New York on Tuesday night.



**12:40 P.M.** EARLY AND OFTEN

### Nancy Pelosi's Eldest Daughter Is Dianne Feinstein's Secret Caretaker

*By Matt Stieb*

With her daughter at Feinstein's side, there are worries that Pelosi could complicate California's succession crisis if the ailing senator resigns.

**12:13 P.M.** POLL POSITION

## Trump Builds Huge Lead in Polls As DeSantis Revs Engines

*By Ed Kilgore*

DeSantis needs to announce and build a comeback narrative, as Trump is starting to run him off the track.

### MOST POPULAR

**1.** **The Enduring Mystery of the FBI Informant and the Schoharie Limo Crash**
*By* BEN RYDER HOWE

**2.** **Harry and Meghan's 'Near Catastrophic' Car Chase: Everything We Know**
*By* MARGARET HARTMANN

**3.** **Frank Luntz Can't Quit**
*By* BEN TERRIS

**4.** **The GOP's Work-Requirement Scam**
*By* ERIC LEVITZ

**5.** **Who Are the Newly Revealed Jeffrey Epstein Contacts?**
*By* CHAS DANNER AND BENJAMIN HART

**11:41 A.M.** EARLY AND OFTEN

## House Republicans Move to Avoid Santos Expulsion Vote

*By Nia Prater*

The House voted to have the Ethics Committee consider a measure to expel George Santos — so he won't be getting kicked out anytime soon.

**11:24 A.M.** EARLY AND OFTEN

## So When Will Ron DeSantis Announce His 2024 Candidacy?

*By Margaret Hartmann*

DeSantis isn't officially running, but he's acting like a candidate, his Trump feud is heating up, and he's dropping hints about when he'll announce.



**10:00 A.M.**  EARLY AND OFTEN

## How to Make Mass Immigration Work

*By Eric Levitz*

To make an influx of people economically beneficial and politically viable, the U.S. must build more housing.



**9:00 A.M.**  ON WITH KARA SWISHER

## FTC Chair Lina Khan on Why She Won't Meet With Elon Musk

*By Intelligencer Staff*

Kara Swisher talks to the ambitious FTC chair about big-tech misbehavior, and whether existing laws are enough to take on AI.



**8:00 A.M.**  THE MONEY GAME

## From Crypto Billionaire to Fugitive

*By Kevin T. Dugan*

The law finally caught up with disgraced founder Do Kwon in Eastern Europe. Will he stick around to face justice?



**5/17/2023**  EARLY AND OFTEN

## Andrew Yang Advises Vivek Ramaswamy to 'Lean Into Memes'

*By Ed Kilgore*

The 2020 quirky outsider candidate for president offers some generally bad advice to the GOP's 2024 version.



**5/17/2023**  UNNATURAL DISASTERS

## The Enduring Mystery of the FBI Informant and the Schoharie Limo Crash

*By Ben Ryder Howe*

Why isn't the FBI informant who owned the limousine that killed 20 people on trial?

**5/17/2023**  EARLY AND OFTEN

### DeSantis Seizes Opening Against Trump in Iowa



*By Ed Kilgore*

Trump's abortion stance irked key Evangelical leaders in Iowa. Now the Florida governor may be looking to go big in the first 2024 contest.

**5/17/2023**  ERIC ADAMS

### Eric Adams Is Already Backtracking on His Plans for Migrants

*By Nia Prater*

The mayor's plan to use schools as housing quickly sparked protests from parents.

**5/17/2023**  SCANDALS

### Who Are the Newly Revealed Jeffrey Epstein Contacts?



*By Chas Danner And Benjamin Hart*

*The Wall Street Journal* got a hold of Epstein's schedules and emails and discovered another seven prominent people with ties to the sex trafficker.

**5/17/2023**  THE DEBT CEILING

### The GOP's Work-Requirement Scam



*By Eric Levitz*

The policy's true purpose is to deny aid to hardworking Americans. And Joe Biden appears to be playing along.

**5/17/2023**  EARLY AND OFTEN

### Frank Luntz Can't Quit

*By Ben Terris*



The GOP's wunderkind pollster swore he was finished with Washington — except that penthouse with Kevin McCarthy.

**5/16/2023**   THE NATIONAL INTEREST

## John Durham Shows 'Lock Her Up' Politics Were Never About Real Crimes

*By Jonathan Chait*



Republicans want to send people to jail after Durham finds no crimes.

**5/16/2023**   TREMENDOUS CONTENT

## All of Ron DeSantis's Crimes Against Good Etiquette

*By Margaret Hartmann*



A running list of all the alleged personal slights and rude behavior that may hamper Ron DeSantis in his 2024 primary battle with Donald Trump.

**5/16/2023**   ARTIFICIAL INTELLIGENCE

## OpenAI CEO Sam Altman Says He Wants Regulation for ChatGPT

*By Matt Stieb*



Altman told the Senate it's time for regulators to step in to check the transformative power of artificial intelligence.

**5/16/2023**   EARLY AND OFTEN

## Mike Pence Wants Republicans to Run on Their Most Unpopular Ideas

*By Ed Kilgore*



The former veep thinks the GOP should return to pre-Trump policies like free trade, entitlement reform, and forever wars.

**5/16/2023**   EARLY AND OFTEN

## Is Ron DeSantis the New Rick Perry?

*By Ed Kilgore*



Different as they are, the two Sunbelt governors who aimed for the White House have some disturbing things in common.

**5/16/2023**   EARLY AND OFTEN

## Man Attacks Democratic Congressman's Staff With Baseball Bat

*By Matt Stieb*

An assailant looking for the congressman hit one of his aides in the head.

**5/16/2023** JORDAN NEELY

## The Sheepdog Defense

*By Sarah Jones*

A killer's military service endears him to the right wing.

**5/16/2023** THE NATIONAL INTEREST

## The Clarence Thomas Ethics Scandal for Dummies

*By Jonathan Chait*

Let's go back to middle-school civics.

**5/15/2023** EARLY AND OFTEN

## Rudy Giuliani Accused of Sexual Assault by Ex-Employee

*By Chas Danner And Nia Prater*

Noelle Dunphy says she was a secret employee of the former mayor and has made stunning allegations in a new lawsuit.

**5/15/2023** GAMES

## Tuesday Night's NBA Draft Is Going to Change Everything

*By Will Leitch*

Forget the playoffs — one lucky team is about to land Victor Wembanyama, the most awe-inspiring prospect since LeBron.



SIGN IN TO COMMENT

Intelligencer

 

ABOUT INTELLIGENCER          ABOUT NEW YORK MAGAZINE

NEWSLETTERS

CONTACT

MEDIA KIT

PRIVACY

AD CHOICES     DO NOT SELL OR SHARE MY PERSONAL INFORMATION

HELP

PRESS

WE'RE HIRING

TERMS

ACCESSIBILITY

INTELLIGENCER IS A VOX MEDIA NETWORK.

© 2023 VOX MEDIA, LLC. ALL RIGHTS RESERVED.



**POWER** | 6:00 A.M.

# Melissa DeRosa's Revenge Campaign With an eviscerating

*Exclusive offer:* *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ➔➔

✕


*By Rebecca Traister, writer-at-large for New York Magazine and the Cut*

---

Melissa DeRosa at the Capitol's Red Room in Albany on March 18, 2015. Photo: Mike Groll/AP

**T**hree central questions about power are how to get it, how to wield it, and what to do when you lose it.

The story of Melissa DeRosa, chief lieutenant to former New York governor Andrew Cuomo, traces all these stages and is particularly revealing about that third act, which she is currently performing. Her new memoir, *What's Left Unsaid: My Life at the Center of Power, Politics & Crisis,* is billed as her chance to tell her version of the downfall of her old boss, who resigned in 2021 after the Office of the New York State Attorney General found he had sexually harassed 11 women, nine of them his employees. It is a rare document: While we are used to former officials writing about their time in government, these are not typically officials whose bosses have stepped down in disgrace.

For those not steeped in Cuomo lore, DeRosa may seem like a mere bureaucrat. But for those who reported on or crossed the administration and experienced her wrath firsthand, she is an infamous figure, not the power behind the throne but power's steely right hand. Cuomo ruled Albany through intimidation and fear, and DeRosa rose so high in the governor's orbit in part because of her facility for his baleful style of communication. As many have described over the years, when DeRosa spoke — often in haranguing tones — it was as if she were channeling him.

---

**COVER STORY**

## The Most Powerful New Yorkers You've Never Heard Of

---

*Exclusive offer:* *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ▸▸



SEE ALL ≫

In fact, how you feel about DeRosa's book will depend on how you feel about Cuomo. "People use the word *Machiavellian* to describe Cuomo," DeRosa writes, "but what they really mean is effective." This is one of the first hints that DeRosa is writing not a tell-all about her former boss but rather a full-throated defense of him and his record, which was tarred in its final days not only by the accusations of sexual harassment but also by his oversight of one of the highest COVID casualty counts in the country and the cover-up of deaths of elderly pandemic victims in New York nursing homes. But it was precisely DeRosa's complete loyalty, we learn, that made her invaluable. "At age 38," she writes, she was the most senior member of his regime, appearing at his daily COVID briefings, "leading the nation through a once-in-a-century pandemic, making life-or-death decisions, projecting our administration's

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ➤➤

His resignation, and the bad press that precipitated it, upended her world. "I had been transformed into a caricature I didn't recognize — a person I never was and didn't want to be," she writes. "It had all unfolded too quickly to slow or stop, like falling onto the tracks of an oncoming train. The words *What just happened?* wouldn't stop reverberating through my entire body."

DeRosa's exploration of this question never reaches the level of meaningful self-reflection. Actually, to note that this memoir lacks self-reflection is like observing that *Moby-Dick* lacks zebras. It is ostensibly an attempt to set the record straight, but it is really an exercise in rehabilitating her image as a glass-ceiling breaker while painting Cuomo in a heroic light. As a document, its relationship to truth is casual, and it's filled with reconstructed dialogue that reads like a cut-rate version of her favorite show, *The West Wing.* ("'Steph, are we ready?' 'Yes, Governor. PowerPoint is loaded.' 'Okay, guys. Let's go.' Rob and I locked eyes as we turned to walk into the Red Room.")

DeRosa's book tour — replete with an interview in *Vanity Fair* and newsy nuggets delivered to the Washington *Post, The Wall Street Journal,* and the New York *Post* — suggests mainstream publications are buying her pitch but have not quite registered her larger project since leaving government, which includes public rampages on X against anyone she views as Cuomo's (or her) challengers and even the browbeating of some of her former colleagues. "She couldn't let go of the job or let go of the past," says a senior official in the administration of Cuomo's successor, Kathy Hochul.

As its subtitle promises, *What's Left Unsaid* prizes DeRosa's position at the heart of power, laying bare her enthusiasm for domination and retribution — exactly the qualities that paved the way for both Cuomo's rise and his ouster. If you want to know how power works — how it's won, how it's used, how it's lost — the answers are here, not only between the lines but in the book's very existence, which is part of a quiet, ceaseless campaign to discredit and bully Cuomo's enemies, starting with the women who came forward, spoke up, and brought him down.

*What's Left Unsaid* is, in some ways, an incredibly sad book. DeRosa is certainly a victim of this punitive, unrelenting power structure almost as much as she is an upholder of it. Among other things, by her account, it cost her her marriage, her reputation, and enormous amounts of goodwill. But what the book makes clear is that even as that system has collapsed, and taken her with it, DeRosa's most fervent wish has remained to see it rise again with Cuomo at its top and her by his side.

**D**eRosa has an enemies list that would make Richard Nixon blush, and she positively revels in each and every one of their failures. In the book, she openly mocks former mayor Bill de Blasio, who came out on the losing end of many a fight with Cuomo, for "never polling above zero percent" in his "embarrassing campaign for president." She writes with glee of how Karen Hinton, a former Cuomo aide who claimed he had harassed and threatened her, published a book that "sold 550 copies." She crows that another Cuomo critic, former state senator Alessandra Biaggi, lost her "election by 34 points," while Lindsey Boylan, the woman who first accused Cuomo of harassment, "came in fifth place in the Manhattan borough president's race, garnering 12.5 percent of the vote."

I have my own relationship with DeRosa, which, in the two years since she and her boss left office, has offered me a direct window into how much pleasure she takes in insulting her enemies.

In 2021, I reported a lengthy story about the brutal and toxic professional atmosphere fostered by the Cuomo administration. It included multiple sources who spoke critically of DeRosa's tendency to employ many of her boss's

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* <u>SUBSCRIBE NOW</u> ➤➤

independent investigation concluding that Cuomo had sexually harassed multiple women and an earlier report suggesting that a policy error at the height of the pandemic might have led to a rash of avoidable nursing-home deaths.

After that story, DeRosa suggested we meet in person, and we did have an off-the-record breakfast and a few off-the-record email exchanges. When it was clear that neither of us was going to win the other over, our communications became more one-sided: DeRosa put me on her friends-and-colleagues email-blast list, sending out some of the columns she occasionally writes for The Daily Beast. Sometimes, she wrote just to me.

When the New York *Post* published a piece about the declining fortunes of Biaggi's 2022 campaign for a House seat, DeRosa emailed me a link and the message "You don't say …" When Ibrahim Khan, former chief of staff to James, resigned after allegations that he had sexually harassed a woman, DeRosa wrote, "Odd that no reporter ever found/reported on this … I guess tish only subscribed to 'believe all women' when it meant clearing her path for governor." In June, after a New York appeals judge threw out a case James had brought against Ivanka Trump, DeRosa tweeted, "In case you need it, here's your daily reminder that @TishJames is a headline chasing hack," and, apparently afraid that I had missed her social-media commentary, sent me a copy of the tweet with a note: "Your profile on tish the great crusader who took on nra (case tossed), Cuomo (5 das, exculpatory evidence hidden) and trump … isn't aging well."

Along with Biaggi, de Blasio, Khan, Boylan, James, and other Cuomo critics, I am listed among the "Dramatis Personae" of *What's Left Unsaid.*

Here, in the spirit of full disclosure, are the burns on me: I am a "self-described feminist" and "stenographer" for Boylan. My reporting on the Cuomo administration was "disgusting" and a "well-orchestrated hit piece" that gave "carte blanche to a litany of far-left, longtime political adversaries." I "took the assessment of a handful of low- to mid-level employees" to reduce "the blood, sweat, and tears" of her "22 years in politics and government to a sexist trope, while simultaneously feigning outrage about sexism and toxicity." The sexist trope is a reference to a quote from one staffer who noted that DeRosa and other senior women on Cuomo's staff wore designer shoes that showed off their legs, part of an office culture in which a certain strain of hyperfeminized self-presentation was encouraged. DeRosa recalls reading my story and exclaiming, "I'm secretary to the governor! I have two degrees from Cornell University. I manage the state government. And Rebecca fucking Traister is quoting some junior staffer I never met talking about my legs. Are you fucking kidding me?" My piece was a lesson to DeRosa, she writes, "that, as it turns out, women can be just as sexist as men."

My last reciprocal exchange with DeRosa came in June when I replied to her note about James by saying that I hoped she had found "paths to joy and satisfaction that are not only about score-settling. There's so much else in life to work toward that does not entail wishing ill on people you've categorized as your enemies." She replied, "I'd ask that you not project your ill conceived and misguided notions onto me anymore. You did enough damage with your 'reporting' the first time."

When I next emailed her, in September, to let her know that I had been assigned a story on her and her new book and that I would like to interview her, she did not respond and instead had a crisis PR consultant contact me. There would be no interview.

---

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ➤➤

**W**In my 20s, I had a journalism colleague whom friends and I dubbed "Li'l Boss" because he carried himself with a prideful officiousness, reminding us of a kid in a commercial for a Playskool plastic briefcase, with a button-down shirt, a pocket protector, and a cup of takeout coffee, always glancing at his watch and huffing his very important stress at the rest of us. In places in the book, it's as if DeRosa is performing a version of that, except it's a very specific kind of Working Woman, the kind you might find in an '80s anti-feminist backlash comedy played by Sigourney Weaver or Diane Keaton. She describes herself doing all the Things That Working Women Do: cracking open sugary beverages, slugging coffee, waking to a 3:45 a.m. alarm, trading in the high heels for the pair of ballet flats she keeps stashed under her desk when it's time to leave the office, and exploding her personal life by putting her job first.

As a teenager, DeRosa writes, "I called in my first political favor and asked my dad" — a powerful lobbyist in Albany — "to help me get an internship" with the political director of the New York State AFL-CIO. That first internship led to another working for Hillary Clinton's New York Senate campaign at age 19. After a brief stint in fashion, DeRosa became a congressional press secretary, eventually landing a role as the deputy chief of staff in Attorney General Eric Schneiderman's office. She started working for Cuomo in 2013 and in 2017 was appointed to the highest nonelected post in government: secretary to the governor.

Her personal feminist ethos involves the embrace of a traditionally macho approach to power that she euphemistically describes as "tough-talking" and "contentious," acknowledging that she could sometimes get "hotter than necessary." "Our office had a reputation for being hard-charging," she writes. "We prided ourselves on it." But what "hard-charging" often meant was being as menacing as possible in order to get what they wanted.

On the page, DeRosa recounts a call she had with Khan, the former chief of staff to James, on the 2021 morning that James's office announced it would be releasing the nursing-homes report. DeRosa writes that she was "furious" and demanded of Khan, "How are you guys blindsiding us with this? … We need to make sure what you guys are saying is true and correct, and we need to make sure the Health Department goes through the numbers with you and that everyone's on the same page. You can't just drop this from the sky!"

This is a positively courtly version of what she actually said, which was, in part: "How the fuck can you do this to us without a conversation? Are you crazy? By the way, who the fuck … If you actually gave a damn about the substance and the facts, you would have these conversations and you would sit with our commissioner and you would go through the goddamn numbers. And you wouldn't fucking blindside us with something where I don't even know where the fuck you're getting your information … And no, I don't trust your fucking pencil pushers who did this because I used to work with them when I worked in the attorney general's office … Don't tell me that you can't do it right now and your hands are fucking tied. You're a fucking liar. And you fucking think I'm not going to remember this, you and Tish? … Are you out of your fucking mind?" (Through her PR consultant, DeRosa said that she stands by what she wrote in the book and that perhaps this was a different conversation.)

At the height of Me Too, high-powered women employed by men accused of abusive behaviors — from Ghislaine Maxwell to Harvey Weinstein's circle of female executives to Ken Friedman's Spotted Pig chef April Bloomfield — came under the spotlight for enabling abuse, protecting their male bosses from criticism, and, in some cases, adopting their tyrannical behaviors. That makes it all the more frustrating, if unsurprising, that even now DeRosa still seems eager to fight Cuomo's battles.

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW ➤➤**

abusive, corrupt, and harassing everyone else in the story is. There's Khan; and Jesse McKinley, the Albany reporter for the New York *Times* who she alleges drunkenly hit on her during an off-the-record conversation; and Boylan, who was alleged by Cuomo's team to be a bullying boss herself. DeRosa's point is about the grimy hypocrisy of the people who pointed accusatory fingers at Cuomo, which she sees as a powerful rebuttal to what she calls the excesses of Me Too. Everybody does this, she is saying.

There is one moment in the book when DeRosa admits to a brief but meaningful break with Cuomo. It comes after DeRosa is alerted, in the summer of 2020, that a young staffer named Charlotte Bennett told co-workers that she had an experience with the governor in which he asked her inappropriate questions about her dating and social life and made her feel that he was hitting on her. The next day, after getting into a car with Cuomo to travel from Manhattan to Albany, DeRosa is feeling increasingly distressed. Cuomo asks what's wrong with her, and she snaps, "What's wrong with *me*? … Charlotte Bennett?! Why, why, why did you engage with her?" She slams out of the car and finds herself on the streets of Manhattan in a polka-dot dress, sunglasses, and stilettos.

I read that scene and thought about what it must have been like for DeRosa, the loyalest of henchwomen, to learn that the boss she idolized had imperiled not just his career and legacy but *her* career and reputation by engaging inappropriately with a young staffer.

This is among the most human and believable of all the moments in *What's Left Unsaid.* But the story quickly pivots to DeRosa claiming to have met up with a friend, Nick Confessore from the *Times,* and telling him of the interaction she had weeks earlier with McKinley, who would go on to break Bennett's story. In a statement, a *Times* spokesperson confirmed that though DeRosa did tell "a friend, who works at The Times, about meeting with McKinley in 2020, in that initial conversation, there was no indication that she was making a complaint, and her characterization of the event was different than it was in 2021 when her lawyers reached out to the Times."

DeRosa claims that Confessore passed along her story to his old boss at the *Times,* Carolyn Ryan, but that McKinley was nevertheless the reporter who led the paper's coverage of harassment claims against Cuomo. This is intended as a bombshell: a way to score points against the *Times,* retroactively undercutting its coverage of Cuomo. The Washington *Post*'s Erik Wemple, who has often taken up Team Cuomo's complaints against the political press, ran a column about DeRosa's allegations a week before her book's publication date. And while there are surely legitimate questions to be asked about the *Times*' handling of McKinley, it is simultaneously true that those questions are being raised now as an element of a much broader campaign against those who held Cuomo accountable.

One member of the press, who many years ago confided in DeRosa about a bad experience she'd had with McKinley, told me she "could not have been more surprised to get calls from Erik Wemple" in the weeks before DeRosa's book was to be published. "It felt crazy that someone had told him about this without my permission," she said. And while she does not know who told Wemple her story, she was dismayed, she said, "to have it coming from a place where it's not about holding powerful institutions accountable; it's not about making sure Albany is a safe place for women to work. It's a story about a nasty thing that happened to me being used to sell a book by Melissa and ultimately defend Andrew Cuomo." (This person declined to comment to Wemple.)

DeRosa writes that she learned from me that women could be just as sexist as men. But of course, plenty of women before me *or* DeRosa have used or vilified other women as they made their way through male-dominated spheres; they have sometimes been rewarded with power and money. Yet their authority is ultimately ancillary and precarious,

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* SUBSCRIBE NOW ➤➤

It is not impossible to feel for Melissa DeRosa. I did, at brief moments in this book as her two-cell-phone, never-sleeping lifestyle, according to her, destroys her marriage and wreaks havoc on her fertility and her mental health, all in service of a man who would always have the power to cut her loose should she cease to be useful to him, and whose professional demise has left her here, still putting him in front of everyone else, including herself.

**B**ecause she could never, really, stop working for him. Even after leaving government, DeRosa contacted staff in the executive chamber who continued to work for Cuomo's successor. "What was concerning was the way she continued to berate, bully, and manipulate the staff that were here that she had a relationship with," said the senior Hochul-administration official. "This included some senior people, including me, but also other staffers, people who had worked for her and for others in the Cuomo administration." (DeRosa's spokesperson said, "Other than a single text message responding to the attacks of a former colleague in the press against Melissa, she hasn't uttered a single, solitary word of derision to anyone else in the administration.")

DeRosa has also remained dogged in her efforts to discredit each and every person who came for her former boss, from the lowliest intern and mid-level staffer to the current governor and attorney general.

Her book is a positively dizzying example of this campaign, fueled by thrashing, venomous score settling and the unloading of gossip and recriminations that might have made for a fun read had they not been so meanly aimed. One of her approaches is to disparage everyone who ever made a Cuomo critique by pointing out what incompetent peons they were.

"'Wait, who's Charlotte Bennett?' I couldn't pick Charlotte Bennett out of a lineup," DeRosa writes. Kaitlin, another of Cuomo's accusers whose last name has not been made public, "did not respond well to pressure." The state trooper who accused Cuomo of making discomfiting comments about her attire and touching her stomach and back was, according to DeRosa, a terrible driver. And Hochul? "Straight out of HBO's *Veep* central casting."

Yet despite everyone being puny and bad at their job, much of *What's Left Unsaid* is DeRosa laying out a red-threaded conspiracy theory in which Boylan, James, Biaggi, and others cleverly conspired to build an army of a dozen young women, many of whom had never previously met or worked together, to speak publicly about mistreatment they had experienced, all so James could become governor, Boylan could become Manhattan borough president, and Biaggi could stage a far-left coup. Or something.

None of it makes sense unless you understand that this kind of elaborate plotting and deception is exactly what Team Cuomo might do and is still doing. That state trooper sued Cuomo and named both DeRosa and her fellow Cuomo mouthpiece Rich Azzopardi in her suit. The trooper's lawyers included James's report on Cuomo's alleged sexual harassment, which opened the door for Cuomo, DeRosa, and Azzopardi to subpoena witnesses from it, relitigating testimony, challenging accounts, and feeding twisted versions of their depositions to the press and social media.

Though DeRosa and Azzopardi were removed as defendants in the Trooper 1 case in September, they had already subpoenaed many of the women who testified to the attorney general. They worked to reveal the last name of Kaitlin, who spoke to this magazine and the attorney general's investigators about how Cuomo had hired her after meeting her once at a party, then demeaned her, screamed at her, commented on her clothes and appearance, and put her in physically awkward positions.

---

*Exclusive offer:* Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide **SUBSCRIBE NOW** ➤➤

a half years of Kaitlin's account information and phone records, hoping to find evidence that she had communicated with Boylan or other accusers as part of some plot to bring Cuomo down. Despite a court confidentiality order, Cuomo's lawyers refused to redact Kaitlin's name and identity; the judge had to issue a new order directing that any documents containing Kaitlin's identifying information be filed under seal. The very next day, DeRosa's counsel filed a letter on the public docket attaching a screenshot of Kaitlin's Twitter account that included her photo, forcing her lawyers to "yet again seek emergency protection from the Court," which was granted within hours.

Cuomo's lawyers have also subpoenaed Biaggi's cell-phone records, again looking for evidence of communication they feel sure will prove an elaborate political setup. They have forced another of my sources, Ana Liss, to give a deposition in which she said reporters had twisted some of her words or taken them out of context. Though nothing Liss said contradicted what she had told me, and despite the fact that Liss believed the deposition would not be made public, Cuomo's lawyers released it in its entirety. DeRosa tweeted out one dishonestly decontextualized line of her testimony — "Listen, I don't know what I'm talking about" — as if it described the whole of her story.

As part of the Trooper 1 case, DeRosa subpoenaed a former undergraduate intern from Boylan's 2021 borough-president campaign. This young woman, according to Boylan's lawyer, Danya Perry, worked for the candidate for just a couple of months. "She just graduated in May," Perry told me. "She's living with her parents now. She's terrified. And they show up at her doorstep — she's 23 years old. She doesn't have the money to litigate this."

In fact, few of these women have the money to litigate this. Boylan has racked up $600,000 in legal bills. Most of the women being subpoenaed are young; some are state employees, civil servants. They do not have the resources to protect themselves legally. Meanwhile, the state has indemnified the former governor and his former secretary, meaning it is footing their legal bills. Cuomo's are now over $6.6 million, while DeRosa has so far charged New York taxpayers $1.3 million. There is simply no economic incentive for them to stop. "He can boil the ocean if he wants," Perry told me of Cuomo's legal approach. (According to her spokesperson, DeRosa "appropriately defended herself — it is called due process.")

From a power perspective, what DeRosa and Cuomo are doing is what they have always done, and it is chillingly effective. It's a sharp and punitive warning for anyone who would come forward in the future. This kind of behavior — the yelling, the threats, the arm-twisting that so marked the Cuomo administration — is conscious and purposeful. I have sometimes wondered at the carelessness of people who are so crudely cruel, who scream into phones surely knowing that both opponents and reporters all over town are pressing RECORD. But they have always, on some level, wanted people to know. As one person who has been actively pursued by them told me, they leave evidence of their vengeful streak because "they want to sign the painting."

If Cuomo wants to stage a comeback, who is going to volunteer for this kind of retributive tax by sharing stories that might stop him? Who wants to risk subpoenas at their parents' doorstep, hundreds of thousands of dollars of legal fees, and being publicly slagged all over social media and between hard covers? Cuomo and DeRosa's vituperative approach is one they cannot give up in defeat, and which they believe might offer them enough fearful insulation to claw their way back to the top again.

*Want more stories like this one?* **Subscribe now** *to support our journalism and get unlimited access to our coverage. If you prefer to read in print, you can also find this article in the October 23, 2023, issue of* New York *Magazine.*

---

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ▶▶

Case 1:22-cv-00893-LDH-TAM   Document 243-1   Filed 02/12/24   Page 53 of 59 PageID #: 6533

◼ SHOW 9 COMMENTS

**Intelligencer**

elissa DeRosa's Revenge Campaign

NTS

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ▶▶

**10:20 A.M.  THE TALENTED MR. SANTOS**

## Here's Every Single Lie Told by George Santos

*By Matt Stieb And Margaret Hartmann*

Navigating the many exaggerations and falsehoods the New York congressman, who is now facing 23 federal criminal charges.



**9:00 A.M.  ON WITH KARA SWISHER**

## Navigating the Digital Fog of the Israel-Hamas War

*By Intelligencer Staff*

Kara Swisher talks with three veterans of the disinformation war about how to tell what's real and who is behind the viral content that isn't.



**8:00 A.M.  EARLY AND OFTEN**

## Can Foreign Policy Help Joe Biden Win Reelection?

*By Ed Kilgore*

Foreign policy rarely wins presidential elections. But it could help Biden rebut concerns about his age and ideology and offer a contrast with Trump.



## <u>MOST POPULAR</u>

**1.  The Most Powerful New Yorkers You've Never Heard Of**
*By* THE EDITORS

**2.  Trump Is Actually Guilty of the Kind of Bribery Republicans Imagine Biden Did**
*By* JONATHAN CHAIT

**3.  Spotify Is Eating the Entire Music Business**
*By* JOHN HERRMAN

**4.  Melissa DeRosa's Revenge Campaign** 🔊
*By* REBECCA TRAISTER

**5.  Ivanka Doesn't Want to Talk About Dad in Court or Anywhere, Really**

---

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ➡➡

**10/23/2023** ISRAEL-HAMAS WAR

## Will Hamas Releasing Hostages Stop Israel From Invading Gaza?

*By Matt Stieb*

The group has freed four captives out of more than 200 as the Biden administration pressures Netanyahu to allow for more time to save lives.



**10/23/2023** TREMENDOUS CONTENT

## Ivanka Doesn't Want to Talk About Dad in Court or Anywhere, Really

*By Margaret Hartmann*

She was spotted partying with Kim Kardashian and dodging questions about her efforts to avoid testifying in Donald Trump's New York fraud trial.



**10/23/2023** CRIME

## Off-Duty Pilot Arrested After Trying to Seize Control of Alaska Airlines Flight

*By Nia Prater*

Joseph Emerson is facing 83 counts of attempted murder after he tried to turn off the engines of an Alaska Airlines plane mid-flight.



**10/23/2023** THE MONEY GAME

## The Three Tweets That Broke the Gloom Over the U.S. Treasury Markets

*By Kevin T. Dugan*

Bill Ackman is a bond vigilante no more.



**10/23/2023** ISRAEL-HAMAS WAR

## Everything We Know About the Gaza City Hospital Blast

*By Chas Danner*

The broad consensus from multiple independent investigations is that a misfired militant rocket was most likely the cause. But questions remain.



**10/23/2023** EARLY AND OFTEN

## RFK Jr. Might Help Democrats Win in 2024 After All

*By Ed Kilgore*

Kennedy's independent presidential run may take more votes from Trump than from Biden thanks to conservative media attention.



***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ➡➡

Case ML:22-cv-00893-LDH-TAM   Document 243-4   Filed 03/12/24   Page 56 of 59 PageID #: 6536

The Mar-a-Lago scandal is way worse even than what Republicans can dream up against Biden.



**10/23/2023**  STUCK IN THE MITTLE

### The Juiciest Revelations From Mitt Romney's Tell-All Biography

*By Margaret Hartmann*

In the forthcoming book *Romney: A Reckoning*, the senator shares gossip about Oprah and Melania Trump, and disses various Republican colleagues.



**10/23/2023**  GAMES

### The NBA's Player Empowerment Era Is Over

*By Will Leitch*

As a new season begins, the league's stars don't quite have free rein anymore.



**10/23/2023**  POWER

### The Most Powerful New Yorkers You've Never Heard Of

*By The Editors*

49 people who are actually running New York City.



**10/22/2023**  ISRAEL-HAMAS WAR

### Don't Blame Gazans for Hamas

*By Jonah Shepp*

The terrorist group's perpetual war with Israel has never had much popular legitimacy.



*Exclusive offer:* Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide  **SUBSCRIBE NOW** ▶▶

**10/22/2023** SCENE REPORT

## 31 Days of Taylor Swift–Travis Kelce Mania in Kansas City

*By Reeves Wiedeman*

My hometown is enjoying its time at the center of the universe.



**10/21/2023** EARLY AND OFTEN

## What If There's No House Speaker for a Month? For a Year?!

*By Ed Kilgore*

Much of what the House does wouldn't be missed. But you can't keep the government running or address emergencies without someone being in charge.



**10/21/2023** ISRAEL-HAMAS WAR

## How Biden Bigfooted Bibi

*By Noga Tarnopolsky*

The American president has captured Israeli hearts. Can he rein in the Israeli government?



**10/21/2023** THE DISCOURSE

## War of the Statements

*By Sam Adler-Bell*

The unusual way Americans have processed the Israel-Hamas War.



**10/20/2023** EARLY AND OFTEN

## Republicans Started a Civil War They Don't Know How to End

*By Ben Jacobs*

Knocking off Speaker candidates is easy, but electing one is impossible so far.



**10/20/2023** POLITICS

## Judge Threatens Jail Time for Trump Over Gag-Order Violation

*By Nia Prater*

Judge Arthur Engoron questioned why an inflammatory post about a court clerk remained on Trump's campaign website after he ordered it removed.



---

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* <u>SUBSCRIBE NOW</u> ▶▶

**10/20/2023**   WHO'S SELLING

## Matt Drudge Lists Very Beige Miami Compound for $2.9 Million

*By Clio Chang*

The secluded property promises buyers "FOREVER PRIVACY."



**10/20/2023**   EARLY AND OFTEN

## One Theory on Why Jim Jordan Kept Going for Broke

*By Ed Kilgore*

If the 2024 election is good for Republicans, it would be bad for Jordan and his far-right supporters.



**10/20/2023**   POLITICS

## Another Trump Co-Defendant Pleads Guilty in Election Scheme

*By Nia Prater*

Kenneth Chesebro, a Trump campaign lawyer who orchestrated a fake-electors plot, is the third defendant in the case to take a plea.



**10/20/2023**   ISRAEL-HAMAS WAR

## Israel-Hamas War: Who Is to Blame for Gaza City Hospital Blast?

*By Chas Danner*

A look at what the experts are saying.





READ MORE ON THE
### Intelligencer
HOMEPAGE

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW ➤➤**

# Intelligencer

 

ABOUT INTELLIGENCER

NEWSLETTERS

CONTACT

MEDIA KIT

PRIVACY

AD CHOICES

ABOUT NEW YORK MAGAZINE

HELP

PRESS

WE'RE HIRING

TERMS

DO NOT SELL OR SHARE MY PERSONAL INFORMATION

ACCESSIBILITY

INTELLIGENCER IS A VOX MEDIA NETWORK.

© 2023 VOX MEDIA, LLC. ALL RIGHTS RESERVED.

***Exclusive offer:*** *Get the Strategist's Truly Surprising and Incredibly Exhaustive Gift Guide* **SUBSCRIBE NOW** ▸▸