1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
                                      )
 3    TROOPER 1,                      )    1:22-CV-00893-LDH-TAM
                                      )
 4                   Plaintiff,       )    Brooklyn, NY
                                      )    February 13, 2024
 5                   vs.              )    10:40 AM
                                      )
 6    NEW YORK STATE POLICE,          )
      ET AL.,                         )
 7                                    )
                     Defendants.      )
 8

 9          TRANSCRIPT OF TELEPHONE STATUS CONFERENCE
              BEFORE THE HONORABLE TARYN A. MERKL
10                UNITED STATES MAGISTRATE JUDGE

11    APPEARANCES (All present by video or telephone):

12    For the Plaintiff:        JOHN S. CRAIN, ESQ.
                                VALDI LICUL, ESQ.
13                              WIGDOR LLP
                                85 Fifth Avenue
14                              Suite Fifth Floor
                                New York, NY 10003
15
      For the Defendant,        DANIEL J. MOORE, ESQ.
16    New York State Police:    JOSHUA D. STEELE, ESQ.
                                HARRIS BEACH PLLC
17                              99 Garnsey Road
                                Pittsford, NY 14534
18
      For the Defendant, Andrew RITA M. GLAVIN, ESQ.
19    Cuomo:                    LEO KORMAN, ESQ.
                                GLAVIN PLLC
20                              156 West 56th Street
                                Suite 2004
21                              New York, NY 10019

22                              NEESHA CHHINA, ESQ.
                                SHER TREMONTE LLP
23                              90 Broad Street
                                23rd Floor
24                              New York, NY 10004

25
</pre>



```
 1
        For Melissa DeRosa and      CATHERINE M. FOTI, ESQ.
 2      Richard Azzopardi:          KAYASHA LYONS, ESQ.
                                    MORVILLO ABRAMOWITZ GRAND IASON &
 3                                  ANELLO PC
                                    565 Fifth Avenue
 4                                  New York, NY 10017

 5      For nonparty Charles        KEVIN MINTZER, ESQ.
        Brown:                      LAURA KOISTINEN, ESQ.
 6                                  THE LAW OFFICE OF KEVIN MINTZER,
                                    P.C.
 7                                  1350 Broadway
                                    Suite 1410
 8                                  New York, NY 10018

 9

10

11

12

13

14

15

16

17

18

19

20

21
                        Sharona Shapiro, CDLT-492
22                              eScribers
                        7227 North 16th Street
23                        Phoenix, AZ 85020
                          www.escribers.net
24
        Proceedings recorded by electronic sound recording; transcript
25      produced by transcription service.
```

1

I N D E X

2

| RULINGS: | | PAGE | LINE |
|---|---|---|---|
| All text messages pertaining to | | 35 | 24 |
| Governor Cuomo must be turned over. | | | |
| | | | |
| Document Request 1 to Mr. | | 40 | 17 |
| Brown is relevant and proportional. | | | |
| Date is limited from November 2017 | | | |
| to the present. | | | |
| | | | |
| The request for communications | | 41 | 6 |
| Between Mr. Brown and Trooper 1 | | | |
| regarding Trooper 1's twenty-six | | | |
| current and former NYSP colleagues is | | | |
| found not relevant and proportional to | | | |
| the needs of the case. | | | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

1          THE CLERK:  This is our telephone status conference

2    for case Number 22cv00893, Trooper 1 v. New York State Police,

3    et al.

4          Before I ask the parties to state their appearances, I

5    would like to note the following.  Persons granted remote

6    access to proceedings are reminded of the general prohibition

7    against photographing, recording, rebroadcasting of any court

8    proceedings.  Violations of these prohibitions may result in

9    sanctions, including removal of court-issued media credentials,

10   restricted entry to future hearings, denial of entry of future

11   hearings, or any other sanctions deemed necessary by the Court.

12         In addition, due to the number of callers, I will ask

13   that all counsel, when addressing the Court, to have a clear

14   transcript of this proceeding, to please state your name when

15   addressing the Court so we can know who is speaking.

16         That being said, counsel for plaintiff, please state

17   your appearance for the record.

18         MR. JOHN CRAIN:  Good morning, Your Honor.  This is

19   John Crain from Wigdor LLP for plaintiff Trooper 1, and I'm

20   joined by Valdi Licul.

21         THE CLERK:  Counsel for New York State Police, please

22   state your appearances for the record.

23         You're on mute.

24         MR. DANIEL MOORE:  I'm sorry.  This is Dan Moore, of

25   the firm of Harris Beach, PLLC, on behalf of the New York State

Colloquy

1    Police.

2        MR. JOSHUA STEELE:  This is Joshua Steele, from Harris

3    Beach PLLC, on behalf of the New York State Police.

4        THE CLERK:  Counsel for defendant, Andrew Cuomo,

5    please state your appearances for the record.

6        MS. NEESHA CHHINA:  Good morning, Your Honor.  Neesha

7    Chhina, from Sher Tremonte LLP, on behalf of Governor Cuomo.

8    And I'm joined by my cocounsel, Rita Glavin.

9        MS. RITA GLAVIN:  Good afternoon, Your Honor.  Rita

10   Glavin of Glavin, PLLC.

11       MR. LEO KORMAN:  Good afternoon.  Leo Korman from

12   Glavin, PLLC.

13       THE CLERK:  Counsels for defendant, DeRosa and

14   Azzopardi, please state your appearances for the record.

15       MS. CATHERINE FOTI:  Katherine Foti, from Morvillo

16   Abramowitz Grand Iason & Anello, for Melissa DeRosa and Richard

17   Azzopardi.

18       MR. KAYASHA LYONS:  Good afternoon.  Kayasha Lyons,

19   from Morvillo Abramowitz Grand Iason & Anello, also on behalf

20   of Melissa DeRosa and Richard Azzopardi.

21       THE CLERK:  And for nonparty defendant, Charles Brown,

22   counsels, please state your appearances for the record.

23       MR. KEVIN MINTZER:  Good morning, Your Honor.  Kevin

24   Mintzer, of Law Office Of Kevin Mintzer, P.C., for nonparty,

25   Charles Brown.



Colloquy

1          THE COURT:  All right.  And are you -- do you have

2   somebody with you, Mr. Mintzer?

3          MR. DANIEL MOORE:  Yes, I think my colleague was just

4   about to enter her appearance.

5          THE COURT:  Okay.  Thank you, sir.

6          MS. LAURA KOISTINEN:  Good morning, Your Honor.  Laura

7   Koistinen on behalf of Charles Brown.

8          THE COURT:  Would you please spell your last name for

9   me?

10          MS. KOISTINEN:  Sure.  K-O-I-S-T-I-N-E-N.

11          THE COURT:  Okay.  All right.  And I understand that

12   there may be additional callers on the line, members of the

13   public, perhaps counsel for interested parties.  But we are

14   here today for a limited purpose, and that is to address this

15   discovery dispute related to matters concerning Charles Brown.

16   So unless you're here on this specific, narrow discovery

17   dispute, I'd ask all other callers to stay on mute.

18          And I'd like to start by trying to get a sense of

19   where we are on this discovery dispute.  It seems as though

20   there have been some changes in the landscape since the letters

21   were first filed by Governor Cuomo's counsel back on February

22   1st, in light of some developments and updates that have been

23   provided by Mr. Licul as of yesterday.  And I'm just trying to

24   understand, kind of, the lay of the land.

25          So Ms. Glavin, who is taking the lead on this issue on

Colloquy

1    behalf of Governor Cuomo?

2            MS. GLAVIN:  Your Honor.  Ms. Chhina from Sher

3    Tremonte.

4            THE COURT:  Thank you.  So Ms. Chhina, would you like

5    to provide me an update as to where you believe we are?  And

6    I'll then hear from Mr. Licul and Mr. Crain.

7            MS. CHHINA:  Yes, Your Honor.  Thank you.  So you're

8    correct in identifying the dispute as being fairly narrow.  And

9    so, with respect to the subpoena to Mr. Brown, our dispute is

10   with respect to two categories of documents, the first being

11   communications between Mr. Brown and Trooper 1 concerning

12   Governor Cuomo, and the second being communications between Mr.

13   Brown and Trooper 1 regarding twenty-six specific troopers that

14   we identified in our modified request.

15           And you're also correct in identifying the fact that,

16   after we filed our joint letter, Trooper 1 came forward and

17   said for the first time that she had a narrow set of documents

18   that were responsive to the Brown subpoena.  We have not yet

19   received these documents for Trooper 1.  They haven't been

20   produced to us.

21           It's our understanding that these documents were

22   responsive to RFPs that we served to Trooper 1 in June of 2022.

23   They're also responsive to RFPs that we served to Trooper 1 in

24   September of 2023.  I'm not sure -- it's still unclear to me

25   why we were not made aware of these documents until we filed

Colloquy

1    our joint letter.

2              We met and conferred with Trooper 1 on this issue

3    after the first filing that they made on February 2nd.  We're

4    still in the meet-and-confer process with them with respect to

5    what they're withholding in these communications, but we have

6    no basis for thinking that Trooper 1 has every communication

7    that's covered by the Brown subpoena.

8              And so we don't see a reason why Trooper 1's objection

9    should prevent the Court from granting our motion to compel Mr.

10   Brown with respect to the documents that we're seeking in the

11   subpoena.

12             THE COURT:  Mr. Licul, who is taking the lead on

13   behalf of Trooper 1?

14             MR. LICUL:  It will be --

15             MR. CRAIN:  It will be me.

16             MR. LICUL:  -- Mr. Crain.

17             THE COURT:  Okay.  Mr. Crain -- and this is what Ms.

18   Dikester (ph.) was getting at a moment ago.  We need to -- in

19   order to have a clear record, we need to use names.  So when I

20   ask somebody a question by name, only that person should

21   respond.

22             So Mr. Licul, who is taking the lead?

23             MR. LICUL:  Mr. Crain.

24             THE COURT:  Thank you.  I could understand neither of

25   you when you speak over each other.





Colloquy

1          So Mr. Crain, if you could please give me an update as

2     to where things stand from your point of view.

3          MR. CRAIN:  Certainly, Your Honor.  We have now

4     offered to produce responsive texts.  These texts will cover

5     the entirety of the Brown subpoena, and they'll cover all

6     relevant document requests that have been made to us on the

7     topic -- Trooper 1, on the topic so far.

8          And I'll point out that this is not the first time

9     we've disclosed that we have these documents.  As we put in our

10    letter, we very clearly disclosed that we were withholding

11    documents pursuant to objections.  There are objections to

12    scope very similar to the ones that the witness here wound up

13    lodging against very similar requests.

14         And we're able to -- well, and so they should have

15    gone through us to get these, pursuant to the terms of the

16    January 16th protective order.  And the bottom line is we can

17    moot out the dispute over the witness subpoena by producing

18    these documents.

19         THE COURT:  Well, two follow-up questions.  You

20    mentioned that it is your view that the Trooper 1 production

21    would cover the entirety of the dispute, but I'm a little bit

22    unclear as to how that could be, depending upon what text

23    messages Trooper 1 still has in her possession.

24         There have been previous mentions in various filings

25    that Trooper 1 had deleted some of her text messages.  And was

Colloquy

1    that specific to the Nevins question or the Diane Parrotta

2    question?  I'm just really unclear about what text Trooper 1

3    has.  Does she have all of her text messages with Mr. Brown?

4              MR. CRAIN:  She has all of her text messages with the

5    witness, correct.  The letter you're referencing from November

6    29th, it was specific to the Nevins letter.  There should have

7    been a footnote clarifying that we had these texts.  But to

8    reiterate, we were not withholding anything.  It's why we filed

9    our letter about this protective order, and it's why we

10   disclosed that we were withholding documents when the documents

11   were sought from us.

12             MS. CHHINA:  Your Honor, if I may just respond to that

13   quickly.  This is Neesha --

14             THE COURT:  State your name.

15             MS. CHHINA:  -- Chhina from --

16             THE COURT:  State your name.

17             MS. CHHINA:  Sorry.

18             THE COURT:  Go ahead.

19             MS. CHHINA:  I just want to push back on the idea that

20   the prior disclosures to the Court were specific to the Nevins

21   issue.  That letter made very clear that Trooper 1 was

22   referring to an interrogatory response she served to us in

23   August of 2023.  That response was unequivocal that she had

24   searched for and produced all responsive communications on her

25   iPhone, as well as on two email accounts, a personal and work

Colloquy

1    email account, and that she had no communications from her

2    BlackBerry that she used prior to 2019.

3              So there is no basis for us to believe, based both on

4    Trooper 1's communications to the Court, in November of 2023,

5    and in her interrogatory responses from August of 2023, that

6    she was withholding any communications that were either email

7    communications or text communications.

8              And it's only now, for the first time, that that

9    letter is being characterized as something specific to Nevins

10   or that -- and it doesn't make sense that that letter would be

11   specific to Nevins, because it was referring to an

12   interrogatory response that was much broader than just the

13   Nevins issue.

14             THE COURT:  Well, he mentioned the November 2023

15   letter not the August 2023 interrogatory response.  Is it

16   possible that the August 2023 interrogatory response is

17   somewhere in the filings in this case?  But are you suggesting

18   we need to have a hearing on this question, Ms. Chhina?

19             MS. CHHINA:  I'm suggesting --

20             THE COURT:  Or are you willing to take the

21   representation that they have the text messages?

22             MS. CHHINA:  I'm suggesting that their representation

23   that they have text messages that cover the entirety of the

24   Brown subpoena should be interrogated a little further.  I'm

25   not sure that -- it seems odd to me that Trooper 1 would make

Colloquy

1    prior representations to us, in interrogatory responses, and to

2    the Court, in multiple updates, that they've searched for and

3    produced all communications that are responsive on her iPhone.

4    They have no responsive text messages.

5            And now, only when this joint dispute has been raised

6    by the Court, are they saying that they have communications

7    with Mr. Brown, and that she has all communications with Mr.

8    Brown, but she has no communications with any other witness in

9    this case.

10           But we know from her phone records that we received

11   recently, for example, that she was regularly in contact with

12   other troopers who were witnesses in this case.  We've received

13   none of those communications.  And Trooper 1's counsel is not

14   now saying that they have those communications.  They're only

15   saying they have communications with Mr. Brown.  And to me, the

16   logic of that is just difficult to understand.

17           So I think the representation that Trooper 1's

18   production to us, which they have described as being a few

19   dozen PDF pages that they have of communications between her

20   and Mr. Brown, that that would cover the entirety of what we're

21   seeking in the Brown subpoena, I'm not sure that that

22   representation should be accepted on its face.

23           THE COURT:  I don't know that I can accept any

24   representations on their face.  The problem is that you guys

25   have an inability, it seems, to communicate effectively in the

Colloquy

1    meet-and-confer process.  And now you're asking me to try to

2    make a determination with zero underlying documentation as to

3    what's true and not true.

4           That was my question as to whether or not you wanted

5    to actually have a hearing on this question, because the point

6    of civil discovery, and the point of the protective order that

7    I issued a few weeks back, was that the parties need to do this

8    on their own.  You cannot come to the Court with every subpoena

9    and every dispute and expect that I am somehow going to be able

10   to get to the bottom of whether or not there is a production

11   that is somehow lacking when I literally don't even have the

12   documents.

13          That is one of the many challenges inherent in these

14   civil discovery disputes.  I don't have the documents.  I don't

15   have your RFPs.  And so to suggest that the Court can somehow

16   make this determination, prior to the parties meaningfully

17   meeting and conferring on it, which I directed the parties to

18   do as part of my January 16th protective order here, really is

19   concerning.

20          All of that said, Mr. Crain, would you like to respond

21   to Ms. Chhina?

22          MR. CRAIN:  Yes.  So just briefly, and to keep things

23   as focused as possible on the current dispute, the

24   interrogatory response said that we had disclosed everything on

25   the phone.  It was true when we served the subsequent responses

Colloquy

1    to requests for production when we said we were now withholding

2    documents that were responsive.  Opposing counsel mentions

3    every last communication except the one that was put in their

4    hands saying that we objected and withheld documents.

5            So we have met and conferred now.  We've suggested a

6    narrow scope, and we're prepared to produce the documents as

7    quickly as possible.  We will also undertake to ensure that

8    there are no more responsive documents of any kind or

9    communications, that we've updated all prior objections and

10   responses, and that there's nothing remaining.  And we will

11   cooperate with opposing counsel on any kind of quality control

12   process that the parties can agree to that's reasonable.

13           THE COURT:  So with regard to the BlackBerry, Mr.

14   Crain, is it correct that she has no text messages before 2019

15   that were utilized on her BlackBerry?

16           MR. CRAIN:  That's correct, yes.

17           THE COURT:  Okay.  So the question that I have, with

18   regard to the representation that you believe you're in a

19   position to produce all responsive documents, is there a time

20   frame included here with regard to the communications between

21   Mr. Brown and Trooper 1?

22           I'm looking at document request number 1, which was

23   filed as an attachment document to 234.  So it's ECF number

24   234-2 is the sealed version.  I believe there was just some

25   minor sealing issues relating to one sensitive matter.  So

Colloquy

1    looking at that version, I don't see a time frame.

2              So Mr. Crain, what is your -- how does your

3    representation square with the missing BlackBerry?

4              MR. CRAIN:  So I thought I had said that we would

5    object to anything from before January 1st, 2018.  In any case,

6    these communications were on her personal phone not her

7    BlackBerry.

8              THE COURT:  She wasn't utilizing her BlackBerry to

9    communicate with Mr. Brown?

10             MR. CRAIN:  No, she was not.

11             THE COURT:  Okay.  All right.  So in terms of the time

12   frame, your position, sir?

13             MR. CRAIN:  I'm sorry, was this question addressed to

14   me?

15             THE COURT:  Yes.

16             MR. CRAIN:  To John Crain?

17             THE COURT:  Yes.

18             MR. CRAIN:  Our position is that the proper time frame

19   is January 1st, 2018 to the present.

20             THE COURT:  2018?

21             MR. CRAIN:  January 1st, 2018 to the present, yes.

22             THE COURT:  Okay.  Ms. Chhina, would you like to

23   respond to Mr. Crain's representations?

24             MS. CHHINA:  Yeah.  Your Honor, this is Neesha Chhina.

25             My one thought on Mr. Crain's representation is

Colloquy

1    they're still objecting to producing documents on two

2    categories that we think are key to Governor Cuomo's defenses

3    in this case, the first being documents between Mr. Brown and

4    Trooper 1, communications between Mr. Brown and Trooper 1

5    regarding Governor Cuomo, and the second being communications

6    between Mr. Brown and Trooper 1 regarding her employment at the

7    New York State Police, including her employment in the PSU and

8    her transfer to the travel team.

9         So Trooper 1 has not agreed to produce all

10   communications between her and Mr. Brown that are responsive to

11   our subpoena request.  She is still maintaining objections to

12   those, and we have not resolved that issue.  If the Court is

13   willing now to make a ruling that those categories of documents

14   are relevant and should be produced, I think that puts us in a

15   slightly different posture.

16        MR. CRAIN:  This is John Crain.  Yes, as we --

17        THE COURT:  Hold on, hold on, hold on.

18        MR. CRAIN:  I apologize.

19        THE COURT:  Ms. Chhina, what you just stated, you

20   stated at the outset; in the letter, you identified two

21   categories of documents, communications that were --

22   purportedly the two categories as to which you were at an

23   impasse.  One was the communications regarding Governor Cuomo,

24   just period, right, subcategory (i) of document request number

25   1, or subcategory (a), depending on which list you're looking

Colloquy

1    at, of document request number 1.

2            And then the second thing identified in your letter

3    was communications regarding twenty-six colleagues.  Now you're

4    talking about something different, which is information

5    regarding her employment with the New York State Police, the

6    travel team, et cetera.  So can you please enlighten me as to

7    what precisely still remains in dispute from your point of

8    view?

9            MS. CHHINA:  Yes, sorry, I apologize.  This is Neesha

10   Chhina.

11           Sorry.  I apologize, Your Honor.  There's a slight

12   difference between what's in dispute with respect to the

13   subpoena to Mr. Brown, and the dispute between us and counsel

14   for Mr. Brown, and what remains in dispute between us and

15   counsel for Trooper 1 with respect to her production of

16   communications with her and Mr. Brown.

17           So I thought we were speaking about Trooper 1's

18   production to us of the communications between her and Mr.

19   Brown, and she has not agreed to produce all of those

20   communications that are responsive to our document requests to

21   her.  And that remains an issue.

22           With respect to the Brown subpoena, and the subpoena

23   that we issued to Mr. Brown, the two things you just

24   identified, communications concerning Governor Cuomo and

25   communications concerning those twenty-six state troopers,

Colloquy

1    those are the issues that are in dispute with counsel for Mr.

2    Brown.

3                    THE COURT:  Okay.  So there's really three categories

4    in play vis-a-vis the communications between Mr. Brown and

5    Trooper 1; is that fair?

6                    MS. CHHINA:  Sorry, can you repeat that?

7                    THE COURT:  There's really three categories in dispute

8    vis-a-vis the communications between Trooper 1 and Mr. Brown,

9    depending upon who is producing them; is that right?

10                   MS. CHHINA:  Yes, that's fair.

11                   THE COURT:  Okay.  So Mr. Crain, would you like to

12   respond?

13                   MR. CRAIN:  This is John Crain.

14                   That is an accurate description, yes.  So there's a

15   dispute that tracks closely the dispute that would have been

16   between the witness and Cuomo about all communications between

17   the two regarding Governor Cuomo.  We also object that that's

18   overbroad.

19                   There's then also the request, the second request

20   mentioned, which was for everything involving her employment or

21   the PSU.  That is not squarely in the Brown subpoena, but it's

22   in dispute between the parties, and we object to that as well

23   as overbroad.

24                   THE COURT:  What is your position with regard to the

25   twenty-six troopers?



19

Colloquy

1          MR. CRAIN:  We would object as well, in principle, but

2     I believe there's nothing responsive in any case.  If we're

3     just talking about the communications between Trooper 1 and the

4     witness, there would not be anything responsive, and I can -- I

5     will triple check to make sure that this is true.

6          THE COURT:  So just to be clear, she doesn't have text

7     messages, in your assessment, with Mr. Brown, talking about --

8     random selection from the list -- Stephen O'Mara (ph.)?  Those

9     communications don't exist; is that what you're saying?

10         MR. CRAIN:  Correct.

11         THE COURT:  All right.  So I have no way of knowing

12    whether or not there are text messages between Mr. Brown and

13    Trooper 1 regarding these twenty-six people.  I did note that,

14    in one of the documents that was provided from -- I believe, it

15    was an email from Ms. Koistinen, pertaining to Mr. Brown's

16    objections to the searching for communications, that she had

17    suggested a list of five or six names, including Diane

18    Parrotta.

19         Ms. Chhina, have the parties done any meaningful

20    effort to limit this list?  Twenty-six people is really a lot

21    and of marginal relevance.  It really just feels like, without

22    knowing in detail who these people are or why mention of them

23    in a communication between Trooper 1 and Mr. Brown, it seems

24    pretty far afield.

25         MS. CHHINA:  Your Honor, this is Neesha Chhina.



Colloquy

1          I just want to touch on one thing regarding the date

2    range before I answer your question.  I just want to make sure

3    we don't lose that in the thread.  With respect to the date

4    range of being from January 2018, I want to point out the fact

5    that Trooper 1 claims in her allegations to have been singled

6    out by the governor and recruited to the PSU in around November

7    of 2017.  And so, as far as date range goes, I think that the

8    most appropriate -- if we're going to have a date range

9    limitation, the most appropriate date range limitation is

10   something around a start of time of November 2017.

11         But to answer your question specifically now on those

12   twenty-six troopers, so you'll note that our original Brown

13   subpoena request was broader than that.  We met and conferred

14   with counsel for Mr. Brown.  In the first instance, he asked

15   for a list of specific troopers rather than just communications

16   with any of her colleagues.  So that list was a more narrow

17   list than what the original request was.

18         Mr. Crain's representation to the Court that there are

19   no communications responsive to this request, I think, actually

20   highlights here the issues that we're having, not just with

21   this subpoena, but with many of the nonparty subpoenas in this

22   case.

23         Counsel for Mr. Brown has -- when we tried to meet and

24   confer to discuss this list of twenty-six troopers further,

25   counsel for Mr. Brown said that it would be overly burdensome

Colloquy

1  to search for these twenty-six troopers, that there -- and

2  wouldn't tell us, for example, how many hits would come from a

3  search of these twenty-six troopers.

4          And so it makes it incredibly challenging for us to

5  even evaluate the burden of production for nonparties in these

6  kinds of requests when we're not provided this type of

7  information.  So it's hard to understand how an objection on

8  the basis of burden can comport with the idea that Mr. Crain is

9  saying now, which is that there's no responsive documents to

10  this request.

11          I mean, I understand that, on its face, a list of

12  twenty-six can appear to be large.  These are all troopers that

13  Trooper 1 identified as individuals with whom she communicated

14  about her allegations, in her interrogatory responses, or who

15  were witnesses in her interrogatory responses, or came up

16  during depositions as troopers relevant to her allegations.

17          So it's not a list that comes from nowhere.  It's a

18  list that is relevant to the claims and defenses in this case.

19  And the burden seems to be none if there is no responsive

20  documents.  But it's just challenging for us to be able to even

21  engage with the nonparties on these issues if they're not

22  willing to provide us with information about the scope of

23  potentially responsive documents they have.

24          THE COURT:  There's two concerns there, though.  It's

25  not just burden.  They state very clearly in the email from Ms.



Colloquy

1    Koistinen that it's also overly broad.  And it is your burden

2    to establish relevance.  Telling me these names have come up is

3    not sufficient to establish the relevance of communications

4    that mention twenty-six people with no subject limitation.

5    Maybe they're going to go out to lunch.  Who cares if they're

6    going out to lunch?  Irrelevant.  It doesn't need to be

7    produced.

8            The production burden is not simply the physical

9    turning over of the documents that have been found.  It's also

10   the search process, and it's the fishing expedition nature of

11   all of this that is concerning.  If you have a list of names

12   that you actually think are the core allegations, and/or you

13   can limit by subject matter, that may be a different question.

14   But at this moment, the Court has very little basis on which to

15   rule that these twenty-six names are relevant based on the

16   representations that have been provided so far.

17           In response to your request, Mr. Brown's attorneys

18   have suggested a narrowing of the list or a meet-and-confer.

19   There's been suggestion of providing some sort of subject

20   matter limitation as to these additional people.  All of those

21   seem like good strategy in terms of trying to come up with a

22   subset of documents that actually might have something to do

23   with this case.  You don't just get everybody's text messages

24   because the name came up and you need to stop thinking that

25   way.  Is that clear, Ms. Chhina?

Colloquy

1          MS. CHHINA:  Yeah, Your Honor.  Yeah, I understand --

2    I understand your point.  I think there's a little bit of

3    misunderstanding of how the meet-and-confer process went here.

4    So I just want to clarify that for the Court.  We provided this

5    list of names as a starting point for the meet-and-confer.  We

6    went into a second meet-and-confer with counsel for Mr. Brown,

7    and we asked them to provide additional information about what

8    the volume of documents would be if this list of names was

9    used.

10         I think your point as to, if they're going for lunch,

11   and the volume of communications not just being something that

12   we're entitled to, carries more weight if the volume is

13   something extremely high.  If you run a search for twenty-six,

14   names and those twenty-six names, in the communication, return

15   only three or five documents, then it wouldn't appear that

16   there is -- like, the proportionality concerns there seem much

17   lower to me.  I'm not --

18         THE COURT:  It doesn't make them relevant.

19         MS. CHHINA:  But how --

20         THE COURT:  If it has nothing to do with this case,

21   it's not relevant.

22         MS. CHHINA:  We were not opposed to proposing search

23   terms in connection with these twenty-six troopers.  We were

24   hung up on by counsel for Mr. Brown during the meet-and-confer

25   process.  And I think that there is a misunderstanding here

Colloquy

1    about our efforts to meaningfully engage in narrowing the

2    subpoena.  We don't want to come before you with discovery

3    dispute after discovery dispute.  We're trying to keep this

4    process moving.

5              THE COURT:  Request number 2 --

6              MS. CHHINA:  It's really our goal here --

7              THE COURT:  Request number 2, "All communications

8    between you and Trooper 1 concerning any of Trooper 1's current

9    or former NYSP colleagues, including, but not limited to Diane

10   Parrotta.  How are communications between Trooper 1 and her

11   fiance, regarding her colleagues in general, relevant to the

12   harassment allegations in this case?  I'm sorry; it is just way

13   too far afield.

14             And your efforts to narrow the names do very little in

15   terms of narrowing the relevance of the communication.

16   Colleagues speak about any number of matters.  That doesn't

17   make them relevant.  You don't get all of her communications

18   because she filed a sexual harassment case.  It's not how this

19   works.

20             MS. CHHINA:  But --

21             MS. GLAVIN:  Your Honor?  Your Honor, this is Rita --

22             THE COURT:  Is that Ms. Glavin?

23             MS. GLAVIN:  Yes.  Could I be heard on this issue

24   briefly?

25             THE COURT:  Yes.

Colloquy

1          MS. GLAVIN:  Okay.  A couple of things.  One is, Your

2    Honor, I want to be clear, we're not engaged in a fishing

3    expedition.  But what has happened here is that nobody --

4    nobody is giving us anything.  And what we do know, and that's

5    why we've had to do interrogatories to Trooper 1, who have you

6    communicated with about your allegations or who are witnesses

7    to the events described in the complaint.  The list we came up

8    with was designed around her responses.

9          How this would normally go in a meet-and-confer, and I

10   was on the call, is that I would expect, because this is what I

11   would do if I were asked to do this as a third-party, I would

12   talk to my client and say, here's a list of twenty-six names;

13   do any of these jump out at you?  Do any of these have any

14   relevance?  Can we narrow these?

15         That's not what's happening.  What happens is that the

16   third party will say to us, you tell us.  And it's hit or miss

17   with us.  So the meet-and-confers, Your Honor, we have tried.

18   And it's not just with Mr. Brown's counsel -- who we understand

19   Mr. Brown's counsel works very closely on a regular basis with

20   the Wigdor firm.  It's not just with Mr. Brown's counsel.  This

21   has been pretty coordinated, and we have -- by a number of the

22   third parties.

23         So if you're frustrated, I share your frustration.  I

24   share it because we now know -- and I do want to make a record

25   on this -- the phone records that we have been arguing about

Colloquy

1   for months, from Trooper 1, we now have those phone records

2   from Verizon.  I'll tell you what those phone records show on

3   first glance.  They show that Trooper 1 was in repeated

4   communication, by voice mail and text, with other witnesses who

5   were troopers, including witnesses that we have deposed in this

6   case.  And she was in touch with them by text and telephone

7   before and after those individuals went in for interviews with

8   the Attorney General's office.  We see that throughout the

9   months of the investigation.  We see communications between

10  Trooper 1 and others, including Parrotta, at the time she filed

11  her lawsuit.

12         So we know that Trooper 1 had text exchanges at

13  critical times with critical witnesses in the case.  None of

14  them have been produced to us.  And so I will tee up for you

15  that -- you've told us we can't get phone records without an

16  order -- we're going to be asking for more phone records based

17  on what we're seeing in those communications.

18         And what is particularly upsetting is that the state

19  police sent out to the PSU -- and Trooper 1 received this on

20  March 16th of 2021.  There was a preservation order.  There was

21  a direction to all the PSU members that they were to preserve

22  any communications relating to the allegations or the AG's

23  investigation.

24         And we see that Trooper 1 is communicating with Diane

25  Parrotta who went in and was interviewed on April 12th.  We see

Colloquy

1    her communicating right before and on the day of her interview,

2    with text and on the phone, but not a single one was produced.

3    So we know these things exist.

4            Here's the other frustrating thing about text messages

5    that I'm seeing as I look at text communications.  I can use

6    Lindsey Boylan as an example.  When I look at the text

7    communications, they are not particularly amenable to search

8    terms because people speak in shorthand.

9            So when you say, for instance, it's irrelevant, Ms.

10   Glavin, that so and so said let's have lunch today, well, it

11   becomes particularly relevant to us if it is the lunch with

12   Diane Parrotta that they had after Diane Parrotta received her

13   subpoena that Diane Parrotta testified about in her testimony.

14           So I am frustrated, as you are, because it is clear to

15   me, from looking at Trooper 1's phone records, that she deleted

16   a host of relevant texts.  What else was she texting with

17   Fabricio Plaskocinski about in April of 2021, when he's going

18   into his interview, when she had not -- what is she talking to

19   Chris Long (ph.) about, when he's going in for his interview,

20   when she hadn't communicated with him for a while.

21           So we know these things are there, and we know Trooper

22   1 doesn't have them because she doesn't produce them.  So we're

23   trying to reverse engineer this.  I would love to have a

24   meaningful meet-and-confer with Charlie Brown's attorneys to

25   say, hey, have you talked to your client?  Who did she talk

Colloquy

1    about?  She may not have even talked about all twenty-six of

2    the people on the list that we created from her

3    interrogatories.  And then come back to us and say this is who

4    I remember she would talk about.

5            She talked about Parrotta.  I'm very interested in

6    communications, of course, about Parrotta, about whether she

7    trusted her, about what Diane Parrotta was saying to her before

8    Trooper 1 went forward, about why it is that Diane Parrotta had

9    Trooper 1 call Major Nevins, who she never worked with, about

10   coming forward with her allegations.

11           So I just want to disabuse the Court and the notion,

12   because it keeps coming on us.  And I'm so frustrated.  And I

13   think I've said this to you before.  This doesn't happen in

14   criminal discovery.  I'm pretty outraged by it, but it has been

15   coordinated to get us in every instance to say give me a name

16   and I'll give you this.  We've been blocked all over the place.

17           Our communications with Charlie Brown's counsel, back

18   and forth, went on for weeks.  And Wigdor was cc'd on these

19   emails, and they never raised their hand to say, hey, we have

20   these and there's, like, twelve of them.  So I just wanted to

21   make a record because I'm as frustrated as you are.

22           THE COURT:  Mr. Crain, would you like to be heard?

23   And then I'd like to hear from counsel for Mr. Brown if he has

24   anything -- if he or she has anything to say.

25           Mr. Crain?

Colloquy

1        MR. CRAIN:  Yes, very briefly.  I think we're going

2    far afield.  I think this is one conference we've had in this

3    case that was fairly close to remaining focused on the actual

4    issues today.  I think what you heard from counsel for Cuomo is

5    that they resent the fact that other people won't carry their

6    burden of establishing the relevance of document requests.

7    That was the basis of the entire complaint, essentially.

8        There's a joke that, if you think every roommate

9    you've ever had is a bad roommate, maybe you're the bad

10   roommate.  I don't think it's a coincidence that now, not just

11   us, but multiple witnesses have very similar objections to

12   scope and to relevance.

13       THE COURT:  That is entirely nonresponsive to the

14   issues that Ms. Glavin raised, Mr. Crain.  Is there anything

15   else you'd like to add?

16       MR. CRAIN:  Well, is there anything that the Court is

17   concerned with in any of Ms. Glavin's representations, because

18   she --

19       THE COURT:  What I'm concerned --

20       MR. CRAIN:  -- said a lot and --

21       THE COURT:  What I'm concerned with, Mr. Crain, is the

22   parties' difficulties with the meet-and-confer process and the

23   notion that here we are, two years into discovery, only to

24   learn that -- I mean, Ms. Glavin is saying it's new to them,

25   Ms. Chhina is saying it's new to them.  I certainly was unaware

Colloquy

1    that there are apparently responsive text messages in

2    plaintiff's possession that have not yet been produced.

3            And so it's concerning on many levels that the parties

4    have not gotten to this point in discovery on their own, and

5    that this is coming up.  It almost feels like a sideswipe, in

6    the context of trying to address the issues pertaining to Mr.

7    Brown, to learn that the plaintiff herself may have responsive

8    documents that they've been trying to get for months from Mr.

9    Brown.  So I really am concerned about how this process is

10   unfolding, Mr. Crain.

11           MR. CRAIN:  Well, I will address that, certainly.  I

12   understand the Court's concerns.  I would just emphasize,

13   again, that we put a document in their hands saying that we had

14   responsive materials.  And it was the best disclosure we could

15   make, and it was a proper disclosure.  They didn't follow up on

16   it.  We were surprised that they didn't follow up on it.  It's

17   why we filed this letter with the Court.

18           THE COURT:  So to be clear --

19           MR. CRAIN:  They knew about this objection.  They

20   mentioned this objection at a December 12th conference.  They

21   said we have this objection from Trooper 1, so we're doing

22   subpoenas instead, because we don't want to address that

23   objection.  I mean, they knew of the objection, and they knew

24   that we were withholding documents.

25           MS. GLAVIN:  Your Honor, this is Rita Glavin, if I

Colloquy

1    might be heard briefly in response.

2              THE COURT:  Yes.

3              MS. GLAVIN:  I just don't get it, okay?  I feel like

4    we're aiming at a target that keeps moving here.  We served a

5    subpoena to Charlie Brown months ago, in August, for these

6    communications.  Why didn't Trooper 1 raise her hand and say,

7    hey, it looks like I have some responsive communications; I'll

8    turn them over to you.

9              We then go through a whole meet-and-confer, and I find

10   it very difficult to believe that Charlie Brown's attorneys,

11   again, who work very closely with the Wigdor firm -- and my

12   guess is that Wigdor probably asked Mr. Mintzer  if he would

13   represent Trooper 1's fiance.

14             I find it very difficult to believe that, through that

15   meet-and-confer, there wasn't somebody saying -- they didn't

16   ask us, particularly when we were on the meet-and-confers with

17   Charlie Brown's lawyers, and she kept saying to us go to

18   Trooper 1.  And our response was Trooper 1 doesn't have text

19   messages.  They've told us this repeatedly, all this time

20   knowing this -- like, just why is it that we see the letter?

21             And I'll tell you, my head popped off last week when I

22   saw that letter.  And I'm, like, they had these all this time.

23   And we went through that whole process and did a letter, and

24   we're finding out about it now.

25             The reality is it's now water under the bridge.  We



Colloquy

 1  know Trooper 1 had responsive text messages.  They were

 2  withheld.  And let me add this; they weren't just withheld from

 3  us.  I've seen the document requests from the New York State

 4  Police, and I'd be curious to hear their views on this, because

 5  her text messages with Charlie Brown would be responsive to

 6  their document request.  And perhaps Mr. Steele wants to weigh

 7  in.

 8          But the reality is Trooper 1 needs to produce these.

 9  I don't know why we're even in this conference today, and they

10  haven't provided the text messages, at least the ones they're

11  willing to give to us, already.  And we can go from there.  But

12  this has been par for the course.

13          I feel like it's the movie Any Given Sunday, and it's

14  the Al Pacino speech where he says, we have to fight, scramble,

15  scratch for every inch on the football field.  Stuff that is

16  basic discovery, we're not getting.  And I feel like we're in a

17  death wrestle to get it.

18          And so I think Trooper 1 needs to produce all of the

19  responsive texts with Charlie Brown now.  I would like to know,

20  given what we have now seen in Trooper 1's phone records, about

21  her fastidious texting, around the times of the Nevins

22  interview, around the times of the Parrotta interview, around

23  the times of the Plaskocinski interview, around the times of

24  the Chris Long interview, around the times of the Kyle

25  Shillingford interview, where are all those text messages?

Colloquy

1          Because why is it that Fabricio Plaskocinski is

2     talking to Trooper 1 right before he goes into the AG's office

3     and right after he gets out?  And why has nothing been

4     produced, particularly when there was a preservation order that

5     was issued to the PSU?  Why didn't Trooper 1 preserve those

6     texts?

7          So I just think they need to be produced.  And this is

8     why we end up having to go to third parties, because Trooper 1

9     destroyed her texts, didn't keep them.

10          THE COURT:  Mr. Crain?

11          MR. CRAIN:  I think there's a lot of sound and fury,

12     and it's just to distract from what was essentially either a

13     bad-faith or a negligent response to receiving a document that

14     said we object and we are withholding documents.  This is the

15     one thing they will not address.  It was a proper objection.

16     It was a proper disclosure.

17          However, we agree on something.  We are prepared to

18     produce the texts that we mentioned, subject to objections

19     about allegations of misconduct, investigations, and reports,

20     allegations in the complaint, and this action between Trooper 1

21     and the witness.

22          And we would also agree with Neesha's suggestion that

23     those go back slightly further than the range we suggested,

24     which was January 1st, 2018.  We agree that they can go back to

25     November 1st, 2017.

Colloquy

1          THE COURT:  But you do not agree, at this juncture, to

2     provide all texts concerning Governor Cuomo going back to

3     November 2017?  You're still objecting to subcategory (1) or

4     (a), depending on which list you're looking at?

5          MR. CRAIN:  Correct.  We maintain that objection.

6          THE COURT:  Why?

7          MR. CRAIN:  Because there is various communications

8     that have no bearing on the case and not even remotely.  She

9     was on --

10          THE COURT:  How much --

11          MR. CRAIN:  She was on the PSU for a long time.

12          THE COURT:  I understand she was on the PSU for a long

13     time, but they're looking to understand the interactions that

14     she had with Mr. Cuomo and the trooper's attitudes towards Mr.

15     Cuomo at various points in history.  So what is the basis for

16     your objection to exclude that first category?

17          MR. CRAIN:  It's overbroad and not proportional to the

18     needs of the case, because the conversations about just Cuomo

19     in general have no real bearing on any of the allegations.  But

20     your point is taken, and if the Court orders it, we can produce

21     these.

22          THE COURT:  Without knowing what exists, that would be

23     just generic chit chat, like, I just got off my detail with

24     Governor Cuomo, okay, plain vanilla, right, plain vanilla

25     mention of Governor Cuomo.  Without knowing how many such text

35

Colloquy

1    messages exist, it's hard for the Court to evaluate burden and

2    proportionality.

3              What I do know and agree with Governor Cuomo about,

4    Mr. Crain, is that shifting attitudes towards the governor are

5    relevant.  So if there are messages in the past where Governor

6    Cuomo is described in laudatory terms, that would be squarely

7    relevant to the issues in this case.

8              And we're not going -- I don't know that it is in

9    anybody's interest to split hairs in terms of trying to produce

10   some narrow subset of documents touching upon Governor Cuomo

11   versus all, given the history of the discovery here and how

12   fraught it has been.  I think that would be walking a very fine

13   and dangerous line.

14             And I also have no sense of how many "nonresponsive"

15   documents would even exist discussing Governor Cuomo.  Do you

16   have a sense of that burden and whether or not that would be a

17   significant number or a small number, Mr. Crain?

18             MR. CRAIN:  Yes.  So the vast majority are covered by

19   the items we don't object to, so allegations of misconduct,

20   investigations reports, the allegations in the complaint and

21   the action.  There are another handful, perhaps amounting to a

22   few dozen PDF pages, that are just about Cuomo generally.

23             THE COURT:  I do not find that to be a burden.  You're

24   going to turn over everything in regard to her text messages

25   pertaining to Governor Cuomo.  With regard to the twenty-six,

36

1    it is your position -- and the date range should be the date

2    range that Ms. Cheena suggested, going back to November 2017.

3            With regard to the list of twenty-six names, I still

4    am at a loss as to what to do.  Okay.  So it's been represented

5    by Mr. Crain that there really aren't any responsive text

6    messages in Trooper 1's possession with Mr. Brown -- text

7    messages with Mr. Brown discussing these twenty-six.

8            So that is the narrow issue we're here to discuss

9    today, Ms. Glavin.  I don't know whether these other folks that

10   you may seek to subpoena have counsel.  I don't know whether or

11   not there have been conversations with their counsel.  But if

12   there are no responsive documents in Trooper 1's possession

13   regarding these twenty-six names, obviously she can't produce

14   them.

15           What we haven't done is heard from the state police or

16   counsel for Mr. Brown.  So Mr. Steele, who's taking the lead

17   today on behalf of the State police?

18           MR. MOORE:  Your Honor, this is Dan Moore.  We support

19   the defendant, Governor Cuomo's, position on this.  In fact, we

20   were concerned as well because our initial discovery demands, I

21   believe, were broad enough, based on the information we have,

22   to cover these texts.  And so it is somewhat concerning to

23   learn now, after all these years, that these texts are out

24   there and have not been produced.

25           THE COURT:  Okay.  And anything further, Mr. Moore?

Colloquy

1          MR. MOORE:  No, that's all I have, Your Honor.

2          MS. GLAVIN:  Your Honor, this is Rita Glavin.  On that

3    issue, could I just be heard briefly?

4          THE COURT:  Which issue?

5          MS. GLAVIN:  The issue with respect to the text

6    messages that Trooper 1 may have versus what Mr. Brown may

7    have.

8          THE COURT:  Yes.

9          MS. GLAVIN:  What I think would be helpful is if the

10   Court could inquire, has Trooper 1's counsel conferred with

11   Charlie Brown's counsel such that all of Charlie Brown's text

12   messages with Trooper 1, do they overlap entirely?  In other

13   words, did Trooper 1 delete any text messages that may be

14   responsive with Charlie Brown?

15         THE COURT:  That is actually part of what I wanted to

16   discuss with Mr. Brown's attorney, Ms. Glavin.

17         MS. GLAVIN:  Okay.  All right.  Thank you, Your Honor.

18         THE COURT:  Anything further?

19         MS. GLAVIN:  No.

20         THE COURT:  Okay.  So Mr. Brown, you've heard Ms.

21   Glavin's question.  I had the same question.  I don't know, and

22   I will certainly loop back to Trooper 1 and ask a similar

23   question.  But in terms of the text message universe that is in

24   Mr. Brown's possession with regard to Trooper 1 -- in

25   communication with Trooper 1, I should say, who is taking the

Colloquy

1    lead today, Mr. Mintzer or Ms. Koistinen?

2            MR. MINTZER:  It's Mr. Mintzer.  Thank you, Your

3    Honor.

4            THE COURT:  Okay.  So could you enlighten me, please,

5    as to what universe of text messages you have had an

6    opportunity to locate with regard to your client?  And do you

7    know the answer to the question as to whether or not they cover

8    the relevant time frame, November 2017 to the present?

9            MR. MINTZER:  Well, Your Honor, we've looked at what

10   our client has and have instructed him, obviously, to preserve

11   everything.  I have not done a comparison to what we just

12   learned that Trooper 1 did.

13           And just to clarify, because there was some mention of

14   it earlier, we had no idea that there were any outstanding text

15   messages that the plaintiff had in her possession.  Based on

16   the representation from Defendant Cuomo, we were proceeding in

17   our discussions with them on the premise that they couldn't get

18   this material from the plaintiff.

19           So we don't have -- to answer your direct question,

20   Your Honor, I don't know what the plaintiff has.  I heard the

21   representation this morning that she's maintained her text

22   messages with Mr. Brown.  And so I have no reason to think that

23   that's different than what we have.

24           THE COURT:  Okay.  But you haven't -- I mean, how

25   many -- what's the volume here?  I can't even imagine what five

Colloquy

1    years of text messages look like between two people who are

2    close.  I mean, have you done a search term, sort of, analysis,

3    or have you just -- you just had it preserved and you haven't

4    really done a lot of searching?

5            MR. MINTZER:  So we've done the searches on the first

6    category.  And I think it's fair to say that our belief about

7    what exists is similar to what Mr. Crain described earlier,

8    right, that it's pretty limited.

9            And so just to clarify, Your Honor, our objection on

10   the first one was really more towards relevance not burden.  I

11   think Your Honor's ruling on the scope of what should be

12   produced was directed to the plaintiff as a party.

13           I think that, as a nonparty being asked to produce any

14   text messages without a date, a limitation as to date or

15   subject matter, that may just merely mention Mr. Cuomo, was not

16   an appropriate request.  It was overly broad and not properly

17   limited time and subject matter.

18           But the answer to the question about what exists, I

19   think, on that one, it's a relatively limited amount.  I have

20   not -- we have not undertaken to do a search for the twenty-six

21   people that they've "limited" their request to, for the very

22   reason that Your Honor identified earlier in this call, is that

23   the burden there is actually in the requested search process.

24           And as Your Honor also pointed out, we intended to

25   engage with counsel for Governor Cuomo in a real lawyer-to-



Colloquy

1    lawyer good-faith discussion, what do you really need here?

2    Give us five or six names.  Give us something reasonable.  And

3    they refused to do that.

4           And now I hear from Ms. Glavin this morning that she

5    thinks the burden should have been on us to tell her what

6    really they should want.  Forgive me, I've never heard of

7    anything like that.  They are the ones seeking discovery.  They

8    are a party to the case.  My client is not.  They need to tell

9    me what it is that they think is actually relevant.

10          Just throwing out a list of twenty-six names of,

11   potentially, people that she -- that my client and Trooper 1

12   might have communicated about, who she works with is, on its

13   face, absurdly overbroad.  And so, despite our request to try

14   to get them to be real about this, they've refuse to.  And

15   that's why we're here.

16          THE COURT:  Understood.  So in terms of next steps, it

17   seems very clear that Trooper 1 needs to produce the text

18   messages that are responsive to the subpoena that was issued to

19   Mr. Brown, with regard to request number 1 of the document

20   requests that were sent to Mr. Brown.

21          In terms of requests 2 and 3, Mr. Brown -- I'm sorry,

22   Mr. --

23          MR. MINTZER:  Mintzer?

24          THE COURT:  On behalf of Mr. Brown, Mr. Mintzer,

25   number 2 is this communications between you and Trooper 1

Colloquy

1    concerning the list of twenty-six, which we've already

2    discussed.  And my understanding is that those are really the

3    two areas of dispute.  Is that correct, Mr. Mintzer?

4              MR. MINTZER:  Yes, Your Honor.

5              THE COURT:  Okay.  So at this juncture, Ms. Glavin and

6    Ms. Chhina, this Court is not prepared to say that text

7    messages pertaining to all twenty-six of these people are

8    relevant and proportional to the needs of the case.  You have

9    given no context as to who precisely these people are and how

10   communications about them, between these two people, could be

11   relevant and proportional to the needs of the case.

12             As I mentioned a moment ago, and Mr. Mintzer echoed,

13   it's not merely the volume of production that is the issue.

14   It's the searching and the efforts to determine what exists

15   that creates some of the burdens on nonparties, particularly in

16   situations like this where the lists are long, overly broad,

17   and it really just feels, in some ways, like a fishing

18   expedition.

19             Perhaps the phone records will help narrow the issues

20   in some ways, Ms. Glavin.  Now you have a more focused set of

21   criteria on which to look at date ranges and the possible

22   relevance that some of these folk's text messages may have.  I

23   think the parties are, I'm sure, fully enmeshed.

24             And the determination that I made in the protective

25   order, issued back on January 16th, the documentary discovery,

Colloquy

1    including nonparty documentary discovery, must proceed.  So I

2    encourage the parties to continue to meet and confer.  I

3    encourage you to continue to meet and confer with the

4    nonparties, Ms. Chhina and Ms. Glavin.  But focusing your

5    requests will yield significantly more results than these

6    extremely broad requests that cause folks to blanch at arguable

7    relevance and really do seem like fishing expeditions to some

8    degree.

9            So I'm not sure there's that much more we can

10   accomplish today.  But I do want to give everybody the

11   opportunity to be heard.

12           I didn't ask Ms. Foti if she had anything to add.  Ms.

13   Foti, is there anything you'd like to raise?

14           MS. FOTI:  No, Your Honor, not on this issue.  Thank

15   you.

16           THE COURT:  Okay.  So --

17           MS. GLAVIN:  Your Honor?

18           THE COURT:  I hesitate to do the roll call.

19           But Mr. Crain, what else is there to resolve today?

20           MR. CRAIN:  Nothing else to resolve.  We will hand

21   over the documents, as instructed, from November 1st, 2017

22   regarding Cuomo.

23           I also want to mention that I've heard what the New

24   York State Police has said.  We're going to also carefully

25   review all responses and objections to date and make sure the

Colloquy

1    loop is closed on all of those for all parties.

2              THE COURT:  Okay.  Thank you for that.

3              And on behalf of Mr. Cuomo, was that you, Ms. Glavin?

4              MS. GLAVIN:  Yes, Your Honor.  This is Rita Glavin.

5              Two things.  One is, with respect to Trooper 1, the

6    Court ordering Trooper 1 to produce the responsive

7    communications with Charlie Brown, I just want to make sure

8    that Trooper 1 has produced all responsive communications.

9              For instance, the list of twenty-six we came up with

10   comes from Trooper 1's interrogatory.  Trooper 1 identified

11   those twenty-six troopers as either witnesses to events in her

12   complaint or as individuals she communicated with about her

13   allegations.  That's how we came up with that list.

14             And I just want to be sure -- and the reason we went

15   to Charlie Brown is because we got nothing from Trooper 1.  I

16   see in her phone records lots of text messaging after the

17   preservation order was issued.  And I want to be sure that

18   Trooper 1 has gone through and understands she is to produce

19   communications, not just with Charlie Brown bearing on these

20   issues, but with any other troopers.

21             THE COURT:  Have you met and conferred with them

22   recently on this issue, Ms. Glavin?

23             MS. GLAVIN:  No, Your Honor, because I had always

24   understood they had done that, based on the production

25   responses.  And now I'm very, very concerned.

Colloquy

1          MR. CRAIN:  Your Honor, John Crain.  Apologies.

2          THE COURT:  Let her finish.

3          MR. CRAIN:  May I, Your Honor?  I'm sorry.

4          THE COURT:  Let her finish.

5          MS. GLAVIN:  I just want to avoid us having to come

6    back and go through a process where we all have to write

7    letters to the Court.  It's a pain for everybody.  And so I

8    just want to make sure that that has been done.  I assumed that

9    that was done.  And now I'm not so sure after having looked at

10   these phone records.

11         THE COURT:  Okay.  Mr. Crain?

12         MR. CRAIN:  Yes.  So I want to mention it's not true

13   that we've never provided responsive documents regarding any of

14   these witnesses.  The famous Diane Parrotta texts were texts

15   that we produced, without anyone chasing them, in response to

16   the discovery we received, which we received -- which we

17   produced as soon as they came into existence.  So we are going

18   to go back and close the loop on everything, and we can meet

19   and confer about it as well.

20         THE COURT:  Thank you for that.

21         MS. GLAVIN:  Your Honor?

22         THE COURT:  Ms. Glavin, you said two things.

23         MS. GLAVIN:  Yes.

24         THE COURT:  What was the second thing?

25         MS. GLAVIN:  The second item is, in Your Honor's

Colloquy

1    recent order, you directed us to come to the Court if we were

2    going to do any more telephonic subpoenas.  And to cut to the

3    chase, we had walked away because we had the Trooper 1 phone

4    records, to the subpoena for Diane Parrotta's phone records.

5          But now what we have seen in the Trooper 1 phone

6    records, with respect to her communications with Parrotta, we

7    have begun to see a pattern from March -- between March 2021

8    and August of 2021.  And then we see more calls around the time

9    that the assembly report is released and Trooper 1 and other

10   complainants testimony is released.  We also see similar

11   patterns around the time Trooper 1 filed her lawsuit.

12         But it appears to us that Diane Parrotta was

13   intermittently speaking with Trooper 1, and then Trooper 1

14   would speak to a witness.  And we think -- we want to get Diane

15   Parrotta's phone records based on the patterns that we've seen.

16   And we'd like to get a subpoena to her service provider for her

17   phone records for the same time period we have -- actually, for

18   Trooper 1, going back to -- I'd like to get it for 2019 up

19   through Ms. Parrotta's testimony in this case, to just get the

20   phone records that -- basic ones that Verizon would give you.

21   We'd like permission for that subpoena.

22         THE COURT:  Does Ms. Parrotta have counsel?

23         MS. GLAVIN:  As far as I know, she does not.

24         THE COURT:  Mr. Crain?

25         MR. STEELE:  Your Honor, this is Joshua Steele.

Colloquy

1        THE COURT:  Yes.

2        MR. STEELE:  With respect to Ms. Parrotta, it's my

3    understanding that she has reached out to Attorney Lisa Joslin.

4    I don't know where that stands in terms of representation, but

5    that's her union attorney.

6        THE COURT:  I see.  Okay.  Thank you for that.

7        Mr. Crain --

8        MS. GLAVIN:  But we view this -- oh, sorry.  We just

9    view this as extremely important, so material to our defense

10   and our theory of the case involving Diane Parrotta's role in

11   this and how these allegations came to be, and communications

12   with troopers who were material witnesses.  In or around the

13   time they were going in and speaking with the AG, we see

14   communications with Diane Parrotta and with those troopers in

15   in almost unison.

16       You would have Diane Parrotta on the phone, and then

17   next thing you know, Trooper 1 is talking to Fabricio

18   Plaskocinski, who is a material witness.  And we think Parrotta

19   was in touch with each of them as well and communicating with

20   Trooper 1 about what her conversations were.

21       Your Honor may recall it was Diane Parrotta who

22   reached out to Major Nevins to ask him to speak with Trooper 1.

23   And we think she was facilitating these conversations.  So we

24   want to get those phone records.

25       THE COURT:  Have you deposed Diane Parrotta yet?



Colloquy

1          MS. GLAVIN:  We did.  We deposed her months ago.  We

2    sent Your Honor some of the video clips.

3          THE COURT:  Um-hum.

4          MS. GLAVIN:  And we didn't have any of these phone

5    records.

6          THE COURT:  I understand that, but I assume you asked

7    her about whether she was in communication with people.  What

8    did her testimony establish in that regard?

9          MS. GLAVIN:  We believe she lied.

10          THE COURT:  What did you ask her?

11          MS. GLAVIN:  Your Honor, I don't have the transcript

12    in front of me, but what I can tell you is we believe that

13    Diane Parrotta lied throughout her testimony, in various

14    instances, and I think this is documented in the letter.

15          THE COURT:  Which letter?  Oh, there are many.

16          MS. GLAVIN:  The one --

17          THE COURT:  There's so many, Ms. Glavin.

18          MS. GLAVIN:  Oh, this is why I just want to serve a

19    subpoena for phone records.  I feel like it's -- I don't have

20    her testimony in front of me, but I just was hoping to avoid a

21    letter process and quickly get the phone records we need,

22    because I know Your Honor has the case management plan, and we

23    need these records.  And we certainly need them before a

24    Trooper 1 deposition.

25          THE COURT:  Have you submitted the case management

Colloquy

1    plan?  I thought you guys got another extension.

2            MS. GLAVIN:  We did.  I don't think it's due yet.  Did

3    we submit it?

4            THE COURT:  Yeah, I don't think it's been submitted.

5    At least it wasn't prior to the conference.  Unless somebody

6    filed it while we've been on the phone, I don't think it's been

7    submitted yet.  So I don't have a sense of the exact cutoff

8    dates.

9            Mr. Crain, is there anything you'd like to say in

10   response to all of this at this point?

11           MR. CRAIN:  Just that the protective order requires

12   that they give one week's notice to Ms. Parrotta if they intend

13   to pursue those records.

14           I mean, of course, without going into all of the

15   issues, the conspiracy theory hasn't been borne out.  It wasn't

16   borne out in Ms. Parrotta's deposition.  The evidence doesn't

17   establish it.  Put all that aside; if they are going to seek

18   these records, then they have a duty to give her one week's

19   notice.

20           THE COURT:  That's where I was going with questions

21   about her attorney, Ms. Glavin.  Given --

22           MS. GLAVIN:  Your Honor, I'll give them --

23           THE COURT:  Civil discovery is obviously very

24   different than criminal grand jury subpoenas, which I know is

25   more what you did for many years.  It's a very different

49

Colloquy

1   process.  So I do need you to go through the process of

2   providing a subpoena to -- if it's the attorney identified by

3   Mr. Steele, or a different attorney, some sort of notice to Mr.

4   Parrotta so that we can try to work through the issues.

5            If you have a strong basis for the subpoena, and if

6   you can discuss that with her counsel, it may be that they

7   recognize that it's not worth bringing it to the Court.  But

8   that's up to them to try to decide.

9            MS. GLAVIN:  I get it, Your Honor.  I will notice it

10  as Your Honor indicated.  As you know, from your experience in

11  this case, and I sadly learned from my own, everybody has a

12  strong objection, I feel like, to everything.  But I will fight

13  and scratch for every yard.

14           THE COURT:  All right.  Anything else for today, Ms.

15  Glavin?

16           MS. GLAVIN:  No, Your Honor.

17           THE COURT:  Okay.  Thank you.

18           And then I don't want to leave you in the cold, Mr.

19  Moore; anything else on behalf of the New York State Police?

20           MR. MOORE:  Nothing further, Your Honor.

21           THE COURT:  Okay.  Ms. Foti?

22           MS. FOTI:  Sorry, Your Honor, I was on mute.  No,

23  nothing further, thank you.

24           THE COURT:  All right.  And on behalf of nonparty

25  Charles Brown, Mr. Mintzer, is there anything further?

Colloquy

1          MR. MINTZER:  Your Honor, I just would like clarity,

2    if possible, on what our obligation is right now.  As I

3    understood the colloquy with counsel for the parties, there's

4    going to be an exchange of production from plaintiff.  I just

5    want to clarify that our obligation to produce is at least on

6    hold until that has been accomplished and there's some sort of

7    showing that we have something further to add to this.  Is that

8    the Court's view of this?

9          THE COURT:  It is my view.  And unless there's some

10   reason to believe that there have been deletions, or there are

11   issues with the Trooper 1 production, you are on hold, but I'm

12   certainly not going to take the position that the subpoena

13   issued to you is not relevant because the communications

14   clearly are relevant.  So it's on hold pending the, sort of,

15   staged order of things that I set forth in the protective

16   order.

17         MR. MINTZER:  Understood.  Thank you, Your Honor.

18         THE COURT:  All right.  All right.  Well, thank you

19   all, and I hope you have a good day.  Enjoy the snow.  I don't

20   know if you enjoy snow or don't enjoy snow, but it's at least

21   very pretty.  So have a good day, everybody.  Take care.

22         MR. MINTZER:  Thank you, Your Honor.

23       (Proceedings concluded at 11:49 o'clock, a.m.)

24                         *  *  *  *  *

25

1

2                        C E R T I F I C A T I O N

3

4              I, Sharona Shapiro, court-approved transcriber, do

5     hereby certify the foregoing is a true and correct transcript

6     from the official electronic sound recording of the proceedings

7     in the above-entitled matter.

8

9     *Sharona Shapiro*

10                                           February 16, 2024

11    _____        _____

      Sharona Shapiro, CET-492                DATE
12

13

      eScribers, LLC
14    7227 North 16th Street
      Phoenix, AZ 85020
15    www.escribers.net

16

17

18

19

20

21

22

23

24

25

eScribers

(973) 406-2250 | operations@escribers.net | www.escribers.net