# Exhibit 1

```
 1

 2                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF NEW YORK
 3
                                        )
 4     TROOPER 1,                       )    1:22-CV-00893-LDH-TAM
                                        )
 5                      Plaintiff,      )    Brooklyn, NY
                                        )    December 10, 2024
 6                      vs.             )    3:10 PM
                                        )
 7     NEW YORK STATE POLICE,           )
       ET AL.,                          )
 8                                      )
                        Defendants.     )
 9

10                  TRANSCRIPT OF STATUS CONFERENCE
                 BEFORE THE HONORABLE TARYN A. MERKL
11                  UNITED STATES MAGISTRATE JUDGE

12     APPEARANCES (All present by video or telephone):

13     For the Plaintiff:         VALDI LICUL, ESQ,
                                  KATHERINE VASK, ESQ.
14                                WIGDOR LLP
                                  85 Fifth Avenue
15                                Fifth Floor
                                  New York, NY 10003
16
       For the Defendants,        RITA M. GLAVIN, ESQ.
17     Andrew Cuomo:              GLAVIN PLLC
                                  156 W. 56th Street
18                                Suite 2004
                                  New York, NY 10019
19
                                  THERESA TRZASKOMA, ESQ.
20                                ALLEGRA NOONAN, ESQ.
                                  SHER TREMONTE LLP
21                                90 Broad Street
                                  New York, NY 10004
22
       For the Defendants,        DANIEL J. MOORE, ESQ.
23     New York State Police:     JOSHUA D. STEELE, ESQ.
                                  HARRIS BEACH PLLC
24                                99 Garnsey Road
                                  Pittsford, NY 14534
25
```

```
 1

 2   For the Defendants,        CATHERINE M. FOTI, ESQ.
     Melissa DeRosa and         KAYASHA LYONS, ESQ.
 3   Richard Azzopardi:         MORVILLO ABRAMOWITZ GRAN IASON &
                                ANELLO PC
 4                              565 Fifth Avenue
                                New York, NY 10017
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21
                     TreLinda Wilson, CET**D-148
22                           eScribers
                       7227 North 16th Street
23                         Phoenix, AZ 85020
                          www.escribers.net
24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

1

2                                    I N D E X

3    RULINGS:                                             PAGE   LINE
     Defendant allowed twenty-five                        42      5
4    depositions total

5    Fact discovery close on May 16, 2025                 47      10

6    Status Report due May 23, 2025                       48      5

7    Objections to deposition notices due by              54      25
     January 10, 2025
8
     Opposition/response to objection of                  56      2
9    deposition notice due January 31, 2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

1        THE CLERK:  This is civil cause for a status

2   conference, docket 22-CV-893, Trooper 1 v. New York State

3   Police, et al.  Before asking the parties to state their

4   appearance, I would like to note the following.  Persons

5   granted remote access to proceedings are reminded of the

6   general prohibition against photographing, recording, and

7   rebroadcasting of court proceedings.  Violation of these

8   prohibitions may result in sanctions, including removal of

9   court issued media credentials, restricted entrance to future

10  hearings, denial of entrance to future hearings, or any other

11  sanctions deemed necessary by the court.

12        Will the parties please state their appearances for

13  the record?  Starting with the Plaintiff.

14        MR. VALDI LICUL:  Good afternoon, Your Honor.  Valdi

15  Licul for the Plaintiff, Trooper 1.  And I'm here with my

16  colleague, Katherine Vask.

17        THE COURT:  Good afternoon.

18        MS. RITA GLAVIN:  Good afternoon, Your Honor.  Rita

19  Glavin for former Governor Andrew M. Cuomo.

20        MS. THERESA TRZASKOMA:  Good afternoon,, Your Honor.

21  Theresa Trzaskoma.  I'm from Sher Tremonte LLP.  Also on behalf

22  of former Governor Cuomo.  And my colleague, Allegra Noonan, is

23  on as well.

24        THE COURT:  Good afternoon.  And on behalf of the

25  State Police?

Colloquy

1          MR. DANIEL MOORE:  Good afternoon, Your Honor.  It's

2    Dan Moore from the Harris Beach Firm on behalf of the New York

3    State Police, with my colleague, Joshua Steele.

4          THE COURT:  Okay.  And I see you're here, Ms. Foti.

5          MS. CATHERINE FOTI:  I am, Your Honor.  I'm Catherine

6    Foti on behalf of Melissa DeRosa and the now dismissed

7    Defendant, Richard Azzopardi, to the extent there is something

8    that affects Mr. Azzopardi.  My colleague, Kayasha Lyons, is

9    also with me.

10         THE COURT:  Okay, thank you.  I'm putting all the

11   names together here.  You guys are all scattered across the

12   screen so it's hard to keep track.

13         All right.  And I see a number of other -- another --

14   number of other dial-ins.  Is anybody else here on behalf of a

15   complainant?  Does anybody else want to state their appearance,

16   or people just members of the press, with the media, if -- or

17   public?  If you would like to state your appearance, please

18   just identify yourself and who you represent.  Okay.  So I will

19   leave the rest of the folks anonymous for now.  This is, of

20   course, a public proceeding.

21         We are here today because the parties have raised a

22   number of issues with regard to next steps in the depositions

23   in this case, and also, there has been a request for some

24   additional time.  And given the confluence of these events, I

25   thought it would be beneficial to just get everybody here so we

Colloquy

1    could talk through kind of anticipated next steps or proposed

2    next steps.  I know there are some sharp disagreements about

3    what is proportional and appropriate, given the history of the

4    discovery to date, some of which is new -- somewhat new to me

5    in terms of how many depositions have actually been taken and

6    of whom and where the parties would like to go from here.

7            So Ms. Glavin, who is taking the lead on behalf of

8    Governor Cuomo?

9            MS. GLAVIN:  I am, Your Honor.

10           THE COURT:  All right.  So do you want to just provide

11   an overview as to kind of where you are.  Of course I've read

12   the papers, but I have to confess, I did not know until these

13   papers that the parties had agreed to 18 depositions, and now

14   it sounds as though you're making an application to me for

15   significantly more than that.  So what are you seeking to

16   accomplish?

17           MS. GLAVIN:  Yes, sure, Your Honor.  So as set

18   forth -- I mean, I think this is in our letter of November

19   22nd, and again, in our letter of December 4th, we have taken

20   to date a total of ten depositions.  Of those depositions, they

21   include Trooper 1 herself, as well as one of the complainants.

22           As the Court knows, Trooper 1's complaint includes

23   about 100 paragraphs about her and 100 paragraphs about other

24   people.  And as the Court had told us, we were to not take

25   depositions of the complainants until after we had taken the

Colloquy

1    depositions of the governor and Trooper 1.  This -- the Court

2    issued that after we took the deposition over a year ago of Ana

3    Liss.  She was one of the complainants.

4            THE COURT:  Um-hum.

5            MS. GLAVIN:  But she's the only one that we took other

6    than Trooper 1.  So the other eight depositions were current or

7    former members of the PSU.

8            With respect to Trooper 1, she has taken the

9    depositions of eight people, including three of the parties.

10   That would be Governor Cuomo, Mr. Rosa, and dismissed party,

11   Mr. Azzopardi.  The remainder were State Police witnesses.  We

12   are now at the point because we completed the party

13   depositions, to take a number of now third-party depositions.

14           And I think it probably is easiest to start with in

15   terms of the complainants, we're not seeking to take all of the

16   other ten or eleven women that are mentioned.  I think we've

17   listed which of the complaints' depositions we want to take

18   that are included in the complaint.

19           So Alyssa McGraff, for instance, her name is mentioned

20   twenty times --

21           THE COURT:  Um-hum.

22           MS. GLAVIN:  -- in the complaint.  Brittany Cameso

23   (ph.), I think it's twenty to thirty times.  Charlotte

24   Bennett's name comes up thirty-five times.  Kaitlin's name,

25   twenty times.  Ms. Boylan, thirty-six times, and Ms. Limmiatis,

Colloquy

1   five times.  So of the other ten or eleven, we've taken one,

2   and we proposed to take those remaining six.

3         Mr. -- Trooper 1, as we understand it, has not agreed

4   that she will not rely on any of the other allegations included

5   in her complaint, but they plan to rely on all of them for

6   trial, which is why we need the other complainants.  But we're

7   not asking for all of them.  There are some we were able to lop

8   off.  I would note that -- I think it's State Entity Employee

9   number 2, we still don't know who that is.

10        So those -- there are the complainants, which I think

11  Your Honor had already ordered that we would be able to take

12  some of those depositions.  We expect some pushback on some of

13  them.  Like, for instance -- and the Court had already said we

14  would be able to take Ms. Boylan's deposition.  And that was --

15  and that was also indicated in the Charlotte Bennett case;

16  however, Ms. Boylan wanted to submit additional briefing as to

17  why her deposition should not be taken in Bennett before Ms.

18  Bennett chose to dismiss her lawsuit yesterday.  I expect that

19  we will get the same from Ms. Boylan in the Trooper 1 case.

20        So I think in terms of Your Honor thinking about

21  timing and scheduling, we expect to get pushback from some of

22  the complainants, and so we're -- that, we would have to work

23  in.

24        The next category, and I think this impacts all of the

25  remaining defendants, are the medical providers.  And we have

Colloquy

1    identified the ones that we really need for purposes of

2    damages.  There's five of those.  And I think that the State

3    Police is also in agreement on those, needing those for

4    purposes of damages and for the reasons that are laid out in

5    the chart that is Exhibit A.  2 -- I think it's ECF 291.

6              THE COURT:  Yes, I have it here.  Thank you.

7              MS. GLAVIN:  Okay.  So those are two categories.  A

8    third category is Trooper 1's former fiance.  And with respect

9    to him, he -- both -- given the text messages that were finally

10   produced -- and I do want to bring Your Honor back to, we had

11   been asking for some period of time -- I think for well over a

12   year, perhaps two years -- Trooper 1 had not produced any text

13   messages to us.  And then, after we subpoenaed Charlie Brown

14   for text messages, Trooper 1 then said she did have text

15   messages.  And those were first produced earlier this year.

16             We then through subpoena to former -- or to PS -- not

17   former, but current PSU Trooper Kyle Shillingford, who is a

18   close friend of Trooper 1 and was identified in her

19   interrogatories as someone with information that she spoke to

20   about her claims, we began his deposition in July.  He had

21   produced prior to his deposition a handful of text messages.

22   During his deposition, he then admitted to having many more

23   text messages with Trooper 1 that were not produced.  We paused

24   the deposition, and because of the volume of them, he could not

25   get through a search of his phone, which is why we had to leave

Colloquy

1    his deposition open.  Subsequent -- so we left the deposition

2    open.

3            Subsequent to that, I would say there are hundreds, if

4    not thousands, of responsive text messages that he had

5    regarding Trooper 1's allegations, including texts with Trooper

6    1 and text -- group text messages that Trooper 1 was on.  That

7    could not have been more material and responsive.  And these

8    are texts -- and these are text messages covering the time

9    period of her complaint.  The time period of the AG

10    investigation and thereafter.  Trooper 1 deleted these text

11    messages.  And those text messages, I think they were finally

12    fully produced to us in September or early -- late September,

13    right before part one of Trooper 1's deposition.

14            Also, what was indicating the -- the additional

15    depositions we wanted to take, is, one, we got all these text

16    messages.  Two, we got all the phone records.  And all this

17    happened in 2024, this year.  Two years in that we got the

18    records.  And they are some of the most important evidence that

19    we've gotten in the case.  And it materially changed, those

20    records, of who we wanted to talk to and what we wanted to talk

21    about.  So for instance, we want to -- so we have the medical

22    providers, we have that category.  We have the complainants

23    category.  We have the Charlie Brown category.

24            THE COURT:  Um-hum.

25            MS. GLAVIN:  And then we have the PSU category.

Colloquy

1          THE COURT:  Okay.  So my tally, according --

2          MS. GLAVIN:  Yeah.

3          THE COURT:  -- to your filing, is that you have seven

4     in the PSU category, five medical providers, six complainants.

5     So that brings us to eighteen.  and then Mr. Brown brings us to

6     nineteen.  And you've already taken ten; is that correct?

7          MS. GLAVIN:  Correct, Your Honor.

8          THE COURT:  Okay.  And then, this issue about

9     reopening -- I'm going to butcher his name -- Mr. --

10          MS. GLAVIN:  Plaskocinski.

11          THE COURT:  -- Plaskocinski, okay.

12          MS. GLAVIN:  Yes, Your Honor.

13          THE COURT:  I should be able to get that.  I grew up

14     near Detroit.  This whole area of Detroit is very Polish.  So

15     the question of that, we will table because that's a

16     different -- completely different analysis, completely

17     different issue.  Okay, go ahead.

18          MS. GLAVIN:  Yes.  So what we did, Your Honor, was

19     Trooper 1, in her interrogatory responses, identifies dozens of

20     people that she spoke to about her allegations.  A lot of them

21     are former PSU members.  We had meet and confers -- so we've

22     now gotten it down to seven.  We had meet and confers with

23     plaintiff counsel on this to ask them, tell us who you are

24     really going to call at trial so we can be informed and

25     efficient about this, and we could not come to agreement on

Colloquy

1   being informed of that.  As a --

2           THE COURT:  But you've taken eight other PSU people,

3   correct?

4           MS. GLAVIN:  Yes.  Most of those people were taken

5   before we got phone records and text messages.  And Kyle

6   Shillingford is -- we left that open and for him to come back

7   because of the text messages that were not produced that were

8   responsive.  So he started his deposition in July, and we had

9   to stop it because of the missing texts.

10          THE COURT:  Right.

11          MS. GLAVIN:  But from what we got, from the text

12  messages and from the phone records, and then of course from

13  Trooper 1's own deposition as well, these are who we identified

14  as the ones that we absolutely need.  And it took some time.

15  Again, Trooper 1 destroyed all of her texts, so we don't have

16  those.

17          THE COURT:  I thought you just said that there was a

18  production late in the game that she did have some texts.

19          MS. GLAVIN:  Only with respect to Charlie Brown.

20          THE COURT:  Okay.

21          MS. GLAVIN:  She destroyed her texts with the other

22  PSU members.

23          THE COURT:  Okay.

24          MS. GLAVIN:  And there --

25          THE COURT:  I just wanted to verify.

Colloquy

1         MS. GLAVIN:  -- will be at some -- there will be at

2    some point a spoliation motion on that point.

3         THE COURT:  Those are very unsatisfying, by the way.

4         MS. GLAVIN:  What are --

5         THE COURT:  They're very --

6         MS. GLAVIN:  -- unsatisfying?

7         THE COURT:  -- unsatisfying.

8         MS. GLAVIN:  What are?

9         THE COURT:  The remedies -- the remedies are not very

10   helpful, but you're free to do whatever you need to do.  But go

11   ahead.

12        MS. GLAVIN:  Okay.  On that note, so what we have done

13   is there are seven more that we want.  And quite frankly,

14   Judge, we would have -- and the thing about the complaint is

15   just taking Trooper 1's allegations alone, there are -- they

16   cover a three year time period.  There are approximately

17   eighteen separate incidents that she's talking about with

18   different witnesses.  And so as we have identified these, for

19   example -- and we're also --

20        One of the other disadvantages is we don't have the

21   interview memos.  We don't know what people said.  But Charles

22   Kaplan (ph.) came to our attention during Trooper 1's

23   deposition.  She talked about that she had discussed the

24   allegations with him.  In fact, she spoke with him the morning

25   of the deposition.  Said she spoke to him all the time.  He was

Colloquy

1    someone she discussed on her recruitment to the PSU, which is a

2    significant part of the complaint.  And the phone records

3    reflect extensive communications with him at key points in the

4    investigation.

5            THE COURT:  Um-hum.  No, I read your letters.  I do

6    appreciate your arguments as to each particular witness, but

7    there's sort of a dilemma here, and that dilemma is the

8    following.  It seems to me that you and the plaintiff's

9    attorney had agreed to eighteen depositions, and you have

10   chosen to take -- so you're shaking your head no.  That's in

11   the letter.  I don't know what the actual agreement was.

12           MS. GLAVIN:  There was an agreement.  I think maybe

13   you -- it's your -- we're probably passing each other in the

14   night.  They agreed to a max of eighteen.  We --

15           THE COURT:  Okay.

16           MS. GLAVIN:  -- didn't say eighteen is going to be the

17   end all and that we had some ironclad agreement.  They would

18   only agree to eighteen, period.

19           THE COURT:  Right.  So the extent of the agreement

20   you've reached with the plaintiff is eighteen.

21           MS. GLAVIN:  Yes.

22           THE COURT:  And absent leave of court, which they're

23   saying you should not get, the question of whether or not I

24   should grant nineteen more depositions, which is more than

25   plaintiff originally agreed to, I don't think is a clear

Colloquy

1    question.  There are many other options available to you.  Have

2    you looked, for example, into taking depositions by written --

3    written depositions under Rule 31, Ms. Glavin?

4         MS. GLAVIN:  What do you mean by written depositions

5    under 31?  In other words, get affidavits?

6         THE COURT:  Yes.

7         MS. GLAVIN:  We can do --

8         THE COURT:  What you're looking for is information,

9    for example, from the complainants as to whether or not they

10   ever knew Trooper 1, ever witnessed anything relating to

11   Trooper 1.  Anything whatsoever that you think was not asked by

12   the Attorney General's investigation that you think is relevant

13   to anticipated motions in limine, for example.  Why --

14        MS. GLAVIN:  So --

15        THE COURT:  -- can't that be accomplished through

16   other discovery means?

17        MS. GLAVIN:  Because, Your Honor, what they want to

18   prove at trial is they want to call ten additional women who

19   did not know Trooper 1 and put into evidence the allegations

20   they have made against Governor Cuomo.

21        THE COURT:  But I don't understand why you didn't

22   prioritize those depositions above all else if that's the

23   gravamen of your argument.

24        MS. GLAVIN:  Because you wouldn't let us.

25        THE COURT:  That's not true.

Colloquy

1          MS. GLAVIN:  Your Honor, we --

2          THE COURT:  I didn't make you take the depositions of

3    all these other folks first.

4          MS. GLAVIN:  Your Honor --

5          THE COURT:  That's your fault, Ms. Glavin.

6          MS. GLAVIN:  Your Honor, you told us --

7          THE COURT:  I told you to stage the discovery.  I did

8    not direct you to take anybody's deposition ever, except the

9    party depositions.

10          MS. GLAVIN:  So in other words, we would be

11    precluded -- Your Honor, as this case started -- and you were

12    pretty clear about this with Trooper 1 and with plaintiff's

13    counsel -- they are the ones that chose to plead a complaint

14    that was a far flung, including the kitchen sink.

15          THE COURT:  I'm aware --

16          MS. GLAVIN:  And the case law --

17          THE COURT:  -- Ms. Glavin.

18          MS. GLAVIN:  Let me --

19          THE COURT:  I'm aware.

20          MS. GLAVIN:  If I can finish.

21          THE COURT:  You don't have to recap the past.  I --

22          MS. GLAVIN:  But Your Honor --

23          THE COURT:  -- fully aware.  I have a clear

24    recollection of the very first oral argument we've ever had in

25    this case.  My question to you is simple.  Why did you choose

Colloquy

1    to prioritize the eight PSU members ahead of the complainants?

2            MS. GLAVIN:  Because they have factual allegations.

3    They are cited in the interrogatories as people who are

4    witnesses to the hundred-some paragraphs and eighteen different

5    incidents that Trooper 1 alleges are related to her

6    allegations.  If this case were simply the Trooper 1 case, as

7    Your Honor has pointed out, that would be enough, but the

8    reality is, this ends up rewarding plaintiffs that choose to do

9    complaints that throw in the kitchen sink.  And the case law is

10   very clear that Your Honor has discretion, and in a

11   circumstance such as this -- and this is included even in the

12   cases that they have cited -- is that counsel's judgment as to

13   what they need is an important factor to the Court.

14           The complainants' depositions are not duplicative.  It

15   never occurred to us in any universe that we wouldn't be

16   allowed to take the core complainants whose names are mentioned

17   twenty times or thirty times.  If Mr. Licul is going to put

18   Lindsey Boylan on the stand and she has absolutely no

19   information about Trooper 1 -- the sum total of her testimony

20   before the AG's Office was about two hours, three hours.  She

21   was not asked critical follow-up questions, and a written

22   affidavit isn't going to do it.

23           THE COURT:  Why not?

24           MS. GLAVIN:  Of course -- because --

25           THE COURT:  Why not?

Colloquy

1          MS. GLAVIN:  -- Your Honor --

2          THE COURT:  From the beginning -- from the beginning,

3     Ms. Glavin, one of the things that we have discussed is how

4     discovery needs to be relevant in proportion to the needs of

5     the case but fair to permit both sides to advance the case

6     and/or their defenses, right.  And --

7          MS. GLAVIN:  Your Honor --

8          THE COURT:  -- my impression, I could be wrong, is

9     that defendants would like to narrow the case, would like to

10    try to tailor the number of complainants who are permitted to

11    testify.  Why wouldn't written depositions as to their lack of

12    knowledge as to the allegations that are actually the claims in

13    this case help with that effort and be sufficient?  You

14    already --

15         MS. GLAVIN:  That --

16         THE COURT:  -- know what they're going to say, vis-a-

17    vis, any sexual harassment allegations that they may be making

18    against --

19         MS. GLAVIN:  No.

20         THE COURT:  -- Governor Cuomo.

21         MS. GLAVIN:  No, we don't.  We could not --

22         THE COURT:  For purposes of a motion in limine, you

23    do.

24         MS. GLAVIN:  Your Honor --

25         THE COURT:  You absolutely do.  You know the

Colloquy

1    circumstances under which they claim that they were subjected

2    to a hostile work environment.

3            MS. GLAVIN:  We don't.  You're wrong.  Did you -- Your

4    Honor --

5            THE COURT:  I've read their depositions.

6            MS. GLAVIN:  Ana Liss -- take Ana Liss' deposition.

7    The deposition we took of Ana Liss, who, as I have mentioned I

8    don't know how many times in that complaint, she gave

9    completely opposite testimony when she took her deposition.

10   She actually said she did not believe that she had ever been

11   touched inappropriately, that the Governor made inappropriate

12   comments to her, and that she believed she was not sexually

13   harassed.  That could not be more probative.  I agree that goes

14   to the legal question, but if I'm someone who's being included

15   in a report and they're saying I was sexually harassed and I'm

16   saying, no, I'm not, that's pretty relevant to whether or

17   not --

18           THE COURT:  It goes --

19           MS. GLAVIN:  -- she should be --

20           THE COURT:  -- to the --

21           MS. GLAVIN:  -- called at trial.

22           THE COURT:  -- legal conclusion.  It's -- her belief

23   is not relevant.

24           MS. GLAVIN:  Of course it is.  It absolutely is

25   relevant because it's based on her own experiences and her own

Colloquy

1   state of mind, Your Honor.  It could not be more relevant.  If

2   Trooper 1 got on the stand and she said in front of a jury, I

3   don't believe I was sexually harassed --

4              THE COURT:  Which we both --

5              MS. GLAVIN:  -- that would not --

6              THE COURT:  -- know is --

7              MS. GLAVIN:  -- more relevant.

8              THE COURT:  I wasn't at the deposition, but I would be

9   shocked if she said that at her deposition.

10             MS. GLAVIN:  She said it at her -- not Trooper 1, but

11  Ana Liss said that --

12             THE COURT:  I know.

13             MS. GLAVIN:  -- at her deposition numerous times.

14             THE COURT:  I have reviewed your motions to designate

15  that deposition three times, Ms. Glavin.

16             MS. GLAVIN:  Your Honor --

17             THE COURT:  I am familiar --

18             MS. GLAVIN:  -- we are in a position --

19             THE COURT:  You're missing the point entirely.

20             MS. GLAVIN:  I am not missing the point.

21             THE COURT:  Which is we talked about these

22  complainants, vis-a-vis, the questions to advance your defense,

23  and one of the key questions that I had understood the

24  defendants to be seeking throughout this discovery process is

25  information in an effort to narrow or limit which complainants

Colloquy

1    would be permitted to testify.  I do not understand why Rule 31

2    depositions as to their lack of knowledge regarding the

3    allegations in this case would not suffice to so move.

4              MS. GLAVIN:  Because, Your Honor, in addition -- it's

5    not just the fact that they don't know Trooper 1.  But Mr.

6    Licul has pleaded in his complaint a pattern and a practice in

7    a hostile work environment.  And he intends to rely on these

8    ten other women who don't know Trooper 1 to prove that up.  He

9    has said that repeatedly.

10             So it is not enough for us to get an affidavit from

11   each of the women, which I'm sure they would readily do,

12   saying, we don't know Trooper 1; it is that we need to explore

13   each of their complaints, because the AG's office didn't ask

14   numerous follow-up questions.  We will then be in a position to

15   say, this is why these allegations should not come in.  This is

16   not a pattern of practice.

17             Mr. Licul wants to put it under 404(b).  This is why

18   this would be a sideshow because here's what they had to say

19   during their deposition.  We may get for a number of these

20   women, as we saw with Ana Liss, that they don't even recall

21   some of these events, but we want to be in a position to say,

22   to bring to the Court, not be limited.  It's not just they

23   didn't know Trooper 1, but here is why this does not fall into

24   a pattern and practice.

25             THE COURT:  Well, as a -- as of the most recent

Colloquy

1   agreement with counsel, you have eighteen depositions.  You

2   have six complainants identified.  You can choose to take those

3   six if those -- that's your priority.  The issue is that you're

4   asking for nineteen more.  And so what I am failing to

5   understand is whether you have explored other avenues to take

6   some of this discovery that you say is so critical.

7           And this is the thing, Ms. Glavin.  At the end of the

8   day, this is a single plaintiff sexual harassment hostile work

9   environment type case.  And I recognize that the complaint is

10  broadly alleged.  Mr. Licul and I have gone back and forth on

11  that numerous times, as you have observed.  But at the end of

12  the day, taking thirty depositions in a case of this type seems

13  disproportionate.

14          And I get that you anticipated being able to take the

15  complainant depositions, and I'm not saying you can't, but I'm

16  saying --

17          MS. GLAVIN:  So --

18          THE COURT:  -- you need to prioritize and taking

19  thirty -- trying to take twenty-nine or so depositions seems

20  excessive.

21          MS. GLAVIN:  Your Honor, with respect to --

22          Go ahead, Ms. Trzaskoma.

23          MS. TRZASKOMA:  Yeah.  I'm sorry.  I'm sorry.  I just

24  need to -- I just need to correct something, which is there was

25  no agreement with plaintiff's counsel regarding the number of

Colloquy

1    depositions.  What happened --

2          THE COURT:  You may not have agreed.  They told you up

3    to eighteen is what they agreed to.  And without leave, you're

4    stuck.  I get it.  She's already made that point, Ms.

5    Trzaskoma.

6          MS. TRZASKOMA:  Well, but you keep -- there's -- there

7    is --

8          THE COURT:  It's in the rule.

9          MS. TRZASKOMA:  Your Honor, I'm --

10          THE COURT:  The rule is very clear that if the other

11    side agrees to it, that's the limit.  They have agreed to up to

12    eighteen.  You may not have agreed, but here we are.  I get it.

13    You already said it twice.

14          MS. TRZASKOMA:  No, I understand that, Your Honor, but

15    you -- you're --

16          THE COURT:  I never said you agreed --

17          MS. TRZASKOMA:  I just want the record --

18          THE COURT:  I said there was an agreement.

19          MS. TRZASKOMA:  Okay.  So I misunderstood --

20          THE COURT:  No, I did not --

21          MS. TRZASKOMA:  -- what your --

22          THE COURT:  Never implied that you had forfeited your

23    rights for other depositions.

24          MS. TRZASKOMA:  Okay.  I just wanted -- I just want

25    the record to be clear that there was no --

Colloquy

1          THE COURT:  Very clear.

2          MS. TRZASKOMA:  That was an offer and it was

3    conditioned on our not seeking any additional depositions.  And

4    so there was no agreement.

5          And I do think in addition, Your Honor, the idea that

6    our depositions could be conducted by written question and

7    limited to the information you suggest that we would need for

8    motion in limine practice is -- sort of assumes that that's all

9    the information we need because we would be successful in a

10   motion in limine.  And without the -- so long as the report and

11   the allegations of these other complainants remain part of

12   Trooper 1's case, we need to be able to take those depositions

13   in full.

14         THE COURT:  I never said you can't --

15         MS. TRZASKOMA:  Not just limited --

16         THE COURT:  -- take the complainants' depositions.

17   Nobody's answering my question, which is, whether or not you

18   can prioritize a fewer number.  The Rule 30 could not be

19   clearer.  If the parties have not stipulated to a number of

20   depositions, you need leave of court.  This is the first time

21   anybody's asked me the total number.

22         MS. TRZASKOMA:  It was a --

23         THE COURT:  I've been --

24         MS. TRZASKOMA:  -- it's a first time --

25         THE COURT:  -- discovery for two years in this case

Colloquy

1    and --

2              MS. GLAVIN:  No --

3              THE COURT:  -- in a conference about a year and a half

4    ago, I said, well, I take it we all agree that there's going to

5    be more than ten depositions.

6              MS. GLAVIN:  Yes.

7              THE COURT:  And everyone kind of laughingly said, yes.

8              MS. GLAVIN:  Yes.

9              THE COURT:  I assumed that the parties had reached

10   some sort of an understanding and that you were managing your

11   discovery plan accordingly.  Nobody has come to me ever to take

12   more than ten depositions in this case.  I have never told

13   anybody how many.  I've never told anybody limits. I have

14   observed that the complainants' depositions seem relevant based

15   upon the way the complaint is crafted, but to assume that

16   there's going to be a result when nobody has asked ever is

17   presumptuous and inappropriate under Rule 30.

18              So I get -- I get the defendants' arguments, but I

19   just don't think that this was handled in an appropriate

20   manner.  If you were -- if you needed to have twenty-five or

21   thirty depositions, and that was your plan all along, you

22   should have sought that permission a long time ago instead of

23   coming to me now and saying, oh, well, we assumed we could take

24   as many depositions as we want, basically, and that's just not

25   how the rule works.

Colloquy

1              Mr. Licul, would you like to --

2              MS. GLAVIN:  Your Honor, just on that --

3              THE COURT:  -- address -- no, I'm done.

4              Mr. Licul --

5              MS. GLAVIN:  No, Your Honor, on that point --

6              THE COURT:  No.

7              MS. GLAVIN:  -- I want to say --

8              THE COURT:  Ms. Glavin --

9              MS. GLAVIN:  -- why we didn't come --

10             THE COURT:  -- Ms. Glavin, no.

11             MS. GLAVIN:  -- to the court.  I would like to

12   explain --

13             THE COURT:  Ms. Glavin --

14             MS. GLAVIN:  -- why we didn't come to the court.

15             THE COURT:  Ms. Glavin, I'm going to mute your

16   microphone.  It is Mr. Licul's turn.

17             MR. LICUL:  Your Honor, we have -- I mean, obviously,

18   we briefed this in our letter.  And I don't intend to go over

19   everything that Ms. Glavin just spoke about, including Ms.

20   Liss' deposition, which we disagree about what it says, but

21   that's neither here nor there.

22             They have in this case, unlike many other cases,

23   actual sworn testimony from many of the witnesses.  And that

24   should inform their judgment as to who to take.

25             In terms of the medical providers, they have medical

Colloquy

1    records.  Certainly, we -- if we get more medical records, we

2    will produce those.  We're not withholding those.  I don't see

3    a need for them to take all five of those medical providers.

4    But again, that's their decision.

5           We've already told them that we do not intend to

6    take -- we do not intend to call Mr. Brown as a witness but

7    they want to take his deposition.  Again, their prerogative.

8           I also do want to point out one thing, which is Ms.

9    Glavin mentioned Mr. Kaplan as somebody who spoke with Trooper

10   1.  I just -- including the morning -- the day of her

11   deposition.  Her testimony was that she spoke to Mr. Kaplan

12   that morning to talk about Hurricane Helene and --

13           THE COURT:  I'm sorry, what did you say?

14           MR. LICUL:  To talk about Hurricane Helene.

15           THE COURT:  Okay.

16           MR. LICUL:  In other words, it didn't have anything to

17   do with the case.  They've had all the emails and text

18   messages, even the ones -- and I do take issue with the way Ms.

19   Glavin presented it, as if there was an intentional

20   destruction.  They have them.  They were able to ask Trooper 1

21   over two full days about them.  And again, they should make

22   decisions about who to depose and who's important in this case.

23           And I know, Your Honor, you and I have gone back and

24   forth on what a hostile work environment means and how to prove

25   that up and all of that, but again, eighteen is a healthy

Colloquy

1    number, especially given that there are sworn testimony with

2    respect to each of the complainants -- we'll call them the

3    complainants -- about their own experiences.  So I don't intend

4    to necessarily belabor what's in my letter.

5          The only thing I will say, and to Ms. Glavin's point

6    about some of the witnesses who they may choose may push

7    back -- and I know we haven't gotten to Mr. Plaskocinski yet,

8    but I do think he should have a say on whether he can be

9    deposed twice.  And there is no representative here for him,

10   and I don't believe the State Police -- the attorneys

11   representing the State Police is an entity representing him.

12   So that may be something -- I know we haven't addressed that

13   issue yet, but that's something that I think he should have a

14   say.  And unless the Court has any other questions, we will

15   rely on our letter.

16         And to the extent the Court -- I do also think, which

17   is not expressed in our letter, maybe expressly, is that some

18   of these -- the time periods are pretty -- I mean, they want to

19   depose Mr. Plaskocinski for five -- another five hours.  Seems

20   excessive given that he's already been deposed.

21         THE COURT:  How long was that deposition?  I thought

22   it was a short one.

23         MR. LICUL:  I don't recall.

24         MS. GLAVIN:  Approximately two hours.

25         MR. LICUL:  It was two hours, okay.

                              Colloquy

1              MS. GLAVIN:  Right.

2              MR. LICUL:  Anyway --

3              THE COURT:  Mr. Licul, here's a question.

4              MR. LICUL:  Sure.

5              THE COURT:  How did you arrive at eighteen as the

6    number to which you agreed?

7              MR. LICUL:  Well, there were six -- six other

8    complainants, as we'll call them.  And so I think all of them

9    already have -- they've given their testimony about their own

10   experiences.  They were able to ask our client at her

11   deposition, had the opportunity to ask if she knew any of these

12   women or -- so -- but --

13             THE COURT:  What did she say, Mr. Licul?

14             MR. LICUL:  What's that?

15             THE COURT:  What did she say?

16             MR. LICUL:  I don't recall.  I don't even recall if

17   the questions were asked.  I truly don't recall.  I'm not

18   posturing.

19             MS. GLAVIN:  They were asked.

20             MR. LICUL:  They were asked, okay.  Thank you.

21             MS. GLAVIN:  Yes, they were.

22             THE COURT:  And so they were able to -- they were able

23   to ask her about her communications with the other troopers.

24   And so we came at eighteen through some combination of a number

25   of other complainants, a number of other troopers, and some

Colloquy

1    medical providers.  That's how we reached the number.  It

2    wasn't necessarily a mathematical equation, but that's the way

3    we came up with eighteen.

4              THE COURT:  Right.  I mean, it is obviously an unusual

5    circumstance that the case is brought on the heels of an

6    investigation that involved interviews of dozens and dozens of

7    individuals and -- what is it?  How many people went under

8    oath?  Something like forty.  So this is an unusual

9    circumstance, Mr. Licul, in terms of how you chose to craft the

10   complaint.

11             So I do hear both sides as to kind of how they thought

12   through this discovery process.  But at the same time, eighteen

13   seems somewhat arbitrary, to be candid.  And I don't -- that's

14   why I asked the question because I --

15             MR. LICUL:  Yeah.

16             THE COURT:  -- wanted to understand your rationale and

17   why that would be relevant and proportional.

18             MR. LICUL:  Again, our rationale was that it would

19   give them the additional opportunity to take the different

20   witnesses and their various buckets.  And that was the -- that

21   was the rationale.

22             And to your point, Your Honor, about an unusual

23   situation where there has been a fulsome investigation and

24   documents, I mean, that speaks to the -- what I'll call the

25   overabundance of information rather than --

Colloquy

1    THE COURT:  The flip side of that is you find it

2    fulsome; they find it deficient because your position, of

3    course, is that the Attorney General's investigators were not

4    asking all of the exculpatory questions, only the inculpatory

5    questions.

6    MR. LICUL:  Right.  But in many cases -- there are

7    many cases in which -- civil cases where, and certainly

8    criminal cases, where witnesses appear and give testimony for

9    the first time when they're in front of a jury box and no one

10   really knows what they're going to say.  So I do think this is

11   a case where there are more witnesses than usual, but there's

12   also more information about what each witness has said and what

13   each witness claims, so.  That's the way we non-scientifically

14   arrived at eighteen.

15   THE COURT:  So how many of the treaters do you plan to

16   call, the treating physicians?

17   MR. LICUL:  I don't know, Your Honor, how many of the

18   treaters we plan to call.  And so -- and I'm not even sure that

19   we will call treaters rather than an expert.  But some of the

20   treaters, like a general practitioner, is likely less relevant.

21   I don't mean to tell Ms. Glavin how to do her job, far for me

22   to do that, but it certainly seems like a therapist who has

23   been treating the client is probably more relevant that

24   somebody who is a general practitioner, for example.

25   THE COURT:  Well, if you're calling -- the expert that

Colloquy

1    you would contemplate calling, what would that be?  And if

2    you're calling like a summary expert on the psychological

3    issues or whatnot, is that what you would anticipate?  Because

4    there's going to be more depositions there as well.  So what

5    are your thoughts --

6                  MR. LICUL:  Yeah.

7                  THE COURT:  -- on that?

8                  MR. LICUL:  We're not -- just to be clear, Your Honor.

9    If we're talking -- our eighteen limit does not --

10                 THE COURT:  (Indiscernible).

11                 MR. LICUL:  -- does not include experts, correct.  I

12   set those aside.  And just so you know, we have one more

13   deposition to take, and that is Stephanie --

14                 THE COURT:  Okay.

15                 MR. LICUL:  -- Benton, who worked at the State and

16   also was present when Mr. -- when Governor Cuomo claims he lost

17   his telephone in the ocean a couple months after this case was

18   filed.

19                 THE COURT:  Okay.  What's her name again, Stephanie?

20                 MR. LICUL:  Benton.

21                 THE COURT:  Right, okay.

22                 MR. LICUL:  And I -- we've spoken to her counsel, and

23   basically, she's not objecting to the deposition.  It's just a

24   timing issue that she would go after the parties.  I believe I

25   spoke to her before the party depositions were completed -- or

Colloquy

1     her counsel, rather.

2              THE COURT:  Okay.  So of the doctors that --

3              MR. LICUL:  Yeah.

4              THE COURT:  -- are identified in the papers, can you

5     help me understand.  We --

6              MR. LICUL:  Sure.

7              THE COURT:  -- have the primary care provider.

8              MR. LICUL:  Sure.

9              THE COURT:  Then we have a DO, who is the person who

10    submitted a letter to the New York State Police regarding work

11    restrictions, and I'm just kind of sanitizing the details.  And

12    then we have the psychiatrist; an independent medical examiner

13    who conducted an examination in connection with the workers'

14    compensation claim; and a psychotherapist.  Is that correct,

15    Mr. Licul?

16             MR. LICUL:  Yes.  And there's one -- there's one

17    pseudo medical provider who's actually a trooper.  And the

18    reason I say he's pseudo is a fellow named Philip Salinardi --

19             THE COURT:  Okay.

20             MR. LICUL:  -- who worked for the Employee Assistance

21    Program.  And Trooper 1 spoke to him during the period of some

22    of these events.

23             THE COURT:  Okay.

24             MR. LICUL:  So he's not a fact witness in terms of

25    incidents, but in terms of her emotional harm with respect to

Colloquy

1    that.

2         THE COURT:  Okay.  Is he -- I know this is not a

3    traditional sort of sexual assault case, but akin to like a

4    immediate outcry type of witness?  Like, what is his relevance?

5         MR. LICUL:  His relevance is that before she saw other

6    providers for emotional distress, she saw Mr. Salinardi as part

7    of the Employee Assistance Program.

8         THE COURT:  Okay.

9         MR. LICUL:  That's -- so I don't know if it's an

10   outcry witness, Your Honor, but it is somebody that she

11   initially saw for her trauma associated with what was

12   happening.

13        So again, I don't see that we would, for example, call

14   Trooper 1's primary care provider.

15        THE COURT:  Um-hum.

16        MR. LICUL:  Although some records may be relevant if

17   she received, for example, medication.  Would have been --

18   would have been diagnosed -- not diagnosed, but ordered by that

19   doctor.

20        The treating -- her treating psychiatrist is

21   somebody -- there are two treating psychiatrists here who are

22   probably on our list of people that we would call, as well as a

23   psychotherapist.  But I'm not sure we would even call all of

24   them.

25        THE COURT:  Okay.  I mean, so just in this

Colloquy

1    conversation, Mr. Licul, putting the primary care provider to

2    the side, you're identifying two to four medical providers that

3    you would be calling that go directly to damages; is that

4    correct?

5             MR. LICUL:  I don't know if I'd go as far as four.

6    I'd probably say two.  Two to three.

7             THE COURT:  You have Mr. Salinardi, the two treating

8    psychologists, and then there was another individual I thought

9    you mentioned.

10            MR. LICUL:  There's a therapist -- a psychotherapist.

11            THE COURT:  Right.  So that's four, isn't it?

12            MR. LICUL:  Yeah, but Mr. Salinardi, I don't -- to the

13   extent there's some question about when she started first

14   seeking treatment, and that would be his purpose.

15            THE COURT:  Right.  Well, I would imagine that would

16   be a hotly contested issue if they're going to challenge

17   causation.

18            MR. LICUL:  Yeah.  I imagine that's the case.  But

19   again, they have all the records from these folks, so -- I

20   mean, they're not experts.  I mean, they're not opining and

21   giving an expert opinion.  They would be speaking about their

22   experience with respect to treating our client, and typically,

23   that's part of their records.  I mean --

24            THE COURT:  Correct.

25            MR. LICUL:  -- yeah.

Colloquy

1          THE COURT:  I mean, if we're looking at four to five

2   medical witnesses and the six complainants --

3          MR. LICUL:  Yeah.

4          THE COURT:  -- we're at eleven depositions.  Then

5   there's Mr. Brown.  Would you like to be heard on Mr. Brown,

6   Mr. Licul?

7          MR. LICUL:  Yeah.  We're not calling him as part of

8   our case-in-chief.  We've already explained that.

9          THE COURT:  Okay.  And has he been interviewed by

10  anybody, to your knowledge?

11         MR. LICUL:  No.  To my knowledge, he has not.

12         THE COURT:  Okay.

13         MR. LICUL:  You mean as part of an investigation, Your

14  Honor?

15         THE COURT:  Yes.  I mean --

16         MR. LICUL:  Not to my knowledge, no, he hasn't.

17         THE COURT:  Okay.  And so there's obviously the

18  concern that the defendants have raised with regard to

19  alternate causation.  Some of this medical is mental distress

20  and emotional distress.  So if we add Charles Brown to the

21  list, we're up to twelve.

22         MR. LICUL:  But Your Honor, I would say --

23         THE COURT:  I think that brings us to --

24         MR. LICUL:  -- I don't mean to interrupt.

25         THE COURT:  Sorry, go ahead.

                                    Colloquy

1          MR. LICUL:  I'm sorry, Your Honor, I didn't mean to

2    interrupt.  With respect to causation, again, that's more

3    properly a question for a medical provider.  I mean, Mr. Brown

4    can't testify about whether he caused Trooper 1 --

5          THE COURT:  Obviously he wouldn't be permitted to ask

6    the ultimate question, but he could certainly be asked

7    questions as to whether or not they were fighting.  Whether or

8    not their relationship was in a good situation.  And I have no

9    idea what's in the medical records and whether any emotional

10   distress effects of the relationship with Mr. Brown are

11   reflected by the treaters.  Do you?

12         MR. LICUL:  I don't, Your Honor, but again, I would --

13         MS. GLAVIN:  There was.

14         MR. LICUL:  But again, those are questions for the

15   medical provider.  It seems to me that if there are medical

16   providers who are going to say, here are my records and here's

17   what they show about alternate causes of distress, I'm not sure

18   that you need Mr. Brown.

19         THE COURT:  All right.  So if we do -- if the four to

20   five medical providers, plus the six additional outstanding

21   complainants brings us to eleven, Mr. Brown brings us to

22   twelve, it seems to me, Ms. Glavin, that the problem here is

23   taking fifteen depositions of troopers.

24         MS. GLAVIN:  Yeah.  I think, Judge, one thing, too, I

25   do want to just walk back and go over this because it got a

Colloquy

1    little hot there and I apologize.  On the issue of the

2    ripeness, the case law is that -- and I'm referring to an

3    Eastern District case that just went off, but that it's -- the

4    case law is that, quote, before seeking to take additional

5    depositions beyond the ten, courts have generally insisted that

6    the movement -- that the movant exhaust the allowable ten

7    first, and that was the principle we were operating under, is

8    that we could not come to Your Honor until we had exhausted the

9    ten.  And that is something that we had discussed with Mr.

10   Licul, and the case law was very clear to us on that,

11   particularly in the Eastern District.  That's why we didn't

12   come earlier.

13          THE COURT:  You know that -- you know that federal

14   discovery is incredibly discretionary, and that this case has

15   required an inordinate amount of special care and attention

16   during the discovery process beyond any other case on my

17   docket.  And although I appreciate the issue might not

18   technically be ripe until those ten depositions are exhausted,

19   if you knew you were going to blow through ten depositions on

20   troopers alone, it would have been prudent to ensure that that

21   plan was not going to paint you into a corner.

22          MS. GLAVIN:  Your Honor, I wish that I had thought

23   that.  I was following what I understood -- we were following

24   what we understood to be the rule.  And so --

25          THE COURT:  The rule is ten.

Colloquy

1          MS. VASK:  -- I --

2          THE COURT:  The rule is ten.

3          MS. GLAVIN:  The rule -- but the rule is that it's not

4     ripe to come to you as a general matter.

5          THE COURT:  But the rule is ten.  That's the default.

6     And to --

7          MS. GLAVIN:  Yes.

8          THE COURT:  -- assume you're going to get thirty by

9     burning through your first ten with choices that may or may not

10    have been your top ten, if you had been stuck with a number

11    from the beginning, was a choice that you guys made.

12         MS. GLAVIN:  Yes, Your Honor.

13         THE COURT:  You guys chose who to depose when.  I had

14    nothing --

15         MS. GLAVIN:  Your Honor --

16         THE COURT:  -- to do with that.  So here we are.

17         Ms. -- I certainly hear --

18         MS. GLAVIN:  An issue with Mr. Brown, I do want to --

19         THE COURT:  Yes, go ahead.

20         MS. GLAVIN:  -- raise a couple of things.  One is, I

21    am not at liberty to discuss because of the protective order,

22    but there was a very sensitive issue that is reflected in

23    Trooper 1's therapist records relating to Charlie Brown that

24    happened in the middle of this.  It was a very traumatic

25    incident that Trooper 1 spoke about.  And only she and Charlie

Colloquy

1    Brown are going to be the witnesses about what exactly happened

2    in that incident, which we think is a dramatic intervening

3    cause here for causation.

4              THE COURT:  Did you depose her about it?

5              MS. GLAVIN:  Yes, we did.

6              THE COURT:  And was her deposition testimony

7    consistent with the treatment records?

8              MS. GLAVIN:  Not precisely, and it was very vague.

9    She could -- she was not able to remember portions of this.

10   There was a lot of I don't recalls.

11             THE COURT:  Okay.

12             MS. GLAVIN:  Including conversations that she had with

13   Mr. Brown after this incident.  What was said that caused her

14   to make an emergency call regarding this incident.  Couldn't

15   remember what that was about.

16             THE COURT:  Um-hum.

17             MS. GLAVIN:  There were --

18             THE COURT:  Like 911?

19             MS. GLAVIN:  Yes.  I assume it was a 911.  She made an

20   emergency call to the best friend to go -- to see him, but she

21   could not remember what was discussed.  And Trooper 1, I will

22   say, during her deposition, there were dozens of I don't

23   recalls.

24             THE COURT:  Okay.  So as I said, if we count Charles

25   Brown together with the five or so treaters and six

Colloquy

1    complainants, we're at twelve.  So the -- we only get to

2    nineteen be deposing seven more PSU workers.

3              MS. GLAVIN:  So -- so let me propose a compromise,

4    Your Honor --

5              THE COURT:  Yes.

6              MS. GLAVIN:  -- on the seven remaining.  We will pick

7    three.

8              THE COURT:  Which would bring you to about fifteen

9    more depositions.

10             MS. GLAVIN:  Yes, Your Honor.

11             THE COURT:  Interestingly my -- in my head, my idea

12   before we got on this call was to pick a number, somewhere

13   between thirty and eighteen.

14             Mr. Licul, do you want to be heard on that proposed

15   compromise?

16             MR. LICUL:  I mean, I still think it's -- I think it

17   should be closer to our eighteen rather than their number.  I

18   do think that some of what they have here is, again,

19   duplicative.  Or they have other information, especially

20   regarding the complaint.

21             THE COURT:  Well, I do note that Philip Salinardi,

22   assuming that's the EAP guy, is -- it is the EAP guy based on

23   this chart, Philip Salinardi is listed as one of their

24   troopers, and I was counting him as a possible in the medical.

25             So I hear you, Mr. Licul, but this is -- the way this

Colloquy

1    complaint is pleaded, there's at least six -- originally I was

2    concerned you were going to have to take ten depositions of the

3    complainants alone, right.  So to me, if the defendants think

4    that they can tailor the New York State Police witnesses down

5    to three or so from the current list of seven, I think twenty-

6    five depositions does not sound unreasonable or grossly

7    disproportionate to the needs of the case, because I also note

8    that many of these depositions are not anticipated to be for

9    the full time.

10        So Ms. Glavin, if you were to narrow the list, would

11   the length of those depositions remain the same or get longer?

12        MS. GLAVIN:  I actually don't know, but quite frankly,

13   Your Honor, we will -- we're going to try and keep them short.

14   We don't have any interest in sitting there for hours if

15   someone only has limited knowledge.  And I think that when that

16   has happened, we finished up.

17        THE COURT:  Okay.  And in terms of the anticipated

18   timing here, if there's -- and this fifteen does not include

19   the issue with Mr. Plaskocinski, which we'll talk about in a

20   moment.  If we -- if there are fifteen more depositions in the

21   offing, I anticipate as you do, Ms. Glavin, that there may be

22   some motion practice relating to those.  What is the timing

23   that you think is doable?

24        MS. GLAVIN:  So here's the thing is we -- we were

25   talking internally, and I'd talked with the State Police

Colloquy

1    counsel before this, and Ms. Foti, we're -- just so you

2    understand timing.  We're going to lose half of the governor's

3    legal team for the month of February because I'm in a criminal

4    trial in Manhattan.  That's -- that is going to go -- it's

5    going to be about three weeks.  It's complicated white collar

6    case.  So we're going to lose the month of February.

7           January has opened up because we had a lot of other

8    depositions in another case, but I should flag for Your Honor

9    that what we have found, and particularly with the medical

10   providers, it is very difficult to get them scheduled for

11   depositions thirty days out.

12          THE COURT:  Right.

13          MS. GLAVIN:  And we were seeing this.  So I was going

14   to propose -- and one -- there's one last thing that we should

15   bring to Your Honor's attention that needs to be discussed is

16   the independent medical expert.

17          THE COURT:  Um-hum.

18          MS. GLAVIN:  So we -- if we can agree with Mr. Licul

19   on a -- on an IME exam, there will be motion practice to the

20   Court, but our expert has informed us that he wants to do his

21   exam of Trooper 1 after all the depositions are done so that he

22   has an opportunity to review all of that, and then he would

23   then tailor his exam of Trooper 1 based on what happens at the

24   depositions.  He also gave us a list of additional records that

25   he wants from providers and/or Trooper 1 that we will give to

44

Colloquy

1    Mr. Licul.  And then, what he told us is that after the -- he

2    does the exam, it would be approximately six weeks for him to

3    do his report, and then I'm certain that Mr. Licul will

4    probably want to take his deposition as well.

5            THE COURT:  Right.  All right.  That's all expert

6    practice.  So --

7            MS. GLAVIN:  Yes.

8            THE COURT:  -- if you can try to get that -- get the

9    paperwork flowing so that you guys are prepared to take that

10   expert deposition after the close of fact discovery, that would

11   obviously be the ideal way to handle it.  But in terms of these

12   additional fifteen fact witnesses, the depositions that he

13   wants to review, I take it those are the medical?  Is he also

14   looking --

15           MS. GLAVIN:  No, he does --

16           THE COURT:  -- at fact witnesses?

17           MS. GLAVIN:  Yeah, some of the fact witnesses.  Like,

18   I'm certain he will want to take a look at Mr. Brown's, Mr.

19   Salinardi's.

20           THE COURT:  Um-hum.

21           MS. GLAVIN:  I do think some of the trooper testimony,

22   because Trooper 1 has cited the traumatic event -- I mean, it's

23   in the medical records -- as being the Belmont September 2019

24   incident.  So he will certainly want to review --

25           THE COURT:  Um-hum.

Colloquy

1          MS. GLAVIN:  -- testimony around that as well.

2          In terms of timing -- so if you put the expert to the

3    side, I was going to say -- I was going to say April, but I'm

4    just nervous and I'd rather say May to complete the fact

5    discovery to be on the safe side, considering everybody's

6    schedule has to align, all the lawyers, including those for the

7    witnesses.

8          THE COURT:  All right.  Mr. Licul, what are your

9    thoughts on pushing the close of fact discovery out to May?

10         MR. LICUL:  That seems a little excessive, Your Honor.

11   I think that I'm perhaps a little bit more hopeful than Ms.

12   Glavin.  So I would say April is fine.  Just so we know --

13   understand now.  We may have an issue with the IME.  I've sent

14   an email to them asking certain questions.  I don't -- this is

15   not the proper forum to resolve that issue, and I don't intend

16   to do that.  I don't intend to argue it now.  We don't oppose

17   the fact of the IME but with certain constraints.

18         But I think -- anyway, to your question, I think April

19   is -- sounds like we can get this done.  I can -- I'll have

20   enough time to do my one deposition and --

21         THE COURT:  You'll have time.  Yes, you'll have time.

22   Bu I do want to hear from the other defendants who have been

23   very patient, because their schedules are implicated as well.

24         So Mr. Moore, what are your thoughts on whether or not

25   these fifteen additional fact depositions can occur between now

Colloquy

1    and end of April?

2          MR. MOORE:  I think that's somewhat unrealistic, Your

3    Honor.  I think I would agree with Ms. Glavin that May is much

4    more reasonable.  I think we will all be running through a lot

5    of -- a lot of other cases and working very hard to get

6    everything done within -- in a set time frame.  If we were to

7    say April, I'm afraid we'd probably be coming back to the

8    court.  So I think if we set -- if we set it in May, I think

9    it's realistic that we can get this done.

10         THE COURT:  Ms. Foti?

11         MS. FOTI:  Thanks, Your Honor.  As much as I enjoy

12   being at these conferences, I'm really hopeful my client will

13   be dismissed after this --

14         THE COURT:  Right.

15         MS. FOTI:  -- after this long -- two and a half long

16   year trial out of her life.  I would really love for her to be

17   dismissed.  That being said, I agree that May is a much more

18   reasonable time frame, just in the -- in terms of the

19   experience of trying to get all these attorneys' schedules and

20   witnesses' schedules.  It's been difficult every time because

21   there are a lot of people that need to attend.  So I think May

22   is a much more reasonable time frame.

23         THE COURT:  And I assume that the bulk of the

24   witnesses are represented, so you're talking about five or six

25   attorneys' schedules to align; is that fair, Ms. Foti?

Colloquy

1            MS. FOTI:  Yes.

2            THE COURT:  In your experience?

3            MS. FOTI:  Yes.

4            THE COURT:  All right.  So I'm looking at the

5    calendar, and with -- I certainly think that once there's

6    clarity about how many witness -- how many more depositions

7    there should be, notices can certainly be generated in the next

8    few weeks, and people can hopefully be working on pinning down

9    dates.  So I think that maybe we should split the baby.  Let's

10   say May 16th, right in the middle of the month.  May 16th will

11   be the next goal for closing fact discovery.

12            And I do expect the parties to continue their diligent

13   efforts.  I know that this is slow going.  I know that this is

14   complicated in terms of getting everybody in the room.

15            I appreciate the arrival at a compromise today, Ms.

16   Glavin, as to the total number.  I think that twenty-five is

17   actually what I was thinking about before I even got on the

18   Zoom.  I think that it's a lot.  Two and a half times the sort

19   of typical anticipated number.  And it will require you to make

20   some strategic decisions, but on balance, I think it is fair

21   and -- and it's certainly -- you have established relevance as

22   to the complainants and the medical providers and Mr. Brown.

23   The exact need for all of the additional troopers, I was a

24   little more skeptical about.  So I think that the sort of plan

25   that we've reached today makes a lot of sense.

Colloquy

1          We will extend fact discovery to May 16th, 2025.  And

2   I am sure I will hear from you in some fashion in the interim.

3   But I'm wondering if I don't hear from you, if I should get a

4   status report a week thereafter certifying the close of fact

5   discovery that would then be due May 23rd, 2025.  And in that

6   status report, the parties should include a proposed schedule

7   for the expert practice.

8          I hope to Mr. Licul's point, if there is a

9   disagreement about what the IME's sort of -- what the IME's

10  protocol is or what the IME situation is, the parties should of

11  course meet and confer in an effort to sort of figure out if

12  there's a way that we can work through those issues before it

13  blossoms into a motion.

14         I'm not sure what precisely the objection would be,

15  Mr. Licul, and not asking you to go into it now until you've

16  met and conferred with Ms. Glavin, but you can let me know in

17  the status report, May 23rd, 2025.  Hopefully sort of find the

18  close of fact discovery and providing me anticipated next

19  steps, vis-a-vis, expert practice, and what those experts'

20  depositions are going to look like, and anticipated timing for

21  the expert disclosures, rebuttal expert reports, things along

22  those lines.  I have a feeling, though, that we're going to be

23  back here dealing with deposition issues pertaining to the

24  complainants long before May.

25         So with all of that said, what else should we do

Colloquy

1    today, Ms. Glavin?

2          MS. GLAVIN:  Your Honor, one last thing.  The

3    reopening of Mr. Plaskocinski's deposition.

4          THE COURT:  Yes.  Yes, thank you --

5          MS. GLAVIN:  So on that --

6          THE COURT:  -- for reraising it.

7          MS. GLAVIN:  And one point I wanted to raise on that

8    too.  He was actually -- it was a defense deposition.  We did

9    not notice him.  The defense did.  And we asked -- we asked

10   questions but it was their deposition.  I asked --

11         THE COURT:  Wasn't it the plaintiff who noticed him?

12         MS. GLAVIN:  The plaintiff noticed him.

13         MS. FOTI:  It was the defense.

14         MS. GLAVIN:  I thought the plaintiff noticed him.

15         MS. FOTI:  Yeah, no, no, you said defense.

16         MS. GLAVIN:  Oh I'm sorry.  Yeah, yeah, sorry.  The

17   plaintiff -- I'm sorry.  The plaintiff noticed Mr.

18   Plaskocinski's deposition.

19         THE COURT:  Um-hum.

20         MS. GLAVIN:  And it was a fairly short deposition.  I

21   actually don't think we would need all five hours, as I was

22   looking at this and thinking about it.  I think we could be

23   reopened and be a couple more hours we could get it done in.

24         THE COURT:  Okay.  So Mr. Licul had suggested that we

25   may need to hear from his counsel.  I certainly -- based upon

Colloquy

1    the filings and based upon the revelation of these text

2    messages and phone records, understand the desire to reopen,

3    and given that you only deposed him for two hours, I don't

4    think it's unreasonable to seek to reopen that deposition.  But

5    I do -- I don't know what to make of Mr. Licul's suggestion

6    that he have an opportunity to be heard in that respect.  Ms.

7    Glavin, what's your answer to that?

8            MS. GLAVIN:  We certainly can check.  He was

9    represented by counsel for the State Police at that deposition.

10           I think, Mr. Moore and Mr. Steele, you can correct me,

11   is Ms. Joslin going to --

12           MR. MOORE:  That's --

13           MS. GLAVIN:  -- represent Mr. Plaskocinski?

14           MR. MOORE:  That's our understanding, yes.

15           MS. GLAVIN:  I think we had an indication from her

16   that he may object, but we can doublecheck.

17           THE COURT:  All right.  So Mr. Moore, are you in

18   position to provide the minute entry and order from today's

19   conference to the counsel who represented him at the

20   deposition?

21           MR. MOORE:  Yes, Your Honor.

22           THE COURT:  Okay.  So what I could do to alleviate any

23   burden on Ms. Joslin, if that is who's going to continue to

24   represent him, is just say, should he object, he can file a

25   letter by a week from today.  And if I don't get anything, I

Colloquy

1    think everyone should assume that the deposition is a go.

2         Is that fair, Ms. Glavin?

3         MS. GLAVIN:  Yes, Your Honor.

4         THE COURT:  Any objection to that, Mr. Moore?

5         MR. MOORE:  None, Your Honor.

6         THE COURT:  Ms. Foti?

7         MS. FOTI:  No objection.

8         THE COURT:  Mr. Licul?

9         MR. LICUL:  Just what's in our letter, but I'm not

10   sure that that's -- I want to repeat that anyway.  And again, I

11   do think that the court's going to allow it pending Mr.

12   Plaskocinski's potential objection or not.  Five hours is

13   probably a little much.

14        THE COURT:  I'd like to hear from him before I rule,

15   so I will happily give him that opportunity.  If he has -- I'll

16   give him the opportunity to object to the fact of the

17   deposition or the length.

18        MR. LICUL:  Okay.

19        THE COURT:  Five hours does seem potentially lengthy,

20   but I don't have the -- I don't have the phone records in front

21   of me.  Ms. Glavin has intimated she might not need the full

22   five hours.

23        Ms. Glavin, what are your thoughts on the timing?

24        MS. GLAVIN:  I actually think we can get it under five

25   hours.  I haven't looked at this in a while, but as we were

Colloquy

1   thinking about it here, I was, like, I don't think we're going

2   to need all five hours.

3            THE COURT:  Okay.

4            MS. GLAVIN:  I mean, it sort of depends on his

5   answers.  But phone records and texts can be, as we learned

6   from the Trooper 1 deposition, very tedious to go through.

7            THE COURT:  Oh yes.  Yes, they are.  And sitting there

8   with the witness, going like, do you -- do you recall this --

9   no, I don't remember.

10           MS. GLAVIN:  Or even like, we tried a summary chart,

11  but --

12           THE COURT:  No, nobody remembers dates and times.  And

13  I would always tell witnesses, like, unless something happened

14  on your birthday, the likelihood that you remembered the exact

15  date of something is almost zero.  So people would try to be

16  like, it happened on December 2nd.  I'd be, like, really?  Are

17  you sure?  So it's very, very rare that people actually

18  remember dates, and that's okay.  So --

19           MS. GLAVIN:  And one last point.  So we will get the

20  notice over to Mr. Plaskocinski's attorney, as Your Honor

21  mentioned.  I think what might be helpful to us, is we will

22  get -- out this week, we will get the notices to the six

23  complainants, their lawyers.  I think we should have a date

24  certain so this is under control by which they are told that

25  they should object if they're going to object to their

Colloquy

1    deposition so we get the ball moving --

2            THE COURT:  Okay.

3            MS. GLAVIN:  -- on this.  Because we've had --

4            THE COURT:  Are we inviting that, then?

5            MS. GLAVIN:  It's going to happen.  We have had so

6    many meet and confers, Your Honor.  We went through a round of

7    this way back when, and it just ended up -- we got nowhere.

8    And I just feel like the most efficient is, if someone is going

9    to object, send a letter -- send a three page letter objecting

10   by X date.  We can do our response, but we'll get them all out

11   this week so that we get it moving.

12           THE COURT:  So when you say this week, do you mean

13   literally by Friday, or within the next, like, actual week?

14           MS. GLAVIN:  How about my Monday.

15           Theresa, is that doable for us, to get all the notices

16   out by Monday?

17           MS. TRZASKOMA:  Yes.  I mean, we already have some of

18   them out.

19           MS. GLAVIN:  Okay.

20           MS. TRZASKOMA:  And so we could get the rest of them

21   out.

22           THE COURT:  And Ms. Trzaskoma, if you know, what sort

23   of dates are you providing in these notices?

24           MS. TRZASKOMA:  We have been providing placeholder

25   dates and just indicating that we are open -- that the date is

Colloquy

1   a placeholder but we're open to scheduling the depositions --

2              THE COURT:  Okay.

3              MS. TRZASKOMA:  -- when convenient for all counsel --

4              THE COURT:  They're --

5              MS. TRZASKOMA:  -- and the witness.

6              THE COURT:  They're not for like dates certain in

7   January, for example?

8              MS. TRZASKOMA:  That would not --

9              MS. GLAVIN:  No.

10             THE COURT:  Not work.

11             MS. TRZASKOMA:  It would not work.

12             MS. GLAVIN:  It would never work.

13             THE COURT:  Right.  All right.  Okay, that's helpful.

14  And then -- so if the notices are out by, say, December 16th,

15  obviously, that brings us right on top of the holiday period.

16  I know that people really slow down the second -- the last week

17  of December, first week of January, for good reason.  I'm not

18  asking anybody to file anything if it's not time sensitive in

19  that -- those two weeks.

20             So I mean, mid-January, like a month after the notices

21  go out, does that seem reasonable, Ms. Glavin?

22             MS. GLAVIN:  Meaning a month to submit a letter?

23             THE COURT:  It would be, like -- yeah, if the notices,

24  in fact, get out -- I mean, having them due by -- having any

25  objections due by January 10th.  I don't know these folks'

Colloquy

1    schedule, so I'm just a little concerned about putting somebody

2    in a pickle if they have a trial and they're going to be out of

3    town and -- who knows.

4              MS. GLAVIN:  That's fine.

5              MS. TRZASKOMA:  I think so.  And if Your Honor could

6    account for an opposition or a response date as well, just so

7    we have clear --

8              THE COURT:  And --

9              MS. TRZASKOMA:  -- guidance on process, that would be

10   helpful.

11             THE COURT:  Right.  I mean, given the history here, I

12   do wonder -- I'm no expecting that some magic is going to be

13   worked through the meet and confer process given the history

14   here.  So I will sort of kind of shortcut around my normal

15   practice of asking the parties to meet and confer.  They're

16   actually not parties.  So if you -- if their objections are due

17   to me by January 17th, and there's like six of them, I would

18   assume you guys want two weeks at least, if not longer?

19             Ms. Glavin, when --

20             MS. GLAVIN:  Yes, that's --

21             THE COURT:  -- does your trial start?

22             MS. GLAVIN:  February 10th.

23             THE COURT:  Um-hum.  Okay.

24             MS. GLAVIN:  We'll get it done.

25             MS. TRZASKOMA:  Your Honor, we can handle them.

Colloquy

1          MS. GLAVIN:  We'll get it done.

2          THE COURT:  So by January 31st.  And then they, I

3    guess, could try to file a reply by February 7th, if any?

4          MS. TRZASKOMA:  Yes, Your Honor.  I would just also

5    urge Your Honor to put clear page limits because that issue has

6    come up as to whether they should be filing a full blown --

7          THE COURT:  Um-hum.

8          MS. TRZASKOMA:  I mean, I know Your Honor remembers

9    this, but we already had, like, meet and confers and full on

10   motions to quash for some of these.  They were fully briefed.

11         THE COURT:  Yeah.

12         MS. TRZASKOMA:  So it's -- I would --

13         THE COURT:  Right.

14         MS. TRZASKOMA:  -- say it's -- it's really only to the

15   extent there is something that's -- that wasn't in their

16   original briefing because they -- many of them have already

17   addressed these issues.

18         THE COURT:  Right.  Here's a question for you.  Have

19   you litigated these issues with any of the folks in the

20   recently dismissed Bennett case?

21         MS. TRZASKOMA:  No, not -- no.  We were teed up to

22   start talking about Ms. Boylan, but that is now off as --

23         THE COURT:  Right.

24         MS. TRZASKOMA:  -- as a result of the dismissal.

25         THE COURT:  Okay.

Colloquy

1          MS. GLAVIN:  Yeah.  What had happened with respect to

2    Ms. Boylan is it was briefed, I think, about a year ago.  Judge

3    Cave said that she was going to sit for a deposition.  Ms.

4    Boylan then counsel requested -- was still objecting.  And I

5    think what Judge Cave said was, we -- we were scheduled to have

6    a conference on December 18th, and she directed, I think, a

7    three to five page submission by Boylan's counsel with a

8    response, but no reply.

9          THE COURT:  Okay.

10         MS. GLAVIN:  And that she would address it --

11         THE COURT:  Well, we don't -- we don't always permit

12   replies for discovery related matters because it is so

13   voluminous.  I mean, and it's usually not very helpful.  The

14   legal issues are clear.  It's a question of fact.  So yeah,

15   maybe I'll skip the replies.  And then if --

16         Mr. Licul, do you anticipate weighing in on any of

17   this?   Does it -- so would you have a -- would you be filing

18   something in the schedule we're trying to set here?

19         MR. LICUL:  I don't know, but if I do file something,

20   it would be according to the schedule.  In other words, if one

21   of the witnesses objects, then I'm fine with the two week from

22   the objection to file a response.

23         THE COURT:  Okay.  All right.  And your response could

24   be in support of their objection or opposing them, depending

25   upon the basis.  I wouldn't want to pin you down.

Colloquy

1          MR. LICUL:  Right.  And if I'm not taking a position,

2     then you won't hear from me.

3          THE COURT:  Okay.  All right.  And I think a maximum

4     of -- I was going to say five -- five pages seems reasonable.

5          Does that seem reasonable to you, Ms. Glavin?

6          MS. GLAVIN:  Yes, Your Honor.

7          THE COURT:  Ms. Trzaskoma?  Are you there?

8          MS. TRZASKOMA:  Yeah, yeah, sorry, I was unmuting

9     myself.  Yes.  One thought, Your Honor, is that as I mentioned,

10    we had already noticed deposition subpoenas for the

11    complainants, I believe, and I believe Your Honor held those in

12    abeyance.  So I'm -- we can re-notice them, I'm fine with that,

13    to kind of set this new -- like process started, but -- and I

14    think we already did re-notice at least a couple of them.  So

15    happy --

16         THE COURT:  Yes.

17         MS. TRZASKOMA:  -- to --

18         THE COURT:  In those --

19         MS. TRZASKOMA:  -- do that.

20         THE COURT:  In the -- the day of the March -- those

21    three opinions that we did in January, I think that we did

22    address some of them.  There were -- it was more granular,

23    though, than simply the depositions themselves because there

24    was also some demands -- document demands for some of them.  So

25    I think we had observed in one of those January opinions or

Colloquy

1   orders, whatever you want to call it, that we anticipated that

2   these depositions would ultimately be relevant based on the

3   totality of the circumstances of the case and the way that the

4   complaint is pleaded.  But the ultimate decision, I don't

5   think, was crystal clear because it wasn't fully fleshed out

6   what the scope of the depositions were going to be.  Some of

7   the things that were being sought at that juncture were a

8   little bit too far afield, so there was some narrowing.  So

9   I'll have to refresh on exactly what we held in the prior

10  ruling, because I -- as we all recall, counsel for many of the

11  complainants showed up to argue those issues.  And so I expect

12  you may have to have a similar conference here.

13          MS. TRZASKOMA:  Okay.  Thank you, Your Honor.

14          THE COURT:  All right.  So we have a plan, twenty-five

15  additional depositions.  Goal of completing fact discovery by

16  May 16th, 2025.  We will look for a status report from the

17  parties by May 23rd, 2025.  Hopefully certifying the closed

18  fact discovery and providing a proposed update as to expert

19  practice.  Defendant is going to serve their deposition notices

20  on the six complainants identified in the most recent letters

21  by December 16th, and the complainants are respectfully

22  directed that if they are planning to object to sitting for

23  their depositions, that they shall do so in writing by January

24  17th, 2025, with responses due by January 31st, 2025.

25          So the question then also becomes whether or not the

Colloquy

1   depositions should be more limited, but I think we can take --

2   not in terms of who, but in terms of the time, but I think we

3   can take that up once we hear from the complainants themselves.

4   I don't think it makes any sense to try to figure that out

5   without them here.

6           All right.  Anything else we should do today?  Ms.

7   Glavin?

8           MS. GLAVIN:  No, Your Honor.  And as always, it's a

9   pleasure.  Good to see you.

10          THE COURT:  Nice to see you too.

11          Mr. Trzaskoma, anything else?

12          MS. TRZASKOMA:  No, Your Honor.  Thank you.

13          THE COURT:  Yes.  And Mr. Moore, on behalf of New York

14  State Police, anything else?

15          MR. MOORE:  No, Your Honor.  Thank you very much,

16  though, for your time and wisdom.

17          THE COURT:  Thank you.

18          Ms. Foti?

19          MS. FOTI:  Nothing else, Your Honor.  Thank you.

20          THE COURT:  Mr. Licul?

21          MR. LICUL:  No, Your Honor.  Just one thing I'd like

22  to clarify.  I may have misheard Your Honor.  It's twenty-five

23  depositions in total, not twenty-five additional, correct?

24          THE COURT:  Correct.  Twenty-five in total.

25          MR. LICUL:  That's what I thought.  No, nothing else,

Colloquy

1   Your Honor.

2            THE COURT:  All right.  Thank you all.  Have a good --

3            MS. GLAVIN:  Thank you.

4            THE COURT:  -- rest of your day.  If I don't see you

5   before the holiday season, Happy Holidays, whatever holidays

6   you celebrate, everybody.  Hopefully you'll get a few days off.

7   So take care, everybody.

8            MS. TRZASKOMA:  Thank you.  Happy Holidays.  Bye.

9            THE COURT:  Thank you.

10       (Proceedings concluded at 4:32 o'clock, p.m.)

11                          *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              C E R T I F I C A T I O N

2

3              I, TreLinda Wilson, court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9                                                 December 27, 2024

10   _____         _____

     TreLinda Wilson, CDLT-148                 DATE

11

12

     eScribers, LLC
13   7227 North 16th Street
     Phoenix, AZ 85020
14   www.escribers.net

15

16

17

18

19

20

21

22

23

24

25